Mauro M. Wolfe  (MW-2380)
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, New York  10036-2714
(212) 277-6726
wolfem@dicksteinshapiro.com

Richard J. Leveridge
Elaine Metlin
Jodi Trulove
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200
*(pending pro hac vice admission)*

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARPENTER CO., CARPENTER CANADA CO., E. R. CARPENTER, L.P., BURKART FOAM, INC., FLEXIBLE FOAM PRODUCTS, INC., HIGH STANDARD PAD, INC., NU-FOAM PRODUCTS, INC., UNIVERSAL URETHANES, INC., FOAM SUPPLIES, INC., HICKORY SPRINGS MANUFACTURING COMPANY, HICKORY SPRINGS OF CALIFORNIA, INC., HUBER ENGINEERED WOODS LLC, J.M. HUBER CORPORATION, CREST-FOAM CORP., LEAVING TAOS, INC., LEGGETT & PLATT COMPONENTS COMPANY, INC., LEGGETT & PLATT, INCORPORATED, L&P FINANCIAL SERVICES CO., LUBRIZOL ADVANCED MATERIALS, INC., SHERWIN-WILLIAMS AUTOMOTIVE FINISHES CORPORATION, THE SHERWIN-WILLIAMS COMPANY, SKYPARK MANUFACTURING, LLC, CREST FOAM INDUSTRIES INCORPORATED, PATHWAY POLYMERS INC., VITAFOAM INCORPORATED, VITAFOAM PRODUCTS CANADA LTD., CARPENTER APS, CARPENTER-DUMO N.V., CARPENTER GMBH, CARPENTER LIMITED, | Docket No.: <br><br> CIVIL ACTION <br><br> **COMPLAINT AND JURY DEMAND** |

CARPENTER S.A.S., CARPENTER SWEDEN AB,          )
LUBRIZOL ADVANCED MATERIALS EUROPE              )
BVBA, BALL & YOUNG LIMITED, BRITISH             )
VITA (LUX III) S.AR.L., BRITISH VITA            )
UNLIMITED, CALIGEN EUROPE B.V.,                 )
CALIGEN FOAM LIMITED, DRAKA                     )
INTERFOAM B.V., ICOA FRANCE S.A.S.,             )
KOEPP SCHAUM GMBH, METZELER SCHAUM              )
GMBH, MORARD EUROPE S.A.S., TRAMICO             )
S.A.S., UAB VITA BALTIC INTERNATIONAL,          )
VEENENDAAL SCHAUMSTOFFWERK GMBH,                )
VITA CELLULAR FOAMS (UK) LIMITED, VITA          )
INDUSTRIAL (UK) LIMITED, AND VITA               )
POLYMERS POLAND SP. Z.O.O.,                     )
                                                )
                       PLAINTIFFS,              )
                                                )
                 v.                             )
                                                )
BASF SE, BASF CORPORATION, BASF                 )
CANADA INC., THE DOW CHEMICAL                   )
COMPANY, DOW CHEMICAL CANADA INC.,              )
HUNTSMAN INTERNATIONAL LLC, AND                 )
LYONDELL CHEMICAL COMPANY,                      )
                                                )
                       DEFENDANTS.              )

## COMPLAINT

## JURY TRIAL DEMANDED

Plaintiffs Carpenter Co., Carpenter Canada Co., E. R. Carpenter, L.P., Burkart Foam,

Inc., Flexible Foam Products, Inc., High Standard Pad, Inc., Nu-Foam Products, Inc., Universal

Urethanes, Inc., Foam Supplies, Inc., Hickory Springs Manufacturing Company, Hickory

Springs of California, Inc., Huber Engineered Woods LLC, J.M. Huber Corporation, Crest-Foam

Corp., Leaving Taos, Inc., Leggett & Platt Components Company, Inc., Leggett & Platt,

Incorporated, L&P Financial Services Co., Lubrizol Advanced Materials, Inc., Sherwin-Williams

Automotive Finishes Corporation, The Sherwin-Williams Company, Skypark Manufacturing,

LLC, Crest Foam Industries Incorporated, Pathway Polymers Inc., Vitafoam Incorporated,

2513969

Vitafoam Products Canada Ltd. (collectively, "U.S. Purchase Plaintiffs"); and Plaintiffs

Carpenter ApS, Carpenter-Dumo N.V., Carpenter GmbH, Carpenter Limited, Carpenter S.A.S.,

Carpenter Sweden AB, Lubrizol Advanced Materials Europe BVBA, Ball & Young Limited,

British Vita (Lux III) S.ar.l., British Vita Unlimited, Caligen Europe B.V., Caligen Foam

Limited, Draka Interfoam B.V., ICOA France S.A.S., Koepp Schaum GmbH, Metzeler Schaum

GmbH, Morard Europe S.A.S., Tramico S.A.S., UAB Vita Baltic International, Veenendaal

Schaumstoffwerk GmbH, Vita Cellular Foams (UK) Limited, Vita Industrial (UK) Limited, and

Vita Polymers Poland Sp. Z.o.o. (collectively, "Foreign Purchase Plaintiffs"); and Plaintiffs'

respective parents, subsidiaries, and affiliates listed on Attachment A bring this action against

Defendants BASF SE (f/k/a BASF AG), BASF Corporation, BASF Canada Inc., The Dow

Chemical Company, Dow Chemical Canada Inc., Huntsman International LLC, and Lyondell

Chemical Company (the "Defendants") arising out of Defendants' and their co-conspirators'

global conspiracy to fix, raise, maintain, and stabilize prices of, and allocate customers and

markets for, certain polyurethanes products specified below.  Plaintiffs seek:  (i) to recover treble

damages and injunctive relief for violation of Section 1 of the Sherman Act of 1890 ("Sherman

Act"), 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"),

15 U.S.C. §§ 15, 26; (ii) to recover full consideration under the antitrust or similar laws of

Colorado, Indiana, Tennessee, and Wisconsin; and (iii) pursuant to Article 6 of the Council

Regulation (EC) No. 1/2003 of 16 December 2002 ("Regulation 1/2003"), to recover the present

value of actual damages sustained, including aggravated and exemplary damages, with

appropriate interest, for infringement of Article 81 of the Treaty on European Union and

Consolidated Version of the Treaty Establishing the European Community, Maastricht, Rome,

and Amsterdam, 7 February 1992, 25 March 1957, 2 October 1996 (36 I.L.M. 56 (1998)) ("EC

Treaty" or "E.U. Law"), and any and all other applicable laws of the nations belonging to the

2513969

European Union ("E.U. Member State"), including but not limited to, the United Kingdom, Germany, France, Spain, Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania. Plaintiffs demand a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure, and allege the following:

<u>NATURE OF THE CASE</u>

1.  Plaintiffs and/or their parents, subsidiaries, and affiliates listed on Attachment A (collectively "Plaintiffs"), as well as their predecessors-in-interest and assigns, are major purchasers of polyether polyols, monomeric or polymeric diphenylmethane diisocyanates ("MDI"), toluene diisocyanates ("TDI"), MDI-TDI blends, and/or polyether polyols systems (except those that also contain polyester polyols) (hereinafter collectively referred to as "Polyether Polyol Products").

2.  This antitrust action arises out of a worldwide combination and conspiracy among Defendants and their co-conspirators to, inter alia, fix, raise, maintain, and stabilize the prices at which Polyether Polyol Products were sold, and to allocate customers and markets for Polyether Polyols Products, throughout the world, including at least in the United States and Europe, from at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs (hereinafter the "conspiracy period").  In furtherance of their unlawful worldwide combination and conspiracy, Defendants and their co-conspirators combined and conspired to fix the prices of Polyether Polyol Products through a series of agreed price increases and price agreements, and agreed to allocate customers and markets for Polyether Polyol Products.  Defendants and their co-conspirators attended numerous meetings together throughout the world, including in the United States, Europe, and Asia, and engaged in numerous communications to discuss, implement, and enforce their unlawful combination and conspiracy. Because of the continuous unlawful conspiracy of Defendants and their co-conspirators

4

throughout the world, including in the United States, within this District, and in Europe, Plaintiffs paid artificially inflated prices for Polyether Polyol Products that they purchased from Defendants and their co-conspirators in the United States and in Europe from at least as early as 1994 through at least December 31, 2004, and possibly continuing though 2006 (hereinafter the "damages period").

3.   In November 2004 and thereafter, a series of class actions were initiated against Defendants and their co-conspirators on behalf of a class of purchasers of Polyether Polyol Products in the United States.  At all relevant times, U.S. Purchase Plaintiffs were members of the putative plaintiff class.  Those actions were consolidated for pretrial purposes by the Judicial Panel on Multidistrict Litigation in the District of Kansas in *In re Urethane Antitrust Litigation*, MDL No. 1616 (D. Kan. 2004) (hereinafter the "Polyether Class Action").  The defendants currently named in the Polyether Class Action are BASF AG (now known as BASF SE), BASF Corporation, The Dow Chemical Company, Huntsman International LLC, and Lyondell Chemical Company.

4.   Originally, co-conspirators Bayer AG, Bayer Corporation, Bayer MaterialScience AG, and Bayer MaterialScience LLC also were defendants in the Polyether Class Action, but a settlement with these defendants was reached in that class action in early 2006.  The Court certified a settlement class for settlement purposes and authorized dissemination of a notice regarding the settlement.  Pursuant to that notice, on or about June 9, 2006, Plaintiffs and/or their affiliates requested exclusion from the Bayer class settlement.

5.   On July 28, 2008, the District Court of Kansas granted class plaintiffs' motion for class certification in the Polyether Class Action and certified a class for Polyether Polyol Products purchases from certain Defendants in the United States during the period January 1,

5

1999 through December 31, 2004.[1]  Certain of the Defendants sought an appeal of the class

certification ruling pursuant to Fed. R. Civ. P. 23(f), but the Tenth Circuit Court of Appeals

denied that request.  On October 10, 2008, the District Court of Kansas authorized dissemination

of the notice of the certified class action to all class members.

## JURISDICTION AND VENUE

6.  This Complaint is filed and these proceedings are instituted on behalf of U.S.

Purchase Plaintiffs under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to obtain,

inter alia, injunctive relief and to recover treble damages and the costs of suit, including

reasonable attorney's fees, against Defendants for the injuries sustained by these Plaintiffs by

reason of Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act

(15 U.S.C. § 1).  U.S. Purchase Plaintiffs also bring these proceedings under the laws of

Colorado, Indiana, Tennessee, and Wisconsin to recover full consideration for their purchases

made in those states against Defendants for the injuries sustained by U.S. Purchase Plaintiffs

under these states' laws.

7.  This Complaint is filed and these proceedings are instituted on behalf of Foreign

Purchase Plaintiffs under Article 81 of the EC Treaty and all other applicable E.U. Member

States' laws, including but not limited to, the United Kingdom, Germany, France, Spain,

Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania, pursuant to Article 6 of

Regulation 1/2003, and pursuant to 28 U.S.C. § 1367(a), to recover, inter alia, the present value

of actual damages sustained by them, including aggravated and exemplary damages, with

appropriate interest, against Defendants for the injuries sustained by Foreign Purchase Plaintiffs

by reason of Defendants' and their co-conspirators' violations of E.U. Law and all other

---

[1] Notably, the litigation class ultimately certified in the Polyether Class Action includes only propylene oxide-based polyether polyols, while Plaintiffs' instant claims includes both propylene oxide-based and ethylene oxide-based polyether polyols.

6

applicable E.U. Member States' laws.

8.   This Court has subject matter jurisdiction over U.S. Purchase Plaintiffs' Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337, as well as under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

9.   This Court has supplemental jurisdiction over U.S. Purchase Plaintiffs' claims arising under state law and over Foreign Purchase Plaintiffs' claims arising under E.U. Law and all other applicable E.U. Member States' laws pursuant to 28 U.S.C. § 1367 because these claims arise from the same nucleus of operative facts alleged in this Complaint and are so related to the Sherman Act claims over which this Court has original jurisdiction that they form part of the same case or controversy.

10.   Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391 because each Defendant resides, maintains an office or agent, transacts business, or is found within the District of New Jersey, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate commerce was carried out in this District.

11.   Personal jurisdiction exists over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the New Jersey Long-Arm Statute, N.J. Ct. R. 4:4-4 (2008), and each Defendant is within the jurisdiction of this Court for purposes of service of process.

12.   Defendants are major companies with sales and operations throughout the United States and/or worldwide.  Between 1994 and 2004, upon information and belief, Defendants sold over $36 billion worth of MDI, TDI, and polyether polyols throughout the United States.  Upon

2513969

information and belief, these sales consisted of more than $7 billion by BASF, $12 billion by Bayer, $10 billion by Dow, $6 billion by Huntsman, and more than $1 billion by Lyondell.

13.   Defendants and/or their co-conspirators engaged in the interstate and international commerce described in this Complaint, a substantial part of which was carried out within the District of New Jersey.  Defendants and/or their co-conspirators performed substantial, unlawful acts in furtherance of their unlawful combination and conspiracy within the District of New Jersey, and throughout the United States and the world, that were expressly aimed at, directed toward, intended to affect, and did affect Plaintiffs and others located in the United States, including within the District of New Jersey.  Defendants and their co-conspirators knew their unlawful combination and conspiracy would inflict injuries on purchasers of Polyether Polyol Products throughout the world, including at least those purchasing in the United States and in Europe, and including Plaintiffs and others purchasing Polyether Polyol Products in New Jersey. Defendants and/or their co-conspirators acted in furtherance of the conspiracy in New Jersey by, inter alia:  (i) selling Polyether Polyol Products in New Jersey at artificially inflated prices; (ii) eliminating competition in New Jersey from non-conspirators; (iii) limiting supply of Polyether Polyol Products sold in New Jersey; (iv) providing false and pretextual reasons for price increases of Polyether Polyol Products in industry publications and to customers in New Jersey; and (v) committing other practices that constitute per se violations of the Sherman Act.

14.   Defendants and their co-conspirators engaged in conduct both inside and outside the U.S. that caused direct, substantial, and reasonably foreseeable anticompetitive effects upon interstate commerce within the United States, giving rise to U.S. Purchase Plaintiffs' claims.

PLAINTIFFS

15.  U.S. Purchase Plaintiffs purchased Polyether Polyol Products in the United States during the damages period, and Foreign Purchase Plaintiffs purchased Polyether Polyols Products in the European Union during the damages period, as set forth below:

U.S. PURCHASE PLAINTIFFS

16.  Plaintiff Carpenter Co. (f/k/a E. R. Carpenter Company, Incorporated) (hereinafter "Carpenter") is a Virginia corporation with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230, and facilities in, among other places, Indiana.  Carpenter, including its subsidiaries, affiliates, predecessors-in-interest and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

17.  Plaintiff Carpenter Canada Co. (f/k/a Carpenter Canada Ltd. and E. R. Carpenter Company of Canada Limited) (hereinafter "Carpenter Canada") is a Canadian corporation with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  Carpenter Canada, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States for delivery in Canada from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

18.  Plaintiff E. R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) (hereinafter "E. R. Carpenter") is a Virginia limited partnership with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  E. R. Carpenter, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether

2513969

Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

19.   Plaintiff Burkart Foam, Inc. (f/k/a Grand Sheet Metal Products, Inc. and Vidrio Products Company) (hereinafter "Burkhart Foam") is an Illinois corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887.  Burkart Foam, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

20.   Plaintiff Flexible Foam Products, Inc. (hereinafter "Flexible Foam Products") is an Ohio corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887, and facilities in, among other places, Colorado, Indiana, and Wisconsin.  Flexible Foam Products, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

21.   Plaintiff High Standard Pad, Inc. (hereinafter "High Standard Pad") is an Alabama corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887. High Standard Pad, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

2513969

22. Plaintiff Nu-Foam Products, Inc. (hereinafter "Nu-Foam Products") is a Tennessee corporation with its principal place of business at 1101 Wisdom Street, Chattanooga, Tennessee 37406, and facilities in, among other places, Tennessee. Nu-Foam Products, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

23. Plaintiff Universal Urethanes, Inc. (hereinafter "Universal Urethanes") is a Texas corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887. Universal Urethanes, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

24. Plaintiff Foam Supplies, Inc. (hereinafter "Foam Supplies") is a Missouri corporation with its principal place of business at 4387 Rider Trail North, Earth City, Missouri 63045. Foam Supplies, including its subsidiaries, affiliates, predecessors-in-interest (including, but not limited to, National Polyurethanes), and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

25. Plaintiff Hickory Springs Manufacturing Company (hereinafter "Hickory Springs") is a North Carolina corporation with its principal place of business at 235 Second Avenue, NW, Hickory, North Carolina 28603, and facilities in, among other places, Tennessee. Hickory Springs, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased

2513969

substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

26. Plaintiff Hickory Springs of California, Inc. (hereinafter "Hickory California") is a North Carolina corporation with its principal place of business at 235 Second Avenue, NW, Hickory, North Carolina 28603. Hickory California, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

27. Plaintiff Huber Engineered Woods LLC (hereinafter "Huber") is a Delaware limited liability company with its principal place of business at 10925 David Taylor Drive, Number 300, Charlotte, North Carolina 28262, and facilities in, among other places, Tennessee. Huber, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

28. Plaintiff J.M. Huber Corporation (hereinafter "J.M. Huber") is a New Jersey corporation with its principal place of business at 333 Thornall Street, Edison, New Jersey 08837, and facilities in, among other places, Tennessee, during the damages period. J.M. Huber, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

2513969

29.   Plaintiff Crest-Foam Corp. (hereinafter "Crest-Foam") is a New Jersey corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  Crest-Foam, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

30.   Plaintiff Leaving Taos, Inc. (hereinafter "Leaving Taos") is a Delaware corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  Leaving Taos, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

31.   Plaintiff Leggett & Platt Components Company, Inc. (hereinafter "Leggett & Platt Components") is a Delaware corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  Leggett & Platt Components, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants during the damages period and was injured by Defendants' antitrust violations alleged herein.

32.   Plaintiff Leggett & Platt, Incorporated (hereinafter "Leggett & Platt") is a Missouri corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  Leggett & Platt, including its subsidiaries, affiliates, predecessors-in-interest (including, but not limited to, Leggett Partners, L.P.), and assigns, purchased substantial quantities of Polyether

2513969

Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

33.   Plaintiff L&P Financial Services Co. (hereinafter "L&P Financial Services") is a Delaware corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  L&P Financial Services, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

34.   Plaintiff Lubrizol Advanced Materials, Inc. (f/k/a Noveon Inc., which was formerly PMD Group Inc. and BFGoodrich Performance Materials) (hereinafter "Lubrizol Advanced Materials") is a Delaware corporation with its principal place of business at 9911 Brecksville Road, Cleveland, Ohio 44141.  Lubrizol Advanced Materials, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

35.   Plaintiff Sherwin-Williams Automotive Finishes Corporation (hereinafter "Sherwin-Williams Automotive") is a Delaware corporation with its principal place of business at 4440 Warrensville Center Road, Warrensville Heights, Ohio 44128.  Sherwin-Williams Automotive, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

2513969

36. Plaintiff The Sherwin-Williams Company (hereinafter "Sherwin-Williams") is an Ohio corporation with its principal place of business at 101 Prospect Avenue, N.W., Cleveland, Ohio 44115. Sherwin-Williams, including its subsidiaries, affiliates, predecessors-in-interest (including, but not limited to, General Polymers Corporation, Pratt & Lambert United, Inc., and Thompson Minwax Company), and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

37. Plaintiff Skypark Manufacturing, LLC (as successor-in-interest to Burtin Urethane Corporation and Burtin Urethane, LLC) (hereinafter "Skypark") is a California limited liability company with its principal place of business at 2550 S. Garnsey Street, Santa Ana, California 92707. Skypark, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

38. Plaintiff Crest Foam Industries Incorporated (hereinafter "Crest Foam Industries") is a Delaware corporation with its principal place of business at 100 Carol Place, Moonachie, New Jersey 07074. Crest Foam Industries, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

39. Plaintiff Pathway Polymers Inc. (f/k/a Vita Industrial Inc., as successor-in-interest to purchases of Synair Corporation) (hereinafter "Pathway Polymers") is a Delaware corporation with its principal place of business at 2003 Curtain Pole Road, Chattanooga, Tennessee 37406,

2513969

and facilities in, among other places, Tennessee. Pathway Polymers, including its subsidiaries, affiliates, predecessors-in-interest (including, but not limited, to Synair Corporation, which also maintained facilities in Tennessee), and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

40. Plaintiff Vitafoam Incorporated (hereinafter "Vitafoam") is a North Carolina corporation with its principal place of business at 2215 Shore Street, High Point, North Carolina 27263. Vitafoam, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.

41. Plaintiff Vitafoam Products Canada Limited (hereinafter "Vitafoam Canada") is an entity organized under the laws of Canada with its principal place of business at 150 Toro Road, Downsview, Ontario, Canada M3J 2A9. Vitafoam Canada, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the United States for delivery in Canada from one or more Defendants and/or their wholly owned subsidiaries, affiliates, or co-conspirators during the damages period, and was injured by Defendants' antitrust violations alleged herein.

<u>FOREIGN PURCHASE PLAINTIFFS</u>

42. Plaintiff Carpenter ApS (hereinafter "Carpenter Denmark") is an entity organized under the laws of Denmark with its principal place of business at Michael Drewsens Vej 9-11, Hojbjerg DK-8270 Århus Denmark. Carpenter Denmark, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol

16

2513969

Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Carpenter Denmark is an indirect subsidiary and/or affiliate of U.S. Purchase Plaintiff Carpenter Co.

43.  Plaintiff Carpenter-Dumo N.V. (hereinafter "Carpenter-Dumo") is an entity organized under the laws of Belgium with its principal place of business at Wijnendalestraat 171 Roeselare, 8800 Belgium.  Carpenter-Dumo, including its subsidiaries, affiliates, predecessors-in-interest (including, but not limited to, Dumo N.V.), and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Carpenter-Dumo is an indirect subsidiary and/or affiliate of U.S. Purchase Plaintiff Carpenter Co.

44.  Plaintiff Carpenter GmbH (hereinafter "Carpenter Germany") is an entity organized under the laws of Germany with its principal place of business at Industriestrasse 2 D-99334 Ichtershausen Thuringen, Germany.  Carpenter Germany, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Carpenter Germany is an indirect subsidiary and/or affiliate of U.S. Purchase Plaintiff Carpenter Co.

45.  Plaintiff Carpenter Limited (hereinafter "Carpenter Limited") is an entity incorporated under the laws of England with its principal place of business at Dinting Lodge, Industrial Estate Glossop Derbyshire SK 13 6LE United Kingdom.  Carpenter Limited, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-

2513969

conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Carpenter Limited is an indirect subsidiary and/or affiliate of U.S. Purchase Plaintiff Carpenter Co.

46. Plaintiff Carpenter Sweden AB (hereinafter "Carpenter Sweden") is an entity organized under the laws of Sweden with its principal place of business at Box 1007, Hoerngatan 10 Tranaas S-573 28 Sweden. Carpenter Sweden, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Carpenter Sweden is an indirect subsidiary and/or affiliate of U.S. Purchase Plaintiff Carpenter Co.

47. Plaintiff Carpenter S.A.S (hereinafter "Carpenter France") is an entity organized under the laws of France with its principal place of business at Boulevard des Bretonnieres, Saint Barthelemy d'Anjou F-49124 France. Carpenter France, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Carpenter France is an indirect subsidiary and/or affiliate of U.S. Purchase Plaintiff Carpenter Co.

48. Plaintiff Lubrizol Advanced Materials Europe BVBA (f/k/a Noveon Europe BVBA) (hereinafter "Lubrizol Europe") is an entity organized under the laws of Belgium with its principal place of business at Chaussée de Wavre 1945, 1160 Brussels, Belgium. Lubrizol Europe, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants'

18

antitrust violations alleged herein.  Lubrizol Europe is an affiliate of U.S. Purchase Plaintiff Lubrizol Advanced Materials, and both of which are subsidiaries of the U.S. company The Lubrizol Corporation.

49.  Plaintiff Ball & Young Limited (f/k/a Vitafoam Limited) (hereinafter "Ball & Young") is an entity incorporated under the laws of England, with its principal place of business at Times Place, 45 Pall Mall, London SW1Y 5JG, United Kingdom.  Ball & Young, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Ball & Young is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

50.  Plaintiff British Vita (Lux III) S.ar.l. (hereinafter "British Vita S.ar.l.") is an entity organized under the laws of Luxembourg with its principal place of business at 5, rue Guillaume Kroll - BP 2501, L-1025 Luxembourg.  British Vita S.ar.l., including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  British Vita S.ar.l. is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

51.  Plaintiff British Vita Unlimited (f/k/a British Vita plc) (hereinafter "British Vita") is an entity incorporated under the laws of England with its principal place of business at Times Place, 45 Pall Mall, London SW1Y 5JG, United Kingdom.  British Vita, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of

2513969

Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. British Vita is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

52. Plaintiff Caligen Europe B.V. (hereinafter "Caligen Europe") is an entity organized under the laws of The Netherlands with its principal place of business at Konijnenberg 59 NL-4825 BC Breda, The Netherlands. Caligen Europe, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Caligen Europe is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

53. Plaintiff Caligen Foam Limited (hereinafter "Caligen UK") is an entity incorporated under the laws of England with its principal place business at Times Place, 45 Pall Mall, London SW1Y 5JG United Kingdom. Caligen UK, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Caligen UK is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

54. Plaintiff Draka Interfoam B.V. (hereinafter "Draka Interfoam") is an entity organized under the laws of The Netherlands with its principal place of business at Van Den Endelaan 15, 2182 ES Hillegom, The Netherlands. Draka Interfoam, including its subsidiaries, affiliates,

2513969

predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Draka Interfoam is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

55. Plaintiff ICOA France S.A.S. (hereinafter "ICOA France") is an entity organized under the laws of France with its principal place of business at Zone Industrielle – Crancey 10100 Romilly Sur Seine, France. ICOA France, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. ICOA France is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

56. Plaintiff Koepp Schaum GmbH (hereinafter "Koepp Schaum") is an entity organized under the laws of Germany with its principal place of business at Rheingaustrasse 19 65375 Oestrich-Winke, Germany. Koepp Schaum, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Koepp Schaum is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

57. Plaintiff Metzeler Schaum GmbH (hereinafter "Metzeler Schaum") is an entity organized under the laws of Germany, with its principal place of business at Donaustrasse 51,

2513969

87700 Memmingen, Germany.  Metzeler Schaum, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Metzeler Schaum is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

58.  Plaintiff Morard Europe S.A.S. (hereinafter "Morard Europe") is an entity organized under the laws of France with its principal place of business at Route d'Authou 27800 Brionne, France.  Morard Europe, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Morard Europe is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

59.  Plaintiff Tramico S.A.S. (hereinafter "Tramico France") is an entity organized under the laws of France with its principal place of business at Route d'Authou 27800 Brionne, France.  Tramico France, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Tramico France is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

2513969

60. Plaintiff UAB Vita Baltic International (hereinafter "Vita Baltic") is an entity organized under the laws of Lithuania with its principal place of business at Jurgiskes LT-4580 Alytus, Lithuania.  Vita Baltic, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Vita Baltic is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

61. Plaintiff Veenendaal Schaumstoffwerk GmbH (hereinafter "Veenendaal Germany") is an entity organized under the laws of Germany with its principal place of business at Bamberger Strasse 58, 96215 Lichtenfels, Germany.  Veenendaal Germany, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Veenendaal Germany is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

62. Plaintiff Vita Cellular Foams (UK) Limited (f/k/a Kay-Metzeler Limited) (hereinafter "Vita Cellular") is an entity incorporated under the laws of the England with its principal place of business at Times Place, 45 Pall Mall, London SW1Y 5JG, United Kingdom. Vita Cellular, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Vita Cellular is a member of the Vita Group and

23

is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

63. Plaintiff Vita Polymers Poland Sp. Z.o.o. (hereinafter "Vita Poland") is an entity organized under the laws of Poland with its principal place of business at ul. Sienkiewicza 31/33 56-120 Brzeg Dolny, Poland. Vita Poland, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Vita Poland is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

64. Plaintiff Vita Industrial (UK) Limited (f/k/a Vita Services Limited) (hereinafter "Vita Industrial") is an entity incorporated under the laws of England with its principal place of business at Times Place, 45 Pall Mall, London SW1Y 5JG, United Kingdom. Vita Industrial, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Vita Industrial is a member of the Vita Group and is an affiliate of U.S. Purchase Plaintiffs Crest Foam Industries, Pathway Polymers, and Vitafoam Incorporated.

65. The aforementioned Plaintiffs maintain this action both on their own behalf and on behalf of their parents, subsidiaries, affiliates, predecessors-in-interest and assigns.

<u>DEFENDANTS AND CO-CONSPIRATORS</u>

66. Defendant BASF SE (f/k/a BASF AG) is a German corporation with its principal place of business at D-67056 Ludwigshafen, Germany. BASF SE takes the central role as the

24

2513969

largest operating company in the BASF Group and has extensive operations in the United States, Europe, and throughout the world. During the damages period, BASF SE manufactured and sold Polyether Polyol Products, either directly or through its wholly owned and/or controlled subsidiaries, affiliates, and predecessors, including, but not limited to, Defendant BASF Corporation, BASF Canada Inc. (Canada), BASF Antwerpen NV (Belgium), BASF Schwarzheide GmbH (Germany), Elastogran GmbH (Germany), and Elastogran UK Ltd. (United Kingdom) (collectively, the "BASF subsidiaries"), to purchasers throughout the world, including at least in the United States and Europe and including Plaintiffs in this action and in New Jersey. At all relevant times, BASF SE wholly owned and/or controlled the BASF subsidiaries, both generally and with respect to the conduct of any of these subsidiaries and/or affiliates in furtherance of the unlawful acts alleged herein. Upon information and belief, BASF SE participated in the combination and conspiracy alleged herein both directly and through its control over the BASF subsidiaries.

67.   Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Campus Drive, Florham Park, New Jersey 07932. During the damages period, BASF Corporation manufactured and sold Polyether Polyol Products to purchasers in the United States and elsewhere, including Plaintiffs in this action and in New Jersey. Upon information and belief, BASF Corporation participated directly in the combination and conspiracy alleged herein.

68.   Defendant BASF Canada Inc. ("BASF Canada") is a Canadian corporation with its principal place of business at 345 Carlingview Drive, Toronto, ON M9W 6N9. During the damages period, BASF Canada manufactured/or and sold Polyether Polyol Products in the United States to purchasers for delivery in Canada, including Plaintiffs in this action. BASF Canada is a wholly owned and/or controlled subsidiary or affiliate of BASF SE and is an affiliate

25

of BASF Corporation.  Upon information and belief, BASF Canada participated in the combination and conspiracy alleged herein either directly, and/or as an agent of BASF SE and/or BASF Corporation, and/or based on BASF SE's control over BASF Canada.  BASF SE , BASF Corporation, and BASF Canada are collectively referred to herein as "BASF."

69.  Defendant The Dow Chemical Company is a Delaware corporation with its principal place of business at 2030 Dow Center, Midland, Michigan 48674.  During the damages period, Dow manufactured and sold Polyether Polyol Products, either directly or through its wholly owned and/or controlled subsidiaries, affiliates, and predecessors, including, but not limited to, Dow Chemical Canada Inc. (Canada), Dow Benelux NV (Belgium), Dow Chemical Company Limited (England), Dow Europe GmbH (Switzerland), Dow France S.A. (France), Dow Poliuretani Italia Srl (Italy), and Dow Stac Polyurethane S.A.S. (France) (collectively, the "Dow subsidiaries"), to purchasers throughout the world, including at least in the United States and Europe, and including Plaintiffs in this action and in New Jersey.  At all relevant times, Dow wholly owned and/or controlled the Dow subsidiaries, both generally and with respect to the conduct of any of these subsidiaries and affiliates in furtherance of the unlawful acts alleged herein.  Upon information and belief, Dow participated in the combination and conspiracy alleged herein both directly and through its control over the Dow subsidiaries.

70.  Defendant Dow Chemical Canada Inc. (hereinafter "Dow Canada") is a Canadian corporation with its principal place of business at 450 1st Street S.W., Calgary, Alberta T2P 5H1 Canada.  Dow Canada is a wholly owned and/or controlled subsidiary of The Dow Chemical Company.  During the damages period, Dow Canada manufactured and/or sold Polyether Polyol Products in the United States to purchasers for delivery in Canada, including Plaintiffs in this action.  Upon information and belief, Dow Canada participated in the combination and conspiracy alleged herein either directly, and/or as an agent of The Dow Chemical Company,

26

and/or based on The Dow Chemical Company's control over Dow Canada.  The Dow Chemical Company and Dow Canada are collectively referred to herein as "Dow."

71.  Defendant Huntsman International LLC (f/k/a Huntsman ICI Chemicals LLC) (hereinafter "Huntsman") is a Delaware limited liability company with its principal place of business at 500 Huntsman Way, Salt Lake City, Utah 84108.  Huntsman was formed in 1999, in connection with the acquisition of the polyurethanes chemicals business of Imperial Chemicals Industries Ltd. ("ICI").  Prior to the sale of its polyurethanes business to Huntsman, ICI manufactured and sold Polyether Polyol Products to purchasers in the United States and Europe, including Plaintiffs in this action.  As part of that acquisition, Huntsman acquired ICI's liabilities.  Thereafter, Huntsman, its parents, subsidiaries, and affiliates, manufactured and sold Polyether Polyol Products to purchasers throughout the world, including at least in the United States and Europe, and including Plaintiffs in this action and in New Jersey.  Upon information and belief, Huntsman participated directly in the combination and conspiracy alleged herein.

72.  Defendant Lyondell Chemical Company (f/k/a Lyondell Petrochemical Company) (hereinafter "Lyondell") is a Delaware corporation with its principal place of business at One Houston Center, 1221 McKinney Street, Houston, Texas 77010.  In or around 1998, Lyondell acquired Arco Chemical Company's polyurethanes business, and in 2000, Bayer acquired Lyondell's polyether polyols business.  During the damages period, Lyondell manufactured and sold Polyether Polyol Products, either directly or through its wholly owned and/or controlled subsidiaries, affiliates, and predecessors, including but not limited to, Lyondell Chemical Nederland B.V. (Netherlands and France), Lyondell Chemical Nederland, Ltd. (Netherland), Lyondell Chemie TDI SCA (France), and Lyondell Chemical Canada (collectively, the "Lyondell subsidiaries"), to purchasers throughout the world, including at least in the United States and Europe, and including Plaintiffs in this action.  Upon information and belief, Lyondell

27

2513969

participated in the combination and conspiracy alleged herein both directly and through its control over the Lyondell subsidiaries.

73. Co-conspirators Bayer AG, Bayer Corporation, Bayer MaterialScience AG, Bayer MaterialScience LLC, and Bayer Inc. (collectively, "Bayer") are Defendants' co-conspirators with respect to the unlawful conduct and conspiracy alleged herein. Bayer AG and Bayer Material Science AG are German corporations, and Bayer Inc. is a Canadian corporation. Bayer Corporation and Bayer Material Science LLC are U.S. companies with their principal places of business in Pennsylvania. At all relevant times, Bayer Corporation, Bayer Material Science LLC, Bayer Material Science AG, and Bayer Inc. were wholly owned and/or controlled subsidiaries of Bayer AG. During the damages period, these Bayer entities manufactured and sold Polyether Polyol Products, either directly or through their wholly owned and/or controlled subsidiaries, affiliates, and predecessors, including but not limited to, Bayer Antwerpen N.V. (Belgium), Bayer Material Science Customer Services GmbH, & Co KG (Germany), Bayer Polymers Customer Services GmbH, & Co KG (Germany), Bayer Polyurethane Business Centre GmbH & Co KG (Germany), and Bayer Polyurethanes B.V. (Netherlands) (collectively, the "Bayer subsidiaries"), to purchasers throughout the world, including at least in the United States and Europe, and including Plaintiffs in this action and in New Jersey. Upon information and belief, Bayer participated in the combination and conspiracy alleged herein both directly and through its control over the Bayer subsidiaries. Bayer's conduct and actions in furtherance of the conspiracy are attributable to its Defendant co-conspirators.

74. Various other individuals, companies, corporations, firms, partnerships, associations, and other legal entities, the identities of which are presently unknown and which are not named as defendants or co-conspirators in this action, may have participated as co-conspirators with Defendants in the violations alleged herein, and have performed substantial acts and made

28

2513969

statements in New Jersey and elsewhere throughout the United States and the world in furtherance thereof. All references to "Defendants" and "co-conspirators" include the named entities herein and their predecessors-in-interest, as well as these unknown individuals, companies, corporations, firms, partnerships, associations, and other legal entities.

75. The acts charged in this Complaint as having been done by Defendants and their co-conspirators were authorized, ordered or done by or through their officers, directors, agents, employees or representatives, while they were actively engaged in the management, direction, control or transaction of Defendants' and their co-conspirators' businesses or affairs.

## TRADE AND COMMERCE

76. During the damages period, Defendants and their co-conspirators manufactured, distributed, sold, and shipped Polyether Polyol Products in a continuous and uninterrupted flow of interstate and international commerce to customers located in states other than those states in which the Defendants produced these products and to customers throughout the world, including in E.U. Member States. In addition, the primary raw materials used to manufacture Polyether Polyol Products were purchased and shipped in a continuous and uninterrupted flow of interstate and international commerce.

77. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate and international commerce. The conspiracy alleged herein in which Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States and international commerce.

78. Polyether polyols are intermediate chemical compounds based on propylene oxide or ethylene oxide that, among other things, are used in the manufacture of flexible foams and rigid

2513969

foams.  While the large majority of polyether polyols are used to make flexible and rigid foams, polyether polyols also are used in the manufacture of elastomers, adhesives, sealants, coatings, and binders.  Polyether polyols are combined with isocyanates such as toluene diisocyanates ("TDI") and monomeric or polymeric diphenylmethane diisocyanates ("MDI") to make polyurethanes.  Defendants and Bayer were the largest producers of polyether polyols during the conspiracy period.

79.  TDI is a diisocyanate used in combination with polyether polyols primarily to manufacture flexible foams.  These flexible foams are used for, among other things, furniture, bedding, car seating, packing, textiles, and carpet underlay.  TDI also is used in the production of coatings, adhesives coatings, adhesives, sealants, and elastomers ("CASE") applications. Defendants and Bayer were the largest producers of TDI during the conspiracy period, and by 2005, Defendants and Bayer owned and controlled 100% of the U.S. production capacity of TDI, 100% of Western European capacity, and most of European capacity.  The critical inputs for the production of TDI are toluene and phosgene.  All of the Defendants are vertically integrated with respect to phosgene, and Dow and Lyondell also are vertically integrated with respect to toluene.

80.  MDI is a diisocyanate used in combination with polyether polyols to, among other things, manufacture rigid foams, binders, and in some cases, flexible foam.  Polymeric MDI is used primarily to make rigid and semi-rigid polyurethane foams, and pure or monomeric MDI is used primarily for injection molding.  Rigid foams are used for construction, appliances, packing, insulation, and transportation.  Defendants and Bayer were among the largest producers of MDI during the conspiracy period, and by 2005, Defendants and Bayer owned and controlled 100% of U.S. production capacity of MDI, 100% of Western European capacity, and almost 100% of European capacity.  The critical inputs for the production of MDI are aniline and phosgene.  All of the Defendants are vertically integrated with respect to phosgene, and BASF,

2513969

Bayer, and Huntsman also are vertically integrated with respect to aniline.

81.   Polyether polyols systems are formulated packages of chemicals that include both an "A" side consisting of a diisocyanate (MDI or TDI) and a "B" side consisting of a polyether polyol and catalysts, foaming agents, and other chemicals.  The "A" side and the "B" side are mixed together and react to form polyurethane foams.  In some cases (e.g., depending on geographical location or the end use of the systems), the "A" side and "B" side labels are reversed.

82.   The structure of the markets for MDI, TDI, and polyether polyols are such that they facilitate unlawful collusion among the Defendants and their co-conspirators and facilitate the raising of prices above competitive levels.

83.   During the conspiracy period, MDI, TDI, and polyether polyols were each largely commodity products with no reasonable substitutes.

84.   The Polyether Polyol Products industry is a multi-billion dollar, international business.  During the conspiracy period, annual sales of Polyether Polyol Products were more than $3 billion in the United States and more than $3 billion in Europe.

85.   Defendants and Bayer were the largest suppliers of Polyether Polyol Products in the United States and the world during the conspiracy period.  There were a limited number of common producers during the conspiracy period, and the markets for Polyether Polyol Products were highly concentrated.  There are high barriers to entry given the capital intensive nature of the business and environmental laws and regulations.  Given Defendants' and Bayer's collective high market share and control over these markets, Defendants and Bayer were able to exercise market power, including controlling prices.

2513969

86. Pricing for Polyether Polyol Products was interrelated during the conspiracy period. On a number of occasions during the conspiracy period, price increases for Polyether Polyol Products were announced and/or became effective at or around the same time. Some examples are included below at paragraphs 119 and 121.

87. Defendants and their co-conspirators' illegal conduct throughout the world, including in the United States and in Europe, directly affected the flow of interstate and international trade and commerce. In particular, as a result of their unlawful combination and conspiracy to artificially fix, raise, maintain, and stabilize the price of, and allocate customers and markets for, Polyether Polyol Products, Defendants and their co-conspirators: (a) eliminated or suppressed competition in the production, distribution and/or sale of Polyether Polyol Products in at least the United States and Europe; and (b) inflated the prices that Plaintiffs and others paid for Polyether Polyol Products in at least the United States and Europe.

THE CONSPIRACY

88. From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing combination, conspiracy, and agreement in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (as amended by the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 662 (2004)).

89. From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in an illegal contract, combination and conspiracy in restraint of trade and commerce in violation of Colorado Revised Statute section 6-4-104.

32

90. From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators, who owned and/or controlled the output of Polyether Polyol Products, engaged in an unlawful arrangement, contract, agreement, and combination made with a view to, and which tended to: (1) lessen full and free competition in the importation or sale of Polyether Polyol Products into Indiana; and (2) advance and control the price and the cost of Polyether Polyol Products to Plaintiffs, in violation of Indiana Code sections 24-1-1-1 and 24-1-1-5.

91. From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in an unlawful arrangement, agreement, or combination made with a view to and which tended to: (1) lessen full and free competition in the importation and sale of Polyether Polyol Products into Tennessee; and (2) advance and control the price and cost of Polyether Polyol Products to Plaintiffs, in violation of Tennessee Code section 47-25-101.

92. From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a combination and conspiracy to restrain trade and commerce in violation of Wisconsin Statute section 133.03.

93. From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing combination, conspiracy and agreement and engaged in concerted practices that constituted an infringement of Article 81(1) of the EC Treaty and all other applicable Member States' laws, including but not limited to, the United Kingdom, France, Germany, Spain, Belgium, The Netherlands, Sweden, Denmark, Poland, and Lithuania.

33

94. The combination and conspiracy alleged in this Complaint consisted of an agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms and/or the purpose of which was to fix, raise, stabilize, and maintain at artificially high levels the prices of Polyether Polyol Products throughout the world, including at least in the United States and Europe.

95. For the purpose of forming and effectuating their combination and conspiracy, Defendants and their co-conspirators, among other things, discussed, formed and implemented agreements to fix, raise, maintain, and stabilize prices, and to allocate customers and markets, for Polyether Polyol Products.

96. Starting at least as early as 1994, the exact date(s) being unknown to Plaintiffs, Defendants Dow and BASF and co-conspirator Bayer engaged in numerous meetings, discussions, and/or communications regarding Polyether Polyol Products pricing throughout the world, including at least in the United States and Europe.  While the exact dates are unknown to Plaintiffs, Defendants Lyondell and Huntsman subsequently joined the unlawful combination and conspiracy.  Upon information and belief, Lyondell entered the Polyether Polyol Products markets in 1998 upon its acquisition of Arco Chemical Company, and Huntsman entered the Polyether Polyol Products markets in 1999 upon its acquisition of ICI's polyurethanes business.

97. In furtherance of their illegal combination and conspiracy, Defendants and their co-conspirators conducted multilateral and bilateral meetings in various locations throughout the world including in the United States, Europe and Asia, and they engaged in numerous telephone conversations to discuss Polyether Polyol Products pricing.  Defendants and their co-conspirators also shared confidential pricing and customer information with one another with respect to Polyether Polyol Products.  They conspired, combined, and agreed to fix, raise, stabilize, and

34

maintain prices for Polyether Polyol Products throughout the world, including at least in the United States and Europe, agreed to specific price increases, agreed to allocate customers and markets for Polyether Polyol Products, and acted in concert in implementing and enforcing those illegal agreements.  On numerous occasions, Defendants and their co-conspirators discussed and collaborated on specific price increases, whether they were planned, announced, or already implemented.

98.  Defendants' and their co-conspirators' meetings and communications in furtherance of their illegal combination and conspiracy continued until at least December 31, 2004, the exact dates being unknown to Plaintiffs.  Plaintiffs' prices for Polyether Polyol Products may have continued to be inflated as a result of Defendants' and their co-conspirators' conspiracy through 2006.

99.  Defendants and their co-conspirators often had communications in furtherance of their unlawful combination and conspiracy while they were at industry trade group meetings, such as those of the American Chemistry Council ("ACC"), Alliance for Polyurethanes Industry ("API"), and International Isocyanate Institute ("III"), among other places.

100.

**CONFIDENTIAL INFORMATION REDACTED:**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE URETHANE***

***ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

35

2513969

**CONFIDENTIAL INFORMATION REDACTED:**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE URETHANE***

***ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

2513969

**CONFIDENTIAL INFORMATION REDACTED:**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE URETHANE***

***ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

101.  In addition to these and numerous other meetings and communications related to U.S. pricing of Polyether Polyol Products, Defendants and their co-conspirators had numerous meetings and communications throughout Europe during the conspiracy period, including in Brussels, Frankfurt, Milan, and Paris, to discuss global and/or European pricing of Polyether Polyol Products.  Defendants and their co-conspirators discussed and agreed on pricing and price ranges for Polyether Polyol Products and often discussed specific customers' pricing. Defendants and their co-conspirators also engaged in a number of telephone conversations designed to monitor implementation and enforcement of their pricing agreements.

<u>COUNT I</u>
<u>(on behalf of U.S. Purchase Plaintiffs)</u>

<u>VIOLATION OF SECTION ONE OF THE SHERMAN ACT</u>

102.  Plaintiffs incorporate by reference paragraphs 1-101 above as if fully set forth herein.

37

103.  As a result of the foregoing, prices for Polyether Polyol Products were artificially raised, fixed, maintained, and stabilized in violation of Section 1 of the Sherman Act during the period of unlawful conduct between at least as early as 1994 and December 31, 2004, with the effects possibly continuing through 2006.

104.  The purpose and effect of Defendants' and their co-conspirators' unlawful combination and conspiracy were to fix, raise, maintain and stabilize the prices that Plaintiffs and others paid for Polyether Polyol Products in the United States and throughout the world, to deprive Plaintiffs and others of the benefit of free and open competition in their purchases of Polyether Polyol Products, and to restrain, suppress, and eliminate competition in the production, distribution, and sale of Polyether Polyol Products in the United States and throughout the world between at least as early as 1994 and December 31, 2004 and possibly continuing through 2006.

105.  By reason of the alleged violations of the U.S. antitrust laws, U.S. Purchase Plaintiffs paid more for Polyether Polyol Products than they would have paid in the absence of the illegal combination and conspiracy during the period between at least as early as 1994 and December 31, 2004 and possibly continuing through 2006.  As a direct and proximate result, Plaintiffs have been injured in their business and property and have suffered damages in an amount presently undetermined.

<u>INJURY TO U.S. PURCHASE PLAINTIFFS</u>

106.  Plaintiffs incorporate by reference paragraphs 1-105 above as if fully set forth herein.

107.  During the period between at least as early as 1994 and December 31, 2006, U.S. Purchase Plaintiffs purchased substantial amounts of Polyether Polyol Products from Defendants and/or their co-conspirators.  As a result of Defendants' and their co-conspirators' *per se*

38

unlawful combination and conspiracy, U.S. Purchase Plaintiffs were compelled to pay, and did pay, prices for Polyether Polyol Products that were substantially greater than what U.S. Purchase Plaintiffs would have paid absent Defendants' and their co-conspirators' illegal conduct. The full amount of U.S. Purchase Plaintiffs' damages will be calculated after discovery and upon proof at trial.

INJUNCTIVE RELIEF

108. Plaintiffs incorporate by reference paragraphs 1-107 above as if fully set forth herein.

109. Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of antitrust violations that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

FRAUDULENT CONCEALMENT AND TOLLING

110. Plaintiffs incorporate by reference paragraphs 1-109 above as if fully set forth herein.

111. At all relevant times, Defendants and their co-conspirators engaged in an illegal price-fixing conspiracy, which Defendants and their co-conspirators affirmatively and fraudulently concealed from Plaintiffs and others, and which, by its very nature, was inherently self-concealing.

112. Plaintiffs did not discover, nor could they have discovered through reasonable diligence, which they in fact exercised, that Defendants and their co-conspirators were engaged in a combination and conspiracy with respect to Polyether Polyol Products from January 1999 through December 2004, until at least November 23, 2004 when one of a series of class actions was filed alleging that Defendants and their co-conspirators engaged in an unlawful price-fixing

39

conspiracy with respect to Polyether Polyol Products. Prior to the filing of these class actions, which assert claims for the period 1999-2004, Plaintiffs did not discover and could not have discovered, through the exercise of due diligence or otherwise, that Defendants and their co-conspirators were engaged in a price-fixing conspiracy regarding Polyether Polyol Products between 1999 and 2004 because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Plaintiffs also did not discover and could not have discovered, through the exercise of reasonable diligence or otherwise, that Defendants and their co-conspirators were engaged in a price-fixing conspiracy because the conspiracy, by its very nature, was inherently self-concealing.

113.   Until December 2007, Plaintiffs did not discover and could not have discovered, through the exercise of reasonable diligence or otherwise, that the price-fixing conspiracy alleged herein extended back prior to 1999. Plaintiffs exercised due diligence in investigating their potential claims relating to these products and did not discover, and could not have discovered, this earlier unlawful conduct by Defendants and their co-conspirators until December 2007. After Plaintiffs reached a settlement with a co-conspirator, which included cooperation, Plaintiffs diligently pursued cooperation from the co-conspirator. It was only in December 2007 that Plaintiffs, through the exercise of due diligence, acquired information, for the very first time, from a cooperating co-conspirator indicating that the price-fixing conspiracy alleged herein extends back prior to 1999 to at least 1994. Plaintiffs did not have access to this information until December 2007. Prior to December 2007, Plaintiffs did not have any facts or evidence, nor could they, through the exercise of reasonable diligence, have been aware of any facts or evidence, that Defendants' and their co-conspirators' unlawful conduct began prior to 1999 because Defendants, Bayer, and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal the existence of their illegal

2513969

conduct. In addition, prior to December 2007, Plaintiffs did not discover, and could not have

discovered, through the exercise of reasonable diligence or otherwise, that the conspiracy was in

existence prior to 1999 because the conspiracy, by its nature, was inherently self-concealing.

114. Plaintiffs did not discover, and could not have discovered, through the exercise of

reasonable diligence or otherwise, Defendants' unlawful conduct prior to the time periods set

forth above because Defendants and their co-conspirators conducted their conspiracy secretly,

deliberately and affirmatively concealed the true nature of their unlawful conduct and acts in

furtherance thereof, and fraudulently concealed their activities through various means, methods,

and affirmative acts designed to avoid detection by Plaintiffs and others.

115. Throughout the relevant time period (i.e., until November 23, 2004 for January

1999 to December 2004 claims and until December 2007 for claims prior to 1999), Defendants

and their co-conspirators successfully concealed from Plaintiffs the existence of their illegal

combination and conspiracy alleged herein through affirmative acts of fraudulent concealment

including, but not limited to:

a. Meeting and communicating secretly with one another, including by telephone, to discuss prices, customers, and markets for Polyether Polyol Products sold in the U.S. and Europe, and to effectuate the collusive increases described herein. Defendants and their co-conspirators affirmatively concealed their meetings and communications.

**CONFIDENTIAL INFORMATION REDACTED:
SUBJECT TO PROTECTIVE ORDER IN *IN RE
URETHANE ANTITRUST LITIGATION*, MDL NO.
1616 (D. KAN.)**

                                                          In

addition to being affirmatively concealed, all of Defendants' and their co-conspirators' secret, conspiratorial communications were, by their very nature, self-concealing in nature and not discoverable by Plaintiffs in the exercise of reasonable diligence.
**CONFIDENTIAL INFORMATION REDACTED**

41

b.  Meeting secretly outside of the United States on a number of occasions in an effort to avoid detection and liability in the United States, to discuss prices, customers, and markets for Polyether Polyol Products sold in the U.S. and Europe and around the world, and to effectuate the collusive increases described herein.  Defendants and their co-conspirators affirmatively concealed these meetings and communications.

**CONFIDENTIAL INFORMATION REDACTED**
In addition, these secret conspiratorial meetings and communications were, by their very nature, self-concealing in nature and not discoverable by Plaintiffs in the exercise of reasonable diligence.
**CONFIDENTIAL INFORMATION REDACTED**

c.  Agreeing among themselves at meetings and in communications not to disclose or discuss publicly or privately beyond those involved, the true nature and substance of the acts and communications in furtherance of the alleged combination and conspiracy.  Defendants and their co-conspirators knew that their conduct was illegal, and specifically agreed that they should not disclose their meetings or communications.
**CONFIDENTIAL INFORMATION REDACTED:**
**SUBJECT TO PROTECTIVE ORDER IN *IN RE***
***URETHANE ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

d.  Giving deliberately false and pretextual reasons for the price increases of Polyether Polyol Products sold by Defendants and their co-conspirators during the conspiracy period, and falsely attributing such pricing as being the result of competitive factors and natural market forces rather than unlawful conspiratorial conduct.  Defendants and their co-conspirators' explanations were false and misleading and were intended to and did conceal their illegal combination and conspiracy.  Examples of these false and pretextual statements are set forth at paragraphs 119 and 121 below.

e.  Denying the existence of the conspiracy in connection with the Polyether Class Action.

116.  It was not uncommon in the Polyether Polyol Products industry for the producers to periodically announce price increases for Polyether Polyol Products.  In dealing with Defendants and their co-conspirators, Plaintiffs were accustomed to price increases from time to time as a part of what Plaintiffs believed was a competitive industry and normal, legitimate business practices.

117.  During the conspiracy period, Defendants and their co-conspirators issued price increase announcements and made numerous statements about price increases in industry

publications reviewed by Plaintiffs and issued price increase letters that were distributed to and relied on by Plaintiffs. These price increase announcements, statements, and letters contained deliberately false and pretextual explanations for price increases of Polyether Polyol Products.

118. Defendants and their co-conspirators consistently attributed their price increases of Polyether Polyol Products – both before and after they were announced – to normal, rational competitive market forces, including but not limited to, raw material cost increases, low margins, desire to increase return on investment, and supply and demand factors. These price increases, instead, were agreed on by Defendants and their co-conspirators, and were the direct result of their unlawful combination and conspiracy alleged herein. Defendants' and their co-conspirators' false and pretextual explanations for the price increases were designed to conceal the true reasons for the price increases and to mislead Plaintiffs into believing that normal market forces justified the price increases. Plaintiffs reasonably believed Defendants' and their co-conspirators' stated reasons for the increases. Plaintiffs did not know, and could not have known until November 23, 2004 for 1999-2004 claims and until December 2007 for pre-1999 claims that the justifications provided by Defendants and their co-conspirators were false and designed to conceal Defendants and their co-conspirators' unlawful combination and conspiracy.

119. Some examples of Defendants' and their co-conspirators' many false and pretextual price increase announcements and/or statements in industry publications include the following:

a. In an August 8, 1994 article, Chemical Marketing Reporter reported that MDI prices in the United States had gone up in July of 1994 and quoted defendant Dow as stating that "'[t]he two leading factors in the increase were the high operating rates and the fact that the industry had gone 12 months without a raise.'"

b. In a September 28, 1994 article, Chemical Week reported that Bayer's then U.S. subsidiary, Miles, had advised that U.S. prices for isocyanates might be increased industrywide in the first half of 1995, due to pent-up.

c. In its April/May 2000 publication, Urethanes Technology reported that Dow

43

attributed industrywide price increases on TDI and MDI to increased feedstock prices, leading to pressure on margins.

      d.  In its June/July 2000 publication, Urethanes Technology reported Lyondell's statements that industrywide price increases on polyols were needed to support reinvestment in capacity. The increased cost of feedstock propylene also was cited as a reason for polyol price increases.

      e.  In a December 2000/January 2001 Urethanes Technology article, BASF AG and its subsidiary, Elastogran GmbH, made public statements indicating that they expected prices of polyols, TDI, and MDI to rise globally because of "increasing demand" and the "tight supply situation." BASF also blamed high prices on "higher crude oil prices" and noted the need for "price development" to justify investment in new plants. BASF went on to state that it had had "rounds of discussions with customers" on this. In the same edition of Urethanes Technology, Lyondell defended a recent U.S. price increase by Lyondell and other suppliers as an indication of "how tight the market is."

      f.  In a May 2002 publication, Chemical Market Reporter quoted Lyondell as stating that "production costs" in addition to "the uptick in demand" were strong reasons for the U.S. price increase on TDI. Dow was quoted as attributing its global price increase on polyols to the need to "partially recover eroded margins." Huntsman noted "unacceptable margins" that "will not support expansions necessary for keeping pace with demand" in connection with U.S. price increases on TDI and MDI.

      g.  In an October 2002 publication, Urethanes Technology reported that Dow increased European prices for TDI and polyols in September 2002 and MDI and polyols in October 2002. Dow blamed the price increases on margins that "do not warrant necessary future investments in technology and capacity that would allow us to keep up with market growth."

      h.  In its February/March 2003 publication, Urethanes Technology reported that Lyondell said that "it achieved price increases and improved margins on TDI due to a tight supply situation in the market throughout 2002." In the same publication, Dow indicated that margins on TDI, MDI, and polyols were "still below satisfactory levels," and that, for all regions, "the need for margin restoration is critical. . .Dow must take immediate action to improve pricing to reasonable levels. . . . Our price increases are ongoing. . . . There will be future announcements as well and they will be implemented as quickly as possible for all products and for all regions."

      i.  In a March 2003 publication, Rubber & Plastic News reported that Dow, BASF, and Huntsman intended to increase U.S. prices for MDI, TDI and polyols in April 2003. BASF attributed the increase to "falling margins caused by significant and ongoing increases in raw material, energy and transportation costs." Huntsman blamed the price increase on "record highs" for raw materials, strong demand, and the need to invest in manufacturing capability. Dow cited "high and volatile oil and energy pricing . . . creating escalated raw material and distribution costs and a subsequent decrease in margins."

      j.  In a June 2003 article, Chemical Market Reporter quoted Huntsman as stating

2513969

that its global price increases had "partly offset higher energy costs, but they have not been sufficient to return acceptable margins or protect the industry from future energy hikes." In the same article, Dow, having raised prices in the United States, stated that "[g]enerally, the overall global TDI increase is being driven by margin recovery initiatives and high energy and feedstock costs."

k. In an April 2004 article, Chemical Market Reporter quoted Huntsman as stating that favorable market conditions have resulted in some price increases on MDI, but that "any margin improvements have largely been eroded by high feedstock costs" and that Huntsman's goal, therefore, "is to see prices rise to a level at which reinvestment can be sustained." Bayer stated that its recent price increase on MDI was successfully implemented, but that the "overall performance of the TDI/MDI business continues to labor under the heavy weight of high energy and raw material costs." Dow cited "margin compression" and the high cost of raw materials and energy in connection with its U.S. price increases on MDI, TDI, and polyols. BASF blamed current market conditions and "low investment levels" for its isocyanates increases.

120. Industry publications such as Chemical Market Reporter, Urethanes Technology, Chemical Week, and others in which Defendants and their co-conspirators made representations about the reasons for price increases were widely published and reviewed by purchasers of Polyether Polyol Products, including Plaintiffs in this action. Defendants' and their co-conspirators' representations were false and pretextual and were designed to affirmatively conceal that these price increases were instead the result of Defendants' and their co-conspirators' unlawful combination and conspiracy. These false explanations successfully misled Plaintiffs into believing that these increases were the result of competitive market forces rather than unlawful collusion. Plaintiffs could not have discovered Defendants' and their co-conspirators' conduct because they did not have access to contemporaneous information sufficient to allow Plaintiffs to determine that Defendants' and their co-conspirators' justifications were false and pretextual.

121. In addition to providing false information to be published in industry trade publications, Defendants and their co-conspirators provided false and pretextual reasons for their price increases in numerous letters to Plaintiffs announcing these increases at or around the same time. A few examples include the following:

45

2513969

a.  BASF, Dow, and Bayer announced they were raising MDI prices $.06/lb, and Bayer announced it was raising MDI and polyols prices $.06/lb and TDI $.08/lb, effective July 1, 1998.  BASF's letter was dated June 1, 1998; Dow's letter was dated May 28, 1998, and Bayer's letters were dated May 22, 1998  and June 12, 1998.  BASF stated that the increase "relate[d] to BASF's ability to make investments to support urethanes growth."  Bayer claimed the MDI increase was necessary as a step to improving deteriorating profits caused by "continued increases in environmental and transportation costs."  Bayer blamed the polyols and TDI increase on price erosion and a need to regain investment profit levels.

b.  BASF, Dow, and Lyondell each announced they were raising both polyol and TDI prices $.03/lb, effective January 1, 2000.  Huntsman announced it was raising polyol prices $.03/lb, effective January 15, 2000, and Bayer announced it was raising polyol prices $.03/lb, effective January 3, 2000.  BASF's letter was dated November 30, 1999; Dow's letters were dated November 5, 1999 and December 3, 1999; Huntsman's letters were dated December 10, 1999 and December 15, 1999; Lyondell's letter was dated November 29, 1999; and Bayer's letter was dated December 14, 1999.  Dow attributed the polyol increase to "an increase in energy and raw material costs" and "supply chain problems" and attributed the TDI increase to "continued increase in energy and raw material costs" and to supply problems.  Huntsman blamed "increased raw material and energy costs."  Lyondell cited "significant and sustained increases in raw material costs."  Bayer stated that "[e]scalating raw materials and energy costs, coupled with increased costs necessitated this price increase."

c.  BASF, Dow, Huntsman and Bayer all announced both polyol and TDI price increases of $.07/lb and MDI price increases of $.08/lb, effective July 1, 2000, and Lyondell announced a TDI price increase of $.07/lb effective July 1, 2000.  BASF's letter regarding polyols and TDI and its letter regarding MDI were dated May 31, 2000; Dow's letter regarding polyols was dated May 15, 2000, and its letters regarding TDI and MDI were dated May 30, 2000; Huntsman's letters regarding polyols, TDI, and MDI were dated June 1, 2000.  Lyondell's letter was dated May 31, 2000.  Bayer's letters regarding polyols were dated May 30, 2000 and May 31, 2000, its letter regarding TDI was dated May 31, 2000, and its letters regarding MDI were dated May 30, 2000 and June 8, 2000.  BASF attributed the polyol and TDI price increases to "continuing deterioration of margins" and "supply/demand imbalances" and the MDI increase to "continuing deterioration of margins creating unacceptable returns."  Dow blamed the polyol price increase on the rising cost of raw materials and "increased continued cost pressures" and blamed the MDI increase on "continued cost pressure."  Huntsman's letters explained that the polyol and TDI increases were necessitated by "escalating feedstock and energy costs, along with increasing regulatory demands," and that the increase was "necessitated by an unprecedented increase in raw material, energy, and distribution costs."  Lyondell's letter cited "significant and sustained increase in raw material costs" and the "tight supply situation" as reasons for the increase.  Bayer stated the polyol and MDI increases were "based on significant increases in raw material and energy costs, as well as continuing rapid growth in demand," and attributed the TDI increase to raw material increases.

d.  BASF, Dow, and Bayer all announced a MDI price increase of $.06/lb, effective April 1, 2002, for BASF and Dow, and effective April 15, 2002 for Bayer.  BASF's letter was dated March 21, 2002; Dow's letter was dated March 14, 2002, and Bayer's letter was dated April 12, 2002.  BASF blamed the increase on "continuing deterioration of margins" and

2513969

"unacceptable returns." Dow cited "erosion of margins" and "loss of profitability." Bayer similarly asserted that the increase was necessary "to regain acceptable margins to maintain investments."

    e. BASF, Dow, Huntsman, Lyondell, and Bayer all announced a TDI price increase of $.08/lb, effective September 1, 2002, and BASF, Dow, and Bayer also announced a polyether polyol price increase of $.06/lb, effective September 1, 2002. BASF's letter was dated August 1, 2002; Huntsman's letter was dated July 26, 2002; Dow's letter was dated August 6, 2002; and Lyondell's and Bayer's letters were dated August 1, 2002. BASF attributed the price increases to "global product balances" and a "weakness in margins." Dow cited "tight supplies." Huntsman blamed recent "raw material increases," and Lyondell similarly cited raw material costs.

    f. BASF, Dow, Huntsman, Lyondell and Bayer all announced a TDI price increase of $.10/lb, effective April 1, 2003. Dow's and Lyondell's letters were dated February 24, 2003; BASF's letter was dated February 28, 2003; Huntsman's letters were dated February 17, 2003 and February 28, 2003; and Bayer's letters were dated February 27, 2003. At or around the same time, BASF, Huntsman, Dow, and Bayer increased MDI and polyether polyol prices. Dow announced its MDI and polyol price increases of $.07/lb effective April 1, 2003. Dow's letters regarding MDI and polyether polyols were dated February 24, 2003. BASF's letter regarding a MDI increase of .$08/lb and a polyether polyol price increase of $.06/lb was dated February 28, 2003. Bayer's letter regarding a MDI increase of $.08/lb and a polyol price increase of $.06/lb was dated February 21, 2003. Huntsman sent letters dated February 27, 2003 and February 28, 2003 regarding a MDI price increase of $.08/lb and a polyether polyol price increase of $.06/lb. BASF attributed its increase to the increasing costs of raw materials. Lyondell likewise stated that the price increase was "made necessary by the significant and sustained increase in raw materials costs." Huntsman also blamed the increase on "rapidly escalating raw material and energy costs." Bayer likewise blamed raw material and energy costs.

    g. BASF, Dow, Huntsman and Bayer all announced a MDI price increase of $.06/lb, effective October 1, 2003. BASF's letter was dated August 28, 2003; Dow's letter was dated August 25, 2003; Huntsman's letters were dated August 29, 2003 and September 3, 2003; and Bayer's letters were dated September 2, 2003 and September 4, 2003. BASF attributed the increase to tighter supply conditions as well as the "persistently high costs for benzene, natural gas and propylene." Huntsman likewise blamed "higher raw material costs," and Bayer claimed the increase was "necessary to offset the continued pressure of raw material and energy increases."

    h. BASF, Huntsman and Bayer all announced a polyether polyol price increase of $.06/lb and a TDI price increase of $.10/lb, effective April 1, 2004. BASF's letter was dated February 19, 2004; Dow's letter was dated February 16, 2004; Huntsman's and Bayer's letters were dated February 27, 2004. Around the same time, Bayer and Huntsman also announced a systems price increase. By letter dated February 15, 2004, Bayer announced its systems price of increase of $.10/lb, effective March 15, 2004; by letter dated February 27, 2004, Huntsman announced its systems price increase of $.06/lb, effective April 1, 2004. BASF blamed the "persistently high benzene, natural gas, propylene and chlorine feedstock cost." Dow attributed the polyols increase to energy and raw material costs, and attributed the TDI increase to

2513969

"continued energy and raw material cost increases," and "supply considerations." Huntsman cited increased demand and tight supply conditions for the polyols and systems increases, and claimed the TDI increase was "necessitated due to continued escalating raw material and energy costs." Bayer likewise cited raw material and energy costs for the polyols, TDI, and systems increases.

122. The reasons and justifications that Defendants and their co-conspirators provided for price increases of Polyether Polyol Products in their letters to Plaintiffs during the conspiracy period were false and pretextual and were designed by Defendants and their co-conspirators to affirmatively conceal that these price increases were instead the result of Defendants' and their co-conspirators' unlawful combination and conspiracy. These false explanations successfully misled Plaintiffs into believing that these increases were the result of competitive market forces rather than unlawful collusion. Plaintiffs could not have discovered Defendants' and their co-conspirators' conduct because Plaintiffs did not have access to contemporaneous information sufficient to allow Plaintiffs to determine that Defendants' and their co-conspirators' justifications were false and pretextual.

123. The District Court of Kansas in the Polyether Class Action has already found that Defendants' false and pretextual reasons such as those alleged above constitute sufficient pleading of fraudulent concealment.

124. Because the conspiracy was self-concealing, and Defendants and their co-conspirators also affirmatively and actively concealed the combination and conspiracy alleged herein, Plaintiffs were unaware of the fact that prices for Polyether Polyol Products had been secretly agreed upon and fixed by Defendants and their co-conspirators and could not, through the exercise of reasonable diligence, which they in fact exercised, have discovered until November 23, 2004 that a conspiracy existed from 1999 through 2004 and could not have discovered until December 2007 that a conspiracy existed prior to 1999.

48

125.  The filing of class plaintiffs' class action on November 23, 2004 and of subsequently filed related class actions tolled the statute of limitations for all class members, including U.S. Purchase Plaintiffs, and also tolled the statute of limitations with respect to Foreign Purchase Plaintiffs' claims.

COUNT II
(on behalf of U.S. Purchase Plaintiffs)

VIOLATION OF COLORADO LAW

126.  Plaintiffs incorporate by reference paragraphs 1-125 as if fully set forth herein.

127.  The acts committed by Defendants and their co-conspirators, as alleged, herein violated Colorado Revised Statute section 6-4-104 and substantially affected the people of Colorado.  Defendants and their co-conspirators entered into a conspiracy for the purposes of restraining trade or commerce by, e.g., discussing, forming and implementing agreements to fix, raise, stabilize, and maintain prices for Polyether Polyol Products.

128.  Each of the above acts constitutes a per se violation of Colorado Revised Statute sections 6-4-104 and 6-4-121.

129.  During the relevant time period, Plaintiff Flexible Foam Products maintained facilities in Colorado for which Polyether Polyol Products were purchased from one or more Defendants and/or their co-conspirators, or purchased for use in Colorado from one or more Defendants and/or their co-conspirators.

130.  The Colorado statute of limitations in this action was tolled by Defendants' and their co-conspirators' acts of fraudulent concealment and the filing of the Polyether Class Action.

131.  Contracts or agreements, pursuant to which U.S. Purchase Plaintiffs purchased Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the

49

violation of Colo. Rev. Stat. § 6-4-104. U.S. Purchase Plaintiffs are entitled to recover any payments made upon, under or pursuant to such contracts or agreements, plus interest.

COUNT III
(on behalf of U.S. Purchase Plaintiffs)

VIOLATION OF INDIANA LAW

132.  Plaintiffs incorporate by reference paragraphs 1-125 as if fully set forth herein.

133.  The acts committed by Defendants and their co-conspirators, as alleged herein, violated Indiana Code sections 24-1-1-1 and 24-1-1-5 and substantially affected the people of Indiana. Defendants and their co-conspirators, while in control of the output of Polyether Polyol Products, entered into an unlawful arrangement, agreement or combination designed to advance or control, or which tended to advance or control, the prices that U.S. Purchase Plaintiffs paid for Polyether Polyol Products.

134.  Each of the above acts caused competitive harm and constitutes a per se violation of Indiana Code sections 24-1-1-1 and 24-1-1-5.

135.  Plaintiffs Carpenter and Flexible Foam Products maintained facilities in Indiana for which Polyether Polyol Products were purchased from one or more Defendants and/or their co-conspirators, or purchased for use in Indiana from one or more Defendants and/or their co-conspirators.

136.  The Indiana statute of limitations in this action was tolled by Defendants' and their co-conspirators' acts of fraudulent concealment and the filing of the Polyether Class Action.

137.  Contracts or agreements, pursuant to which U.S. Purchase Plaintiffs purchased Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the violation of Indiana Code sections 24-1-1-1 and 24-1-1-5. U.S. Purchase Plaintiffs are entitled to

50

recover any payments made upon, under or pursuant to such contracts or agreements, plus interest.

COUNT IV
(on behalf of U.S. Purchase Plaintiffs)

VIOLATION OF TENNESSEE LAW

138.  Plaintiffs incorporate by reference paragraphs 1-125 as if fully set forth herein.

139.  The acts committed by Defendants and their co-conspirators, as alleged herein, violated Tennessee Code section 47-25-101 and substantially affected the people of Tennessee. Defendants and their co-conspirators entered into an unlawful arrangement, agreement or combination:

      a.  Made with a view to lessen, or which tended to lessen, full and free competition in the importation or sale of Polyether Polyol Products into Tennessee; and

      b.  Designed, or which tended to advance or control, the prices that U.S. Purchase Plaintiffs paid for Polyether Polyol Products.

140.  Each of the above acts constitutes a per se violation of Tennessee Code sections 47-25-101 and 47-25-106.

141.  Plaintiffs Nu-Foam Products and Pathway Polymers, which have been and are residents of Tennessee, along with Plaintiffs Hickory Springs, Huber, and J.M. Huber, maintained facilities in Tennessee for which Polyether Polyol Products were purchased from one or more Defendants and/or their co-conspirators, or purchased for use in Tennessee from one or more Defendants and/or their co-conspirators.

142.  The Tennessee statute of limitations in this action was tolled by Defendants' and their co-conspirators' acts of fraudulent concealment and the filing of the Polyether Class Action.

143.  Contracts or agreements, pursuant to which U.S. Purchase Plaintiffs purchased

51

Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the violation of Tennessee Code section 47-25-101.  U.S. Purchase Plaintiffs are entitled to recover any payments made upon, under or pursuant to such contracts or agreements, plus interest.

<u>COUNT V</u>
(on behalf of U.S. Purchase Plaintiffs)

<u>VIOLATION OF WISCONSIN LAW</u>

144.  Plaintiffs incorporate by reference paragraphs 1-125 as if fully set forth herein.

145.  The acts committed by Defendants and their co-conspirators, as alleged herein, violated Wisconsin Statute section 133.03 and substantially affected the people of Wisconsin. Defendants and their co-conspirators illegally combined the acts of two or more persons for the purposes of:

a.  Creating or carrying out unreasonable restraints of trade or commerce in Wisconsin; and

b.  Advancing and controlling the prices that Plaintiffs paid for Polyether Polyol Products in Wisconsin.

146.  Each of the above acts constitutes a contract, combination and conspiracy in restraint of trade or commerce in violation of Wisconsin Statute sections 133.03 and 133.14, and substantially affected the people of Wisconsin.

147.  Plaintiff Flexible Foam Products maintained facilities in Wisconsin for which Polyether Polyol Products were purchased from one or more Defendants and/or their co-conspirators, or purchased for use in Wisconsin from one or more Defendants and/or their co-conspirators.

148.  The Wisconsin statute of limitations in this action was tolled by Defendants' and their co-conspirators' acts of fraudulent concealment and the filing of the class action.

52

149.  Contracts or agreements, pursuant to which U.S. Purchase Plaintiffs purchased Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the violation of Wis. Stat. § 133.03.  U.S. Purchase Plaintiffs are entitled to recover any payments made upon, under or pursuant to such contracts or agreements, plus interest.

<u>COUNT VI</u>
(on behalf of Foreign Purchase Plaintiffs)

<u>VIOLATION OF E.U. AND E.U. MEMBER STATES' LAWS</u>

150.  Plaintiffs incorporate by reference paragraphs 1-125 as if fully set forth herein.

151.  During the damages period, Foreign Purchase Plaintiffs purchased Polyether Polyol Products in the European Union and have suffered pecuniary injury as a result of the infringements of E.U. Law and all other applicable E.U. Member States' laws, including but not limited to, the United Kingdom, France, Germany, Spain, Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania.

152.  Defendants' and their co-conspirators' agreements and concerted practices, as complained of herein, had the following effects, among others:

      a.  The selling prices of Polyether Polyol Products were directly or indirectly fixed by Defendants and their co-conspirators at supra-competitive levels; and

      b.  Competition within the common market has been prevented, restricted, or distorted.

153.  If the cartel had not been implemented and/or given effect, the Foreign Purchase Plaintiffs would have been able to buy Polyether Polyol Products at lower prices.

154.  By reason of these breaches, Foreign Purchase Plaintiffs have suffered loss and damage.

2513969

155.  During the damages period, Defendants and their co-conspirators sold Polyether Polyol Products and received payment for Polyether Polyol Products in the European Union, including but not limited to, in the United Kingdom, France, Germany, Spain, Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania.

156.  Defendants and their co-conspirators agreed to and engaged in concerted practices which appreciably and foreseeably affected trade between and among E.U. Member States, and prejudiced the realization of a market between and among E.U. Member States. These concerted practices had as their object and effect the prevention, restriction and distortion of competition within the common market and were conducted in a manner incompatible with the common market.

157.  Through the agreements and concerted practices complained of herein, Defendants and their co-conspirators directly or indirectly fixed selling prices of Polyether Polyol Products, in breach of Article 81(1) of the EC Treaty, and any and all other applicable E.U. Member State laws, including but not limited to, the United Kingdom, France, Germany, Spain, Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania.

158.  Defendants' and their co-conspirators' agreements and concerted practices as complained of herein were not indispensable to the attainment of improved production or distribution of goods or the promotion of technical or economic progress, and did not allow consumers a fair share of any resulting benefit.

159.  These agreements and concerted practices introduced the possibility of eliminating competition in respect of Polyether Polyol Products.

160.  Defendants' and their co-conspirators' wrongful actions were carried out with

54

knowledge of and willful disregard of the rights of the Foreign Purchase Plaintiffs, in a calculating fashion and/or with the expectation of profiting therefrom by exceeding the amounts payable to them by the Foreign Purchase Plaintiffs as a result of such wrongful actions, warranting aggravated and exemplary damages accordingly.

161.  By reason of their implementation of and/or giving effect to the Polyether Polyol Products cartel, Defendants acted in breach of:

a.  A statutory duty imposed under Article 81(1) of the EC Treaty; and

b.  A statutory duty imposed under any and all other E.U. Member State laws not to infringe Article 81(1) of the EC Treaty, including but not limited to, the laws of the United Kingdom, France, Germany, Spain, Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania.

162.  Defendants' anticompetitive agreements and practices and their foreign effects have caused injury to the Foreign Purchase Plaintiffs in the E.U. Member States.  The Foreign Purchase Plaintiffs seek injunctive relief, and to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, and any other such relief that the Court deems necessary and appropriate.

163.  The limitations periods for all claims under E.U. Law, as well as those under all other applicable E.U. Member States' laws, was tolled as a result of Defendants' and their co-conspirators' active and fraudulent concealment of their unlawful conduct and by the Polyether Class Action.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request the Court to:

a.  Enter judgment for U.S. Purchase Plaintiffs declaring that the foregoing combination and conspiracy, and the acts done in furtherance thereof, were an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

2513969

b.  Enter judgment in favor of U.S. Purchase Plaintiffs for the damages period and jointly and severally against Defendants for treble the amount of the jury verdict and for attorney's fees, costs and prejudgment interest as provided for in Section 4 of the Clayton Act;

c.  Enter judgment in favor of U.S. Purchase Plaintiffs and jointly and severally against Defendants for the full consideration paid by U.S. Purchase Plaintiffs for Polyether Polyol Products purchased from Defendants and their co-conspirators during the damages period in the states of Colorado, Indiana, Tennessee, and Wisconsin.

d.  Enter judgment in favor of Foreign Purchase Plaintiffs declaring that the implementation and effect of the cartel alleged herein constitutes a breach of Article 81(1) of the EC Treaty and all other applicable E.U. Member States' laws, including but not limited to, the United Kingdom, France, Germany, Spain, Belgium, The Netherlands, Denmark, Sweden, Poland, and Lithuania not to infringe Article 81(1) of the EC Treaty.

e.  Enter judgment in favor of Foreign Purchase Plaintiffs for the present value of actual damages determined to have been sustained by them by virtue of Defendants' infringements of E.U. Law, and for aggravated and exemplary damages, with appropriate interest, as allowed by law.

f.  Enjoin Defendants from continuing the unlawful conspiracy alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes or effects; and

g.  Enter, and retain jurisdiction to enter, such further orders and decrees as may be necessary or appropriate to remedy the injury to Plaintiffs or as the Court deems appropriate.

<u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

2513969

Dated:  October 17, 2008

DICKSTEIN SHAPIRO LLP

    Richard J. Leveridge
    Elaine Metlin
    Jodi Trulove
    1825 Eye Street, NW
    Washington, DC  20006
    (202) 420-2200
       *(pending pro hac vice admission)*

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By:
    s/ Mauro M. Wolfe
    Mauro M. Wolfe (MW-2380)
    1177 Avenue of the Americas
    New York, New York  10036-2714
    (212) 277-6726

    Attorneys for Plaintiffs

In Association With:

Michael D. Mustard
Hunt Suedhoff Kalamaros LLP
803 South Calhoun Street, Ninth Floor
Fort Wayne, Indiana  46858-1489

Additional Counsel for Burkart Foam, Inc.,
Flexible Foam Products, Inc., Nu-Foam Products, Inc.,
and Universal Urethanes, Inc.

Delmer Mitchell
Schmiedeskamp, Robertson, Neu & Mitchell
P.O. Box 1069
Quincy, IL  62306

Additional Counsel for Foam Supplies, Inc.,
Huber Engineered Woods LLC and
J.M. Huber Corporation

Rufus F. Edmisten
Edmisten & Webb Law Firm
132 South Salisbury Street
Raleigh, North Carolina  27601

Additional Counsel for Hickory Springs Manufacturing
Company and Hickory Springs of California, Inc.

2513969

Joseph D. Carney
Carney, Gluntz & Associates, LLC
2001 Crocker Road, Suite 530
Cleveland, Ohio  44145

Additional Counsel for
The Sherwin-Williams Company and
Sherwin-Williams Automotive Finishes Corporation

Jason S. Hartley
Ross, Dixon & Bell, LLP
Suite 400, 550 West "B" Street
San Diego, California  92101-3599

Additional Counsel for
Skypark Manufacturing, LLC

2513969

**ATTACHMENT A**

| COMPANY NAME | PARENTS, SUBSIDIARIES AND/OR AFFILIATES |
|---|---|
| **Hickory Springs Manufacturing Company** | Eastern Foam Products, Inc. |
| **Leggett & Platt, Incorporated** | Hanes Companies, Inc.<br>L&P Manufacturing, Inc.<br>L&P Materials Manufacturing, Inc.<br>L&P Underlay Products, Inc.<br>Polyester Fibers, LLC<br>SCI Parent, Inc.<br>Sponge-Cushion, Inc. |
| **Lubrizol Advanced Products, Inc.** | The Lubrizol Corporation<br>LZAM International, Inc. |
| **The Sherwin-Williams Company** | Life Shield Engineered Systems LLC<br>Omega Specialty Products & Services LLC |

2512267