**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | Master Docket No. 08-5169 (WJM) (MF) |
| | *Document Filed Electronically* |

**DEFENDANT THE DOW CHEMICAL COMPANY'S BRIEF**
**IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO LIMIT THE**
**TESTIMONY OF PROFESSOR KENNETH G. ELZINGA**

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
llustberg@gibbonslaw.com
dmcgrady@gibbonslaw.com

David M. Bernick (*admitted pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile:  (212) 698-3599
david.bernick@dechert.com

*Attorneys for Defendant*
*The Dow Chemical Company*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

I.     PROFESSOR ELZINGA IS AN EMINENTLY QUALIFIED ECONOMIST AND ENGAGED IN A RELIABLE ANALYSIS ............................................ 3

     A.    Qualifications ............................................................................................. 3

     B.    Assignment ................................................................................................ 4

     C.    Professor Elzinga Concludes that the Economic Evidence Is Contrary to Plaintiffs' Allegations of a Cartel .......................................................... 6

II.    PROFESSOR ELZINGA CRITIQUES DR. MARX'S OPINION THAT PROLONGED PROFIT LOSS WILL NOT LEAD TO MARKET EXIT ...................... 7

ARGUMENT .......................................................................................................... 8

I.     PROFESSOR ELZINGA'S TESTIMONY IS BASED ON SPECIALIZED ECONOMIC KNOWLEDGE THAT WILL AID THE JURY ......................................... 8

     A.    Professor Elzinga Reliably Applied The Universally Accepted "Structure-Conduct-Performance" Paradigm In Assessing Plaintiffs' Hypothesis Of A Cartel ........................................................................................................ 8

          1.    Plaintiffs' Claim that Professor Elzinga Used "No Method" Is Demonstrably False ............................................................................ 9

          2.    Plaintiffs' Claim That Third Circuit Law *Requires* A Regression Study Is False ................................................................................... 13

     B.    Professor Elzinga Relied On Sufficient Facts and Data ...................... 14

     C.    Professor Elzinga's Testimony Will Assist the Jury .......................... 17

          1.    Professor Elzinga's Review of Market Prices, Analysis of Price Increase Announcements, And Evidence of Competition Will Aid the Jury as Part of His Overall Economic Analysis ................................. 17

          2.    Professor Elzinga Is Not Offering Testimony on the Standard of Proof .............................................................................................. 18

II.    PROFESSOR ELZINGA'S TESTIMONY SHOULD NOT BE EXCLUDED UNDER RULE 403 ......................................................................................... 19

III.   PLAINTIFFS CONCLUSORY CRITIQUE OF PROFESSOR ELZINGA'S SUPPLEMENTAL REPORT IS WITHOUT MERIT ................................................ 20

CONCLUSION ...................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................4

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)......................................................................................................3

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)..........................................................................................8

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)...........................................................................................12

*In re Processed Egg Prods. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D.Pa. 2015) .........................................................................14, 16, 18

*In re Se. Milk Antitrust Litig.*,
No. 2:08–MD–1000, 2010 WL 8228885 (E.D. Tenn. Dec. 8, 2010) .............................12, 19

*In re Steel Antitrust Litig.*,
No. 08-5214 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015)...............................................12

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
No. 02-MD-1468-JWL 2008 WL 4382141 (D. Kan. Sept. 26, 2008).......................9, 12, 14

*In re Urethane Antitrust Litig.*,
No. 04-1616-JWL 2012 WL 6681783 (D. Kan. Dec. 21, 2012) ....................9, 11, 14, 17, 18

*Kleen Prods. LLC v. Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015).................................................................................9, 12

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
551 U.S. 877 (2007)......................................................................................................3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)......................................................................................................3

*Petruzzi's IGA Supermarkets v. Darling-Del. Co.*,
998 F.2d 1224 (3d Cir. 1993).................................................................................13, 17

*TC Sys. Inc. v. Town of Colonie, New York*,
213 F. Supp. 2d 171 (N.D.N.Y. 2002) ........................................................................18

ii

## TABLE OF AUTHORITIES
### (Cont'd)

**Page(s)**

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)....................................................................8, 11, 15, 18

**Rules**
Fed. R. Evid. 403 .........................................................................................................2, 19

Fed. R. Evid. 702 ...................................................................................................... *passim*

**Other Authorities**
Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization (4th ed. 2005) ... *passim*

Kenneth G. Elzinga, *New Developments on the Cartel Front*, 29 Antitrust Bull. 3 (1984) ..........11

Federal Judicial Center, *Reference Manual on Scientific Evidence* (2d ed. 2000) .......................13

Donald H. Slavik, 2 *Litigating Tort Cases* § 21:29 ....................................................15

## INTRODUCTION

Plaintiffs' motion *in limine* to limit the testimony of Professor Kenneth G. Elzinga is an unfounded attack on a reliable, objective economic analysis.  Plaintiffs do not dispute Professor Elzinga's qualifications—nor could they—he is one of the most noted scholars of in the field of competition analysis, and a founder of the type of analysis presented here.  And there can be no real dispute that the method Professor Elzinga applied is a sound, well-established part of the scholarly literature on Industrial Organization.  Economic liability analyses, such the analysis employed by Professor Elzinga in this case, are regularly admitted in antitrust cases.  Plaintiffs' arguments go at most to the weight, not admissibility, of Professor Elzinga's opinions and should therefore be rejected.

*First*, contrary to Plaintiffs' insistence that Professor Elzinga used no method for his analysis beyond mere *ipse dixit*, in assessing Plaintiffs' hypothesis of a cartel, Professor Elzinga in fact applied the universally accepted "structure-conduct-performance" ("SCP") paradigm, which is well-established in the literature.  Accordingly, Professor Elzinga studied the structure and competitive interactions in the urethanes industry to determine whether there is "███████ ███████████████████████████████████████████████████████████████ ███████" *See* Ex. A [Elzinga Rpt.] at 29.

*Second*, Professor Elzinga analyzed objectively ascertainable evidence of economic conduct to reach his conclusions.  Plaintiffs misapprehend Professor Elzinga's stated purpose for not analyzing ambiguous "gumshoe" evidence and focusing instead on objective evidence of business conduct, such as observed price movements and their relationship to raw materials costs, demand and volume.  The law is well-settled that it is not the proper role of an economist to parrot one side's view of conflicting documentary evidence.  Unlike Plaintiffs' expert, Professor Elzinga examined the *economic* evidence that he is qualified to assess; this cannot be

construed as a basis for excluding his testimony.  Moreover, as Professor Elzinga explained in his report, it is a fundamental tenet of the scientific method that hypotheses can only be disproven, not proven, and therefore Professor Elzinga analyzed the economic evidence of competition in order to test Plaintiffs' hypothesis that there was a cartel, a proposition that he ultimately rejected.  Notably, Plaintiffs offer no expert opinion criticizing this approach.

*Third*, Plaintiffs offer virtually no reason to support their contention that Professor Elzinga's testimony will somehow be a waste of time for the jury under Rule 403—aside from criticizing Professor Elzinga for not changing his opinion in light of the jury's compromise verdict in the class case, which is a meritless critique because the jury's verdict in the class case is entirely *unrelated* to Professor Elzinga's study of *economic* behavior in the urethanes industry. Indeed, the MDL Court has already held that allowing the jury in this case to hear evidence of the verdict in the class case would create a risk of confusion and unfair prejudice.  In any event, Professor Elzinga concisely explained in his 2014 deposition why the jury's verdict does not change his analysis:  the jury may have reached its verdict through the consideration of non-economic evidence or may have failed to understand the economic opinion Professor Elzinga presented.

*Fourth*, Plaintiffs' two-sentence argument that the Court should limit an opinion expressed in Professor Elzinga's Supplemental Report lacks merit.  Dr. Marx opined that extended profit losses in the urethanes industry would not necessarily cause firms to exit the industry.  In response, Professor Elzinga explained that Dr. Marx's analysis was economically flawed because her statement was based on a temporary state:  "███████████████████████

████████████████████████████████████████████████████████

2

███████" *See* Ex. B [Elzinga Supp. Rpt.] at 12.  This is a valid, economic critique of Dr. Marx's opinion.  The jury should have the opportunity to hear, assess and accept or reject it.

For these reasons and others explained below, Plaintiffs' motion should be denied.

## BACKGROUND

Professor Elzinga "██████████████████████████████████████" that urethanes manufacturers engaged in price-fixing.  *See* Ex A [Elzinga Rpt.] at 1.  In doing so, he followed accepted methods for examining the economic evidence of a cartel, and concluded that the objective, economic evidence does not support Plaintiffs' contention that a urethanes cartel existed.

## I.  PROFESSOR ELZINGA IS AN EMINENTLY QUALIFIED ECONOMIST AND ENGAGED IN A RELIABLE ANALYSIS.

### A.  Qualifications

Plaintiffs do not dispute—nor could they—that Professor Kenneth Elzinga is an eminently qualified economist.  Professor Elzinga is the Robert C. Taylor Professor of Economics at the University of Virginia, where he has served on the faculty since 1967; he has received many honors over the course of his career.  *See* Ex. A [Elzinga Rpt.] at 1-2.  Most of his academic career has been dedicated to teaching and research in the field of antitrust economics. *Id.* at 2.  Professor Elzinga has also served as an economic advisor to the Assistant Attorney General in the Antitrust Division of the Department of Justice, as an economic consultant and testifying expert for both the Federal Trade Commission and the Antitrust Division, and as a special consultant to Judge Lewis A. Kaplan in *In re Auction Houses Antitrust Litigation*.  *Id.* The Supreme Court has favorably cited Professor Elzinga's work in antitrust economics, *see, e.g.*, *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993), and Professor Elzinga was the economic expert in three prominent antitrust cases that went to the

Supreme Court.[1] *Id.* Two of those cases, *Matsushita* and *Brooke Group*, involved allegations of price-fixing.  Professor Elzinga's qualifications cannot be impeached.

**B.      Assignment**

The question confronting Professor Elzinga was whether the objective *economic evidence* would support the inference that a cartel operated in the market for urethanes as alleged by Plaintiffs.  Professor Elzinga made "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"  Ex. A [Elzinga Rpt.] at 2-3.  Professor Elzinga explained that "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[3]  *Id.* at 27-28. Professor Elzinga was clear that where, as here, evidence of a conspiracy is weak and contested, economic analysis is useful to assess whether a cartel was operational.  *See id.* Nevertheless, Plaintiffs claim that "Professor Elzinga admitted that there *is* direct evidence of a cartel in this case[.]"  Pls.' Br. at 20 (emphasis in original).  That is false.  What Professor

---

[1] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Brooke Group*, 509 U.S. at 226; and *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007).

[2] Professor Elzinga noted that an example of such non-economic evidence would be recordings of a meeting between sellers who agreed on prices, which would not require economic expertise to interpret.  *Id.* at 27-28.

[3] "Even conscious parallelism, a common reaction of firms in concentrated markets that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007) (internal citations and quotations omitted).

Elzinga explained in his deposition is that there is ambiguous, non-economic evidence that he is not qualified to assess:



*See* Ex. C [Excerpt of May 3, 2012 Elzinga Dep.] at 84:4-21.  From this explanation of what type of evidence Professor Elzinga feels that he, as an economist, is qualified to assess, Plaintiffs leap to the unwarranted conclusion that Dow's economic expert concedes there is direct evidence of a conspiracy.  *See* Pls.' Br. at 20.

Similarly, Professor Elzinga explained in his report that "



" *Id.* at 9.

Professor Elzinga was thus clear that he would not assess such ambiguous, documentary evidence of conspiracy and that he believed economists have no special expertise in evaluating such evidence.  Professor Elzinga described his methodology as follows:



5

*Id.* at 29.

**C.    Professor Elzinga Concludes that the Economic Evidence Is Contrary to Plaintiffs' Allegations of a Cartel.**

Professor Elzinga concluded that " ███████████████████████████ ███████████████████████████████████████ " Ex. A [Elzinga Rep.] at 11. Put another way, " ███████████████████████████████████████ ██████████████████████████████████████████ " *Id.* at 139. Professor Elzinga reached this conclusion pursuant to the "structure-conduct-performance" paradigm:

- **Market structure.**  The urethanes industry is an oligopolistic industry:  there are high barriers to entry in terms of capital and investment costs and a concentrated number of manufacturers.   Ex. A [Elzinga Rep.] at 26-29. Professor Elzinga explained that this market structure directly impacts market conduct: " █████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ " (especially when price announcements become known to rivals through the trade press or customer disclosures).  *Id.* at 77-78.  Not only are simultaneous pricing announcements not evidence of cartel behavior, but *a fortiori* ineffective pricing announcements that did not result in actual price increases are not consistent with a price-fixing cartel.  *Id.* at 80-90.

- **Conduct.**  Because cartels depend on coordination and disciplining of cheaters, " ████████████████████████████ ████████████████████████ " *Id.* at 28, 60-62.  The differing strategies of the urethanes manufacturers (which entailed undercutting prices and stealing market share of alleged "co-conspirators"), by contrast, were inconsistent with the operation of a cartel.  *Id.* at 29-63.

  In addition, because " ███████████████████████████ █████████████████████████████████████████ ██████████ " to cheat, evidence that that the firms are undercutting one another's prices or stealing market share is inconsistent with the existence of a cartel.  *Id.* at 95.  Here, the record was replete with just such competition.  *Id.* at 95-139 & App'x E.

- **Performance.** The movement of prices, volume, and costs were also contrary to what would be observed in a cartel. Because Plaintiffs cannot show the sustained price increases typical of price-fixing conspiracy claims, Plaintiffs in effect are arguing that "absent the alleged cartel, polyurethane prices would have fallen more than they did." *Id.* at 66. Such allegations would only be plausible if the economic conditions were "███████████████████████████ ████████████████████████████████████████████" *Id.* The evidence was to the contrary on both fronts. *Id.* at 66-76.

## II.    PROFESSOR ELZINGA CRITIQUES DR. MARX'S OPINION THAT PROLONGED PROFIT LOSS WILL NOT LEAD TO MARKET EXIT

Plaintiffs' initial economic expert in this case was Dr. Matthew Raiff. On June 28, 2013, Plaintiffs moved to substitute Dr. Leslie Marx as an expert witness for Dr. Raiff, who at the time was unavailable. *See* MDL Dkt. No. 2931. Dr. Marx submitted an expert report on September 20, 2013, in which she opined, among other things, that because a measure of profits used by Dow's econometric expert Dr. Keith Ugone "████████████████████████████████ ████████████████████████████████████████████" Ex. E [Marx Report] at 32 ¶ 96.

As permitted by the MDL Court's scheduling order, Professor Elzinga submitted a supplemental report responding to the economic issues raised by Dr. Marx and sat for a follow up deposition. MDL Dkt. No. 3007, at 1-2.[4] In response to Dr. Marx's opinion on firm

---

[4] Plaintiffs claim that Professor Elzinga "conceded" during this second deposition that a "jury's verdict ultimately 'trump[s] his own opinions." Pls.' Br. at 6. Of course it does—in the context of the result of a trial. But that says nothing about the validity of Professor Elzinga's opinions. As Professor Elzinga explained, "████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████"

profitability, Professor Elzinga explained that Dr. Marx's analysis was economically flawed because her statement was based on a temporary state: "██████████████████████████

███████████████████████████████████████████████████" *See* Ex. B [Elzinga Suppl. Rpt.] at 12.

## ARGUMENT

## I.     PROFESSOR ELZINGA'S TESTIMONY IS BASED ON SPECIALIZED ECONOMIC KNOWLEDGE THAT WILL AID THE JURY.

The Third Circuit uses of a "trilogy" of criteria—"qualification, reliability and fit"—to assess the admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence. *See Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).  Here, Plaintiffs offer a multifaceted—but ultimately meritless—attack on Professor Elzinga's anticipated testimony.  For the reasons below, Professor Elzinga's analysis is sufficiently grounded in reliable economic theory and will be helpful for the jury to understand the evidence of economic behavior in this case; whether the jury agrees with it is, of course, a matter for trial and not for *in limine* motion.  *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) (admitting economic liability opinion and noting that conflicting evidence is not a basis to exclude an economic expert's testimony).

### A.     Professor Elzinga Reliably Applied The Universally Accepted "Structure-Conduct-Performance" Paradigm In Assessing Plaintiffs' Hypothesis Of A Cartel.

As a threshold matter, Plaintiffs claim that that Professor Elzinga used no method at all in his analysis, and therefore did not reliably apply a method.  *See* Pls.' Br. at 7, 13.  This is simply wrong, and Plaintiffs offer no expert opinion to the contrary.  Plaintiffs also make the erroneous

---

████████████████████████████████" *See* Ex. D [Excerpt of Feb. 26, 2014 Elzinga Dep.] at 32:6-25.

assertion that Third Circuit law always requires a regression analysis—broadly misconstruing applicable case law and disregarding the reliability and validity of economic (as opposed to econometric) analysis.  *See id.* at 3, 16.

### 1. Plaintiffs' Claim that Professor Elzinga Used "No Method" Is Demonstrably False.

As explained above, Professor Elzinga—a pioneer in the economic analysis of oligopolies—applied the well-accepted "structure-conduct-performance" ("SCP") paradigm, as to which there is a vast literature, in assessing Plaintiffs' hypothesis of a cartel—a method that is "generally accepted in the field as material to a determination concerning price-fixing."[5]  *See In re Universal Service Fund Telephone Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 4382141, at *1-2, *5 (D. Kan. Sept. 26, 2008) (Lungstrum, J.) ("*USF*") (economic expert opinion of no conspiracy admissible where expert evaluated only economic evidence including structure of market and economic behavior; court found credible that the method is generally accepted); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL 2012 WL 6681783 at *3 (D. Kan. Dec. 21, 2012) (concluding "that [an SCP analysis] would be helpful to a jury for an expert to put events into an economic context"); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 598 (N.D. Ill. 2015) ("it is a well-accepted practice to look to industry events as a whole to determine whether a defendant's conduct is consistent with collusion, as [the expert] does with his SCP analysis").

The "structure-conduct-performance" paradigm is explained by Professors Dennis W. Carlton and Jeffrey M. Perloff in their widely-used industrial organization text, cited by

---

[5] Using economics to evaluate hypothetical cartel conduct is an unremarkable proposition. Plaintiffs own expert Dr. Marx did just that in her book *The Economics of Collusion, Cartels, and Bidding Rings*.  *See* Robert C. Marshall and Leslie M. Marx, *The Economics of Collusion, Cartels, and Bidding Rings* (Cambridge, MA: MIT Press, 2012) (excerpts attached as Ex. I).

Professor Elzinga in his report.  *See* Elzinga Rpt. App. C at 43.[6]  This approach is one of "two major approaches to the study of industrial organization."  Carlton, at 2.  Under this method, an antitrust economist examines the structure of the relevant market (*e.g.*, whether the market is oligopolistic with high barriers to entry such as the urethanes industry), the conduct of the market participants (*e.g.*, business strategy and pricing behavior), and the economic performance of the industry (*e.g.*, the movement of prices and volume) for a causal explanation of a firm's performance in a market.  *See* Ex. D [Excerpt of Feb. 26, 2014 Elzinga Dep.] at 268:24-271:16.[7]

Here, Professor Elzinga followed these basic principles to examine the question of whether the objectively ascertainable economic evidence was consistent or inconsistent with the Plaintiffs' hypothesis that there was a cartel in the urethanes industry.  *See supra* at 6-7.  In the course of his review of the voluminous record, Professor Elzinga uncovered a pervasive pattern of recurring competition during the conspiracy period alleged by Plaintiffs, which he compiled in

---

[6] Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization (4th ed. 2005) (excerpts attached as Ex. G).  Indeed, Professor Elzinga's analysis of Plaintiffs' allegations of conspiracy is consistent with that of Carlton and Perloff.  For example, (1) cartels are organized to restrict output and raise prices, Elzinga Rpt. at 27; Carlton, at 123-25; (2) cartels give rise to the incentive for cartel members to "cheat" on the agreement, Elzinga Rpt. at 61; Carlton, at 125-27, and (3) controlling and eliminating cheating is essential to the sustainability of a cartel, Elzinga Rpt. at 61; Carlton, at 136.

[7] As Dow explained it its prior *Daubert* briefing, Professor Elzinga's methodology is an example of the "structure-conduct-performance" paradigm.  MDL Dkt. No. 2455 at 10-11.  In reply, Plaintiffs maintained—as they continue to do so here—that Professor Elzinga did not perform such an analysis and cited to deposition testimony where Professor Elzinga expressed the opinion that he did not understand the class plaintiffs' expert, Dr. John Solow, to have conducted a structure-conduct-performance analysis.  MDL Dkt. No. 2532 at 4-5.  Notably, after submitting their briefing in 2012, Plaintiffs had the opportunity to depose Professor Elzinga in 2014.  Despite claiming ignorance of the method employed by Professor Elzinga in 2012, Plaintiffs chose not to ask any foundational questions about Professor Elzinga's methodology in 2014—apparently in an attempt to maintain their ignorance and argue again, without any expert support, that Professor Elzinga's analysis does not conform to their attorneys' understanding of a structure-conduct-performance analysis.  If the Court has any doubt as to the method employed by Professor Elzinga, which it should not, Professor Elzinga is available to provide additional information in a pretrial hearing.  Such testimony is, however, better saved for trial.

his 305-page appendix.  *See* Ex. A [Elzinga Rpt.] at App. E.  Professor Elzinga also reviewed the trade literature covering the urethanes industry, visited the manufacturing facilities of BASF in Wyandotte, MI, interviewed BASF, Huntsman, and Dow employees, and reviewed deposition testimony, documents, and market data.  *Id*. at 4, 9.

Professor Elzinga then applied the well-established economic principles outlined above to express opinions that will be helpful to the jury in this case on several key issues, including: (1) the extent to which price movements were accounted for by demand or input costs, *id.* § IV.B; (2) the extent to which the price increase announcements, alleged by Plaintiffs to be a mechanism of the cartel, accounted for price movements, *id.* § IV.C; (3) the extent to which the urethanes manufacturers had harmonized their strategies, which would make it easier for the alleged cartel to implement agreed-upon pricing and quantities, detect cheating, and punish noncompliance, *id.* § IV.A; and (4) the extent to which the defendants actively competed with one another, as they would not do if the cartel suppressed cheating, *id.* § IV.D-E.  Professor Elzinga's investigation of these topics as described in his report demonstrates that he did in fact reliably apply the SCP paradigm to the facts of this case.[8]

Indeed, it is routine for parties to present the testimony of a liability expert in similar antitrust and price fixing cases.  For example, the class plaintiffs presented the liability testimony of Dr. John Solow to accompany the econometric testimony of Dr. James McClave.  *See In re Urethane Antitrust Litig*., 2012 WL 6681783; *see also ZF Meritor, LLC*, 696 F.3d at 289-90 (approving of economic expert opinion and noting that the "the District Court properly rejected [the opposing party's] argument that [the expert's testimony should have been excluded on the

---

[8] Plaintiffs' argument that Professor Elzinga's application of economic principles is unreliable rests on Plaintiffs' contention that he applied no method.  *See* Pls.' Br. at 13.  That is wrong and Plaintiffs offer no other reason that his application of those methods is not reliable.

basis that it was contradicted by other facts"); *In re Se. Milk Antitrust Litig.*, No. 2:08–MD–1000, 2010 WL 8228885, at *1 (E.D. Tenn. Dec. 8, 2010) (Inman, M.J.) (admitting testimony of Prof. Elzinga); *In re USF*, 2008 WL 4382141, at *1-2, *5 (admitting SCP liability testimony); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. at 598 (admitting SCP liability testimony); *In re Steel Antitrust Litig.*, No. 08-5214 2015 WL 5304629 at *6 (N.D. Ill. Sept. 9, 2015) (admitting SCP liability testimony).  Plaintiffs, however, made the strategic decision not to present the opinion of a liability expert, and Plaintiffs' experts—Dr. Raiff and Dr. Marx—have disclaimed any intent to offer an opinion on liability.  *See* Ex. F [Excerpt of Marx. Dep.] at 581-82.[9]  That was their choice, but it is irrelevant to the admissibility of Professor Elzinga's opinions.

In short, Professor Elzinga's analysis is more than "sufficiently based in principles generally-accepted in the field of economics."  *USF*, 2008 WL 4382141, at *3; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (nothing that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'").  Professor Elzinga's own work has laid the foundation for the now

---

[9] In notable contrast, the class plaintiffs presented their own liability expert and did object to Professor Elzinga's testimony on *Daubert* grounds.  Notably, while Plaintiffs claim that Professor Elzinga is concocting novel made-for-litigation methods of economic analysis, Exhibit I to their initial *Daubert* motion was an article that Professor Elzinga wrote that traces in depth the evolution in the literature (replete with citations) of the very economic principles that Professor Elzinga applies in his expert report.  *See* Kenneth G. Elzinga, *New Developments on the Cartel Front*, 29 Antitrust Bull. 3, 25-26 (1984) (discussing requisites of concurrence, coordination, and compliance in cartels, and the difficulty of proving cartelization given the prevalence of non-cooperative interdependence in oligopolistic markets) (attached as Ex. H).

Plaintiffs also argue that, in their opinion, Prof. Elzinga did not cite to enough scholarly material in support of the method he applied.  Pls.' Br. at 7-10.  Contrary to Plaintiffs' claims, there is no general requirement under Federal Rule of Evidence 702 that an expert report read like a treatise, with every proposition footnoted.  Professor Elzinga is one of the leading lights of the antitrust academy, and he has "████████████████████████████████████████████████████████" Ex. A [Elzinga Rpt.] at 2.

beyond-question economic analysis of collusive behavior, and he has faithfully applied that analysis here. His analysis can and should be admitted.

### 2.     Plaintiffs' Claim That Third Circuit Law *Requires* A Regression Study Is False.

Rather than acknowledging the case law showing that the SCP paradigm is a well-accepted technique for analyzing competitive interactions in the price-fixing context, Plaintiffs erroneously assert that a statistical study is required to offer an opinion on pricing data under Third Circuit precedent. *See* Pls.' Br. at 3, 16. For this proposition, Plaintiffs rely on *Petruzzi's IGA Supermarkets v. Darling-Del. Co.*, 998 F.2d 1224 (3d Cir. 1993). *See id.* In *Petruzzi's*, the Court stated that multiple regression analysis can be a reliable methodology—an unremarkable proposition. *See Petruzzi's*, 998 F.2d at 1238 ("First, we note that the scientific method used by the economists, multiple regression analysis, is reliable."). In *dicta* following this statement, the Court noted that the regression analysis and accompanying testimony in that case would assist the trier of fact to make sense out of otherwise "meaningless" data, which without further analysis could be meaningless to an economist as well:

> Second, and more importantly, the testimony clearly will assist the trier of fact because it makes sense out of pricing data through the use of multiple regression analysis. The data standing alone are meaningless to a lay person. In fact, they are meaningless to an economist until a statistical study is run.

*See id.*

From this off-handed remark, Plaintiffs assert that "Courts in this Circuit allow economists to testify about pricing data only where the expert is needed to help the jury make sense of the data through statistical analysis." Pls.' Br. at 16. But this extreme proposition is devoid of meaningful support, and disregards the reliability of economic analysis in general. For example, the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000)

13

("*Reference Manual*") supports the use of graphs to analyze data, as Professor Elzinga has done to demonstrate visually the inefficacy of price increase announcements. *See Reference Manual* at 110 ("Graphs are useful for revealing key characteristics of a batch of numbers, trends over time, and the relationships among variables.").

Other courts, including the MDL Court, have likewise concluded that there is no blanket requirement for a quantitative or regression analysis in similar cases. *See In re Urethane Antitrust Litig.,* 2012 WL 6681783, at *2 n1 ("[T]o the extent that [a *Daubert* challenge] relies on a qualitative analysis instead of a quantitative one . . .  such a challenge would not succeed . . . . [T]his Court has previous rejected challenges based on a lack of empirical studies as relating to the weight of the evidence and not the admissibility."); *USF*, 2008 WL 4382141, at *3 (rejecting a requirement for economic liability experts to use "some sort of mathematical formula or weighting system in order to render their opinion that, based on the totality of the economic evidence, a price-fixing agreement is indicated"); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 422 (E.D. Pa. 2015) (noting that market characteristics "are appropriate for an economist to opine on, given that economists regularly study the conditions that give rise to collusion" and that an expert's analysis is admissible where it is "based on his economic expertise:  in particular his expertise as to whether actions can be explained by rational self-interest").

## B.    Professor Elzinga Relied On Sufficient Facts and Data.

As noted above, Professor Elzinga conducted significant research into the urethanes industry prior to forming his opinion. *See supra* at 6-7.  Among other things, Professor Elzinga identified and summarized hundreds of instances of competition during the conspiracy period. *See* Ex. A [Elzinga Rpt.] at 95-122 & App. E.  He also examined other objective economic evidence, including the observed price movements and their relationship to raw materials costs,

14

demand and volume, and the economic conduct evidence relied on by Plaintiffs (namely, the various price-increase announcements from urethanes manufacturers). *See id.* at 29-94. This evidence was more than "sufficient" as a basis for his opinions. Fed. R. Evid. 702 (b). *See ZF Meritor, LLC*, 696 F.3d at 290 ("In an antitrust case, an expert opinion generally must 'incorporate all aspects of the *economic* reality' of the relevant market." (emphasis added)).

Plaintiffs' real complaint with Professor Elzinga seems to be that, in their view, he did not adequately consider the ambiguous *non*-economic evidence—evidence Professor Elzinga refers to as "gumshoe evidence." Pls.' Br. at 11-12; Ex. C [Excerpt of May 3, 2012 Elzinga Dep.] at 84:6-85:13. But it would have been inappropriate for him to interpret ambiguous documentary evidence or to evaluate competing issues of credibility as Plaintiffs' experts have improperly done.

In his Report, Professor Elzinga explained that antitrust economists do not have any special skill to opine on non-economic evidence:



Elzinga Rpt. at 29 (emphasis added). In his deposition, Professor Elzinga reiterated that he was aware of the evidence that Plaintiffs contend indicates collusion, and did not dispute its relevance to the jury, but made clear that such evidence was different than his *economic* analysis, *see* Ex. C [Excerpt of May 3, 2012 Elzinga Dep.] at 84:6-85:13, because it is a fundamental tenet of the scientific method that "a hypothesis cannot be proven by the scientific method; a hypothesis can only be disproved." Donald H. Slavik, 2 *Litigating Tort Cases* § 21:29. Therefore, the proper inquiry is to examine whether the evidence is inconsistent with the cartel hypothesis. *See id.* at

15

80:17-81:2.  Ambiguous evidence that is *consistent* with collusion would not prove or disprove

the hypothesis that two parties reached an agreement; rather, an economist can only examine

economic actions and evaluate whether they are consistent or inconsistent with the proposition

that an agreement has been reached.  *See id.*  But where, as here, actors are behaving

inconsistently with the operation of a cartel, the hypothesis should be rejected.  *See id.*; Ex A

[Elzinga Rep.] at 11.[10]

Indeed, courts have recognized that an expert *should not* simply interpret "documentary

evidence" that is "unrelated to … economic expertise."  *See In re Processed Egg Prods. Antitrust

Litig.*, 81 F. Supp. 3d at 421 ("the cases are clear that an economist's testimony is not admissible

where he or she simply reads and interprets evidence of collusion as any juror might, or where an

economist infers intent to collude from mere documentary evidence, unrelated to his or her

---

[10] Contrary to Plaintiffs' claims that Professor Elzinga ignored inconvenient evidence, a review
of Professor Elzinga's report in the context of the specific cartel allegations advanced by
Plaintiffs reveals that he did consider the *economic* evidence in an unbiased and complete
fashion.   Near the beginning of his report, Professor Elzinga reviewed Plaintiffs' actual
allegations that urethanes manufacturers "███████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████"  Ex A [Elzinga Rep.] 9.  He acknowledged Plaintiffs'
allegation that the urethanes manufacturers issued price increase announcements for similar
amounts at about the same time, that these announced increases could not be explained by
changes in demand or the cost of raw materials, and that the defendants gave "false and
pretextual" reasons for their price increases.  *Id.* at 10.  Professor Elzinga then proceeded to
address the *economic* evidence relevant to each of these allegations.  For example, he assessed
the incidence, causes, and economic significance of near simultaneous price increase
announcements, and the effectiveness of the price increase announcements.  *See id.* at 76-90.  He
addressed the question of whether or not the publicly stated reasons for price increases could be
"██████████████████" by assessing whether or not the stated reasons were false.  *Id.* at 90-92 &
App'x D.  And he addressed Plaintiffs' suggestions that swap agreements, joint ventures, and
trade association activities created opportunities for the manufacturers to communicate
improperly or were symptomatic of their having done so.  *See id.* at 118.  Professor Elzinga
explained how each of these activities can play an efficiency enhancing (*i.e.*, pro-competitive)
role in the market, so they would not be an appropriate basis upon which to infer the existence of
a cartel.  *See id.* at 118-123.

economic expertise"); *In re Urethane Antitrust Litig.*, 2012 WL 6681783 at *3 (noting that an expert may not "simply and impermissibly lend an expert imprimatur to plaintiffs' position on disputed facts"). Here, Professor Elzinga has expressly relied upon the economic evidence that he is competent to examine, as an expert. Nor do Plaintiffs identify any economic evidence that Professor Elzinga purportedly overlooked.

At this stage, this Court need only determine whether Professor Elzinga arrived at his opinion in accordance with the standards of the economics profession. This standard has been easily met, particularly where Plaintiffs have come forward with no expert testimony or other basis to conclude that Professor Elzinga's opinion is fatally flawed. *See Petruzzi's*, 998 F.2d at 1238 (faulting opponents of expert testimony that had failed to come forward with any contrary expert opinion that a study's methodology was fatally flawed).

    **C.**    **Professor Elzinga's Testimony Will Assist the Jury.**

        **1.**    **Professor Elzinga's Review of Market Prices, Analysis of Price Increase Announcements, And Evidence of Competition Will Aid the Jury as Part of His Overall Economic Analysis.**

In an apparent effort to ignore the obvious force of Professor Elzinga's overall analysis, Plaintiffs seek to exclude portions of his analysis as nothing more than attorney argument. In particular, Plaintiffs' seek to exclude four components of Professor Elzinga's analysis that bear on central issues of whether the economic evidence is consistent or inconsistent with collusion: (1) Professor Elzinga's review of market-wide prices, (2) Professor Elzinga's opinion that price increase announcements were ineffectual, (3) the stated reasons for price increase announcements were consistent with economic evidence, and (4) Professor Elzinga's identification of evidence that is inconsistent with the operation of a cartel. Pls.' Br. at 13-19.

In attempting to excise portions of the analysis, Plaintiffs offer no principled basis or expert opinion to support their contention that these areas are not proper components of an SCP

17

analysis.  Indeed, there can be little dispute that an expert may permissibly bring economic expertise to bear to place evidence in context for a jury.  *See, e.g.*, *ZF Meritor, LLC*, 696 F.3d at 290 (approving of economic liability opinion and rejecting argument that expert "failed to employ any recognized or reliable economic test for determining whether [the party's] conduct harmed competition and caused antitrust injury"); *In re Urethane Antitrust Litig.*, 2012 WL 6681783 at *3 (admitting expert that would allow a jury to consider events in an economic context); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d at 424-25 (admitting expert testimony that was "consistent with orthodox economic theory as to when collusion can and does arise" and specifically citing the "well-accepted" structure-conduct-performance method); *TC Sys. Inc. v. Town of Colonie*, *New York*, 213 F. Supp. 2d 171, 183 (N.D.N.Y. 2002) (finding that expert's methodology based on structure-conduct-performance paradigm . . . "is grounded in accepted methods or procedures of economic analysis").

## 2.  Professor Elzinga Is Not Offering Testimony on the Standard of Proof.

Plaintiffs also argue that Professor Elzinga's standard for rejecting the hypothesis of collusion is inconsistent with the ultimate legal burden in this case.  Pls.' Br. at 2, 14.  However, as another court remarked in rejecting a similarly unfounded claim that "Dr. Elzinga is using an impermissible legal standard regarding the level of proof necessary to prove a conspiracy":

> Professor Elzinga is an economist, not a lawyer.  He is not going to offer testimony on the standard of proof necessary to prove whether a conspiracy exists.  Instead, in this regard, he is going to point to facts and evaluate them from an economic perspective.  The District Judge will instruct the jury on the applicable law.  His expert testimony will be helpful to the jury.  They may not believe him, or they may disagree with the factual assumptions which underlie his opinions.  But no basis exists under *Daubert* or the applicable Rules to exclude his testimony at this juncture.

18

*In re Se. Milk Antitrust Litig.*, No. 2:08–MD–1000, 2010 WL 8228885, at *1 (E.D. Tenn. Dec. 8, 2010) (Inman, M.J.).[11]   Here, Professor Elzinga's analysis will assist the jury in evaluating whether the economic evidence is consistent or inconsistent with Plaintiffs' cartel hypothesis—not whether Plaintiffs have met their ultimate legal burden, or what that burden is, which are matters for counsel and, of course, ultimately the Court.

## II.   PROFESSOR ELZINGA'S TESTIMONY SHOULD NOT BE EXCLUDED UNDER RULE 403.

Because Professor Elzinga's analysis is grounded in well-accepted economic principles that have been reliably applied to the facts of this case, his analysis will be helpful to the jury. Nevertheless, Plaintiffs argue that Professor Elzinga's testimony will be duplicative and a waste of time for the jury because Professor Elzinga purportedly "admitted" that there is direct evidence of a conspiracy and that an economist's role is "minimal" where there is direct evidence.  Pls.' Br. at 20.  But Professor Elzinga has made no such "admission," and Plaintiffs' claim is a distortion of the record.  *See supra* 7-8 n. 5.

In addition, Plaintiffs argue that because the jury in the class case found liability for some unstated period of time between November 2000 and December 2003, *see* MDL Dkt. No. 2799 (Verdict Form), Professor Elzinga will be subject to "significant" cross examination for not changing his opinion in light of the class verdict,  Pls.' Br. at 20 n.8.  However, the MDL Court has already concluded that the jury's verdict in the class case should not be disclosed in this case. *See* MDL Dkt. No. 3111 at 11.  Moreover, as Professor Elzinga has already explained, the jury's verdict does not alter the validity of his economic analysis.  *See supra* 7-8 n. 5.

---

[11] Indeed, Plaintiffs' argument that an expert's analysis must match the applicable legal standard would all but eviscerate the requirement that expert testimony "be evaluated by reference to the 'knowledge and experience' of that particular field."   Advisory Committee Notes to Fed. R. Evid. 702 (citing Standards and Procedures for Determining the Admissibility of Expert Testimony after *Daubert*, 157 F.R.D. 571, 579 (1994)).

### III. PLAINTIFFS CONCLUSORY CRITIQUE OF PROFESSOR ELZINGA'S SUPPLEMENTAL REPORT IS WITHOUT MERIT.

Finally, Plaintiffs make a passing argument that Professor Elzinga cannot "corroborate" the opinion of Dow's econometric expert, Dr. Keith Ugone.  But Professor Elzinga is not "corroborating" Dr. Ugone's opinion; to the contrary, Professor Elzinga has offered an economic critique of Plaintiffs' expert, Dr. Marx.  In particular, in response to Dr. Marx's opinion that profit losses in the urethanes industry would not necessarily cause firms to exit the industry, Professor Elzinga explained that Dr. Marx's analysis was economically flawed because her statement was based on a temporary state: "███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████."  *See* Ex. B [Elzinga Supp. Rpt.] at 12.  This is a valid, economic critique of Dr. Marx's opinion, permitted by the MDL Court's order on substitution.  MDL Dkt. No. 2974.

## CONCLUSION

Because Professor Elzinga's testimony reliably applies accepted economic principles of oligopolistic competition and expected cartel behavior to an exhaustive array of *objective* economic facts, it is admissible "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue[,]" Fed. R. Evid. 702(a).  Plaintiffs' motion should be denied.

Respectfully submitted,

Dated: September 30, 2015
Newark, New Jersey

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545

David M. Bernick (*admitted pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599

*Attorneys for Defendant*
*The Dow Chemical Company*

21

**CERTIFICATE OF SERVICE**

On September 30, 2015, a copy of the foregoing was served on all counsel of record via

ECF.

/s/ Daniel J. McGrady
Attorney for The Dow Chemical Company