UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | Master Docket No. 08-5169 (WJM)(MF) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION *IN LIMINE*
TO PRECLUDE EVIDENCE AND ARGUMENT
RELATING TO PLAINTIFFS' FINANCIAL CONDITION**

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
(973) 994-1700

Jeffrey M. Johnson
Richard J. Leveridge
Elaine Metlin
James R. Martin
Adam Proujansky
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ............................................................................................................................. 1

LEGAL ARGUMENT ...................................................................................................................... 3

I.     THE URETHANE CHEMICALS MARKET DOES NOT INCLUDE DOWNSTREAM MARKETS FOR PRODUCTS THAT MAY INCORPORATE URETHANES CHEMICALS AS INGREDIENTS ............................................................ 3

II.    DOW FAILED TO MEET ITS BURDEN OF ESTABLISHING RELEVANCE .............. 5

III.   DOW SHOULD BE PRECLUDED FROM INTRODUCING ANY FACTS OR ARGUMENT THAT RAISE A DANGER OF UNFAIR PREJUDICE, UNDUE DELAY, WASTING TIME, OR NEEDLESSLY PRESENTING CUMULATIVE EVIDENCE ........................................................................................................................ 7

CONCLUSION ................................................................................................................................. 8

## **TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*Apartment Source, L.P. v. Phila. Newspapers, Inc.*, 1999 WL 349938 (E.D. Pa. May 21, 1999) .................................................................................................................. 4

*Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140 (E.D. Pa. 1976) ....................................................... 6

*Demodulation, Inc. v. Applied DNA Sciences, Inc.*, 2012 WL 6204172 (D.N.J. Dec. 12, 2012) ................................................................................................................ 1, 4

*Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469 (3d Cir. 1985) ............................................... 4

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ................................. 3, 6, 7

*Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) ................................................................................ 6

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ........................................................... 4

*In re Bulk (Extruded) Graphite Products Antitrust Litig.*, 2006 WL 891362 (D.N.J. Apr. 4, 2006) ...................................................................................................... 6

*In re Homestore.com, Inc.*, 2011 WL 291176 (C.D. Cal. Jan. 25, 2011) ....................................... 7

*In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001) ................................... 4

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), *abrogated by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ............................................... 4

*N. Jackson Pharm., Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740 (N.D. Ill. 2005) ................................................................................................................................. 4

*New York ex rel. Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848 (E.D.N.Y. 1993) ............................................................................................................................... 4

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998) .................................................. 4, 6

*Town Sound & Custom Tops., Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992) ............................................................................................................................. 2, 4

*United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956) ........................................ 4

*United States v. Gillen*, 599 F.2d 541 (3d Cir. 1979) .................................................................... 7

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) ............................................ 4

*Vaughn v. Target Corp.*, 2015 WL 632255 (W.D. Ky. Feb. 13, 2015) .......................................... 7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)............................................7

**RULES**

Fed. R. Evid. 403 ...................................................................................................................7

**INTRODUCTION**

In its use of the phrase the "urethanes industry" in its Brief in Opposition to Plaintiffs' Motion *In Limine* to Preclude Evidence and Argument Relating to Plaintiffs' Financial Condition [hereinafter "Opp'n"], Dkt. 135, Dow misleadingly conflates separate markets:  (1) the market for urethane chemicals (TDI, MDI, and Polyether Polyols) that Plaintiffs *purchased*, which is the market that has consistently been referred to in this case as the "urethanes market" and (2) the downstream markets in which Plaintiffs *sold* products, such as foam products, some of which incorporated urethane chemicals as an ingredient.  The Court is abundantly familiar with the concept of "relevant markets" in the antitrust context and should quickly see through Dow's obfuscation.  *See, e.g.*, *Demodulation, Inc. v. Applied DNA Sciences, Inc.*, 2012 WL 6204172, at *7 (D.N.J. Dec. 12, 2012) (Martini, J.) (explaining definition of a "relevant market").  The issue in this case is whether Dow fixed prices in the market for urethanes chemicals, *i.e.*, the urethanes market — in which Plaintiffs were buyers, not sellers.

Confirming the adage that no good deed goes unpunished, Dow also mischaracterizes Plaintiffs' position during meet-and-confer discussions as to what evidence *would* be relevant. In an effort to avoid having to file this motion, Plaintiffs offered to stipulate to the admissibility of evidence that Dow said it wanted to introduce regarding Plaintiffs' "purchasing power."[1] Plaintiffs' offer to stipulate stated that "purchasing power" evidence (which Plaintiffs referred to as "market power") would be deemed relevant.  Rather than agree to Plaintiffs' sensible proposal to put a dispute to rest, Dow seized on Plaintiffs' phraseology to further muddy the waters with

---

[1]   In its Statement of Contested Facts, Dow asserted it would show that Plaintiffs are "all very different," their "transactions with the various urethanes suppliers and with Dow varied," and during negotiations Plaintiffs attempted to use their "purchasing power" to invite their urethane chemical suppliers to compete.  Final Pretrial Order § 4(B), Def. Dow Chemical Co.'s Statement of Contested Facts ¶¶ 16-18, Dkt. 84.

its confusing "urethanes industry" construct. Dow's insincere and clumsy assertion that Plaintiffs "concede" the relevance of their "market power" in the "urethanes industry" both wastes this Court's time and undermines Plaintiffs' ability to trust that Dow will negotiate future trial issues in good faith.

Building on its own obfuscation, Dow argues that it should be permitted to indirectly prove Plaintiffs' "market power" in the "urethanes industry" — again conflating the relevant urethanes market and the irrelevant downstream markets — through evidence of Plaintiffs' profitability. Opp'n at 4. Although Dow bears the burden of establishing relevance and admissibility, it never explains what fact a plaintiff's power in this combined "urethanes industry" would tend to show — let alone why it needs to show this through a circuitous argument about Plaintiffs' supposed "profitability."

Dow does not articulate a theory of relevance because there is none. The cases on which Dow relies all discuss a *defendant's* "market power" in the "relevant market," terms of art used to describe elements of proof for plaintiffs in monopolization and "rule-of-reason" cases. This is very different from Plaintiffs' use of the phrase in meet-and-confer discussions in the non-technical sense of negotiating power in the market for urethane chemicals. The cases on which Dow relied are thus inapposite. Indeed, as used in the judicial opinions cited by Dow, a defendant's "market power" is irrelevant in horizontal price-fixing cases such as this one, which is "condemned with no inquiry at all into market structure or the activity's actual effect or possible justifications" because "the challenged conduct has so little chance of being economically beneficial and so great a likelihood of being economically harmful that inquiry into market structure and real world effect is not worth the cost." *Town Sound & Custom Tops., Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992). The "market power" concept

discussed in these cases is even more plainly irrelevant when a defendant seeks to apply it to a plaintiff's conduct in a price-fixing case, as Dow seeks to do here.

Plaintiffs make and sell hundreds of products, from bowling balls to car parts and gasoline additives. Some of these products incorporate urethane chemicals and some do not. Opening the door to irrelevant "profitability" evidence for each Plaintiff would be needlessly time-consuming, and would unfairly prejudice Plaintiffs by suggesting that they earned their profits (for those Plaintiffs that were profitable) by "passing on" to their customers the overcharges they paid to Dow and its co-conspirators, an argument that is barred by *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 488 (1968).

## LEGAL ARGUMENT

### I. THE URETHANE CHEMICALS MARKET DOES NOT INCLUDE DOWNSTREAM MARKETS FOR PRODUCTS THAT MAY INCORPORATE URETHANES CHEMICALS AS INGREDIENTS

Plaintiffs in their motion *in limine* exposed the obvious errors and improper purpose underneath Dow's attempts to conflate the markets for (1) urethanes chemicals (TDI, MDI, and Polyether Polyols) purchased by Plaintiffs from Dow and its co-conspirators and (2) downstream markets for products that Plaintiffs sold, some of which incorporated urethane chemicals as an ingredient. *See* Pls.' Br. Supp. Mot. *In Limine* To Preclude Evidence and Argument Relating to Pls.' Financial Condition, Dkt. 105-1. Undeterred by Plaintiffs' showing, Dow's Opposition continues to refer to the "urethanes industry" as if Dow and Plaintiffs all competed in the same product market. Opp'n at 3-7.

Dow engages in this obvious fiction because it provides the illusory foundation necessary for it to argue such absurdities as the assertion that Plaintiffs "concede" the relevancy of their power "in the urethanes industry," *i.e.*, the downstream markets combined with the urethanes market; and that "courts and commentators consider profitability to be one way to assess a

3

participant's market presence or power" — relying on inapposite cases regarding a defendant's "market power" in a "relevant market," not a plaintiff's power in a downstream market. Opp'n at 4-5. Indeed, Dow's argument is so brazen that it hardly seems worth pointing out that antitrust law defines the boundaries of a "relevant market" by "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Demodulation, Inc.*, 2012 WL 6204172, at *7. Market definition, however, does not matter in cases of naked horizontal price fixing, because such conduct is considered so reprehensible and devoid of redeeming virtue. *See, e.g.*, *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir. 1985); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 359 (D.N.J. 2001); *New York ex rel. Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 870 n.63 (E.D.N.Y. 1993). That is why all of Dow's authorities involve a defendant's "market power" in cases involving alleged monopolies,[2] "tying" claims,[3] or "rule-of-reason" cases[4] where the plaintiff had to establish the defendant's market power to

---

[2] Opp'n at 4 (citing *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 378 (1956) (defendant denied that it lacked monopoly power because it did not have the power to control price in, or exclude competitors from, the relevant market); *Apartment Source, L.P. v. Phila. Newspapers, Inc.*, 1999 WL 349938, at *2 (E.D. Pa. May 21, 1999) (defendant lacks monopoly power in a relevant market)).

[3] Opp'n at 4. As noted above, the first of these cases makes clear the difference between "tying" and naked horizontal price fixing. *Town Sound & Custom Tops., Inc.*, 959 F.2d at 474, 477 (defendant denied that plaintiffs could prove it had "economic power in a properly defined tying product market"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 (1984) (defendant denied it possessed market power in hospital market), *abrogated by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

[4] Opp'n at 4 n.2 (citing *United States v. LSL Biotechnologies*, 379 F.3d 672, 696-97 (9th Cir. 2004) ("rule of reason" case in which the court, in dicta, wrote "Although a participant can exercise market power either as a seller or as a buyer, it is usually defined from the point of view of the seller: Market power is the seller's ability to raise and sustain a price increase without losing so many sales that it must rescind the increase."); *N. Jackson Pharm., Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 749-50 (N.D. Ill. 2005) (refusing to apply *per se* rule to alleged ancillary restraints and finding that pharmacy benefits manager lacked market power to be held liable under rule-of-reason)).

meet its burden of proof. None of those cases involved allegations that a plaintiff's market power was relevant to any issue in dispute.

Once Dow's sleight-of-hand regarding its conflation of the urethanes market and downstream markets, and its misleading use of the term "market power," are exposed, it is readily apparent that Dow cannot show that evidence of Plaintiffs' "profitability" from the sale of products in downstream markets has any relevance to Plaintiffs' power to negotiate with sellers in the urethanes market. Dow's only answer to the numerous cases that Plaintiffs cited in their *in limine* motion showing that courts routinely exclude evidence regarding a plaintiff's financial condition is relegated to a footnote and the tautological assertion that the Court should distinguish those cases because the evidence there was not relevant but in this case it is. Opp'n at 6-7 n.3. Dow offers literally zero legal support for its position.

## II.   DOW FAILED TO MEET ITS BURDEN OF ESTABLISHING RELEVANCE

Dow's relevance argument relies on the following chain of assertions, each link of which suffers from insurmountable flaws: (1) Plaintiffs were supposedly profitable in the "urethane industry;" (2) Plaintiffs' asserted profitability "is indicative of their market presence and thus their negotiating power;" (3) Plaintiffs "concede" that "market power" is highly relevant in an antitrust case; and (4) therefore Plaintiffs' profitability is highly relevant. *Id.* at 7-8.

The focus on Plaintiffs' profitability in the first link fails to account for the fact that Plaintiffs comprise a group of companies that sold hundreds of different types of products. Plaintiff Skypark, for example, made bowling balls, pool and spa filters, automotive bumpers, hood scoops, handles, and doors. Similarly, Plaintiff Lubrizol made chemical additives for engine oils, industrial lubricants, gasoline and diesel fuel, and polymers. It should also be recognized that not every Plaintiff was profitable throughout the conspiracy period. Thus, delving into any Plaintiff's "profitability" would be an incredibly time-consuming task.

5

In fact, one of the primary reasons the Supreme Court barred the "pass on" defense is because a cartel victim's profitability could be affected by any one of a number of issues, for example by increasing sales volume or decreasing other costs, that did not justify the judicial time and expense of evaluating such factors. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 725 (1977); *see also Hanover Shoe*, 392 U.S. at 489 (noting "as long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows" and "whatever price the buyer sells, the price he pays the seller remains illegally high").

As shown above, Dow's use of the terms "urethanes industry," "market" presence, and "market" power are vague, misleading and intentionally overbroad.  And Dow offers no reason to believe that the jury could fairly draw any relevant inference about a Plaintiff's bargaining power as a buyer of urethane chemicals from its "profitability" or "presence" in downstream markets for bowling balls and the like.  To the contrary, all urethane chemical buyers relied on just a handful of producers for supply, and the cartel agreements stripped those buyers of some measure of their "negotiating power."

Finally, Dow never actually connects the would-be links to fashion a plausible theory of relevance.  At one point, it argues that each Plaintiff's profitability will somehow show whether that Plaintiff was "impacted" by the conspiracy.  Opp'n at 7.  In a footnote, though, Dow says that profitability evidence will show whether Dow "intended to fix prices." *Id.* at 7 n.3.  Neither conclusory argument can withstand scrutiny.

In price-fixing cases, a plaintiff suffers "impact," also known as "injury in fact," if at any time it paid more than it otherwise would have paid as a result of the conspiracy. *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, 2006 WL 891362, at *11 (D.N.J. Apr. 4, 2006); *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 149 (E.D. Pa. 1976); *see also Rossi*, 156 F.3d at

6

483. Inquiry beyond this "minimum point" goes only to the amount of damage. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).  Final Pretrial Order § 4(A), Pls.' Statement of Contested Facts ¶¶ 542-45. All of this evidence arises from the confines of the urethane chemicals market only. As for intent, Plaintiffs must show only that Dow joined or formed the conspiracy. *United States v. Gillen*, 599 F.2d 541, 544 (3d Cir. 1979) ("Price fixers do not even approach 'the gray zone of socially acceptable or economically justifiable business conduct.'" (citation omitted)). A Plaintiff's profitability or financial condition has nothing to do with either of these issues.

### III. DOW SHOULD BE PRECLUDED FROM INTRODUCING ANY FACTS OR ARGUMENT THAT RAISE A DANGER OF UNFAIR PREJUDICE, UNDUE DELAY, WASTING TIME, OR NEEDLESSLY PRESENTING CUMULATIVE EVIDENCE

If logic and the law were not enough, the Court should apply Fed. R. Evid. 403 to preclude defendants from introducing any facts or evidence that could arguably implicate "pass on" issues or detour the trial into time-consuming and unnecessary examinations of Plaintiffs' profitability. *Vaughn v. Target Corp.*, 2015 WL 632255, at *3 (W.D. Ky. Feb. 13, 2015); *In re Homestore.com, Inc.*, 2011 WL 291176, at *1 (C.D. Cal. Jan. 25, 2011); *see also Hanover Shoe*, 392 U.S. at 489. Whether or not Dow would explicitly argue that Plaintiffs passed on the overcharges to their own customers, there can be no doubt that the jury would be prone to drawing that inference.

7

In addition, the sheer magnitude of time and energy that would be required to delve into each Plaintiff's profitability independently justifies exclusion of this evidence. Assuming that a particular Plaintiff's "negotiating power" would be relevant, Dow would have more direct and less unfairly prejudicial ways to show this.

## CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' original brief, Plaintiffs respectfully request that the Court grant their motion *in limine* and exclude evidence and argument relating to Plaintiffs' financial condition.

        CARELLA, BYRNE, CECCHI,
        OLSTEIN, BRODY & AGNELLO
        *Attorneys for Plaintiffs*

        By:   /s/ James E. Cecchi
              JAMES E. CECCHI

DATED: October 15, 2015

Jeffrey M. Johnson
Richard J. Leveridge
Elaine Metlin
James R. Martin
Adam Proujansky
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
Tel: (202) 420-2200
Fax: (202) 420-2201

*Attorneys for Plaintiffs*