UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE URETHANE ANTITRUST LITIGATION** | Civ. No. 2:08-5169 (WJM-MF) |
| | **OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

This is an antitrust action in which Plaintiffs accuse The Dow Chemical Company ("Dow") of colluding with other businesses in order to artificially inflate the prices of urethane chemicals. This matter comes before the Court on Plaintiffs' motion *in limine* to limit the testimony of one of Dow's expert witnesses, Dr. Kenneth G. Elzinga. For the reasons stated below, Plaintiffs' motion will be **DENIED**, subject to the Court reserving its decision on whether Dr. Elzinga may opine on assessments made by the parties' damages experts.

## I. BACKGROUND

Dr. Kenneth G. Elzinga is the Robert C. Taylor Professor of Economics at the University of Virginia, where he has served on the faculty for nearly 50 years. Elzinga Rpt. at 1. Dr. Elzinga's academic career has focused on the field of antitrust economics, and he has served as an antitrust expert in various capacities. *Id*. at 2. Moreover, Dr. Elzinga has published numerous articles on antitrust issues and other issues bearing on the study of law and economics. *Id*., App'x A at 3-9. In connection with this case, Dow tasked Dr. Elzinga with "offer[ing]…an assessment of the economic conduct of the defendants and a determination as to whether their behavior is consistent with the operation of a cartel or instead squares with independent, head-to-head competition." *Id*. at 3. According to Dow, Dr. Elzinga employed the following framework when approaching this task:

> To determine a cartel's existence, an antitrust economist must find evidence of business conduct that cannot be explained as the result of non-cooperative interdependent behavior. Absent such evidence, the inference of a cartel agreement [as alleged by plaintiffs] should be rejected. Sellers responding unilaterally to actions (actual or anticipated) by their competitors is not evidence of a cartel.

*Id*. at 29.  Dr. Elzinga based his analysis on a variety of sources, including trade literature covering the urethanes industry, visits to the facilities of suppliers, testimony and documents produced in the discovery, and of course, his own knowledge concerning antitrust economics.  *See id*. at 4.  However, Dr. Elzinga relied on only "economic evidence"; he did not analyze "gumshoe evidence," meaning he did not seek to deny or confirm the factual allegations that Dow and other urethane producers reached secret price-fixing agreements.  He instead analyzed the structure of the urethanes market and then sought to determine whether the economic behavior of suppliers was consistent with the existence of a price-fixing cartel.  *See id*. at 29-60.  Additionally, he sought to determine whether the urethanes market experienced the type of pricing movements that one would expect to see where suppliers have agreed to fix prices.  *See id*. at 63-94.  Below is a brief description of the factors that guided Dr. Elzinga's analysis and conclusions.

With respect to "economic behavior," Dr. Elzinga assessed strategic business approaches taken by different urethane suppliers and concluded that his findings were not consistent with the existence of a cartel.  Specifically, he noted that urethane suppliers embraced divergent business strategies in their pursuit of success in the urethane market.  While one supplier sought to maximize margins by cutting undesirable customers, a different supplier sought to increase profitability by rapidly expanding its customer base.  *See id*. at 30-43.  Dr. Elzinga then opined that the divergent business strategies adopted by urethane suppliers "renders the operation of a cartel more difficult and its existence less plausible."  *Id*. at 29.  Additionally, Dr. Elzinga's report notes that urethane suppliers were competitively vying for customers, which is also inconsistent with the existence of a price-fixing conspiracy.  *See id*. at 95-112.  For example, Dr. Elzinga noted that the alleged conspirators would undercut each other's prices in order to lure customers.  *See id*. 95-106.  Similarly, Dr. Elzinga found that internal communications reveal that urethane producers strove to increase their market shares at the expense of their competitors.  *See id*. at 111-12.  According to Dr. Elzinga, such behavior is characteristic of an actively competitive market, not a price-fixing cartel.  *See id*. at 29.

Dr. Elzinga also opined that price movements in the urethanes market were not consistent with the existence of a price-fixing conspiracy.  *See id*. at 63-74  He reached this conclusion after noting that urethane prices did not experience the type of sustained increase that one would typically expect in the presence of a cartel.  Dr. Elzinga also anticipated the argument that other factors, notably the cost of raw materials, could be the culprit for price stagnation, and that prices would have been even lower were it not for collusive conduct.  In response, Dr. Elzinga analyzed the costs of certain raw materials linked to the production of urethanes, and concluded that the lack of price increases in urethanes could not be attributed to factors such as a reduction in costs and/or demand.  *See id*. at 90.  Dr. Elzinga also opined that the timing of price announcements did not reveal a conspiracy, but instead was consistent with the existence of an oligopolistic market in which suppliers will promptly respond to the actions of their competitors.  *See id*. at 76-80

("Where there is a limited number of competitors producing the product at issue, an announcement of price increase by one will quickly catch the attention of the others and will, as a matter of recognized competition theory, be likely to result in similar announcements"). Finally, Dr. Elzinga concluded that the suppliers' stated reasons for price increases were not false or pre-textual, and instead were consistent with real-world conditions affecting the urethanes market. *See id*. at 90-94.

In determining that the economic evidence did not point to the existence of a conspiracy, Dr. Elzinga also considered the structure and composition of the urethanes market. *See id*. at 27,29, 127-38. He repeatedly emphasized that the urethanes market is an oligopoly in which a supplier's "pricing decisions may be in reaction to the price and output decisions of its rivals." *Id*. at 27. Because oligopolistic firms face few competitors, they can act as "price-makers" and enjoy some discretion in the prices they charge. *Id*. Most importantly, while it is true that an oligopoly will often rule out "perfect competition," it does not necessarily follow that a conspiracy is afoot. In other words, the report explains, "competition among the few" is not the same thing as collusion. *Id*. In the backdrop of that principle, Dr. Elzinga concluded that the economic evidence is not consistent with the presence of a cartel; instead, it merely supports the unremarkable proposition that urethane suppliers operated under non-cooperative oligopolistic conditions. *See id*. at 131-39.

Plaintiffs now move to limit the scope of Dr. Elzinga's testimony. Specifically, Plaintiffs contend that while Dr. Elzinga should be permitted to testify regarding the structure of the urethanes market, the remainder of his testimony, *i.e.*, the portions related to economic behavior and pricing trends, should be ruled inadmissible.

## II.   RULE 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Therefore, under Federal Rule of Evidence 702, expert testimony will be admissible only if it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The proponent of expert evidence must demonstrate its admissibility by a preponderance of the evidence. *Id*. at 593 n. 10.

The Supreme Court has held that when determining whether expert testimony is reliable, courts may consider (1) whether a theory or technique "can be (and has been) tested;" (2) "whether the theory or technique has been subject to peer review or publication;" (3) "the known potential rate of error;" and (4) whether there is "general acceptance" in the methodology in the relevant scientific community. *Daubert*, 509 U.S. at 593—94. However, "[t]he factors drawn from *Daubert*…are neither exhaustive nor applicable in every case." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) (citations and quotations omitted).

In serving the "gatekeeper function" and assessing the reliability of an expert's methodology, the Court must be mindful that in order to be admissible, a scientific method need not be the "best" method or one that is demonstrably correct. "Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000) (citing *Kannankeril v. Terminix International Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *see also Daubert*, 509 U.S. at 588 (Rule 702 embraces the "liberal thrust" of the Federal Rules of Evidence). Accordingly, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Here, Plaintiffs do not appear to seriously challenge Dr. Elzinga's qualifications. Instead they argue that Dr. Elzinga's opinion (1) is based on an unreliable methodology; (2) ignores pertinent facts; and (3) would not be helpful to the jury. The Court addresses those argument in turn.

### A. Dr. Elzinga's Methodology

Plaintiffs first contend that Dr. Elzinga's report is not based on any methodology whatsoever, let alone a methodology that meets the standards of *Daubert*. The Court disagrees. Dr. Elzinga sought to determine whether the economic evidence was consistent with the existence of a cartel by analyzing the following: (1) the composition of the urethanes market, (2) the economic behavior of suppliers, and (3) trends in urethane prices. As Dow points out, Dr. Elzinga's approach tracked the "structure-conduct-performance" paradigm that other courts have accepted in the past. *See, e.g., Kleen Prods. LLC v. Int'l Paper,* 306 F.R.D. 585, 598 (N.D. Ill. 2015); *TC Systems Inc. v. Town of Colonie, New York,* 213 F.Supp.2d 171, 182-83 (S.D.N.Y. 2002). Most notably, Dr. Elzinga's proffered testimony bears great resemblance to the expert opinion offered in *In re Processed Egg Products Antitrust Litig. (In re Processed Egg Products)*, 81 F.Supp.2d 412, 424-25 (E.D.Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion or an entity or individual's self-interest…."). In that case, the district court admitted testimony of an economist who applied his expertise to determine whether the economic evidence was consistent with the presence of a price-fixing cartel.

4

81 F.Supp.2d at 418. Specifically, the expert examined the scope of the relevant market, the market share held by relevant suppliers, barriers to entry, and the opportunity for suppliers to instill discipline and punish those who deviate from the alleged price-fixing agreement. *Id*. at 422. Also like Dr. Elzinga, the expert in *In re Processed Egg Products* used his economic expertise to opine on whether pricing trends and economic conduct of suppliers were characteristic of collusion. *Id*. at 422-23. Just as the expert testimony was found to be reliable in *In re Processed Egg Products*, the Court finds Dr. Elzinga's testimony to be reliable here.

Moreover, the Court rejects Plaintiffs' argument that Dr. Elzinga's testimony should be limited simply because he did not use the magic words "structure-conduct-performance" when describing his methodology. *See TVIIM, LLC v. McAfee, Inc.*, No. 13-cv-04545-HSG, 2015 WL 414 8354, *3 (N.D.Cal. Jul. 9, 2015) ("But Plaintiff cites to no authority requiring experts to use [] magic words…in order to save themselves from *Daubert* exclusion, and the Court is not aware of such authority.") In light of the Court's discussion of Dr. Elzinga's report in the background section of this opinion, as well as the points touched upon in the foregoing paragraph, it is readily apparent that Dr. Elzinga reached his opinion after applying a structure-conduct-performance paradigm. His report unequivocally demonstrates that he examined the structure of the urethanes market, the conduct of suppliers, and the performance, *i.e.*, pricing trends, of urethane sales during the conspiracy period. Simply put, the Court is concerned with substance, not form; and in this case, it is satisfied that the substance of Dr. Elzinga's methodology meets the requirements set forth in *Daubert*.

### B. The Facts and Data that Formed the Basis of Dr. Elzinga's Opinion

Plaintiffs also argue for exclusion on the grounds that Dr. Elzinga's report is self-serving in that it ignored evidence pointing to the existence of collusion. In support of their position, Plaintiffs note that Dr. Elzinga failed to consider, among other things, testimony from a former Dow employee accusing Dow of engaging in price-fixing and documents showing that Dow and its competitors exchanged confidential information.

The Court rejects Plaintiffs position. The evidence that Plaintiffs accuse Dr. Elzinga of ignoring is largely non-economic evidence from which a jury could potentially infer the existence of a conspiracy. However, Dr. Elzinga's report makes clear that his opinion relies solely on economic evidence. The Third Circuit has similarly recognized the distinction between economic evidence and non-economic evidence in antitrust cases. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (distinguishing between economic and non-economic evidence, and noting that in an antitrust case "[t]he most important evidence will generally be non-economic evidence 'that there was an actual manifest agreement not to compete.'" (citing *In re High Fructose Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002)). Here, Dr. Elzinga was concerned with economic evidence, such as whether urethane suppliers adopted parallel business strategies or

5

whether urethane pricing history reflects competition rather than collusion. He did not concern himself with the kind of non-economic evidence that, for example, supports allegations of unscrupulous backdoor meetings; nor did he rely on testimony concerning firsthand knowledge of price-fixing arrangements. While the narrowly tailored approach adopted by Dr. Elzinga may go to the weight of his testimony, it does not serve as a grounds for exclusion. *Cf. Steff v. Home Depot, Inc.*, No. 1:06-CV-02227, 2008 WL 5189505, *5 (M.D.Pa. Dec. 10, 2008) (limitations in scope of expert report goes to weight of testimony, not admissibility). Similarly, even if some of the evidence on record did arguably undermine Dr. Elzinga's opinion, exclusion would still not be warranted in this case. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 289-90 (3d Cir. 2012) (expert testimony may be admissible even where it is contradicted by other facts).[1] Moreover, when Plaintiffs' theory of the case did implicate economic evidence, Dr. Elzinga offered his view on why such evidence did not invariably point to the existence of a cartel. For example, Dr. Elzinga noted that while Plaintiffs have pointed to swap agreements as evidence of a cartel, such agreements may have been put in place for reasons unrelated to a price-fixing conspiracy. Elzinga Rpt. at 118-20.

For the reasons stated above, the Court concludes that Dr. Elzinga relied on sufficient facts and data when forming his opinion.

### C. Whether Dr. Elzinga's Opinion Would Help the Jury

Plaintiffs also contend that Dr. Elzinga's opinion would not be helpful to the jury. Couching their argument in terms of "fit," Plaintiffs contend that Dr. Elzinga's testimony does not speak directly to the issues in this case and will likely mislead the jury. "When considering fitness, the court must conclude that the expert's testimony assists the trier of fact and is 'relevant to the task at hand.'" *See, e.g., Dymnioski v. Crown Equip. Corp.*, Civ. No. 11-3696, 2013 WL 2297035, *4 (D.N.J. May 24, 2013) (citations omitted). For the reasons that follow, the Court concludes that Dr. Elzinga's opinion would help the jury in this case.

First, the Court rejects Plaintiff's argument that Dr. Elzinga should be prohibited from testifying about urethane prices. Plaintiffs' primary objection to such testimony appears to be that Dr. Elzinga did not perform a statistical analysis and instead merely "eyeballed" general trends reflected in the pricing data. However, while Dr. Elzinga may have not conducted the type of econometric regression analysis performed by the parties' damages experts, Plaintiffs' characterization of Dr. Elzinga's methodology is oversimplified. Dr. Elzinga did not merely observe the data and casually conclude, without any foundation, that price announcements were ineffectual. Rather, he first explained why, based on his economic expertise, he would expect price announcements to "stick" where there is a functioning price-fixing cartel. *See* Elzinga Rpt. at 62-63. He then offered his assessment that the economic evidence did not support the finding of sustained price increases, even after taking into

---

[1] Plaintiffs cite no authority supporting their suggestion that the jury verdict against Dow in the class case somehow affects the admissibility of Dr. Elzinga's testimony.

account changes in the cost of raw materials. *See id*. at 68-73. The Court therefore concludes that Dr. Elzinga's testimony regarding urethane prices would be helpful to the jury.

Second, the Court does not believe that Dr. Elzinga's testimony would confuse the jury. Plaintiffs argue that Dr. Elzinga's methodology imposes a higher burden for finding the existence of a conspiracy than does the legal standard applicable to civil antitrust cases. Specifically, while Dr. Elzinga sought to determine whether there was economic evidence that could be explained only by the existence of a conspiracy, a jury may find an antitrust violation where a conspiracy is "one reasonable inference to be drawn from the totality of the evidence…" Mt to Limit Dr. Elzinga at 2 (citing *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)). However, Dr. Elzinga does not purport to opine upon whether Plaintiffs can meet their legal burden for proving an antitrust violation, nor does he seek to offer his interpretation of the Sherman Act. He offers his opinion solely from an economic perspective, not a legal one. This case is therefore distinguishable from instances where an expert seeks to opine on "the ultimate legal conclusion" or "the law or legal standards." *See, e.g., Berckeley Inv. Grp., Ltd.*, 455 F3d 195, 217 (3d Cir. 2006) (expert permitted to testify regarding customs and practices that may implicate legal duties so long as she does not testify as to what is actually required under the law).[2] *See also Patrick v. Moorman*, 536 Fed.Appx. 255, 258 (3d Cir. 2013) (citations omitted). Consequently, the Court finds that Dr. Elzinga's opinion is admissible under Rule 702 and *Daubert*.

### III.    RULE 403

Plaintiffs argue that even if Dr. Elzinga's testimony is admissible under Federal Rule of Evidence 702, it should nonetheless be limited under Federal Rule of Evidence 403. However, "if expert testimony survives the rigors of Rule 702 and 703, then Rule 403 becomes an unlikely basis for exclusion, especially in the pretrial setting." *See Pertruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1239 (3d Cir. 1993) (citing *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990). Moreover, Rule 702 already contemplates the risk of unfair prejudice, which means that exclusion under Rule 403 in this case would have to be based on something else, such as "confusion of the issues or waste of time." *See id*. (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). For reasons already explained, the Court finds that Dr. Elzinga's testimony would be helpful to the jury and would not cause confusion. Therefore, the testimony is admissible under Rule 403.

### IV.    TESTIMONY REGARDING DAMAGES EXPERTS

Plaintiffs also object to a portion of Dr. Elzinga's supplemental report concerning Dow's damages expert, Dr. Ugone, and Plaintiffs' damages expert, Dr. Marx. Specifically, Dr. Elzinga voices agreement with Dr. Ugone's analysis of Dow's profitability while disagreeing

---

[2] Plaintiffs reserve the right to argue for a jury instruction indicating that it is the sole province of the Court to explain the governing law to the jury.

with Dr. Marx's analysis of that same issue. Elzinga Suppl. Rep. at 11-12. Because Dr. Marx is in Plaintiffs' case-in-chief and will therefore take the stand before Dr. Elzinga, a preliminary ruling on this issue would be premature. *See Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Group, Inc.*, Civ No.05-3362(GEB), 2007 WL 1659056, at *4 (D.N.J. June 5, 2007) (declining to rule on admissibility of expert opinion until it had become clear on how the expert's opinion would be used). The Court will reserve on whether and to what extent Dr. Elzinga will be permitted to opine on assessments made by the parties' damages experts.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion to limit the testimony of Dr. Elzinga is **DENIED**. However, the Court will reserve its decision on whether Dr. Elzinga may opine on assessments made by the parties' damages experts. An appropriate order accompanies this decision.

      /s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: January 14, 2016**