IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Civil No. 2:08-cv-05169(WJM)-MF

- - - - - - - - - - - - - -x
IN RE URETHANE ANTITRUST   :   TRANSCRIPT OF PROCEEDINGS
LITIGATION                 :      - Daubert Hearing -
- - - - - - - - - - - - - - x

Newark, New Jersey
January 13, 2016

B E F O R E:

THE HONORABLE WILLIAM J. MARTINI,
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, PC
BY:  JAMES E. CECCHI, ESQ.
     - and -
DICKSTEIN SHAPIRO LLP
BY:  JEFFREY M. JOHNSON, ESQ.
     JAMES R. MARTIN, ESQ.
     LINDSEY H. TAYLOR, ESQ.
     RICHARD J. LEVERIDGE, ESQ.
     ALLISON M. VISSICHELLI, ESQ.
Attorneys for Plaintiffs

GIBBONS P.C.
BY:  DANIEL J. McGRADY, ESQ.
     - and -
DECHERT LLP
BY:  DAVID M. BERNICK, ESQ.
     CAROLYN M. HAZARD, ESQ.
     WILLIIAM T. McENROE, ESQ.
Attorneys for Defendant

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above entitled proceedings.

S/WALTER J. PERELLI

WALTER J. PERELLI, CCR, CRR
Official Court Reporter

INDEX

OPENING REMARKS
    By Mr. Martin..............page 4
    By Mr. Bernick.............page 14

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LESLIE M. MARX | | | | |
|   By Mr. Martin | 56/167 | | – | |
|   By Mr. Bernick | | 92/171 | | – |
| | | | | |
| KEITH R. UGONE | | | | |
|   By Mr. Bernick | 149 | | 164 | |
|   By Mr. Martin | | 158 | | – |

CLOSING REMARKS
    By Mr. Martin..............page 177

Procedural Discussion..........page 192

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

January 13, 2016

THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning, everyone.  Please be seated.

MR. JOHNSON:  Good morning.

MR. MARTIN:  Good morning.

THE COURT:  Again, good morning.

This is the matter of in re Urethane Anti-Trust Litigation.

Could I have the appearance of counsel, please, for the Plaintiffs?

MR. CECCHI:  Good morning, your Honor.  James Cecchi, Carella Byrne, on behalf of the Plaintiffs.  And I'll let my colleagues from Dickstein Shapiro introduce themselves, who will be handling the majority of the presentation.

MR. JOHNSON:  Good morning, your Honor.

THE COURT:  That's Mr. Johnson?

MR. JOHNSON:  Yes.

THE COURT:  Hi.  Okay.  And Mr.?

MR. MARTIN:  Mr. Martin.

THE COURT:  Martin, okay.

MR. MARTIN:  James Martin.

THE COURT:  And if you would get used to using the microphones.  If you have to, pull them closer to you if you have to.

Thank you.  And for --

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

MR. JOHNSON:  Your Honor, Mr. Leveridge and Mr. Taylor and Allison Vissichelli from our office are here today as well.

THE COURT:  All right.

Who is going to be handling the matter for the plaintiff primarily?

MR. MARTIN:  I am, your Honor.

THE COURT:  Mr. Martin?  Okay.  Thank you.

And for the Defense.  Mr. Bernick is it?

MR. BERNICK:  Yes, thank you very much, your Honor.  David Bernick for Dow.  And with me from Dechert are William McEnroe and Carolyn Hazard.  And I will be handling the matter this morning.

THE COURT:  Good morning.

Just by way of a little background, the purpose of today's hearing is to have a Daubert hearing regarding the motion made by defendant to preclude the expert witness of the plaintiff, Ms. Marx.

The matter has been extensively briefed and I compliment all of you for the detail and the insightfulness of the briefs, so we're familiar with the issues that are presented in the briefs.

However, I thought I'd give you an opportunity in a limited way to highlight any of the issues you feel are important to highlight to the extent it would assist the Court.  So that's the purpose of today's hearing.

And I've limited it as you know by way of letter to two hours on each side, however you wish to utilize the time. We'll keep track of the time.  We'll have a little flexibility if we need it, but I thought that would also help you get to the points that you feel are most helpful perhaps to the Court. That time would include any opening remarks you wish to make, or in your cross, your direct, your cross and any closing remarks you wish to make.

And the burden is on the plaintiff to go forth first, you have the burden to establish reliability, so we'll ask you to go forth at this point.

MR. MARTIN:  Thank you, your Honor.

Do you mind if I use the podium?

THE COURT:  No, I wish you would.  Thanks.

MR. MARTIN:  I am going to have a handful of slides.

THE COURT:  All right.

MR. MARTIN:  There should be four copies for you.

THE COURT:  There are copies?

MR. MARTIN:  There should be four copies.

THE COURT:  Okay.  You can proceed, counsel.

MR. MARTIN:  Thank you.

There are two things I'd like to address before we get started with Dr. Marx's testimony.  First, to give you just a quick road map of what she's going to testify about so you have a sense of what she's going to say and the order in which she's

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

going to say it, in case you have any questions it might help to inform you about when to ask those questions. I'm also going to try to address some legal issues, primarily those that arose after the filing of the Daubert motions which was at issue almost two years ago. So there have been some intervening events that we wanted to bring the Court up to date on.

As a preliminary housekeeping matter, I had hoped for today before Dr. Ugone testifying is have Dr. Marx testify. She would do her affirmative presentation, explain why she came up with the opinion she came up with, and then have Dr. Ugone testify. And to the extent that she has any responses to what she hears Dr. Ugone say, I would like to reserve some time to allow her to come back up on the stand and answer some questions from the Court and explain for herself what she heard from Dr. Ugone. I think that might be more efficient than her trying to anticipate all of the criticisms that were in the briefs in her affirmative testimony.

Would that be acceptable?

THE COURT: Well, it is.

Is it acceptable to Mr. Bernick?

MR. BERNICK: That's fine. That's fine.

THE COURT: Okay. Then that's fine.

MR. BERNICK: I'm assuming that if there's something that is new that's raised by Dr. Marx as well, that we would

have the opportunity --

THE COURT:  Yes.

MR. BERNICK:  -- to at least ask your Honor if it would be appropriate to respond?

THE COURT:  Yes, that's fine.

MR. MARTIN:  So, with that background, Dr. Marx, just to outline what she's going to be talking about, she is going to provide the Court with all her qualifications, a sense of her qualifications, give a sense of why you should credit her testimony, and give a background of her background in economics and econometrics.

THE COURT:  I don't think that's in question, her qualifications as an expert.

MR. BERNICK:  It is not.

THE COURT:  So don't use your time that way.

MR. MARTIN:  I think we will do it briefly just to get the sense of what --

THE COURT:  Okay.

MR. MARTIN:  Okay.

She'll explain why economists and econometricians use models in general, not just in price-fixing cases;

She'll explain why after forecasting models of her choice, why a two-stage model makes sense, and that's the model that was used in this case;

She'll explain why the before-and-after forecasting

model was a good choice; why a two-stage model makes sense;

She'll talk about how the model was developed; how the benchmark period was chosen to include data from a competitive period; how the explanatory variables were chosen and provide the best estimate of pricing behavior; why the models is highly reliable and it's structural in the sense that it does isolate the conspiracy as the cause of higher prices paid by the plaintiffs.

She'll talk then about how the transaction level model works.  That's the second stage of this model.  How it computes plaintiff's specific damages on a transaction-by-transaction basis, and how it accounts for plaintiff-specific factors such as bargaining skill and negotiating leverage; and

Then she'll follow up with an explanation of how she used standard economic principles to form her opinion on impact, and then show how the real world facts support her opinion and rebut the criticisms by Dow's expert which are, in large part, fact-based criticisms.

So that's what we expect Dr. Marx to talk about.  The hope is it will be about 45 minutes to 55 minutes subject to the Court's questions.

With regard to the legal issues -- I have a time line here -- we find ourselves in sort of a unique situation where this is a case on remand from an MDL case where there has been a class trial on a parallel case, it's a subset of this case.

That trial went to verdict.  It has been affirmed by the Tenth Circuit and we have a substitute expert who came into this case late.  She's subject to a Substitution Order, and we've had motions to strike by both sides, one of which was granted and one of which was not.  And the motion that was granted regarding Dr. Ugone I want to spend a few seconds talking about because it really permeates the issues that Dow has raised in its Daubert motion.

They have argued throughout their motion that Dr. Marx or Dr. Raiff, her predecessor, should have included express variables other than capacity or identified alternative causes or not use the process of elimination.  These are all arguments that were raised for the first time by Dr. Ugone in his supplemental expert report.  When Dow filed its Daubert motion, at the same time it filed a motion to strike Dr. Marx on the ground she went too far.

The court denied that and found that Dr. Marx did not exceed the Substitution Order.  We at the same time filed our motion to strike saying Dr. Ugone's opinions are too late and should not be part of this case.  And the MDL court granted that motion in its entirety.  And, in fact, I'm not sure if the Court has a copy of it but --

THE COURT:  You're talking about the Order of May 16, 2014?

MR. MARTIN:  I'm talking about the Order.  And what

the Order did is it actually adopted --

THE COURT:  Judge Lungstrom.

MR. MARTIN:  Yeah, Judge Lungstrom.  He adopted the appendix that we supplied.  It's an interlineated version of the supplemental report.  I have copies if the Court would like to have it.

THE COURT:  That's okay, I have his Orders.  Go ahead.

MR. MARTIN:  Well, the Orders expressly refer to and incorporate this by reference, so I have these available if the Court wants them.  And I'm hoping and assuming that Dr. Ugone will not testify inconsistent with those stricken opinions.

And the reason the stricken opinion matters is because while we bear the burden of proof of establishing disability, it's understood that in a regression analyses it's up to the party challenging our regression to come up with something more than attorney argument to show that a variable should have been included and it would have made a difference.

The Linerboard case which we cited heavily is one of those cases that makes that clear.  It cites a Supreme Court case called Bazemore.  But the point is, to say a regression model is fundamentally flawed so badly that you can't present it at trial, that you need to come forward with some evidence to say it would have made a material difference.  Without those stricken opinions Dow does not have that.

Now, in preparing for today's hearing I was reading

Opening Statement by Mr. Martin                    10

through Dow's Reply, and what I noticed was an awful careful avoidance of the Linerboard case.  Linerboard is on all fours with this case.  It's a model that was very similar to this model.  It was challenged on virtually the same grounds: Questions about the variables, questions about whether it could attribute damages to conduct as a whole, whether close prediction of prices is a sufficient measure of reliability.

There was a hearing in which Dr. White, Bates White, testified, and the ruling really dealt with and dispensed with many of the arguments that again are in Dow's motion.  The court in Linerboard found, for example, omitting tainted variables is scientifically valid; this whole question about whether an economist will exclude capacity is variable in these kinds of models.  That was at issue in Linerboard, and the court found that made sense.

The reduced form equation; that's a phrase that's used to refer to a way to develop a model where each independent variable doesn't have to have a specific significance so long as all the variables working together as a whole provide a good prediction of prices.  That's a slightly different way of doing things, but the court found that is a standard way and an acceptable way to develop an econometric model.  The Linerboard court also found that essentially the same model, a before-and-after predictive model was structural in that it did isolate the conspiracy as the cause of harm to the plaintiffs.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

And, finally, the Linerboard court found that the process of elimination that Dow claims was unusual is scientifically valid and it is not unusual.

The next set of cases that have at least in part arisen between the filing of these motions today involved the Class case.  And the Class case, again, the court has dealt with many of the same issues that Dow has raised in its opposition -- or in its motion.  I'm sorry.  The court there was faced with arguments by Dow that the statistician, Dr. McClave, cherry-picked variables and used them just to come up with an overcharge.  And the court rejected that under the same logic that the Linerboard court rejected it and the Bazemore court rejected it.  You have to do more than just point to variables.  Variable selection goes to weight, not to admissibility.

The MDL court ruled that the 2004 period didn't have to be in the conspiracy period, it could be in the benchmark. The MDL court found, and the Tenth Circuit found that it was sufficient for a model to attribute harm to a single price-fixing conspiracy as a whole rather than to specific acts within that conspiracy.  And the Tenth Circuit had the benefit of actually dealing with that in the context of Comcast which defendants have raised as one of their core arguments.  And the Tenth Circuit also found -- or the district court found that dummy variable models are not required, experts can use

whatever model happens to makes sense at the time.

The last issue I wanted to touch on before Dr. Marx testifies is causation.  Dow's motion reads as if it's a summary judgment motion, as if Dr. Marx is supposed to come in and provide all of the evidence of causation in this case.  And that's just wrong.  Dr. Marx will provide some evidence of causation, but their record is going to contain a lot more than that.

These are factors that are actually taken from the Tenth Circuit decision in the Urethanes case and it identifies the evidence of causation that will come in independent of Dr. Marx.  Admissions by industry insiders; collusive behavior; susceptibility of the industry to collusion; testimony that manufacturers sometimes used announcements to avoid price decreases; some price announcements were partially or fully accepted.  This is all straightened out in the Tenth Circuit opinion.  This is the evidence that will also come in in this case.

And then the Tenth Circuit also found that the model results in that case was Dr. McClave, but again, it's an econometric model.  It provided some evidence both of liability and causation.  It's not up to Dr. Marx, it's not up to us today to show that Dr. Marx's testimony will in and of itself establish causation; it is of course relevant to that task.

In many ways the questions that Dow is raising are

going to come from the record.  Dow wants evidence that the price increase announcements were successful.

What we have in the record are actually price announcements.  It's a stipulation among the parties what price announcements will be in this case by which defendants, at which time, in which amounts.  We also have in the record defendants' data which tells us what the prices were.

So this chart shows you the prices, the top line of TDI over the conspiracy period, it also shows you the price announcements at issue that were issued over that time period.

The jury can look at this and decide whether or not the price increase announcements were successful or not, and if so, during what time periods.

Dr. Marx who provides that bottom line has a prediction of what prices would have been will testify that the impact that plaintiffs suffered were because the prices were higher than they would have been in the absence of a conspiracy, and she'll explain to you in detail how she came to that conclusion.

But this whole idea that she has to come up with some econometric opinion to show the price increase amounts were successful, I think that's not necessary, it's not expert testimony.  It's one of our issues with Professor Elzinga.  So I want to have that in the Court's mind as she testifies.

Thank you.

Opening Statements by Mr. Bernick                14

THE COURT:  Thank you.

MR. MARTIN:  Thank you.

THE COURT:  Thank you, Mr. Martin.

All right.  Mr. Bernick.

MR. BERNICK:  We had printing problems this morning, your Honor, so we've got a couple more copies that are in the process, but that's for the Court (handing up documents).

THE COURT:  Okay.  Thank you.

MR. BERNICK:  Your Honor, as -- are we set up to go on this?

Great.

So, in terms of what we'd like to try to accomplish this morning, I'm probably going to be a little bit longer.  I know I'm going to be longer than Mr. Martin was in his remarks because they're in a sense -- there's a lot of ground that we would like to cover, and it's a very difficult model.

We'll obviously then be happy to ask questions of Dr. Marx, and then we'll be calling Dr. Ugone, as Mr. Martin indicated, to focus on some particular issues.  So I'm going to do more of the overview.  Dr. Ugone is going to focus on very particular issues.  And part of the reason for that actually goes to one of the points that Mr. Martin just made, and that is, what happened with respect to the timing of the expert work in the case.

So it is true, there was one expert, Dr. Raiff, and

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

then he became -- for a variety of reasons Dr. Marx stepped into his shoes. During a time just prior to that we became involved in the case -- I had not been involved previously -- and there were a series of issues that we wanted to pursue in the Class case but were really not able to pursue because the expert reports were closed. So when it came to the opt out cases, we were very interested in pursuing these other matters.

Because of the substitution we did have the opportunity to examine Dr. Marx at some length, and in the course of that deposition we were able to pursue many of the issues that we think are very important to understanding the model case. Dr. Ugone then incorporated some of what Dr. Marx had acknowledged in a supplemental report.

The court, the class action court decided, Judge Lungstrum decided that that report was out of time because we could have anticipated these issues originally. And so it's true that there are portions of -- most of Dr. Ugone's report was stricken. However, our brief relied in principal part on his first report. There's not too much in the second report that we depend upon.

In essence, most of the arguments that Dr. Ugone addressed in his supplemental report were already covered with Dr. Marx in the deposition. So part of the reason I'm standing up and doing a lot of the work here is a lot of what I'm going to tell you actually comes from the examination that we were

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                16

able to conduct of Dr. Marx.  And Dr. Ugone will not be testifying to the matters that have been stricken.  We recognize that.  So that's the little bit why my part is a little bit longer and Dr. Ugone's is a little bit shorter. It's not for want of the support and record, it's just that the support does come from the cross-examination of Dr. Marx.

I'd like to start out then in my overview dealing a little bit with what I think is the core question that we suggest that the Court should address here.  And in contrast to most Daubert proceedings where you kind of end up with a very dry recitation of reliability requirements and fit requirements, we're going to get to those.  But the overwhelming issue that we think pervades this model -- and this model is different from the other models, including the Linerboard model, and we will have a little chart here when it arrives of why this model is different -- there is no such thing as a single format for these models.  They are all somewhat different, and the differences make a big difference. And so when you -- when your Honor hears about other decisions, the devil is truly in the details.  In fact, some of the experts who have been very instrumental on the plaintiffs' side in developing these forecasting models have said:  Every single model is different.  And your Honor is going to see how even in the Foam case which was litigated on similar issues in Toledo, the experts on the plaintiffs' side have now changed how they

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

do these models specifically as a result of the Comcast decision.

Your Honor is considering a last generation model when you consider this model.  Things have changed for precisely the reasons that we pursued actually originally in the Class case and have pursued here, which have to do with the fit between what the model does and the actual facts of liability.  That was huge in Comcast.  The plaintiffs' bar and their experts, have definitely reacted to this.  And the model that you're seeing here has now been abandoned.  So we're dealing with a little bit of history here.

I focus on this question though, because just thinking about being here before your Honor today and contemplating a trial on March the 7th, I think that this is ultimately the biggest issue.  It's not the technical issues, although we are going to go through the technical issues, it is coming to grips with the fact that you just can't get around, and that is that expert testimony is first and foremost designed to assist the trier of fact, to facilitate their work.  And if it doesn't do that there's no right to have a statistical model in this case.

The issue is the other way around, which is:  Does the statistical model actually help?

And in this case our fundamental position is that this model impedes the ability of a jury to actually conduct their own assessment.  That's what the jury has to do.  They're not

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick          18

supposed to take anybody's word for it, they're supposed to make their own assessment.

And so I'm going to ask a question at the end after your Honor hears all of this:  Does anyone really believe that a lay jury is going to understand this model to the point of doing their own assessment on some of the issues that we're going to cover?

THE COURT:  How would they do their own assessment without the assistance of an expert --

MR. BERNICK:  Yes.

THE COURT:  -- as to what the prices would have been but for the conspiracy?  How do they do that without that assistance?

MR. BERNICK:  Well, exactly.  So, sure, experts could provide the assistance.

THE COURT:  Okay.

MR. BERNICK:  That's not the -- we're not saying that this kind of exercise couldn't be useful; it could be.

THE COURT:  Okay.

MR. BERNICK:  It is that the model in this case in the way it's being used by Dr. Marx does not facilitate the jurors' understanding to the point that they can actually deal with the merits of the model.

This model is so complex and the fit problems and the reliability problems are so profound, your Honor I think will

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                 19

assess at the end of the day -- you've got your very able clerks and your Honor yourself -- is that a lay jury, after all the testimony is done, are they really going to be in sufficient command of these key issues that they can discharge their function?

And I think that the answer to that is "no" for the following three basic reasons:

One.  This model, this model does not go from front to back.  It's backwards.  Typically -- and this is what Comcast requires.  Comcast actually says the following, and we'll have a little slide on this:  The first step -- not the second step -- the first step in the damages study is the translation of the legal theory of the harmful event -- harmful event -- translated into an analysis of the economic impact of that event.

This model was not developed on the basis of taking that first step.  This model worked backwards.  It worked from a damage calculation methodology backwards to the idea that this actually is related to liability, and it never actually got to liability.  It never got back to the harmful conduct.  It dealt a lot with the purported impact but it never got back to the harmful conduct.  And that's the key thing about this antitrust law by reason of requirement.  But for cause there has to be damage that flows from the wrongful act.  That's where you begin.  This model does not begin with it.  It does

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

not.

And the other cases that have been cited do, including Foam; Foam begins with the wrongful conduct, the harmful conduct injury and traces it through.

This model goes exactly the opposite way. That's why all the charts that we submitted in the briefs look backwards, because they're beginning with the benchmark period in a damage structure and they're seeking to go backwards to link it up to the liability even though the liability conduct is not even in the model. That is a fundamental problem.

Number two. Because of the way that this is structured, this model suggests that if you find this variance in the model, well, the only answer has got to be that there's anti-competitive conduct. And this encourages the jury -- this is why these are so successful in front of a jury -- the jury is not going to understand the details of this model by and large. And I've tried many, many cases over the years -- and I know your Honor has as well -- realistically, are they going to understand the model? I think they'll understand it in part, but not completely.

But this model, because it finds that variance and says, oh, there's a variance, there must be something going on, ends up being a proxy for a finding of liability. Liability here turns on a lot of details: Individual price increase announcements, meetings, telephone calls. The little chart

Opening Statement by Mr. Bernick                21

that Mr. Martin showed makes it all seem like it's uniform.
It's chock full with individual facts.  The jury has to
struggle through those issues, and it's not easy.

The model says:  Don't work.

We now know that we've run the computer, we've got the
variance, there must have been something bad.  And the details
you'll learn about.  But the model gives -- that is exactly
what the model should not do.  Damages are derivative, they're
not the benchmark for whether there was liability or not.

And this particular expert, Dr. Marx, hasn't even done
a liability analysis, has no liability opinions, doesn't
express any views even on what the actual conspiracy was.  So
she is not equipped to take anything out of the model and
actually say it's traceable.  As Comcast says:  Must be
traceable; flows from; translates into; that it's traceable
back to specific conduct.  She can't do it and she'll admit it
here this morning.

Number three.  At the end of the day after the dust
all settles -- everything that I just said, do we expect the
jury is going to get it?  I'm an enormous believer in juries.
I've tried lots of cases where you kind of wonder whether
people are going to get it.  I think that they get it and I
think that the Class jury got it, in part, except one critical
thing which we'll come back to at the end which is also a
problem in this model.  I think that for the jury to understand

Opening Statement by Mr. Bernick                22

what I just said, that you've got a model that's backwards, that it has to go back and tie up the variances, is the jury really going to understand that point?  Maybe.  But I have a lot of doubts.  I've got a lot of doubts, and that gets back to the fundamental question.

And again, you're talking to somebody who -- I believe in the jury system.  The point that -- oftentimes I would rather have a jury than a Judge.  Why?  With all respect to the Court, the jury has no particular sense of what their agenda is, they come to it fresh.  I love juries.  But this model, this model is a model that I don't believe should come before a jury.

So let me get to some basic facts.

If we could go forward to Slide 3.

And what I'm going to get to with these facts really addresses this issue of directionality; what comes first, what comes second.

So we have an alleged price-fixing conspiracy, 10 years.  The operative evidence that's at the heart of this is that there is evidence of coordinating price increase announcements, trying to make them stick over a 10-year period.  My price trend here comes right out of the expert report for the other side.  That's not our trend, that's their trend.  And this is for TDI which I'll talk about pretty consistently.

The next slide, 4.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

The key are the price announcements, the price increase announcements.  They're the vehicle for the alleged conspiracy, and they're indicated here by little red flags.  Those essentially, including their dimensions, indicates the amount of the increase that's being announced.

And now we come on Slide 5 to an important concept that in the Class trial was -- and it was my fault because I got in very close to the event and I don't think that we prepared the jury enough for this.  These price increase announcements are letters and they all say the same thing to every single customer.  They say:  We want to raise TDI, for example, by ten cents a pound.

Now, there may be 2400 customers as there were in the Class case.  Every one of those customers negotiates an individual price through a contract or purchase order.  Why is it that the letter says the same thing to everybody?

The answer is that the letter is really directional.  It says:  We, the supplier, would like to take our prices up.

There is no actual price in the letter.  That actual price, ten cents more, means something that's different for every single customer because it works off of the baseline, and the baseline is the carryover from the last -- from the last contract.  So because the contracts are variable when they're finalized, if you say ten cents as this indicates, if you're starting out with a 75-cent contract or a 60-cent contract or

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

62 cents, it means a different actual price. The actual price is not in the letter. Then of course -- so it translates into different total prices for the same customer, same product; that is, same kind of customer, same product, they're different prices.

The effective date comes along and now you have a negotiation. Maybe you don't get 10 cents, maybe you get two, maybe you get nothing. Whatever it is, the final result will be a function of the actual negotiation, not the price increase announcement. That's a statement that we want to go up. The actual negotiation produces the price.

And if their theory were correct, actually what this really says is, by all of the suppliers saying 10 cents, 10 cents, 10 cents, you know, it somehow says, well, everyone is going to do better is actually not true. Because the people who start out in a less competitive position with the higher prices, people who are charging more, they'll end up charging more if they stick with the 10 cents and they'll be disadvantaged by sticking with the 10 cents.

So the price increase announcement is itself a complicated variable that has to be accounted for in the damage calculation. Why? Because the wrongful conduct at issue is the price increase announcement and trying to stick to it. That's the wrongful conduct. This is not an agreement on a table of actual prices. This is they say an agreement. They

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

have the same increase and then, quote, stick to it.  Of course anybody who wanted to get a price increase for business reasons would also want to stick to it.

But if they're going to isolate wrongful conduct, you need to know what that wrongful conduct is and how damages or loss flows from it.  The beginning point again under Comcast is, and under the antitrust statute by reason of, is always, always, always the wrongful conduct.  The piece of the conduct that's wrongful.

Going forward.  Some basic facts again.  Mr. Martin showed a chart that said, well, here's the price curve and here are all the announcements and he showed the but-for curve.

This is the same price curve.  TDI is on top as he showed.  This makes a very simple point, which is that we begin against a backdrop where you don't have some huge price rise.  Instead, if you go at the beginning of the period and you draw a straight line -- I just drew this last night, there's no statistics to it -- you just draw a straight line from the beginning point to the endpoint and you just draw a line.  And what this will tell you, of course, is that if there's really a big rise and you can see the conspiracy at work, you ought to see a hump.  And you don't see that hump.  You see kind of a mixed performance over time.

Next slide.

By contrast, this is what happened in the Vitamins

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                        26

case.  You can see how if you did a straight line test you'd end up with a very, very different picture.

Next slide.

These are also again basic things.  Just before you get to any models, just focus on the actual prices.

This shows if you take MDI not TDI and you simply differentiate the prices that are charged by year for all of the supplier, by all of the suppliers to all of the plaintiffs here, you get these price runs.  And you can see it is far from this case that everybody is kind of walking around with the same price.  That's just not the way this industry operated.

Next slide.

If you tease out the percentage differences from the median, that is, how much these prices deviated from a percentage point of view, you can see these prices are all over the map.  These people are undercutting each other, they're taking different positions in the marketplace.

If you take Slide 10, the changes, that is, the degree or nature of the changes in any year, the different colors represent what's happening with different suppliers.  And you can see that some of this goes down, some go up a lot, some of them go up a little bit.  You don't have -- if the price increases were all the same, the same, the same, you ought to see them popping up, popping up, popping up.  And you just don't see that.  So it's against this backdrop.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                27

And of course you get the last slide.  As your Honor mentioned, we were able to reopen discovery against one of the DAPs, because one of the DAPs -- a lot of the plaintiffs here, the senior executives have taken the Fifth Amendment as a result of a criminal investigation, so we were not able to take their depositions back in the original round of depositions.

When the DAPs -- when the time came after the case -- the Class case was done, Carpenter decided to change their invocation.  So Stan Paully for Carpenter and Mr. Hearst who worked for him -- Paully was and is the owner -- they decided to no longer invoke the Fifth Amendment.  And Mr. Paully testified -- and I took his deposition -- and you see it here, but this man was in control.  He made these big companies snap to it.  And when they didn't, he cut them off.  And that's exactly what he says.  And at the end, this was -- go back, please -- "And you did it because the business was a competitive business.  Correct?

And the answer from the witness is "Yes."

Then you get to see -- now go forward -- we got these things, these are his notes.  Hearst says:  "Can't buy from Bayer at these numbers."

He says, "I agree.  Cut them."

Then this next slide indicates that -- this was a response, and then the following slide after that, for people to get back into his good graces, the suppliers, they had to

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

pay him cash dollars.  So you have BASF, 500,000; Bayer $600,000.

This is a very, very much a DAPs and control position.

Next slide.

This is the slide that Mr. Paully himself marked up. It indicates the different colored lines are the different prices being charged to Carpenter specifically by different competitors.  And you can see how they're changing and fluctuating and they're not matching.  And he's marked it up at my request.  These are things that he said in his deposition as his competitive moves to drive competition between these suppliers, and it worked.

Against this backdrop then, we come to the -- we come to the different approaches.

So if we could have the next slide, and if you could --

(Mr. Bernick confers with his Tech.)

MR. BERNICK:  Let's go now to the forwards/backwards issue, which is beginning at the beginning rather than the end.

So the established framework that everybody knows about in antitrust analysis says structure, conduct, performance.  You first look at the structure of the industry, then you look at the conduct of the players in the industry, and then you look at the performance of the industry. Structure, conduct, performance.

Dr. -- which, by the way, that's the same direction that Comcast requires.  You start with the conduct in the context of the structure before you start looking at damages.

Dr. Elzinga follows this sequence.  He is our economist and one of our experts.  And his approach -- next slide, please -- he starts right in the period of time at issue, direct analysis of price announcements, market conditions, and he's looking for, again, structure, it's an oligopoly.  And therefore the question is:  Is behavior -- oligopolies are different.  We're going to see in the next slide -- is the behavior collusive or non collusive?  That is where he starts out.

Next slide.

This is a fancier, kind of a more nicely formatted version of his chart that he wrote in the Class trial.  It says, look at one end, you get perfect competition, lots of sellers, easy entry.  The other end you get one seller, tough to get in.  That's a monopoly.

On the left side you get lots of price competition all the way down to the last marginal penny of cost.  Oligopolies.  You can have that but you generally do not, and the reason for it is that somewhere in between perfect competition and a monopoly you have concentration in the business and you have -- as a result, you have the necessity of buyers to purchase but also to maintain their supplies.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

So if two companies went out of business and their factories shut down, the suppliers would be completely out of luck.  There would be a panic and people would be running for the materials.  So there's kind of an odd, you know, competitive but partnership between the suppliers and the customers to maintain steady supply.

So marginal dollars, that is all the way down to the cost of the oil feed stocks.  That can't be the way you go because you've got these enormously expensive plants.  If all you're doing is covering the cost of the oil feed stocks, you can't operate, you're going out of business.

MR. MARTIN:  Your Honor, I'm sorry.  I'm sorry.

I'm going to object on two grounds:  One, we do have a motion to exclude Professor Elzinga on the ground that he's not qualified to offer any opinion in this case;

Two, we are now straying well outside of whatever was argued in the Daubert motion and the papers.  He can use his time how he wishes, but I wanted to at least make that objection.

THE COURT:  All right.  Your objection is noted.

Go ahead.  If you think it's relevant, go ahead.

MR. BERNICK:  Thank you very much.

So the issue he addresses is:  Where does it stand?

Next slide.

What does he then do?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

He focuses on the period at issue and he goes to a systematic analysis of the conduct during the period in issue, including the price increase announcements and where they stuck.

And with that, I'm done with Dr. Elzinga, because the reason I wanted to talk about Dr. Elzinga is very simply to point out the dramatic contrast between what it's like when you begin with the conduct and then go to the damages and when you go the other way.  Elzinga begins with the conduct and he analyzes then all the way through performance.  Raiff is different.

So now Dr. Raiff's model is what I'm going to talk about.  Dr. Raiff's model proceeds very differently.  He does not, nor does Dr. Marx, actually reach any conclusion regarding wrongful conduct; that is, was there a conspiracy or was there not.

They reviewed the evidence but they were not asked to. They were asked to assume that there was a conspiracy.  They were not asked to opine as to whether there was or whether it was an agreement, and they haven't done the necessary work.

So they have -- they comment on structure, they comment -- they review evidence, but no conclusions, no analysis, because the only relevance that it has for them is to determine where to set the benchmark periods for the model.

So everything is performance in the model without

those predicates to drive what the model's actually looking for. So they jump to performance; indeed, performance in a different time, which is the benchmark time, not the period of time that's at issue.

Now, with that decision -- that's the fundamental divide. How do they get back to the conduct at issue? That is a key, key question, and I'm going to come back to it at the end. But in the meantime I'm going to talk a little bit about the development of the model.

The model is developed, your Honor, in a way that only an econometrician really could understand. I've spent hours upon hours going through the equations and the variables just to understand how they get put together.

Only a statistician could love it. Why? Because these are statistically very clever models, but they do not follow traditional economic laws of the marketplace. They're focused on fitting, not structural explanation.

Why did this happen? Why did this happen? Was there a conspiracy? Did it cause...

All they're focused on is using economic data, economic variables --

THE COURT: When they ran their models, they assumed there was a conspiracy. Correct? I didn't --

MR. BERNICK: Sure.

THE COURT: In other words, they were told to assume

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

there was a conspiracy --

MR. BERNICK:  Yes.

THE COURT:  -- during this period?

MR. BERNICK:  Yes.  That is the problem, is that they're told to assume it.  But what they -- unless they know what the acts, the harmful conduct is, you can't beat Comcast and you can't tie it to damages.

To say there was a -- you make an assumption is not a data point.  An assumption is not a fact.  They're not asked to assume particular wrongful conduct, they're just asked to assume there was a conspiracy.

You can't take conspiracy and turn it into a historical fact that causes damages and drives a model.  That's why Comcast says:  It is the harmful conduct, it's a fact, it's out there, it causes something to occur.

The very problem here is that they were asked to assume, and they were asked to assume not some historical fact, they were asked to assume simply there is a conspiracy.

And so none of them actually did the work to analyze and formulate what was the wrongful conduct that constituted the conspiracy.  What is the conduct?  What is the actual conduct that is problematic and let's trace it through.  And that is essentially why they can never get back.  Very different from the Class case.

In the Class case Dr. Solow testified to structure and

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                34

conduct, Dr. McClave to performance.  There were still problems with causation and connection but at least it was there.  Here there is no expert who actually analyzes and offers an opinion with respect to structure or analyzes and issues an opinion with respect to conduct during the period at issue, and as a consequence there is nothing to trace forward.  This is why it's backwards.

Development.  I'm going to go through as quickly as I can the basic developmental elements of the forecast model. Now we're into reliability and fit, and I'm going to go very quickly, but one thing is very, very important here.  This is not a case where we're saying, oh, you forgot a variable or it's got the wrong sign.  That's not where we're going.

Where we're going is that this is a case where there was no consistent, objective methodology that was followed in putting this model together.  It's an absence of consistent and objective testable methodology.  That's the problem.  This is not a little beep, you missed this one, or the Bazemore Supreme Court case, you missed this variable.  This is a systematic failure to pursue -- to pursue the development of the model.  So again, I'm going to go through these quickly now.

The model is based on benchmark periods not based upon the actual conditions during the period at issue.  Very important.  The benchmark periods are combined to produce one

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick

benchmark model.  The benchmark model works as a whole.  If you take a piece away, it's a different model.

So if your Honor were to say or the jury were to say: I think that what you did with this piece is wrong, the model completely changes because these are regression models, everything works together.  So if there's one problem here, the model doesn't work.  One problem and it doesn't work.

If the jury concludes that there's not a conspiracy during one of these periods, as they did in the Class case, the model can't tell you what the right answer is because the model assumes that all of the data that makes up the benchmark period is used and assumes that all of the data that makes up the period at issue is used.  It's unitary.  You pull out one piece, it's a different model.

Okay.  So, you know, your Honor, I'm sure that the model becomes fixed and it's going to run, you've got the variance during this period of time.  And here is another very important part of this case, this is Slide 24.

Of course it's not really predictive.  Everybody knows all of the data that's going to be used.  So you're not really predicting anything, you're kind of pretending that you're predicting in order to frame this model.

Number two.  Because Raiff did not produce -- and I'm not saying he had to -- how he actually developed this model, he reports on the final model that he has, he doesn't tell you

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                36

all the different iterations that he went through.  Today's computers, you can run programs millions of times to optimize outcome.  He could run a program millions of times to find the fit and the benchmark period that maximized or that targeted the lack or variance during the conspiracy period, and we would never do this because it is not truly predictive, it's just predictive in format.  It's a "black box."

We today don't really have somebody that we can ask on the stand all of the questions about how to put it together and we don't have the information on the basis of that, so there's a substantial limitation.

Here are some issues that are obviously issues.  Slide 25, the alleged conspiracy period is changed because the attorneys told him to do it.  That's exactly what he said: "The attorneys told me to do it."

Does that make a difference?  Absolutely.

Slides 26, 27 and 28 all show that if you -- if you move 2004 back into the benchmark -- on the benchmark period, all the overcharged -- all the variances change.  So that's a move.  That was a lawyer-driven move and it makes a difference.

If you take a look at beginning at Slide 29, for a whole period of time from the middle of 2005 to 2009, we get the extensive use of dummies.  The extensive use of dummies has the effect of altering, of altering the data that is input during this period of time.  And the reason that's it's done --

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                    37

we're not quarreling with the fact that there was a problem, but we're quarreling with the way it was addressed -- is that there were human structural changes in the marketplace, in part, because of the operation of the capacity.  Capacity is not a variable in the model.

MR. MARTIN:  I would object.  We're now venturing into opinions that were stricken by Dr. Ugone.

MR. BERNICK:  Not at all -- I'm sorry.

MR. MARTIN:  It's in the reports.  This is one of this things that was stricken from Dr. Ugone's opinion.  To the extent that he wants to argue it, a lawyer can argue anything.  There's no expert evidence that he can cite to that will back it up.

MR. BERNICK:  We covered this extensively on cross-examination of Dr. Marx.  We're not relying on Dr. Ugone to testify to this fact.

THE COURT:  Go ahead.  Your objection is noted.

Go ahead.

MR. BERNICK:  So what we end up with on Slide 30 -- what we end up on Slide 30 is, we have -- what actually the benchmark periods end up looking like, which is that we have the two years early on, we have essentially 20 months before the changes in the industry when the dummy variables are used, and then everything to the right of that involves the use of dummy variables, which affect the inputs.  So those are not

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

actual inputs, those are modeled inputs.

So you really have three different periods in the case of TDI.  TDI is the one that is affected by the dummies.

If you look at 31, this shows that if you exclude -- if you just use 1992 and '93 versus '04 to '08, all the results change.  That says that the period is different.  If you use the same thing with respect to PMDI, again it changes.  And so again, this is a difference that makes a difference.

When it comes to the selection of variable -- so again, benchmark selection is actually eclectic, it's not systematic.  You have different periods being used all in the same -- in the same model.

The same thing applies to the selection of variables.  This is not simply one variable.  It is the approach that Dr. Raiff used where he himself picked certain variables that he wanted to use no matter what.  He just picked them.  We don't know how he picked them, we don't know why he picked them, we don't know which ones he rejected.  This was his subjective judgment.  And then he used a computer program to pick more variables so long as that they would optimize, fit under the circumstances that he describes.

So the mandatory variables were subjectively chosen, they're not chosen by any computer program or any methodology.  There's no stated methodology for that, and it includes dummies.  The computer program then takes over.  And you don't

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick          39

run the computer program to revisit whether you're going to use those mandatory variables.  Those are assumed to be required, and you're just running the computer program to say that the others were.

So one of the issues that your Honor will hear about that is in the papers is:  What about capacity?

And Dr. Raiff and Dr. Marx say, well, capacity, even if we had included it, we shouldn't have included it.  But even if we did it wouldn't have changed anything because we did consider it in the computer run.

That's not really completely, completely accurate.  The computer program, because all it's doing is searching for incremental fit, never revisits the first variables, the mandatory variables.  And as a result, the computer program doesn't act whether capacity would be a better variable than the mandatory variables.  So it's not really seen if it would have made a difference because they're assuming that the mandatory variables stay in when they run for the optional variables.

Does this make a difference?

It certainly does.  Dr. Ugone has done the analysis, and Dr. Ugone has shown that if you just focus on the mandatory variables and you don't have this mix-and-match where you have mandatory plus AIC, which is, no one said, well, here's where it's been done, here's the textbook that says this is -- it's

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                40

not a consistent objective approach -- if you just run the key mandatory variables again, your results change and that's what the succeeding slides show.

So where are we at the end of this process?

There's no consistent objective method for the benchmark period or data.  It's a collection.  There's no consistent or objective measured method for variable selection.  It's a selection.  Some of it's subjective, some of it's by computer.  It is -- where is it going?  The apparent goal is to maximum fit to the benchmark period, and that then creates the problem.

The problem on the next slide is overfit.  And what does "overfit" mean?

And this, your Honor, again I find to be not so easy to get your mind around.

Overfit means that because you go back to the point that all of this data is already known, it's not a true prediction, you don't really -- or you're not really testing whether it predicts well for a future that hasn't occurred, because you already know that future.  You're looking in the past and you're saying:  I'm going to project in the past.  So how do you test whether this model works?  You don't have a future to test it on.

So the only way that you can really test to see whether this model is predictive out of sample -- because

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick 41

that's what you want.  If all you're doing is testing, is meshing it to the benchmark period and saying, does it predict well in the benchmark period?  Well, of course it does.  That's what you did, is you made it fit the benchmark period.

You really want to know:  Is it going to predict well outside of the benchmark period; in this case, the conspiracy period?

That's called "out of sample predictive power."  And if you've got big time fit, you have a risk of overfit, which means anything you do to use it outside of sample is going to show a variance, and it's not a true variance.

So where you have all these efforts to fit, fit, fit without a consistent methodology, you have to look at the question of out of sample predictive power.

This is an established test.  The way you do it is within your sample now, you hold back part of the data.  And so you're really kind of saying:  I'm going to pretend that the model is pretty much the same but I'm going to calibrate it or estimate it on the basis of a short period to see if it predicts within sample.  And if it doesn't, there's a problem with that model because there's no reason to believe that it can predict during the conspiracy years.

This is established testing.

Next slide.

Dr. Marx has written to the same effect.  She admits

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                42

it, that this is the traditional way to do it in the next page.

You would typically hold out the last period of data and estimate your model on the other data.  She did not do it because Dr. Raiff did not do it.  Dr. Ugone did, and he shows -- as the next slide indicates -- that this model lacks predictive power out of samples.  It's straightforward failure to follow a required methodology, which is particularly important here because of the risk of overfit.

Now I'm going to go to the next step of the model, which is running.  This is now -- let's take -- that's repetitive, that's repetitive, that's repetitive.  Next, next.

Okay.  Now we have to run the model.  We fixed the model.  This is now page 43, and we're going to run it on the conspiracy period.

This makes an assumption.  It makes the assumption that the economic relationships during this period of time are the same as the economic relationships during the benchmark periods.  That's an assumption.  That's a pretty bold assumption that ends up saying, your Honor, that essentially under this approach the model assumes that they're -- all the economic and statistical relationships are the same from 1992 all the way through 2009; for 17 years these relationships did not change.

And there is no support for that that they muster; none.  There was no systematic analysis to see whether that was

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                43

true.  It's not done.  But the evidence that is present in this case -- and these are Slides 44 through 47, and 48, and 49 and 50 -- what we do is we take the testimony of three Dow people, one that we just took last week, Mr. Ho.  He was there from 1994 to 1997; we take the testimony of Mr. Dawson, who was there from 2004 forward, but he also knows about 2003; and we take the testimony of Mr. Paully himself, who was present as a customer throughout this period of time.  And every single person says that the market changed, the market changed, the market changed.

So where is the analysis that says that we can rely upon the assumption that all relationships remain stable?

In fact, we know that after 2004 they didn't on TDI. There was a big shock on TDI and they had to change their model to get rid of the shock.  So we know it can happen.  They assume their model basically creates a world in which everything is calm and constant so that any variation, any lack of fit equals dollars.  That is how this system works.

Going now to statistical significance, this is Slide 55.

The other thing that you have to do is to focus on -- it's not 55 -- it's statistical significance.  I think you're going to hear about it from Dr. Ugone, but you have to run for statistical significance.  This is slide -- I'm sorry -- 51.

One of the things he had to do of course is to see

Opening Statement by Mr. Bernick                    44

whether the variance is statistically significant.  It turns
out that it's not statistically significant, and 95 percent
confidence levels for two of the three models.  And he's
showing two of the three models.  That variance is not
statistically significant.  And Dr. Ugone is going to address
that, so I'm going to go on and talk about 55.

There's one step left.  We're not done.  We still
don't have -- we have industry variance, but what about the
DAPs themselves?  Do they cure these issues with the industry
model by the DAP model which is now specific to them?

So you've got industry periods, you have to get DAP
periods.  Do they cure it?  The answer is no.

Let's skip over, 56 to 57.  They simply create a
relationship between the actual prices charged by the industry
as a whole to the actual prices charged by the DAPs and they
apply that relationship to the but-for calculation.  So all
that this is, is the same essential but-for calculation in the
industry model translated in a fairly simple fashion to the
DAP.  So all the problems in the industry model carry through
to the DAPs.

So now we get to 58.

58 now is the problem.  With 58 the question is, okay,
we've got the variances.  Does this connect back to the conduct
at issue?

Because so far you've seen nothing that does that.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

They apply -- they do a model on the benchmark period.  They fix it so it's rigid and they just apply it to the conspiracy period and say there's a difference.  That's called variance.

Variance is not causation.  Variance is not linkage. Variance doesn't tell you why there's a difference, it just says that there is a difference.

And so the question is:  Well, is there anything in the model that actually takes that variance and says:  I can connect it to these price increase announcements?  Is there something in the model that does that?

No.  There's nothing in the model that connects that variance back to any specific conduct.  It's not there in the model at all.  And this is just absolutely vital.  There's not a variable for price increase announcements, there's not price increase data, there is nothing specific from the conspiracy period.

MR. MARTIN:  I'm going to object again.  Once again we're doing Dr. Ugone's stricken analysis.

MR. BERNICK:  No, it's all admissions.  She'll take the stand, she's going to admit that.  She's going to admit that.

THE COURT:  Dr. Marx?

MR. BERNICK:  Dr. Marx is going to admit that.

So she comes in now with her process of elimination. She tries to get to that connection with a process of

elimination.

The process of elimination is not in the model.  The process of elimination isn't called for by the model, it's not set out by the model.  It's her kind of saying:  I'm going to draw an inference.  I think that there's a relationship.

Does she then say -- and she'll admit this today -- does she then say, oh, I can infer, I infer, I look at this, that there's the price increase announcements that account for the variance?

No.  She still can't do that.

All she can say is that it's consistent with, or it's based upon the evidence of conspiracy as a whole.

That's it.  No particular act, no particular conduct.  Conspiracy evidence as a whole.

That is a total derogation of the idea of "by reason of laws."  It's a total derogation of Comcast.  It's only being done because they know, they know they've got to get back to conduct, and they can't do it because they don't have anybody who draws that link.  They don't have anybody who studied the price increase announcements and said, here's where it went.  They never did it.  It's not in the model.  It's nowhere.  You can't find it in any report.  Zero.  That's why we're here.

What's interesting is, that not only that -- go to Slide 60 -- did they ever even go through the model and say, okay, now that we know what the model says versus the actuals,

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                47

let's take a look at what happened historically to see if there's a reason, to see if there's a reason why the actuals go up and the model said they should go down.

She never looked at that.  Never looked at that.  And there's no verification.  There's no going from what the model says to saying, hey, does that make sense in light of the history?

In fact, in 61 we now have testimony from Dr. -- from Mr. Ho, but also from Mr. Paully.  They say, we'll tell you why it happened.  It's because the capacity changes.

But guess what.  Capacity got dummied up, wasn't elected as a variable.

They say, well, it's a tainted variable on the basis of three documents so we can't include it.

They took capacity out and they said, we'll make up for that with the other variables.

Is it any surprise that what's going on here is tight capacity, loose capacity, prices change, that --

THE COURT:  Who controls capacity?

MR. BERNICK:  What?

THE COURT:  Who controls capacity?  The defendant does.

MR. BERNICK:  Well, sure, but that's always --

THE COURT:  So it's very discretionary then.

MR. BERNICK:  Well, no.  That's the problem.  Is that

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Opening Statement by Mr. Bernick                48

in this particular case -- first of all, you are always going to have the defendant in some degree of control of capacity, always, always, always.  So if you have a market where capacity matters, does that mean that in every single case if you're going to do a model to try to explain, I mean --

THE COURT:  Wouldn't actual supply be more a meaningful consideration?

MR. BERNICK:  It's the same thing.

THE COURT:  Well, it's not the same.

MR. BERNICK:  It is.

THE COURT:  Supply and capacity are not the same thing.

MR. BERNICK:  But it's like, if you think about it, your Honor, I mean, you're right, you're right.  To the extent that what you're looking for is the available supply to the marketplace --

THE COURT:  Right.

MR. BERNICK:  -- if you're running your refinery, right?

So, yes, you can loosen up your refinery, you can do de-bottlenecking and stuff like that, so there is some latitude.

But what actually happened here was that in this industry, if you really want to meet a new demand, you've got to build a whole new plant, and the TDI plants take at least

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

three years to build.  So for three years, if you're out of sync there's no way, there's no way.

THE COURT:  If you want to lower capacity you don't have to build anything.

MR. BERNICK:  I'm sorry?

THE COURT:  If you want to lower capacity you don't have to build anything.

MR. BERNICK:  True.  But guess what happened.

What happened was, the growing demand outstripped the existing capacity, that's why the prices went up.  And almost as soon as that happened, every single supplier decided that they were going to do things to increase capacity.

Now they have some -- they have a couple of documents later on where they say, oh, well, maybe that didn't happen for MDI, whatever.  But the fact is, there is an enormous expansion of capacity.  Dow in particular doubled it's TDI capacity.  Mr. Ho testified to that, testified that -- we have the documents -- about when it was planned, when it came on stream and there was a delta of a few months because they had a startup problem.

So the theory is, this is a conspiracy to increase prices?

The last thing you do is build capacity.  And the industry built so much capacity, your Honor, that by the mid 1990s there's too much capacity and the prices plummeted, and

this was a terrible period of time.  Everyone lost money.

Now, I may be wrong about that, it's what the facts say.  But one thing is for sure, is that the model, when it says, oh, everybody should have been charging less, actually less, prices should have been dropping 5 percent, 10 percent, 30 percent, the model says that, but people on the ground say and the data says, we're capacity constrained.  The fact that raw material costs are dropping or are stable, that doesn't make any difference.  We don't have the stuff to sell.  You can't sell and get market share when your factory can only produce a certain amount.

There's no method that Dr. Marx uses to verify anything about these spreads as being reasonably grounded in the facts on the ground.  Zero.  All you have is a model that's going like this.

And, your Honor, we can get into this in more detail, and it's just a function of the variables.  I can say it because it's right on paper.  There's a lagged variable, which means that the model in predicting the next price gives a lot of weight to the existing price, which means that once prices start to fall the model continues to carry forward that trend for some period of time.  So as soon as you open that gap, boy, you're going to have variance, you're going to have some significant dough.

Why -- of all things, everybody knows the scientists

verify -- why was there no verification that this model line had some basis in the market reality when you see this huge gap open up that was for a reason other than capacity, which of course is not in the model?

So it's a methodological problem that you construct -- or Dr. Raiff constructed this model, and neither one of them did anything to go back and look at price increases, they did nothing to go back and look at what actually was going on. Why, why, why do you see the divergence?  It's not in their reports.  They do not explain why.

Why?  Because variance -- the model is not designed -- and this is a fundamental point that Dr. Ugone is going to talk about -- the model is not a structural model, it's designed to predict, it's not designed to give causal explanations.

And that's why the only way that Dr. Marx can talk about cause is not through the model, it's her inference, it's her ipsi dixit, that's what it is.

I'll close -- I want to skip to where we are -- well, give me 62.

This shows, you know, it's not just my speculation and it's not just Mr. Ho.  These again is Mr. Paully explaining exactly the same phenomena.  A plaintiff in this case explains exactly the same phenomena.  Here's the vulnerability.

Skip to 64.

The vulnerability.  This is actually a chart in the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Class case.  Remember in the Class case there was a compromised verdict, and the jury said -- was asked:  Did the conspiracy cover all the years?

And they said no, and as a result they came up with a compromise.

And the reason they did is because in the cross-examination of Dr. McClave I got him to admit that his model was showing this big conspiratorial impact in a period of time where there were no price increase announcements.  How could that be?  And I drew a red arrow.  And that's exactly the period of time when the jury said, I'm sorry, no conspiracy.

Why do I go through that?

A, because the model should match reality.  We shouldn't have models predicting the impact of collusive price increase announcements when there were no price increase announcements.  We have the same presently here.

Number two.  The jury did not understand -- this goes back to my point -- that the model doesn't work piecemeal. Doesn't work.  So if you take out the conspiracy -- for example, let's assume that year three is not in the conspiracy. Different result.  The model will operate differently.  You can't simply subtract.

So in the Class case there was a statute of limitations issue that was posed to the jury.  Then to get the statute of limitations, which assumes there's a conspiracy, all

they had to do was to see where the model -- what portion of the total was corresponding to that period of time.

But if the question is:  What if there's no conspiracy?  You can't include that period in the conspiracy period, you should include it in the benchmark.

So this then, if you were take 1994 and there's no conspiracy, you then -- the benchmark now changes.  It goes from '92 all the way through '94.  Different model.

So these models are highly, highly vulnerable to changed assumptions.

What if the jury finds less than 10 years of conspiracy?  The model will not tell them how to award damages, will not, because it works on the basis of these defined periods of time.

Last point.  65.

This is Foam.  And in the Foam model we're not using it to talk about downstream.  The Foam model was developed after the Class trial and after Comcast.  And this model doesn't go back to the benchmark periods, it's a predictive model.  It works with the price increase announcements.  It says:  What impact did they have?

Exactly what we say they should have done here.

And it was upheld and it was approved in the district court for that reason, and it passes Comcast, and the Sixth Circuit said, we understand Comcast.  They've complied with

Comcast.

They haven't complied with Comcast here.

So this gets me to the end.  I come back to the question that I asked at the outset, which is -- next slide -- no -- oh, these are the cases, your Honor, Vitamins, very different, you have guilty pleas so you can define the period.  Linerboard, the variables were selected methodically, not: We'll pick some arbitrarily and then we'll run a computer program, and the hold-back test was performed.  McClave again, all discussions about these cases are all the same.  The models are the same.  Not true.

Last slide.  Come back to it.

Do we really expect that after, let's say, four hours of examination of these witnesses at trial the jury is going to be able to absorb enough that they can independently, on their own with that assistance, but then make their own decision about these technical issues as well as these fit issues?  And I think, your Honor, that under traditional Daubert standards the answer is no.  But on the practical basis looking forward to that jury, I don't think anybody can be terribly comfortable that they'll be able to deal with this problem.

And that's all that I have.  Thank you, your Honor.

THE COURT:  Thank you.

Why don't we just take a 10-minute break until 11:00 o'clock for the court reporter's benefit.  Okay?  Then at that

time I'll assume you'll call Dr. Marx.

MR. MARTIN: We will, your Honor.

THE COURT: Okay. Thanks. We'll see you in ten minutes promptly, 11:00 o'clock.

(A recess is taken.)

(Proceedings resume.)

THE DEPUTY CLERK: Please remain seated.

THE COURT: All right. Mr. Martin.

MR. MARTIN: I'll call Dr. Marx.

L E S L I E  M.  M A R X, called as a witness, having been first duly sworn, is examined and testifies as follows:

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: Leslie Marx. L-e-s-l-i-e; and Marx is M-a-r-x.

THE DEPUTY CLERK: Thank you. You may be seated.

THE COURT: Good morning.

THE WITNESS: Good morning.

THE COURT: All right. You may proceed, counsel.

MR. MARTIN: Thank you.

DIRECT EXAMINATION

BY MR. MARTIN:

Q  Dr. Marx, I had left for you your Rule 26 disclosure as

well the expert reports of Dr. Raiff, both the original and your reply.  If you need to refer to them, please feel free to do so.  I just want you to have them available.  Okay?

A    Okay.  Thank you.

Q    And you heard the Judge say let's go short on your qualifications.  I just want to do a quick hit on your background, if that's okay.

You got a mathematics degree from Duke.  Is that right?

A    That's right.

Q    And you were a valedictorian of your class?

A    Yes.

Q    Then you got a Ph.D in economics from Northwestern.  Is that right?

A    Yes.

Q    Did you take classes in econometrics while you were at Northwest?

A    Yes, I did.

Q    Did you take a field exam in econometrics after -- during your tenure there?

A    Yes, I did, and I passed it.

Q    Your CV lists you -- good.  Your CV lists you as the Robert Bandeen Professor of Economics at the Fuqua School of Business at the Duke University.  Could you could give us a couple of minutes of what your academic responsibilities are?

A    Yes.  I'm a Professor at Duke.  And as a Professor at Duke --

THE COURT:  If you don't mind, just a little bit back from --

THE WITNESS:  I'm too loud?  Sorry.

THE COURT:  No.  Keep your voice up.  I think it will pick up if you just stay a little further away.

MR. MARTIN:  It's my fault.  I told her she couldn't talk too loud, and it turns out that was wrong.

THE COURT:  You could probably get closer to the mic.  And you can stay a little further away and we'll all be fine.

(Laughter.)

THE WITNESS:  I'll try to calibrate better here.  So louder but farther?

THE COURT:  No, that's okay.  It's just that it was coming up on the mic a little loudly.

Go ahead.  Let's see.

A    (Continuing) At Duke University, the faculty responsibilities would be typically divided into research and teaching and service.  For research, my research is focused on applied microeconomics, particularly in the field of industrial organization, and that's mostly doing research that would end up being published in peer-reviewed journals.  My focus is on collusion and auctions and procurements.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

For teaching, I teach classes in environmental economics, in managerial economics.  I teach Ph.D classes both in game theory and industrial organization.

Then for service, there are a number of administrative responsibilities at the University, but also a component of the service is to perform duties on editorial boards of journals and to do peer reviews for peer-reviewed journals.

THE COURT:  Thank you.  Go ahead.

Q   Do you teach econometrics in your classes?

A   I do.

Q   Is there any significance to that Robert Bandeen title, the label?

A   The name isn't that important.  It's an endowed professorship.  It's a distinguished professorship which means that I'm at the top of the professorial ladder at the University.

Q   What is your background in the type of econometric models that were used by Dr. Raiff?

A   I have experience with these models in past cases I've worked on, including Vitamins and Linerboard and DRAM.

Q   Are you familiar with what's known as a peer-reviewed process?

A   Yes.

Q   Can you briefly explain with that is?

A   In economics the research would typically be published in

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

peer-reviewed journals.  So if you have a piece of research, you would submit it to one of these peer review journals and the editorial board would send it out to impartial third parties for a peer review for a referee report.  And then those would be returned to the journal, and the editors would review the paper along with any criticisms that are raised by the referees in making a decision about whether to publish the article in the journal.

Q   Have you been a peer reviewer?

A   Yes, many times.

Q   Have you published articles in peer-reviewed publications?

A   Yes.

Q   On topics related to collusion?

A   Yes.

Q   And have you received awards for your writings?

A   Yes, I have.

Q   Okay.  Let's turn to your assignment in this case.

Can you briefly just talk about how you got involved?

A   Yes.

I was approached by my colleagues at Bates White and told that Dr. Raiff was no longer going to be able to continue as the expert in this case.  And then I spoke with you, Mr. Martin, about -- you asked whether I would be willing to take a look at the materials in this case and decide whether I would be able to endorse and defend the models, conclusions, and

opinions of Dr. Raiff at trial.

Q    And so today I'm going to ask you questions without referencing back to Dr. Raiff.  I may call them your models or your analysis.  If you need to refer back to Dr. Raiff, please feel free to do so.  It's kind of an odd situation we're in.  Okay?

A    That's fine.

Q    Were any limits placed on what materials you could look at to perform your task?

A    No.

Q    Generally, what materials did you review?

A    I reviewed largely reports, the reports of Dr. Raiff; the reports of Dr. Ugone, Professor Elzinga; I looked at a large number of depositions; looked at the evidence available in the record; a large number of documents; looked at the legal filings related to the case; the reports of Dr. McClave; and I also talked about Mr. Proger, who's anti-trust counsel for Bayer about his -- what he had learned in his investigation.

Q    You mentioned, I thought, that you looked at the testimony and reports of Dr. Ugone and Professor Elzinga.  Is that right?

A    That's right.

Q    They were the experts for Dow?

A    That's right.

Q    Were those important to you in forming your opinions?

A    Yes.  I mean, I thought of the whole process as like, kind

of like in the peer review process that I'm involved in working on the editorial board of a peer review journal where I had the initial work of Dr. Raiff, and then I had essentially referee reports, the criticisms of his work produced by Dr. Ugone and Professor Elzinga, and I had Dr. Raiff's responses to those. So I was considering -- I thought those were useful and important to consider, and I considered those.

Q   Okay.  Can you describe for us just in general terms what an econometric model is?  Fifth grade language, if possible.

A   Sure.  An econometric model is at its heart just an equation, but it's an equation that's generated from data.

Could I draw a picture?  Is that --

THE COURT:  Sure.

Q   Sure.  There's markers there for you.

A   Yeah, it would help.

Q   Take your pick of colors.

A   Thanks.

Can you see --

Q   You can grab the microphone there.

THE COURT:  I think if you keep your voice up you'll be okay.  You have a good voice.

THE DEPUTY CLERK:  She does have a hand mic there if she needs it.

THE WITNESS:  I can be like a rock star.

THE DEPUTY CLERK:  You have to turn it on.

THE WITNESS:  I have it on I think.

THE COURT:  Okay.

A    Let me just draw a picture that I think will maybe help think about what an econometric model is.

So I'm going to draw a graph.  And let's just -- these techniques are frequently used in -- they're used in agriculture and finance and in medicine.  So just an example from medicine.

Let's think about there's a drug, and you're not sure of the right dosage for the drug.  And so you can try -- do some trials, and you can offer a number of people the drug in different dosages and then measure health outcomes associated with the different outcomes.  So if we give -- associated with the different dosages.

If we give the drug in different dosages to a large number of people, we'll have different health outcomes.  And so you might have someone down here with a lower dose and a relatively lower health outcome, some other people that had different outcomes.  Maybe the higher dosage is not as successful.  And so you have some data.

Now, what an econometric model is going to do is going to take that data and capture it as an equation.  So in this data your equation might look something like this, and that equation would allow you to see, oh, this is indicating the best health outcomes come with a particular dosage, seems to be

giving us the best health outcomes.

So the econometric model is taking the data and formulating it as an equation which is meant to capture what's going on in the data.

Q   So in the use of these kinds of models, do economists engage in any form of process of elimination to reach conclusions about what the model is telling them?

A   Sure.  In the literature, the way an economist or any scientist looking at this data, the way you're going to estimate the effect of some intervention is to look at the outcomes with the intervention and compare that to what outcomes you would expect to have in the absence of the intervention, and then you would attribute that difference to the intervention itself.

So when you give individuals the medication, you would attribute the change in health outcome to the medication.  That would be the intervention here.

Q   Why would an economist use an econometric model in a price-fixing case?

A   Well, in a price-fixing case that's exactly the kind of thing you're trying to consider here; you're trying to capture the effect of the conspiracy.  So you want to think about what the impact on prices is as a result of the conspiracy.  In order to do that you have to have some estimate of what prices would have been in the absence of the conspiracy.  And an

econometric model is the way an economist would go after quantifying that effect.

Q   The model in this case is a two-stage model.  Do you have any familiarity with those kinds of models?

A   Yes.

Q   You've worked with them before?

A   Yes, I have.

Q   In general, why use a two-stage model?

A   Well, in this particular case we need to understand the effect of the conspiracy, or the alleged conspiracy, on prices, so we need to know what the prices look like in the absence -- we're going to estimate what the prices look like in the absence of the conspiracy.  And the way that's captured in this model is by looking at the effect of the conspiracy on benchmark prices, on the prices of the key TDI, MDI and polyols products.

But it's also true in this market that the prices, individual prices for each transaction are determined through a negotiation between the buyer and the seller.  And so by having the second stage model, that allows us to capture any individual effects associated with a particular transaction.

Q   In your experience, has the same type of two-stage model been used in other price-fixing cases?

A   Yes.

Q   I'm going to turn now then to just start talking about the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

benchmark product model.  I'll talk about the transactional model a bit.

The model here is what's called a prediction model. Is that right?

A   Predictive or prediction model, yes.

Q   Okay.  And why is it called a predictive model?

A   Because you're going to use it to predict prices.

Q   Is it a structural model?

A   No.  Usually -- it has structural aspects, but usually the word "structural model" is used a little bit differently.  So the model, Dr. Raiff's model is using -- allowing the variables in the model to work together to predict prices, and so he's allowing interactions among the variables and the possibility that the variables explicitly in the model proxy for other variables not explicitly included in the model.

A different type of model that economists sometimes use is one called a structural model.  And in a structural model you would be giving -- you'd be looking for the identifiable individual effect of each variable in the model, holding everything else constant.  And so in a structural model you would give this interpretation to each coefficient as the effect of a variable, holding everything else constant.

In the model like Dr. Raiff's, you're allowing the possibility that all the variables are working together and interacting with one another.

Case 2:08-cv-05169-WJM-MF    Document 227    Filed 01/22/16    Page 67 of 207 PageID:
Marx - direct - martin                                    66
1891

Q    Is the predictive model that Dr. Raiff formed and you're going to endorse and defend, is that a commonly accepted one in the scientific community?

A    Yes.

Q    I'm going to put up on the board a slide that was prepared under your direction.  Is that right?

A    That's correct.

Q    And while I'm at it, if I may, I'm just going to turn this board over.

So, this lists five steps that are used in developing a benchmark product model.  Right?

A    That's correct.

Q    So I'd like to walk through them.  I'll just prompt you one by one.  The first one:  "Choose the appropriate benchmark period."  What is that?

A    In this model we're going to estimate what prices would have been in the absence of the conspiracy.  So in order to do that, we're going to need to give the model data from a period that doesn't have effects of the conspiracy.  If you want to know what prices look like in the absence of a conspiracy, you need to start with data from a period that is absent the conspiracy, and that's going to be the benchmark period.

Q    Okay.  And we're going to talk about the benchmark just a little bit more, but let me jest walk down the rest.

The next step would be to "Choose Appropriate Cost and

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Demand Variables."

A     Economics teaches that the price in a period absent a conspiracy would be determined by the interaction of cost and demand factors, and so we'll need to identify those.

Q     And then you develop a mathematical equation that estimates prices during the benchmark period.  Is that kind of like what you drew on that --

A     That's right, that's the step where we generate the line like from this picture here.  We'll have the data from the benchmark from a period we expect is free of the effects of the conspiracy, and we'll have cost and demand variables.  Those would be playing the role of the dosage in the picture here.  So we'll have data points, and we'll develop the mathematical equation that helps us understand how the cost and demand variables translate into price.

Q     And then the next step is "Apply the model."

      Again, we're going to talk about this in more detail in a little bit, so if you just give us a sense of what that means.

A     That just means you're going to use the model to predict the but-for prices.

Q     That's how we get the red line on the bottom of the TDI?

A     Yeah.

      So this is -- this is a graph of the TDI price.  TDI 80/20.  It's a high volume TDI product, commodity-like product,

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

its sold throughout the period of interest here. And the blue line is the price, the actual price for this TDI product. So you can see in this graph there's the period before the conspiracy period, the period through the conspiracy period, and then the period after.

When we say "Apply the model" in step 4 here, we're going to use the equation to estimate what the price would have been during the conspiracy period.

Q And then the last step is, "Inspect the Results for the Reliability."

Can you tell us just generally what that means?

A Yes. There are a number of statistics that one would look at to assess the reliability of an econometric model. There are the predictive performance and the model we would look at to assess the reliability of the model, any sensitivities. Those are the kinds of things that an economist would do, in addition to looking at whether the results are sensible.

Q Is a before-and-after benchmark period like this unusual?

A No.

Q Is it commonly accepted in the scientific community?

A Yes.

Q Did you undertake any investigation to determine whether the benchmark period here, '92 to '94 and 2004 through 2008, was the appropriate benchmark period?

A Yes.

Q    Had let me just flip to the next slide here.

Also prepared under your direction.  Correct?

A    Yes.

Q    This is titled "Historical Facts Support the Benchmark Choices."  The first one is '92 through '93 should be in the benchmark period.  Could you explain that please?

A    Let me first say that this period of time, '92 through 2008, that's the period.  The whole period here is the period for which we have data.  So then the question is:  Which of these periods are we thinking of as affected by the conspiracy.

There's -- there's no evidence -- nobody's claiming effects of the conspiracy in '92 to 1993.  I didn't see anything that would suggest that needed to be excluded from the benchmark period.  So we would keep those years in the benchmark period.

Q    Okay.  And then the next bullet point is '94 through 2003 should not be in the benchmark period, and it references some materials.

Could you just walk us through those materials?

A    Sure.  First, this is the period of time that Dr. Raiff was told to assume the existence of a conspiracy.  And there's quite a bit of work that he went through to make sure -- to assure himself, and I did as well, to assure myself that it's reasonable to assume the existence of a conspiracy in that period of time.

Case 2:08-cv-05169-WJM-MF    Document 227    Filed 01/22/16    Page 71 of 207 PageID:
Marx - direct - martin                                                    70
18914

In conversations with Mr. Proger, he communicated that a number of Bayer employees had admitted, starting in 1994, to the participation in urethane pricing conversations with their competitors.  There's evidence of meetings and phone calls and other indicators starting in 1994.

MR. BERNICK:  Excuse me, Jim, if I could.

We have a motion in limine with regard to relying upon outside counsel for Bayer's statements after the settlement with Bayer about what Bayer found through some internal investigation.  That's a motion in limine.  So, you know, this is a 104 hearing.  I guess I probably should object to it, but I just want to say, we're reserving on -- we hope your Honor will rule on that, in which case --

THE COURT:  All right.  Your objection is noted.

MR. BERNICK:  Thank you.

THE COURT:  Thanks.

A    There was other deposition testimony where admissions and implication of others of meetings and phone calls with competitors discussing prices during that period of time; business records indicating instances of manipulation of capacity; restriction, coordinated restriction of capacity --

THE COURT:  I don't think we need to get into too much on this.

MR. MARTIN:  That's fine.

THE COURT:  I mean, I'm more interested in the model.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

I assume she undertook to determine that there's evidence of a conspiracy during that time period.

MR. MARTIN:  We'll move along then.

THE WITNESS:  Okay.

Q   We'll skip the 2004 to 2008 given the Judge's comments.

A   That's fine.

Q   Let's turn then to the cost and demand variables that were used.  That's Step 2.  Right?  The first step was "Choose a Benchmark Period"; the second step was "Identify the Appropriate Cost and Demand Variables."

A   That's right.

Q   This is another slide that was prepared under your direction.  Correct?

A   Yes.

Q   Okay.  And does this accurately summarize the cost and demand variables that were considered in developing the regression models?

A   Yes.

Q   Can you tell us how in a high level way these variables were chosen?

A   They were chosen through a detailed study of the products and market and industry to select what would be relevant cost and demand factors.

THE COURT:  Again, these were chosen by Dr. Raiff?

MR. MARTIN:  Yes.

THE COURT:  Okay.

MR. MARTIN:  Again, every now and then --

THE COURT:  I know, I understand.

MR. MARTIN:  Thank you.

Q    And that was a process in which he identified core variables with the intention of supplementing with a strict -- with an objective test.  Is that right?

A    Yes.  He drove the set of variables as the candidate set of variables, and the ones that are indicated with an asterisk there are included in one or more of the models as a mandatory variable or a core variable, where his procedure was to select variables that he thought were important key variables, key cost and demand factors, and then to use a procedure that's called AIC in order to select additional variables.

And one of the things that you need to think about when predicting a predictive model, in a predictive model, more variables is not necessarily better.  So you can -- you can think of it as making a cake, where you might start with sugar and flour and egg, and then there are lots of different flavors you can add.  You could have chocolate cake or vanilla or licorice or lemon or coconut, you could have different flavors of cake.  You don't want to put them all in together.

So he's starting with a baseline core cost and demand factors.  For example, the toluene price.  Toluene is the key factor input for making TDI, so that would be the key input to

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

making TDI, so that's going to be included.

But then in order to discipline which other variables you should actually include he uses this statistical technique called AIC. It stands for Akaike Information Criterion. But what it does is guides you in which additional variables you should add, keeping in mind that you want to maximize your predictive performance. So he's going to add only additional variables that improve the predictive performance of the model.

Q   Does AIC help or limit the model's tendency to, quote/unquote, overfit?

A   No. The AIC is specifically designed to address the overfitting probably. So the reason you would use AIC is if you are concerned about overfitting, you'd want to have AIC in there to make sure you're not putting in more variables than you should to guide when you should stop adding variables, which variables you should add, keeping in mind the cake problem, that you don't want to throw everything in. But which ones should you add. You're going to be disciplined about that and use that as your criterion to determine which ones to add.

Q   And that's an objective process?

A   Yes. A computer would -- you would run it through a computer.

Q   Is it unreasonable for an economist to use economic judgment to choose a set of core variables?

A   Oh, no.

Q    Is it unreasonable for an economist to use the AIC to refine the set of variables?

A    No, that's what AIC is designed for.  AIC is a comparative criteria.  You have to give it a starting place, and then it's going to guide you in what additional variables you would also add to the model.

Q    Now, we're looking at this list.  There's a number of things up there.  When you looked at Dr. Ugone's report and his testimony, did he claim that any one of these variables should have been excluded from the model?

A    No.

Q    Now, if we look at this list, did he in his testimony, reports, help you form your opinion to identify any variables he thought should have been included but were not?

A    Yes.  He suggested that capacity should be included.

Q    Let's talk briefly about capacity.

        Why was capacity not included?

A    Dr. Raiff explained this in his report, and it's commonly understood.  In trying to develop a model that's going to tell you what prices would have been in the absence of the conspiracy, you wouldn't want to include variables that were manipulated by or affected by the conspiracy.  You wouldn't be able to get an estimate of what prices would be in the absence of the conspiracy if you're including things that were manipulated by the conspiracy.  So, he explicitly did not

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

include capacity in the set of factors considered.  But it was raised by Dr. Ugone, and so in response to that, Dr. Raiff put it into the model, and it didn't change the results.

Q   What is the reason it didn't change the results?  Does that mean the model already accounted for capacity somehow?

A   Yes, the fact --

MR. BERNICK:  I object.

A   -- that it was not --

MR. BERNICK:  Excuse me.  Objection.  Leading.

THE WITNESS:  Sorry.

THE COURT:  No, that wasn't leading.  Overruled.

A   The fact that the model didn't -- that the results weren't affected by including capacity in the model indicates that whatever capacity was contributing to explaining prices was already being captured by the other variables.

Capacity is going to be -- capacity is a choice, and it's going to be affected by the same cost and demand factors that are affecting price.  So it makes sense that the factors --

THE COURT:  Which would be supply?

THE WITNESS:  Supply and demand.

THE COURT:  Okay.

BY MR. MARTIN:

Q   In these types of models, particularly in price-fixing cases, based own your experience, is it unusual to exclude

capacity as a potentially tainted variable?

A    No, it's understood, and it's in the literature that capacity in particular is an example of the kind of variable you would want to be careful about including because of its potential -- potentially being tainted by the effects of the conspiracy.

Q    In your review of the evidence, did you see any reasons to believe that excluding capacity as a potentially tainted variable was reasonable?

A    It seemed reasonable to exclude it, and particularly in light of the fact that when you include it, it doesn't make any difference.

Q    Is there any record evidence that supported that view?

A    That I --

Q    Documents?  Documents regarding capacity?

A    Well, there are several -- Dr. Raiff points to several instances in the record where it seems Dow, BASF and Bayer were taking steps to artificially restrict capacity, and in particular, one it looks like they formed an agreement to restrict capacity.

Q    Let's turn then.  We've done the benchmark period; the variable selection.  The next step as I recall was to run the regression.

A    Right.

So, run the model or run the regression.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

So we've got the data, we've got the equation now. So we've got our equation, we've used the data from the benchmark period, we have an equation that tells us what price is as a function of those cost and demand factors. So as costs are changing, demand factors are changing, the estimated price is going to change.

So now what we're going to do is, you can think of it as launching the model. So let's think about starting -- running the model from right just before the conspiracy period.

And now you'll ask: Okay. Given what prices were at the very end of 1993, what does the model predict they would be in January of 1994? And given that prediction, what do you predict it would be in February of 1994? And month by month you roll that prediction forward through the conspiracy period.

And this graph is showing that prediction continued to be rolled forward -- this is still the prediction -- into the benchmark period.

This prediction of price, it doesn't have to match up here. This is a prediction that was launched back here, and it was never given actual prices at any point along this -- through the conspiracy period. It's given the actual cost and demand factors as they occurred during the conspiracy period, but it's continuing through this period without knowing what actual prices are. And you see that it matches up with the actual prices here in the period -- in the benchmark period at

the end.

THE COURT:  What about -- I have this.  Let me just see if this works.  Yeah.

What about this period here?

THE WITNESS:  Yeah, good question.

THE COURT:  You didn't run any models for that period?

THE WITNESS:  Yeah, we did, that's what the green one is here.

So the green -- the model -- the equation that's giving you this line is calculated on data from --

THE COURT:  All right.

THE WITNESS:  -- these periods, the before and the after.  And then another test you can do of the model is launch the model from the very beginning.  So you give it just the price in January of 1992 and kind of take your hands off the wheel and let the model go and see what it would predict.  And that gives you this green line here.

So you're seeing -- the green and the red are telling you two things:  One, that it predicts well if you launch it from the -- just before the conspiracy period, and also that it predicts well when you launch it from the beginning of the data.

THE COURT:  Okay.

BY MR. MARTIN:

Q    And just to clarify:  There's nothing -- that model could

have gone any direction, it didn't necessarily have to match up with the actual prices in the post conspiracy benchmark period?

A    That's right.

MR. BERNICK:  Excuse me.  Again, these are almost all leading questions.  That was a leading question.  I object.

Q    Is there any --

THE COURT:  Just a moment.

I'm going to allow it.  There's no jury.  I'll allow it.  I didn't think it was significantly leading, but I understand.

Go ahead.

MR. MARTIN:  I'm just trying to move it along.

THE COURT:  No, I know you are, and I am too, so...

A    (Continuing) Okay.  They don't have to match.  There's nothing that forces them to match up.

THE COURT:  Right.

A    Dr. Ugone provided a number of examples of how it can miss badly, so there's clearly nothing that ties it down.  So the fact that it does match up is a measure of the reliability of the model.

You can also see if it comes through, there's a period of time where cost and demand factors suggest that price would be falling where the actual price stays relatively flat through here, and then you see a period here where the predicted and actual price match up again.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Marx - direct - martin                    80

This is a period of time, that's where a number of Professor Elzinga's indicators of competition show up.  So it seems like this was a period of where the conspiratorial -- it seems to fall apart a little bit, there seemed to be less effective conspiracy during this period of time.  So it matches up exactly with what the predictive prices would have been, and then finishes here.

Q    Does this model also account for the nature of competitive interaction in a competitive time period?

A    Sure, that's what the model is capturing.  The model is capturing the nature of competitive interaction in the benchmark period.

So it's using the data from the benchmark period to understand what the nature of competitive interaction is, how prices arise in the benchmark period as a function of the cost and demand factors.  And then it's asking the question: Suppose we kept the nature of competitive interaction the same in the conspiracy period -- we'll use the cost and demand factors that show up in reality in the conspiracy period -- but we keep the nature of competitive interaction the same as it was in the benchmark period, what would we have predicted prices to be?

And the prediction would be this line here.  And we see that the predicted prices are less than the actual prices, which suggests that there was something different about the

nature of competitive interaction in the conspiracy period, something that made it less competitive, but prices were higher than would be predicted.

Q   Okay.  So we've gone through the first four steps.  We've now run the model.  The last step is to "Inspect for Reliability."  Correct?

A   Yes.

Q   Okay.  I'll pull up the next slide.

This is another slide that was prepared under your direction?

A   Yes.

Q   And it's titled, factors supporting your opinion that the benchmark product model is reliable.

I'm going to ask you to go through these one-by-one. I'll prompt you so you don't have to read the entire board at once.

Number one is "Methodology Grounded in the Literature and Facts."

How did that help you?

A   This is -- the methodology that Dr. Raiff used is well accepted in the literature.  The choices made along the way were grounded in the facts of the case.  I think that's important for having a reliable model.

Q   The next one is that "The model performs well and accurately predicts benchmark prices and standard diagnostics."

Can you explain?

A   Yes.  The "accurately predicts benchmark prices," that's what we were talking about pointing to the picture in that the predictive prices match up with the actual prices in the benchmark period both before and after the conspiracy period. So that's a measure of performance of the model that it accurately predicts the benchmark prices.

And then there are a number of standard diagnostics that economists would do.  There's something called an R-squared that you want to be large.  It is large in this case.

There's another statistic called the residual auto-correlation, which you would like to be small, which it is in this case.  And the low residual auto-correlation gives you an indication that you haven't left out anything important. There's no -- the model isn't showing any kind of systematic mistakes which would indicate to you that something was missing.

So it performs well under those standard diagnostics.

Q   Number three is that it produces sensible results.

How does that help you?

A   Yes.  Well, you need to also inspect your model to make sure you're getting sensible results.  And here you see reasonable estimates of overcharges in the sense that they're well in the range of what we see historically from collusion. You see the place where the predicted price matches up with

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

the -- (approaching easel) you see this place here, which is sensible particularly in light of other evidence that's been raised.

THE COURT: During that period of time, during two thousand --

THE WITNESS: Yeah. Exactly.

A number of Professor Elzinga's indicators of competition that he notes during the conspiracy period are happening right in here. So it seems like that was perhaps a more competitive period of time.

THE COURT: Okay.

THE WITNESS: The conspiracy was less effective in elevating prices above what they otherwise would have been.

THE COURT: Okay.

BY MR. MARTIN:

Q    The fourth bullet point: "Consistent results across models." Can you explain what that means?

A    Right.

This board here is for TDI, but there's something analogous to this that was done for MDI and for polyols. And the -- oh, you've got pictures, don't you?

Q    No, I don't. I'm sorry. I thought I did.

A    They have the same character and analogous results and consistent levels of overcharges predicted from the MDI and polyols and TDI models.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

And this is a conspiracy -- the alleged conspiracy is across all three of these products.  And there are many of the same players responsible for pricing the different products, so that's another consistency check.

Q    Number five is corroborated by Dr. McClave's models, Dr. McClave's results.

A    Dr. McClave was a Class expert and he also did an estimate of overcharges.  And he did a different model.  He did one of -- the structural model that we talked about before where he was particular about being able to have -- understand the -- to give an interpretation to each of the coefficients in his model.  But despite having a different approach, the overcharges that are estimated are similar.

Q    And, finally, you considered criticisms.  Elaborate, please.

A    Yes.  I reviewed the criticisms that were raised by Dr. Ugone and Professor Elzinga and considered Dr. Raiff's responses to them, and I'd be happy to talk about them.

Q    We'll get there.

A    They didn't cause me to change my opinion about the reliability of the model.

Q    If I don't get you there, my learned counsel friend will.

Okay.  Is there any one test that a before-and-after model must pass to be considered reliable?

A    No, there's not -- there's not one key test.  Although for

me it would raise red flags for me if the model didn't predict well in the benchmark period.  That would certainly -- that would raise red flags for me.  But there's not a single test.

Q   Okay.  So now we've developed the benchmark product model, the same processes for the MDI and the polyols.  Correct?

A   Yes.

Q   Let's turn to the transaction model, if we could.

A   Yes.

Q   Can you briefly explain how the transaction level model was designed?

THE WITNESS:  Your Honor, if I point to this TV here, does that work for you?

THE COURT:  Yes.

THE WITNESS:  It would help to point.

THE COURT:  Do we have a pointer?

THE DEPUTY CLERK:  Yes, we do.

THE COURT:  Oh.  That might help her.

THE WITNESS:  Oh, look.  This is great.

MR. MARTIN:  And she's left-handed.  This is good.

THE WITNESS:  I'm left-handed.  I'm a fencer, so this is perfect.

(Laughter.)

THE WITNESS:  Okay.  Although I'll probably break the screen.

A   (Continuing) This graph, the blue line here is the same as

the blue line over here, it's just we've changed the time scale.  So now this runs from 1994 through the end of 2003.  It's just the conspiracy period.  So the graph looks maybe a little bit different, a little jumpy, a little more flat spaces but it's just because the time scale has changed.  The line is the same.

Okay.  So during the conspiracy period, the actual prices for TDI.

Now we're going to put on here, for every transaction between Leggett & Platt and Dow for Dow's Voranate T80 product.  So this is a particular TDI 80/20 product produced by Dow and selling it to Leggett & Platt.

So the prices that are negotiated between Dow and Leggett & Platt for this product are given by the circles in this graph.

And you can see that the negotiated prices generally follow the industry-wide price that we've been talking about before.  You know, they go up here, they go down here.  So they're following the industry-wide price but they're not exactly at the industry-wide price.  There are a number of factors that can affect what exactly the price is:  It could recollect relatively negotiating power; delivery terms; payment terms; something particular about the buyer/supplier relationship.  So we need to take those into account too.

So what we're going to do is, this is -- what I'm

describing now is the transactional level model, the second stage that we talked about.

So the first stage was to develop this red line, which is the red dots there, it's the but-for price.  And now what we need to do is for each of these transactions, we're going to relate this transaction -- we're going to use another regression and relate these transactions, say how they relate to the blue line to the actual prices, and then we'll use that same relationship but just substitute in the but-for line instead of the blue line.

So we'll say, suppose we keep everything the same about these dots, relationship to the blue line, but instead of benchmarking them off the actual price, we'll benchmark them off the but-for price, the red line.  And that's going to generate a but-for price for every transaction.

So for every transaction, every blue dot, they'll be an estimate of what the but-for price, the little red X would have been for that particular transaction.  And what we're assuming here is that whatever special idiosyncratic effects were affecting the individual transaction in reality, that those same effects would come into play in the but-for world in the absence of the conspiracy.  So they have really good bargaining power in reality.  We'll assume that they continue to have that strong bargaining power in the but-for world.

Q    Was this analysis done for every product?

Case 2:08-cv-05169-WJM-MF    Document 227    Filed 01/22/16    Page 89 of 207 PageID:
Marx - direct - martin                                            88
18932

A    This is done for every product, every buyer, every seller, every product, every transaction.

Q    And does it account for the bargaining skill and negotiation power?  I think you might have just said that.

A    Yeah, this is what we're trying -- the whole point of having this second stage is to make sure we're accounting for those kinds of things.

Q    Okay.  So now you've developed first stage model, second stage model.  Looking at those models, can you form the opinion that the alleged conspiracy caused a difference --

THE COURT:  Just a question.

THE WITNESS:  Yes.

THE COURT:  Like this one here, that was a transaction.  Correct?

THE WITNESS:  That's right.

THE COURT:  All right.  And then these are all transactions.  Most of them are consistent with the blue line. Correct?

THE WITNESS:  That's right.

THE COURT:  Okay.

THE WITNESS:  These are not.

THE COURT:  Okay.

THE WITNESS:  Yeah.  And so these, the little red dots that are up here are the estimated but-for prices associated with these transactions.  So you can see how these transaction

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

prices were way above the market price line.  And our estimate of the but-for price is also way above the estimated but-for line, so --

THE COURT:  Okay.  All right.  Thank you.

THE WITNESS:  Yep.

BY MR. MARTIN:

Q   Okay.  So you've done the models.

A   Yes.

Q   You've inspected the results.

A   Yes.

Q   The transactional model, was that developed the way that economists normally develop such models?

A   Yes.

Q   Okay.  Looking at these models, were you able to form the opinion that the alleged conspiracy caused the difference between actual and predicted prices?

A   Yes.

Q   Did you rely just on the model results, or did you look further into the historical facts to evaluate the reasonableness of those results?

A   Well, in looking at the results of the model, those would be interpreted in light of my understanding of what was going on of the facts in the industry.

Q   Professor Elzinga asserted there was too much evidence of competition to believe that a conspiracy caused elevated

prices.  Do you agree with that assertion?

MR. BERNICK:  Your Honor, I object.  The subject I believe of this hearing is supposed to be the model and not Dr. Elzinga's opinions.

THE COURT:  No, overruled.  I'll allow it.

Go ahead.

A   My understanding from Dr. Elzinga -- Professor Elzinga's deposition is that he didn't look at the evidence of conspiracy, he just focused on evidence related to competition. And when I balance that with evidence that I saw in the record that spoke to the possible existence of a conspiracy, those comments didn't -- caused me to doubt the reliability of the model.

MR. MARTIN:  If the Court has any further questions, otherwise I'm ready to pass the witness.

THE COURT:  Doesn't this model, the transactional model, does that take into account competition?

THE WITNESS:  Yes.

THE COURT:  It would.  Correct?

THE WITNESS:  Yes.

THE COURT:  All right.  Okay.

All right.  Each one of those black slashes is a transaction?

THE WITNESS:  That's right.

THE COURT:  A sale?

THE WITNESS:  Right.

THE COURT:  Okay.  All right.  Thank you.

THE WITNESS:  It would be some quantity associated with each one of those, delivery terms.

THE COURT:  Okay.  Go ahead.  I'm fine.

Cross-examination, Mr. Bernick.

MR. BERNICK:  You're going to catch me a little bit off guard here.  Could I have like five minutes, your Honor?  Is that all right?

THE COURT:  Okay.

MR. BERNICK:  Thank you.  I just want -- I don't want to shuffle paper.

THE COURT:  Is it okay if we just sit here, or do you need --

MR. BERNICK:  Absolutely, absolutely.

THE COURT:  Five minutes will turn into ten or 15 if we recess.  So I don't mind, I'm okay.  Be patient and we'll wait.  Don't get too flustered here.  You won't, I know that.

MR. BERNICK:  Okay.

(There is a pause for Mr. Bernick.)

THE COURT:  If you want to stretch and stand up, go ahead.  But let's not leave the room if we don't have to, and I'll even just step outside.  I don't want to put undue pressure on Mr. Bernick.

MR. BERNICK:  Thank you, your Honor.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Case 2:08-cv-05169-WJM-MF    Document 227    Filed 01/22/16    Page 93 of 207 PageID:
Marx - direct - martin
18936
92

THE COURT:  You can step down if you like.

THE WITNESS:  Thanks.

(Witness temporarily excused.)

(A recess is taken.)

(Proceedings resume.)

L E S L I E   M.   M A R X, resumes, testifies further as

follows:

CROSS-EXAMINATION

BY MR. BERNICK:

Q    Dr. Marx, good afternoon.

A    Good afternoon.

Is it afternoon already?

THE COURT:  Almost.

THE WITNESS:  Almost.

MR. BERNICK:  Oh, okay.  I guess I've been up for a
while so that's probably the issue.

(Laughter.)

Q    Dr. Marx --

MR. BERNICK:  I don't know; if I walk away too far
like this, do I go off the mic?

THE WITNESS:  I have a microphone.

MR. BERNICK:  Yeah, but I'm worried --

THE COURT:  Your voice is loud enough.  I think we can

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

all hear.

MR. BERNICK:  I'll take that in a good way.

THE COURT:  It is, it's a compliment.

MR. MARTIN:  Your Honor, do you mind if I sit over here?

THE COURT:  Too often I don't hear the lawyers.

Go ahead.

THE DEPUTY CLERK:  Can he sit in the jury box?

THE COURT:  Sure.  Sure.

MR. MARTIN:  I can't see.

(There is a pause for the Deputy Clerk.)

MR. BERNICK:  There we go.

THE DEPUTY CLERK:  Okay.

MR. BERNICK:  So if I zoom it a little bit -- maybe if I do auto-focus.

I don't know why it doesn't look so good, but I guess it's good enough.

BY MR. BERNICK:

Q   So just a few questions to pick up, Dr. Marx, on a little bit of your testimony on the design of the model.  And Dr. Urgone, the person in the back, will have an opportunity to do a response.

But I just want to clarify.  Wherever you have an asterisk, those are all variables that Dr. Raiff chose himself -- he chose himself and he didn't leave the computer

Marx - cross - Bernick

program with the option of rejecting them.  Correct?

A    That's correct.

Let me just point out that, for example, the toluene price, see where it says TDI in parenthesis?  It means it was only a mandatory variable for the TDI model.

Q    But the answer to my question:  Where the asterisk is there, those are variables that Dr. Raiff selected, and he didn't give -- the computer program was then run -- the chance to reject them.  They were mandatory.  Right?

A    That's correct.

Q    All right.  Is it also true that when he made that selection, there's no methodology that was used that you're aware of; he just made the selection based upon his judgment.  Fair?

A    Well, the methodology was a deep study of the industry and the products in the market, and then using his judgment as an economist on what -- given that information, what relevant cost and demands factors would be.

Q    I'll stipulate for purposes of the discussion he did a deep study.  So he's done with the deep study.  Now we get to the question of what to pick.  And that's a matter purely and simply of his judgment.  Yes or no.

A    It's his judgment based on what he knew about the industry, yes.

Q    Okay.  And isn't it true that today we don't know, do we,

how many other variables Dr. Raiff considered as mandatory variables and decided not to use.  Correct?

A    I just know this list was his candidate set of variables.

Q    So today we have no way of really knowing what it is that he considered as alternatives and tested out.  We only know what actually appears in the model today.  Correct?

A    I'd have to go back to his deposition.  I don't know whether he was asked about that in his deposition.  I don't recall.

Q    Certainly not in his reports.  Correct?

A    It's not in his report.

Q    In fact, today we don't know anything about runs or experiments or alternative variables that he considered before he actually seized upon the combination that we see in the report.  Correct?

A    Again, I'd have to go back to his deposition to see if he was asked about that.  But I don't know -- I don't know what he did prior to coming up with that list.

Q    Now, the optional variables are variables that are all selected with a computer program, and that program does not have the latitude to reject the mandatory variables.  Correct?

A    Correct.

Q    And so when you say that, well, he considered capacity, you have no record that he ever considered capacity as a mandatory variable.  Correct?

A    That's correct.

Q    And so when he decided to run capacity as an optional variable, it would only be accepted if it contributed, according to the program, something more than the mandatory variables.  Correct?

A    Right.  It was -- I mean, it was rejected by the program in that it reduced the predictive performance relative to other combinations of these variables.

Q    On the assumption that you keep the mandatory variables in the game.  Correct?

A    Yeah.  The mandatory variables were always mandatory.

Q    So we don't really know based upon his work whether you could have gotten to the same or a better fit if he had included capacity as a mandatory variable, do we?

A    Since he never included it as a mandatory variable --

Q    Whoa.  You don't know whether he did or not.  Correct?

A    Oh.  As far as I know he didn't include it as a mandatory variable.

Q    You don't know whether he ever included capacity as a mandatory variable in order to tested it out, do you?

A    I don't recall.  We could go back to his deposition and see if he was asked that.  I don't recall, and as far as I know he didn't.

Q    Okay.  Well, you certainly read his deposition, didn't you?

A    Oh, definitely.

Q    And you certainly read his report, didn't you?

A    Yes.

Q    Okay.  So far as we know today, you don't know anything that says -- you don't know one way or another whether he tested out capacity as a mandatory variable.  Correct?

A    I don't think he did.

Q    Okay.  Well, you don't know.  Fair?

A    I guess I don't know.

Q    Okay.  That's fine.

And, in fact, if capacity had been included as a mandatory variable, have you ever tried to figure out what it would have shown about all these curves and models?  Have you ever done that?

A    No.  It wasn't selected so I wouldn't expect anything to change.

Q    I just asked you a simple question:  Have you ever done the work to know how these models would have turned out if capacity had been selected as a mandatory variable?

A    No.  I think that would probably run afoul of the agreement that I was working under.  I didn't do it.

Q    Well, the agreement that you were working under is an agreement that was set by Judge Lungstrum.  Correct?

A    That sounds right.  Sorry.

Q    Okay.  Now, in point of fact, capacity, you say, well, there's evidence that there may have been some manipulation of

capacity.  Do you recall that?

A    Yes.

Q    Okay.  But isn't it true that you have not been asked to do an analysis of whether there was a conspiracy to manipulate capacity ever?

A    I wasn't asked to do that.

Q    And you haven't done anything to determine whether the documents that you have referenced, whether in fact anything actually took place pursuant to those documents; you don't know.  Right?

A    I just looked at the documents.

Q    And the documents don't tell you whether anything actually was done with capacity, do they?

A    There's one that looks like a signed agreement, but I didn't -- I didn't go beyond looking at the documents.

Q    That's a swap.  Correct?

A    It was product in exchange for an agreement to slow the -- to delay the increase in capacity.

Q    Swap, s-w-a-p.  Right?  It's a swap agreement?

A    As I recall, it was an agreement for Bayer to give product to BASF in exchange for BASF delaying the expansion of its TDI capacity.

Q    TDI or MDI?

A    Well, there was one that involved MDI.  I was actually thinking of the one that related to TDI.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Q   Okay.  But you don't -- do you know what a swap is?

A   Yes.

Q   Do you know whether that was a swap agreement?

A   My recollection is it was just product for the delay in the capacity expansion.

Q   And, in fact, with respect to TDI and capacity, during this period of time, that is the early 1990s, it's a fact, is it not, that there was a dramatic expansion in TDI capacity.  True or not?  Do you know?

A   I don't think that's right.

Q   You don't think that's right.

So when Mr. Ho says for Dow that there was a doubling of Dow's TDI capacity in the early 1990s, he's wrong?

A   I don't -- I don't recall sitting here right now the exact capacity numbers.

Q   Well, apart from exact capacity numbers, just tell us whether or not you have done any analysis to determine what actually happened with capacity in the early 1990s.  Have you done it?

A   I looked at the capacity numbers and looked at the fact that Dr. Raiff put capacity in the model, and it didn't have an effect --

Q   Okay.

THE COURT:  Don't interrupt.  Let her finish her answers, please.  You're --

MR. BERNICK:  I know, I know.

THE COURT:  -- going right away.  Go ahead.

I don't want her to feel rushed either.

MR. BERNICK:  Okay, that's fine, that's fine.

Q  I'm asking a simple question:  Did you or did you not actually analyze what happened to capacity in the early 1990s?

A  I looked at the capacity numbers for the whole period.

Q  Okay.  So then what happened to capacity in the early 1990s?  Just tell us.

A  I don't have that graph in my head sitting here right now --

Q  Do -- I'm Sorry.

A  -- I'm sorry.

Q  Do you know anything about the capacity trends during the 1990s?

A  Well, they were, as I recall, relatively flat going into the beginning of the conspiracy period, and then they were -- the name plate capacities were higher going out of the conspiracy period.  I also recall lots of documents that talked about there being difficulties getting all of these facilities online.  So it's a little hard to understand exactly what actual capacity was.

Q  So the capacity stayed flat.  Did it go up, did it go down?  What did it do?

A  I'm sorry, I just don't have that graph of capacity locked

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

in my head sitting here right now.

Q    Isn't the fact that the reason why there was pricing softness in the early 2000s was that so much capacity for TDI had been built in the early 1990s that there was overcapacity? Isn't that a fact?

A    I don't think that's the case.

Q    So that's wrong?

A    Well, when you look at, for example, the capacity graph that's in Dow's memorandum, it's one of the legal documents associated with this case, there are periods where it looks from that graph like the -- like capacity utilization is very high, which would suggest to you you'd expect to see increasing prices, and it's a period where the actual prices are decreasing but where the but-for price seems to be capturing that effective increasing prices.

So I'm not really sure what to make of the arguments about capacity.

Q    Well, that's a --

THE COURT:  Let me see if I understand something, and maybe I'm confusing capacity with supply, or I don't know if they're one and the same thing.

MR. BERNICK:  Right.

THE COURT:  But if you increase capacity --

MR. BERNICK:  Right.

THE COURT:  -- am I correct, that means there's more

supply available in the market, or not?

MR. BERNICK:  Yes, if you increase --

THE COURT:  Let me ask the witness that, maybe she can better answer.

MR. BERNICK:  Sure.

THE WITNESS:  It means it would be possible to produce more.

THE COURT:  More supply?

THE WITNESS:  It doesn't mean that you did produce more.

THE COURT:  So the fact that you're capable of producing more but you don't produce more, what effect, if anything, does that have?

MR. BERNICK:  Nothing.

THE WITNESS:  You'd have to look at the data and see if --

THE COURT:  Wouldn't the more meaningful variable be the supply that's actually there and that was sold?

THE WITNESS:  One would think.

THE COURT:  All right.  So I'm trying to understand capacity in relationship to supply.

MR. BERNICK:  If I can --

THE COURT:  Do you want to try?

MR. BERNICK:  I'll take a try.  We've been through this before.

THE COURT:  You're not under oath, but go ahead.

MR. BERNICK:  No.  But the thing is, it's not in any of Dr. Marx's analysis because you don't have capacity that's being treated in that analysis for the reasons you've indicated.

Dr. Marx referred just now to capacity graphs that were in Dr. Ugone's report that were stricken.  So that's why -- she read it, I'm not taking issue with that -- but that's what he's referring to.  The real issue, you're correct, is capacity utilization.

THE COURT:  What?

MR. BERNICK:  Capacity utilization.

THE COURT:  Okay.

MR. BERNICK:  So as our presentation shows -- I don't think there's going to be any disagreement about this on the facts -- during the early 1990s, demand was rising because for TDI, TDI is in beds, underlay for carpet, car seats.

THE COURT:  Okay.

MR. BERNICK:  So the economy is picking up from the recession that occurred back in the early 1990s and it's coming back.  So demand is coming up.

No capacity, new capacity was built during that period of time.  And so because it's rising quickly and China is now coming into play as a center for demand, the capacity that's available -- this is where hard capacity matters -- if the

demand is greater than that pipeline coming out to the plant, then you can utilize capacity until the cows come home but your supply is still limited by the size of that pipeline, plus whatever de-bottlenecking you can do.

So when demand rises at a certain point, it hits a hard stop.  At that point, when you start to get that high utilization and you hit that hard stop, that's when there starts to be real price pressure because people literally can't make more come out of the factory to satisfy the demand, and so the market --

THE COURT:  How -- okay, go ahead.  In effect, it's supply.

MR. BERNICK:  At the end of the day it becomes --

THE COURT:  You know, I'm not an economist like you but --

MR. BERNICK:  It is supply, but --

THE COURT:  -- but I mean, my basic understanding is, if there's a demand because there's more demand to make carpets, China is on the market --

MR. BERNICK:  Right.

THE COURT:  -- and then the defendants have just so much supply --

MR. BERNICK:  Right.

THE COURT:  -- whether they can put out more or not, the price will be determined by what's available and how much

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

somebody is willing to pay for it.

MR. BERNICK:  It's a relationship between what the demand is --

THE COURT:  Right.

MR. BERNICK:  -- and what the supply is.

THE COURT:  Okay.

MR. BERNICK:  And all the capacity adds to the equation is that it deals with how much flexibility you have to increase the supply.

So if demand is going up, the supply is no longer adequate and capacity restrains -- because it's a fixed capacity -- restrains your ability to produce more.  That's going to drive prices up.  If you can produce more and meet the demand, there won't be the same kind of pressure on price.

THE COURT:  And if they have control, hypothetically, they may not have complete control depending on how quickly they can invest to put out more product or whatever --

MR. BERNICK:  Right.

THE COURT:  -- but the defendants have control --

MR. BERNICK:  They will always have control over that. The question really is:  Does that then mean that every time you do a model you take capacity out because it's within the control of defendant?  And I think what you're going to hear is that --

THE COURT:  How much is capacity -- well...

MR. BERNICK:  How --

THE COURT:  I'll let you go ahead.

MR. BERNICK:  No.

THE COURT:  No, no, no, no.

I mean, how much does it add to the model if the model takes into consideration supply, cost, and these other variables?  Then whether or not the defendant has the ability to produce more, the price is going to be based on what was sold and what was available on the market at the time it was sold.

MR. BERNICK:  No.  Volume being sold doesn't capture the pressure on price if capacity is limited.  All that you know is how much is being sold.  Then you don't know whether there's more that's being -- less that's being sold than could be sold.

THE COURT:  Okay.

MR. BERNICK:  So if there's a pinch, it's a squeeze.  So if the customers call up and say:  I got demand in China, I want you to make another million pounds, and the company says, I'm sorry, we're tapped out, so you can't have more.  So at that point different customers are now bidding to be able to get what's there to meet the demand, and the price goes up.

THE COURT:  Yeah.

MR. BERNICK:  And that's all that this really is.

THE COURT:  Okay.  Okay.  I see -- it's some

difference.  But --

MR. BERNICK:  But it's --

THE COURT:  -- if the variables included what the supply was at the time the transaction took place, and I assume it did --

MR. BERNICK:  Yes.

THE COURT:  -- then they're bidding on what's available.

MR. BERNICK:  Well, but you don't know from that alone whether --

THE COURT:  If I go to the fish market and I want fish, and the fellow says, this is what I have, pay this amount.  And he said, but maybe in two days I may have more fish, well, if I want the fish that day I'm going to pay whatever the price is determined that day.

MR. BERNICK:  Exactly.  But the point is that in this particular case, because it takes so long to change the capacity, it's hard for you to come back.  So you're going to face a period of time of rising prices.  And this is basic business, it's not fancy economics.

THE COURT:  Okay.

MR. BERNICK:  It takes three years to build more TDI capacity.  So you can't wait until next week, you've got to wait for three years.  So at that point you're going to see prices rise.

And that's exactly what they did.  And it's not in Dr. Marx's report, but it's in all the business people who have testified.

THE COURT:  Okay.

MR. BERNICK:  And so then the question becomes:  If you had included capacity as a variable, what would your -- how would your model have worked?

And there's no analysis that's been done by other Dr. Raiff or Dr. Marx on that subject because capacity was only made an optional variable.

THE COURT:  How would an economist -- I'm just curious -- how would you include capacity?  What facts would you need to include capacity?

THE WITNESS:  There's a series of annual capacity levels, the name plate capacity --

THE COURT:  Okay.

THE WITNESS:  -- that's in Dr. Raiff's back-up materials, and it's what he included as a variable.  So he offered the variable in addition to these other choices to the model.  And that means when you do -- when you run the AIC procedure, it's going to run the model with all the different combinations of variables.  So it ran the model with capacity and exchange rates, and capacity and housing starts, and capacity with all the different variables and asked:  Did any of these models that include capacity give better predictive

performance than the one that's depicted here?  And none of them did.

THE COURT:  Okay.

MR. BERNICK:  And that's the problem again that I asked her the question about, which is:  That's true, but it's not the full story.  Because you make the model accept these mandatory variables capacity doesn't have the opportunity to shine on its own.  It's only all the other variables that are there are picking up whatever they're picking up.  And all that the computer program asks is:  Does it make a difference, a positive difference by adding capacity?

It doesn't answer the question of:  Well, what if you actually had capacity in place of some of those variables --

THE COURT:  Okay.

MR. BERNICK:  -- what would it do?

And that's key.  Because this gets now back to a question I'm going to ask her in a minute which has to do about the ability to tease out what actually is making this model work.  I'll do it right now.

THE WITNESS:  Can I say something?

THE COURT:  No, go ahead, because I've asked these questions.

Then I'll let you go ahead with your questioning.

Go ahead.

THE WITNESS:  I just wanted to comment that he's

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

making it sound like all of the squared variables are included in all the models.  Remember that the only thing in, for example, TDI, is the toluene, the natural gas, the things that say "TDI" in parenthesis afterwards.

THE COURT:  No, I understand that.  I understand that.

MR. BERNICK:  Okay.  I'll push on.

THE COURT:  It's three different products.

THE WITNESS:  That's right.

THE COURT:  It's three different products, so you wouldn't run the model including TDI and the MDI running --

MR. BERNICK:  But those products, those variables cover all three products, which means --

THE COURT:  On the right.

MR. BERNICK:  All TDI, MDI and --

THE COURT:  You have one that's not an asterisk I think.  Which one is that?

Wait.  Oh, no, they all have asterisks.  Okay.

MR. BERNICK:  These are the optional ones right here.

THE COURT:  Okay, yeah.

MR. BERNICK:  Okay.  But the point is, in a sense it's like in the model, because it's forced to take the ones that Dr. Raiff picked, and that covers all three products.  All three products between these different mandatory variables, all three products are covered by mandatory variables.  Which means if you want to test out capacity using his procedure, just kind

of mix and match procedure, you don't ever get to test capacity as a basic variable because it has to compete with all these other ones.

THE COURT:  Okay.

MR. BERNICK:  And that's the point.  And Dr. Ugone will explain that this business of having mandatory selection subjective, plus AIC, you can't find it, that's very unusual and it makes a difference to the bottom line.

If you want all mandatory picking would be one thing; he's got that run; if you went all AIC, he's got that run.  And each time you do that you get different results.  So this methodology or the absence of it makes a difference.

THE COURT:  Okay.  All right.  Go ahead.

THE WITNESS:  I have a comment if it's acceptable.  I don't know if it is.

THE COURT:  One more, and then I'll let Mr. Bernick go ahead.

MR. BERNICK:  I'm still rolling.  I thought I was going to be short on this one.

THE COURT:  Okay.  Go ahead.

THE WITNESS:  The AIC procedure is a comparative measure, it compares one model with the next.  So you have to start somewhere.

MR. BERNICK:  Okay.  Now I'm going to ask about this one.

THE COURT:  Go ahead, please.

BY MR. BERNICK:

Q    Okay.  So this one here, this is page 7 of the presentation.  I just want to clarify, Dr. Marx, these are the industry prices and these are the Leggett & Platt prices. Right?

A    The ones showing at the top are Leggett & Platt price, they're the actual Leggett & Platt prices.

Q    You're right, you're right.  I'm sorry.  Thank you.

A    No worries.

Q    Okay.  So this is Leggett & Platt.  This is industry?

A    Yep.

Q    And you can see how basically Leggett & Platt and industry follow along pretty well?

A    That's right.

Q    Okay.  And isn't it true that the second step model, the second step model that you used to get the Leggett & Platt but-for prices ends up tracking pretty much the industry but-for prices?  Right?

A    It's true, it does here.  It didn't necessarily have to, but it does in this one.

Q    So what that means is that when we think about that second stage model, that second stage model, it's no accident, that second stage model rides the back of the industry model. Right?  The industry model is used as the baseline for

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

developing the plaintiff-specific but-for price.  Correct?

A    I think so.

Q    Okay.

A    Can you say it again?  Or I can rephrase it, or however you want to do it.

Q    In other words, you're not re-estimating anew a but-for model for Leggett & Platt, you're using the industry but-for model as a baseline on the basis of which to then -- it's not so simple -- but to produce the echo that is specific to Leggett & Platt.  Fair?

A    Okay.  There is a regression that's done --

Q    Yes.

A    -- that relates the Leggett & Platt actual prices to that industry-wide price.

Q    Yes.

A    And you can see that they're related.

Q    Yes.

A    And then the but-for prices are calculated by, instead of using that relationship with the -- think of it as an equation that gives the transaction prices, how they depend upon the industry-wide price -- instead, we're putting in the but-for price --

Q    Yes.

A    -- to say, keep everything else the same.

Q    The same, yes.

A    But benchmark it off the but-for price.

Q    Yeah.  But if, God forbid, there were to be a problem in the design of the industry model, God forbid, but if that were to happen, that same problem would affect the second stage model, would it not?

A    If the but-for price were different it would give you a different result in this second stage model.

Q    But if the -- if there's a problem, a design problem with the industry model, that design problem would carry through to the second stage model.  Correct?

A    To the extent that this problem changes the but-for price, it's going to change what you get in the second stage model.

Q    Okay.  Now, very important little transition here.

So this chart simply shows Leggett & Platt.  Right?

A    That's right.

Q    But if you want to know what's actually happening to Leggett & Platt, are their prices the same as -- as prices that are being paid by other DAPs?  That's not on this chart, is it?

A    That's not on there.

Q    Likewise, if Leggett & Platt -- if different suppliers -- these are -- let me take it this way.  The prices actually charged to Leggett & Platt are charged by certain suppliers. Right?

A    This graph is all Dow.

Q    Oh, it's all Dow?

A    Yes.

Q    Oh.

A    It's Voranate T80.  That's a Dow product.

Q    That makes life so much simpler.

So this is Dow?

A    Yes, sir.

Q    What you don't have on this chart is what other companies; that is, Bayer, or BASF, you don't have what they were offering as prices, do you?

A    That's right, that's not on there, it's just Dow.

Q    So this price does not show whether there's competitive interaction.  True or not?

A    It's just the price.

Q    It's just the price.

So you don't know from this whether there's any competition for Leggett & Platt's business, do you?

A    It would just be reflected in the price here.

Q    To be precise:  You can't tell whether there was competition for the business of Leggett & Platt from this chart, can you?

A    I think you can only see the price on this chart.

Q    I think that means "that's right."  So I'm going to go on now and ask you about this chart.

This is also customer level pricing.  This is Carpenter 80/20, and this shows not just what Dow --

A    I'm sorry.  Can I come over there?  I can't really see it.

THE COURT:  Yeah.

MR. MARTIN:  It's that thing too if it helps.

THE WITNESS:  Yeah, I'm sorry.

Q    You can come over with me.  I'm sorry.

A    I can't see it.

(The witness approaches the easel on the other side of the courtroom.)

Q    So this chart now -- you were shown this in your deposition.

So this one shows for a customer like Leggett & Platt, Carpenter, but it doesn't just show the Dow prices.  Dow is green.  So Dow wasn't much of a supplier.  It shows instead others, like Bayer is red, and yellow is Lyondell, and gray I think is BASF.  So this chart actually shows what different suppliers are charging in order to get Carpenter's business.  Correct?

A    It shows the different prices they're paying, yeah.

Q    Okay.  And the handwriting here is all about how Mr. Paully -- that's his handwriting -- is putting these companies against one another in computation.

You're familiar with Dr. -- with Mr. Paully's testimony, are you not?

A    I am.  But as I recall, you told him to write those things on there.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Q   Well, the Court will see -- I did tell them to write it.  I told him to write what he just said.

So he testified, and I said, "I want up to write it on that chart," and he wrote it on that chart.  Right?  Or do you remember?

A   That's what the transcript sounded like, yeah.

Q   Okay, yeah.

So those are what he said.  And I said, it would be nice if I could show people on this chart so that we don't have to worry about the transcript says one thing and the graph says another one, put it all in one place.

And you were shown this in your deposition, were you not?

A   Looks like, yeah.  I don't have a clear recollection actually.  It was a couple of years ago.

Q   Here's my question to you:

Isn't it a fact that neither the benchmark model nor the second stage model compared the difference in prices charged by different suppliers for the same customer, nor explain those differences?  Isn't that true?

A   I don't think I did a comparison of the prices, and I don't think the model was attempting to explain the differences.

Q   Well, that's really the bottom line answer, isn't it?

Your model -- not your model -- Dr. Raiff's model that you have come to endorse, that model does not explain the

actual price -- the actual competitive pricing that the companies were made to offer to Carpenter.  Correct?

This -- this graph -- let's just be plain.  I'll withdraw that question.

A    These prices are in the data, so --

Q    Let's be plain about it.

There was intense competition for Carpenter's business.  Yes or no?

A    Relative to what?  The whole exercise here is to ask what prices would have been --

Q    Did --

THE COURT:  Don't interrupt, please.  Don't interrupt.  Okay?  Let her answer.

A    So is this competitive?

Well, relative to the but-for price, no, not as competitive as if the competitive forces had been acting in the same way as in the benchmark period.

Q    Okay.  Is it competitive?

A    No, not relative to the benchmark.

Q    No, it's not, okay.

Isn't it true that your model does nothing to explain why those differences are there and whether they're competitive or not?  True or not?

A    The differences are there in the data.  I didn't make an attempt to explain the differences.  The transactional model

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

takes account of the differences.

Q    The model does not explain what's going on with that pricing.  True or not?

A    I didn't try to explain that, I just tried to take it into account.

Q    And isn't it true -- and this is now a key question -- I don't need to keep Dr. Marx up -- but this is a key question. You made a contrast, Dr. Marx, between two types of models. You had a structural model and you had a predictive model. Right?

A    Actually a model can be both structural and predictive. That's like Dr. McClave's model is a structural model that's used in a predictive way.  I think what you mean is structural versus reduced form.

Q    Okay.  I thought you said -- I'll take that; reduced form.

A    So Dr. Raiff's model is the reduced form where the variables work together; the structural is the one where you try to give a particular interpretation to each coefficient in the equation.

Q    Now, what I had down is:  The structural enables you to look at each variable, plus hold everything else constant.  I wrote that down from what you said.  Is that right?

A    Yes.

        Sorry, that was loud.  Sorry.

Q    And what that means is that in a structural model, once

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Marx - cross - Bernick                                     120

it's done you can determine causation from a variable.
Correct?

A    That would be the interpretation you would give in a
structural model.  Causation given all else equal.

Q    Causation.  So what that means is causation for that
variable.  Correct?

A    That's the idea in a structural model.

Q    And isn't it true that predictive models, even predictive
reduced form models do not provide causal explanations?

A    That's right, they're not meant to, they're not to allow
the variables to work together and so you don't necessarily
have that causal interpretation from the coefficients.

Q    Now, as a result, at the end of the day, once you've run
your predictive model, the model itself doesn't tell you
anything about causation.  Correct?

A    Oh, no, that's not right.  I mean --

Q    The model --

A    -- it gives you -- the whole idea of the model is to help
you explain what the effect caused by the conspiracy.  I mean,
it's focused on the effect of the conspiracy.  It doesn't allow
the interpretation of the -- a causal interpretation of the
coefficients on the individual variables in the equation.

Q    You're saying that the model tells you the causal effect of
conspiracy.  Is that your testimony?

A    Yeah, that's what it's designed to do, is to help us

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

understand the price impact of the conspiracy.

Q    That's not what you testified to in this case, is it?

A    I'm not aware of what you're talking about.

Q    I'm going to have to find it now.

THE COURT:  What we'll do is we'll recess for lunch.

It's 12:30.

MR. BERNICK:  Yes.

THE COURT:  Why don't we try to all get back here at

1:15.

MR. BERNICK:  Okay.  I'm sorry to keep on going for so

long --

THE COURT:  No, I'm keeping track of your time.

MR. BERNICK:  I'm using up all my time.

THE COURT:  I took away five minutes --

MR. BERNICK:  Five minutes, right.

THE COURT:  -- for my questions, okay?

MR. BERNICK:  All I'll say is --

THE COURT:  And by the way, right now --

MR. BERNICK:  I know, yeah, yeah.

THE COURT:  Oh, no.  Look, we'll have some

flexibility, but we're going to finish this today.  Okay?

That's the whole point of the time restrictions.

MR. BERNICK:  There's a chart -- I'm sorry, go ahead.

THE COURT:  Just, I think the plaintiff has used an

hour, and Mr. Bernick, you've used an hour and 30 minutes and

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

I've taken away five or so for myself.  I don't mean to be -- we're getting this done today is my point.

MR. BERNICK:  Yes.

THE COURT:  So let's get back here at 1:15.

I understand you're eating lunch in the building.  Correct?

MR. CECCHI:  Yes, your Honor.

THE COURT:  So that's not too much of an imposition then.

Thank you, Doctor.  We'll see you at 1:15.

(Witness temporarily excused.)

(A luncheon recess is taken.)


A F T E R N O O N   S E S S I O N


L E S L I E   M.   M A R X, resumes, testifies further as
    follows:


THE DEPUTY CLERK:  Remain seated.

THE COURT:  Be seated everyone.  Thanks.

Okay.  Mr. Bernick, you're on cross-examination.

MR. BERNICK:  Okay.

CROSS-EXAMINATION CONTINUED

BY MR. BERNICK:

Q   Good afternoon, Dr. Marx.

A    Good afternoon.

Q    Now it is afternoon.

I want to try to march across this chart here for a moment.  I'll try to improve this a little bit.

Can you see that?

A    I can see that.  It's no problem.  Thank you.

Q    Okay.  So, this is a quote from a Supreme Court case, and I just want to capture certain elements of it in order to guide our questioning here.

You see the first step in a damages study, the first step is the translation of the legal theory of the harmful event -- so you have a harmful event -- into an analysis of the economic impact of that event.

And I just made up three columns here.  See that?

A    I see it.

Q    Now, you made a point of talking a little bit this morning about Dr. Elzinga.  Do you recall that?

A    Yes.

Q    And Dr. Elzinga spent a lot of time analyzing what I'll abbreviate is price increase announcements, or PIAs.  Correct?

A    Yes.

Q    And, in particular, he was very focused on whether those price increase announcements actually affected the final price.  Right?  That's what he was looking at.

A    Yes, I think that's correct.

Q    And the reason that he was spending so much time doing that is that that's the bulk of the evidence that relates to how prices -- how the plaintiffs believe that prices were affected; that is through price increase announcements.  Correct?

A    That was part of it, yes.

Q    Well, there's no other path that the plaintiffs have argued -- I'm sorry.  There's no other path that the plaintiffs have traced that intervenes between the price increase announcement and the actual price.  Correct?  That's the way you get to a price.  Actual price is through a price increase announcement.  Right?

A    Well, there were these meetings where they had the urethane pricing discussions, there were efforts to try to make these price increase announcements stick, and there was evidence related to capacity restriction.  So I think there are other things than just the price increase announcements.

Q    Okay.  Let's focus on the price increase announcements. Maybe we'll get to the others.

        But there's extensive evidence that the plaintiffs have presented regarding the price increase announcements and whether there was an agreement to actually make them stick. Right?

A    There were discussions of that, yes.

Q    Well, that is -- maybe you've answered the question.  That is a major focus of the plaintiffs' theory -- theory of the

case.  Right?

A    It's one of the focuses of the plaintiffs' case.  I'm not -- I'm not sure how to classify it as the major focus or not.

Q    Okay.  So now I want to ask you first with respect to these price increase announcements and their relationship to actual prices.  You with me?

A    I think so.

Q    The relationship between the price increase announcements and the actual prices that were charged.

Isn't it a fact that this is something as to which you have done no quantitative analysis?

A    I looked at the price increase announcements but I don't think there's anything that you would classify as a quantitative analysis of the price increase announcements.

Q    In fact, isn't it true that in your reports we cannot find any analysis of what happened between the price increase announcements and the final price?

A    I don't think I did that analysis.

Q    Now I want to go to economic impact.  And economic impact is something that's determined through, in your view, through Dr. Raiff's model.  Correct?

A    I mean, it's not that the impact was caused by the model, the model helps us understand whether there was impact.

Q    I think I said "determine."  The economic impact is

determined through the model under the approach that you endorse.  True?

A   Can you just use "assessed"?  It was assessed using the model?

I mean, the model didn't determine the impact.

Q   "Assessed through the model"?

A   That's lovely.

Q   Okay.  This is where the model comes in.  Right?

A   Yes, sir.

Q   Isn't it true that the model does not trace the impact of these price increase announcements?

A   Only to the extent that they are reflected in prices.

Q   The model does not analyze the relationship between price increase announcements and actual prices.  Correct?

A   That's correct.  Only to the extent that the price increase announcements stuck and they're reflected in the prices, then of course that would be in there.

Q   Isn't it true that I asked you these questions and you gave these answers during your deposition on November 15th:

(Reading) QUESTION:  Is there anywhere in the reports set out an expert opinion regarding the quantitative relationship?

I should go back.

QUESTION:  I'm going someplace else.  I'm talking about the actual result of the price increases quantitatively,

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

the quantitative relationship between the price increase announcement asked and the final price.  Is that anywhere in the reports set out in an expert opinion regarding the quantitative relationship?

Your answer was:  "I don't believe so."

And I went on to ask:  (Reading) Okay.  And that certainly was not the purpose of the model?

And you answered, "That's correct."

Do you stand by that answer?

A    Yes, I do.

Q    Now, model -- "coming out of the model" is something else.  Coming out of the model is I think what we call variance.  Right?  A statistical variance?

A    It's the but-for price.

Q    Okay.  The gap between --

A    Sorry.  You can use the but-for price and then calculate the gap, yes.

Q    So the gap, how would you refer to the gap?  I thought it was variance.  But if there's a better word that you like, that's fine.

A    It's fine, yeah, whatever you want to use.  It's the difference between the but-for line and the actual prices.

Q    Should I say "gap"?

A    That's up to you.  That's fine.

Q    I'll say "variance" because I wrote it on all the other

charts, so I might as well --

A    That's fine.  Statisticians use it for other things too, but I know what you mean.

Q    Okay.  So now I want to focus very carefully.  You've got the economic impact as assessed through model, and that shows that there is a variance between the actual prices and the but-for prices.  Right?

A    That's correct.

Q    Okay.  Now, isn't it true that the model does not determine the cause -- what it is that caused the variance?  The model itself does not determine the cause of the variance?

A    That's correct.

Q    Number two, the model does not enable -- does not enable you to say -- the model doesn't tell you that price increase announcements cause variance.  Correct?

A    Correct.

        MR. BERNICK:  Let it be observed that I'm a lefty, too.

Q    I bet you your handwriting is better than mine.

        Okay.  Here's a very key one.  Isn't it true that the model does not tell you the causal effect of a conspiracy?  The model doesn't say that the variance is caused by conspiracy.  Correct?

A    The model itself doesn't tell you that.  Just like when you give someone a drug and you observe a statistically significant

impact of the drug, you don't -- it could be something else, but you attribute that effect in this kind of exercise to the drug.

Q    That's to be determined through controlled clinical trials. Correct?

A    To determine whatever data you have.

Q    That, in fact, in the world today is determined by controlled clinical trials.  True or not?

A    These techniques would be used in many settings where you have to work with real world data where you don't have a perfectly controlled experiment.

Q    The effect of the drug must be determined by controlled data.  Correct?

A    I don't think that's correct.

Q    You don't think so?

Is your model a controlled study?

A    No, it's using real world data.

Q    So it's not a controlled data and it's not like -- it is not the kind of study that is used to determine the effect of drugs.  Correct?

A    It has nothing to do with the drugs.

Q    Well, you raised drugs as an example.  This case has nothing to do with the testing required to determine the efficacy of drugs.  Is that correct?

A    I agree with that.

Q    (Writing on chart) Variance does not tell you that variance caused by conspiracy.

Right?  It doesn't tell that you?

A    The model itself doesn't tell you that.

Q    Right.

A    It just tells you there's something different and it tells you the direction.

Q    Something's different.  The model -- all the variance says is that something is different.  Right?

A    It tells you a little more than that.  It tells you something about the nature of competitive interaction is different because you're taking into account the cost to the manufacturers and it tells you the direction, that whatever it is that was different about the nature of competitive interaction is causing prices to be higher than they would have been predicted --

Q    But --

A    -- given the competitive interaction in the benchmark period.

Q    But -- I'm sorry, I interrupted you again.  Go ahead.

A    No, I'm finished.  Thanks.

Q    I apologize.

But it may say there's something -- you believe it says there's something competitively different, but it doesn't tell you, just so we're sure, just like you said once, twice:

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

The model does not tell you that the cause of the difference is the conspiracy.  Correct?

A    It doesn't tell you that.

Q    Right.

(Writing on chart) And so in order to be able to go from variance and there being something different, in order to get from -- the same column -- economic damage as assessed by the model, variance to -- of that harmful conduct -- to get from variance to variance caused by that harmful conduct, isn't it true that that requires a second step that is not in the model?

A    Well, you would take the results of the model and then, for example, attribute that difference between the but-for and the actual price to the conspiracy.  If you think of that as a step --

THE COURT:  This point here (indicating) where the evidence that a conspiracy had concluded -- correct?  Well, there's evidence, whether you agree with the evidence or not, there's evidence I understand that the conspiracy was concluded right there.

MR. BERNICK:  Oh, at 2004?

THE COURT:  '4.

MR. BERNICK:  Sure --

THE COURT:  Yeah.

MR. BERNICK:  -- they will say --

THE COURT:  And the model from that point on, the factors which would have caused this variance -- or at least in this expert's opinion -- was the conspiracy.  And then it's confirmed by the fact that when those factual things are no longer there; the collusion, the evidence of all that, the model shows that it's very consistent.

MR. BERNICK:  Well, we're going to get to that --

THE COURT:  We'll get to it.

MR. BERNICK:  -- in just a minute.

THE COURT:  I understand what you've been saying for 15 minutes already that, you know, the model itself doesn't scream out "it's the conspiracy."  No model would.

MR. BERNICK:  Not only the model not screaming out, the model says zero about causation.

THE COURT:  Of course.

MR. BERNICK:  Okay.

THE COURT:  What economic model would say it's a conspiracy?  It needs to be interpreted by any expert.

MR. BERNICK:  Oh, no --

THE COURT:  That's what experts do.

MR. BERNICK:  Well, no.  We're --

THE COURT:  Now the question here -- look, look, look, the question is becoming very clear:  She's qualified.  You acknowledge that the type of model she's used is recognized and accepted in the -- well, you don't -- no, you're differing with

the model as it was fitted into the facts of this case.

MR. BERNICK:  I'm --

THE COURT:  Stage two of the Daubert hearing, one and two is not an issue.

Your expert is not going to come up and say:  The predictive model is not recognized in the economic world.  He's not going to say that.

What he's going to say and what you're saying is, the model that was used did not fit the facts.  That's Step 3 of the Daubert hearing.

MR. BERNICK:  I --

THE COURT:  And what I'm getting at is -- you know, I -- I'm following you.

MR. BERNICK:  Okay.  We'll get there.

THE COURT:  Get there.

MR. BERNICK:  Now before you get to Step 3, we're saying just -- because you've given me the opportunity to clarify -- we're saying that the model is of a type that certainly has been recognized.  We are not --

THE COURT:  Yeah.

MR. BERNICK:  -- we're not fighting that battle.

THE COURT:  Okay.

MR. BERNICK:  Although we would love to, we're not fighting that battle here because we have a sense of realism.

But when you take a look at the models that have been

used of this type -- you know, Dr. Albert White was the progenitor along with a guy named Bernheim in the Vitamins case where he saw the big thing, and they developed this thing and it's very, very elegant.  He calls it a "concerto."  A concerto.

All the judges are like, oh, oh, that sounds kind of like science and math, probably real -- a little platonism there.  That's great.  That's great.

There is a world of difference between how those models are actually deployed, and it's not just factual, it's designed; designed.

THE COURT:  Okay.

MR. BERNICK:  And our presentation goes through the design differences.

THE COURT:  No, I --

MR. BERNICK:  And that makes all the difference.  So there's a reliability issue as well as a fit issue.

And Dr. Ugone, if he ever gets the chance to interrupt me will at least cover a couple of features of that.

THE COURT:  Go ahead.

MR. BERNICK:  So the last step is now, we're going to go through variance.

Your Honor is already on top of this.  This is a separate step.  The witness thinks about this as a process of elimination and as an inference.

And I'll short circuit this by saying, we agree it's an inference, we agree that she refers to it as a process of elimination.  But to draw a causal statement, to draw a causal statement can be done through a model.  It can be done.  This kind of model.

They decided not to do this kind of model.  And, therefore, when they go forward and get into the question of, well, what do we now do with this thing that we've created?  They brought themselves into a world that is very vulnerable -- should be very carefully scrutinized under Daubert --

THE COURT:  Okay.

MR. BERNICK:  -- which is the world of inference and judgment and particularly what the judgment is.

And this now comes back to what they say here.  And I'll ask a few questions and then I think we'll get to a point where we can talk about that chart, which I do want to do.

BY MR. BERNICK:

Q   Isn't it true that when you say now your interpretation or your inference is that the variance was caused by conspiracy -- that's what you say.  Right?

A   That's right.

Q   -- that this here, the conspiracy is not defined, not defined by any specific harmful conduct?  It is simply the evidence of the conspiracy as a whole.  Isn't that true?

A   Yes.  I was looking at the conspiracy as a whole, looking

that the price effects of the conspiracy acts as a whole.

Q   Well, effects is one thing.  Effects is variance, it's modeling, it's da, da, da.

"The effects of" is what I'm asking about.

You're not prepared to say that that variance is caused by any particular act.  True?

A   Right.  The acts as a whole, the conspiracy as a whole.

Q   The evidence of conspiracy as a whole.  Those are your words.  Correct?

A   Okay, yes.

Q   When I go back to the Supreme Court and I say that harmful conduct, that injurious conduct, you have nothing to say, you do not have an opinion of causation that specifies what harmful conduct causes the variance.  True?

A   Just the conspiracy as a whole.

Q   So price increase announcements, you can't say that -- you can't even infer that price increase announcements caused variance, can you?

A   To the extent that that was part of the operation of the conspiracy, then I would expect it to be captured here.

Q   I'm making a distinction.  I'm saying not just the evidence of the conspiracy as a whole, I'm working with what the Supreme Court told us, which is:  Look, real world, something happened.  There was conduct, and the conduct caused prices to be higher.  And all I'm saying is, even with your inference you can't say

Marx - cross - Bernick

specifically that this event -- actually the court talks about -- this event caused variance?

THE COURT:  Which event?  Which event?  When you say "this event" --

MR. BERNICK:  That's the problem.

THE WITNESS:  No, no.

THE COURT:  That's not the problem.  Because I don't want her to be confused.  When you say "this event," are you referring to the price-fixing or are you referring to -- I mean, to the price announcement increases or --

MR. BERNICK:  I --

THE COURT:  No, no.

MR. MARTIN:  To the extent that we can bring it out of the world of the Supreme Court and back into the world of economics I think would be helpful for all.

THE COURT:  I'm sorry.  Would you speak up a little?

MR. MARTIN:  If we can take the hypotheticals out of the world of the Supreme Court for the purpose of questions and bring them back into economics --

THE COURT:  Okay.

MR. MARTIN:  Thank you.

MR. BERNICK:  I'll rephrase my question.

BY MR. BERNICK:

Q   Let's talk just about real world events, events that cause harm.  That's what I want to talk about.

You are unable even by inference to express the opinion that a particular harmful event caused variance.  True or not?

A    I think what you're asking me is, if you called out a particular price increase announcement, you're asking me, can I point to that announcement and tell you that that specifically was one of the portions of the conspiracy that caused there to be a price elevation relative to the but-for price.  I'm not going to be able to do that.

Q    Do you recall giving this testimony on November 15th, at page, unfortunately, 580:

(Reading) Well, that's exactly my point, is that if it came to attributing the gap to collusive conduct, you have not made that attribution on the basis of any particular act that is alleged to be conspiratorial.  True?

And your answer is:  I made that attribution on the basis of the evidence altogether as a whole.

THE COURT:  Which is what she said here today.

A    I agree with that.

THE COURT:  No, it's consistent.  So I don't know what you bring -- it's consistent to what she's testified to.

MR. BERNICK:  But the -- I don't think -- respectfully, I thought her answer was -- I asked her specifically not about the event, which is the evidence of the whole.  My question was "particular act."

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Marx - cross - Bernick                              139

THE COURT:  That's your question.  But her answer is --

MR. BERNICK:  Oh, now I can do better -- okay.

THE COURT:  You didn't clarify it there.  You didn't call her to the carpet on that so it's not an inconsistent answer.

BY MR. BERNICK:

Q    Now we're there.

This is going to be -- I was going to save this for the last chair.  Page 579, line 17.

(Reading) In your reports, do you at any point actually identify what was happening in the way of alleged conspiratorial conduct that caused those gaps to exist?

ANSWER:  I looked at the evidence overall of conspiracy, particularly what's laid out in Dr. Raiff's initial report, it contains descriptions of many acts.

A    You're off the top of the screen there.  I'm sorry.

Thanks.

Q    Okay. Thank you.

A    Of course.

Q    (Reading) I'm not trying to associate individual pieces of evidence with particular changes in the way the distance between the actual and the but-for line evolve.

I then say:  Well, that's exactly my point, is that if it came to attributing the gap to collusive conduct, you have

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

not made -- did I just repeat that?

MR. MARTIN:  Yes.

A    I'm a little confused but I think I agree with what I said there.

THE COURT:  Sounds to me like it's consistent to what she's testified to.

MR. BERNICK:  What did I just see?

Oh, here it is.  That's the one before it.

Q    (Reading) In your reports, do you at any point actually identify what was happening in the way of alleged conspiratorial conduct that caused those gaps to exist?

ANSWER:  I looked at the evidence overall of conspiracy, particularly what's laid out in Dr. Raiff's report, that contains descriptions of many different acts that could --

Yeah.

-- be viewed as anti-competitive.  I'm not trying to associate individual pieces of evidence with particular changes in the way that the distance between the actual and the but-for line evolve (reading concludes).

A    I think I agree with that.

Q    Which goes back to this chart.

(Reading) Keep that in mind.  I am -- I am not trying to associate individual pieces of evidence, like the evidence that you say that the conspiracy failed.  I'm not trying to associate any pieces of evidence with particular changes in the

way that the distance between the actual and but-for lines evolve.

That's what you said at the deposition.  Right?

A    That's what I said.

Q    And, yet, today you are prepared to attribute the particular changes that took place here in 2002 to particular evidence of conspiracy.  Correct?

A    I just thought it was interesting that that point where the predicted line and the actual line matched up corresponded with the period of time where a number of Professor Elzinga's indicia of competition lined up.  There wasn't -- in this context in the deposition you were focused particularly on price increase announcements and evidence of collusion, not evidence of competition.  So I think I agree with everything I said in the deposition.

Q    "Interesting" is one question.  It may be interesting.  We can all line things up.  But when it comes --

A    It wasn't a discussion of whether I viewed it as being sensible --

Q    Sensible is interesting, and a lot of things are sensible.

Attribution is a statement of causation, is it not?

A    I suppose so, yes.

Q    And the point is that you can't make a statement of attribution that says, as these lines dip up and down it is due to some particular conspiratorial conduct.  True or not?

A    I think that's correct.

Q    Okay.  Now, if we go then beyond that to one further point that I want to cover which deals with this line -- and I'm going to try to mark it up here, and I'm real interested in this line.

First of all, in your report isn't it true that there's nothing in your report that actually goes through --

A    Just to clarify.  This is polyols, so it's different from the -- it's a different product.

Q    Right.  In fact, I would like to get --

A    But it's the same thing, just for a different product.

THE COURT:  No, I understand, a different product.

THE WITNESS:  Yes, sir.

(Mr. Bernick confers with co-counsel off the record.)

MR. BERNICK:  It's in my master deck.  Somebody took it.

Q    Here's TDI.  This is page 1 of the presentation that I made this morning.

We can see, can we not -- can you see that, Dr. Marx?

A    I think I can see it fine, plus it matches the board over here.

Q    We used the same price curves and the same but-for curves in our analysis as well, or in this presentation as well.  And of course, this over here is variance.

Now, I'd like to ask my question very carefully

because I want to be responsive to what you and Mr. Martin this morning discussed.

If we want, we can walk through, variance just tells you statistically that you've got two lines, one's actual price, and the other is but-for, and that that came out of a model that was designed.  Right?

A    It came out of a model, yes.

Q    Okay.  So we now need to interpret.  And you do some interpretation, a little interpretation here with Mr. Martin.

If we wanted to though, beyond doing kind of interpretation, if we wanted to, we could actually go back over the actual history that was associated with all these actual prices and determine the factual circumstances that were involved.  We could do that, couldn't we?

A    We could certainly look at the factual circumstances.

Q    And isn't it true that there's nothing in your report that actually does that, that goes back to say, okay, I've got statistical variance, how does it compare with the actual market facts on the ground?  We can't find that in your report. Correct?

A    Well, there's a long section in Dr. Raiff's report about events happening during the conspiracy period.

Q    I'm talking about market facts; that is, while the business was being operated, what the capacity was, what the prices were, what the business thought the demand was, the facts on

the ground from the business people who were taking decisions.

A    I spent a long time looking at the prices, the capacity, the cost, the demand, the factors you just mentioned.  I studied all of those things.

Q    You studied the variables and the data but you haven't studied what the market facts were, the actual negotiations of the prices that were paid and why those negotiations turned out the way they did.  You haven't done that.  Correct?

A    I looked at the prices, so that's how the negotiations turned out.

I'm not sure what you're suggesting I should have looked at.

Q    Negotiations -- price is the result of negotiations.  Right?

A    Yes, sir.

Q    The negotiations take place under perceived circumstances of what the buyer wants and what the seller is willing to sell for.  Correct?

A    I suppose so, yes.

Q    And your report does not recount, does not trace that history in how these prices came to be agreed.  Correct?

A    I don't have transcripts of these negotiations where they're talking to each other and trying to negotiate prices. I don't have those, I haven't looked at those.

Q    You haven't looked, for example, at whether capacity was

tight in the early 1990s, have you?

A    I looked at capacity.

Q    Was it tight or not?

A    It wasn't important to me to assess at any particular time whether it was tight or not --

Q    Was there --

A    -- particularly in light of the fact that when I included capacity, when Dr. Raiff included capacity into the model, it didn't change the result.  So it seems that the model is taking into account whatever contribution capacity has to the price.

Q    Did you look through the published articles in the trade press about what was driving price trends during the '90s?

A    I've read very many of those articles.

Q    What did those articles say about the price trends?

A    Well, some different things at different points in time.

Q    Your report doesn't recount the history of price trends according to the trade press, does it?

A    I think that's correct.

Q    Your report doesn't recount the history of price trends according to the business people, does it?

A    It just reports the prices.

Q    It doesn't --

        THE COURT:  I'm just going to let you know, you have about a half hour left of your time.

        MR. BERNICK:  Oh, my time?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

THE COURT:  Use it wisely.

MR. BERNICK:  I'm -- I'm --

THE COURT:  No.  I mean --

MR. BERNICK:  Because I have Dr. Ugone yet.

THE COURT:  Use it wisely.  You spent an hour in your opening address.

MR. BERNICK:  I know, I know, I know.  I'm just trying to think of --

THE COURT:  That's why I gave you a heads-up two days ago how much time you would have.

MR. BERNICK:  I pass the witness.

THE COURT:  And you're repeating a lot, frankly.

MR. BERNICK:  Okay.

THE WITNESS:  Should I step down?

THE COURT:  No.  No, don't step down.  But I'm just giving him notice that he's got about a half hour left to use however he wishes.

MR. BERNICK:  I pass the witness, your Honor.  Thank you.

THE COURT:  Okay.

MR. MARTIN:  Your Honor, we're just going to call her after Dr. Ugone testifies.

THE COURT:  I'm sorry.  What was that?

MR. MARTIN:  We'll call her back to the stand after Dr. Ugone testifies.

THE COURT: You're not done. Are you done with Dr. Marx?

MR. BERNICK: I pass the witness.

MR. MARTIN: He just passed the witness. I'm sorry.

THE COURT: Oh.

MR. BERNICK: I'm going to save my time for Dr. Ugone.

THE COURT: Okay. And you're going to call Dr. --

MR. MARTIN: I'm going to call her after Dr. Ugone. I have no redirect now.

THE COURT: You can step down, Doctor. Thank you.

(Witness excused.)

MR. BERNICK: We call Dr. Keith Ugone, your Honor.

I'm sorry, Dr. Marx, I'll let you get off the stand.

THE COURT: Mr. Martin, you're calling Dr. --

MR. MARTIN: I'm just going to recall Dr. Marx once she's had a chance to listen to Dr. Ugone's criticisms.

THE COURT: Right.

MR. BERNICK: And I agree to that.

THE COURT: And you're calling Dr. Ugone?

MR. BERNICK: I'm calling Dr. Ugone.

MR. MARTIN: And I'm going to sit down for now.

THE COURT: All right. Doctor, why don't you step forward, please.

Gail, we have to swear him in. Right?

THE DEPUTY CLERK: Okay. We're doing the other side's

Ugone - direct - Bernick                                    148

expert?

(The Court and the Deputy Clerk confer off the record.)


K E I T H   R.   U G O N E, called as a witness, having been first duly sworn, is examined and testifies as follows:


THE DEPUTY CLERK:  Please state and spell your name for the record.

THE WITNESS:  Keith Raymond Ugone.  Last name is spelled U-g-o-n-e.

THE DEPUTY CLERK:  Thank you.  You may be seated, sir.

MR. JOHNSON:  Your Honor, if I may, perhaps I just didn't understand.  Have you granted an extra half hour here? Because he's already used two hours.

THE COURT:  I know.  I've been looking at -- I just was doing my own addition.

MR. JOHNSON:  You know, we had rules.

THE COURT:  No, I know.  I'm going to allow it.

But keep it short.  You know, you spent a lot of time repeating things, Mr. Bernick.  I'm going to allow it; and allow you to have some extra time if you need it.

MR. JOHNSON:  Thank you, your Honor.

THE COURT:  I'll determine how much extra time, so you better get to the point.


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

MR. BERNICK:  That's why I'm going to be parsimonious. And I apologize if I've been repetitious.

THE COURT:  No, you were a little bit on the last area.

Okay, go ahead.

MR. BERNICK:  Okay.

DIRECT EXAMINATION

BY MR. BERNICK:

Q   Dr. Ugone, you and I are under the clock, a sort of Damocles, pick your metaphor, it's there, and I therefore want to ask you some very specific questions.

Number one, I'm showing you this demonstrative which is a piece from my presentation, page 6.

MR. BERNICK:  Why don't we just put it on -- I don't want to go through all that.

6.

Q   When it comes to the benchmark determination, there's a reference to 2004 being moved from the conspiracy period to the benchmark period.  And are you familiar with that?

A   Yes.

Q   The procedure where attorneys told -- and I think this comes -- does come directly from Dr. Raiff -- to move the benchmark period, move the conspiracy period, year of 2004, into the benchmark.  Is there any accepted economic methodology that would be consistent with that?

A    I'm sorry.  Consistent economic methodology with moving 2003 from conspiracy to the benchmark period?

Q    Correct.  At the direction of counsel and without the stated reason.

A    I guess what I would say is that as an expert sometimes you're asked to make assumptions, and it usually is the case that you should really kind of make sure that you can accept those assumptions and that you shouldn't just blindly do it, especially if it kind of flip-flops some of the results.

So the best I can say is, you know, whether you want to call it an accepted methodology, you need to make sure that the assumptions you're asked to make are reasonable.

Q    Okay.  Next question.  Overfit.  I showed this morning that there was as a result of that and other design moves, there was an issue of overfit.  Tell us whether or not that is your view; that is, that there's an issue of overfit.

A    Yeah.  I can answer that question without the slide -- okay, I see.

The way I would think about it is with overfit, what you're trying to do is explain the in-sample information so well and be so tight during the benchmark periods that that will create difficulties when you try to do either a prediction or even an out of sample prediction holding out data.  So the whole point with the overfit issue is, to put it into a nutshell, is that it's so tight in the estimation period that

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

you lose the ability to predict outside of the estimation period.

Q    Now, that slide also talked about hold-back periods as testing that needs to be done in order to assure that there's predictive power for the model.

And I have a quote from Dr. Marx's book.  Do you or do you not agree that the appropriate test for predictive power is the hold-back of a period of time?

A    Yes, that's clearly something that you would look at, that would be within the set of the setting that you would do.

Q    And in the testimony that Dr. Marx has offered, she agreed obviously with her book.

A    Yeah, she talks about holding out the last period.  I mean, you could choose different periods to hold out, so I don't think it has to be the last period, but she appears to agree with the concept.

Q    Okay.  Now, was there a hold-back test done by Dr. Raiff or Dr. Marx?

A    Yeah.  I don't believe there was a hold-back period test, no.

Q    Now, there was testimony just now from Dr. Marx that says that the AIC protects against overfit.  Did you remember hearing that from the back of the courtroom?

A    Actually I did -- I do remember that, yes.

Q    What's your response to that?  What's your view of that?

A   Well, I don't agree with that, because what the AIC is doing is really trying to optimize something, and what it's trying to optimize -- when I say "something," what I mean by that is, there's how much of the variation the data can explain, but you also don't want to put in, in a sense, the "kitchen sink" into the projection.  So it has a penalty for additional variables.  So it's trying to balance those concepts.  But with the problem with the AIC is, once you've identified your candidate set of variables, it really -- it then becomes math, it's not economics anymore.  And so it brings the relationships together, and that's where I think there's been some allusions to wrong science and insignificant variables and that's sort of the result.  So it turns it from sort of an economic issue into just a math issue.

And you heard at the very beginning of Dr. Marx's testimony that she kept talking about equations and math.  Well, we've got an economic problem we're trying to solve.

Q   So I've got here as page 19 something called "Out of sample testing - PMDI."  Are you familiar with that chart?

A   Yes.

Q   Why -- how are you familiar with that chart?

A   Well, we generated it as part of my work.

Q   Does that or does that not reflect an actual hold-out test?

A   Yes, for excluding one year at a time to excluding data.

Q   And what did you conclude based on that hold-out test?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

A    That the model was not able to predict that hold-out period.  So when you take that data and you hold it out from the estimation and then say, okay, let me see if I can predict that back and see how close I get, you can see quite a bit that it's not close at all.

Q    Okay.  Now, is there anything that Dr. Raiff or Dr. Marx performed that is anything like that test?

A    No, I don't recall them performing any sort of test that was like this.

Q    The AIC computer program that was used to select optional variables, does that have any relationship to this process here where you do the hold-out testing?

A    The only thing I would say is that we followed the methodology of Dr. Raiff and Dr. Marx when we were doing this, so that's the only way the AIC came into it.

Q    Okay.  Based upon this conclusion from this test, the same test that's in Dr. Marx's book, what conclusion do you draw as an econometrician about the predictive power of this model in this case?

A    Okay, two-part answer.  Taking the model as developed by Dr. Raiff and Dr. Marx, when we do an out of sample testing, we do not get good predictive ability.  But I also -- I would say I would combine that -- for my ultimate opinion I don't just draw my opinion from this chart, I have a lot of reasons when I do my reports as to the unreliability of the model, this is

just one of them.

Q   And based upon this hold-out test as well as the other things in your report, does this test, before you even actually apply it to the conspiracy period -- and you got statistical significance and all the rest of that -- before you even apply it, based on this test, should this model even get out of the box as a valid benchmark model?

A   Right.  What this is saying is, if I can't predict when I know the data, the out of sample testing and the hold-back period, if I can't predict then, that would really call into question that I'd have a great amount of pause of saying even without adjustments that I'm going to use it for the conspiracy period.

Q   Tell me, yes or no:  Based upon this, before we get into all the other issues that we've talked about this, tell me whether this model, based upon the methods and practices of econometrics, whether this model is suitable for any use in understanding the conspiracy period in this case.

A   Yeah.  I do not find the model reliable, and that's what I say in my report.  And it's for a lot of reasons, not just for this reason, but for a lot of reasons in my report.

Q   The hold-back test -- there's been a whole lot of discussion about Linerboard and other cases.  Was the hold-back test done in Linerboard?

A   I would have to refresh my memory on that.  As I'm sitting

here I don't remember right now, so...

Q   Was there a hold-back test -- we didn't like it -- but was there a also hold-out test by Dr. McClave in the Class trial?

A   I think he would argue that his model did predict -- well, there were other issues with his model as well though.

Q   But he did do some hold-back?

A   Yes.

Q   Okay.  But in this case, goose egg; none?

A   I'm not aware of any hold-back analyses.

Q   Okay.  Last area, which is capacity.  Capacity.

The Court asks a question as to which all lawyers and all witnesses are required to say "yes," not only because the Court asks it but because it's unquestionably true, and that is:  Isn't all capacity ultimately under the control of the suppliers in the urethane business?

A   I would generally say yes.

Q   Now, that's true.  What, if any, impact does that have on whether capacity should be a variable?

A   The reason -- so the answer is that capacity has to enter into the equation somewhere, and it can't be through this proxy approach where I'll use other variables to measure capacity. In other words, I do a lot of research as well in terms of what the underlying economic conditions were, and if you read all the articles, they would talk about capacity being tight, capacity utilization being high.  And the problem is, if you

don't do some sort of direct measure of capacity and if you only do it through other indirect measures, whether there was a little bit of an increase in demand or whether maybe natural gas prices changed, so when there was the discussion that capacity is sort of in there through other variables, well, that's saying it's in there through the demand variables, it's in there through the price of toluene or the price of natural gas or the price of chlorine.  Those are all, at best, would be just imperfect measures of trying to get at this, but I would never do it that way.

Q    I want to talk about verification and go back to this chart here.

You saw that there was a lot of discussion about whether there was an effort to go back and look for the historical facts at the time of these gaps.  Do you recall that?

A    Yes.

Q    Focusing solely on 1994 to 1996, and setting aside everything that is in your supplemental report that was stricken, did you or did you not go back to this very period of time and perform that kind of assessment?

A    Yes, I did, and I believe it's on page 71 and 72 of my original report.

Q    And what did you find?

A    That during that period of time the industry was

rebounding, there were increases in demand, capacity utilization was getting tight, and they say that basically we're saying that the industry was -- was rebounding.  And all of that is consistent with seeing the actual prices increase as opposed to a prediction that says prices would decrease when you have those events that I was just talking about.

Q   Finally, I want to get to the question that we left off with Dr. Marx about whether price increase announcements and their relationship with price were part of the model and --

MR. MARTIN:  Your Honor, I'm going to object.  Whether or not price increase announcements should have been a variable was one of the opinions that was stricken from his supplemental report.  So if that's what the question is going to be, I would ask that it not be asked.  If it's going to be asked, I would ask that you take into account the fact that it's based on an opinion that will not be up for trial.

MR. BERNICK:  I'm asking about an opinion.  It has nothing to do with that.

THE COURT:  All right.  Subject to that objection I'll listen to it.

But go ahead.

MR. BERNICK:  I think I'm right.

Q   There was testimony that it wasn't in the model.  Right?

A   Yes.

Q   Okay.  Based upon the Foam model, is there a model -- which

came out very -- came out in the last year -- has there now been a model that actually includes price increase announcements and looks for its impact on prices?

A    Yes, that's my understanding of the Foam model.  And I use a different set of words, I call it like an event study.  In other words, something happened, and what follows from that.

MR. BERNICK:  That's all I have, your Honor.

THE COURT:  Okay.  Thank you.

Any cross, Mr. Martin?

MR. MARTIN:  Just a few minutes.

CROSS-EXAMINATION

BY MR. MARTIN:

Q    Good morning, Dr. Ugone.  How are you?

A    Good, thank you.  I'm doing fine.

Q    A few questions about your qualifications.

A    Sure.

Q    You've never held a tenured position at a university, have you?

A    No.  I have taught for a number of years, but very early in my career I switched over to doing consulting.

Q    You never taught a class in econometrics, have you?

A    Not econometrics, but a lot of economics classes.

Q    Never had an article published in a peer-reviewed journal, have you?

A    Because I don't do that.  I'm a consultant.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Q   Well, you do that; you had one article submitted but it was rejected.  Right?

A   That -- the first -- when I first got out of my Ph.D program I taught for a couple of years, I did submit one article.  I'm barely remembering this.  But in the last 30 years I've essentially been doing consulting.

Q   Never been the editor of a peer review journal, have you?

A   No.

Q   Never took a field exam in either statistics or econometrics.  Right?

A   That's correct.  My area of specialization is industrial organization, which is a theory of firm behavior which fits squarely with this.  But I did not take a field exam in econometrics.

Q   You don't hold an opinion on whether or not a conspiracy existed, do you?

A   No.

Q   You don't hold the opinion that 2004 was a time in which the conspiracy was active, do you?

MR. BERNICK:  Your Honor, I object.  This goes beyond the scope of anything that I asked him.

THE COURT:  I'll allow it.

Go ahead.

A   I'm sorry, I just missed the question.

Q   You don't hold the opinion that 2004 was a conspiracy

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

period year?

A    I don't hold the opinion, but I do know empirically that it makes a big difference how you treat that year.

Q    You are aware that there is evidence that conspiracy stopped before 2004.  Right?

A    Actually, I'm thinking -- what I think back to is in the original Complaint.  I think 2004 was considered part of the conspiracy period.  But the best I can say is, I know there's a debate between the parties over that.

Q    Fair enough.

I asked you in our deposition -- do you recall I sat and asked you questions at our deposition?

A    I do recall, yes.  Actually I recall the deposition.  I'm not sure if I recall all the questions.

Q    I remember because I had my appendix out two days beforehand.

During that deposition I asked you:  If you were in the plaintiffs' shoes how would you have developed your analysis.

And you told me that as part of your work you would have used a regression analysis.  Do you recall that?

A    I think that would have been part of it.  Not all of it but part of it.

Q    Because the regression analysis allows an economist to gain information about pricing behavior.  Correct?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

A     Properly implemented and making sure that you construct that model to comport with economic facts and data, then econometrics can be a useful tool properly implemented

Q     You did not attempt to develop your own affirmative econometric model in this case.  Right?

A     That's correct, I evaluated the model of Dr. Raiff and Dr. Marx.

Q     You didn't try to attempt to quantify damages in this case.  Right?

A     If you're asking if I came up with an alternative number, I was just asked to evaluate the work of Dr. Raiff and Dr. Marx.

Q     Now, in that first deposition that we had, do you recall that we had a back-and-forth about the variables that should be included in Dr. Raiff's model?  Do you recall that?

A     I do recall, yes.

Q     I asked you specifically:

      (Reading) Tell me all the variables that should have been included in the model or that you thought shouldn't be included in the model.

      Do you recall that?

A     I think I recall you asked -- in the spirit of the question you just asked I'll say yes.  I recall it slightly differently. But within the spirit of what you just said, I'll agree.

Q     Okay.  And, in fact, I told you that Dr. Raiff was going to read your testimony because he wanted to understand all of the

criticisms that might be lodged at this model.

And you told me that there was demand -- I mean, conspiracy -- I mean -- I've been here too long -- capacity, and some measures of demand that he should look at more closely. Right?

A    I remember at least those, yes.

Q    You didn't tell me capacity utilization, did you?

A    Actually you would have to show me. I don't recall.

I do know it's in my report. And I've not always in this case thought about capacity and capacity utilization. And like I said on page 71 and 72 of my report, I bring some of those factors in. But as I sit here I don't recall how I phrased my answers to you.

Q    The record is before the Court so I'm not going to take our time. We can go through the list.

You didn't do any modification to the model to insert capacity as a mandatory variable, did you?

A    I don't believe so, no, not that I recall.

Q    So you can't tell us what would have happened to that model if capacity was included. Correct?

A    I can tell you theoretically that there would be then a direct measure of capacity and capacity utilization as opposed to however Dr. Raiff and Dr. Marx now think it's entering into the model. We know that capacity and capacity utilization are not being directly measured. But we can say, if that was added

to the model, then the impact would be directly measured.

Q   This is in your view a big concern?

A   I'm sorry?

Q   This was in your view a big concern?

A   Well, that's what the industry articles were talking about, when capacity was tight and when it wasn't.

Q   Your report is 145 pages long, it has 60 exhibits.  Nowhere in there did you include capacity as a variable to show the effects on the analysis.  Correct?

A   I don't think in that report we had capacity as a variable.

Q   You know about Dr. McClave's report.  Right?

A   I do.

Q   His is a benchmark model, right, where he has a period of time that he uses a benchmark of competitive prices?

A   Yes.

Q   And then he back-casts?

A   Yes.

Q   And his model results are roughly equivalent to the model results that Dr. Raiff reached.  Right?

         MR. BERNICK:  I'm going to object on the grounds of lack of foundation,

         THE COURT:  Speak up, please.

         MR. BERNICK:  It goes way to another matter, which is the relationship of the Class case.  That's a result of the Class case, not for this case at all.  So the fact of the

methodology is one thing.  The results of that model compared to this one is not in this case.

THE COURT:  I'll allow it, a limited amount.

MR. MARTIN:  I have one more question on it.

A   I'm sorry.  If it just helps, I wasn't quite understanding how you were saying it, so if you could say it again.

Q   The results that Dr. McClave generated in terms of overcharges for TDI, MDI and polyols were in the same range as the results of the overcharges that Dr. Raiff had for TDI, MDI and polyols.  Correct?

A   I will agree that it was in the same range, but I also had very many similar criticisms of what Dr. McClave did.

Q   Dr. McClave did include capacity as a variable in his model.  Correct?

A   And I think there were some issues of how he included it. A lot of times during the discussion today we're doing a lot of hand-waving over is it in or is it not in.  But a lot of times, how you put it in is very important.

MR. MARTIN:  I have no further questions.

THE COURT:  All right.  Any redirect?

MR. BERNICK:  Yeah.  I've got just two questions.

REDIRECT EXAMINATION

BY MR. BERNICK:

Q   Dr. McClave's report was in the Class case?

A   Yes.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Q    This whole period of time we've been talking about capacity in the 1990s up to 1999 -- I think it's right here on the chart -- Dr. McClave wasn't even talking about that period. Right?

A    He was providing an estimate, right, as I recall now, for the entire time period from 1994 to the very end of 2003, that was his --

Q    McClave?

A    McClave, yeah.

Q    In the Class case?

A    My recollection was that he wanted to -- or that ultimately the jury wanted to parse some of his numbers, and I always said that you couldn't do because of the way he was estimating the equation.  That's my recollection.

Q    Well, then you recall now better than I do.

So the questions that were asked about you about academic publications and the like, and you were very candid and accurate in talking about the fact that you've been a consultant.

Would you give the Court some idea of in how many cases you've been accepted and what kinds of cases you've been accepted as an expert in economics and econometrics?

A    So, I have -- I work in the area of antitrust; I work in the area of securities, which often has event type analyses; I work in the area of class certification; and I work in the area

of intellectual property; and I work in the area of what I'll call professional negligence, when attorneys or accountants get sued; and also breach of contract.  So all of those areas I've generated reports and had depositions and/or trials.

Q   Okay.  Give us a rough number of how many matters that is.

A   So, I have testified at trial in 30 years about 110 times, and been deposed I think it's like 270 times.  So I've testified over, you know, 380 times in 30 years.

MR. BERNICK:  No further questions.

THE COURT:  Thanks.

Anything further with Dr. Ugone?

MR. MARTIN:  Nothing further for Dr. Ugone.

THE COURT:  Doctor, you can step down.  Thank you.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  You would like to call Dr. Marx back?

MR. MARTIN:  I would like to call Dr. Marx back for about ten minutes, if that's okay.

THE COURT:  Go ahead.

L E S L I E   M.   M A R X, recalled as a witness, having been previously duly sworn, is examined and testifies further as follows:

THE COURT:  Are you okay?

MR. MARTIN:  I'm double-checking with the slide people.

UNIDENTIFIED VOICE:  We're good.

THE COURT:  You can proceed.  Go ahead.

DIRECT EXAMINATION (REBUTTAL)

BY MR. MARTIN:

Q   Dr. Marx, you just listened to a number of questions and answers about hold-out testing.  Are you familiar with the phrase "hold-out testing"?

A   Yes, I am.

Q   Have you have used so-called hold-out testing in your practice?

A   I understand what it is.

Q   Okay.  How do you use hold-out testing?

A   I use it as part of -- well, what I advocate its use for, which was the excerpt from my book that Mr. Bernick put up, that's advocating the use of hold-out periods for variable selection as an alternative to AIC.

Q   Were you using it as a method to test the robustness or the reliability of the predictive model?

A   No.

And also, he mentioned that it was used in Linerboard, but it wasn't used for testing the reliability of the model in Linerboard, it was used for variable selection as an alternative to AIC.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

And also he mentioned that Dr. McClave used hold-out testing. But he didn't, he just used it as a response to criticisms by Dr. Ugone that he hadn't performed that, so he did some hold-out testing.

Q   Just to close the loop. Is there a rule stating that a prediction model must pass some so-called hold-out test to be deemed reliable?

A   No.

Q   You also listened to a lot of questions and answers about capacity and you answered a lot of questions about capacity.

I'd like to take a look at, if we can, what is Ugone Exhibit 16. This is one from a supplemental report that wasn't stricken. It should be the first one.

Have you seen that chart before?

A   Yes, I have.

Q   And this is a chart, I'll tell you, it was taken from Professor -- Dr. Ugone's supplemental report, and it purports to identify capacity on the top line, TDI consumption and exports in the bars below it. Do you see that?

A   I do. I don't see where the TDI imports are. I don't see gray bars.

Q   Neither do I. But --

A   Okay.

Q   -- anyway, it's the chart that he used.

A   It is, I agree.

Q   And you were asked some questions about whether or not if the real world facts match up with your model results.

Could you take a look at '96 and '97 and tell me what in your economic judgment those years represent in terms of capacity and consumption.

A   I think the interpretation you would probably give to this graph in '96 and '97, is see how the bars are kind of right up against the black line?  That's saying that basically all of the available capacity is being used.  So that's a high capacity utilization period of time.

Q   Now, if you take a look at your TDI 80/20 board over there and take a look at the actual prices for TDI during 1996 and '97, what does it show?

A   Well, you see an increase in price here in the beginning of 1996, but then through the rest of 1996 and '97 you have a decrease in price.  So this is the price decline here.  And if you are focused on this capacity graph, that would suggest that you should see actual prices increasing.  I think that's the interpretation they are trying to give to the high capacity utilization.

But when you look at actual prices, they're declining. You see the predictive prices increasing or staying flat here. So it seems to me that the -- as a sensibility check, the predictive prices seem in line with the kinds of things that you might draw from a graph like this; whereas, the actual

price is coming down suggests that maybe there are other forces at work.

Q   So having undertaken this brief exercise, does that support your view that your model results are sensible?

MR. BERNICK:  I'm sorry, I missed that.

MR. MARTIN:  Does that support her view that the model results are sensible.

MR. BERNICK:  Your Honor, this now goes beyond the scope of even her own report.

MR. MARTIN:  I'll withdrew it.

MR. BERNICK:  He's now commenting on --

MR. MARTIN:  I'll withdraw the question.

THE COURT:  He withdrew the question.

BY MR. MARTIN:

Q   Having listened to and being cross-examined by Mr. -- Dr. -- Mr. Bernick -- sorry -- are you still convinced that the model was developed reliably?

A   Yes, I am.

Q   The choices that were made along the way were consistent with good economic practice?

A   Yes.

Q   The model results are reliable?

A   I believe so, yes.

Q   And the inference of causation that you drew from that is consistent with the way economists always draw inferences of

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

causation from model results in cases like this?

A    Yes, I agree.

MR. MARTIN:  I have no further questions.

THE COURT:  All right.  Thank you.

Mr. Bernick.

MR. BERNICK:  Can you put that one back up on the board?

MR. MARTIN:  Say "please."

MR. BERNICK:  Thank you.  I'm sorry.

(Laughter.)

MR. BERNICK:  We've spent too much time together, your Honor, Mr. Martin and I.

THE DEPUTY CLERK:  Do you want this?

MR. BERNICK:  Yes, the capacity one.

Okay.

CROSS-EXAMINATION

BY MR. BERNICK:

Q    Okay.  So if you take a look on TDI and we go now back through this particular thing, capacity is pretty uniformly topping out, as you indicated, from '92 through '97.  Right?

A    I'm sorry.  You're looking at --

Q    Just what you just testified about, yeah.

A    Right.  I mean, it's even worse in 2005 and 2007.

Q    I'm just talking about the period of time from 1992 through 1997.

A   Okay, yeah.

Q   And then you pointed out how prices go up, in fact, during this time but then they start to fall even when capacity looks like it's still up there.  Right?

A   It seems so, yes.

Q   And that's what you just pointed out to the Court.  Right?

A   That's correct.

Q   Okay.  Did you read Mr. Ho's deposition?

A   No, I don't think I've read Mr. Ho's deposition.

Q   Okay.  Did you read the --

MR. JOHNSON:  Your Honor, a clarification.  Mr. Ho is named as a witness after everything was done --

THE COURT:  Yes, I know.

MR. JOHNSON:  -- and he was just taken a week ago.

THE COURT:  He was deposed last week?

MR. JOHNSON:  He was deposed a week ago.

THE COURT:  I understand.

Go ahead.  Let me hear the question first.

MR. JOHNSON:  Thank you, your Honor.

BY MR. BERNICK:

Q   Okay.  There's another reason why that price could come down even though capacity is full.  Right?

A   There are all of the factors affecting demand and supply, all of those things would be incorporated into a model like this.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Q   So one thing that could happen is that all the capacity that's being built out starts to exceed demand because demand is falling during this time.  Right?

A   I'd have to look at the different demand factors.  There are a number of different demand factors, they go in different directions.

Q   Before you came in to testify in court that this was inconsistent with -- at least I thought you were saying -- this shows the capacity doesn't necessarily account for price.  Is that what you were suggesting?

A   I think you were telling a very strong story that this was it, this was the whole story, was a capacity story, and it's clearly not the case.

Q   No, I said that for the earlier period of time, 1994 to 1997.

A   Okay.

Q   And what happens also during this time, and it's in the presentation that we made, is that demand, which has been outstripping capacity as a result of the rebound from the recession, demand softens in the mid 1990s.  And as a result, if demand is softening, then even though capacity is fully utilized, there will be less pressure on price.  Correct?

A   There are a number of different demand factors that are taken into account and they're not all moving in the same direction.  So when you say that demand is softening, I think

it's a broad generalization.

Q   But the fact of the matter is, before you testified on this here this afternoon, you didn't actually study what was happening to supply, demand and capacity at this point in time when the prices start to fall.  Correct?

A   I've spent a long time studying supply and demand and capacity in this case in all of these periods of time.

Q   But right now you can't explain, based upon those variables, why price declined.  Right?

A   Why the actual price declined?

Q   Yes, yes.

A   No.

Q   And what your model is saying at this time actually is that prices should be staying flat?

A   That's what the prediction is.

Q   Okay.  So in this period of time -- before this period of time the actual prices showed a rise.  Your predicted price was going in the opposite -- in the negative direction rather than a positive direction.  Right?

THE COURT:  What period of time?  Starting when?

MR. BERNICK:  1994, 1995, 1996.

A   I think you're looking here.  Right?  The actual price is increasing, and this is --

Q   Right.  So your --

A   -- it's down --

Q   So your model has a negative slope; actual prices have a positive slope.  Right?

A   We're flat here but --

Q   Well, that's later.  But early on when they diverge, they have the opposite slopes.  Right?

A   That's correct.

Q   And we're all in agreement, aren't we, based upon this chart over here, that one of the factors that's operative is the capacity is tight.  Are we in agreement?

A   No.  My argument before is that the inferences that we seem to be trying to make from this graph seem problematic to me.  Because they don't -- they're not consistent with the actual prices observed.  So I want to be very careful about drawing strong inferences from this capacity graph.

Q   Okay.  So you can't draw any conclusion from that capacity graph?

A   Well, I was pointing out that there's a period of time where if you were focused on this graph you'd say, oh man, I should expect to see increasing prices.

Q   And you do --

A   And then when you look at the actual prices, they're going down.  So that gives me a lot of caution about trying to say strong things about how just this one thing by itself would -- it should be meaning for prices, particularly in light of a model that's taking into account a broader array of cost and

demand factors.

Q    And the analysis you just went through is something that's not even in your report.  Right?

A    The discussion of this graph, I don't think that's in my report.

            MR. MARTIN:  Your Honor --

            MR. BERNICK:  That's all.

            MR. MARTIN:  The exhibit was submitted after she filed her report.

            MR. BERNICK:  I --

            THE COURT:  That's all right.

            MR. BERNICK:  I'm done, your Honor.

            THE COURT:  No, I understand.  Thank you.

            Is there anything else?

            MR. MARTIN:  Nothing further.

            THE WITNESS:  Do you have any questions?

            THE COURT:  No, I don't have any questions right now. Thank you.

            You can step down.

            MR. CECCHI:  That's probably the first time a witness wanted to stay on the stand.

            THE COURT:  Yeah.

            Hold on.

            THE WITNESS:  "Hold on" me or "hold on" everybody?

            (Laughter.)

THE COURT:  No, not for you.  Thanks.

(Witness excused.)

THE COURT:  All right.  To the extent you need it, I'll give you each 15 minutes if you need it, ten or 15 minutes to make any closing remarks you'd like to make, if you'd like.

MR. MARTIN:  Your Honor, I'm satisfied.

THE COURT:  Okay.  Mr. Bernick?

MR. BERNICK:  I would just like to make one or two remarks.

THE COURT:  One or two?

MR. BERNICK:  One or two that are quick, because I know --

THE COURT:  I'll give you ten minutes.

MR. BERNICK:  I'll tell you why --

THE COURT:  If you need ten minutes, go ahead.

MR. BERNICK:  There are two dimensions, there are two ways to slice -- I don't even need -- this here, this is what it's all about.  You cannot get -- you can't get an attribution for a cause for variance out of this model or out of this inference process, the process.  You can't get there for any specific act that's wrongful.  And until you do you've got a big problem, which is what the law requires.  You have to have conduct, you have to have an event, you have to have translated into economic impact in the model of that event.

Unless you can go across this line, you just can't get

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick          178

there.  And the witness has now admitted, Dr. Marx has admitted she can't get there with respect to any particular harmful event.  All she can say is evidence of the conspiracy as a whole.

I think it's one of the most clear admissions of a problem with fit that I think we've ever seen.  I don't think it's ever been admitted in one of these model cases.  It's very, very stark.

The second thing --

THE COURT:  Okay.

MR. BERNICK:  I'm sorry.

The second thing I would say though on a more moderate note is I think that there are two issues.  The first issue is whether this model kind of makes it as being reliable and as having fit in the case such that the jury shouldn't even see it.  And I think again that's quite clear.

The second issue is whether the model might be safe, but Dr. Marx was closed from offering the attribution opinion because it goes beyond the scope of the model.  And she does not have the ability to make that attribution based upon -- for causation -- for any particular matter.

So we think the whole thing is out.  But one thing I would say of this whole process, we can talk about the design of the model, but this ability, this idea that any witness can step out of a rigorous econometric analysis and then say:  I'm

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick                                    179

prepared to tell the jury that this is really caused by the evidence of the conspiracy as a whole when my model doesn't get there, when my attribution testimony doesn't enable you to get there or a level of specificity to conduct the Supreme Court requires --

THE COURT:  When you say "the Supreme Court requires"; you're talking about Comcast?

MR. BERNICK:  Yes, Comcast.  But all that Comcast really is saying.  It's Comcast, it's Story Parchment, it is the "by reason of requirement."  The fit that you have to have between a wrongful event, a wrongful fact is a predicate for all of the different federal statutes that deal with the causation requirement.

So this is not something that's unique.  It says you can't simply say "something there about the conspiracy" or "something there about the nondisclosure" in a securities case had impact.  You have to have a tailored MCI -- out of the Seventh Circuit, Judge Pozner in the MCI Communications case, same thing -- you have to have a damage model that is tailored to the wrongful event.  Unless you have that, you're not at Step 1.

THE COURT:  Well, she's -- you know, she's testified to that, that this model does that.

MR. BERNICK:  That's the point, is that she testified -- no, it's right here.  The model does not do that.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick                    180

THE COURT:  No.  As to any one specific act.

MR. BERNICK:  As to any specific act.

THE COURT:  No, no, she said as to the overall conspiracy she makes an opinion.

MR. BERNICK:  That's the problem.  Here's the --

THE COURT:  Not as to any one particular act.

MR. BERNICK:  It's not one -- any particular act.  The idea is that the opinion -- this is where this thing lives -- all she can get to is not based on the model.  The model is out of the picture when it comes either to conspiracy or a particular wrongful event as part of that conspiracy.  Either way you go, big or small, the model doesn't get you there.  The model does not say PIAs cause variance, the model does not tell you variance caused by this conspiracy.  The model is not there.

THE COURT:  I mean, you've said -- how many times have you --

MR. BERNICK:  I know.

THE COURT:  I know, I know.  You spent a lot of time on your examination repeating that.

MR. BERNICK:  Yes.  Okay.  So the only way that you get here --

THE COURT:  Of course.  She got there by the model and what the model predicted, and then her expert opinion based upon her belief that the model had sufficient variables for her

to opine that the variance was based on the overall conspiracy.

MR. BERNICK:  I am more than happy to have --

THE COURT:  You can cross, as you've done here.

MR. BERNICK:  What?

THE COURT:  As you've done here, you obviously will have the opportunity to weigh that opinion through cross-examination and through your own expert and, you know, pick it apart as you did here --

MR. BERNICK:  Yeah.

THE COURT:  -- and make whatever points --

MR. BERNICK:  I understand.

THE COURT:  -- you, you know -- most of this goes to the weight of this opinion.

MR. BERNICK:  Well, I think that, first of all, that's a threshold issue of the law; that is, whether if you don't have a model, that the attribution by inference is sufficient.

THE COURT:  You're relying a lot on Comcast.  And I read Comcast.  I can't say I've studied it for weeks or anything.  But the gist that I got out of there was that, first of all, it was a class action matter.

MR. BERNICK:  Right.

THE COURT:  And the plaintiffs in that case initially set forth a variety of different causes of liability --

MR. BERNICK:  Yes.

THE COURT:  -- three or four different theories of

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick                    182

liability.

MR. BERNICK:  Correct, yes.

THE COURT:  The district court judge struck out three --

MR. BERNICK:  Yes.

THE COURT:  -- and only let them go forth on one theory of liability.

MR. BERNICK:  Yes.

THE COURT:  But the expert opinion never was modified to only take into consideration that theory of liability.

MR. BERNICK:  Right.

THE COURT:  And it included all the theories of liability.  And that to me seems it's very obvious why therefore that expert opinion didn't stand up --

MR. BERNICK:  Right.

THE COURT:  -- because it included everything that was not even part of the record.

MR. BERNICK:  Yeah.

THE COURT:  So in that's the case, Comcast really dealt with a class action matter, and obviously that model and the opinion rendered based on all the theories of liability should be stricken.

MR. BERNICK:  Okay.  And I --

THE COURT:  Because you keep going back to Comcast, and I see significant differences in Comcast.

MR. BERNICK:  Well, I think --

THE COURT:  And less differences in Linerboard.

MR. BERNICK:  Well, Linerboard though, Linerboard --

THE COURT:  I know.

MR. BERNICK:  -- had a different approach.

But here's where this is going.

The language -- and I would agree with all your Honor said about Comcast.  But the language of Comcast wasn't picked, wasn't created in Comcast.  They got it right out of the reference manual.  And the reference manual -- I believe it's the reference manual -- but originally the Supreme Court decision that focused on this, not in the class action context, was Story Parchment.  And the principle that's actually articulated and I have written down here is exactly the language of --

THE COURT:  Let me ask counsel your fall-back argument about whether or not she should be allowed to render the ultimate opinion that the variance is caused by the overall conspiracy.  Okay?  Why don't you just comment on that and let me hear your thoughts on that.

MR. MARTIN:  Your Honor, in the urethanes case, the Class case, Dr. McClave was allowed to testify that the model allowed him to eliminate everything other than competition as the cause of a variance.  They had a liability expert who actually came in and said, looking at the qualitative evidence,

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick                          184

I believe a conspiracy was here.

If he's not excluded, Professor Elzinga will come in and say:  I've looked at the evidence and there is no conspiracy.

Exactly the language that she's allowed to use at trial I think is subject to negotiation.  Whether it's exclude out factors other than competition or I believe it was the alleged conspiracy, I think either one are within the standards of economics, and then it's up to you whether or not it's problematic.

But certainly I think she should be able to go all the way up to "I've eliminated everything.  It can't be chance, it can't be competition," and the defendants have offered no other reason why this variation exists.

THE COURT:  She can also testify in her opinion it has nothing to do with capacity.  Correct?

MR. MARTIN:  Yes.  Yes.

THE COURT:  And you would argue it has to do with capacity.  I mean, she would be able to testify to that.

MR. MARTIN:  Yes.

THE COURT:  And she'd be able to testify that the variance -- there's no discernible reasons why there's a variance absent a denial of competition.  Correct?

MR. MARTIN:  Right.  And as you know, she's not just done statistics, she has looked at and talked to people to

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick                    185

confirm that there's evidence there.  It's not just --

THE COURT:  And obviously in this case there's a lot of factual evidence that's going to establish there was collusion; emails, conversations, et cetera.

MR. MARTIN:  Yes.

THE COURT:  So in the context of that she's then going to testify as to this.

MR. MARTIN:  Absolutely.

THE COURT:  And that's where you compute your damages here.

MR. MARTIN:  Correct.

THE COURT:  And this comes out to $661,000,000?

MR. MARTIN:  Give or take.

THE COURT:  No, okay.  I just wanted to --

MR. MARTIN:  If I could have just 30 seconds of --

THE COURT:  Go ahead.  Then I'll hear from you, Mr. Bernick.

MR. MARTIN:  The argument that Mr. Bernick has made and made and made about fit, about you can't attribute overcharges to the whole conspiracy is an argument that he has lost, he already lost it.  In the reply papers on the Daubert motion there's a footnote that says:  The McClave model suffers the same fit problem.  That's Footnote 14 in the Reply.

And they said that when their motion to overturn the verdict was still pending appeal.  They went up on appeal.  The

Tenth Circuit rejected that same argument.  Dr. McClave said, I attribute it to the conspiracy as a whole.  It's a shorter time period, but conceptually it's the identical thing.  And the Tenth Circuit says, not only is it permissible but it doesn't conflict with Comcast.

It's what experts do all the time in these kinds of cases.  We're going to allege a conspiracy and the jury verdict will say:  Is there evidence that Dow participated in a conspiracy to fix prices of urethane chemicals.

THE COURT:  How is it any different than an expert medical examiner, Mr. Bernick, testifying -- he testifies what he observed:  Broken bones in the neck, bruises, et cetera, et cetera, and he can testify as to the ultimate opinion that this was not an accident, that this was an intentional cause of death?  I mean, you know, that's the ultimate opinion by the expert subject to cross-examination.

You know, someone might argue, well, those broken bones in neck are something -- were caused by a fall or there's evidence that she fell in the tub or something.  You know, how is it different than her rendering that ultimate opinion that based on her model and her analysis and taking into consideration all the variables, in her expert opinion with her background, the only reason for this variance would be the non-competitive nature or the collusion between the parties, the conspiracy?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick                187

MR. BERNICK:  Is it okay -- I'm happy to stand up over there.

THE COURT:  No, go ahead, I can hear you.  You can sit down.

MR. BERNICK:  I think it's entirely different, and for a very simple reason, which is the question that's posed in a malpractice case or --

THE COURT:  A homicide.

MR. BERNICK:  -- or whatever it is, is a question of causation.  It's not governed by the same standard that applies under the antitrust laws.  So a differential diagnosis can work.  Well, I've eliminated the alternatives.  This is one that I think is probably best.  The causation requirement is much more rigorous in a statutory context because of concerns about the reach of these statutes.

And when I talk about that line out of Comcast, again, it's not just Comcast, it was articulated by Comcast, and it's narrower than the conspiracy as a whole or evidence of conspiracy as a whole.  It's more specific.  And that's why I think that it's not a matter -- this is a fit issue.  It's both a reliability and a fit issue.

The doctor's differential diagnosis is okay in a diagnostic context.  If you're talking about a mass tort in a drug, the differential diagnosis doesn't work.  You have to establish general causation, and that's a pretty rigorous

requirement before you get to individual causation and differential diagnosis.  So even in that context it's stronger. But here you have a statutory mandate that it could be a fit, and fit is what this is all about.  That's how I would answer that question.

THE COURT:  Okay.

MR. BERNICK:  If I could comment just a moment on the other question that was raised.

You know, I really do think that this issue is -- there are now a few cases before the Supreme Court, including the Class case is now before the Supreme Court.  There's a lot of interest in statistical models.  And we'll provide, if we haven't, we will provide the cases.  And the momentum that can be inferred in the case law, it's there, but ultimately when the rubber hits the road is, okay, and maybe these arguments have been made in part, but we made a record in this case that was very precise.  We went way down the road to make this record and on a timely basis and with a new model, and we think that this is wrong, that you cannot just work with, quote, a conspiracy.

But I would also point out -- and I can go back and further pursue the idea of what your Honor calls a fall-back position.  It's not -- I don't like to think of it that way. But recognizing that characterization at least by way of saying this, you go back to the question of the jury.  It's very

Closing Statement by Mr. Bernick                          189

compelling for the plaintiffs to stand up with a sophisticated model and say, oh, well, there's a conspiracy, and I don't have to nail down exactly what in that conspiracy caused anything. And so the pressure is off the jury to really go through what are the acts of conspiracy, and did they actually affect the prices at the time?  And I think --

THE COURT:  There's going to be evidence of different things that occurred on different dates that are going to be consistent with probably these variances.

MR. JOHNSON:  There's quite a bit of that evidence, your Honor.

THE COURT:  I mean, so it may not be absolutely consistent.  But there's going to be evidence of conclusions, certain dates that things happened.

MR. BERNICK:  That's what I'm really getting at, your Honor.  If the witness is allowed to say, allowed to create the linkage in any way, shape or form between the variance and the conspiracy as a whole and that's permitted --

THE COURT:  Well, I understand your fall-back position.  I think I heard counsel even say they may even entertain some thoughts as to how to handle that.  I'm not ruling on this at that point, on that part of it, I'm not ruling on it.

MR. BERNICK:  Can I point out one more thing that relates to this that is germane.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Closing Statement by Mr. Bernick            190

There's a whirlwind of examination that that also opens up, is you see the witness starts to comment on the evidence and there's really no way to really cross-examine her on all of the liability evidence.  That's impossible.  That's another feature.  It's trial time, it's confusion and --

THE COURT:  Okay, I understand.

MR. BERNICK:  Okay.

THE COURT:  Look, so you think you have an idea.  Then I'm inclined -- I'm ruling on this very quickly, but I've studied the briefs and it's not like we're -- you know, I wanted to give you a chance today to bring out whatever points you wanted.

I'm inclined to allow her testimony, her expert opinion.  The issue of whether or not she can opine the final opinion I'll reserve on.  Okay?  And I'll welcome any additional thoughts you may have.  Quite frankly, from the plaintiffs' point of view I don't know if it's even -- you know, if she testifies that there was this variance during this period and you have all this other evidence that there was collusion and other things, you know, it may be -- you know, I'm not trying your case -- but, you know, how much is necessary and what cross-examination then it opens up her to rendering that final opinion is a judgment you have to make. I'll reserve on that for a little bit.

Okay.  Go ahead.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

MR. JOHNSON:  Your Honor, just one point, is that these facts are important in connection with the analysis for the benchmark period.

THE COURT:  Right.

MR. JOHNSON:  In other words, she doesn't just sit there and take this assumption and you have to stick with it no matter what the evidence is.  She has to look at the evidence, and did look at the evidence --

THE COURT:  And she did.

MR. JOHNSON:  -- in order to confirm for herself that the benchmark periods were realistic and appropriate in this case.

THE COURT:  Right.

MR. JOHNSON:  So it's not like the evidence simply goes away for her.  It's an integral part of what she's doing.

THE COURT:  I understand that.  I understand.  I'm not ruling on that part of it.  But so you can start to plan as to where we're going here because we're under a time clock as far as getting this thing teed up --

MR. JOHNSON:  I must say this, your Honor:  After today's performance, we definitely need a time clock.

THE COURT:  You're going to get it, and it will work, with a little exception.

(Laughter.)

MR. JOHNSON:  It's very obvious to me that we are

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

going to need it if we are going to complete this trial in a reasonable amount of time.

THE COURT: We are, and you're going to get it.

And now I want to hear from both of you -- I asked you to give me your estimations as to how many hours you both need. So why don't we start with that right now.

You got my letter to that effect. Right? So let's hear from you as to how many hours you think you need and how many witnesses you're going to be calling.

So, Mr. Johnson, go ahead.

MR. JOHNSON: Very good, your Honor.

We presently estimate the time we will need to present our case, including opening, closing and cross-examinations at 80 hours, which equates to three weeks of trial time, five and a half hours a day. And, by the way, in that regard I would applaud your idea that you have used in other cases, particularly long ones, to have the abbreviated day starting earlier and finishing at 2:30. I think that would be terrific in this case.

THE COURT: It's okay, but the jury sometimes gets tired coming in that early. You know, we'll see.

MR. JOHNSON: But they do enjoy, because I've done it in a very long trial in Salt Lake City, they do enjoy being able to go take care of what they have to take care of in their lives in the afternoon.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

THE COURT:  I know the benefits of it, I've done it a number of times, and in all likelihood I'll certainly do it at least some of the days of the week and I always tell the jury when we're going to do it so they can plan ahead.  You know, that's -- Mr. Bernick?

MR. BERNICK:  We had asked and I hadn't heard back but we will take no more time than the plaintiffs.

THE COURT:  Okay.  Well, then that's another three weeks.  I'm probably going to adjust those, so you know.  Okay?  You probably estimated higher knowing I was going to adjust, which I've done too.

MR. JOHNSON:  Your Honor.

(Laughter.)

THE COURT:  You're happy with it, trust me.

And, by the way, if they're going to listen to video depositions all day, they're going to be happy with it too.  No way is this going to take six weeks, seven weeks with video deposition in terms of keeping the attention of the jury.

MR. JOHNSON:  It is unfortunate much of the evidence is in the form of videotape, your Honor.

THE COURT:  I know that.  I'll give some further thought to that.

How many witnesses do you expect, Mr. Johnson?

MR. JOHNSON:  We're actually in the process of working on that in a good direction.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

THE COURT:  Okay.

MR. JOHNSON:  So I don't have that number.  We started off with 41 witnesses, and the defendant started off with over 80.  And they've already given me seven that they've dropped, which is a start.  And we are working on that right now --

THE COURT:  Listen, gentlemen, when you say this is a start; this is it.  You have to understand, I told you that two weeks ago.  I wanted to get real numbers.  We have a date.  This Court has put aside a large bulk of its time where I have a lot of other cases to attend to.  This is it.  This was not, you know, an update session:  Judge, we're working on it.  Okay?

You know, this case has been pending for how many years?  2012?

THE DEPUTY CLERK:  '8.

MR. JOHNSON:  '8.

THE COURT:  '8, right.  What am I talking about?

So you've had ample time to figure out it was coming to some point where it's going to trial.  Okay?

And I don't want to hear "We're working on it" anymore.  I want to hear real numbers so I can also determine the Court's schedule, our schedule, and how things are going to proceed.  So you're going to be back here very shortly.  By the way, you're going to go before Judge Falk next Friday, January 22nd at 10:00 a.m. for a Final Pretrial Order.  Okay?  Because

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

the one that we have is not a Final Pretrial Order.  And so you have to get it in shape where you come up with real witness lists and real estimates of time.  Okay?  And then after I see that I'll determine how many hours you'll be allotted, each of you.  Okay?

So I don't mean to sound -- I am sounding tough because you wanted to get this case to trial.  We're going to get it to trial.  And but I am not allocating just as much time, you know, just because we are going to just keep talking here, you know, in terms of you're going to be succinct in presenting your evidence and your direct examinations and your cross, especially if it's going to be video depositions.  Which is problematic in itself, you know, that you have so many of those.

Okay.  You have the date for Judge Falk.  I've cleared it with him.  He's expecting you there:  January 22nd at 10, and you'll probably see me later that day.  So plan on coming over to see me later that day.  Okay?  It might be late that day because I start another trial on that day.  Okay?

MR. CECCHI:  That's fine.

THE COURT:  So picking a jury and doing openings, I'll probably have some time late in the day to at least get a report back as to what's going on.

I didn't mean to interrupt you, Mr. Johnson, but I'm trying to make a point.  You know, three four weeks ago you all

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

196

came in, we had this, you know, it will take two months, three months, you know.

We're going to get it down to a realistic trial.

MR. JOHNSON:  And we're all in favor of that.

THE COURT:  You're great lawyers so you're going to be able to do it and get your case in front of the jury and let the jury decide it.  Okay.

MR. JOHNSON:  Yeah.

If I could --

THE COURT:  Sure, go ahead.

MR. JOHNSON:  -- ask for something about how you like to do certain things, because we've got some disagreements between us that we're trying to clear up, and it's hard because --

THE COURT:  Well, it's been hard all along.

MR. JOHNSON:  Yes, it has been hard.

So we have a debate now about the treatment of pre-admitted because we were attempting of course to get down to a set of agreement with respect to pre-admitted exhibits. And we were making good progress in that regard.  But we came upon Dow's view of a pre-admitted exhibit that was different from our view and we just wanted to get the Court's reaction to it.

Dow's view was that "pre-admitted" means that the document can be used in opening statements but that the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

document will not be admitted into evidence without a foundation provided by some witness or deposition.

THE COURT:  Is that your view, Mr. Bernick?  You're shaking your head "no."

MR. BERNICK:  No, it's backwards.

The question is, we've got hundreds, indeed thousands of documents that are being offered for pre-admission.  In the Class case we made a deal in order to get agreement on as many documents as we could, and that agreement was, they could be used in opening, but before they actually came in there had to be some context for their coming in, usually it was a deposition or live testimony.

Both sides wanted that because the last thing that we want and I think the last thing the jury wants is for hundreds of documents to be pre-admitted and be floating around, and any one of them can be used in closing even though there's been no evidence about it.

THE COURT:  That's reasonable.  I mean that sounds reasonable to me.

MR. BERNICK:  I mean, we --

MR. JOHNSON:  Here is the problem.  When I have done pre-admission it really means pre-admission.  In other words, you don't have to go through a litany or establishing a foundation.  The whole point is you've agreed --

THE COURT:  Right.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

MR. JOHNSON:  -- that the document is admissible and it's a business record or whatever is happens to be, and there's no debate about it and there's no objection to it so you don't have to go through that.

THE COURT:  It still has to be relevant.

MR. JOHNSON:  Of course.  And now presumably they won't agree to pre-admit something that's not relevant.

THE COURT:  I think what he's saying is, you just can't pre-admit it and -- I don't know.  It would seem like you might need testimony for some of the exhibits that you're trying to pre-admit.

MR. BERNICK:  I mean, I've been through this so many times where you have these big document cases, and the problem is -- and it's clearly to the plaintiffs' advantage because they would like to have the optionality of really -- especially course of conduct cases, this happens all the time.  So we need to have rules of evidence act as a gate so that the spigot is not going like this because we can't keep up with it.

So we have -- I've always called it the "orphan documents" which come in.  There's no testimony about them but they can be used against you at any time.  That's not what the rules say.

The rules say relevance, they say foundation, and cumulative.  We're not going to show a thousand documents to this jury.  There has to be a regulator.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

So we're happy to have the documents come in pre-admitted.  It's the word that's the problem.  They're going to come in but they're going to be presented to the jury so the jury has some context for the document which will also have the effect of limiting the total number of documents that will go back to this jury.

THE COURT:  Okay.  Okay.

MR. JOHNSON:  Your Honor --

THE COURT:  I'm listening.  Go ahead.

MR. JOHNSON:  -- Dow asked us to pre-admit, agree to pre-admit over 1400 exhibits, and we looked at that and we said yes.  Now I assume that he's not going to pull out a document in closing that nobody has talked about or looked at, and I presume I won't do the same thing either.

THE COURT:  All right.

MR. JOHNSON:  But to have us have to sit with this pre-admitted list and then during the course of the trial have to worry about somehow laying foundation for exhibits or keeping track of -- as I understand it, your Honor likes binders of exhibits --

THE COURT:  Right.

MR. JOHNSON:  -- to be able to give to the jury, and we're going to have to go through the entire course of the trial keeping track of, okay, there was a document mentioned, is it in?  Is it out?  Do I have to move for admission?

THE COURT:  Look, this is something I think you can initially address with Judge Falk.

MR. JOHNSON:  Okay.

THE COURT:  But my reaction is, it seems to me that what you're talking about is authenticating exhibits.  That shouldn't be an issue.

MR. BERNICK:  It's not an issue.

THE COURT:  Authenticating exhibits so you don't have a bring in a business record or a custodian of business records or anything like that, that should not be a difference between you.

How they're used at trial would be subject I think to the rules of evidence as to relevance and where they're used.

Now, if they're not referred to at all in the trial in any way and then someone stands up at summation and tries to use them, I would think that's objectionable.  In other words, you're pre-admitting them.  When you say "pre-admitting," subject to, and I think you can come up with an agreement, subject to the Court's determination as to relevance, context, in other words.

MR. BERNICK:  That's fine.  There's a little bit of I'll call it gently, a little bit of Dow bashing here.  This issue is not something that we all of a sudden raised.  This was the same procedure in the Class case.  So when we proposed pre-admits here, last year at the very beginning we said the

same thing:  Let's avoid a lot of quarreling.  Let the documents in.  We'll be flexible just like in Class.  But pre-admission does not mean that they simply don't -- they're in there and they don't have to be used.  So we're not backing into this requirement.

THE COURT:  I think I've said it, I haven't given it much thought, but I think -- in other words, as far as bringing a custodian of records and stuff like that, forget it.  You can agree on that.

MR. JOHNSON:  Oh, I don't think there's any debate about that your Honor.  I'm just --

THE COURT:  Okay.  As far as pre-admitting anything, it has to be in the context, it has to be relevant and I'm the gatekeeper on that.  So if documents are sitting on the desk here just because they're pre-admitted but there's no reference to them at all I would probably have to strike them as never having been brought before the jury.  Those are my gut reactions.  But Judge Falk -- I'll discuss it with him and I'm sure he'll have some input on it.

Mr. Cecchi.

MR. CECCHI:  In terms of the pre-admitted documents, given the quantity and everybody is trying to pare them down, right, and Dow is not going to agree to pre-admit irrelevant documents.  But given your Honor's comments, would there be a procedure?  Say there's ten, 20, whatever they are, documents

which aren't put in front of a witness or the witness doesn't talk about but they're clearly relevant.  I mean, I would think we would have the opportunity to make an offer of proof and say, Exhibits 21, this is an email from so-and-so to so-and-so. It wasn't discussed but it's clearly relevant for the following reason.  There's no question about its authenticity.  I would think that that's a process we can follow with some of these documents that inevitably are relevant, are probative, don't violate 403 but haven't been discussed with the witness. Because I don't know what other way to do it than to make sure that we put every document before a witness, and that's just going to take too much time.

MR. BERNICK:  Your Honor, that is exactly what the rules -- and I have no problem with having this discussion, Jim, in advance, because it means that there's the pipeline that's being regulated.  I really don't want to be worrying about making offers of proof when the evidence is closed --

THE COURT:  Let me ask you this:  Let's say there's an email by the defendant, from one defendant to a co-conspirator, and there's an email, and that email is by Bob Jones, let's say, to Bill Smith or something.  An email is very incriminatory, you know.  And you would want to admit that without even bringing in Bob Jones or the recipient of the email?

MR. JOHNSON:  I might want to eliminate his deposition

in order to reduce the time of the trial.  But I have that email and I have somebody else that touched upon having a relationship with him.

THE COURT:  How does the defendant then have the opportunity to cross-examine that witness in front of a jury? "Well, he did it at the video deposition"?

MR. JOHNSON:  Correct, of course.

MR. BERNICK:  Maybe, maybe.

THE COURT:  Well, look, we're not -- you know, if he had the opportunity and it was a video deposition and you were put on notice that in all likelihood this person is not going to be a live witness at trial, then you had your shot.  You might have to on those type of significant types of letters or emails, I would think you would have to put it in the context of a video deposition and take that into account, that's all.

MR. BERNICK:  As long as I know while the trial is going on I have the opportunity to react to this so I can do something, I'm happy.

THE COURT:  What are you going to do, you're going to cross-examine the video?

MR. BERNICK:  No.  I'm saying there has to be some way that -- by and large almost all the documents that count based on the Class case, they were the subject of examination at a dep, they were.  So all you have to do is to designate that, and sometimes we would reach agreement --

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

THE COURT:  Yeah.

MR. BERNICK:  -- that we didn't even really need that. The key thing was in advance so that we can react to it at trial.

THE COURT:  I think with respect to documents like that you'd either -- you'd have to put on the video and try to give him some notice of that.  That's my thinking.

I'll share it with Judge Falk, but bring it up with him as well.  But I can't imagine you could just have them pre-admitted, an incriminatory email like that and just complete -- and without the jury even knowing that he had the chance to cross-examine the author of the email.  I don't think you could.

MR. JOHNSON:  Your Honor, do you anticipate deciding any of the remaining motions in limine?

THE COURT:  Yeah, pretty soon.

MR. JOHNSON:  Okay.  It helps in streamlining the case.

THE COURT:  I know, I know.  A lot of them are not that involved.

MR. JOHNSON:  Right.

THE COURT:  I'll decide if I can get to them the middle of next week or certainly as quickly as we can.  We've already been working on them.

MR. JOHNSON:  Thank you.

THE COURT:  And I wanted to get this Daubert hearing out of the way.  Okay.

MR. JOHNSON:  Yes.

THE COURT:  let's take a few-minute break, then I would like to see you just in the conference room, not everybody.  But how about the two or three of you and two or three of you.  That will be enough.  You can report back to your associates.

Okay.  Ten minutes in the jury room.

(A recess is taken.)

(Off the record conference held.)

(At 3:12 p.m., the hearing is concluded.)

ooOoo