**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | Master Docket No. 08-5169 (WJM) (MF) *Document Filed Electronically* |

**DEFENDANT THE DOW CHEMICAL COMPANY'S TRIAL BRIEF**

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
llustberg@gibbonslaw.com
dmcgrady@gibbonslaw.com

David M. Bernick (*admitted pro hac vice*)
Jonathan R. Streeter (*admitted pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile:  (212) 698-3599
david.bernick@dechert.com
jonathan.streeter@dechert.com

*Attorneys for Defendant*
*The Dow Chemical Company*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 1

    A.    The Urethanes Industry Is An Oligopoly ............................................... 1

    B.    No Witnesses Will Testify to Entering Into an Agreement ..................... 3

    C.    Dow Competed Vigorously Throughout the Relevant Time Period ....... 4

    D.    The Plaintiffs' Statistical Model Is Not Evidence of Conspiracy And Is Contradicted By Economic Reality ........................................................ 7

    E.    Plaintiffs' Witnesses Will Largely Not Participate At Trial In the Forum They Chose ............................................................................................ 8

III.   RELEVANT LAW AND LEGAL POSITIONS ................................................. 9

    A.    An Agreement Under the Sherman Act Requires Commitment............. 9

    B.    Parallel Price Announcements Are Expected—And Lawful—In An Oligopoly ............................................................................................... 11

    C.    Plaintiffs' Pre-Class Claims (1994-1999) Are Time Barred................ 13

    D.    Plaintiffs Cannot Save Their Remaining Claims Prior to November 2000 Based On Fraudulent Concealment .................................................... 15

    E.    Plaintiff-Specific Issues Reduce or Eliminate Liability....................... 16

    F.    Evidentiary Issues ................................................................................ 16

CONCLUSION................................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*AAA Liquors, Inc. v. Joseph Seagram and Sons, Inc.*,
   705 F.2d 1203 (10th Cir. 1982) ........................................................... 10

*Adolph Coors Co. v. FTC*,
   497 F.2d 1178 (10th Cir. 1974) ........................................................... 10

*American Pipe & Construction Company. v. Utah*,
   414 U.S. 538 (1974) ........................................................................... 14

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
   758 F.2d 1486 (11th Cir. 1985) ........................................................... 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................... 10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ........................................................................... 11

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212  (3d Cir. 2011) ............................................................... 13

*Crown, Cork & Seal Co. v. Parker*
   462 U.S. 345 (1983) ........................................................................... 15

*Drippe v. Gototweski*,
   434 F. App'x 79 (3d Cir. 2011) ........................................................... 13

*Fineman v. Armstrong World Indus., Inc.*,
   980 F.2d 171 (3d Cir. 1992) ............................................................... 10

*Forbes v. Eagleson*,
   228 F.3d 471 (3d Cir. 2000) ............................................................... 15

*Garcia-Martinez v. City and Cnty. of Denver*,
   392 F.3d 1187 (10th Cir. 2004) ............................................................. 9

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ............................................................ 2, 12

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015) .......................................................... 11, 12

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) .......................................................... 11, 12

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)..................................................................12

*In re Linerboard Antitrust Litig.*,
    504 F. Supp. 2d 38 (E.D. Pa. 2007) .....................................................15

*In re Nat'l Ass'n of Music Merch., Musical Instr. & Equip. Antitrust Litig.*,
    MDL No. 2121, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012) ............10

*King & King Enterprises v. Champlin Petroleum Co.*,
    657 F.2d 1147 (10th Cir. 1981) ............................................................16

*Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................10

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984)................................................................................9

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2000) ..................................................14

*United States v. Standard Oil Co.*,
    316 F.2d 884 (7th Cir. 1963) ................................................................10

*Valspar Corp. v. E.I. Du Pont de Nemours*,
    No. 14-527, ___ F. Supp.3d ____, 2016 WL 304404 (D. Del. Jan. 25, 2016) ......................12

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 1429 .......................2

ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws*
    (2010)......................................................................................................12

## I.      INTRODUCTION

Defendant The Dow Chemical Company ("Dow") respectfully submits this memorandum in advance of trial.  This memorandum provides a background of this case, and then discusses important legal and factual issues that Dow expects to be raised at trial, including (1) what constitutes an "agreement" under Section 1 of the Sherman Act, (2) the law regarding oligopolies and parallel pricing, (3) whether plaintiffs' claims for 1994-1999 are time-barred, (4) whether plaintiffs can show fraudulent concealment (necessary if they are to recover for claims prior to November 24, 2000), (5) several plaintiff-specific issues, and (6) a brief note regarding evidentiary issues.  These are important issues for the Court to address in its instructions to the jury.  In addition, Dow expects that the issues relating to statute of limitations and certain plaintiff-specific issues will be raised through motions for judgment as a matter of law at the appropriate time.

## II.     BACKGROUND

### A.      The Urethanes Industry Is An Oligopoly.

This case involves three chemical products: toluene diisocyanate ("TDI"), methylene diphenyl diisocyanate ("MDI"), and polyether polyols.  Typically, isocyanates (TDI or MDI) are combined with polyols to make products called "urethanes."  Urethanes, in turn, are used to create many products like foam for mattresses, cushions in car seats, insulation in appliances, and many others.  For ease of reference, we refer to TDI, MDI, and polyols collectively as "urethanes."

Urethanes are made in bulk and, for the most part, are sold in bulk by large companies.  The business requires technical sophistication and significant capital.  It is therefore not surprising that the urethanes industry is an oligopoly dominated by a few large companies.  *See* Pls.' Expert Dr. Leslie Marx Nov. 15, 2013 Dep. at 536 (█████████████████

██████████████████ ).[1]   Understanding the dynamics of an oligopoly is critical to understanding the respective suppliers' behavior.  As Dow's economic expert Professor Kenneth G. Elzinga explained in his initial expert report, "████████████████████████ ████████████████████████████████████████████████████ " Elzinga Mar. 23, 2010 Expert Report at 27.   In other words, the urethanes industry is interdependent—*i.e.*, each supplier must consider the impact of a decision on other firms and anticipate their response and vice versa.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 1429 (titled "Oligopoly Makes Interdependent Behavior Inevitable"), attached as Ex. A; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999) ("In an oligopolistic market, meaning a market where there are few sellers, interdependent parallelism can be a necessary fact of life but be the result of independent pricing decisions.").

For TDI, throughout the relevant time period, there were five major suppliers: Dow, Bayer, BASF, Lyondell (and predecessors ARCO and Olin), and Huntsman (and predecessor ICI).   For MDI, production in the United States was split among Dow, BASF, Bayer, and Huntsman/ICI.   For polyols, 80% of the market was controlled by Dow, Bayer, BASF, Huntsman/ICI, and Lyondell/ARCO/Arch.   *See* May 13, 2011 Revised Expert Report of Dr. Matthew Raiff at 52-55.

As discussed in the economic literature, there is no question that oligopolies have competitive characteristics that are specific to them.   And critically, these characteristics are reflected in the law.   *See infra* § III(B).   Accordingly, the jury should also be aware of them.  These unique characteristics include parallel price announcements, price leadership, regular

---

[1] *See also* MDL Dkt. 2637 at 9 ("In this case, the parties do not dispute that the structure of the industry—a highly concentrated oligopoly with high barriers to entry and homogeneous commodity products without close substitutes . . . .").

contacts and business relationships between competitors, and supracompetitive profits.  In this case, plaintiffs' purported evidence of collusion (such as parallel price increases) is evidence that is fully consistent with competition and, as a result, the need for instruction to the jury on oligopolies and oligopolistic behavior is particularly prominent.

      **B.**      **No Witnesses Will Testify to Entering Into an Agreement.**

As to plaintiffs' evidence, the record is devoid of direct evidence of an agreement.  By comparison to evidence of legitimate price increases and oligopolistic behavior (recast by plaintiffs as collusive behavior), plaintiffs' evidence of collusion is all but nonexistent.

Plaintiffs primarily rely upon the testimony of two witnesses:  Larry Stern of Bayer and Stephanie Barbour of Dow.  Notably, the evidence offered by these two people is confined to the period from 2000 to 2003.  Stern served in his position with Bayer from 2000 to 2002 and purports to testify to "pricing" discussions with competitors.  But what "pricing" means is never made clear in the testimony, and discussions of pricing alone are not illegal.  And importantly, despite having a cooperation agreement with plaintiffs and immunity with the government, Stern emphatically denies that there was any actual agreement.  *See* Stern Nov. 2, 2009 Dep. at 215-16 (█████████████████████████████████████).

Barbour, a former Dow business director for MDI and rigid polyols, has testified that she was present when Dow's director for TDI, Marco Levi, reported internally that he had contacts with Bayer in Europe that made him confident that Bayer would support price increases.  Barbour claims that Levi used the word "agreement," but she never raised this allegation when she was asked about antitrust violations in 2004 in a Dow internal investigation.  *Compare* Barbour Sept. 14, 2010 Dep. at 27 (████████████████████████████████████ ██████████████████) *with* Tom McCormick, Dow in-house counsel, Sept. 23, 2013 Dep. at 45, 69 (███████████████████████████████████████████

██████████████████████████████████████████); *see also* Barbour Sept. 15, 2010

Dep. at 354 (████████████████████████████████████████████████

██████████████████████).

Both because this evidence is so equivocal and because mere communications about pricing are not illegal, it is essential that the jury receive practical definitions of what an agreement is.  This issue is not a question of formality versus informality—*e.g.*, whether the agreement was written or not.  Rather, the question is whether or not there was an actual, effective meeting of the minds.  As discussed below, the appropriate test under Third Circuit and Supreme Court law is whether there was a *commitment*.  *See infra* § III(A). The jury should be instructed accordingly.

### C.    Dow Competed Vigorously Throughout the Relevant Time Period.

Plaintiffs' liability theory turns upon price increase announcements.  It is undisputed that the announcements served the legitimate needs of customers to receive advance notice of intended price changes.  The announcements were made in advance of actual price increases, did not include the actual price but only changes in price, and, most critically, simply began a process of customer-by-customer, contract-by-contract price negotiations to determine the actual price.

Importantly, the actual prices ultimately charged varied by supplier and customer, in part because plaintiffs themselves monitored raw material prices and thus had differing views of the necessity of price increases.  Plaintiffs also had varying incentives about whether to accept a price increase and pass it on to their customers (perhaps with an additional markup of their own), or to fight the price increase due to their differing competitive situations.  The following graphic shows the many different prices that plaintiffs themselves paid compared with the rest of the market for TDI:



**TDI Transaction Prices - Plaintiffs and Other Purchasers**

◇ OTHER PURCHASERS   ◇ PLAINTIFFS

By and large, plaintiffs *beat the market* and did not pay the same prices as each other.  In fact, suppliers often offered special incentives to plaintiffs just to have an opportunity to get their business.  Plaintiffs seek to skirt this central fact—that suppliers' prices were not all the same— with a theory which says the agreement was to coordinate the announcements and then to try to make the announcements "stick."

But the economic evidence—the real world facts—cannot be reconciled with any price-fixing agreement.  As noted above, prices as a whole stayed flat, rising only after the alleged conspiracy ended—by a significant margin.  While plaintiffs surmise that prices would have fallen further absent collusion, it is undisputed that costs did not fall during the period at issue. Neither did demand.  Basic economics tell us that, absent falling demand or falling costs, prices would not fall in a non-collusive market.  Moreover, there is no pattern of price increases

sticking.  Most of the increases simply failed as the following graphic shows for Dow's average

MDI prices:[2]



**Actual Average Monthly Prices vs. Price Increase Announcements**
**Dow MDI Products**

Note: The price calculation excludes sales to entities whose billing location and shipping location were determined to be foreign, sales transactions without a valid date, and sales transactions with quantities that could not be converted to pounds.  Prices are net of returns that could be tied back to sales, adjustments, and rebates.  Outliers prices have been excluded at the level of customer, product, and month.

Sources: Dow sales data; *In re: Urethane Antitrust Litigation*, Case No. 08-5169 (D.N.J.), Summary of Urethanes Price Increase Announcements.

* This exhibit is an updated version of an exhibit of the same number found in the Supplemental Report of Kenneth G. Elzinga, December 18, 2013.

In this chart, the blue line is the actual average price for Dow's MDI products, and the red lines

represent the date and amount of price increases.  If price increases are effective, as they were in

two instances in 1994 and 1995, the blue line matches the red line.  But when price increases are

not effective, there is no relationship between the two lines.  The evident failure of price increase

announcements is why prices stayed flat.  And the frequency of the announcements reflects only

that the price increases repeatedly failed to stick, due to competition.

While plaintiffs try to label the contemporaneous recitation of real business conditions in

the price increase announcement letters as "concealment," those letters were accurate.  In fact,

plaintiffs themselves monitored raw material costs and therefore knew and understood the

---

[2] Of course, plaintiffs did not pay average prices.  In many instances, price increase announcements were simply not applicable to plaintiffs.

justifications for price increases.   Nevertheless, they pushed back.   As Larry Heppe from Plaintiff Leggett & Platt will testify, he "███████████████████████████████████████" Heppe Dep. at 173.  In one particularly "colorful" response to Dow's Rick Beitel, Heppe told Beitel that he had promptly sent Dow's price increase letter to the "circle file."



Rick, Someone must be signing your name to increase letters without your knowledge again.  I received one this afternoon and promptly sent it to the circle file.  You should check out who is sending this B S and terminate them immediately – before someone reminds us of announced recent price increases that deteriorate below the existing price.

Timing is everything, and with current business conditions, now is not the time.

Regards,    Larry

*See* DX-1191 (LPI_000137215).

Under these circumstances, the jury will face two competing characterizations of the evidence of competition and the efficacy of price increase announcements.  Plaintiffs will say there was an agreement but it was not always effective.  It will be Dow's position that the fact that there was competition establishes that there was no agreement and that plaintiffs were not injured.  Either way, the jury should be clearly instructed that competition is a defense to the claim in the case and is not simply a factor which mitigates damages.  In other words, competition is relevant to agreement, as well as to impact and damages.

### D.      The Plaintiffs' Statistical Model Is Not Evidence of Conspiracy And Is Contradicted By Economic Reality.

Without credible direct evidence of an agreement, plaintiffs rely largely on their expert's statistical models for both damages and (inappropriately) as evidence that there was an actual conspiracy which caused injury.  This Court is very familiar with the problems of these models, but the key issue that needs to be squarely addressed is whether the model can be used to establish the fact of a conspiracy or whether the conspiracy caused injury.  We believe that the

answer is unequivocally "no."  To allow these flawed models to serve as evidence of an actual conspiracy which caused injury is wrong under *Daubert* and enormously unhelpful to the jury.

Moreover, the models are contradicted by economic reality.  For example, Patrick Ho, a former Dow business manager for isocynates, will testify live that during the period 1992-1994, the industry went through a very difficult time because the general economy was in a slump and there had been little new capacity added because of lack of investment.  This led to rising prices in 1994 and 1995. As Ho wrote at the time:

> During the last low point in the business cycle (1992/3) the majority of MDI producers were economically unprofitable due to low capacity utilization, depressed pricing and high raw material cost. Dow was, and is, disadvantaged with its high raw material cost. Dow is the only major MDI producer not integrated into aniline.

> 1995 saw a business upturn. Improved world economy and a change in foam blowing agent technology drove up MDI demand and pricing. MDI producers are making good return on their investment.

*See* DX-2409 (TDCC_PU364083-096).  Nevertheless, despite the economic reasons for prices to be rising at that time, plaintiffs' models claim prices should be falling and the difference between actual and predicted prices should be dollars in the plaintiffs' pockets.  This is simply not credible.  In any event, it should be made very clear to the jury that the model can only be used as plaintiffs' suggested estimate of damages.  The fact that plaintiffs have crafted a model that shows a variance between actual prices and predicted prices cannot be a substitute for proof that Dow and other manufacturers entered into an *agreement* which impacted plaintiffs.

      **E.**      **Plaintiffs' Witnesses Will Largely Not Participate At Trial In the Forum They Chose.**

Despite the power of hearing evidence from witnesses like Larry Heppe first hand—or perhaps because of it—plaintiffs have ignored this Court's suggestion to bring more live

witnesses to trial.  In fact, plaintiffs have done the opposite.  Plaintiffs now intend to present only *three* live fact witnesses at trial: one from Hickory Springs, one from Woodbridge, and one from Skypark.  There will be no live witnesses from *eight* plaintiff entities or their subsidiaries: Carpenter, Flexible Foam, Foam Supplies, Huber, Leggett & Platt, Lubrizol, Marchem, and Vita—these witnesses will now be presented only by deposition.  And rather than bringing Carpenter's CEO Stan Pauley to trial, plaintiffs have elected to drop him as a witness altogether.  Dow believes that this gamesmanship will only reduce plaintiffs' credibility before the jury.  As the Tenth Circuit explained, "The preference for a witness's attendance at trial is axiomatic. When the 'key factual issues' at trial turn on the credibility and demeanor of the witness, [the court prefers] the finder of fact to observe live testimony of the witness. *This is especially true when the witness is the plaintiff*."  *Garcia-Martinez v. City & Cnty. of Denver*, 392 F.3d 1187, 1191-92 (10th Cir. 2004) (citation omitted) (emphasis added).

## III.   RELEVANT LAW AND LEGAL POSITIONS

The following section provides a high-level overview of legal issues that we expect will be addressed at trial including (1) what constitutes an "agreement" under Section 1 of the Sherman Act; (2) the law regarding oligopolies and parallel pricing; (3) whether plaintiffs' claims for 1994-1999 are time-barred; (4) whether plaintiffs can show fraudulent concealment (necessary if they are to recover for claims prior to November 24, 2000); and (5) several plaintiff-specific issues that reduce or eliminate liability.

### A.   An Agreement Under the Sherman Act Requires Commitment.

The United States Supreme Court has adopted the Third Circuit's formulation that to form an agreement actionable under Section 1 of the Sherman Act, parties must arrive at "a conscious commitment to a common scheme designed to achieve an unlawful objective."  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney*

*& Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)); *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212 (3d Cir. 1992) (same).  The requirement of a commitment is essential.  Unless a party limits its freedom to act, the "mutual obligation" which is a "touchstone of an agreement" under the Sherman Act is absent.  *In re Nat'l Ass'n of Music Merch., Musical Instr. & Equip. Antitrust Litig.*, MDL No. 2121, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012); s*ee also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.4 (2007) (describing "restricted freedom of action and sense of obligation" associated with an "agreement") (quotation and citation omitted); *AAA Liquors, Inc. v. Joseph Seagram & Sons, Inc.*, 705 F.2d 1203, 1205 (10th Cir. 1982) ("The crux of any price-fixing agreement is the relinquishment by a [seller] . . . of the freedom to set prices in accordance with his own judgment.") (quotation and citation omitted); *Adolph Coors Co. v. FTC*, 497 F.2d 1178, 1183 (10th Cir. 1974) (the test of any price-fixing agreement "is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment") (quotation and citation omitted)); *United States v. Standard Oil Co*., 316 F.2d 884, 890 (7th Cir. 1963) ("The substantive law of trade conspiracies requires some consciousness of commitment to a common scheme . . . .  Unless the individuals involved understood from something that was said or done that they were, in fact, committed to raise prices, there was no violation of the Sherman Act.  It is the *fact of commitment* which is really at issue.") (internal citations omitted) (emphasis added).

It will be critical for the jury to understand that a commitment is required under federal antitrust law, and the instructions to the jury should reflect this requirement given the real danger of mistaken inferences of conspiracy.  *See Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp*.,

475 U.S. 574, 594 (1986) ("Mistaken inferences [of conspiracies] are especially costly, because they chill the very conduct that the antitrust laws are designed to protect.") (citation omitted).

As to the evidence that will be presented at trial, as discussed above, there is no credible testimonial or documentary evidence of an actual agreement to fix prices.  And the economic evidence discussed above shows that even if there were discrete discussions of industry pricing, no manufacturers committed to an unlawful scheme to make prices stick—all urethanes producers, and in particular Dow, competed vigorously.  For this reason, price increase announcements generally were not effective.

## B.    Parallel Price Announcements Are Expected—And Lawful—In An Oligopoly.

In an oligopoly like the urethanes industry, parallel, interdependent conduct is to be expected.  *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("[O]ligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions") (citation omitted).  The United States Court of Appeals for the Third Circuit has made clear that conscious parallelism in the form of parallel price announcements "cannot alone create a reasonable inference of conspiracy."  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015).

Accordingly, courts must be "cautious" about inferring anticompetitive conduct in cases involving oligopolistic markets because of the lawful "interdependence" that characterizes such markets.  *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358-59 (3d Cir. 2004) ("[T]his Court and others have been cautious in accepting inferences from circumstantial evidence in

cases involving allegations of horizontal price-fixing among oligopolists. . . .  The basis for this circumspect approach is the theory of 'interdependence.'") (citing cases) (footnote omitted).  In oligopolistic markets, "procompetitive conduct can look like anticompetitive behavior at first glance, and vice versa."  ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws* (2010) at 66 ("The difficulty in distinguishing conspiracy from competition is exacerbated in oligopoly markets, which are generally characterized by parallel conduct."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010) ("[P]arallel conduct is just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.") (citation and quotation omitted).  Rational decisions by oligopolists necessarily take into account the anticipated reactions of other firms. *See In re Flat Glass*, 385 F.3d at 359.

Therefore, "[f]or parallel pricing to go 'beyond mere interdependence,' it 'must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it."  *Valspar Corp. v. E.I. Du Pont de Nemours*, No. 14-527, ___ F. Supp.3d ____, 2016 WL 304404, at *6 (D. Del. Jan. 25, 2016) (rejecting an inference of a price-fixing agreement from frequent price increase announcements made with expectation that competitors would follow because that shows only interdependence, not unlawful conduct) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d at 135).  In fact, even possession of non-public information about competitors' future pricing is "not evidence of concerted action to fix prices" because "it makes common sense to obtain as much information as possible of the pricing policies and marketing strategies of one's competitors."  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 407 (quotation and citation omitted); *In re Baby Food Antitrust Litig.*, 166 F.3d at 118 ("Exchanges of information [among competitors] are not considered a *per se* violation because 'such practices

can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.'") (quoting *United States v. United States Gypsum C*o., 438 U.S. 422, 441 n. 16 (1978).); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223 (3d Cir. 2011) ("[T]he exchange of price information still requires showing that the defendants had an agreement."); *Amey, Inc. v. Gulf Abstract & Title, Inc*., 758 F.2d 1486, 1505 (11th Cir. 1985) ("The exchange of price information among competitors is not a *per se* violation of the antitrust laws.  'Absent an agreement to fix prices, there is nothing unlawful about competitors meeting and exchanging price information or discussing problems common in their industry, or even exchanging information as to the cost of their product.'") (citations omitted).

Given plaintiffs' anticipated emphasis on parallel, lawful conduct—an emphasis made necessary by the lack of direct evidence plaintiffs will be able to present at trial—it will be incumbent upon this Court to instruct the jury as to the lawful characteristics of an oligopoly. Absent clear instruction, it is possible (if not likely) that a jury will improperly ascribe illegality to conduct that is lawful and expected in an oligopolistic market.  An instruction on oligopolies is necessary to effectuate the clear direction provided by the Supreme Court and the Third Circuit:  parallel pricing and oligopolistic behavior does not violate the antitrust laws.

### C.      Plaintiffs' Pre-Class Claims (1994-1999) Are Time Barred.

Dow also intends to move for judgment at the close of plaintiffs' case because claims sought for overcharges between 1994 and 1999 are time barred.[3]  In short, antitrust claims must

---

[3] Dow did not move for summary judgment on this basis, but it is not required to move for summary judgment.  *See Drippe v. Gototweski*, 434 F. App'x 79, 81 (3d Cir. 2011) (noting that a party raised an affirmative defense in responsive pleadings and was therefore entitled to pursue the defense at trial, even without seeking summary relief).  Dow raised the issue of statute of limitations in its operative answers and included the statute of limitations as an anticipated legal issue in the pretrial remand order and the final pretrial order filed with this Court.  *See* Carpenter Answer at 27 (Sixth Additional Defense); Woodbridge Answer at 19 (Sixth Additional Defense); Dash Answer at 13 (Sixth Additional Defense); MDL Dkt. No. 3202 at 19; Dkt. No. 76 at 155.

be filed within four years under the applicable statute of limitations.  The pendency of the class action tolls claims that are the same as those asserted by the class.  But a conspiracy from 1994-1999 was not alleged by the class.  Because plaintiffs' complaints were filed more than four years after the latest possible date that could still be timely, *see infra* n.4, plaintiffs pre-class claims are time barred.

Section 4B of the Clayton Act bars private antitrust suits not commenced within four years of when the plaintiff's claim accrued, which in this case is when the purchaser paid an overcharge.  *See, e.g.*, *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 265-66 (E.D.N.Y. 2000) (for plaintiff purchasers alleging overcharge, claim accrues when overcharge is paid).  Where some injuries occur within the limitations period and others do not, plaintiff can recover damages only for injuries suffered within the limitations period.  *See id.*

Plaintiffs did not file suit until October 17, 2008 (Carpenter); November 21, 2008 (Woodbridge); and November 3, 2009 (Marchem). But, the most recent overcharge alleged by plaintiffs occurred on December 31, 2003, meaning that the statute of limitations for any claim (even the very last overcharge) had run by December 31, 2007.  Accordingly, absent any tolling, all of the plaintiffs' claims are time barred.

Dow does not dispute that plaintiffs are entitled to tolling during the pendency of the class action for claims that *are the same* as those raised by the class.  This is referred to as class action tolling or *American Pipe* tolling, based on the Supreme Court's decision in *American Pipe & Construction Company. v. Utah*, 414 U.S. 538, 552-554 (1974).  Class action tolling applies to all subsequent claims that have the same factual and legal nexus as the class action claims because the defendant is not prejudiced when it can rely in subsequent litigation on the same

evidence and witnesses required for the class action.  *Id.*; *see also Crown, Cork & Seal Co. v. Parker* 462 U.S. 345, 355 (1983) (Powell, J., concurring).

In contrast, subsequent individual suits that are based on different facts or that expand the size of the litigation to cover new class members or additional damages not covered by the earlier class action are prejudicial to defendants and do not warrant class action tolling.  In *Linerboard,* the Eastern District of Pennsylvania held that a subsequently filed claim alleging a longer conspiracy period (as there is here) was not tolled because it introduced a potentially larger claim with larger damages and new evidence and witnesses not covered in the earlier class action.  *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 48-49 (E.D. Pa. 2007).  Under the reasoning of *Linerboard*, plaintiffs cannot receive class action tolling for the 1994-1999 claims, and accordingly those claims are time barred, and judgment as a matter of law should be granted on those claims.[4]

### D.   Plaintiffs Cannot Save Their Remaining Claims Prior to November 2000 Based On Fraudulent Concealment.

In addition, if Plaintiffs fail to prove fraudulent concealment, all of their claims are limited to purchases made after November 24, 2000. To establish fraudulent concealment, each plaintiff will need to prove (1) that Dow (or the other alleged conspirators) actively misled that particular plaintiff into believing it had no cause of action, (2) that the particular plaintiff did not have actual knowledge or reason to know of the alleged conspiracy, and (3) that the particular plaintiff exercised reasonable diligence in investigating the underlying facts.  *Forbes v.*

---

[4] Even if plaintiffs could prove that Dow engaged in fraudulent concealment of the conspiracy, the latest plaintiffs could establish fraudulent concealment is March 15, 2004, when Crompton issued a press release disclosing its plea with DOJ relating to urethanes.  *See* PX-17.  Thus, even assuming plaintiffs can prove fraudulent concealment, any claims not tolled by class action tolling would have needed to have been filed, at the latest, within four years of March 15, 2004. Because Carpenter did not file until October 17, 2008, and other plaintiffs were even later, all pre-class claims are time barred regardless of fraudulent concealment.

*Eagleson*, 228 F.3d 471, 486-487 (3d Cir. 2000).  Each plaintiff has the burden with respect to

each element of their fraudulent concealment claims in this case.  *Id*.; *King & King Enterprises v.*

*Champlin Petroleum Co.*, 657 F.2d 1147, 1154-55 (10th Cir. 1981).  Dow anticipates that, after

the close of plaintiffs' case, it will be readily apparent that each of the plaintiffs will have failed

to satisfy its burden.

     **E.**    **Plaintiff-Specific Issues Reduce or Eliminate Liability.**

     In addition to the foregoing issues of liability, impact, damages, and statute of limitations,

there are a number of plaintiff-specific issues that we expect will be raised at trial, including but

not limited to:

- **Assignment.**  Some plaintiffs purport to bring claims on behalf of third-party entities on the basis of assignments or co-purchasing agreements, which Dow contests.  For example, plaintiff Skypark Manufacturing LLC purports to bring claims on behalf of purchases by Burtin Corp. and Burtin LLC.  Such claims have not been validly transferred to Skypark.

- **Release.**  Certain plaintiffs have released Dow and/or other suppliers from liability.  For example, due to an issue related to the smell of TDI in September 2001–March 2002, Leggett & Platt released Dow "from any and all manner of actions, causes of action . . . relating to . . . the sale of TDI by Dow to Leggett & Platt between September 1, 2001 and March 1, 2002." DX-1225 at 2.

- **Impact.**  Certain plaintiffs were not impacted by the effects on any price increase announcements due to long-term contracts or contracts with price protection.  For example, throughout the entire 1994-2003 period, plaintiff Lubrizol enjoyed contractual protection from any increases for MDI, the only urethane chemical it purchased from any defendant.  Accordingly, it could not have been impacted by any conspiracy to fix prices through coordinated price increase announcements.

- **Inquiry notice of claims.**  Certain plaintiffs were on inquiry notice of their claims prior to 2004 because certain of the events that they allege were conspiratorial happened in their presence.  The statute of limitations bars their claims in whole or in part.

     **F.**    **Evidentiary Issues**

     In addition to the foregoing legal and factual issues, Plaintiffs and Dow are currently in

the process of resolving various evidentiary objections through a meet and confer process with

the Special Master appointed by the Court, the Honorable Joel A. Pisano.  Given the on-going

nature of these discussions, it is unclear at this time what, if any, evidentiary disputes will remain

for the Court's consideration at trial.

### **CONCLUSION**

For the foregoing reasons, Dow contests the basis for each individual plaintiff's

entitlement to relief.

Respectfully submitted,


Dated: February 22, 2016                    s/ Lawrence S. Lustberg
Newark, New Jersey                          Lawrence S. Lustberg
                                            Daniel J. McGrady
                                            **GIBBONS P.C.**
                                            One Gateway Center
                                            Newark, NJ 07102
                                            Telephone:  (973) 596-4500
                                            Facsimile:  (973) 596-0545

                                            David M. Bernick (*admitted pro hac vice*)
                                            Jonathan R. Streeter (*admitted pro hac vice*)
                                            **DECHERT LLP**
                                            1095 Avenue of the Americas
                                            New York, NY 10036
                                            Telephone:  (212) 698-3500
                                            Fascimile:  (212) 698-3599

                                            *Attorneys for Defendant*
                                            *The Dow Chemical Company*

## <u>CERTIFICATE OF SERVICE</u>

On February 22, 2016, I caused a copy of the foregoing to be served on all counsel of

record via ECF.

<u>/s/ Lawrence S. Lustberg</u>
Lawrence S. Lustberg
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
llustberg@gibbonslaw.com

*Attorney for Defendant*
*The Dow Chemical Company*

18