# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | Master Docket No. 08-5169 (WJM)(MF) |

## **PLAINTIFFS' TRIAL BRIEF**

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
(973) 994-1700

Jeffrey M. Johnson
Adam Proujansky
Daniel P. Schaefer
Alex E. Hassid
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

Richard J. Leveridge
ADAMS HOLCOMB, LLP
1875 Eye Street, NW
Washington, DC 20006
(202) 580-8818

James R. Martin
ZELLE LLP
1220 L Street, NW
Suite 100-143
Washington, DC 20005
(202) 359-6688

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ............................................................................................1

II.     STANDARD OF PROOF ...............................................................................1

III.    FORMER EXECUTIVES OF DOW AND ITS CO-CONSPIRATORS TESTIFIED
        ABOUT THE EXISTENCE OF THE CONSPIRACY .....................................2

IV.     THERE IS ABUNDANT EVIDENCE OF CONSPIRACY BEYOND THE
        TESTIMONY OF STERN AND BARBOUR ..................................................7

V.      THE URETHANES MARKET WAS RIPE FOR COLLUSION ....................16

VI.     EXPERT EVIDENCE SHOWS THE EXISTENCE OF A CONSPIRACY ....19

VII.    INTERSTATE OR FOREIGN COMMERCE ................................................23

VIII.   INJURY AND DAMAGES .............................................................................24

IX.     FRAUDULENT CONCEALMENT ...............................................................28

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                   Page(s)

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ...................................................28

*American Seed Co., Inc. v. Monsanto Co.*, 271 F. App'x 138 (3d Cir. 2008) ............................24

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ...........................................7

*Bellevue Drug Co. v. Advance PCS*, 2004 WL 724490 (E.D. Pa. Mar. 2, 2004) ...........................2

*Bigelow v. RKO Radio Pictures, Inc,.* 327 U.S. 251 (1946) ...............................................25

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) ............................................24

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ......................................2

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)...................................................28

*Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 500 F. Supp. 2d 437 (D.N.J. 2007) ...................................................................................................28

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ...........................................23

*Fuentes v. South Hills Cardiology*, 946 F.2d 196 (3d Cir. 1991) ....................................2

*In re Aspartame Antitrust Litig.*, 2007 WL5215231 (E.D. Pa. Jan. 18, 2007) .............................29

*In re Bulk Extruded Graphite Products,* 2007 WL 1062979 (D.N.J. 2007)................................28

*In re Fasteners Antitrust Litig.*, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ....................28, 29

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004)...................................2, 16

*In re Gabapentin Patent Litig.*, 649 F.Supp.2d 340 (D.N.J. 2009)...................................2

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) .........................17

*In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666 (E.D. Pa. 2007).......................................25

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) .........................28

*In re Magnesium Oxide Antitrust Litigation*, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ..................................................................................................2

CASES                                                                                    Page(s)

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 3276932 (N.D. Cal.
  Aug. 9, 2012) ..................................................................................................23

*In re Urethane Antitrust Litig.*, 2013 WL 2097346 (D. Kan. May 15, 2013) ...............................24

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ......................................20, 24, 25

*In re Vitamins Antitrust Litig.*, 320 F.Supp.2d 1 (D.D.C.2004).....................................................2

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003).........................................................................25

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700 (1969) .........................2

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir.
  1993) .................................................................................................................7

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998)................................................24, 25

*Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555 (1931)..........................25

*Texaco, Inc. v. Dagher,* 547 U.S. 1 (2006) ...................................................................................15

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ......................................................................17

*United States v. Snow*, 462 F.3d 55 (2d Cir. 2006).........................................................................7

## I.     INTRODUCTION

Plaintiffs will present abundant evidence at trial that Dow participated in an effective conspiracy to fix the price of urethanes they purchased over a 10-year period.  This will include direct, circumstantial, and economic evidence.  The evidence will show that high-ranking executives of Dow and its co-conspirators met throughout the world to discuss prices, customers, and capacity.  They met privately at hotels, coffee shops, and corporate lodges.  They had discussions at trade association meetings, golf outings, and dinners.  They called each other frequently at work, at home, and on vacation.  They went to great lengths to conceal their actions, using calling cards and pay phones, falsifying expense reports, and using code names. They gave their customers pretextual reasons for their price increases.

In addition, the evidence will show that Dow and its co-conspirators had a motive to conspire, and that they engaged in numerous acts that were against their unilateral self-interest. Moreover, Plaintiffs will present expert testimony showing that urethanes prices during the conspiracy period cannot be explained by cost and demand factors – which were the reasons contemporaneously offered by Dow and its co-conspirators for price increases – or by so-called "oligopolistic" pricing strategies.  Dow and its co-conspirators maintained prices at levels higher than they would have been but for the price-fixing agreement.  Undisputed evidence will show that coordinated price announcements were highly effective throughout the conspiracy period.

## II.    STANDARD OF PROOF

To establish their claim against Dow, Plaintiffs must prove by a preponderance of the evidence (1) that Dow knowingly became a member of a conspiracy to fix, raise, or stabilize the prices of urethane products; (2) that such conspiracy occurred in or affected interstate, import or foreign commerce; and (3) that the conspiracy caused Plaintiffs to suffer injury to their business or property.  *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 198-99 (3d Cir. 1991).

1

No formal agreement is necessary to constitute an unlawful conspiracy.  *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 704 (1969); *In re Magnesium Oxide Antitrust Litigation*, 2011 WL 5008090, at *17 (D.N.J. Oct. 20, 2011) (citing *In re Vitamins Antitrust Litig.*, 320 F.Supp.2d 1, 15 (D.D.C.2004)); *Bellevue Drug Co. v. Advance PCS*, 2004 WL 724490, at *6 (E.D. Pa. Mar. 2, 2004).  The agreement can be shown by direct and/or circumstantial evidence, and the finder of fact "must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence."  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004).  Plaintiffs are entitled to the full benefit of their proof on the entire alleged conspiracy, "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *In re Gabapentin Patent Litig.*, 649 F.Supp.2d 340, 358 (D.N.J. 2009) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

## III.   FORMER EXECUTIVES OF DOW AND ITS CO-CONSPIRATORS TESTIFIED ABOUT THE EXISTENCE OF THE CONSPIRACY

A number of witnesses have provided direct evidence of conspiracy, testifying that they personally participated in unlawful discussions with competitors or had personal knowledge of such discussions.  Larry Stern, the head of Bayer's NAFTA polyurethanes division, and Stephanie Barbour, Dow's manager for MDI and rigid polyols, are among those who provided direct evidence of illegal pricing discussions among the urethanes producers.

Stern will testify via videotape about multiple pricing discussions he had with competitors, including Dow.  For example, in June 2000, Stern discussed raising urethanes prices with Mike Parker, CEO of Dow, and Robert Wood, Dow's President of Polyurethanes, during a golf outing at an American Chemistry Council meeting.  They specifically discussed pricing with regard to Plaintiff Carpenter and another major purchaser, Foamex (a member of the urethanes

2

class).  At deposition, Stern recalled "Mr. Parker saying that we needed to get prices up as he looked at us, at least looking at me, and I was somewhat taken aback that a comment like that would be made in proximity of other people."

Stern also testified at deposition that he had several discussions with William Bernstein, head of BASF's NAFTA polyurethanes division, regarding future urethanes pricing.  For example, during one or more meetings of the Alliance for the Polyurethanes Industry in 2000-01, Stern met privately with Bernstein twice at a coffee shop to avoid detection.  They discussed "industry conditions" and "business relationships between BASF and Bayer."  During the second coffee shop meeting, Stern and Bernstein talked about future urethanes pricing.

Stern also testified that he had several discussions with David Fischer, head of Dow's NAFTA polyurethanes division, in which they discussed Bayer's and Dow's intention to raise urethane prices and coordinated future price increases.  For example, in October 2000, Stern, his predecessor Hans Kogelnik, and Fischer, had a private conversation in which they discussed the need to increase pricing, bad margins in the industry, and pricing at Plaintiff Carpenter and Foamex.  They also discussed their intention "to raise prices for both polyols as well as for TDI."  The day after the meeting, Dow rejected Foamex's previously relayed request for price relief.  Shortly afterward, Dow, Bayer, and the other co-conspirators issued an "unprecedented" $0.15/lb. price increase that was almost fully implemented.

In the 2001-02 time period, Stern twice called Fischer from a payphone with a prepaid calling card to avoid detection.  Stern testified that he and Fischer talked about Bayer's need to improve pricing, specifically regarding "Bayer's intention to raise both polyol and TDI prices," and Fischer's intent to do the same, leaving Stern with the belief "that Dow would, in fact, either support or lead further price increase attempts."

Similarly, at the May 2002 meeting of the International Isocyanate Institute, Stern met privately with Bernstein of BASF, and informed him that Bayer "had determined to increase [the] price of MDI probably in the range of 6 to 8 cents per pound." Bernstein also indicated that "BASF had an intention to raise prices in a similar range." Stern then met with Tony Hankins, who was in charge of Huntsman's urethanes business, and told him that Bayer intended to raise MDI prices 6 to 8 cents per pound. Hankins also indicated a need to improve pricing, leaving Stern with "an impression that Huntsman needed to improve profitability as did others in the industry and that they would likely be following, you know, price increase announcements." Shortly thereafter, Stern spoke with Jean-Pierre Dhanis, head of BASF's global polyurethanes business, and "indicated to Mr. Dhanis that Mr. Bernstein and I had met, that I had informed Mr. Bernstein of our intention to raise prices 6 to 8 cents per pound, and I noted either a verbal or a non-verbal indication from Mr. Dhanis that he thought that would be healthy for the industry, and I walked away with an impression that BASF would be attempting to raise price consistent with what Mr. Bernstein had told me." Prices for MDI rose after those meetings.

Moreover, Stern communicated with competitors to see whether they were going to implement price increases. For example, in August 2002, Stern met Hankins at the Philadelphia Airport Marriott and discussed industry pricing and the "resolve to move forward with and have the current price increase [effective July 1, 2002] which was still solidifying stick." They compared notes on pricing at MDI accounts for which both Bayer and Huntsman were the suppliers. Stern gave Hankins a copy of an internal Bayer pricing report, but only after Hankins promised he would destroy the document after he used it. Stern shared this confidential Bayer pricing information with Huntsman because he "wanted Huntsman to have the facts so they can make, you know, an assessment, and, again, which I then believed would lead to price increases

4

at those accounts and perhaps in the industry." Stern testified that he believed this conversation was wrong both from an "ethics perspective" and from his "own conscience." After the meeting, Stern "felt flushed and wondered why I had done that and was immediately chagrined, embarrassed and flushed about having done that."

Similarly, Stephanie Barbour, a high-ranking Dow executive during much of the relevant time period, testified that BASF and Dow executives invited her into the conspiracy and, even though she declined, kept her apprised of Dow's agreements with competitors.

After Barbour assumed responsibility for MDI and rigid polyols at Dow in 2000, she attended a meeting with Marco Levi, who was Dow's global TDI manager, and Uwe Hartwig, who was in charge of BASF's NAFTA urethanes business. Hartwig asked Barbour to leave the room so that he could talk to Levi alone. Levi and Hartwig met privately, after which Levi told Barbour that Hartwig wanted to see her and "would like to discuss pricing." Barbour advised Hartwig that she would not have such a discussion.

Barbour testified that Levi told her directly on "more than ten" occasions about Levi's price-fixing discussions with Dow's competitors. Levi discussed his price-fixing agreements with competitors at Dow meetings attended by Barbour and Fischer.

Barbour recalled that these events placed in context events from earlier in her tenure, when Dow executives instructed her to increase prices when she believed that an increase would be doomed to fail due to market conditions. Barbour testified that in either 1998 or 1999, Dow executive Charles Churet told Barbour and Rick Beitel, Dow's sales and marketing director for North America, that they needed to raise prices. Beitel and Barbour argued that it was not a good time for a price increase because of supply and demand conditions, but Churet was adamant that they must raise prices. After the meeting, Barbour was in the hallway with Levi

and another Dow employee, who also reported to Churet.   Barbour shook her head and asked, "What was that about?"  The other Dow executives responded, "Where was Charles last week?"  Barbour said, "I don't know," and they said, "He was at a Triple I [*i.e.*, International Isocyanate Institute, a trade association] meeting."  Barbour responded, "So?"  They said "You'll learn."  Barbour testified that, based on subsequent events, she understood that they meant that Dow had price-fixing discussions with competitors at trade association meetings.

In 2003, Barbour asked Levi how he was able to increase the price of TDI given that the industry was rife with excess capacity.  Levi admitted that he had met with Hartwig and Bayer and "that there was an agreement, that they were all in a bad situation financially, and that they were going to make sure that these price increases stuck."

Also in 2003, Peter Davies, Dow's Vice President of Polyurethane Systems Houses, told Barbour that "he had a conversation with BASF, and that they were not happy" that Dow was not sticking with the full amount of an MDI and polyols industry price increase at GE and wanted to know why Dow was not going up the full amount.  Barbour explained to Davies that Dow had a contract with GE.  Davies then told Barbour that he was going to explain the situation to BASF, and that if the conversation ever became the subject of litigation, "he would deny the conversation and call [her] a liar."

Barbour testified at deposition that she kept electronic notes on her work computer of debriefings that Levi provided Fischer about pricing conversations with Dow's competitors.  Barbour told Dow executives and an in-house counsel about the existence of those notes before her termination from Dow was final.  Barbour testified that her notes were still on her computer when she left Dow.  Dow's corporate designee, Arthur Eberhart, testified at deposition that Dow took "a snapshot" of Barbour's hard drive when she was terminated in February 2004, because

she was considered a litigation threat.  But Dow never produced any of Barbour's notes.  In addition, although Fischer was the subject of one or more investigations for improper contacts with competitors, and therefore Dow had a duty to preserve his documents given the threat of litigation, Fischer's computer was wiped clean when he was terminated by Dow in 2004.

## IV.     THERE IS ABUNDANT EVIDENCE OF CONSPIRACY BEYOND THE TESTIMONY OF STERN AND BARBOUR

It is well established that "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'"  *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (citation omitted).  Conspiracy "'by its very nature is a secretive operation.'"  *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (citation omitted).  In conspiracy cases, circumstantial evidence can be "quite compelling."  *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 & n.7 (3d Cir. 1993).  Here, in addition to the clear testimonial evidence discussed above, there is a plethora of compelling circumstantial evidence.

For example, in February 1994, Bayer's Lee Noble and a Bayer colleague met with William Long and another Dow executive for three separate one-hour meetings during a four-day golf outing.  Dow documents state that two of the meetings involved a polyurethane "industry discussion," but Dow's Long and Bayer's Tom Harrick could not explain what was discussed.  Long admitted that the descriptions on his expense reports may have been inaccurate.  Eleven days after these meetings, Bayer announced an MDI price increase, and BASF, Dow, and ICI (a company which was later acquired by Huntsman) followed shortly thereafter.

In May 1994, Bayer's Noble and Harrick met with Dow's Long for a "PU Business Discussion" during an International Isocyanate Institute ("Triple I") trade association meeting.  Less than two weeks later, BASF announced a MDI increase, and Bayer and Dow followed.

Similarly, at a meeting of the Chemical Manufacturers Association at the Greenbrier resort in West Virginia on June 10, 1994, there was a private meeting between Long, Noble, and a BASF executive to discuss, according to Long's expense report, "polyurethane industry growth."  In fact, in a four-month period beginning in March 1994, Long attended six trade association meetings with Bayer's Noble and BASF's Robert Lawrence.

On October 4, 1995, Dhanis sent a memo to Lawrence and another BASF NAFTA executive describing two "proposed scheme[s] of cooperation" in which the industry could reduce global TDI capacity.  Dhanis used the colors "Blue" (Bayer), "Amber" (ARCO), "Orange" (Olin), and "Scarlett" (Shell) as code names for certain urethanes manufacturers.[1]  In the memo, Dhanis identified two "models" for future cooperation among producers and encouraged his counterpart in NAFTA, Dr. Godwin, to talk directly with "Orange" and "Amber" to find out their urethanes strategy.  BASF could not explain the document.

On February 19, 1998, Dow's Churet and BASF's Vogel met for dinner.  The next day, Churet met with Reinhard Clausius of Bayer.  That same day, Noble and Harrick of Bayer met with Bernstein and Dick Mericle of BASF.  At that meeting, Noble proposed that Bayer provide MDI to BASF in the United States, to delay BASF in bringing new MDI capacity on-line.  Mericle admitted that conversations between Noble and Bernstein must have taken place on the side of this meeting.  Also that day, Bayer announced an MDI price increase.  During February 23-25, ICI announced virtually identical MDI and polyol price increases, and Dow announced a polyols price increase.  On February 26, Churet met with Reinhard Leppkes of BASF.  The next day, Churet went to London to meet with ARCO's Martin Dawson.  The same day, Dow announced a price increase for MDI, effective April 1.  On March 1, Churet traveled to

---

[1] Olin's urethanes business was later acquired by ARCO.  ARCO was later acquired by Lyondell.

Mannheim, Germany for a third meeting with BASF.  That same day, BASF announced MDI and polyol price increases, effective April 1.  Also on March 1, Bayer announced a polyols price increase, followed by a polyols price increase announcement by ARCO/Lyondell on March 9.

On February 8, 1999, Jean-Pierre Dhanis of BASF hosted a meeting at the Swan Restaurant in Brussels, attended by Robert Wood of Dow, and Ed Dineen of Lyondell.  During the dinner, Dhanis stated that the industry needed to get prices up and that profits were too low.  Dhanis indicated that if BASF were to raise prices, BASF needed assurances that they would not lose volume.  On his expense report submitted for reimbursement for this dinner, Dhanis did not report that Wood and Dineen attended.  Instead he indicated that "Lefebvre" and "Christiansen" attended this dinner when no such people attended.  Similarly, on Dineen's expense report for reimbursement related to this trip, Dineen only reported that he was meeting with Dow in Brussels regarding business opportunities.  He did not report that he was meeting with BASF and Dow together, nor does his expense report mention BASF at all.

A few weeks after the Swan meeting, a Lyondell internal strategy document discussed the "need to help stabilize the market" and Lyondell's resolution to "pass on some opportunistic business" for the "balance of 1999" in North America and Europe.  In late February and early March 1999, Dow, Lyondell, Bayer, BASF, and ICI/Huntsman all announced similar price increase announcements for polyols and TDI, effective April 1.

Three days after an August 31, 1999, meeting between Bernstein of BASF and Hans Kogelnik and Bob Kirk of Bayer, Kogelnik called Bernstein.  A message pad reflecting the call states: "Sept. increase - where, who, why."  Later in September 1999, Bayer led, and BASF followed, a successful price increase for TDI and polyols.

9

Kirk of Bayer also testified that he had drinks around this time (late 1990s or early 2000s) with Fischer of Dow at Bayer's Baywood facility in Pittsburgh.  Fischer told Kirk that Dow intended to increase prices at some future date, and Kirk responded that Bayer had supported industry increases in the past.

On or around June 9, 2000, at a time in which Dow, Bayer, BASF, Lyondell and Huntsman were trying to implement a price increase effective July 1, Stern played golf with Attila Molner, a board member at Bayer, and Mike Parker, Dow's CEO.  They discussed future pricing and raising prices of urethane products, and pricing at Foamex and Carpenter accounts.  After this golf outing, Parker stated in the presence of Stern that they (*i.e.*, the industry) needed to get prices up.  Stern was taken aback that Parker would make such a comment with other people around.

In late February 2001, Dow and Bayer announced MDI and polyols price increases, effective April 1.  On March 8, 2001, while on vacation, BASF's Bernstein called Huntsman's Hankins using his calling card at 10:58 a.m.  At 1:57 p.m., Bernstein sent an email to his colleagues stating, "I have tried to determine what Huntsman's response will be but have not connected."  Later that day and the next, Bernstein made seven phone calls to Hankins, as well as a call to Kirk of Bayer.  On March 9, 2001, BASF and Huntsman both followed Dow's and Bayer's price increases, back-dating their letters to March 1 and March 5, respectively.

In August 2001, after the urethanes producers noted internally that they did not believe that Fall 2001 was a good time for a price increase announcement, there were a number of competitor meetings.  On August 16, Bayer's Stern met with BASF's Bernstein at the Pittsburgh airport, and the very next day, Stern recommended a price increase, reversing his earlier position that Bayer should wait for an improved economy to try to increase prices.  A few days later,

Stern spoke to Bernstein from home at night, and two business days later, BASF led TDI and MDI price increases.   Dow followed the next day.   After calls between Bernstein and Huntsman's Hankins, Huntsman followed the price increase, as did Bayer.

On March 13, 2002, the assistant for BASF's Dhanis contacted Fischer's secretary and told her that "Dhanis would like to have a telephone call with D. Fischer as soon as possible." The next day, BASF's Bernstein spoke with Fischer, and Bayer's Hagen Noerenberg spoke with Fischer as well.   That day, Dow led an MDI price increase.   Over the next few days, there was a rash of competitor communications, after which BASF followed the increase.   On March 28, a BASF executive wrote in an email:   "I have also not heard from either Bayer or Huntsman supporting.   I was told by JPD [Dhanis of BASF] that Huntsman would support, and with that, we knew that Bayer would follow.   Neither has occurred.   I don't know what the problem is." The same day, BASF's Bernstein and Huntsman's Hankins met, and Huntsman followed the increase the following day.   Bayer followed the increase shortly thereafter.

Michelle Blumberg, a Bayer MDI executive, testified that in June 2002 she met in Germany with Wolfgang Friedrich, Bayer's global head of MDI, who told her not to worry about low pricing in the United States at one of Bayer's MDI customers because "I've already talked to the competition."   When Blumberg asked if that was illegal, he responded "not in this country."

Blumberg also testified that in June 2002 she overheard a conversation at Bayer's offices in Pittsburgh between Friedrich and a colleague about an online customer bid where Friedrich told the colleague not to adjust the online bid, and said that the competition would not change their pricing either.   During the same visit, Friedrich met with a subordinate, Gerald Phelan, to whom he indicated that he had an understanding with one or two competitors regarding the July

2002 MDI price increase.   Friedrich said his superior in Germany was aware of his understanding with competitors.

On November 6, 2002, Huntsman records show a 14-minute call to the cellphone of BASF's Larry Berkowski, followed by a call to the office of Phelan of Bayer.  The following day, Uwe Hartwig met with Hankins of Huntsman for dinner.  The next day, BASF's Dhanis called Noerenberg of Bayer twice.  That same day, Huntsman records show a call to Bill Bernstein of BASF, and two calls from Hankins to Hartwig.  On November 11, 2002, Huntsman records show a call to Berkowski of BASF.  The following day, Uwe Hartwig of BASF called Friedrich and Christian Buhse of Bayer.  The next day, Hartwig called Kay Gugler of Huntsman. The day after that, BASF's Bernstein drove two hours to meet Dow's Fischer for breakfast at 6:30 a.m.  On November 19, 2002, Huntsman records show three calls to Rick Beitel of Dow, a call to Berkowski, and a call to Phelan.  That same day, BASF issued an MDI price increase announcement.  On November 22, 2002, Dow announced an MDI price increase.  On November 25, at 2 p.m., Huntsman circulated a price increase letter internally to Greg Geaman, Tony Hankins, and others that it intended to send to customers.  Huntsman phone records show a 2:06 p.m. call that day to Berkowski and a 2:36 p.m. call to Phelan.  The next day, on November 26, Geaman wrote "Good luck in dealing with the verbal abuse of this 2nd increase, but rest assured you will succeed and our share sacrifice will be tolerable."   On November 27 and 29, 2002, Huntsman and Bayer announced price increases, effective January 1, 2003.

On December 13, 2002, Dhanis had a 19-minute call with his counterpart at Bayer, Noerenberg.  Two hours later, Bayer's Friedrich reprimanded the Bayer North America staff for taking the MDI Firestone business from BASF and potentially undermining the January 1, 2003 increase.  Friedrich told Bayer NAFTA employee Phelan that Bayer's pursuit of the Firestone

MDI business at the expense of the urethane producers' price increases would result in people losing their jobs and that he was going to tell Noerenberg that NAFTA did not know how to run its business.   On December 16, 2002, Friedrich called John Houston, the head of the Bayer division that took this Firestone business from BASF, and immediately thereafter Friedrich called Hartwig of BASF's cell phone and spoke to him for 21 minutes.   On December 16, 2002, and again on December 20, Hartwig called Friedrich.   A January 13, 2003 Bayer report noted that BASF retaliated for the Firestone loss by taking a similar volume of polymeric MDI from Bayer at Atlas.   That same day, BASF reported a delay in the price increase based on the Firestone issue, but indicated optimism that the increase would still hold.   That same day and twice again on January 15, 2003, Hartwig again called Friedrich.

On January 6, 2003, Bayer's Buhse advised that Bayer's TDI NAFTA product manager, Dan McMahon, had to be careful not to increase its share too much in NAFTA "to leave room for [its] competitors."   A January 20, 2003 memorandum by Dow's Fischer indicated that demand was weak and price increases were difficult in that environment.   That same day, Bernstein of BASF made two calling card calls to Fischer in Switzerland.   During the next two weeks, Fischer met with Bayer personnel in Europe.   Fischer stated that Dow must take immediate action to improve pricing to acceptable levels.   On February 19, 2003, Buhse met with Marco Levi of Dow.   On that same afternoon, Buhse and Phelan of Bayer met with Hartwig of BASF in the Detroit airport.   The next day, Dow's Levi called Mario Portela of Lyondell (who was listed as one of the contacts with whom Levi met "one-on-one o/s office.").   The following day, Bayer announced price increases for MDI and polyols, effective April 1, 2003.   Dow and others joined these price increases, and ultimately all the co-conspirators announced increases for all three urethane chemicals products.   On March 7, 2003, Huntsman records show multiple

phone calls to Dow and BASF.  On March 7, 2003, Greg Geaman of Huntsman wrote internally that "We appear to have support [for price increases] from our competition at these levels, we will keep you posted on any new developments."

On August 19, 2003, Hartwig met with Fischer at the Dow Club.  The next day, Fischer had a breakfast meeting with Dhanis and Bernstein of BASF.  The day after, Hartwig met with Dennis McCullough of Bayer.   On August 26, 2003, Beitel of Dow sent an internal email directing price increases for polyols and MDI to be announced in early September.  The same day, Beitel spoke to Huntsman, and Huntsman called Berkowski of BASF.  The next morning, Greg Geaman sent an email internally stating: "I am picking up rumors from customers of a 6 cents/pound increase in MDI and Polyol and systems for October 1.  Both Dow and BASF have started to alert customers."  Huntsman phone records show calls from Huntsman to Berkowski of BASF and Beitel of Dow the same day and next day.  On August 26, 2003, Dow announced price increases for MDI and polyols.  Between August 28 and September 1, BASF, Huntsman, and Bayer also announced price increases. On September 3, 2003, Huntsman called Bernstein and Berkowski.  That same day, Huntsman issued a price increase letter.  After communications between Dhanis of BASF, Noerenberg of Bayer, Hartwig of BASF, and Dennis McCullough of Bayer on September 2, 2003, Bayer followed the price increase announcements.

The conspiracy ended at the close of 2003, after, among other things, Bayer withdrew from the conspiracy and a number of participants in the price-fixing agreements left their respective urethanes positions.  Buhse had become nervous after government raids at Bayer in late 2002 related to other chemical products, including rubber chemicals and EPDM.  There was increased emphasis on antitrust compliance at Bayer.  As a result of a reorganization effective

early 2003, Buhse had less ultimate authority over pricing decisions than he had previously had, and it was more difficult for him to discuss the ability to raise urethanes prices with competitors.

At a meeting in September 2003 among Buhse, Hartwig of BASF, and Levi of Dow, Buhse said that he would not participate in any further discussions regarding raising prices and market conditions.  According to Buhse, Hartwig and Levi tried to convince Buhse to continue the discussions and proposed that they agree to stability of market shares, but Buhse refused and did not engage in any further pricing discussions with urethanes competitors.

By the end of 2003, a number of the participants in the conspiracy had left or changed positions at their respective companies.  For example, Stern left Bayer at the end of 2002, and Friedrich left Bayer in 2003.  Fischer, Levi, and Wood left or were removed from their urethanes positions at Dow around January 2004.

Notably, coincident with the end of the conspiracy, by the end of 2003, urethanes prices had moved back to the prices predicted in a market free from conspiracy.

### Evidence of Discussions Relating to Capacity
### in Furtherance of the Price-Fixing Conspiracy

In addition, the evidence at trial will show that Dow and its co-conspirators had discussions about limiting capacity expansion, supporting an inference that they were controlling supply when necessary to smooth things over in the cartel.  It is unlawful to reach agreements to restrict output.  *Texaco, Inc. v. Dagher,* 547 U.S. 1, 5 (2006).

The evidence will show that in February 1998, there was a meeting at Bayer's Baywood Country Club at which Bayer's Noble suggested to BASF's Bernstein that they enter into an agreement whereby Bayer would send "significant quantities" of MDI to BASF in order to delay BASF in bringing on new MDI capacity in the United States.  This meeting took place on the same day that Bayer announced an MDI price increase, which the competitors followed shortly

thereafter.  Dick Mericle, a BASF executive who also attended the meeting, admitted at his deposition that delaying new MDI capacity is ███████████████████████████ ██████████████ and conceded that an agreement with a urethane competitor to delay the startup of a new MDI facility could be the same as an agreement to restrict supply for MDI.

Moreover, an October 1998 memorandum discussed BASF's efforts to delay Dow's MDI plant from 2002 to 2004 by supplying Dow.  The memo indicated that BASF had spoken to Dow and Dow was interested.  Dow's Churet confirmed that in late 1998, Dow had discussions with BASF regarding BASF's offer to sell MDI to Dow as an alternative to building a new plant. Similarly, between November 1998 and January 1999, Bayer and BASF entered a TDI swap/purchase agreement, which was structured based on Bayer's agreement to provide TDI to BASF in exchange for BASF's agreement to postpone its planned TDI capacity expansion in the United States by six months.  BASF admitted that it agreed to postpone the planned TDI capacity expansion in the United States as a condition of the TDI swap agreement with Bayer.

## V.    THE URETHANES MARKET WAS RIPE FOR COLLUSION

There is clear evidence that Dow and its co-conspirators had an economic motive to enter into the conspiracy.  "Evidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion."  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004).  In *Flat Glass*, the court found a motive to enter a price-fixing conspiracy was shown by (1) a concentrated market, (2) a product that was standardized and sold primarily on the basis of price, (3) high fixed costs in the industry, (4) declining demand, and (5) excess capacity.

Here, the parties agree that the structure of the market was one in which secret price-fixing might have an effect on prices, and therefore be worth attempting,  in that:

- The market was concentrated ("oligopolistic"), meaning that a few sellers dominated the industry. In such markets, elaborate communications, quick to be detected, would not have been necessary to enable prices to be coordinated. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002). In addition, in concentrated industries, if one seller breaks ranks, the others will quickly discover the fact, and so the seller would have gained little from cheating on his co-conspirators; the threat of such discovery tends to shore up a cartel. *Id.*

- The products are highly standardized ("commodities"). As a result, colluding sellers can agree on price without worrying about complicating that agreement to account for differences in quality, design, post-sale services, and the like. *Id.* This is another reason why a successful conspiracy would not require such frequent communications as to make prompt detection likely.

- Demand is relatively inelastic, meaning that buyers cannot choose to forego purchasing the product in response to price increases because those buyers need the product. *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001). Here, for example, makers of flexible foam needed TDI and polyols to make their products, regardless of the price of TDI and polyols. There was no cost-efficient substitute for those key raw materials. An attempt to raise price above cost would "not be likely to come to grief by causing a hemorrhage of business to sellers in other markets." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 657.

Moreover, Dow and its co-conspirators engaged in a number of actions against their unilateral economic self-interest throughout 1994-2003. For example, they pushed for price increases and placed business at risk when market conditions did not warrant increases.

In 1995, Hans-Joachim Kaiser, Bayer's global leader of polyurethanes, directed Bayer to increase urethanes prices, stating that ███████████████████████████████ ████████████████ and highlighting ██████████████████████████ But at the same time, Harrick, Bayer's Senior VP of Polyurethanes in NAFTA, wrote that ██████████ ████████████████████████████ based on market conditions. Yet Bayer and its competitors announced and successfully implemented price increases.

Similarly, in January 1996, Harrick again reported that market conditions would not support price increases for MDI and TDI because raw material costs were expected to trend

downwards in 1996 and suppliers added TDI capacity.  At the time, TDI prices were already well above competitive levels after three rounds of highly successful price increases over a span of 15 months.  Bayer executives instructed personnel to not ███████████ and to ███████████ ███████████ even though those levels were artificially inflated, and in the absence of agreement, other producers would have reduced prices to take Bayer's business.

In September and October 1997, BASF Coordination Center in Brussels urged BASF in NAFTA to increase prices in spite of competitors' and customers' expectation that new capacity increases by ICI would exert downward pressure on prices.  In fact, costs and demand were falling throughout most of 1997 and into mid-1998.

In 1998 or 1999, Dow's Churet insisted on urethane price increases even though existing price and market conditions did not support it.

In September 2000, Bayer's Werner Spinner demanded that regional businesses raise prices for MDI, TDI, and polyols.  Stern noted his concern that price increases could not be accomplished.

In January 2003, a week after citing weak demand for polyurethanes, Dow's Fischer insisted to his global leadership team to "act across the board to raise prices further ASAP."

Other examples of conduct in which Dow and its co-conspirators engaged that was against their unilateral self-interest included controlling supply in order to maintain prices, agreeing with competitors to stay out of certain markets, choosing to forego competing for large pieces of business, and selling to one another at less than market price.

For example, during implementation of the April 1999 TDI and polyol price increases, based on the view that ███████████████████████████████ ███████████████████████████████ Dhanis made the decision to

walk away from a large piece of business, even though other BASF employees called the decision into question and warned that it could result in a significant loss for BASF. As a result, BASF lost substantial TDI and polyol business at both Foamex and Carpenter.

In the November-December 2000 time frame, BASF and Huntsman negotiated an MDI swap agreement that was contingent on BASF agreeing not to be aggressive in the woodbinder market, an important polyurethane product segment for Huntsman.

William Long of Dow testified that after Dow announced plans for a new TDI plant, BASF sold TDI to Dow to allow Dow to build up market share. In return, Dow agreed to sell TDI to BASF once the plant came online.

In March 2002, Berkowski instructed his subordinates that "Also, we need to avoid being aggressive on business right now. It sends the wrong message."

This conduct was against the unilateral self-interest of each producer. Horizontal agreements to stay out of one market in exchange for help in another market are inherently unlawful. Moreover, outside a price-fixing context, a producer does not forego business for fear that a competitor will be upset.

## VI.   EXPERT EVIDENCE SHOWS THE EXISTENCE OF A CONSPIRACY

Plaintiffs' expert analysis demonstrates that urethanes prices during the conspiracy period cannot be explained by supply and demand factors alone, or by competitive "oligopolistic" pricing. Applying a reliable and well-established methodology, Plaintiffs' expert (now Leslie Marx, Ph.D.) developed an econometric model that isolated the conspiracy as the cause of supracompetitive prices paid by Plaintiffs. The model confirms the existence of the agreement and Dr. Marx will testify that in her expert opinion the alleged conspiracy is the only plausible explanation for overcharges paid by Plaintiffs in the markets for TDI, MDI, and polyols of 12-15

percent.  Such testimony and analysis constitutes admissible evidence of the fact of conspiracy. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1265-66 & n.22 (10th Cir. 2014).

The chart below shows actual and but-for prices over the conspiracy period for TDI 80/20, with stipulated coordinated price increases superimposed on the chart.  It shows that the TDI  conspiracy began and took effect in the Fall of 1994 and through three sets of coordinated price increases over 15 months succeeded in artificially increasing prices by nearly 20 percent. From 1996 through early 1997, the conspiracy was less effective but held the artificial gains it achieved from the earlier price increases.  Over the next four years, through a series of seven coordinated price announcements, Defendants held on to the price gains despite declining cost and demand.



TDI prices, however, suddenly dropped from $0.90/lb. in May 2001 to $0.72/lb. in July 2001, which is the same price that Dr. Raiff's model predicts should be the prevailing price. For the next several months, actual and but-for prices track each other. This is a very revealing pattern because it suggests that the conspiracy was less effective during this time period, as happens in virtually all long-running conspiracies. It is also a period during which the conspirators, including at the highest levels of Bayer, BASF, and Dow, were meeting regularly to determine which companies were cheating on the agreements and causing these price declines (it also correlates with the evidence of "competition" that Dow will claim refutes the existence of a conspiracy).

In early 2002, TDI 80/20 prices turned around – after a series of meetings among BASF's Hartwig, Dow's Levi, and Bayer's Buhse in which the conspirators recommitted themselves to increasing prices and not stealing business from one another. The conspirators then announced an "unprecedented" $0.15/lb increase in TDI prices and implemented that increase. The renewed effectiveness of the conspiracy from June 2002 through June 2003 resulted in prices peaking at $0.90/lb. By September 2003, actual and but-for prices had lined up again. From that time forward, actual and but-for prices track each other very closely, which provides powerful evidence that the model properly accounts for the normal supply and demand factors that determined prices in the absence of collusion.

For polyols, which is a complementary product to TDI, the story is similar but with some differences. The model predicts very similar prices to actual transaction prices from 1994 through 1996. Coordinated price announcements were effective in escalating and holding prices when cost and demand factors would have led to price declines. As with TDI, the conspiracy held these price gains through early 2001, when there was an apparent dispute within the cartel

21

and prices fell to "but-for" levels for the next 10 months.  The conspiracy then escalated polyol prices again through mid-2003.



With respect to polymeric MDI, as with TDI and CFS polyols, there was a one-year start-up period where actual prices track predicted prices quite well.  In 1995, as with TDI and CFS Polyols, producers increased prices at a time when cost and demand factors would have resulted in decreased prices.  By 1996, actual prices exceeded but-for prices by nearly $0.15.  From that time through late 2003, the conspiracy held its artificial gains when cost and demand factors would have caused price decreases.  As with TDI and CFS polyols, the model predicts MDI prices very well through the post-conspiracy benchmark period.



## VII.   INTERSTATE OR FOREIGN COMMERCE

The Sherman Act applies only to conduct that affects interstate or foreign commerce.  In this context, foreign commerce refers to transactions between persons in the United States and persons in a foreign nation.  Plaintiffs must prove that the conspiracy had a direct, substantial, and reasonably foreseeable effect on commerce within the United States.  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 3276932, at *1 (N.D. Cal. Aug. 9, 2012).

The evidence will show that the conspiracy had a direct, substantial, and reasonably foreseeable effect on interstate commerce.  Dow and its co-conspirators manufactured, sold, and shipped urethane products in a continuous and uninterrupted flow of interstate commerce to

23

customers located in states other than those states in which Dow and its co-conspirators produced these products.

The evidence will also show that the conspiracy had a direct, substantial, and reasonably foreseeable effect on domestic U.S. commerce.  This domestic effect on U.S. commerce gave rise to each Plaintiff's claims, including Plaintiffs' claims for purchases of any urethane products that were invoiced to the United States but delivered to locations outside of the United States, and Plaintiffs' claims for purchases of any urethane products shipped to the United States but billed to customers who were located outside the United States.

## VIII.   INJURY AND DAMAGES

Plaintiffs are entitled to recover damages if they can establish by a preponderance of the evidence that they were in fact injured as a result of Dow's violation of the antitrust laws, and that Dow's conduct was a material cause of the injury.  *American Seed Co., Inc. v. Monsanto Co.*, 271 F. App'x 138, 140 (3d Cir. 2008) (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir. 1998).   If the jury finds that Dow participated in a price-fixing conspiracy, Plaintiffs will be entitled to recover the overcharges they paid to Dow and its co-conspirators, as measured by the difference between the prices they actually paid and the prices they would have paid in the absence of the alleged price-fixing conspiracy.  *See Rossi*, 156 F.3d at 484.  Dr. Marx has quantified those losses on a plaintiff-by-plaintiff, and transaction-by-transaction basis.

Notably, plaintiffs need not – as Dow would have it – show impact on a price-increase-announcement-by-price-increase-announcement basis.  *In re Urethane Antitrust Litig.*, 768 F.3d at 1265-66.  To the contrary, plaintiffs must only show "a causal link between the single price-fixing conspiracy alleged by plaintiffs at trial and the impact to plaintiffs."  *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *3-4 (D. Kan. May 15, 2013); *see also LePage's Inc. v.*

*3M*, 324 F.3d 141, 166 (3d Cir. 2003) ("it would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act as the theory was not that any one act in itself was unlawful, but that all the acts taken together showed [an antitrust] violation," and therefore it was sufficient for the expert to show that defendants' actions "taken as a whole" caused plaintiffs' harm); *Rossi*, 156 F.3d at 485 (holding that it was inappropriate to preclude the model even though it "does not deal with the particularized effects of specific injuries, but rather aggregates all of [plaintiff's] damages into one figure"); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 683 (E.D. Pa. 2007) (permitting expert to opine that the collusive behavior "taken together" caused the alleged overcharges).

Rather, as in the class action, plaintiffs will prove that the supra-competitive prices were caused by a single-price fixing agreement that lasted from 1994 through late 2003, and that the price-increase announcements were merely an instrument used to effectuate that agreement. Plaintiffs will present ample evidence that they suffered harm as a result of a reduction in competition and that the conspiracy, including coordinated price announcements, successfully elevated prices above the levels that would have existed had there been unrestrained competition in the marketplace. *In re Urethane Antitrust Litig.*, 768 F.3d at 1266. Dow chose not to develop its own econometric model or to offer affirmative expert testimony except to argue that there was no effective conspiracy.

Once the jury has concluded that the conspiracy caused some harm, plaintiff's burden of proof to establish the amount of damage is relaxed. The jury may make a "just and reasonable estimate of the damage" based "on probable and inferential as well as [upon] direct and positive proof." *Bigelow v. RKO Radio Pictures, Inc,*. 327 U.S. 251, 264 (1946) (quoting *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 564 (1931)). Courts recognize

25

that since the defendant created the need for damage estimation by violating the antitrust laws, "it should bear the burden of uncertainty in proving the consequent damages."  II. Phillip E. Areeda et al., Antitrust Law ¶ 392 (3rd ed. 2007).

As shown in the chart below, Plaintiffs collectively suffered $581.7 million in damages on nearly $5 billion worth of purchases as a result of the unlawful conspiracy.[2]  The average overcharge for Plaintiffs' purchases was 11.7%.

---

[2] Previously, Plaintiffs alleged that their damages were $616,787,349, a figure that included (1) certain purchases that were neither invoiced in, nor delivered to, the United States and (2) overcharges for propylene oxide purchased by Carpenter (which was mistakenly identified by Lyondell as polyols).



## IX.    FRAUDULENT CONCEALMENT

The Clayton Act provides that a private antitrust action must be commenced within four years after the cause of action accrued, unless the running of the limitations period is tolled.

Under the class tolling doctrine, the filing of a class action lawsuit tolls the statute of limitations for all putative class members. *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974).  Here, the filing of the class action complaint on November 23, 2004 tolled the running of the statute of limitations as to Plaintiffs, all of whom were putative members of the class.

Moreover, the equitable doctrine of fraudulent concealment applies here.  To establish fraudulent concealment, Plaintiffs must prove by a preponderance of the evidence that Dow and its co-conspirators concealed the conspiracy from Plaintiffs, that Plaintiffs failed to discover the conspiracy, and that Plaintiffs did not know, or by the exercise of due diligence could not have known, that they might have a price-fixing claim.  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178-79 (3d Cir. 1993); *Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 500 F. Supp. 2d 437, 448 (D.N.J. 2007).

The same acts giving rise to the conspiracy can also support a finding of fraudulent concealment; there is no requirement that plaintiffs prove that the defendants engaged in affirmative acts of concealment that were independent of the conspiracy itself.  *E.g.*, *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *4 (E.D. Pa. Aug. 12, 2011); *In re Bulk Extruded Graphite Products*, 2007 WL 1062979, at *2 (D.N.J. 2007).  Indeed, price-fixing conspiracies like the one alleged in this case have been held to be "self-concealing" – that is, because a price-fixing scheme necessarily includes concealment of the existence of the conspiracy, proof of the conspiracy itself automatically suffices to prove that the defendants engaged in affirmative acts to conceal the conspiracy from plaintiffs, and no additional evidence

28

of affirmative acts of concealment is required.  *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *4-5; *In re Aspartame Antitrust Litig.*, 2007 WL5215231, at *5-6 (E.D. Pa. Jan. 18, 2007).

Here, the affirmative acts that Dow and its co-conspirators undertook to conceal the conspiracy included the following:  meeting privately outside of the office at sites such as restaurants, bars, coffee shops, airports, hotels, golf courses, the grounds of their facilities, and on the side of trade association and other meetings; speaking by payphone, prepaid calling cards, cell phone, or a home phone line rather than on an office phone line in order to maintain the secrecy of such conversations and out of a concern that office phone lines might be bugged or conversations might be overheard; placing calls outside of regular business hours; lying on expense reports by failing to report the presence of competitors at dinner for which reimbursement is sought, in order to conceal competitor meetings; using code names in order to conceal the real purpose of a communication involving competitors and to conceal the identity of competitors involved; asking that certain documents containing confidential pricing information be destroyed after they had been used in furtherance of the conspiracy, limiting knowledge of the conspiracy to a core group of senior executives at Dow and its competitors.

In addition, Dow and its co-conspirators affirmatively concealed their price-fixing conspiracy by issuing false, deceptive, and pretextual price increase announcements.  The price increase letters provided misleading and pretextual justifications for the producers' price increases, such as raw material cost increases, increased energy costs, the need to improve margins, and the need to justify reinvestment, that were superficially plausible but deliberately did not disclose that a reason for the price increase was the existence of the price-fixing conspiracy.  Thus, the pretextual price increase announcements were intended to deceive

Plaintiffs and divert attention from the price-fixing conspiracy.  Dow and its co-conspirators also made false, deceptive and pretextual statements orally to Plaintiffs and in trade publications about the reasons for urethane products price increases in which they failed to disclose that the urethanes producers' collusion was a reason for the price increase announcements.

As a result of this fraudulent concealment, Plaintiffs, despite having exercised due diligence with respect to the investigation and discovery of their claims, did not know (and by the exercise of due diligence could not have known) that Dow and its competitors were engaged in a conspiracy with respect to urethane products, or that Plaintiffs might have a claim against Dow.  Therefore, none of Plaintiffs' claims are barred by the statute of limitations.

Respectfully Submitted,

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
*Attorneys for Plaintiffs*

By:____/s/ James E. Cecchi_____
      JAMES E. CECCHI

Jeffrey M. Johnson
Adam Proujansky
Daniel P. Schaefer
Alex E. Hassid
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

James R. Martin
ZELLE LLP
1220 L Street, NW
Suite 100-143
Washington, DC 20005
(202) 359-6688

*Attorneys for Plaintiffs*

Richard J. Leveridge
ADAMS HOLCOMB, LLP
1875 Eye Street, NW
Washington, DC 20006
(202) 580-8818