## INSTRUCTIONS

### FINAL PRETRIAL ORDER

**Hon. William J. Martini, U.S.D.J.**

1.  THE ATTACHED FORM IS TO BE RETYPED IN FULL (INCLUDING ALL INSTRUCTIONS) AND ALL MATERIAL INSERTED IN PROPER SEQUENCE AND NOT BY MEANS OF ATTACHED RIDERS EXCEPT AS SPECIFICALLY SET FORTH BELOW.

2.  NUMBER ALL PAGES.

3.  AN ORIGINAL AND ONE COPY OF THE COMPLETED FINAL PRETRIAL ORDER MUST BE DELIVERED TO THE CHAMBERS OF MAGISTRATE JUDGE MARK FALK.

4.  THE COPY, WHEN EXECUTED, WILL BE GIVEN TO JUDGE MARTINI. THE COPY MUST BE IN A THREE-RING BINDER.

5.  EACH SECTION OF THE FINAL PRETRIAL ORDER MUST BEGIN ON A SEPARATE PAGE.

6.  ALL NUMBERED SECTIONS OF THIS FINAL PRETRIAL ORDER MUST BE PRECEDED BY A CORRESPONDINGLY NUMBERED PAGE.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | Master Docket No. 08-5169 (WJM) (MF) <br><br> **FINAL PRETRIAL ORDER** |

A pretrial conference* having been held before the Honorable Mark Falk, U.S.M.J.,

Jeffrey M. Johnson, Richard J. Leveridge, Daniel P. Schaefer, and James E. Cecchi having

appeared for Plaintiffs and David M. Bernick, Jonathan Streeter, William T. McEnroe, and

Lawrence S. Lustberg having appeared for Defendant, this Final Pretrial Order is hereby entered:

*Time Incurred: _____

1

**[PRECEDE WITH DIVIDER #1]**

1.      JURISDICTION (set forth specifically)

      1.      **Subject Matter Jurisdiction.**  Subject matter jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1337, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).  Subject matter jurisdiction is not disputed.

      2.      **Personal Jurisdiction.**  Personal jurisdiction exists over Dow pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.  Personal jurisdiction is not disputed.

**[PRECEDE WITH DIVIDER #2]**

2.      PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also set forth the nature of the motion. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's contemplated <u>in limine</u> motions should also be set forth.)

1.      Plaintiffs requested the Court's special permission to file a Bench Brief to address the question of whether Plaintiffs' expert, Dr. Marx, can "opine that the variances detected by her models are attributable to the alleged conspiracy or are otherwise consistent with the evidence of the conspiracy as a whole," an issue upon which the Court reserved in its opinion denying Dow's *Daubert* motion to exclude Dr. Marx's testimony.  Dow opposed Plaintiffs' request.

2.      Dow proposed to Plaintiffs that each party provide a list one week prior to beginning its case in chief of its planned order of witnesses.  Dow further proposed that this list be updated each Thursday during trial to provide accurate witness order for at least the following week.  This proposal will allow the parties to bring any potential issues related to documents to be offered through each witness to the Court in advance of that witness's appearance.  Plaintiffs felt this was too far in advance and instead proposed that the parties provide notice of each witness it intends to call four days in advance on a rolling basis.  The parties request the Court's assistance in resolving this dispute.

**Stipulations Regarding Motions *in Limine***

The parties have reached the following agreements:

1.      The parties will not make reference to or seek to introduce evidence or argument regarding settlements or settlement discussions with former Defendants, with Dow, or with alleged co-conspirators, except that if the Court were to deny Dow's motion *in limine* 23 above, then the parties may refer to and introduce evidence or argument regarding the Bayer settlement in this case.[1]

2.      The parties will not make reference to or seek to introduce evidence or argument that the antitrust laws provide for treble damages.

3.      The parties will not make reference to or seek to introduce evidence or argument with respect to any purported conspiracy to fix the price of polyether polyol systems, but the parties are not precluded from mentioning systems.

4.      The parties will treat the opinions proffered in a supplemental expert report by Dow's damages expert, Dr. Ugone, that the MDL Court struck in its order, dated May 16, 2014 (MDL Dkt. 3193), as if they had never been disclosed.

---

[1] This agreement does not preclude Dow from arguing to the Court that the Court must reduce the amount of any judgment against Dow to account for amounts Plaintiffs recovered from Dow's alleged co-conspirators.

5.      The parties will follow the ruling in the class case regarding Dow's overall financial condition.  *See* Tr. Mot. in Limine Conf. Before Hon. John. W. Lungstrum, Jan. 9, 2013, at 60-64.  The parties will not introduce evidence or argument regarding Dow's overall revenues, assets, profits, or net worth.  This does not preclude the parties from introducing evidence and argument regarding Dow's global scope, the range of its business, the location of its witnesses, or other issues raised by Dow's experts.

6.      Dow shall be permitted to conduct its direct examination of live witnesses called by Plaintiffs during Plaintiffs' case-in-chief (assuming the evidence that Dow seeks to elicit from these witnesses is relevant and admissible), rather than requiring Dow to recall these witnesses during the defense case.

7.      Plaintiffs will not introduce the deposition testimony from former Dow employees William Long or Robert Wood if they testify live at trial, except for purposes of impeachment; rather, should Plaintiffs wish to examine these witnesses during their case-in-chief, Plaintiffs would call them as adverse witnesses.[2]

8.      Any document produced in discovery by a settled defendant and marked as a trial exhibit, whether offered by Plaintiffs or Dow, shall be deemed to qualify as a business record under Rule 803(6), and, except as to any extraneous markings, such as handwriting, to be a true and correct copy of a document under Federal Rule of Evidence 901.  The parties reserve all other objections to the admissibility of such documents.

## Stipulations Regarding Jury Instructions

To resolve motions *in limine* that the parties contemplated filing, the parties have agreed to propose the following jury instructions:

1.      "Several potential witnesses from chemical manufacturers have not testified in this matter.  Neither Dow nor the Plaintiffs are responsible for the failure of these potential third-party witnesses—including, in particular, the Bayer Witnesses—to testify.  As a result, you should draw no inference either for or against the Plaintiffs or Dow based on these witnesses' failure to testify."[3]

2.      "Due to the passage of time and through no fault of the parties, many documents for the time period 1994-1998 were discarded and no longer exist.  As a result, you should draw no inference for or against either the Plaintiffs or Dow based on the fact that very few documents were produced relating to this time period."

---

[2] Dow notified Plaintiffs on February 23 that Mr. Long will be unable to appear live in New Jersey and that Dow proposed, if Mr. Long was able to appear at all, to have Mr. Long testify by live video feed.  Therefore, Plaintiffs will introduce Mr. Long's testimony via deposition pursuant to Fed. R. Civ. P. 32(a)(4)(B)-(C).  Dow intends to raise with the Court its proposal to have Mr. Long testify by video feed.

[3] Dow disputes that the parties reached agreement on this proposed jury instruction.

[PRECEDE WITH DIVIDER #3]

3.     STIPULATION OF FACTS (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions to which the parties agree.)

1.     Between 1994 and 2003, Dow sold certain TDI, MDI, and polyether polyol products in interstate commerce.

2.     The parties reached a stipulation regarding the fact of certain public price increase announcements for TDI, MDI, and polyether polyols announced by urethane suppliers during the period 1994-2003.  The parties further agreed upon two summary exhibits (PX-1413 and PX-1414) that could be admitted into evidence in lieu of the underlying records and used with appropriate witnesses without the need for Plaintiffs to call a witness who can testify to their preparation.[1]

3.     The parties reached a stipulation regarding the fact of certain trade association meetings.  The parties further agreed that a summary exhibit (PX-1415) could be admitted into evidence in lieu of the underlying records without the need for Plaintiffs to call a witness who can testify to its preparation.

---

[1] With respect to PX-1413, a demonstrative, Dow has no objection to its accuracy, will not require Plaintiffs to have a witness to describe its preparation, and does not object to it being used with appropriate witnesses.  Dow does object, however, to PX-1413 and PX 1414 being used with Plaintiffs' expert, Dr. Marx as such testimony would be beyond the scope of her expert disclosure and beyond the scope permitted by the MDL order allowing her substitution for Dr. Raiff.  Plaintiffs do not believe Dow's objection to the use of these exhibits with Dr. Marx is well taken, as the price increase announcements which form the underlying bases for the summaries were produced in connection with Dr. Raiff's report.  *See* Revised Expert Report of Matthew E. Raiff, Ph.D. (May 13, 2011), Appx. D, at 204.

1

**[PRECEDE WITH DIVIDER #4]**

4.    CONTESTED FACTS (Proofs shall be limited at trial to the contested facts set forth. Failure to set forth any contested facts shall be deemed a waiver thereof.)

   **A.    Plaintiffs:**

   1.    Plaintiffs are Carpenter Co., Crest Foam Industries Inc., Crest-Foam Corp., E.R. Carpenter, L.P., Flexible Foam Products, Inc., Foam Supplies, Inc., Hickory Springs Manufacturing Co., Hickory Springs of California, Inc., High Standard Pad, Inc., Huber Engineered Woods LLC, J.M. Huber Corp., L&P Financial Services Co., Leaving Taos, Inc., Leggett & Platt Components Co., Leggett & Platt, Inc., Lubrizol Advanced Materials, Inc., Dash Multi-Corp., Inc., MarChem Corp., MarChem Southeast, Inc., MarChem Pacific, Inc., Nu-Foam Products, Inc., Ohio Decorative Products, Inc., Pathway Polymers Inc., Jorge Burtin as assignee of Skypark Manufacturing, LLC, Universal Urethanes, Inc., Vitafoam Inc., Vitafoam Products Canada, Ltd., Woodbridge Corp., Woodbridge Foam Corp., Woodbridge Foam Fabricating, Inc., Woodbridge Holdings Inc., and Woodbridge Services Inc.  These plaintiffs belong to eleven families of companies:  Carpenter, Flexible Foam, Foam Supplies, Hickory Springs, Huber, Leggett & Platt, Lubrizol, MarChem, Skypark Manufacturing, Vitafoam, and Woodbridge.

   2.    Plaintiffs' claims include claims by the named Plaintiffs, their subsidiaries, affiliates, predecessors, successors or assigns for purchases of TDI, MDI, and polyether polyols from The Dow Chemical Company ("Dow") and the defendant urethanes producers BASF, Bayer, Huntsman and Lyondell (and their predecessors, including ICI and ARCO) (defined together as the "defendant urethanes producers" and together with Dow, the "urethane conspirators") in the United States from 1994-2003.[1]  Documents responsive to discovery demonstrating Plaintiffs' ownership of claims brought in the action have been produced in the case.

   3.    Dow participated in a conspiracy, with the defendant urethanes producers, as set forth below, to fix, raise, or stabilize prices for TDI, MDI, and polyether polyols in the United States at any time between January 1, 1994 and December 31, 2003 (the "conspiracy period"), in violation of Section 1 of the Sherman Act, 15 U.S.C. §1 ("the conspiracy").

   4.    The conspiracy included TDI, MDI, and polyether polyols ("urethane products").

   5.    The conspiracy began in 1994.

   6.    The conspiracy ended by late 2003.

   7.    Dow is jointly and severally liable for all of the damages to Plaintiffs resulting from the conspiracy.

---

[1] As set forth below, BASF includes BASF SE, BASF Coordination Center Comm. V., and BASF Corporation, and Bayer includes Bayer AG, Bayer Corporation, and Bayer Corporation predecessor Miles.

8.      Plaintiffs purchased MDI, TDI, and polyether polyols from Dow and the defendant urethanes producers alleged to be part of this conspiracy during the period January 1, 1994 through December 31, 2003.  Plaintiffs' purchases during the conspiracy period and their damages resulting directly from the conspiracy during this period, as calculated by Plaintiffs' expert, Dr. Leslie Marx, consist of:

| Plaintiff | Defendant | Product family | Purchases | Overcharges |
|---|---|---|---|---|
| VITAFOAM | BASF | MDI | $25,832 | $1,577 |
| | | POLYOLS | $67,215,212 | $6,388,586 |
| | | TDI | $40,077,953 | $3,895,534 |
| | BASF Total | | $107,318,997 | $10,285,697 |
| | BAYER | MDI | $1,674,541 | $308,075 |
| | | POLYOLS | $82,703,127 | $9,853,277 |
| | | TDI | $102,216,821 | $12,898,905 |
| | BAYER Total | | $186,594,489 | $23,060,257 |
| | DOW | MDI | $2,262,533 | $331,810 |
| | | POLYOLS | $43,193,098 | $9,046,436 |
| | | TDI | $22,898,468 | $3,774,398 |
| | DOW Total | | $68,354,098 | $13,152,644 |
| | LYONDELL | POLYOLS | $50,497,865 | $7,268,016 |
| | | TDI | $13,339,819 | $2,143,129 |
| | LYONDELL Total | | $63,837,684 | $9,411,145 |
| **VITAFOAM TOTAL** | | | **$426,105,268** | **$55,909,743** |
| CARPENTER | BASF | MDI | $56,611,626 | $8,421,018 |
| | | POLYOLS | $1,038,359 | $43,250 |
| | | TDI | $199,387,913 | $22,793,163 |
| | BASF Total | | $257,037,898 | $31,257,432 |
| | BAYER | MDI | $26,799,569 | $4,121,750 |
| | | POLYOLS | $7,470,257 | $899,936 |
| | | TDI | $191,301,933 | $22,597,652 |
| | BAYER Total | | $225,571,759 | $27,619,338 |
| | DOW | MDI | $9,934,027 | $2,232,193 |
| | | POLYOLS | $6,766,242 | $1,371,514 |
| | | TDI | $5,143,204 | $350,383 |
| | DOW Total | | $21,843,473 | $3,954,090 |
| | HUNTSMAN | MDI | $9,181,955 | $1,108,734 |
| | | POLYOLS | $51,082 | $2,094 |
| | | TDI | $306,018 | $(2,683) |
| | HUNTSMAN Total | | $9,539,055 | $1,108,145 |
| | LYONDELL | POLYOLS | $22,495,239 | $1,330,916 |
| | | TDI | $350,485,278 | $57,159,903 |

| Plaintiff | Defendant | Product family | Purchases | Overcharges |
|-----------|-----------|----------------|-----------|-------------|
| | LYONDELL Total | | $372,980,516 | $58,490,820 |
| **CARPENTER TOTAL** | | | **$886,972,702** | **$122,429,826** |
| FLEXIBLE FOAM | BASF | MDI | $740,605 | $78,995 |
| | | POLYOLS | $11,926,922 | $1,895,100 |
| | | TDI | $18,209,010 | $2,431,098 |
| | BASF Total | | $30,876,537 | $4,405,193 |
| | BAYER | MDI | $20,781 | $2,449 |
| | | POLYOLS | $116,288,335 | $9,099,807 |
| | | TDI | $136,671,281 | $17,301,441 |
| | BAYER Total | | $252,980,397 | $26,403,696 |
| | DOW | MDI | $86,905 | $1,823 |
| | | POLYOLS | $4,009,151 | $565,906 |
| | | TDI | $2,190,657 | $86,630 |
| | DOW Total | | $6,286,713 | $654,359 |
| | HUNTSMAN | MDI | $21,104,161 | $1,998,705 |
| | | POLYOLS | $155,086 | $23,848 |
| | | TDI | $151,872,798 | $17,871,132 |
| | HUNTSMAN Total | | $173,132,045 | $19,893,685 |
| | LYONDELL | POLYOLS | $260,426,141 | $34,666,924 |
| | | TDI | $829,131 | $149,598 |
| | LYONDELL Total | | $261,255,272 | $34,816,522 |
| **FLEXIBLE FOAM TOTAL** | | | **$724,530,964** | **$86,173,455** |
| FOAM SUPPLIES | BASF | MDI | $7,355,235 | $1,619,091 |
| | | POLYOLS | $120 | $9 |
| | BASF Total | | $7,355,355 | $1,619,100 |
| | BAYER | MDI | $12,055,925 | $1,548,899 |
| | | POLYOLS | $70,874 | $254 |
| | BAYER Total | | $12,126,799 | $1,549,153 |
| | DOW | MDI | $37,171,461 | $5,392,752 |
| | | POLYOLS | $7,435,065 | $980,998 |
| | DOW Total | | $44,606,526 | $6,373,750 |
| | HUNTSMAN | MDI | $5,494,753 | $621,552 |
| | | POLYOLS | $537,810 | $49,513 |
| | HUNTSMAN Total | | $6,032,563 | $671,066 |
| | LYONDELL | POLYOLS | $1,441,296 | $170,258 |
| | LYONDELL Total | | $1,441,296 | $170,258 |
| **FOAM SUPPLIES TOTAL** | | | **$71,562,539** | **$10,383,326** |
| HICKORY SPRINGS | BASF | MDI | $3,820,972 | $593,163 |
| | | POLYOLS | $228,695,370 | $28,952,334 |

| Plaintiff | Defendant | Product family | Purchases | Overcharges |
|---|---|---|---|---|
| | | TDI | $167,302,814 | $17,718,371 |
| | BASF Total | | $399,819,155 | $47,263,868 |
| | BAYER | POLYOLS | $51,734,367 | $4,392,156 |
| | | TDI | $150,992,203 | $13,739,452 |
| | BAYER Total | | $202,726,570 | $18,131,608 |
| | DOW | POLYOLS | $84,404,557 | $10,477,092 |
| | | TDI | $5,205,749 | $170,561 |
| | DOW Total | | $89,610,306 | $10,647,652 |
| | HUNTSMAN | MDI | $4,061,335 | $708,759 |
| | | POLYOLS | $439,089 | $66,974 |
| | | TDI | $2,620,967 | $151,503 |
| | HUNTSMAN Total | | $7,121,391 | $927,236 |
| | LYONDELL | POLYOLS | $25,104,155 | $4,192,053 |
| | LYONDELL Total | | $25,104,155 | $4,192,053 |
| **HICKORY SPRINGS TOTAL** | | | **$724,381,577** | **$81,162,417** |
| HUBER | BASF | MDI | $480,292 | $89,781 |
| | BASF Total | | $480,292 | $89,781 |
| | BAYER | MDI | $115,574,500 | $13,360,997 |
| | | POLYOLS | $570,809 | $38,528 |
| | BAYER Total | | $116,145,309 | $13,399,525 |
| | HUNTSMAN | MDI | $125,361,580 | $19,818,625 |
| | | POLYOLS | $559,207 | $27,294 |
| | HUNTSMAN Total | | $125,920,787 | $19,845,919 |
| **HUBER TOTAL** | | | **$242,546,388** | **$33,335,225** |
| LEGGETT & PLATT | BASF | MDI | $1,503,660 | $286,405 |
| | | POLYOLS | $57,847,701 | $7,434,019 |
| | | TDI | $78,547,151 | $9,024,928 |
| | BASF Total | | $137,898,512 | $16,745,353 |
| | BAYER | MDI | $793,655 | $29,249 |
| | | POLYOLS | $1,175,572 | $82,414 |
| | | TDI | $1,970,509 | $196,636 |
| | BAYER Total | | $3,939,736 | $308,299 |
| | DOW | MDI | $33,276,752 | $3,698,071 |
| | | POLYOLS | $236,022,497 | $31,790,654 |
| | | TDI | $113,936,485 | $13,163,344 |
| | DOW Total | | $383,235,735 | $48,652,068 |
| | HUNTSMAN | MDI | $19,678,918 | $2,122,111 |
| | | POLYOLS | $844,526 | $(10,326) |
| | | TDI | $23,884,535 | $4,757,297 |

| Plaintiff | Defendant | Product family | Purchases | Overcharges |
|---|---|---|---|---|
| | HUNTSMAN Total | | $44,407,979 | $6,869,082 |
| | LYONDELL | POLYOLS | $5,301,128 | $457,255 |
| | LYONDELL Total | | $5,301,128 | $457,255 |
| **LEGGETT & PLATT TOTAL** | | | **$574,783,090** | **$73,032,057** |
| LUBRIZOL | BASF | MDI | $182,162 | $5,537 |
| | BASF Total | | $182,162 | $5,537 |
| | BAYER | MDI | $29,139,200 | $1,703,790 |
| | BAYER Total | | $29,139,200 | $1,703,790 |
| | HUNTSMAN | MDI | $60,492,149 | $4,341,111 |
| | HUNTSMAN Total | | $60,492,149 | $4,341,111 |
| **LUBRIZOL TOTAL** | | | **$89,813,511** | **$6,050,438** |
| MARCHEM | BASF | MDI | $1,744,462 | $185,943 |
| | | POLYOLS | $1,803,981 | $113,249 |
| | BASF Total | | $3,548,443 | $299,193 |
| | BAYER | MDI | $39,326,785 | $5,026,190 |
| | | POLYOLS | $15,765,311 | $775,958 |
| | | TDI | $802,995 | $58,657 |
| | BAYER Total | | $55,895,091 | $5,860,806 |
| | DOW | MDI | $34,683,024 | $4,242,683 |
| | | POLYOLS | $4,031,804 | $498,049 |
| | DOW Total | | $38,714,829 | $4,740,732 |
| | HUNTSMAN | MDI | $50,347 | $4,998 |
| | HUNTSMAN Total | | $50,347 | $4,998 |
| | LYONDELL | POLYOLS | $33,208,927 | $3,153,133 |
| | LYONDELL Total | | $33,208,927 | $3,153,133 |
| **MARCHEM TOTAL** | | | **$131,417,636** | **$14,058,863** |
| SKYPARK | BASF | MDI | $46,977 | $8,606 |
| | BASF Total | | $46,977 | $8,606 |
| | BAYER | MDI | $5,501,499 | $1,095,736 |
| | | POLYOLS | $3,595,439 | $437,976 |
| | BAYER Total | | $9,096,939 | $1,533,712 |
| | DOW | MDI | $17,893,672 | $3,204,506 |
| | | POLYOLS | $15,807,027 | $2,083,598 |
| | DOW Total | | $33,700,699 | $5,288,104 |
| | HUNTSMAN | MDI | $16,312,189 | $2,412,437 |
| | | POLYOLS | $62,988 | $6,121 |
| | | TDI | $3,630 | $(17) |
| | HUNTSMAN Total | | $16,378,808 | $2,418,541 |
| | LYONDELL | POLYOLS | $11,080,436 | $1,567,083 |

5

| Plaintiff | Defendant | Product family | Purchases | Overcharges |
|---|---|---|---|---|
| | LYONDELL Total | | $11,080,436 | $1,567,083 |
| **SKYPARK TOTAL** | | | **$70,303,858** | **$10,816,046** |
| WOODBRIDGE | BASF | MDI | $0 | $0 |
| | | POLYOLS | $14,566,315 | $768,196 |
| | | TDI | $150,216,950 | $18,901,390 |
| | BASF Total | | $164,783,265 | $19,669,586 |
| | BAYER | MDI | $2,192,583 | $277,655 |
| | | POLYOLS | $300,453,611 | $12,820,218 |
| | | TDI | $117,838,576 | $10,737,014 |
| | BAYER Total | | $420,484,769 | $23,834,887 |
| | DOW | MDI | $51,966 | $13,579 |
| | | POLYOLS | $105,335,114 | $9,635,422 |
| | | TDI | $14,631,977 | $1,212,054 |
| | DOW Total | | $120,019,057 | $10,861,055 |
| | HUNTSMAN | MDI | $4,270,229 | $311,147 |
| | | POLYOLS | $77,657 | $1,878 |
| | | TDI | $12,501,137 | $1,492,961 |
| | HUNTSMAN Total | | $16,849,022 | $1,805,986 |
| | LYONDELL | POLYOLS | $258,855,777 | $27,436,189 |
| | | TDI | $36,518,502 | $4,776,011 |
| | LYONDELL Total | | $295,374,279 | $32,212,200 |
| **WOODBRIDGE TOTAL** | | | **$1,017,510,392** | **$88,383,715** |
| **PLAINTIFFS' TOTAL** | | | **$4,959,927,926** | **$581,735,110** |

9.     The conspiracy involving Dow and the defendant urethanes producers caused each Plaintiff to pay more for urethane products than they would have paid absent the conspiracy.

10.     The conspiracy involving Dow and the defendant urethanes producers caused Plaintiffs to pay more for urethane products before November 24, 2000.

11.     The urethane conspirators fraudulently concealed the existence of the conspiracy from Plaintiffs.

12.     Plaintiffs use TDI, MDI, and polyether polyols to manufacture a number of categories of polyurethane end products, including:

    a.     flexible foam, which is used in things such as bedding, carpeting, furniture, and auto cushions;

    b.     rigid foams used primarily as insulating material in construction and refrigeration applications;

6

c.   coatings, adhesives, sealants and elastomers ("CASE") that have a wide range of applications in construction, transportation, electronics, appliances, machinery, textiles and furniture industries;

d.   thermoplastic polymers used for injection molding and extrusion primarily used for injection molding and extrusion primarily for products going into industrial and automotive applications;

e.   polyurethane binders used in the manufacture of engineered wood products such as oriented strand board, as a biding agent for tracks and flooring, and in foundries; and

f.   systems combining MDI or TDI and polyols custom made for customers.

13.   From 1992 to 2008, approximately 63% of U.S. consumption of TDI, MDI, and polyether polyols was in foam and binder uses in the transportation, construction, and appliances/carpeting/furniture end-use industries.

14.   Foam applications generally involve the combinations of an isocyanate (TDI or MDI) and polyol.  Non-foam applications often involve both an isocyanate and a polyol, but might only involve the use of only an isocyanate or only a polyol.

15.   Dow and the defendant urethanes producers manufactured, distributed, sold, and shipped urethane products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than those states in which Dow and the defendant urethanes producers produced these products.

16.   The conspiracy had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

17.   Urethane products are actively traded worldwide, and the export of these products can affect prices for these products.  In addition, if prices in Europe differ materially from prices in the United States, purchasers/suppliers will buy/sell product overseas.

18.   The conduct of Dow and the defendant urethanes producers, engaging in a conspiracy to fix the prices of urethane products in the United States, had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.  This domestic effect on U.S. commerce -- artificially inflated prices for urethane products in the United States -- gave rise to each Plaintiff's claims, including Plaintiffs' claim for purchases of any urethane products that were delivered to Plaintiff locations outside of the United States.  Each Plaintiff's injuries/damages arose from the domestic effect of the conspiracy involving Dow and the defendant urethanes producers.

19.   Vitafoam's purchases for urethane products delivered in the United States and to Canada were negotiated with U.S. conspirator representatives, and a U.S. Vita employee led the negotiations in the United States.  Vitafoam paid the same price, one NAFTA price, for all such products.  The urethane products Vitafoam purchased and had delivered to Canada were manufactured in the United States.  The domestic effect of the conspiracy – artificially inflated

prices in the United States – gave rise to Vitafoam's injury for urethane products purchased in the United States and delivered to Canada. Vita, Inc., a U.S. company, was invoiced for and paid for all urethane products delivered in the United States and those products were solely within domestic commerce.

20.     Woodbridge's purchases for urethane products delivered in the United States and to Canada were negotiated with U.S. conspirator representatives in part in the United States. Woodbridge paid the same price, one NAFTA price, for all such urethane products. The urethane products Woodbridge purchased and had delivered to Canada were manufactured in the United States. The domestic effect of the conspiracy – artificially inflated prices in the United States – gave rise to Woodbridge's injury for urethane products purchased in the United States and delivered to Canada. Woodbridge Holdings, a U.S. company, was invoiced for and paid for all urethane products delivered in the United States and those products were solely within domestic commerce.

21.     While Carpenter Co. had certain urethane products that it purchased in the United States from Dow and the defendant urethanes producers delivered to Canada, those purchases are not subject to the FTAIA. Carpenter Co., a U.S. company, negotiated, was invoiced for, and paid for all of its purchases for all urethane products in the United States, including those delivered to Canada.

22.     The urethanes industry market conditions were conducive to successful collusion throughout the conspiracy period.

23.     The urethanes industry in the United States is a concentrated industry with a limited number of producers.

24.     TDI (toluene di-isocyanate) is an isocyanate chemical used primarily in the manufacture of flexible polyurethane foam.

25.     The most common form of TDI is TDI 80/20, which accounted for 95% of TDI sales during the conspiracy period.

26.     Other forms of TDI include TDI 65/35, TDI 100, and TDI/MDI blends.

27.     TDI 80/20 is a fungible commodity, and purchasers could readily substitute TDI 80/20 made by one supplier with TDI 80/20 made by another supplier.

28.     TDI is combined with polyols for most end-use applications. TDI and polyols are combined in fixed proportions by weight (or volume).

29.     TDI is traded worldwide.

30.     MDI (methylene diphenyl di-isocyanate) is an isocyanate chemical used primarily to manufacture rigid foams and binders, and in CASE and flexible foam applications.

31.     The most common form of MDI is polymeric MDI, which accounted for approximately 81% of MDI sales during the conspiracy period.

8

32.     Other forms of MDI include monomeric MDI (also called pure MDI), modified MDI and MDI/TDI blends.

33.     Polymeric MDI is a fungible commodity.  While different suppliers' formulations varied slightly, purchasers could generally substitute polymeric MDI made by one supplier with polymeric MDI made by another supplier.

34.     In foam and CASE applications, MDI is combined with a polyol.

35.     MDI is traded worldwide.

36.     Polyether polyols are chemicals primarily used in combination with TDI and MDI to make flexible foams, rigid foams, binders, and in CASE applications.  The demand for polyols is, therefore, largely driven by the same applications and business segments that use TDI and MDI.

37.     The most common form of polyols sold to Plaintiffs were CFS polyols, copolymer polyols, and HR Flexible, which accounted for approximately 82% of polyols sold to Plaintiffs.

38.     CFS polyether polyols, by grade, are fungible commodities, and purchasers could generally substitute a CFS polyether polyol of a certain grade made by one supplier with a CFS polyether polyol of the same grade made by another supplier.

39.     CFS polyols are used in fixed proportions with isocyanates to make flexible foam.

40.     Polyols are traded worldwide.

41.     There are no reasonable substitutes for TDI, MDI, or polyether polyols.

42.     The key feedstocks used to make TDI, MDI, and polyols are toluene, benzene, and propylene.  Other feedstocks include nitric acid, natural gas, chlorine, formaldehyde, and ethylene.

43.     The urethanes producers who participated in the conspiracy include at least:

    a.      The Dow Chemical Company ("Dow");

    b.      Bayer AG, Bayer Corporation and its predecessor Miles ("Bayer");

    c.      BASF SE, BASF Coordination Center Comm. V., and BASF Corporation ("BASF");

    d.      Huntsman International LLC ("Huntsman") and its predecessor ICI; and

    e.      Lyondell Chemical Company ("Lyondell") and its predecessors ARCO Chemical Company ("ARCO").

44.     Bayer settled with Plaintiffs prior to Plaintiffs filing this action, and Bayer agreed to provide cooperation.  As part of that cooperation, Bayer's counsel provided information about price-fixing meetings that Bayer had with Dow, BASF, Huntsman, ICI, Lyondell, ARCO, and others from 1994 through 2003.[2]

45.     As part of the cooperation, Bayer's counsel also answered questions posed by Plaintiffs' expert, Dr. Leslie Marx, relating to Bayer's meetings and communications with competitors during the period 1994 through 1998.[3]

46.     As set forth below, Bayer's counsel confirmed that a number of Bayer employees admitted that they participated in price-fixing meetings and communications during this time period, including Lee Noble, Christian Buhse, Reinhold Lang, Hans Kogelnik, Helmut Von Hagen, and Reinhard Clausius.  Defense counsel had an opportunity to cross-examine Plaintiffs' expert about this information and also had the ability to depose Bayer's counsel, but chose not to do so.

47.     Bayer's counsel also confirmed information relating to the end of the conspiracy.

48.     Aside from Bayer, the remaining conspirators (except for the predecessors) were defendants in Plaintiffs' case.  Except for Dow, the other conspirator urethanes producers have settled with Plaintiffs.

49.     The conspirators were large, multinational chemical companies who were competitors in the urethanes business.

      a.     Dow is an American company headquartered in Midland, Michigan.  Dow manufactured urethane products in the United States (Texas, among other places) and worldwide in South America, Canada, Europe and Asia.  In addition to making urethane products, Dow produces propylene oxide ("PO"), one of the major raw material products used to make polyols.  In 2001, Dow acquired Enichem's urethanes business, including plants in Italy and Belgium.

      b.     Bayer is a German company with its global headquarters in Leverkusen, Germany.  Its U.S headquarters are in Pittsburgh, Pennsylvania.  In 2000, Bayer acquired Lyondell's polyols business.  Bayer manufactured urethane products in the United States (including Texas and West Virginia) and worldwide in Mexico, South America, Europe, and Asia.

---

[2] During the 2005-2007 timeframe, Bayer's outside counsel conducted an internal investigation into whether Bayer was involved in pricing discussions with regard to urethane products.  Bayer's counsel interviewed numerous people who worked for Bayer in the urethanes business during the conspiracy period.

[3] Among the people interviewed by Bayer's counsel were Bayer employees who worked for Bayer during the period 1994-1998, including Lee Noble, Hans Kogelnik, Reinhard Clausius, Reinhold Lang, Christian Buhse, and Helmut Von Hagen.

c.   BASF is a German company with its global headquarters in Leverkusen, Germany. Its global urethanes business is based in Brussels, and its U.S. headquarters is in New Jersey. BASF's urethanes business in the United States was based in Wyandotte, Michigan. BASF manufactured urethane products in the United States (including Louisiana and Michigan) and worldwide in Mexico, South America, and Asia.

d.   Huntsman is an American company headquartered in Salt Lake City, Utah, and its predecessor ICI's global headquarters were in Everburg, Belgium. Huntsman acquired ICI's urethanes business in 1999. Huntsman manufactured urethane products in the United States (including Louisiana) and worldwide in Europe, Asia, and Australia.

e.   Lyondell was an American company headquartered in Houston, Texas. Lyondell acquired ARCO Chemical Co.'s urethanes business in 1998. Lyondell manufactured urethane products in the United States (including Louisiana) and worldwide.

f.   The conspirators controlled 75% of TDI capacity in the United States through 1995, and 100% from 1996 through 2008. The conspirators controlled 100% of MDI capacity in the United States from 1992 through 2008. The conspirators controlled approximately 80% of polyether polyol capacity in the United States from 1992 through 2008.

g.   Employees of Dow and the defendant urethanes producers acted within the scope of their employment and/or apparent authority when they engaged in the conspiracy. The companies are bound by the acts and statements of their employees and the employees' participation in the conspiracy.

50.   All of the facts set forth below demonstrate, by the preponderance of the evidence, that Dow participated in a conspiracy with the defendant urethanes producers to fix, raise, or stabilize prices of urethane products from January 1994 through the end of 2003.

51.   The urethane products producers compete primarily on the basis of price. A purchaser will often switch to a different supplier if it can get a better price for the same product from that supplier.

52.   Significant barriers to entry existed in the markets for urethane products.

53.   Plants that manufacture urethane products are large-scale, time-consuming to build, and very expensive. The cost of building a TDI and MDI plant was in the hundreds of millions of dollars.

54.   Urethanes production technologically is complex and, therefore, it is difficult for others to develop the necessary technology to enter the market.

55.   The urethanes producers regularly shared important information about urethane products through industry trade journals and trade associations.

11

56.     The urethanes producers participated in many business ventures together in which they shared sensitive business information, including urethane products pricing information, with one another.

57.     The urethanes producers attended many trade association meetings together and participated in other business transactions with one another, such as buy/sell transactions, swaps, and co-producer transactions.  These interactions among the urethanes producers provided opportunities for them to communicate regarding their price-fixing agreement with respect to urethane products.  Witnesses have testified that the urethanes producers' price-fixing discussions did take place, among other places and times, during trade association meetings, at the side of trade association meetings, and during interactions among the urethanes producers related to their business transactions with one another.

58.     The trade associations to which Dow and the defendant urethanes producers belong included:  International Isocyanate Institute ("III"), the Chemical Manufacturers' Association ("CMA"), the American Chemistry Council ("ACC"), Alliance for the Polyurethane Industry ("API"), and Society of the Plastics Institute ("SPI").

59.     The III had annual meetings attended by the top executives of Dow and the defendant urethanes producers in which they discussed industry issues, including economic and other industry conditions.  The III also held regular meetings among subgroups, including the Executive Committee.

60.     The III collected and distributed statistical data regarding production volumes, demand, co-producer transfers, market share, and capacities.

61.     Dow and the defendant urethanes producers regularly shared statistical information regarding their nameplate capacity and market share through trade associations and trade journals.  The conspirators could accurately estimate one another's sales based on the information available in the urethanes industry and through trade associations.

62.     Starting on or after January 1994, Dow conspired with BASF, Bayer, ARCO, and ICI to fix, raise or stabilize the prices of urethane products.  Lyondell and Huntsman joined the conspiracy when they acquired urethanes businesses from ARCO and ICI, respectively.

63.     Dow and the defendant urethanes producers conspired with a common purpose to keep prices at a level higher than they would be under competitive conditions.  They sought to reduce or eliminate competition in the market for TDI, MDI, and polyols.

64.     Dow knowingly joined the conspiracy by agreeing with the defendant urethane producers to fix, raise, or stabilize the prices of urethane products and coordinating with the defendant urethanes producers to implement the agreement.

65.     In furtherance of their collusive conduct, Dow and the defendant urethanes producers coordinated price increase announcements on a number of occasions from 1994 through 2003, announcing price increases at the same or virtually same time for the same amounts (or in some instances, a very similar amount) with the same effective dates.

12

66.     Prior to the announcements, the conspirators communicated or met with one another about prices and price increases.

67.     During and after the announcements, the conspirators communicated to promote the effectiveness of the announced price increases.

68.     During the period 1994-2003, the conspirators were not acting independently in their decisions to announce and implement urethane products price increases, and the price increase announcements did not result from each company's unilateral decision to set its own urethane products prices.

69.     Sometimes the conspirators announced price increases that were higher than what they anticipated achieving.

70.     The conspirators' price increase announcements were designed to raise or prevent a decrease of the overall baseline level of urethane products prices from which negotiations began.

71.     The conspirators viewed price increase announcements as a "success" even if they were not able to fully implement the announced increase or if they were able to prevent or minimize a decrease.

72.     The objective of the conspiracy was, at times, to stabilize prices or to minimize a decrease in prices.

73.     Dow and the defendant urethanes producers sometimes announced price increases for TDI, MDI, and /or polyether polyols together in the same letter.  They sometimes used market conditions existing with respect to one product, such as TDI, to pull through price increases on a related product, such as polyols.

74.     Dow and the defendant urethanes producers also used swaps to limit output in furtherance of the conspiracy.

75.     During the conspiracy period, the conspirators shared information regarding customers and exchanged sensitive, commercial information relating to price, competitors, and customers.

76.     Dow and the defendant urethanes producers also shared sensitive business information with one another, including pricing, in the course of the communications relating to co-producer arrangements and mutual business ventures.

77.     Dow and the defendant urethanes producers met and communicated privately, in order to conceal their unlawful conduct.

78.     Dow and the defendant urethanes producers' meetings in furtherance of the conspiracy often occurred outside of business offices at sites such as restaurants, bars, coffee shops, airports, hotels, golf courses and the grounds of the producers' facilities.

79.     Dow and the defendant urethanes producers engaged in collusive discussions during trade association meetings or at the side of trade association meetings.

80.     The conspirators also engaged in collusive discussions during or on the side of other private meetings to discuss their business relationships or ventures.

81.     The conspirators communicated numerous times by telephone, payphone, cell phone and calls to personal residences, sometimes outside of normal business hours, in furtherance of the conspiracy.

82.     During many of private meetings, whether in person or via telephone calls, the conspirators agreed to announce price increases or discussed implementation of already announced increases.

83.     The meetings among the conspirators in which they discussed, agreed on, and furthered urethane products price increase announcements were often *seriatim* bilateral meetings or communications among two producers at a time rather than all of the producers all at once.

84.     Dow and the defendant urethanes producers engaged in conduct that was against their economic interest, including:

> a.     walking away from significant urethane products business to support a price increase;
>
> b.     issuing and implementing price increases not correlated with changes in costs and demand;
>
> c.     sharing highly confidential information, including pricing at particular customer accounts; and
>
> d.     entering agreements to restrict capacity.

85.     A number of former senior executives at Dow and the defendant urethanes producers participated in the conspiracy over the period 1994-2003.

86.     Some of these former executives have acknowledged their participation in pricing discussions, including the producers' intent to increase future prices, with executives at competitor urethanes producers.

87.     The European urethanes producers' executives exercised significant influence over their U.S. urethanes businesses.  This included coordination of additional supply for NAFTA and of sales contracts for global customers.

88.     During the conspiracy period, the European attitude toward price-fixing was different from that in the United States.  A number of the conspiracy meetings were held in Europe, where there was a perception that the price-fixing discussions would not be subject to the same scrutiny as they would be in the United States.

14

89.     Whether or not Plaintiffs had leverage with regard to pricing from Dow and the defendant urethanes producers is not relevant to the issue of whether Dow and the defendant urethanes producers fixed the prices of urethane products.

90.     There were a limited number of urethanes producers, and Plaintiffs often were forced to accept all or at least part of a price increase.

91.     Plaintiffs did not have the bargaining advantage over the urethanes producers during the 1994-2003 time period to achieve prices at a level that they should have been absent the conspiracy.  Dow and the defendant urethanes producers still conspired regardless of Plaintiffs' buying power.

92.     The fact that each transaction for the purchase of urethane products was negotiated between a purchaser and a urethanes producer on a one-on-one basis did not mean that Dow and the defendant urethanes producers were not engaged in a conspiracy to fix the price of urethane products.

93.     The fact that Plaintiffs paid different prices or that Dow and the defendant urethanes producers may have retaliated against one another at times does not indicate that there was not a urethanes conspiracy and is instead consistent with the existence of a conspiracy.

94.     Evidence related in any way to the Plaintiffs' foam businesses, to their conduct in the foam businesses, or to the foam markets, is irrelevant to this case.  Conduct by the foam producers in the foam industry – such as announcing price increases for foam at or around the same time, that one producer lead a price increase announcement and others followed, sometimes meeting together, or and that they attended trade association meetings -- is irrelevant to the issue of whether the urethanes producers were engaged in a conspiracy.

95.     The fact that urethane products prices increased significantly after the conspiracy period in no way suggests there was no conspiracy during the conspiracy period.

96.     Increases in urethane products prices after the conspiracy ended is explained by a number of very significant changes in the market that occurred:  (i) Hurricane Katrina destroyed many of the urethanes producers' warehouses and (ii) Lyondell and Huntsman exited the TDI business in 2005.

97.     In the late 1980s and early 1990s, the urethanes industry went through a significant "slump," which lasted through 1993.

98.     During this period, the urethanes producers faced significant pressure to increase prices and improve profits.

99.     Polyols prices were depressed and the producers could not implement TDI price increases.

100.     There was overcapacity for TDI, which put downward pressure on prices.

15

101.    It has been empirically observed that firms characterized by low profits and low rates of sales growth demonstrate a tendency toward collusive behavior.  Dow and the defendant urethanes producers had a motive to enter a conspiracy.

**1994-1995**

102.    Dow and the defendant urethanes producers did not produce many documents from the period 1994-1998.  They asserted that many of those documents no longer existed at the time of discovery in this case

103.    In late 1993, BASF AG created BASF Coordination Center ("BCC") to develop and implement a strategy and act as the headquarters for BASF's global urethanes business.

104.    Through BCC, BASF controlled the activities of its urethanes business in the United States.  BCC had profit and loss responsibility for urethane products globally and thus considerable oversight over BASF's urethanes business in the United States.

105.    BASF appointed Jean-Pierre Dhanis as BCC's top executive.  Dhanis continued in that role throughout the conspiracy period.

106.    Dhanis met and communicated with many senior executives from competitor urethanes producers during his tenure.

107.    At one point during a two-year period, Dhanis had more than twenty-four telephone contacts with his counterpart at Bayer.

108.    Dhanis played a prominent role in the urethane products pricing discussions.

109.    There were multilateral meetings between Bayer and some of the defendant urethanes producers, including at least Dow, BASF, and Bayer, in 1994 and 1995 to discuss urethane products prices.

110.    Hans Kogelnik of Bayer indicated that he recalled a multilateral meeting in 1994 in Europe with BASF, Dow, and possibly ICI.

111.    At that time, Kogelnik was responsible for Bayer's U.S. automotive business, which included MDI.

112.    Kogelnik attended this meeting with Reinhold Lang (then Bayer global product manager for TDI) and Reinhard Kaufung (reported to Lang) of Bayer.

113.    Kogelnik believes the meeting was held at the Zurich airport and he felt uncomfortable.

114.    At this meeting, the parties discussed European business conditions and possibly European prices.

16

115.   Plaintiffs sought testimony from Kogelnik and Lang, but they declined to provide testimony.

116.   Lee Noble, in charge of Bayer's NAFTA polyurethanes business during the 1990s, admitted to Bayer's counsel that he had urethanes pricing conversations with Bill Long and Bob Wood of Dow and Manfred Buller and Bob Lawrence of BASF.

117.   Noble admitted that Reinhard Clausius, Head of Global Strategic Marketing for Bayer AG in the 1990s, told Noble about price-fixing agreements among the producers for urethane products related to Europe and told Noble to increase prices in the United States. Clausius told Noble that the Big Elephants BASF, Bayer, and Dow had met and that Noble should feel comfortable raising prices in the United States.

118.   Plaintiffs sought testimony from Lee Noble, but he declined to provide testimony.

119.   Lee Noble frequently met with his counterparts at Dow and BASF immediately before and after industry price increase announcements and reached agreements with Dow and BASF to increase or stabilize prices for TDI, MDI, and polyols.

120.   Between February 14 and 17, 1994, Lee Noble (and Tom Harrick of Bayer) had three separate one-hour meetings with Bill Long (and George Byrd) of Dow at The Boulders, a resort in Arizona, during a four-day golf outing between Bayer and Dow.  According to Long's expense reports, two of the meetings involved a urethane "industry discussion." Long acknowledged that he did not describe fully the details of competitors' meetings in his expense reports.  Long could not explain what was discussed at these meetings.

121.   On February 28, 1994, Bayer announced an MDI price increase, effective April 1. BASF, Dow, and ICI also announced an MDI price increase over the next few days (March 1-3).

122.   Bill Long, Bob Lawrence of BASF, and Lee Noble attended at least 3 more meetings together in the Spring of 1994 -- SPI and III trade association meetings -- including one before and one just after the April 1, 1994 effective date of the price increase and one in mid-April.  Long acknowledged that he generally met with competitors outside of the trade association group meetings as necessary.

123.   On May 11, 1994, Noble and Harrick met for 1.5 hours with Long at the Hotel Sofitel in Brazil during a III trade association meeting.  Long's expense report indicates that the competitors had a "PU Business Discussion."

124.   On May 12, 1994, Jean-Pierre Dhanis and Bob Lawrence of BASF, Reinhard Clausius and Lee Noble of Bayer, and Bill Long of Dow, among others, attended the III trade association meeting in Brazil.

125.   On May 25, 1994, BASF announced an MDI increase, effective July 1.  Bayer and Dow announced identical increases days later.  In their price increase announcements, Dow and BASF put their customers on allocation and refused to sell them more than the customers' normal monthly purchases.

17

126.   On June 8-10, 1994, Noble, Lawrence, and Long attended the CMA trade association meeting together at the Greenbrier Hotel in West Virginia, prior to the July 1 effective date of the MDI price increase.  During the CMA meetings, Noble, Long, and BASF's Manfred Buller met for two hours over dinner to discuss "polyurethane industry growth."

127.   In late August and early September 1994, Dow, ICI, BASF, Bayer, and ARCO announced price increases, effective October 1.  The producers limited the amount that customers could purchase.

128.   A document produced by Dow dated September 13, 1994 contains a spreadsheet of North American sales volumes, by producer, for MDI, TDI, and polyols. The spreadsheet includes handwritten notes that convert some of the volumes to market share, confirms some volume entries, and revises other entries.  Bill Long could not explain this document.

129.   On October 10, 1994, Bayer's Noble, Dow's Long, and BASF's Lawrence attended another III board meeting at the Sheraton hotel in Boston, Massachusetts.

130.   Bayer's global head of urethanes, Hans Kaiser, strongly emphasized the need for price increases and improved profitability in 1995.

131.   On February 1, 1995, Lyn Stanton, then President of ARCO, met with Jean-Pierre Dhanis and explained why ARCO bought Rhone-Poulenc's TDI business.  Stanton told Dhanis that ARCO did not intend to add any capacity in the immediate future and assured Dhanis that ARCO's core business was propylene oxide ("PO").  Dhanis complained that BASF had lost market share in polyols in the past due to poor polyol prices monitored by the integrated PO producers and not sufficient support on the raw material PO.  BASF did not request to recover the lost market share, but Dhanis expressed a firm intention for BASF to keep existing market share in slab polyols.

132.   On February 15, 1995, ARCO announced a polyol price increase, effective April 1, 1995.  BASF, Bayer, Dow, and ICI shortly thereafter announced price increases for MDI, TDI, and/or polyols (February 21 through March 1).

133.   On February 17, 1995, Lee Noble met with Bill Long and others at The Boulders to discuss TDI.

134.   In 1994 and 1995, BCC limited the supply of MDI available to BASF Corp. in the United States. As a result, BASF passed on obtaining business at a large MDI customer rather than drop the price to a lower level.

135.   On May 11, 1995, executives from Bayer, BASF, Dow, ICI, and Enichem attended the III annual board meeting at the Steigenberger Hotel in Berlin, Germany.  The executives attending included Reinhard Clausius and Lee Noble of Bayer, Jean-Pierre Dhanis and Bob Lawrence of BASF, Bill Long of Dow, Patrick Thomas of ICI, and Renato Moroni of Enichem.  During the conference, Bill Long and another Dow executive, Theo Walthie, met with Lee Noble to discuss PO.

18

136.    Plaintiffs sought testimony from Patrick Thomas, but he declined to provide testimony.

137.    Dow produced in discovery a spreadsheet dated May 8, 1995 containing information about North American sales volumes of MDI, TDI, and polyols, broken out on a company-by-company basis.

138.    On May 30-31, 1995, Bayer, ICI, ARCO, and Dow announced MDI increases, effective July 1, 1995.  Bill Long indicated that cost increases were the only reason for price increases during this time period.

139.    In early June, prior to the July 1 effective date of the price increases, Bob Lawrence, Bill Long, and Lee Noble attended the annual the CMA trade association meeting at the Greenbrier Hotel in West Virginia.  Bill Long indicated that high level executives from the urethane products producers met and had dinner together at the CMA meetings.

140.    On August 28, 1995, Bayer announced a TDI price increase, effective October 1, 1995.  The day that Bayer announced, Lawrence solicited input from a senior BASF executive in Europe, Friedrich Vogel, on whether BASF should follow Bayer's increase.  On August 30-31, 1995, BASF and Dow both announced price increases.

141.    On October 2, 1995, Tom Harrick of Bayer reported internally that production costs would "further decrease" in the upcoming year and that "realistically [the price increases'] chances to succeed appear somewhat limited."

142.    On October 4, 1995, Jean-Pierre Dhanis sent a memo to his BASF NAFTA colleagues describing two "proposed scheme[s] of cooperation" in which the industry could reduce global TDI capacity.  Dhanis used the colors "Blue," "Amber," "Orange," and "Scarlett" as code names for certain urethanes manufacturers.  In the memo, Dhanis noted Blue's (Bayer) desire to achieve 45% market share in TDI and the possibility that Scarlett (Shell) would either sell into the United States or shut down production.  Dhanis identified two "models" for future production.  Dhanis encouraged his counterpart in NAFTA, Dr. Godwin, to have a preliminary discussion with "Orange" and "Amber" to find out their urethanes strategy.  BASF could not explain the document.

143.    Reinhold Lang, who reported to Clausius at Bayer, admitted that he had urethane products pricing discussions with BASF, Dow, Enichem, and ICI related to Europe.  Lang admitted that he had pricing discussions with Jean-Pierre Dhanis, Joe Roser, Werner Diehl, Goeldner, and Lars Karcher of BASF.  Lang also admitted that he had pricing discussions with Charles Churet of Dow, Giancarlo Battistone of Enichem, and Steve Hubrecht of ICI.  Lang said that the competitor meetings in which prices were discussed took place at various places throughout Europe in the 1990s, including Leverkusen, Ludwigshafen, Vienna, Zurich, Budapest, Brussels, and Frankfurt.

144.    Helmut Von Hagen, a German native of Bayer who also reported to Clausius, admitted that he had urethane products pricing discussions with BASF, Dow, Shell and ARCO related to Europe.  Plaintiffs sought to depose Von Hagen in Uruguay, where he was living at the time.  While the court in Uruguay personally served him and commanded his appearance, he had

19

left the country and did not appear for his court-ordered deposition. If Von Hagen had been in the country, he could have been subject to criminal sanctions for his failure to appear.

145.    Christian Buhse of Bayer indicated that, in the mid-1990s, Von Hagen, his boss at the time, brought Buhse into the urethane products pricing discussions. Buhse said that he believes that he participated with Von Hagen in at least two urethane products pricing discussions with BASF, Enichem, Dow, and Rhone-Poulenc in Europe between 1993 and 1995. Attendees during these urethane products pricing discussions included Otto Elle for BASF, Herbert Verhulst, and Giancarlo Battistone for Enichem, and Flavio Terruzzi for Dow. Buhse indicated that these urethane products pricing discussions may have occurred in London, Milan, and possibly Paris.

146.    Plaintiffs sought testimony from Christian Buhse, but he declined to provide testimony.

147.    Von Hagen and Buhse traveled from Germany to Brussels, Paris, Milan, and Zurich, sometimes around the time of industry pricing actions, and often obtained reimbursement from Bayer without providing any business purpose for those trips in their expense reports.

148.    Bayer's counsel identified a number of other executives from Dow and the defendant urethanes producers who also participated in urethane products pricing discussions during the 1994-1998 time period, including Marco Levi of Dow, Reinhard Leppkes of BASF, Renati Moroni of EniChem, Steve Hubrecht of ICI, and David Sedler, Marin Dawson, and Carlos San Martin of ARCO.

149.    In late October and November, 1995, Dow, BASF, Bayer, ICI, and ARCO announced another round of polyol price increases, effective January 1, 1996.

150.    Dow estimated internally that TDI operating rates for 1995 were in the range of 88%.

151.    The conspiracy was successful in turning around things for the urethanes producers. The years 1994 and 1995 were phenomenally profitable years for the urethanes producers.

152.    Bayer's urethanes business profits improved 305% globally in 1994 over the prior year.

153.    Bayer's net sales, marginal income, gross profit, profits before taxes, and return on assets all improved over the prior year.

154.    BASF's profitability also increased significantly from 1993 to 1994, and BASF more than doubled its profitability target for that year.

155.    BASF's return on assets for its urethane business in North America jumped from around 12% in 1993 to over 20% in 1994 -- more than doubling its profitability target for that year.

156.    Dow experienced "tremendous growth" for its polyols business from 1993 to 1994.

157.    Dow reported internally in early 1996 that "1995 saw a business upturn" and that "MDI producers are making good return on their investment."

158.    TDI prices rose from $0.83/lb. in September 1994 to nearly $0.99/lb. in January 1996.  At the same time, Dr. Marx's econometric model predicted that TDI prices should have been $0.78 in November 1995 based on supply and demand factors that determined prices in non-collusive time periods.

159.    Bayer more than doubled its gross profit per pound on TDI sales, from $0.15 in 1994 to $0.34 in 1995.

160.    For CFS polyols, Dr. Marx's econometric model predicts similar prices to actual transaction prices from 1994 through December 1995, but in late 1995, actual and predicted prices deviate sharply, with CFS Polyol prices increasing sharply and non-collusive prices predicted by Dr. Marx's model decreasing sharply.

161.    In November 1994, actual MDI prices jump to $0.74/lb. while Dr. Marx's econometric model predicts prices at $0.71/lb.  By December 1995, actual polymeric MDI prices reach $0.80/lb. while the predicted prices fall to $0.64/lb.  Dr. Marx's model indicates that the October 1994 price increase announcements discussed above were highly successful.

162.    The April and July price increase announcements for MDI discussed above correlate with price increases during times when Dr. Marx's econometric model predicts falling prices.  By October 1995, actual prices reach $0.80/lb. while predicted but-for prices are near $0.66/lb. and falling.  Bayer reported internally that it increased its gross profit per pound on MDI sales by $0.13/lb. in 1995.

163.    In January 1996, BASF declined to provide ARCO with TDI to sell to an ARCO customer in Canada because of ARCO's "previous comments regarding no designs on TDI in North America."

**1996-1998**

164.    In January 1996, Tom Harrick of Bayer reported that market conditions could not support price increases for MDI and TDI that year, due to expected declining raw material costs and excess capacity.  Nevertheless, Bayer executives in the United States and Germany directed the sales force to not "let pricing slip" and to "defend current pricing levels."

165.    In early 1996, Dow wrote in an internal MDI Global Business Plan that "Consistent with our strategy, we will not lower prices to gain market share."

166.    BASF also wrote internally in a 1996 memorandum that it would rather lose business than decrease prices.

21

167.    On May 9-10, 1996, Bayer's Reinhard Clausius met privately with Bill Long and Charles Churet of Dow during the III meeting in Beijing, China.

168.    On June 5, 1996, Lee Noble of Bayer, Bob Lawrence of BASF, and Bill Long of Dow attended the annual CMA meeting at The Greenbrier.

169.    Later in June 1996,  Churet and Dow's future head of its urethanes business, David Fischer, had a "polyurethane business discussion" with ICI's Ian Clark.

170.    On August 6-7, 1996, Bill Long of Dow traveled to Pittsburgh to meet with Lee Noble of Bayer.

171.    On August 13, 1996, less than a week later, Dow announced MDI, TDI, and polyol price increases, effective October 1, 1996.  Shortly thereafter, BASF, Bayer, and ARCO announced similar increases for TDI and/or polyols with the same effective date.

172.    Profits for BASF, Bayer and Dow all increased substantially in 1996.  BASF's return on assets increased to 35%, which more than tripled its target for the year.  BASF acknowledged that its increase in urethanes profits during 1994-1996 was due in large part to BASF's ability to raise prices during that period.

173.    Bayer's urethanes profits before taxes for 1996 were very favorable and increased dramatically over the prior year due to improved volumes and higher prices.  While Dow did not provide documents that identify its contribution margins for TDI, MDI, or polyols during this time period, it did provide similar trade standard margins. Dow reported earning $100 million for MDI, $24 million for TDI, and $182.8 million for polyols in 1996 in North America.

174.    While prices for TDI, MDI, and polyols generally declined in 1996, they did so slowly and did not approach the prices predicted by Dr. Marx's models.

175.    On February 3, 1997, Bob Lawrence of BASF spoke to Peter Huntsman of Huntsman and voiced his displeasure that Huntsman would not firmly rule out the possibility that Huntsman would begin selling polyols.

176.    In March 1997, Bob Lawrence of BASF asked for, and received, a memorandum from his subordinates identifying the accounts that Bayer took from BASF "in case anyone is crying foul."

177.    In June 1997, Lee Noble of Bayer, Bob Lawrence of BASF, Bill Long of Dow, and Bob Wood, then Dow's global head of urethanes, attended the CMA meeting at the Greenbrier in West Virginia.

178.    On September 16, 1997, Jean-Pierre Dhanis of BASF met with Patrick Thomas of ICI.  An internal BASF meeting memorandum states that they discussed ICI's production capacities for MDI, volume of sales into the wood binder market, and at least one business plan in which BASF would agree to delay capacity additions for MDI if ICI cooperated with a joint venture arrangement.

22

179.    In October 1997, BCC urged its NAFTA business to resist price decreases in 1998 and instead implement price increases -- despite its customers' expectations that increased MDI and TDI capacity had caused a supply imbalance in the market.

180.    Churet, Lawrence, and Noble attended an III executive committee meeting in Palm Beach, Florida on November 13-14, 1997.

181.    Churet testified that he gave a speech at a trade association meeting in the mid-1990s in which he presented Dow's urethanes strategy and intent with regard to the market, including the pricing.

182.    For its 1998 planning, BASF assumed a "price stability instead of a price erosion."

183.    Dow's Global Business Plan for TDI, prepared in October 1997, states that "Consistent with our strategy, we will not lower prices to gain market share."

184.    While actual prices for TDI, MDI, and polyols generally fell through 1997, there were April 1997 TDI and polyols price increase announcements which were followed by an increase in prices that was not predicted by Dr. Marx's econometric models.

185.    On January 12, 1998, Jean-Pierre Dhanis of BASF hosted a meeting at the La Maison du Cygne, also known as the Swan restaurant, in Brussels, Belgium.  Bob Wood and Charles Churet of Dow, as well as Friedrich Vogel of BASF attended this meeting.  On that same day, Reinhard Clausius of Bayer's personal calendar had the sole entry "Fr. Vogel." Dhanis acknowledged they discussed urethanes business at this meeting, including market growth expectations globally and for Asia.  Dhanis took no notes and claims he only documented a meeting with a competitor if there was a specific "action item" arising from the meeting.

186.    Clausius of Bayer initially denied pricing discussions with urethanes competitors but later admitted it.  Clausius provided information about two multilateral meetings among the conspirators in which pricing was discussed.  One of these multilateral pricing meetings was at the Swan Restaurant in Brussels in the late 1990s.  A two-day meeting occurred in which discussion was organized by products.  Clausius indicated that Charles Churet of Dow, Jean-Pierre Dhanis of BASF, and Patrick Thomas of ICI/Huntsman attended this meeting.

187.    Kogelnik recalled being told about a multilateral meeting among urethanes producers in which urethane products pricing was discussed, attended by BASF, Bayer, Dow, Huntsman, and Ed Dineen of Lyondell.

188.    On February 19, 1998, Charles Churet of Dow met Friedrich Vogel of BASF for dinner in Frankfurt, Germany.

189.    The next day, on February 20, 1998, Churet met with Reinhard Clausius of Bayer in Leverkusen, Germany, where Bayer's headquarters are located.

190.    On February 20, 1998, Lee Noble and Tom Harrick of Bayer met with Bill Bernstein and Dick Mericle of BASF at Bayer's Baywood Country Club near Pittsburgh,

23

Pennsylvania.  At that meeting, Lee Noble proposed that Bayer provide MDI to BASF in the United States, to delay BASF in bringing new MDI capacity on-line.  Dick Mericle admitted that conversations between Lee Noble and Bill Bernstein must have taken place on the side of this meeting.  Mericle acknowledged that an agreement to delay capacity is wrong.  Handwritten notes indicate that Bernstein would discuss with Jean-Pierre Dhanis whether an MDI delay was possible.

191.   On the same day as the February 20 meetings, Bayer announced an MDI price increase in the United States.  During February 23-25, ICI announced virtually identical MDI and polyol price increases, and Dow announced a polyols price increase.

192.   On February 26, 1998, Charles Churet met with Reinhard Leppkes, Churet's second meeting with BASF that week.

193.   On February 27, Churet went to London to meet with ARCO's Martin Dawson.

194.   On February 27, 1998, Dow announced a price increase for MDI, effective April 1.

195.   On March 1, 1998, Charles Churet of Dow traveled to Mannheim, Germany for a third meeting with BASF.

196.   That same day, on March 1, 1998, BASF announced MDI and polyol price increases, effective April 1.  Also on March 1, Bayer announced a polyols price increase, followed by a polyols price increase announcement by ARCO/Lyondell on March 9.

197.   On April 22, 1998, Charles Churet and Reinhard Clausius attended a III meeting in Austria.

198.   On May 7-8, 1998, Charles Churet, Bill Bernstein and Jean-Pierre Dhanis of BASF, Lee Noble and Reinhard Clausius of Bayer, and Tony Hankins of ICI attended a III board meeting in Prague, Czech Republic.

199.   On May 8, 1998, Bill Bernstein, Bob Lawrence's successor as head of BASF's urethanes business in NAFTA, met privately over lunch with Reinhard Clausius of Bayer in Prague, while attending the III meeting there, to discuss U.S. market conditions for urethanes.

200.   Two weeks later, on May 22, 1998, Bayer announced an MDI price increase, effective July 1.

201.   On May 28, 1998, Jean-Pierre Dhanis hosted another dinner meeting at the Swan restaurant in Brussels, Belgium.  Dhanis' receipt identifies only BASF personnel at this dinner; however, the expense report for Reinhard Clausius of Bayer indicates that he came to Brussels on May 28 and stayed overnight at the nearby Radisson hotel.  Another expense report from BASF shows that Dhanis paid for and sought reimbursement for something at the Radisson that same day, and Dhanis admits that he may have met with Clausius that day.

24

202.    On the same day, May 28, 1998, Dow announced MDI, TDI, and polyol price increases, effective July 1.

203.    Over the next few days, May 29 through June 1, Bayer, ARCO, BASF, and ICI also announced price increases.

204.    On June 2, 1998, during the CMA meeting at the Greenbrier resort in West Virginia, BASF and Dow personnel, including BASF's Bill Bernstein and Dow's Bob Wood, met for dinner and cocktails.

205.    In a September 3, 1998, internal Bayer memorandum, Clausius reported that Churet told him that Churet had been getting "very obvious pressure from America to implement the price hike by any means necessary."

206.    In October 1998, Jean-Pierre Dhanis and Bill Bernstein of BASF discussed with Dow executives, including Charles Churet, BASF engaging in an MDI swap with Dow designed to delay Dow's capacity expansion from 2002 to 2004.  The discussion included an offer by BASF to sell MDI to Dow as an alternative to Dow expanding its capacity.

207.    In late 1998 and early 1999, Jean-Pierre Dhanis of BASF and his counterpart at Bayer, Hans Kaiser, negotiated a TDI swap agreement whereby Bayer agreed to supply BASF with TDI in exchange for BASF's agreement not to bring online its planned TDI capacity expansion in the United States for six months.  The agreement was implemented in the Fall of 1999.

208.    Prices increases for TDI, MDI, and polyols correlated with price increase announcements in 1998.

209.    With respect to polyols and TDI, there were significant price increases in the Fall 1998 at a time when Dr. Marx's econometric model predicts major price decreases.  Prices for MDI stabilized and experienced some growth in the late Fall 1998 when Dr. Marx's econometric model predicts major price decreases for MDI.

210.    According to Stephanie Barbour of Dow (who had sales and marketing responsibilities for MDI and rigid polyols), in 1998 or 1999, Charles Churet of Dow (Commercial Director for North America and Europe) came to Dow's offices in the United States for meetings, and while there, he told Barbour and her colleagues to raise prices.  Barbour and Rick Beitel of Dow argued that supply and demand did not support an increase.  Churet nonetheless insisted on an increase.  Barbour asked her colleagues afterwards in the hallway what the interaction with Churet had been about.  Marco Levi and Steven English of Dow asked Barbour where Churet had been, and then advised her that Churet had been at an III trade association meeting.  They told Barbour she would learn what that meant, and she later understood that meant that Dow had had price-fixing discussions with competitors at trade association meetings.

### 1999-2003

211.    During Stephanie Barbour's tenure as global business director for MDI and rigid polyols at Dow, which was from 2000 through early 2004, on at least 10 occasions in Barbour's presence, Marco Levi of Dow, global business director for TDI and flexible polyols, debriefed Levi's and Barbour's boss, David Fischer, global head of Dow's urethanes business, on Levi's pricing conversations with Dow's urethanes producer competitors.  Barbour reported this information to Dow's then in-house counsel, Lynn Schefsky.[4]

212.    Around 2000, Stephanie Barbour attended a meeting with Marco Levi and Uwe Hartwig of BASF in the Detroit area.  After the meeting, Hartwig asked Barbour to leave the room so that he could talk to Levi alone.  Barbour left the room.  After Hartwig and Levi's private discussion, Levi came out and told Barbour that Hartwig wanted to discuss pricing with her.  Barbour went into the room where Hartwig was alone and told Hartwig that she would not engage in pricing discussions.  Barbour reported this incident to Lynn Schefsky.

213.    In 2003, Barbour once asked Marco Levi how he was able to get urethane products prices up successfully given excess capacity.  He said that he had met with BASF (Uwe Hartwig) and Bayer and they were in a bad situation financially and were going to make sure the price increases stuck.  Barbour reported this incident to Lynn Schefsky.

214.    Barbour indicated that in 2003, Peter Davies, the head of urethane chemicals systems worldwide for Dow, told Barbour that he spoke to BASF and they were not happy that Dow was not sticking with a price increase (regarding MDI and polyols) and going up the full amount at GE.  Davies reported that BASF wanted to know why Dow was doing this. Barbour explained to Davies that Dow had a contract with GE, and Davies indicated he would explain that to BASF.  Davies told Barbour that if he told anyone about their conversation, he would deny it and call her a liar.

215.    Barbour reported that in 2003, she received a call from her counterpart at Bayer, new to the MDI and related polyols position, and he spoke to her about an MDI increase.  The Bayer person indicated that he knew he was not supposed to have those conversations with her, that he had been told that she did not have those conversations, but that he wanted to let her know that Bayer was being good.

216.    Levi admitted to Barbour multiple conversations with competitors where they agreed to get the prices to stick.

217.    Barbour wrote an email documenting an April 2003 meeting with Frank Morgan of Dow and a subsequent meeting with Greg Comeaux of Dow in which she expressed concerns about David Fischer and refusing to agree to lie for him, among other things.  Barbour's email refers to borderline illegal activities by Fischer.  Barbour indicated that the activities she was

---

[4] Levi had his secretary maintain a document that contained a note indicating "Critical Contacts: Competitors (one on one o/s office)" and listed Shell, BASF (Berkowski/Roser), Bayer (Buhse), and Lyondell (Portela) contact names.  Levi testified that he did not understand what "o/s" meant and denied that he understood it to mean "outside."

referring to included Levi's discussions with competitors. Barbour indicated that she used the word "borderline" because she was worried about putting this in writing.

218.   Barbour reported these conversations between or among the urethanes producers related to urethane products pricing to Dow's counsel, Lynn Schefsky, on more than 10 occasions.

219.   Lynn Schefsky recalled two separate instances in which Barbour reported suspicious communications between Fischer and Kay Gugler of Huntsman[5] and unusually high phone traffic between Fischer and competitors. All that Schefsky did in response to these complaints was to speak privately with Fischer, who denied the allegations. Schefsky did not check Fischer's phone records or calendars or speak with Fischer's secretary or anyone else in the department. Each of Schefsky's "investigations" lasted no longer than ten to twenty minutes. Although Dow's policy required an attorney to document investigations of suspected collusion, Schefsky took no notes and notified no one else in Dow's legal department regarding Barbour's complaints.

220.   Schefsky admitted that if he had been aware that there were anomalous increases in the amount of Fisher's phone communications with Dow's competitors immediately preceding price increase announcements, he would have conducted a more extensive investigation than he did.

221.   Barbour kept notes of the debriefing sessions with Levi and Fischer. She maintained those notes on her computer at Dow and believes they were still there when she left Dow in 2004. Barbour assumed they would have been destroyed pursuant to document retention after she was fired. The notes have not been produced. Barbour told Phil Cook, Tom McCormick, and Larry Washington about her notes.

222.   Stephanie Barbour's employment was terminated by Dow in February 2004. She believes that she was fired based on retaliation by David Fischer for expressing opposition against him in the way that he managed Dow's business and for blowing the whistle to Dow's counsel about Levi's and Fischer's antitrust violations and other illegal conduct that she witnessed.

223.   After Barbour's employment was terminated, in February 2004, she wrote a letter to Phil Cook of Dow stating that she had been retaliated against by David Fischer and that Fischer had violated Dow's Code of Conduct.

224.   Afterward, Barbour met with Phil Cook, and she advised him about unlawful activity at Dow. While Barbour remembers telling Cook about Levi's and Fischer's antitrust violations in person, she did not put these concerns in her letter to Cook because she knew how harmful it could be to Dow to create that type of record.

---

[5] Gugler wrote in a performance review for the year 2000 that he had 'strong relations building/strategic influencing externally" with David Fischer of Dow and Joachim Roser of BASF. He also wrote that he "Delivered masterpieces of strategic influencing this year – you better don't know."

225.    In response to Barbour's complaints, Cook instructed Tom McCormick, an attorney in Dow's in-house legal department, and Larry Washington, in Dow's HR department, to investigate the matter.  During an interview with McCormick and Washington, Barbour again reported the antitrust concerns about Fischer and Levi that she had previously raised to Cook and Schefsky.  Barbour gave them several specific examples of things she had observed that she thought were illegal, and Washington replied "that sounds pretty illegal to me as well."

226.    In an email dated March 16, 2004, McCormick instructed Lynn Schefsky, Dow's business lawyer for the urethanes business, to investigate Barbour's allegation that Levi had attended one or more "inappropriate meetings among competitors in the TDI business" to limit Lyondell's success in the market.[6]  McCormick made no reference to Fischer or the larger investigation that was underway concerning Fischer's and Levi's inappropriate contacts with competitors, and Schefsky did not investigate price-fixing within the urethanes business unit.

227.    Fischer testified that during the course of his separation from Dow in the Spring of 2004, Dow investigated Barbour's complaints about Fischer's "harsh management style and improper activities with competitors."  When confronted with this testimony that contradicted McCormick's statement that he was "absolutely" sure that Barbour did not raise these types of antitrust concerns about Fischer or Levi, McCormick said he was unfamiliar with this investigation.

228.    The extent of Schefsky's investigation was to interview Levi and review his calendar.  Despite admittedly lacking confidence that Levi was being fully candid about his competitor contacts, Schefsky recommended that Dow close the investigation, which McCormick did promptly.

229.    McCormick was not aware that Schefsky had previously investigated reports made by Barbour regarding inappropriate competitor contacts on at least two occasions.  McCormick acknowledged that if he had known that, he would not have chosen Schefsky and that this might have compromised the independence and integrity of the investigation.

230.    McCormick acknowledged that Levi failed to disclose to Schefsky the fact that he had met with Hartwig of BASF and Buhse of Bayer at Hartwig's home in Brussels in 2003 (at which counsel was not present and no agenda was prepared) and that the evidence was consistent with what Barbour had complained about.  McCormick agreed that he would have followed up on this information if he had known about it.

231.    Around April 2000, Larry Stern of Bayer replaced Hans Kogelnik as the head of Bayer's NAFTA polyurethanes business.

232.    Kogelnik advised Stern to conduct sensitive pricing conversations with competitors outside of the office.  Kogelnik warned the offices could be bugged due to earlier antitrust issues involving Bayer.

---

[6] Schefsky is the same lawyer who had received and summarily dismissed complaints by Barbour against Fischer and Levi earlier during her tenure at Dow.

233.     Larry Stern met and spoke by phone with his counterparts at Dow, Huntsman and BASF many times. There were discussions of pricing and other matters among Stern and other urethanes producers that Stern in retrospect wishes he had not had.

234.     Stern discussed with his competitors the need to raise prices, future prices competitors would charge for urethanes, and Bayer and its competitors' intent to raise urethane products prices in the future.

235.     Stern exchanged information with his competitors about the prices Bayer was charging specific customers.

236.     In order to conceal their unlawful communications, Stern met with competitors at off-site locations, such as coffee shops, hotels and airports, used pay phones with prepaid cards, or walked outside to make sure his conversations were not overheard.

237.     Stern was aware of times when urethane products pricing between or among competitors was discussed at trade association meetings, including the API, ACC, and III.

238.     During his tenure, Stern had eight to fifteen discussions with David Fischer of Dow involving urethane products pricing.

239.     Stern's discussions with David Fischer included discussions in which Fischer gave ranges that Dow had decided or was in the process of deciding for current or future price increase announcements.

240.     Fischer acknowledged that he spoke with Stern on the phone one to twenty times and met with Stern in person one to six times during Fischer's tenure as global Vice President of urethanes at Dow.

241.     In 2001 or first half 2002, Stern drove to a pay phone and called David Fischer on his cell phone using a prepaid calling card.  Stern and Fischer discussed industry conditions, including pricing.

242.     A few weeks or months later, Stern again called Fischer from a pay phone near Bayer's office using a prepaid phone card.  They discussed Bayer's intent to raise prices and Dow's intent to raise prices and to support or lead a future price increase.

243.     Stern had three to six future urethane products pricing discussions with Bill Bernstein of BASF.  On two occasions, in the Fall 2000, 2001, or 2002, Stern met with Bernstein during the API trade association meeting at a coffee shop in Arlington, Virginia.  Stern and Bernstein discussed market conditions and at least at one of these meetings, discussed future pricing.

244.     Stern discussed pricing with urethanes competitors to determine if increases would at least partially stick.  He also wanted to figure out whether he could push for increases without being concerned about Bayer losing market share.

245.    At times when Stern discussed urethane products price increases with competitors, Stern wanted to convey to his competitors Bayer's resolve to implement announced increases. Stern also discussed with his competitors the resolve to have price increase announcements stick.

246.    In 2002, Stern and Phelps of Bayer were on a speakerphone with Christian Buhse, a Bayer global urethanes executive based in Germany, and Buhse began to talk about one of his urethane products pricing discussions with a Bayer competitor. Phelps cut him off and ended the discussion.

247.    Stern did not tell Bayer's customers about his pricing conversations with Bayer's urethanes competitors.

248.    Stern advocated a strategy of prioritizing margin on urethane products sales over volume of sales, which can result in loss of market share in the absence of a conspiracy.

249.    Stern was aware that other executives at Bayer, such as Christian Buhse, Wolfgang Friedrich, and Hans Kogelnik, had urethane products pricing discussions with competitors.

250.    Bob Kirk of Bayer had drinks with David Fischer of Dow at Bayer's Baywood facility in Pittsburgh, in or around 1999, 2000, or 2001. Fischer told Kirk that Dow intended to increases prices at some future date, and Kirk responded that Bayer had supported industry increases in the past.

251.    Later that same evening, Kogelnik and Lee Noble of Bayer had dinner with David Fischer.

### April 1999 Price Increases

252.    On February 3, 1999, Charles Churet had a telephone call with Reinhard Clausius of Bayer.

253.    On February 8, 1999, Jean-Pierre Dhanis of BASF hosted a meeting at the Swan Restaurant in Brussels, attended by Dhanis, Bob Wood of Dow, and Ed Dineen of Lyondell. Dr. Kaiser, the global head of urethanes at Bayer, was supposed to attend but could not make it. Wood had invited Dineen to the dinner to meet some of his competitive counterparts.

254.    During the dinner, Dhanis made comments that made Dineen feel uncomfortable, including that the industry needed to get prices up and that profits were too low. Dhanis stated that if BASF were to raise prices, BASF needed assurances that they would not lose volume.

255.    Dhanis' communications at the dinner made Dineen feel uncomfortable from an antitrust perspective and did not believe it was the type of discussion that competitors should be having.

256.    On his expense report submitted for reimbursement for this dinner, Dhanis did not report that Wood and Dineen attended. Instead he indicated that "Lefebvre" and "Christiansen"

30

attended this dinner when no such people attended. Similarly, on Dineen's expense report for reimbursement related to this trip, Dineen only reported that he was meeting with Dow in Brussels regarding business opportunities. He did not report that he was meeting with BASF and Dow together, nor does his expense report mention BASF at all.

257.    Shortly after the February 1999 meeting, Dineen spoke to his predecessor, Lynn Stanton at Lyondell, about the dinner at the Swan. Stanton warned Dineen to be careful with the Europeans. They approach antitrust issues differently. Dineen inferred that Stanton had had similar issues in the past.

258.    A February 23, 1999 Lyondell strategy document identified as an objective to develop consensus and staff support to stabilize TDI competitive dynamics. The documents states that Lyondell will pass on obtaining new North American and European business to help stabilize the market.

259.    On February 15, 1999, Charles Churet of Dow met with Joe Roser of BASF in Frankfurt, Germany.

260.    On February 25, 1999, Dow issued a price increase announcement for polyols and TDI, effective April 1. On March 1, 9, and 11, Lyondell, Bayer, BASF, and ICI/Huntsman, respectively, announced similar increases.

261.    In April, 1999, during implementation of the April 1999 increases, Jean-Pierre Dhanis of BASF walked away from a large piece of business at Foamex, one of the largest urethanes purchasers. William Lizzi of BASF warned that this decision could result in a significant loss of business to BASF.

262.    In an internal memorandum explaining the decision to Lizzi, Bill Bernstein of BASF wrote that "BASF needs to shows its willingness to be a disciplined, structured member of the industry and support announced price increases." BASF lost 140 MM pounds -- a very significant amount of business -- of TDI and polyols business at Foamex and Carpenter.

263.    The price increase announcements for TDI in 1999 were correlated with increases in price through August 1999.

264.    While prices for MDI experienced minor declines in 1999, Dr. Marx's econometric model shows that prices were predicted to be significantly lower, 70% lower than actual MDI prices.

265.    The price increase announcements for polyols in 1999 were correlated with increasing and stabilizing actual prices, and Dr. Marx's model predicts that prices should have declined and been more than 60% less than actual prices.

## October 1999 and January 2000 Price Increases

266.    On August 31, 1999, Bill Bernstein of BASF met with Hans Kogelnik and Bob Kirk of Bayer at the Montour Country Club for a golf outing.

31

267.     Three days later, on September 3, 1999, Kogelnik called Bernstein, and a message pad in the handwriting of either Bernstein or his secretary reflecting the call states: "Sept. increase-where, who, why."

268.     On September 30, 1999, Bayer announced a 3 cent price increase TDI and polyols, effective October 1, and another 3 cent increase for January 1, 2000.

269.     On October 4, Lyondell verbally supported these increases, and on October 4, BASF announced a 3 cent increase.

270.     On October 8-9, 1999 BASF, including Bill Bernstein and others, hosted Dow executives, including Bob Wood, on a two-day hunting trip at BASF's privately owned Fighting Island.

271.     After the hunting weekend, Bernstein sent pictures of the trip to Bob Wood of Dow, stating in the cover letter that he "wanted to pass them along to our friends at Dow" as "a reminder of how much fun you had that October weekend."

272.     On October 18-19, 1999, Charles Churet of Dow met with BASF's Reinhard Leppkes and attended an III European Union director's meeting in England on October 20.

273.     On November 5, 1999, Dow announced a 3 cent price increase for TDI and polyols.

274.     On November 11, 1999, Charles Churet of Dow met with an executive from Huntsman and Reinhard Clausius of Bayer during a III executive meeting in Coral Gables, Florida.

275.     Between November 24 and December 15, 1999, Bayer, BASF, Huntsman, and Lyondell announced similar price increases for polyols and/or TDI, effective January 1, 2000 (with Huntsman's price increase effective January 15).

276.     The January 2000 increases were successfully implemented.

**April 2000 Price Increases**

277.     In February, the conspirators announced price increases for MDI, TDI, and polyols, effective April 1. (with Lyondell's effective on March 15)

**July 2000 Price Increases**

278.     On May 15, 2000, Dow announced a price increase for polyols, effective July 1.

279.     On May 17-18, 2000, urethanes executives, including Larry Stern of Bayer, David Fischer of Dow, Bill Bernstein and Jean-Pierre Dhanis of BASF, Patrick Thomas of Huntsman, and Mario Portela of Lyondell met at a III meeting in New Orleans.

280.    Between May 30 and June 1, 2000, Dow, Bayer, BASF, Lyondell and Huntsman announced price increases for MDI, TDI and/or polyols, effective July 1.  Dow, Bayer, BASF, and Huntsman announced increases on all three products.

281.    After the price announcements but before the effective date, on or around June 9, Larry Stern of Bayer played golf with Attila Molner, a board member at Bayer, and Mike Parker, Dow's Chief Executive Officer, at the ACC annual conference at the Greenbrier in West Virginia.  They discussed general conditions and poor margins in the urethane chemicals industry, future pricing and raising prices of urethane products, and pricing at Foamex and Carpenter accounts.  After this golf outing or a similar one at the Greenbrier in 2001, Mike Parker stated in the presence of Larry Stern that they (*i.e.*, the industry) needed to get prices up. Stern sensed conviction.  Stern was taken aback that Parker would make such a comment with other people around.

282.    A few days later, David Fischer of Dow wrote internally to Rick Beitel and Stephanie Barbour of Dow that despite Dow's excess capacity, the price increases they were doing prevented Dow from aggressively gaining market share.

283.    On June 22, 2000, just before the July 1 effective date of the increases, Bill Bernstein of BASF had lunch and played golf with Bob Wood of Dow at the Dow Club.

284.    Prior to this meeting, Bernstein had a folder of documents for the meeting that included a June 16 internal BASF email regarding Dow activity at certain BASF accounts.  It was Bernstein's practice to have folders prepared by his secretary for him in anticipation of meetings.

285.    On June 26, 2000, Bob Kirk of Bayer attended a Dow golf event in Indiana and indicated that Rick Beitel of Dow was in his golf foursome. An expense report of Don Marquette of Dow identifies David Fischer, Bob Wood, and Rick Beitel of Dow, and Bob Kirk of Bayer, at an event that day.

286.    That same day, on June 26, Beitel issued a document internally reinforcing Dow's internal commitment to the price increases (effective July 1) and noting the support of Bayer and BASF.

287.    Bill Bernstein had a file folder labeled "Woodbridge 2000," which contained a document dated August 3 in which Bernstein wrote a note to himself stating, "Call Dow-prices not up in August."

288.    On August 6, 2000, after a Dow internal conference call, Beitel resolved that if Dow lost TDI business at Woodbridge, it would move against Bayer's accounts in retaliation for not supporting the price increase, but not against BASF's accounts since they supported the increase.

## January 2001 Price Increase

289.    At a September 2000 internal Bayer Singapore meeting. Werner Spinner, a senior executive at Bayer, insisted on urethane products price increases even though Larry Stern did not

33

think they could be accomplished. In a strategic plan dated October 11, 2000 entitled "NAFTA Project Cure," Stern wrote that Bayer had and would continue to lead price increases even though supply and demand conditions would not warrant them until at least 2002 due to loose capacity and capacity utilization.

290.    Plaintiffs sought testimony from Werner Spinner, but he declined to provide testimony.

291.    On October 19, 2000, David Fischer of Dow met with Hans Kogelnik and Larry Stern at Bayer's Baywood facility in Pennsylvania.

292.    The purpose of the Baywood meeting was to discuss the contractual supply agreement between Dow and Bayer regarding PO.

293.    At this meeting, Kogelnik suggested the participants take a walk outside for a more private conversation. Outside, they discussed bad margins in the industry, the need to increase prices at larger accounts like Foamex and Carpenter, and the intent of Dow and Bayer to raise TDI and polyols prices.

294.    Dow sought to increase prices at Foamex in October 2000, and Foamex sought a delay until January 1, 2001.

295.    Foamex was an important customer for Dow. Bayer also sought TDI and polyols business from Foamex.

296.    On October 20, the day following the meeting between Bayer and Dow, Dow sent a letter to Foamex rejecting request to delay the price increase.

297.    Bill Bernstein of BASF notes in a "MDI-2 Performance File Folder" indicate that per Dhanis on October 23, 2000, Bayer indicated that the price for Woodbridge was successful and the price for Foamex was unsuccessful.

298.    Bill Bernstein's calendar notes a call with David Fischer of Dow on October 27 and with Hans Kogelnik of Bayer on  October 31.

299.    On November 6, 2000, Bill Bernstein and David Fischer had dinner together near Bernstein's home in Michigan.

300.    On November 9, 2000, Dow announced a polyols increase, effective January 1, 2001.

301.    On November 13, 2000, Rick Beitel of Dow summarized the situation in North America. He referred to price increases and the need for price increases, the need for MDI leadership, the need for Bayer to support and position polyols and TDI (and BASF would follow), and the need for Huntsman to develop control and management to support.

34

302.    On November 16, 2000, Bob Wood of Dow wrote to Dow's David Fischer, Stephanie Barbour, and Marco Levi and stated: "That's why it is so critical that we do EVERYTHING we can to raise prices."  It is not an option for Dow to miss its EBIT target.

303.    On November 17, 2000, Bayer announced TDI and polyols price increases, effective January 1, 2001.

304.    That same day, November 17, Bernstein of BASF spoke to David Fischer of Dow by telephone.

305.    On November 20, 2000, Werner Spinner of Bayer met with Bob Wood of Dow.

306.    On November 27, 2000, Dow announced a TDI price increase.

307.    That same day, on November 27, 2000, Bill Bernstein of BASF spoke to David Fischer of Dow by phone, and BASF announced TDI and polyols increases.

308.    During the November and December 2000 (and early January 2001) timeframe, Huntsman and BASF were involved in a swap agreement in which BASF agreed not to be aggressive in the wood binder market, an important market segment for Huntsman.

309.    On December 6, 2000, Dow announced an MDI increase, and Huntsman announced isocyanates and polyol increases.

310.    On the following two days, December 7-8, 2000, Huntsman telephone records show four calls to Bill Bernstein and one call to Bernstein's fax number.

311.    A December 8, 2000 BASF email notes that: "Late today we have been able to confirm an initiative by Huntsman and Dow to raise MDI prices by $0.08/lb effective January 1, 2001."

312.    A December 8, 2000 Bayer internal email also reported: "We learned yesterday that both DOW and Huntsman have announced $0.08/lb on MDI."

313.    On December 8, 2000, Bayer announced an MDI increase.

314.    On December 11, 2000, Bill Bernstein of BASF and Tony Hankins of Huntsman spoke on the telephone.

315.    The next day, on December 12, BASF announced an MDI price increase.

316.    Dr. Marx's model shows that prices for TDI, MDI and polyols were volatile during 2000.

317.    The TDI price increase announcements in 2000 are correlated with a significant jump in prices not predicted by Dr. Marx's econometric model.  From November 2000 through January 2001, TDI 80/20 prices increased from $.84/lb to more than $.93/lb.

318.    For MDI, the July 2000 price increase announcements are correlated with a temporary spike in prices.  Polyols prices dropped dramatically in early 2000, but rapidly recovered coincident with the April 2000 price increase announcements.

### April 2001 Price Increase

319.    In a January 2, 2001 memorandum by Larry Stern, he discussed his willingness to lose business in order to increase prices.  Stern noted that if one supplier is aggressive, that can erode or prevent price increases.

320.    Stern reported that MDI capacity utilization would be relatively loose in NAFTA until 2002.

321.    A January 17, 2001 BASF internal memorandum noted that it was premature to say that January price increases were holding.  Competition was seen to be weakening, and BASF noted that ongoing competitive activity must be addressed.

322.    Bill Bernstein of BASF met privately with David Fischer of Dow on January 22, 2001 and Tony Hankins of Huntsman on January 24, 2001.

323.    On January 22, the day that Bill Bernstein met with David Fischer, Dow sent to BASF a press release reporting challenging TDI conditions and expected raises in TDI prices. The next day, Bill Bernstein told BASF colleagues to issue something similar.

324.    On February 13, 2001, using his cell phone, David Fischer called Bill Bernstein's office, and they spoke for six minutes.

325.    On February 14, 2001, Werner Spinner of Bayer held an internal strategy meeting and told Bayer's NAFTA executives that they needed to be firmer in their resolve to increase prices. Spinner asked why a salesperson who had reduced pricing at an account due to competitive activities had not been fired.

326.    On February 19, 2001, Dow announced MDI, TDI, and polyols price increases, effective April 1.  On February 28, 2001 Bayer announced MDI and polyols price increases.

327.    On March 6, 2001, Bill Bernstein of BASF indicated in writing that BASF was "deciding on course of action" with regard to price increases.

328.    On March 8, 2001 while on the road, Bill Bernstein made 3 phone calls to Tony Hankins of Huntsman using his calling card.  He first called at 10:58 am on March 8.

329.    The afternoon of March 8, Bernstein sent an email to BASF subordinates stating, "I have tried to determine what Huntsman's response will be, but have not connected."

330.    Bernstein claimed he had been trying to contact a customer regarding Huntsman, but he was unable to identify any customer call on his phone records.

331.    Later on the afternoon of March 8, 2001, after sending that email, Bernstein called Hankins two more times.

332.    The next morning, on March 9, Bernstein called Hankins five more times. Bernstein also called Bob Kirk of Bayer that morning.

333.    Later the afternoon of March 9, 2001, BASF and Huntsman announced price increases for MDI and polyols.

334.    BASF back-dated its letter to March 1, and Huntsman back-dated its letter to March 5.  A Huntsman facsimile shows that the Huntsman letter was actually sent on March 9.

335.    Bernstein called David Fischer of Dow three (3) times on March 14.

336.    Hans Kaiser of Bayer had a call scheduled with David Fischer for March 16, 2001.  That day, Kaiser asked Larry Stern to provide an overview of Dow's activities in the NAFTA marketplace.

337.    In response to Kaiser's request, Dennis McCullough of Bayer prepared a summary indicating that Dow seemed to be attempting to hold on to announced increases, though some recent activities contradicted their profit-driven strategy.

338.    McCullough's summary also indicated that Dow was unhappy that Bayer took business from Dow in the automotive segment.

339.    Plaintiffs sought testimony from Dennis McCullough, but he declined to provide testimony.

340.    On June 5-8, 2001, at the ACC meeting at the Greenbrier in West Virginia, Larry Stern played golf with Attila Molnar of Bayer and Mike Parker and Bob Wood of Dow.

341.    Stern testified the golf participants discussed the need to improve margins in the industry and the need to improve pricing to improve margins.

342.    During the June 5-8, 2001 ACC meeting, Bill Bernstein of BASF met with David Fischer and Bob Wood of Dow to discuss the "urethane market."

343.    In mid-June 2001, Joe Roser of BASF asked Larry Berkowski and Bill Bernstein of BASF for any major market share shifts between BASF and Bayer in the United States and Canada for MDI and polyols.  Obtaining this information was urgent because BASF was in the middle of swap negotiations with Bayer.

344.    Bernstein indicated that it appeared that BASF in Europe was going to have discussions with Bayer regarding tolls/swaps.

345.    Bernstein acknowledged that it would not be appropriate to discuss market share shifts with a competitor in the context of swap negotiations.

## October 2001 Price Increases

346.   On August 13, 2001, Bill Bernstein and David Fischer met together for breakfast. Fischer's secretary sent an email to Bernstein indicating that Fischer would be driving a black Oldsmobile Intrigue.

347.   On August 14, 2001 Larry Stern met with David Fischer and others at Dow about a manufacturing facility in West Virginia. Stern testified it would be typical to talk about industry conditions rather than just a simple narrow topic like the West Virginia facility.

348.   On August 16, 2001, Stern and Bernstein met in at the Pittsburgh Airport. Stern's expense report identifies the meeting, but Bernstein's does not.

349.   Bernstein usually flew direct from Newark (where he traveled to go to BASF's offices in New Jersey) to Michigan where he was based. On the August 16, 2001 trip, however, Bernstein had a layover in Pittsburgh, where Stern was based.

350.   On August 17, 2001, Stern wrote that he was thinking about using the upswing in propylene and slightly stronger demand as a basis for raising prices.

351.   On August 23, 2001, Bernstein called Stern at home at 8:19 pm. They talked for 12 minutes.

352.   Four days later, on August 27, 2001, BASF announced TDI and MDI price increases. On August 28-30, Dow announced MDI, TDI, and polyols price increases.

353.   On August 30, Bernstein spoke two times on the phone with Huntsman. Huntsman phone records show a call to Bernstein's office at 12:28 pm and then a 2:45 pm call by Bernstein using his calling card to Hankins of Huntsman.

354.   The next day, on August 31, Huntsman and Bayer announced MDI and TDI price increases, Lyondell announced a TDI price increase, and Dow announced a polyols price increase. On September 5, 2001, BASF and Bayer announced polyols price increases.

355.   Bill Bernstein of BASF and Tony Hankins of Huntsman attended the API meeting in Arlington, VA, in October 2001, along with Larry Stern of Bayer. Bernstein and Hankins met offsite from the API offices.

356.   Dr. Marx's econometric model shows that notwithstanding the urethanes producers' efforts, TDI and polyols prices tracked the prices that the econometric model predicted should have prevailed but for the conspiracy.

## April 2002 Price Increases

357.   On January 9, 2002, Larry Stern met with David Fischer in Michigan.

38

358.    The next day, on January 10, Bayer had an internal meeting in which they discussed using the January/February meetings to develop a strategy for the urethanes price increase and stated that Bayer was highly motivated to improve profitability.

359.    On January 21, 2002, Christian Buhse of Bayer met with Marco Levi of Dow.

360.    The next day, on January 22, 2012, Dhanis called and talked to his Bayer counterpart, Hagen Noerenberg, two times.

361.    On January 24, 2002, Uwe Hartwig of BASF spoke to Christian Buhse of Bayer by phone.

362.    On January 28, 2002, Buhse sent an email to Bayer colleagues stating: "We have to try to turn the situation around and increase our prices as soon as possible." Buhse attached a chart identifying the dates for two rounds of 2002 increases worldwide. This represented a change in original strategy to wait for BASF to announce TDI and Dow or Shell to announce polyols because these companies had been the most aggressive.  Buhse noted that without signs of increased support from these companies, it would be difficult to have a successful price increase.

363.    On February 4, 2002, Bayer led an unprecedented TDI price increase of $.15/lb.

364.    That same day, on February 4, Marco Levi of Dow called Mario Portela of Lyondell.

365.    On February 7, 2002, BASF announced the same TDI increase, and Lyondell announced on February 8.  Uwe Hartwig recalls that he met with Buhse around this time.

366.    On Sunday evening, on February 10, Fischer called Bernstein's home and they spoke for 12 minutes.

367.    The next day, on February 11, Dow followed the TDI price increase announcement and announced a polyols price increase.

368.    Later that week, on February 14, BASF announced a polyols price increase, followed by Bayer on February 15, and Huntsman announced TDI and polyols price increases on February 15 and February 28, respectively.

369.    On February 25, Stephanie Barbour of Dow warned David Fischer and Bob Wood that significant price moves were not warranted because of over-supply of MDI.

370.    On March 4, 2002, Bob Wood wrote to Stephanie Barbour regarding MDI customer GE: "GET THE DAMN PRICE UP NOW!!!!!"

371.    On March 13, 2002, Jean-Pierre Dhanis of BASF sought a call with David Fischer of Dow as soon as possible.

39

372.    The next day, on March 14, Bill Bernstein called David Fischer's cell in Switzerland three times using his calling card.

373.    The same day, on March 14, Dow announced an MDI price increase, effective April 1, 2002.

374.    On March 19, Tony Hankins of Huntsman called on his cell BASF's Bill Bernstein's office at 5:56 am and Bernstein's cell phone at 7:22 am.

375.    On March 20, Marco Levi of Dow had a "marketing meeting" in Brussels with Uwe Hartwig and Larry Berkowski of BASF, followed by dinner.

376.    On March 21, 2002, BASF announced an MDI price increase.

377.    On March 28, 2002, Larry Berkowski of BASF wrote an email "I have also not heard from either Bayer or Huntsman supporting. I was told by JPD [Jean-Pierre Dhanis] that Huntsman would support, and with that, we knew that Bayer would follow.  Neither has occurred. I don't know what the problem is."

378.    On the same day, March 28, Bill Bernstein met with Tony Hankins of Huntsman at the Big Fish restaurant in Dearborn, Michigan.

379.    On March 29, 2002, Huntsman announced an MDI price increase.  On April 1, Bayer announced an MDI price increase.

380.    Shortly before the April 1 effective date, Marco Levi, Uwe Hartwig, and Larry Berkowski had dinner in Brussels.

381.    In a March 2002 report, BASF walked away from 1.1 million pounds per month of business at customers (NCFI, Leggett & Platt, and W.T. Burnett) to support implementation of the April 2002 price increases. BASF also responded to an offer from Foamex to participate in a major share of their volume that the move would be disruptive to the market and BASF did not have the global capacities to proceed.  Bill Bernstein's note on the report said "Take to III Singapore meeting."

**July 2002 Price Increase**

382.    During late April and early May 2002, there were numerous calls and contacts among Dow's David Fischer, BASF's Bill Bernstein, Huntsman's Tony Hankins, BASF's Jean-Pierre Dhanis, and BASF's Uwe Hartwig.

383.    4/22, 4/23: Two calls from Hankins' cell to Bernstein's cell/office.

384.    4/24: Fischer to visit BASF's Brussels offices to meet with Dhanis and Hartwig.

385.    4/25, 4/26, 4/28 : Three two minute calls from Fischer's cell to Bernstein's cell phone.

40

386.  4/26: Four one minute calls from Hankins' home to Bernstein's cell/office.

387.  4/29: Call from Hankins' home to Bernstein's office.

388.  4/29: Call from Dhanis to Hagen Noerenberg of Bayer.

389.  4/29: Two calls from Fischer's cell to Bernstein's cell.

390.  5/1: Call from Huntsman's office to Bernstein's office.

391.  5/1, 5/2: Bernstein calling card call to Hankins' cell and to David Fischer's lake house.

392.  5/2: Three calls from Hankins to Bernstein.

393.  5/6: Call from Hankins' home to Bernstein's office.

394.  5/7: Two calls from Hankins' home to Bernstein's cell/office.

395.  On May 13, 2002, just before III meetings in Singapore, Dhanis and Fischer had lunch at Dow in Switzerland.

396.  On May 16, 2002, the III held its annual meeting at the Shangri-La Hotel in Singapore.

397.  At the III meeting in Singapore, Larry Stern met in a private conference room with Bill Bernstein.

398.  Stern told Bernstein that Bayer was going to increase the price of MDI 6-8 cents/pound.  Bernstein indicated BASF had an intent to rise prices in a similar range.

399.  Stern met with Tony Hankins the same day in Singapore.  Stern told Hankins that Bayer intended to raise prices 6-8 cents/pound.  Hankins indicated a need to improve pricing and Stern left the meeting with the impression that Huntsman needed to improve profitability and that Huntsman would be following price increase announcements.

400.  Later that day, Stern bumped into Jean-Pierre Dhanis and Hagen Noerenberg, global heads of BASF's and Bayer's urethanes businesses, respectively, in the hallway and told them that he and Bernstein had met, and that he had told Bernstein that Bayer would increase prices 6-8 cents/pound.

401.  Stern noted either a verbal or non-verbal indication from Dhanis that he thought that would be good for the industry.  Stern walked away with the impression that BASF would attempt to raise prices consistent with what Bernstein had told Stern.

402.  After these discussions, Bayer re-implemented its price increase for July 1, 2002.  Stern testified that his conversations with competitors strengthened his belief that increases would at least partially stick.

403.    Right after the producers returned from Singapore, on May 22, 2002, Larry Berkowski of BASF wrote a memo to Hartwig stating, "[O]ur objective is a full $0.06/lb increase on July 1 . . . Bayer must support $.06/lb increase . . . and Bayer must control their volumes in the market place.  This is the most important event that needs to happen."

404.    The next day, on May 23, Uwe Hartwig had a twenty-three minute phone call with Wolfgang Friedrich of Bayer.

405.    The following day, on May 24, 2002, Hankins called Bernstein while traveling back to the United States.  On May 27 (Memorial Day), Hankins called Bernstein again.

406.    The next day, on May 28, Bernstein ordered an MDI price increase for BASF.

407.    On May 29, 2002, Bernstein and Hankins met at the Philadelphia Airport Marriott.

408.    On May 30, Huntsman began implementing its MDI increase.  In an internal Huntsman email, Greg Geaman of Huntsman noted that customers would be told in next couple of days (no new letters to be sent out) and Huntsman would hold firm on the increase and accept the risk of sacrificing some volume.

409.    Geaman indicated he believed Huntsman would see industry support for the increase.

410.    By June 6, 2002, Bayer, BASF, Huntsman, and Dow had all issued MDI price increases of six cents, effective July 1.  From May 30 through June 6, 2002, Dow, Bayer, and BASF also issued polyols price increases.  On May 30 and May 31, Dow and Lyondell issued TDI price increases.

411.    During the first week of June, 2002, the urethanes producers had many meetings at the ACC trade association meeting at the Greenbrier.

412.    While at the ACC meeting, Bill Bernstein had drinks with David Fischer and Bob Wood to discuss the urethanes market.  David Fischer acknowledged that he discussed the urethanes market with Bernstein, including the need to improve profitability and margins.

413.    Patrick Thomas of Huntsman flew to the ACC meeting on the BASF jet with Jean-Pierre Dhanis, Bill Bernstein, John Feldmann of BASF, and others, and returned on the BASF jet on a flight alone with Dhanis.

414.    In June 2002, Huntsman's NAFTA polyurethanes head, Tony Hankins, contacted a subordinate to tell him that Huntsman's polymeric MDI price would be increased so he suggested they flag that early to Bayer to signal "ou[r] clear intent on a polymeric market increase" for July 1, 2002.

415.    In June 2002, Michele Blumberg of Bayer, who was based in the United States, traveled to Bayer's office in Germany.

42

416.    On June 10, Blumberg met with Wolfgang Friedrich of Bayer in Germany. Friedrich asked about the pricing at Huber, a Bayer MDI customer in the wood binder market, and she told him that pricing from the competition was low.

417.    Friedrich responded "you don't have to worry about that, I've already talked to the competition." Blumberg asked whether that was illegal, and Friedrich responded that it was not in "this" country.

418.    Blumberg reported the incident to her supervisor, Dennis McCullough.  After this conversation, Bayer was able to get the price increase that Blumberg and Friedrich had discussed.

419.    On June 19, 2002, Uwe Hartwig of BASF called Wolfgang Friedrich of Bayer.

420.    From June 24 through June 28, 2002, Wolfgang Friedrich was at Bayer's U.S. offices.

421.    During Friedrich's visit, Blumberg overheard a conversation between Friedrich and Irene McGee, relating to a bid for MDI business at Sealed Air.  Friedrich instructed McGee not to adjust any of the pricing during the online bid because the competitor would not change any of the pricing either.

422.    McGee seemed upset because Friedrich seemed in control of the bid.  McGee and Blumberg were upset regarding Friedrich's statements because he was in the United States where such conduct is illegal.

423.    A June 11, 2002 email from Larry Berkowski of BASF indicated that BASF purposefully planned to make a bid at Sealed Air so as to not disrupt the July 1 price increase. Berkowski indicated that if BASF has a small share, BASF should not go for more than that.

424.    On June 25, 2002, BASF customer Firestone reported that the MDI increase was falling apart.

425.    Three days later, Friedrich of Bayer called Larry Berkowski of BASF's cell phone six times. Huntsman records also show calls to Larry Berkowski and/or Bill Bernstein three times that day.

426.    On June 30, 2002, Larry Berkowski of BASF sent an internal email encouraging the BASF sales force to hold firm on the increase, stating that Dow and Bayer did not have pMDI to speak of and Huntsman wanted to get an increase through.

427.    During Wolfgang Friedrich's June 2002 trip to Bayer's offices in the United States, he met with Jerry Phelan of Bayer, a NAFTA manager for MDI.  Friedrich indicated to Phelan that he had an understanding with one or two competitors regarding the July 2002 MDI price increase.  Friedrich told Phelan his superior was aware of Bayer's understanding with the competition.  Friedrich told Phelan to be strong and firm in talking with customers.

### September 2002 Price Increases

428.    On July 10, 2002, Christian Buhse discussed internally at Bayer the need to finalize Bayer's position on the September price increase.

429.    Immediately after this email, there were calls among Buhse of Bayer, Uwe Hartwig of BASF, and Marco Levi of Dow.

430.    July 11: Levi used his cell phone to call Hartwig's office.

431.    July 15: Hartwig called Buhse.

432.    July 16: Levi again used his cell phone to call Hartwig's office.

433.    The minutes of a July 21-23, 2002 BASF global strategy meeting in Brussels reported a planned TDI increase.

434.    On July 24, 2002, Jean-Pierre Dhanis of BASF had a call with David Fischer of Dow, followed by call with Hagen Noerenberg of Bayer, followed by a second call with Fischer.

435.    On July 26, 2002, Huntsman announced an increase on TDI, effective September 1, 2002.

436.    On July 31, Bill Bernstein of BASF called Larry Stern of Bayer.  Stern also spoke with Tony Hankins of Huntsman.

437.    On August 1, 2002, BASF and Bayer announced TDI and polyol price increases, and Lyondell announced a TDI price increase.

438.    On August 2, 2002, while on vacation, Marco Levi of Dow called Christian Buhse of Bayer's office phone.

439.    On August 5, 2002, Larry Stern of Bayer met Tony Hankins of Huntsman at the Philadelphia Airport Marriot.

440.    At the August 5 meeting, Stern and Hankins discussed a variety of issues, including a possible joint venture acquisition, an MDI swap and security issues.

441.    Stern and Hankins also discussed the resolve to move forward with and have the current price increase still solidifying stick.

442.    At the meeting, Stern and Hankins exchanged prices at particular accounts where both Huntsman and Bayer supplied the account.  Hankins was trying to figure out where Huntsman's pricing was relative to Bayer's pricing.  Stern wanted Hankins to have information about Bayer's pricing at those accounts.

443.    To facilitate the discussion, Stern used an internal Bayer document containing Bayer pricing at specific customers.

444.     Stern provided the document to Hankins after Hankins assured Stern he would destroy the document after he used it.  Stern believed that giving this confidential pricing information to Huntsman would lead to price increases at certain accounts and perhaps in the industry.

445.     Stern regretted the conversation with Hankins afterwards, saying it felt wrong from an ethics perspective and from his own conscience.  Stern described walking to car feeling flushed and wondered why had had done that, and feeling chagrined, embarrassed and flushed.

446.     Stern and Hankins both prepared memos describing the "legitimate" business topics that were discussed at the August 5, 2002, airport meeting, but neither memo mentioned the price increase discussion or exchange of confidential information and documents.

447.     Stern stated that he did not include mention of their pricing discussion  in his memo because it was "inappropriate."

448.     On August 5, 2012, using his cell phone, Marco Levi of Dow called Mario Portela of Lyondell and then called Larry Berkowski of BASF in his office.

449.     On August 6, 2002, Christian Buhse of Bayer met Marco Levi of Dow in the lobby of a hotel in Switzerland.

450.     The same day, on August 6, Dow announced TDI and polyol price increases.

451.     On August 7, 2002, Marco Levi made three calls to Uwe Hartwig of BASF's office phone from his cell phone in Switzerland, with the third call lasting 16 minutes.

452.     On August 9, 2002, Marco Levi called Christian Buhse of Bayer.

453.     On August 27, 2002, just prior to the September 1 effective date, Uwe Hartwig called Christian Buhse and Wolfgang Friedrich of Bayer.

454.     The next day, on August 28, 2002, Uwe Hartwig met with Wolfgang Friedrich in Brussels.  That same day, Uwe Hartwig had a nineteen minute phone call with Christian Buhse.

**January 2003 Price Increases**

455.     On November 6, 2002, Huntsman records show a fourteen minute call to Larry Berkowski of BASF's cell phone, followed by a call to the office of Jerry Phelan of Bayer and another call to Larry Berkowski's cell phone.

456.     On November 7, 2002, Uwe Hartwig met with Tony Hankins of Huntsman for dinner in Chadds Ford, Pennsylvania.

457.     On November 8, 2002, Jean-Pierre Dhanis of BASF called Hagen Noerenberg of Bayer twice.  The same day, Huntsman phone records show a call to Bill Bernstein of BASF, and two phone calls from Tony Hankins of Huntsman to Uwe Hartwig of BASF.

458.    On November 11, 2002, Huntsman phone records show a call from Huntsman's headquarters to Larry Berkowski of BASF.

459.    On November 12, 2002, Uwe Hartwig of BASF called Christian Buhse and Wolfgang Friedrich of Bayer.

460.    On November 13, 2002, Uwe Hartwig called Kay Gugler of Huntsman.

461.    On November 14, 2002, Bill Bernstein of BASF drove two hours to meet David Fischer of Dow for breakfast at 6:30 a.m.

462.    On November 19, 2002, Huntsman corporate phone records include three calls to Rick Beitel of Dow, a call to Larry Berkowski of BASF, and a call to Jerry Phelan of Bayer.

463.    That same day, November 19, BASF issued an MDI price increase announcement.  On November 22, 2002, Dow announced an MDI price increase.

464.    On November 25, 2002 at 2 pm, Huntsman circulated a price increase letter internally to Greg Geaman, Tony Hankins, and others that it intended to send to customers.

465.    Huntsman phone records show a 2:06 pm call that day to Larry Berkowski of BASF and a 2:36 pm call to Jerry Phelan at Bayer.

466.    The next day, on November 26, Greg Geaman wrote "Good luck in dealing with the verbal abuse of this 2nd increase, but rest assured you will succeed and our share sacrifice will be tolerable." Huntsman stated internally that it might choose to sacrifice some business to improve margins and that it did not want to gain market share.

467.    On November 27 and 29, 2002, Huntsman and Bayer announced price increases, effective January 1, 2003.

468.    On December 13, 2002, Jean-Pierre Dhanis had a nineteen minute call with his counterpart Hagen Noerenberg of Bayer.

469.    Two hours later on December 13, Wolfgang Friedrich of Bayer reprimanded the Bayer North America staff for taking the MDI Firestone business from BASF and potentially undermining the January 1, 2003 increase.

470.    Friedrich told Bayer NAFTA employee Jerry Phelan that Bayer's pursuit of the Firestone MDI business at the expense of the urethane producers' price increases would result in people losing their jobs and that he was going to tell Hagen Noerenberg that NAFTA did not know how to run its business.

471.    On December 16, 2002, Wolfgang Friedrich called John Houston, the head of the Bayer division that took this Firestone business from BASF, and immediately thereafter Friedrich called Uwe Hartwig of BASF's cell phone and spoke to him for 21 minutes.

472.   On December 16, 2002, and again on December 20, Uwe Hartwig called Wolfgang Friedrich.

473.   A January 13, 2003 Bayer report noted that BASF retaliated for the Firestone loss by taking a similar volume of polymeric MDI from Bayer at Atlas.

474.   That same day, on January 13, 2003, BASF reported a delay in the price increase based on the Firestone issue, but indicated optimism that the increase would still hold.

475.   That same day and twice again on January 15, 2003, Uwe Hartwig of BASF again called Wolfgang Friedrich of BASF.

476.   A Bayer internal report later discussed the need to aggressively solidify the January increase and to lay the ground work for further increases, possibly as soon as April.

477.   Following these efforts, prices for TDI and polyols rose dramatically and, once again, exceeded the pricing levels predicted absent a conspiracy by Dr. Marx's econometric model.  For example, TDI prices jumped from $.65/lb. in January 2002 to $.87/lb. in January 2003.  CFS polyols prices jumped from $.61/lb. in June 2002 to $.65/lb. in July 2002.

### April 2003 Price Increases

478.   On January 6, 2003, Christian Buhse advised that Bayer's TDI NAFTA product manager, Dan McMahon, had to be careful not to increase its share too much in NAFTA "to leave room for [its] competitors."

479.   A January 20, 2003 memorandum by David Fischer of Dow indicated that demand is weak and price increases were difficult in an environment of weak demand.

480.   That same day, on January 20, 2003, Bill Bernstein of BASF made two calling card calls to David Fischer in Switzerland.

481.   During the next two weeks, David Fischer of Dow met with Bayer personnel in Europe.

482.   David Fischer stated that Dow must take immediate action to improve pricing to acceptable levels.

483.   On February 19, 2003, Christian Buhse of Bayer went to Midland, Michigan to meet with Marco Levi of Dow.

484.   On that same afternoon, on February 19, Christian Buhse and Jerry Phelan of Bayer met with Uwe Hartwig of BASF in the Detroit airport.

485.   On February 20, 2003, Marco Levi of Dow called Mario Portela of Lyondell.

47

486.    On February 21, 2003, Bayer announced price increases for MDI and polyols, effective April 1, 2003.  Dow and others joined these price increases, and ultimately all defendants announced increases for all three urethane chemicals products.

487.    On March 7, 2003, Huntsman records show multiple phone calls to Dow and BASF (two to Rick Beitel of Dow, two to Larry Berkowski of BASF, and one to Bill Bernstein of BASF).

488.    On March 7, 2003, Greg Geaman of Huntsman wrote internally that "We appear to have support [for price increases] from our competition at these levels, we will keep you posted on any new developments."

489.    On March 8, 2003, Bill Bernstein of BASF met David Fischer of Dow at Applebee's in Flint, MI.

490.    On March 10, 2003, Bernstein met with Hickory Springs to discuss the price increases.

491.    PowerPoint slides prepared for BASF executives planning to attend the May 2003 CMA meeting at the Greenbrier discuss issues/concerns with Dow.  The slides indicate that while Dow publicly states the need to improve margins by taking a firm stance on price increases, Dow's actions do not support the rhetoric.

### October 2003 Price Increases

492.    On August 19, 2003, Uwe Hartwig of BASF met with David Fischer of Dow at the Dow Club.

493.    The next day, on August 20, 2003, David Fischer had a breakfast meeting with Jean-Pierre Dhanis and Bill Bernstein of BASF in New Orleans.

494.    On August 21, 2003, Uwe Hartwig met with Dennis McCullough of Bayer.

495.    On August 26, 2003, Rick Beitel of Dow sent an internal email directing price increases for polyols and MDI to be announced in early September.  The same day, Beitel spoke to Huntsman, and Huntsman called Larry Berkowski of BASF.

496.    The next morning, on August 27, 2003, Greg Geaman sent an email internally stating: "I am picking up rumors from customers of a 6 cents/pound increase in MDI and Polyol and systems for October 1.  Both Dow and BASF have started to alert customers."  Huntsman phone records show calls from Huntsman to Larry Berkowski of BASF and Rick Beitel of Dow the same day and next day.

497.    On August 26, 2003, Dow announced price increases for MDI and polyols. Between August 28 and September 1, BASF, Huntsman, and Bayer also announced price increases.

498.    On September 3, 2003, Huntsman called Bill Bernstein and Larry Berkowski of BASF. That same day, Huntsman issued a price increase letter.

499.    After communications between Jean-Pierre Dhanis of BASF, Hagen Noerenberg of Bayer, Uwe Hartwig of BASF and Dennis McCullough of Bayer, on September 2, 2003, Bayer followed the price increase announcements.

500.    Prices for TDI, MID, and polyols increased substantially in early 2003. MDI prices rose from $.65/lb. in March 2003 to $.71/lb. in April 2003. While TDI prices were volatile, they rose from $.82/lb. in February 2003 to a brief peak of $.95/lb. in June 2003. Polyol prices rose from $.53/lb. in March 2003 to $.57/lb. in May 2003.

**End of Conspiracy**

501.    The conspiracy ended by the end of 2003, after, among other things, Bayer withdrew from the conspiracy and a number of participants in the price-fixing agreements left their respective urethanes positions.

502.    Christian Buhse of Bayer had become nervous after government raids at Bayer in late 2002 related to other chemical products, including rubber chemicals and EPDM. There was increased emphasis on antitrust compliance at Bayer. As a result of a reorganization at Bayer effective early 2003, Mr. Buhse had less ultimate authority over pricing decisions than he had previously had, and it was more difficult for him to discuss the ability to raise urethanes prices with competitors.

503.    At a meeting in September 2003 among Mr. Buhse, Uwe Hartwig of BASF and Marco Levi of Dow, held at Mr. Hartwig's house in Belgium, Buhse told Hartwig and Levi that he would not participate in any further discussions regarding raising prices and market conditions. According to Buhse, Hartwig and Levi tried to convince Buhse to continue the discussions and proposed that they agree to stability of market shares, but Buhse refused and did not engage in any further pricing discussions with urethanes competitors. In late 2006, Hartwig called Levi to discuss what to tell the lawyers about this meeting at Hartwig's house. Hartwig claims that Levi would not discuss it with him on this call.

504.    By the end of 2003, a number of the participants in the conspiracy had left or changed positions at their respective companies. Larry Stern left Bayer at the end of 2002, and Wolfgang Friedrich left Bayer in 2003. David Fischer, Marco Levi, and Bob Wood all left or were removed from their urethanes positions at Dow around January 2004. Tony Hankins of Hankins took a one-year hiatus starting around November 2003.

505.    Notably, coincident with the end of the conspiracy, by the end of 2003, urethanes prices had moved back to the prices predicted by Dr. Marx's model in a market free from conspiracy.

**Antitrust Policies and Training**

506.    Dow and the defendant urethanes producers had antitrust policies, which were violated over and over again, during the conspiracy period.

49

507.    Dow had an antitrust policy that explains how the employees are supposed to behave when they deal with or interact with competitors: don't discuss industry pricing or pricing strategies and don't exchange pricing information with competitors.

508.    Dow had written guidelines for meetings with competitors that were part of the company's antitrust compliance policy.  The guidelines, which were given to employees, have a list of do's and don'ts.

509.    Lynn Schefsky, then Dow's in-house counsel, sent an email to the urethanes group, including Bob Wood and David Fischer, stating that "we need to be vigilant in these times to keep our skirts clean regarding price increases and the rules relating to antitrust / competition law," and Schefsky transmitted the list of do's and don'ts.

510.    Schefsky admitted on the record during the trial of the urethanes class action against Dow that some of the conduct described in testimony in this case by Larry Stern and Stephanie Barbour violates Dow's training and the law.

511.    Barbour understood that discussing pricing with competitors was contrary to Dow's antitrust guidelines.  From her perspective, there is nothing borderline about discussing pricing with competitors.  Dow's lawyers gave Barbour instructions regarding antitrust compliance.

512.    Dow had substantial training on antitrust issues, what is legal, what is illegal, what you should do, and what you should not do.

513.    Marco Levi and Bill Long of Dow testified regarding Dow's antitrust program and compliance program and the fact that Dow's executives received antitrust compliance training.

514.    Bayer had an antitrust program that included a written policy and training annually.  Bayer's antitrust compliance program states clearly that all employees should conduct business activities legally.

515.    Bayer's antitrust policy prohibited employees from discussing price-fixing or market allocations with competitors.

516.    Bayer had an antitrust training program during 1994-1999, and Bayer took compliance with antitrust laws seriously.

517.    Larry Stern of Bayer was generally aware that Bayer had an antitrust compliance policy while Stern was at Bayer.  Stern could not say whether any of his pricing conversations with competitors violated these policies, but noted "it was not something that should have occurred."

518.    BASF memorialized a code of conduct in writing for BASF SE in Germany in 2000.  Prior to 2000, although there was no written code of conduct, BASF had antitrust training and the principles outlined in the code of conduct were essentially the same as before.

519.   BASF's code of conduct prohibited agreements with competitors regarding any aspect of the business.  The code provided that where contact with a competitor was unavoidable and served a legitimate business purpose, the legal department should be consulted in advance.

520.   BASF's antitrust guidelines prohibited employees from having communications with any representative of a competitor concerning price-fixing, including a number of specific off-limit topics.

521.   Bill Bernstein received antitrust training and was aware of the antitrust rules. Dhanis was also aware that BASF had an antitrust compliance program.  Hartwig was aware that BASF had an antitrust policy providing what could and could not be discussed with competitors

522.   The ACC provided members with an antitrust checklist.  Dhanis would not agree that it is important to follow the guidelines during the ACC meetings at the Greenbrier.

523.   ICI and Huntsman had antitrust policies in place during 1994-2003.  All employees received a copy.

524.   ICI and Huntsman also conducted antitrust training for any employees who had an opportunity to interact with competitors (i.e., sales, marketing, senior leadership).

525.   Tony Hankins of Huntsman attended 1-2 antitrust compliance training sessions during 1999-2004.  Hankins periodically received handouts and written reminders of the company's antitrust policy.  Hankins also received antitrust compliance training during 1994-1998 while with ICI.

526.   Greg Geaman of Huntsman regularly received and signed Huntsman's antitrust compliance guide, and attended training annually.  Geaman understood the topics that were off-limits with competitors.

527.   Lyondell had an antitrust compliance program while Stern was at Lyondell.

**Fraudulent Concealment**

528.   Dow and the defendant urethanes producers successfully fraudulently concealed the conspiracy from Plaintiffs.  They engaged in affirmative acts to conceal the conspiracy from Plaintiffs including, but not limited to, secret meetings and communications, false and pretextual price increase announcements, and other acts designed to maintain the secrecy of the conspiracy.

529.   In addition, Dow and the defendant urethanes producers' conspiracy was, by its very nature, self-concealing and, therefore, the conspiratorial acts themselves constitute acts of fraudulent concealment.

530.   Dow and the defendant urethanes producers affirmatively concealed the conspiracy by, among other means:  meeting privately outside of the office at sites such as restaurants, bars, coffee shops, airports, hotels, golf courses, the grounds of their facilities, and on the side of trade association and other meetings; speaking by payphone, prepaid calling cards, cell phone, or a home phone line rather than on an office phone line in order to maintain the

51

secrecy of such conversations and out of a concern that office phone lines might be bugged or conversations might be overheard; placing calls outside of regular business hours; lying on expense reports by failing to report the presence of competitors at dinner for which reimbursement is sought, in order to conceal competitor meetings; using code names in order to conceal the real purpose of a communication involving competitors and to conceal the identity of competitors involved; asking that certain documents containing confidential pricing information be destroyed after they had been used in furtherance of the conspiracy, limiting knowledge of the conspiracy to a core group of senior executives at Dow and defendant urethane producers. Examples of this conduct are set forth above.

531.    In addition, Dow and the defendant urethanes producers affirmatively concealed their price-fixing conspiracy by issuing false and pretextual price increase announcements.

532.    The price increase letters provided justifications for the producers' price increases, which included, but were not limited to, raw material cost increases, increased energy costs, the need to improve margins, and the need to justify reinvestment. The conspirators lied about the justifications for their price increases.

533.    Dow and the defendant urethanes producers' price increase announcements deliberately did not disclose, and materially omitted, information that a reason for the price increase announcement was they were engaged in a price-fixing conspiracy.

534.    A Huntsman employee, testifying on behalf of Huntsman, acknowledged that Huntsman used a reason in a letter sent to customers to justify a price increase announcement which was not true.

535.    Dow and the defendant urethanes producers announced such false and pretextual price increase announcements at regular intervals throughout 1994-2003.

536.    In addition, Dow and the defendant urethanes producers made false and pretextual statements orally to Plaintiffs and in trade publications about the reasons for urethane products price increases in which they failed to disclose that the urethanes producers' collusion was a reason for the price increase announcements.

537.    Dow is responsible not only for its own acts of fraudulent concealment committed, but also for any acts of concealment committed during and in furtherance of the conspiracy by any other defendant urethanes producer who is a member of the conspiracy.

538.    While Plaintiffs tracked or monitored, to the extent possible, the market costs of the raw materials used to make urethane products through tracked benchmarks, broad market indices, and other publicly-available information, Plaintiffs had to rely on what their urethane suppliers told them about the need for a price increase. Plaintiffs did not have knowledge of any of the producer's real costs, overhead costs, contracts with their suppliers, operating margins, or requirements for capital reinvestment, so as to be able to ascertain whether any specific announced price increase was necessary, whether the information about the necessity for the announced price increase being provided to them by producers was true and accurate, or whether there might be other reasons for the price increases.

52

539.    Prior to November 23, 2004, when the first urethanes products class action was filed, Plaintiffs did not know and by the exercise of due diligence could not have known, with respect to plaintiffs' price-fixing claims for the period 1999-2003, that Dow and the defendant urethanes producers were engaged in a conspiracy with respect to urethane products, or that plaintiffs might have had a cause of action against defendants.

540.    Prior to December 2007, when plaintiffs obtained cooperation from Bayer, Plaintiffs did not know and by the exercise of due diligence could not have known, with respect to Plaintiffs price-fixing claims for the period 1994-1998, that Dow and the defendant urethanes producers were engaged in a conspiracy with respect to urethane products or that plaintiffs might have had a cause of action against defendants.

541.    Plaintiffs in fact exercised due diligence with respect to the investigation and discovery of their claims.

**Causation and Injury**

542.    Plaintiffs will demonstrate that prices would have been lower than they in fact were from 1994-2003 as a result of the conspiracy.

543.    Dr. Marx's econometric model indicates that existence of an effective conspiracy that increased prices market wide from 1994-2003. Dr. Marx's model indicates that market forces cannot fully explain prices movements of urethanes products during the period 1994-2000 and that but for existence of the conspiracy, prices would have been lower.

544.    Plaintiffs sustained damages directly as a result of the alleged conspiracy by paying more for the urethanes products they purchased from Dow and the defendant urethane producers than they would have absent the conspiracy during the period 1994-2003.

545.    Dr. Marx's model demonstrates that Plaintiffs were damaged by Dow and the defendant urethanes producers' conduct in the amount of $ 608,576,318.

**Calculation of Damages**

546.    Plaintiffs will present evidence to rebut Dow's assertions regarding market conditions and the respective bargaining positions of the parties. Plaintiffs' damages expert will demonstrate the impact caused by conspirators' conduct and the damage inflicted upon each Plaintiff. Plaintiffs' expert, Dr. Leslie Marx, has presented detailed estimates of each individual Plaintiff's damages and will present testimony to support her damage estimates.

547.    Dr. Marx engaged in a thorough econometric analysis of the urethanes market. Using accepted statistical methods that relate product prices to the underlying cost and demand factors in the industry from a non-collusive benchmark period, Dr. Marx developed reliable econometric models which show that the supply and demand factors that determined prices during periods of competition do not fully explain the way prices behaved during the conspiracy period. For TDI, MDI, and polyether polyols, the forces of competition that prevailed outside the conspiracy period would have led to prices lower than actual prices during the conspiracy period, as reflected in Dr. Marx's expert report.

53

548.   Dr. Marx's model also demonstrates that movements in raw materials prices do not fully explain the price movements of urethanes products during the conspiracy period.

549.   In addition, James T. McClave, a highly qualified statistician, independently performed an econometric analysis and developed models that provided results that are highly consistent with, and corroborate, Dr. Marx's models.

550.   Dr. Marx properly excluded the period 1994-1998 from the competitive benchmark for purposes of calculating damages based on information that it is tainted by collusion by Dow and the defendant urethanes producers.

551.   Dr. Marx properly included 2004 in the benchmark period for purposes of calculating damages, based on information from Bayer's outside counsel regarding the end of the conspiracy in 2003 and other information above indicating the conspiracy ended in 2003.

552.   Dow incorrectly points to indicators of competition as rebutting an inference of causation.  The purpose of the conspiracy is to limit risks of independent action. Customer switching and changes in purchasing mix happens in many price-fixing conspiracies.  In addition, during a price-fixing conspiracy, you often see low-level competition among sales employees who are not in on the conspiracy agreement.

553.   The benchmark product model already accounts for these competitive interactions.  This model finds there is something different about the period and no plausible market explanation other than collusion.  In addition, there are many episodes of competition that can be viewed as evidence of "retaliation," which supports the existence of a conspiracy.  In addition, many of the episodes of competition that Dow's expert points to occurred during times when the conspiracy was less effective, which makes sense as cartel members are constantly jockeying for a bigger piece of the pie.

554.   A market with strong buyers is more likely to be cartelized.

555.   Dow's expert's contention that 1994-1996 price increases are explained by strong demand and constrained supply is incorrect.  Bayer's counsel provided contemporaneous evidence that a conspiracy existed during this time period, and other evidence and information supports this, including Fifth Amendment invocations properly considered by Dr. Marx.  In addition, Dr. Marx did an independent analysis of the 1994-1998 time period to determine whether it should be included in the benchmark.

556.   The fact that prices did not "experience a sustained rise" throughout the conspiracy period does not rebut the results of Dr. Marx's model.  Other conspiracies, such as ESBR, Rubber Chemicals, and polyester polyols reflect similar price movements.  In addition, there were periods of sustained rise in urethane chemicals prices and the producers kept prices from falling to competitive levels.

557.   Cost and demand factors support the results of the model.

558.    Capacity should not be included in a dynamic forecasting model because it is within the control of the defendants.  Here, there is evidence that Dow and the defendants urethane producers actually agreed to limit capacity.

559.    It is not accurate that defendants lost money during the conspiracy.  The years 1994-1997 marked record high prices.  Prices were still above variable costs.  In any event, as a result of the conspiracy, prices were still above that which they would have been absent the conspiracy.

560.    Statistical significance tests are not necessary for purposes of testing the validity or robustness of an econometric model.  Dr. Marx performed her own independent evaluation.  Dr. Marx did a cross-check by adding a capacity variable and starting model in 1992, and it did not change the results.

561.    Dr. Marx's analyses establish damages for each of the Plaintiff families, as set forth above.

**B.    Defendant:**

1.    Dow did not engage in any contract, combination, or conspiracy with its competitors to fix, raise, maintain, or stabilize the price of any of the three categories of urethane chemicals at issue in this case—MDI, TDI, and/or Polyether Polyols (collectively, "urethane chemicals")—for any portion of the time period alleged in Plaintiffs' complaints (1994 to 2004) or Plaintiffs' revised conspiracy period of 1994-2003 ("alleged conspiracy period").

2.    Moreover, Dow did not participate in a conspiracy with any or all of its competitors in the urethanes industry during the alleged conspiracy period:  Bayer, BASF, Huntsman, and/or Lyondell or their affiliates or predecessors in interest.

3.    Plaintiffs did not suffer any injury in their business or property by reason of the alleged conspiracy.  Plaintiffs did not pay higher prices than they otherwise would have, and Plaintiffs suffered no damages.

4.    Dow did not conceal any conspiracy from Plaintiffs during the alleged conspiracy period.

5.    Dow did not actively mislead any Plaintiffs through the use of price increase announcements or through any others means during the alleged conspiracy period.

6.    The basis for Plaintiffs' claims—which Dow contests—was known to Plaintiffs long before November 23, 2004, which is evidenced in part by the testimony of Jorge Burtin, assignee of Plaintiff Skypark.

7.    In any event, Plaintiffs failed to exercise due diligence to discover the basis for their claims.

8.      Plaintiffs' purchases of urethanes chemicals from outside the United States, in particular from Canada, do not give rise to any claims against Dow or any alleged co-conspirator.

9.      The stated reasons for Dow's price increase announcements during the alleged conspiracy period were accurate, legitimate, and reasonable.

## Background

10.      During the alleged conspiracy period, business conditions in the urethanes industry varied:  the market conditions were at times favorable to suppliers, including Dow, and at other times unfavorable to suppliers.

11.      In this sophisticated industry, both buyers and sellers can develop negotiation leverage without any collusion, depending upon market conditions.  Thus, when demand for consumer products containing foam is high and the capacity to produce it is tight, it can be a sellers' market, and sellers of urethanes have bargaining power.  When demand is soft and capacity is available, buyers can have the bargaining power.

12.      Both Dow as a seller and Plaintiffs as buyers understood these market dynamics and were determined and sophisticated negotiators. Thus, the prevailing economic conditions at different periods of time directly affected the ability of urethanes suppliers, including Dow, to raise or lower the prices charged to their customers.

13.      During a period of time extending from the mid-1990's through the end of 2003, business conditions in the urethanes industry were generally unfavorable to suppliers:  demand for urethane chemicals was soft, capacity was plentiful, and prices remained essentially flat.  As a result, Plaintiffs took advantage of the then-existing buyers' market and used their leverage as large customers and strong negotiators to keep prices low.

14.      Because of the state of the market, competition between other producers, and advantages possessed by Plaintiffs, Dow's overall urethanes business at times suffered significant losses.

15.      It was only after the alleged conspiracy ended that the market began to turn, prices for urethane products began to rise, and urethanes producers began to recover from their losses.

## Plaintiffs and Their Theory of the Case

16.      The Plaintiffs are all very different. They differ in size, the products they sold, the urethane products they purchased, and the producers from whom they purchased those urethane products.

17.      Their transactions with the various urethanes suppliers and with Dow varied; and each transaction was negotiated separately, one-on-one with the selling urethanes producer.

18.      These one-on-one negotiations between Dow and its customers were often highly contentious. Individual plaintiffs would use their considerable purchasing power to play

suppliers off of each other to extract the best prices they could, and suppliers—including Dow—often bent over backwards to win business from their competitors.

19.     Not surprisingly, no Plaintiffs have testified as to liability or damages in this case. Instead, all Plaintiffs rely solely upon their counsel and hired experts.

20.     Plaintiffs' theory of this case turns upon price increase announcements issued periodically throughout the alleged conspiracy period by Dow and the other urethanes producers.

21.     The price increase announcements—usually in the form of letters—served the legitimate interest of notifying customers in advance of any change in urethanes pricing.

22.     The announcements did not include the actual price but only the change in price, and, most importantly, only began a process of customer-by-customer, contract-by-contract price negotiations to determine the actual price that would be charged to Plaintiffs in a given purchase.

23.     The actual prices ultimately charged varied between suppliers and between customers, in part because Plaintiffs themselves monitored raw material prices and thus had a difference of opinion on whether a given price increase on a particular urethane product was actually necessary.

24.     Moreover, Plaintiffs had varying incentives on whether to accept a given price increase announcement and pass those costs onto their customers (perhaps with an additional markup), or to fight the price increase in light of their bargaining power in the then-buyers' market.

25.     The vigorous competition among suppliers is a primary reason why the economic evidence is not consistent with the operation of a cartel, and in fact, Dow often lost money due to the vigorous competition during the alleged conspiracy period.

**Evidence to be Presented at Trial**

26.     The simple fact of price increase announcements is unexceptional in the urethanes industry (or any industry for that matter).

27.     Also unexceptional is the fact that suppliers in the urethanes industry would often announce similar price increases at or around the same time.  Indeed, this is to be expected in an oligopolistic industry, such as the urethanes industry, where factors like raw material costs affect every company in the industry.

28.     In fact, Plaintiffs participated in the same business practices with regard to price increase announcements for their own products.

29.     The same logic applies to any inferences of collusion Plaintiffs wish to draw from the fact that competitors often met both formally and informally in meetings and at trade conferences—occurrences which are both expected and inevitable in an oligopolistic industry (like the urethanes industry) where competitors are also clients and customers in swaps and buy-

sell transactions and share mutual interests.  Such meetings were for legitimate business purposes.

30.     As to actual prices, no witness has provided any direct evidence of any agreement between Dow or any of its competitors in the urethanes industry on actual prices.

31.     Moreover, economic evidence does not support any allegation of price fixing. Although Plaintiffs allege that prices would have fallen further absent some collusion to keep prices inflated, the evidence shows that costs did not fall during the alleged conspiracy period, and neither did demand for the urethane products at issue.  Basic economic principles instruct that absent falling demand or falling costs, prices would not fall in a non-collusive market.

32.     Moreover, there is no evidence of a pattern of sticking prices.  In fact, the evidence shows that most of the proposed price increases failed to take effect—which is why prices stayed flat.  Indeed, the transaction data provided by Dow and the other urethanes producers actually shows that the price in each of the three urethanes categories went *down* (not up) during the alleged conspiracy period.

33.     Additionally, the fact that price increase announcements were issued frequently throughout the alleged conspiracy period is further evidence that price increases repeatedly failed to take effect, primarily due to competition between urethane producers and the bargaining power of Plaintiffs and other purchasers.

34.     Plaintiffs' experts and their models do not establish liability either.  In fact, the models and the opinions of Plaintiffs' experts are not supported by law and are not supported by the evidence in this case.

35.     Plaintiffs' statistical model remarkably avoids making any economic or statistical assessment of the history of the alleged conspiracy period generally and avoids making any specific analysis of whether the price increase announcements issued by Dow and the other urethanes producers went into effect in some way that reflected collusion.  In fact, price increase announcements are not even taken into account in Plaintiffs' model, and neither is any other allegedly collusive act. At bottom, Plaintiffs' experts have not even reached a conclusion as to whether there was collusion, much less what it was, and they have not designed a model tailored to it.

36.     Additionally, Plaintiffs' model does not meet the established methodological standards for admission.  Indeed, two of the three product line models do not yield statistically significant results; none of the models, which are designed to be predictive forecasting models, actually pass basic tests for predictive power; and all of the models were "estimated" using variables that were subjectively chosen to "fit" the benchmark period as closely as possible, thereby assuring that the same would not be true during the alleged conspiracy period at issue.

37.     Thus, as a matter of law, Plaintiffs' model cannot support a finding of liability on the part of Dow.

38.     Finally, Plaintiffs' expert cannot explain how the facts, as they relate to Plaintiffs themselves, support the alleged conspiracy.  To the contrary, the evidence shows that different

prices were being charged by different urethanes suppliers to the same customer, at the same time.  Additionally, customers used their leverage to extract lower prices from urethanes suppliers and/or to punish suppliers that insisted on enforcing a given price increase.  These core instances of competition, which Plaintiffs fully enjoyed, could not be explained by Plaintiffs' expert.

[PRECEDE WITH DIVIDER #5]

5.     FACT WITNESSES:  (Aside from those called for impeachment purpose, only the fact witnesses set forth by name and address may testify at trial. No summary of testimony is necessary.)[1]

        A.     **Plaintiffs:**

**Witnesses Plaintiffs Anticipate Calling Live**

            **Witnesses Currently or Formerly Affiliated with Plaintiffs**

        1.     Jorge Burtin (Skypark and Burtin)

               c/o Dickstein Shapiro LLP
               1825 Eye Street, N.W.
               Washington, D.C.  20006

        2.     Joseph Plati (Woodbridge)

               c/o Dickstein Shapiro LLP
               1825 Eye Street, N.W.
               Washington, D.C.  20006

        3.     David Underdown (Hickory Springs)

               c/o Dickstein Shapiro LLP
               1825 Eye Street, N.W.
               Washington, D.C.  20006

            **Witnesses Currently or Formerly Affiliated with Dow**

        4.     Robert Wood (Dow)

               c/o Dechert LLP
               1095 Avenue of the Americas
               New York, NY  10036-6797

---

[1] Both sides reserve the right to call any of the witnesses they presently anticipate calling live via video deposition should those witnesses be unavailable live for trial.  Further, both sides reserve all rights and objections with respect to the parties' witness lists.

1

<u>**Witnesses Plaintiffs Anticipate Calling Via Video Deposition**</u>

<u>**Witnesses Currently or Formerly Affiliated with Plaintiffs**</u>

5.    James Boehm (Foam Supplies)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

6.    Jeffrey Briney (Flexible Foam)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

7.    Martin Cosgrove (Vitafoam)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

8.    Helen Ebert (Pathway/Vitafoam)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

9.    Del Felter (Carpenter)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

10.    Larry Heppe (Leggett & Platt)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

11.    Franklin Hurst (Carpenter)

     c/o Dickstein Shapiro LLP
     1825 Eye Street, N.W.
     Washington, D.C.  20006

12.    Thomas Laursen (Vitafoam)

       c/o Dickstein Shapiro LLP
       1825 Eye Street, N.W.
       Washington, D.C.  20006

13.    Bruce O'Brien (Woodbridge)

       c/o Dickstein Shapiro LLP
       1825 Eye Street, N.W.
       Washington, D.C.  20006

14.    John Quackenbush (Lubrizol)

       c/o Dickstein Shapiro LLP
       1825 Eye Street, N.W.
       Washington, D.C.  20006

15.    Mark Talbert (Huber)

       c/o Dickstein Shapiro LLP
       1825 Eye Street, N.W.
       Washington, D.C.  20006

16.    Stuart Watson (Carpenter)

       c/o Dickstein Shapiro LLP
       1825 Eye Street, N.W.
       Washington, D.C.  20006

17.    Sandon Wool (MarChem)

       c/o Dickstein Shapiro LLP
       1825 Eye Street, N.W.
       Washington, D.C.  20006

## Witnesses Currently or Formerly Affiliated with Dow or Settled Defendants

18.    Stephanie Barbour (Dow)

       c/o Lindquist & Vennum PLLP
       4200 IDS Center
       80 South Eight Street,
       Minneapolis, MN  55402

3

19.   William Bernstein (BASF)

    c/o Mayer Brown LLP
    71 S. Wacker Drive
    Chicago, IL  60606

20.   Michele Blumberg (Bayer)

    c/o Jones Day
    51 Louisiana Avenue, N.W.
    Washington, D.C.  20001

21.   Charles Churet (Dow)

    c/o Dechert LLP
    1095 Avenue of the Americas
    New York, NY  10036-6797

22.   Jean-Pierre Dhanis (BASF)

    c/o Mayer Brown LLP
    71 S. Wacker Drive
    Chicago, IL  60606

23.   Edward Dineen (Lyondell)

    c/o Rouse Hendricks German May PC
    1201 Walnut, 20th Floor
    Kansas City, MO  64106

24.   Arthur Eberhart (Dow)

    c/o Dechert LLP
    1095 Avenue of the Americas
    New York, NY  10036-6797

25.   Thomas Feige (Dow)

    c/o Dechert LLP
    1095 Avenue of the Americas
    New York, NY  10036-6797

26.     David Fischer (Dow)[2]

        c/o Vorys, Sater, Seymour and Pease LLP
        52 East Gay Street
        Columbus, Ohio  43216

27.     Gregory Geaman (Huntsman)

        c/o Vinson & Elkins LLP
        First City Tower
        1001 Fannin Street, Suite 2500
        Houston, TX  77002

28.     Uwe Hartwig (BASF)

        c/o Mayer Brown LLP
        71 S. Wacker Drive
        Chicago, IL  60606

29.     Robert Kirk (Bayer)

        c/o Jones Day
        51 Louisiana Avenue, N.W.
        Washington, D.C.  20001

30.     Robert Lawrence (BASF)

        c/o Mayer Brown LLP
        71 S. Wacker Drive
        Chicago, IL  60606

31.     Marco Levi (Dow)

        c/o Dechert LLP
        1095 Avenue of the Americas
        New York, NY  10036-6797

32.     William Lizzi (BASF)

        c/o Mayer Brown LLP
        71 S. Wacker Drive
        Chicago, IL  60606

---

[2] Counsel for Dow notified Plaintiffs on February 4, 2016 that Dow has dropped Mr. Fischer as a live witness.  Plaintiffs will therefore call Mr. Fischer via deposition.

33.   William Long (Dow)[3]

c/o Dechert LLP
1095 Avenue of the Americas
New York, NY  10036-6797

34.   Richard Mericle (BASF)

c/o Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL  60606

35.   Gerald Phelan (Bayer)

c/o Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001

36.   Lawrence Stern (Bayer)

c/o Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001

**B.     Defendant:**

**<u>Witnesses Dow Anticipates Calling Live</u>[4]**

**<u>Witnesses Currently or Formerly Affiliated with Dow</u>**

1.    Richard Beitel

c/o Dechert LLP
David M. Bernick, Esq.
1095 Avenue of the Americas
New York, NY  10036-6797

---

[3] Counsel for Dow notified Plaintiffs on February 23, 2016 that Mr. Long will be unavailable at trial and that Dow proposed to have Mr. Long testify by live video feed.  Plaintiffs will therefore call Mr. Long via deposition and Dow will raise the live feed proposal with the Court

[4] Dow reserves the right to identify additional witnesses for the purpose of authenticating exhibits, including summary exhibits, to the extent the parties are not able to reach agreement regarding such issues.

2.     Phillip Cook

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

3.     Patrick Dawson

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

4.     Patrick Ho

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

5.     William Long

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

6.     Frank Morgan

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

7.     David Pashalidis

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

8.     Lynn Schefsky

c/o Dechert LLP
     David M. Bernick, Esq.
     1095 Avenue of the Americas
     New York, NY  10036-6797

9.      Robert Wood

c/o Dechert LLP
    David M. Bernick, Esq.
    1095 Avenue of the Americas
    New York, NY  10036-6797

### Witnesses Currently or Formerly Affiliated with Plaintiffs

10.     David Underdown (Hickory Springs)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

11.     Jorge Burtin (Skypark)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

12.     Joseph Plati (Woodbridge)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

### Witnesses Dow Anticipates Calling Via Video Deposition

### Witnesses Currently or Formerly Affiliated with Dow[5]

13.     Gregory Comeaux

c/o Dechert LLP
    David M. Bernick, Esq.
    1095 Avenue of the Americas
    New York, NY  10036-6797

---

[5] In light of Special Master Joel Pisano's rulings on the scope of deposition testimony that Dow may play during the plaintiffs' case, Dow will play portions of Stephanie Barbour's deposition during its case unless those rulings are not affirmed by the Court.

14.    Peter Davies

c/o Dechert LLP
   David M. Bernick, Esq.
   1095 Avenue of the Americas
   New York, NY  10036-6797

15.    David Fischer

c/o Vorys, Sater, Seymour and Pease LLP
   52 East Gay Street
   Columbus, OH  43216

16.    Marco Levi

c/o Dechert LLP
   David M. Bernick, Esq.
   1095 Avenue of the Americas
   New York, NY  10036-6797

17.    Tom McCormick

c/o Dechert LLP
   David M. Bernick, Esq.
   1095 Avenue of the Americas
   New York, NY  10036-6797

**Witnesses Currently or Formerly Affiliated with Co-Defendants**[6]

18.    William Bernstein (BASF)

c/o Mayer Brown LLP
   71 S. Wacker Drive
   Chicago, IL  60606

19.    Michelle L. Blumberg (Bayer)

c/o Jones Day
   51 Louisiana Ave., N.W.
   Washington, D.C.  20001

---

[6] In light of Special Master Joel Pisano's rulings on the scope of deposition testimony that Dow may play during the plaintiffs' case, Dow will play portions of Lawrence Stern's deposition during its case unless those rulings are not affirmed by the Court.

20.     George Harrick (Bayer)

    c/o Jones Day
        51 Louisiana Ave., N.W.
        Washington, D.C.  20001

21.     Robert Kirk (Bayer)

    c/o Jones Day
        51 Louisiana Ave., N.W.
        Washington, D.C. 20001

22.     Gerald MacCleary (Bayer)

    c/o Jones Day
        51 Louisiana Ave., N.W.
        Washington, D.C. 20001

23.     John Phelps (Bayer)

    c/o Jones Day
        51 Louisiana Ave., N.W.
        Washington, D.C. 20001

24.     Ernie Springolo (Bayer)

    c/o Jones Day
        51 Louisiana Ave., N.W.
        Washington, D.C. 20001

25.     Anthony Hankins (Huntsman)

    c/o Vinson & Elkins LLP
        First City Tower
        1001 Fannin St., Suite 2500
        Houston, TX  77002

### Witnesses Currently or Formerly Affiliated with Plaintiffs

26.     Del Felter (Carpenter)

    c/o Dickstein Shapiro LLP
        Richard J. Leveridge, Esq.
        1825 Eye Street, N.W.
        Washington, D.C.  20006

27.    Franklin Hurst (Carpenter)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

28.    Stanley Pauley (Carpenter)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

29.    Stuart Watson (Carpenter)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

30.    Jeffrey Briney (Flexible Foam Products)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

31.    James Boehm (Foam Supplies)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

32.    Mark Talbert (Huber)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

33.    Alan Weber (Huber)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

34.   Larry Heppe (Leggett & Platt)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

35.   Joe York (Leggett & Platt)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

36.   John Quackenbush (Lubrizol)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

37.   Sandon Wool (MarChem)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

38.   Martin Cosgrove (Vita)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

39.   Helen Ebert (Vita and Pathway Polymers)

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

40.   Jeffrey Gomberg (Synair (Vita))

c/o Dickstein Shapiro LLP
    Richard J. Leveridge, Esq.
    1825 Eye Street, N.W.
    Washington, D.C.  20006

41.     Raj Mehta (Crest Foam (Vita))

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

42.     David Fowler (Woodbridge)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

43.     Bruce O'Brien (Woodbridge)

    c/o Dickstein Shapiro LLP
       Richard J. Leveridge, Esq.
       1825 Eye Street, N.W.
       Washington, D.C.  20006

## [PRECEDE WITH DIVIDER #6]

6.    EXPERT WITNESSES:  (No expert shall be permitted to testify at trial unless identified below by name and address and unless the expert's curriculum vitae and report are attached hereto.  An expert's qualifications may not be questioned unless the basis therefor is set forth herein.)[1]

### A.    Plaintiffs:

Leslie M. Marx, Ph.D.

c/o Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006

### B.    Defendant's objections to plaintiff's expert qualifications:

Dow moved to exclude Dr. Marx's testimony pursuant to Federal Rule of Evidence 702 and *Daubert* (*see* MDL Dkt. 3152, 3193).  The Court denied Dow's motion, subject to the Court reserving on whether Dr. Marx will be permitted to opine that the variances detected in her models are attributable to the alleged conspiracy or are otherwise consistent with the evidence of the conspiracy as a whole (*see* Dkt. 229).

### C.    Defendant:

Kenneth G. Elzinga, Ph.D.

c/o Dechert LLP
David M. Bernick, Esq.
1095 Avenue of the Americas
New York, NY  10036-6797

Keith R. Ugone, Ph.D.

c/o Dechert LLP
David M. Bernick, Esq.
1095 Avenue of the Americas
New York, NY  10036-6797

### D.    Plaintiff's objections to defendant's expert qualifications:

Plaintiffs moved to limit the scope of the testimony of Dr. Elzinga.  Specifically, Plaintiffs contended that while Dr. Elzinga should be permitted to testify regarding the structure of the urethane market, the remainder of his testimony, i.e., the portions related to economic

---

[1] If the parties stipulate to an expert's qualifications there is no need to attach a curriculum vitae. In any event, however the expert's report must be attached.

1

behavior and pricing trends, should be ruled inadmissible (*see* Dkt. 101).  The Court denied Plaintiffs' motion, subject to the Court reserving its decision on whether Dr. Elzinga may opine on assessments made by the parties' damages experts (*see* Dkt. 224).

**[PRECEDE WITH DIVIDER #7]**

7.     DEPOSITION:

      The Court appointed a special master, the Honorable Joel A. Pisano (retired), to address various evidentiary issues concerning the parties' designations of video deposition testimony. Pursuant to that Order, the special master has been issuing preliminary rulings on the parties' objections, and the Court will conduct a *de novo* review of Judge Pisano's findings.  As of February 29, Judge Pisano has decided objections and issued rulings for all of the depositions that Plaintiffs intend to introduce in their direct case.  The Court has ordered that, by no later than March 2, 2016, the parties are to provide the Court with objections to any rulings made by Judge Pisano as of February 29.  The parties will continue to file objections with the special master for the remaining depositions to be introduced in Dow's defense case.

**[PRECEDE WITH DIVIDER #8]**

8.      EXHIBITS (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may introduced at trial. Objections to authenticity are deemed waived unless such objections are set forth).[1, 2]

     A.     **Plaintiffs:**     Please see attached exhibit list.

     B.     **Defendant's objections to authenticity:**

          1.      Plaintiffs' Exhibit 17

          2.      Plaintiffs' Exhibit 21

          3.      Plaintiffs' Exhibit 136

          4.      Plaintiffs' Exhibit 139

          5.      Plaintiffs' Exhibit 145

          6.      Plaintiffs' Exhibit 150

          7.      Plaintiffs' Exhibit 155

          8.      Plaintiffs' Exhibit 235

          9.      Plaintiffs' Exhibit 299

          10.     Plaintiffs' Exhibit 381

          11.     Plaintiffs' Exhibit 392

          12.     Plaintiffs' Exhibit 481

          13.     Plaintiffs' Exhibit 535

          14.     Plaintiffs' Exhibit 570

---

[1] The exhibit lists should follow this page.

[2] Both sides agree that demonstratives, records custodian declarations, and summary exhibits may be identified at a later date, and to the extent the parties are not able to reach agreements regarding such issues, they reserve their rights to object to any such exhibits within a reasonable time after they are identified.  The parties have reached agreement regarding the pre-admission of certain exhibits.

15.     Plaintiffs' Exhibit 586

16.     Plaintiffs' Exhibit 587

17.     Plaintiffs' Exhibit 588

18.     Plaintiffs' Exhibit 589

19.     Plaintiffs' Exhibit 611

20.     Plaintiffs' Exhibit 620

C.     **Defendant:**     Please see attached exhibit list.

D.     **Plaintiff's objections to authenticity:**

1.     Defendant's Exhibit 70

2.     Defendant's Exhibit 108

3.     Defendant's Exhibit 113

4.     Defendant's Exhibit 317

5.     Defendant's Exhibit 318

6.     Defendant's Exhibit 350

7.     Defendant's Exhibit 354

8.     Defendant's Exhibit 369

9.     Defendant's Exhibit 530

10.     Defendant's Exhibit 619

11.     Defendant's Exhibit 623

12.     Defendant's Exhibit 624

13.     Defendant's Exhibit 625

14.     Defendant's Exhibit 698

15.     Defendant's Exhibit 708

16.     Defendant's Exhibit 715

17.     Defendant's Exhibit 716

18.     Defendant's Exhibit 717

19.     Defendant's Exhibit 718

20.     Defendant's Exhibit 719

21.     Defendant's Exhibit 721

22.     Defendant's Exhibit 729

23.     Defendant's Exhibit 909

24.     Defendant's Exhibit 994

25.     Defendant's Exhibit 1089

26.     Defendant's Exhibit 1090

27.     Defendant's Exhibit 1150

28.     Defendant's Exhibit 1188

29.     Defendant's Exhibit 1229

30.     Defendant's Exhibit 1230

31.     Defendant's Exhibit 1231

32.     Defendant's Exhibit 1284

33.     Defendant's Exhibit 1309

34.     Defendant's Exhibit 1324

35.     Defendant's Exhibit 1325

36.     Defendant's Exhibit 1334

37.     Defendant's Exhibit 1340

38.     Defendant's Exhibit 1351

39.    Defendant's Exhibit 1352

40.    Defendant's Exhibit 1353

41.    Defendant's Exhibit 1360

42.    Defendant's Exhibit 1361

43.    Defendant's Exhibit 1362

44.    Defendant's Exhibit 1363

45.    Defendant's Exhibit 1364

46.    Defendant's Exhibit 1365

47.    Defendant's Exhibit 1370

48.    Defendant's Exhibit 1372

49.    Defendant's Exhibit 1374

50.    Defendant's Exhibit 1376

51.    Defendant's Exhibit 1377

52.    Defendant's Exhibit 1385

53.    Defendant's Exhibit 1390

54.    Defendant's Exhibit 1400

55.    Defendant's Exhibit 1430

56.    Defendant's Exhibit 1452

57.    Defendant's Exhibit 1482

58.    Defendant's Exhibit 1493

59.    Defendant's Exhibit 1497

60.    Defendant's Exhibit 1576

61.    Defendant's Exhibit 1624

4

62.     Defendant's Exhibit 1625

63.     Defendant's Exhibit 1626

64.     Defendant's Exhibit 1635

65.     Defendant's Exhibit 1637

66.     Defendant's Exhibit 1640

67.     Defendant's Exhibit 1654

68.     Defendant's Exhibit 1724

69.     Defendant's Exhibit 1745

70.     Defendant's Exhibit 1765

71.     Defendant's Exhibit 1785

72.     Defendant's Exhibit 1797

73.     Defendant's Exhibit 1802

74.     Defendant's Exhibit 1824

75.     Defendant's Exhibit 1874

76.     Defendant's Exhibit 2073

77.     Defendant's Exhibit 2097

78.     Defendant's Exhibit 2112

79.     Defendant's Exhibit 2207

80.     Defendant's Exhibit 2208

81.     Defendant's Exhibit 2225

82.     Defendant's Exhibit 2239

83.     Defendant's Exhibit 2297

84.     Defendant's Exhibit 2461

85.    Defendant's Exhibit 2499

86.    Defendant's Exhibit 2573

87.    Defendant's Exhibit 2598

88.    Defendant's Exhibit 2604

89.    Defendant's Exhibit 2777

90.    Defendant's Exhibit 2780

91.    Defendant's Exhibit 2818

92.    Defendant's Exhibit 2819

93.    Defendant's Exhibit 2820

94.    Defendant's Exhibit 2843

95.    Defendant's Exhibit 2848

96.    Defendant's Exhibit 2852

97.    Defendant's Exhibit 2892

98.    Defendant's Exhibit 2945

99.    Defendant's Exhibit 2986

100.    Defendant's Exhibit 2989

101.    Defendant's Exhibit 2995

102.    Defendant's Exhibit 3025

103.    Defendant's Exhibit 3052

104.    Defendant's Exhibit 3061

105.    Defendant's Exhibit 3072

106.    Defendant's Exhibit 3078

107.    Defendant's Exhibit 3079

108.   Defendant's Exhibit 3080

109.   Defendant's Exhibit 3081

110.   Defendant's Exhibit 3082

111.   Defendant's Exhibit 3098

112.   Defendant's Exhibit 3099

113.   Defendant's Exhibit 3100

114.   Defendant's Exhibit 3101

115.   Defendant's Exhibit 3136

116.   Defendant's Exhibit 3279

117.   Defendant's Exhibit 3510

118.   Defendant's Exhibit 3562

119.   Defendant's Exhibit 3576

120.   Defendant's Exhibit 3584

121.   Defendant's Exhibit 3655

122.   Defendant's Exhibit 3683

123.   Defendant's Exhibit 3773

124.   Defendant's Exhibit 3774

125.   Defendant's Exhibit 3822

126.   Defendant's Exhibit 3823

127.   Defendant's Exhibit 3844

128.   Defendant's Exhibit 3906

129.   Defendant's Exhibit 3949

130.   Defendant's Exhibit 3983

131.   Defendant's Exhibit 4038

132.   Defendant's Exhibit 4046

133.   Defendant's Exhibit 4074

134.   Defendant's Exhibit 4143

135.   Defendant's Exhibit 4267

136.   Defendant's Exhibit 4338

137.   Defendant's Exhibit 4431

138.   Defendant's Exhibit 4464

139.   Defendant's Exhibit 4636

140.   Defendant's Exhibit 4638

141.   Defendant's Exhibit 4651

142.   Defendant's Exhibit 4670

143.   Defendant's Exhibit 4754

144.   Defendant's Exhibit 4802

145.   Defendant's Exhibit 4874

146.   Defendant's Exhibit 4920

147.   Defendant's Exhibit 4921

148.   Defendant's Exhibit 4935

149.   Defendant's Exhibit 4936

150.   Defendant's Exhibit 4976

151.   Defendant's Exhibit 5066

152.   Defendant's Exhibit 5217

153.   Defendant's Exhibit 5292

154.   Defendant's Exhibit 5308

155.   Defendant's Exhibit 5434

156.   Defendant's Exhibit 5435

157.   Defendant's Exhibit 5440

158.   Defendant's Exhibit 5479

159.   Defendant's Exhibit 5586

160.   Defendant's Exhibit 5628

161.   Defendant's Exhibit 5670

162.   Defendant's Exhibit 5771

163.   Defendant's Exhibit 5772

164.   Defendant's Exhibit 5773

165.   Defendant's Exhibit 5774

166.   Defendant's Exhibit 5775

167.   Defendant's Exhibit 5926

168.   Defendant's Exhibit 6048

169.   Defendant's Exhibit 6049

170.   Defendant's Exhibit 6133

171.   Defendant's Exhibit 6321

172.   Defendant's Exhibit 6322

173.   Defendant's Exhibit 6468

174.   Defendant's Exhibit 6488

175.   Defendant's Exhibit 6691

176.   Defendant's Exhibit 6822

177.    Defendant's Exhibit 6849

178.    Defendant's Exhibit 8595

179.    Defendant's Exhibit 8596

180.    Defendant's Exhibit 8597

181.    Defendant's Exhibit 8598

182.    Defendant's Exhibit 8599

183.    Defendant's Exhibit 8600

184.    Defendant's Exhibit 8609

185.    Defendant's Exhibit 8610

186.    Defendant's Exhibit 8626

187.    Defendant's Exhibit 8629

188.    Defendant's Exhibit 8631

189.    Defendant's Exhibit 8633

190.    Defendant's Exhibit 8634

191.    Defendant's Exhibit 8643

**[PRECEDE WITH DIVIDER #9]**

9.      SINGLE LIST OF LEGAL ISSUES (All issues shall be set forth below. The parties need not agree on any issue. Any issue not listed shall be deemed waived.)[1]

**A.      Plaintiffs:**

1.      What factors and evidence the jury can consider in determining whether there was a conspiracy among urethane manufacturers to fix, raise, maintain, and/or stabilize the prices of urethane products in violation of Section 1 of the Sherman Act.

2.      Whether there was a conspiracy among urethane manufacturers to fix, raise, maintain, and/or stabilize the prices of urethane products.

3.      Whether Dow was a member of the conspiracy.

4.      Whether the conspiracy occurred in or affected interstate, import or foreign commerce.

5.      Whether each Plaintiff sustained an injury in fact to its business or property.

6.      Whether the conduct of Dow or its co-conspirators was a material cause of injury to Plaintiffs.

7.      The applicable legal standard for fraudulent concealment.

8.      Whether Dow and its co-conspirators fraudulently concealed the conspiracy.

9.      When Plaintiffs could have discovered the conspiracy with reasonable diligence.

10.     Whether any of Plaintiffs' purchases should be deemed subject to the Foreign Trade Antitrust Improvements Act, 15 U.S.C. §6a ("FTAIA").

**B.      Defendant:**

11.     The legal standard for proving conspiracy in an antitrust case, including but not limited to the standard for proving conspiracy through circumstantial evidence in an oligopolistic industry.

12.     The legal standard for proving impact/injury in an antitrust case.

13.     The legal standard for proving causation in an antitrust case.

14.     The legal standard for proving damages in an antitrust case.

---

[1] Both sides also incorporate by reference the legal issues reflected in their list of Pending/Contemplated Motions (*see* Section 2 *supra*).

1

15.     The legal standard for proving fraudulent concealment in an antitrust case.

16.     The sufficiency of Plaintiffs' proof regarding the existence of the alleged conspiracy, including but not limited to the sufficiency of the econometric "model" proffered by Plaintiffs' expert in this case.

17.     The sufficiency of Plaintiffs' proof regarding Dow's participation in the alleged conspiracy.

18.     The sufficiency of Plaintiffs' proof regarding alleged co-conspirators' participation in the alleged conspiracy.

19.     The sufficiency of Plaintiffs' proof regarding the products subject to the alleged conspiracy.

20.     The sufficiency of Plaintiffs' proof regarding the time period of the alleged conspiracy.

21.     The sufficiency of each Plaintiff's proof of impact/injury to its business or property by reason of the alleged conspiracy, including but not limited to the sufficiency of the econometric "model" proffered by Plaintiffs' expert in this case.

22.     The sufficiency of each Plaintiff's proof as to causation, including but not limited to the sufficiency of the econometric "model" proffered by Plaintiffs' expert in this case.

23.     The sufficiency of each Plaintiff's proof as to the amount of its alleged damages, including but not limited to the sufficiency of the econometric "model" proffered by Plaintiffs' expert in this case.

24.     The sufficiency of each Plaintiff's proof as to its entitlement to recover damages for purchases by persons or entities that are not named as Plaintiffs in this case.

25.     The sufficiency of each Plaintiff's proof as to the timeliness of its claim and the elements of fraudulent concealment.

26.     Whether Plaintiffs' claims are barred in whole or in part by the statute of limitations.

27.     Whether Plaintiffs' claims are barred in whole or in part by the Foreign Trade Antitrust Improvements Act.

28.     The legal standard for admitting evidence of econometric "models" such as the one proffered by Plaintiffs' expert in this case (*see, e.g.*, Dow's pending *Daubert* motion (MDL Dkt. 3152)).

29.     The extent to which expert testimony in general—and Plaintiffs' proposed expert testimony in particular—can be used as evidence of conspiracy, impact/injury, causation, and/or damages in an antitrust case.

30.     The appropriate standard for statistical significance.

31.     Whether Plaintiffs' claims are barred in whole or in part because their alleged damages, if any, are speculative and because of the impossibility of the ascertainment and allocation of such alleged damages.

32.     Whether any award of damages would violate Dow's due process or other constitutional rights.

33.     Whether Plaintiffs' claims are barred in whole or in part by their failure to mitigate damages.

34.     Whether Dow may be held liable for treble damages, costs of suit, attorneys' fees, and/or interest.

35.     Whether the statements of alleged co-conspirators may be used against Dow.

36.     Whether Dow may be held jointly and severally liable for the conduct of alleged co-conspirators.

37.     Whether Dow is entitled to set off for any award of damages due to Plaintiffs' settlements with alleged co-conspirators.

38.     Whether Plaintiffs should be estopped from taking positions in this litigation inconsistent with those they took in this or other litigation, including but not limited to *In re Polyurethane Foam Antitrust Litigation*, No. 10-md-2196 (N.D. Ohio), and any appeals therefrom; and/or whether these fundamentally inconsistent positions should preclude Plaintiffs from prosecuting their case.

39.     Whether any of the Plaintiffs' claims are barred in whole or in part by the doctrine of judicial estoppel.

40.     Whether the jury may draw any adverse inference based on the refusal of Plaintiffs' current and/or former employees to testify on Fifth Amendment grounds.

**[PRECEDE WITH DIVIDER #10]**

10:    CONCLUSION

    A.    MISCELLANEOUS: (Set forth any matters which require action or should be brought to the attention of the Court.)

    B.    TRIAL COUNSEL:  (List the names of trial counsel for all parties.)

**Plaintiffs:**

    Jeffrey M. Johnson
    Richard J. Leveridge
    James R. Martin
    Alex E. Hassid
    Daniel P. Schaefer
    James E. Cecchi
    Lindsey H. Taylor

**Defendant:**

    David M. Bernick
    Lawrence S. Lustberg
    Jonathan R. Streeter
    Carolyn M. Hazard
    William T. McEnroe

    C.    JURY TRIALS:

    Not later than February 22, 2016:

    1.    Each party shall submit <u>to the District Judge and to opposing counsel</u> a trial brief in accordance with Local Civil Rule 7.2.(b) (SEE ATTACHED "RIDER ON LENGTH OF BRIEFS") with citations to authorities cited and arguments in support of its position on all disputed issues of law.  THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE.  In the event a brief is not submitted, the delinquent party's pleading may be stricken.

    2.    Any hypothetical questions to be put to an expert witness on direct examination shall be submitted <u>to the District Judge and to opposing counsel</u>.

    3.    Each party shall <u>submit to the District Judge and to opposing counsel</u> proposed <u>voir dire</u>.

    4.    Plaintiff shall <u>submit to opposing counsel, in writing</u>, proposed jury instructions.  Each instruction shall be on a <u>separate</u> sheet of <u>legal sized paper</u> and

shall be numbered in sequence.  Each instruction shall include citations to authorities, if any.

Within 7 days of the above, opposing counsel shall, on the face of the instructions submitted by plaintiff, set forth any objections to the proposed jury instructions and/or proposed counter-instructions.

D.      NON-JURY TRIALS: Not later than _____

1.      Each party shall submit to the District Judge and to opposing counsel a trial brief in accordance with Local Civil Rule 7.2(b) (SEE ATTACHED "RIDER ON LENGTH OF BRIEFS") with citations to authorities cited and arguments in support of its position on all disputed issues of law.  THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE.  In the event a brief is not submitted, the delinquent party's pleading may be stricken.

2.      Any hypothetical questions toput to an expert witness on direct examination shall be submitted to the District Judge and to opposing counsel.

3.      Proposed Findings of Fact and Conclusions of Law shall be submitted to the District Judge and to opposing counsel after the close of evidence. These shall include annotations to trial transcripts and exhibits.

E.      BIFURCATION (When appropriate, liability issues shall severed and tried to verdict. Thereafter, damage issues will be tried to the same jury.)

F.      ESTIMATED LENGTH OF TRIAL

The Court has allotted each side 60 hours to present its case at trial, including opening remarks, closing remarks, direct examination and cross-examination.

G.      TRIAL DATE: March 7, 2016

AMENDMENTS TO THIS FINAL PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.   THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

_____
Attorneys for Plaintiff

_____
Attorneys for Defendant

3/1/16

_____
Hon. Mark Falk
United States Magistrate Judge

2

## RIDER ON LENGTH OF BRIEFS

The attention of the parties is directed to Local Civil Rule 7.2.  Briefs shall not exceed 40 "ordinary typed or printed pages ***" (emphasis added).  This page limitation shall be strictly enforced.

When submitting a brief in accordance with this rule a party may request special permission to submit an additional brief on any point or points deemed to need additional pages of argument.  This request must be made by letter not to exceed two ordinary typed or printed pages and must be submitted with the brief.

The Court shall, in its sole discretion, decide whether to allow additional briefing on review of the party's brief and letter.

The Court also reserves the right, in its sole discretion, to require additional briefing on any point or points after review of the written submissions of the parties or oral argument.