UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | Master Docket No. 08-5169 (WJM)(MF) |

---

**PLAINTIFFS' REPLY TO DOW'S OPPOSITION
REGARDING DR. MARX'S ATTRIBUTION OF OVERCHARGES**

---

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
(973) 994-1700

Jeffrey M. Johnson
Adam Proujansky
Daniel S. Schaefer
Alex E. Hassid
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200

Richard J. Leveridge
ADAMS HOLCOMB, LLP
1875 Eye Street, NW
Washington, DC  20006
(202) 580-8818

James R. Martin
ZELLE LLP
1220 L Street, NW
Suite 100-143
Washington, DC  20005
(202) 359-6688

Attorneys for Plaintiffs

Dow originally premised its argument as to why Dr. Marx should be precluded from attributing the variances detected in her models to the alleged conspiracy on her use of "a predictive or 'reduced form' model." *Daubert* Op. 13, Jan. 25, 2016, ECF No. 229 (citing Dow *Daubert* Reply 15, ECF No. 202; *Daubert* Hr'g Tr. 189:15-18, Jan. 13, 2016). Confronted with Plaintiffs' Bench Brief,[1] which provided an overwhelming showing that courts routinely allow experts to employ predictive models, Dow now abandons that argument and admits that predictive models *can* be used to address causation. Dow Chemical Co.'s Br. Opp'n to Pls.' Bench Br. Regarding Dr. Marx's Attribution of Purported Overcharges ("Opp'n") 4, ECF No. 276. Dow instead shifts its argument to the theory that Dr. Marx merely "assumed" the existence of the conspiracy without determining whether "actual historical facts" supported that assumption or "pinpointing" the dates when the conspiracy was in effect to identify the proper benchmark period. Opp'n 4-5. This theory fares no better than the last.[2]

The Court largely anticipated and rejected this theory at the *Daubert* hearing, when the Court said that it "assume[d] [Dr. Marx] undertook [an investigation] to determine that there's evidence of a conspiracy during the time period." *Daubert* Hr'g Tr. 70:22-71:2. The Court made that comment after Dr. Marx began summarizing the "historical facts" that supported her conclusion that it was reasonable to treat (1) the years 1992-93 and 2004-08 as competitive time periods, and (2) the years 1994-2003 as the time period in which the conspiracy was in effect. *Id.* 69:4-70:25.

---

[1]  Pls.' Bench Br. Regarding Their Expert Dr. Marx's Attribution of Overcharges ("Attribution Br.") 1-3, 9, ECF No. 249-1.

[2]  In this Reply, Plaintiffs do not revisit issues they have already addressed, such as the irrelevance of *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1435 (2013) to the scope of Dr. Marx's testimony, *see* Attribution Br. 1-3, 9, or the plain relevance of the rulings of other courts faced with similar models and similar questions, *see id.* 3-7.

The expert reports, depositions, and hearing testimony all establish that the Court's assumption was correct. Dr. Marx examined the historical facts in detail and at length. Dr. Marx reviewed, among other material, Dr. Raiff's reports, materials referenced in those reports, back-up materials accompanying those reports, and deposition testimony. Rule 26 Disclosure of Leslie M. Marx, Ph.D. ¶¶ 9-10. As shown in the examples listed below (attached hereto as Exhibit A), in ultimately endorsing and defending Dr. Raiff's methodology, analysis, and conclusions, Dr. Marx specifically:

- "[R]eviewed the underlying evidence to inform [her] understanding of the industry, the behavior of the conspiracy, the period over which it operated, and other related topics." Revised Reply Report of Matthew E. Raiff, Ph.D. ("Raiff Reply") ¶ 11.

- Determined "the pricing structure" in the industry was "consistent with [her] understanding of how the conspiracy operated." *Id.* ¶ 44. As explained, "while rarely perfect, agreements among producers help to limit the risks involved in any unilateral attempt to increase prices, thereby inflating prices above the levels that they would have been achieved in the absence of the conspiracy." *Id.* ¶ 16.

- Found "the pricing dynamics in 2004 [were] consistent with nonconspiratorial conduct" based on record evidence – information supplied by Bayer's counsel, which "confirmed [her] understanding that Bayer's participation in discussions about raising prices and industry conditions with competitors had ended by the end of 2003." *Id.* ¶¶ 87-88.

- Concluded that the "predicted overcharges [were] quite improbable if Defendants' claims there was no effective conspiracy are true" and the low probabilities of false positives were "evidence there was an effective conspiracy that caused plaintiffs economic harm in the amounts estimated by my models." *Id.* ¶¶ 109, 120.

- Observed that Defendants regularly shared important statistical information and shared sensitive business information with each other. Revised Expert Report of Matthew E. Raiff, Ph.D. ¶¶ 197-200.

- Undertook a lengthy evaluation of the historical facts showing that "high-level executives met and communicated with one another to coordinate prices in the United States and in Europe." *Id.* §5.7.2  This included evidence of multilateral meetings in 1994 and 1995 among Dow, Bayer, and BASF and conspiratorial communications among executives at those companies in the 1994-98 time

2

period, the central role played by BASF's Jean-Pierre Dhanis, and additional specifics that have been corroborated by other evidence. *Id.*

- Used the assumption of conspiracy as a starting point only to determine the appropriate benchmark period. Marx Dep. 215:9-216:4, Nov. 15, 2013; *see also, e.g.*, Raiff Dep. Vol. 1, 42:1-20, 50:2-2153:2-15, 174:22-175:22, 200:15-201:2, May 25, 2011.

- Expressed the view that the model results support the conclusion there was a conspiracy (as opposed to supporting a formal liability opinion). Marx Dep. 217:20-218:6.

- Explained to the Court that she and Dr. Raiff did "quite a bit of work" to confirm that "its reasonable to assume the existence of a conspiracy" during the 1994-2003 time period. *Daubert* Hr'g Tr. 69:16-70:5, 124:6-16.

- Observed that TDI and Polyols overcharges were negative at the start of the conspiracy (1994), at the end of the conspiracy (2003), and in late 2001/early 2002 – patterns that "[were] consistent with a conspiracy whose effectiveness was lower at the start and at the end of the conspiracy period than in the intervening years, and with a conspiracy whose effectiveness was lower in late 2001/early 2002." Raiff Reply ¶¶ 125-126.

The Court accordingly should reject Dow's latest theory. Doing so will allow Dr. Marx to offer her properly formed and factually grounded opinion to the jury, and to the extent Dow quarrels with the work Dr. Marx performed to reach her opinions, allow Dow to raise those issues on cross-examination.

                        CARELLA, BYRNE, CECCHI,
                        OLSTEIN, BRODY & AGNELLO
                        *Attorneys for Plaintiffs*

                        By:   /s/ James E. Cecchi
                               JAMES E. CECCHI

Jeffrey M. Johnson
Adam Proujansky
Daniel P. Schaefer
Alex E. Hassid
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

Richard J. Leveridge
ADAMS HOLCOMB, LLP
1875 Eye Street, NW
Washington, DC 20006
(202) 580-8818

James R. Martin
ZELLE LLP
1220 L Street, NW
Suite 100-143
Washington, DC 20005
(202) 359-6688

*Attorneys for Plaintiffs*

4