UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION<br><br>This Document Relates to: All Actions | Civil Action No. 08-5169 (WJM)(MF) |

**THE DOW CHEMICAL COMPANY'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO JUDGE PISANO'S SECOND AND THIRD SET OF FINDINGS**

## TABLE OF CONTENTS

                                                                                          **PAGE**

**TABLE OF AUTHORITIES** ............................................................................................... ii
**ARGUMENT** ........................................................................................................................ 1
**I. JUDGE PISANO CORRECTLY OVERRULED PLAINTIFFS' OBJECTIONS TO THE TESTIMONY OF STUART WATSON (CARPENTER)** ................................................. 1
**II. JUDGE PISANO CORRECTLY OVERRULED PLAINTIFFS' OBJECTIONS TO THE TESTIMONY OF BRUCE O'BRIEN (WOODBRIDGE), GEORGE HARRICK (BAYER), JOHN PHELPS (BASF), AND DEL FELTER (CARPENTER).** .......................... 4
    **A. O'BRIEN AND HARRICKAND PHELPS** ....................................................... 4
    **B. FELTER** ................................................................................................................ 5
**III. JUDGE PISANO CORRECTLY OVERRULED PLAINTIFFS' OBJECTIONS TO STANLEY PAULEY'S TESTIMONY.** ................................................................................ 6
    **A. MR. PAULEY'S TESTIMONY THAT HE SAW NOTHING WRONG WITH CERTAIN PRACTICES IS ADMISSIBLE.** ................................................................ 6
    **B. EVIDENCE OF MR. PAULEY'S FINANCIAL INTEREST IN THIS CASE IS CLEARLY ADMISSIBLE** ........................................................................................... 9
**IV. JUDGE PISANO CORRECTLY RULED THAT GEORGE HARRICK AND GERALD MACCLEARY ARE COMPETENT TO TESTIFY ABOUT WHETHER BAYER WAS INVOLVED IN THE ALLEGED CONSPIRACY** ......................................... 10
**V. DOW AGREES TO USE CERTAIN EXHIBITS AS DEMONSTRATIVES** ................... 13
**CONCLUSION** .................................................................................................................... 14

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467 (11th Cir. 1992)............... 10

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ........................................................................... 4

*Miller UK Ltd. v. Caterpillar Inc.*, 17 F. Supp. 3d 711 (N.D. Ill. 2014) ...................................... 10

*Solaia Tech. LLC v. Arvinmeritor, Inc.*, No. 02-4704, 2004 WL 549449 (N.D. Ill. Jan. 28, 2004) ........................................................................................................................................ 10

*United States v. Green*, 617 F.3d 233 (3d Cir. 2010) ............................................................... 9, 10

*United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963)................................................ 12

**RULES**

Fed. R. Civ. P. 32(a)(1)(B) ............................................................................................................. 6

Fed. R. Evid. 601 advisory committee's note............................................................................... 10

Fed. R. Evid. 602 .......................................................................................................................... 13

Plaintiffs have filed objections to certain evidentiary rulings rendered by Special Discovery Master Joel A. Pisano (Dkt. No. 307) ("Pls.' Br."). For the reasons set forth below, Judge Pisano properly overruled Plaintiffs' objections, and Defendant The Dow Chemical Company ("Dow") respectfully requests that the Court decline to disturb his rulings.

## ARGUMENT

### I. JUDGE PISANO CORRECTLY OVERRULED PLAINTIFFS' OBJECTIONS TO THE TESTIMONY OF STUART WATSON (CARPENTER).

In his December 2011 deposition, Stuart Watson explained that plaintiff Carpenter was itself a manufacturer of polyether polyols – one of the allegedly price-fixed products in this case – and interacted with Dow and other suppliers of urethane chemicals not only as a customer buying product from them but also as a supplier who was competing with them for other customers.  *See* Watson Dep. (Dkt. No. 307-Exhibit A) at 38:2-18; 75:22-76:19; 79:13-21; 80:6-81:7; 235:25-236:17.  He testified that, in its role as a competitor in the urethane supply industry, Carpenter gathered market intelligence about Dow and the other chemical suppliers' pricing, used that intelligence in Carpenter's pricing decisions, led and followed price increases, made reference to "leading" or "following" or "supporting" price increases, met with these chemical supplier competitors at trade conferences, bought product from and sold product to those competitors, raised prices in an attempt to make more money – and that Carpenter did all of this without having entered into a price-fixing conspiracy. *See, e.g.*, Watson Dep. (Dkt. No. 307-Exhibit A) at 94-100; 106-118; 132-141; 209-220.

Plaintiffs object to this testimony as irrelevant, prejudicial, and violative of this Court's downstream order.  It is none of those things.  First, it is not evidence violating this Court's order on downstream activity (Dkt. No. 213) because it is not about downstream activity in the foam market at all.  Rather, it is about Carpenter's activities as a competitor in the very market that is

1

at issue in this case – the urethane chemical supply market. Moreover, unlike that order, which was addressed to alleged wrongdoing by Plaintiffs as "seller[s] of polyurethane foam in the downstream market," Dec. 21, 2015 Op. (Dkt. No. 213) at 1, the testimony at issue here relates to a *lack* of wrongdoing by Carpenter in the market at issue in this case – namely polyether polyols. Dow is not using wrongful conduct by Carpenter or any other Plaintiff as a defense. Rather, it is offering the testimony to show that industry participants engaged in the very same conduct that Mr. Watson testified Carpenter engaged in – for example "following" or "supporting" price increases, gathering market intelligence, attending industry meetings, etc. – without collusion. This is relevant to undermine Plaintiffs' claims that this conduct demonstrates conspiracy. Second, the evidence does not raise any specter of a lengthy mini-trial – Plaintiffs' objections implicate only a few lines of testimony. Third, there is nothing unfairly prejudicial to Plaintiffs about this testimony. It involves matters of logic, not emotion, and it does not invite the jury to compare the parties' "relative moral worth"[1] or render a ruling on any other improper basis. Pls.' Br. at 9. Rules 402 and 403 are thus no bar to admission. Fourth, Plaintiffs attempt to characterize Carpenter as a minor player in the polyols market, Pls.' Br. at 2, thereby somehow rendering the evidence inadmissible. But Mr. Watson's testimony is to the contrary. He explained that Carpenter "embarked" on making more external sales starting in 1995 and grew its polyols business over time during subsequent years. Watson Dep. (Dkt. No. 307-Ex. A) at 41. He also acknowledged that Carpenter competed with all of the big players including "Arch, BASF, Dow, Bayer, Huntsman" in the production and sale of polyols. *Id.* at 61.

---

[1] The testimony at issue does not in any way suggest that Carpenter or any other Plaintiff did anything wrong. Mr. Watson denies engaging in any wrongful conduct, and Dow will certainly not argue otherwise.

Plaintiffs' additional challenges to Mr. Watson's testimony are also without merit.  They challenge testimony on page 73 – testimony in which Mr. Watson was asked whether he or anyone at Carpenter had discussions with Bayer, Huntsman, BASF or Dow about fixing prices to other customers, and Mr. Watson answered, "No, sir" – as irrelevant and prejudicial.  Pls.' Br. at 2 n.4.  But, as Judge Pisano recognized, this question is certainly relevant:  if one of the participants in the polyols market which had relatively few players – in this instance Carpenter – was not part of the alleged conspiracy, that fact is relevant, as Dr. Marx testified yesterday, to how likely or plausible it is that a cartel existed.  Trial Tr. at 33:21-34:15 (March 23, 2015).  The presence of competitors who are not part of the alleged conspiracy is also relevant to whether the conspiracy had any effect or impact.  And it is difficult to fathom how Carpenter's *denial* of participation in a conspiracy could possibly be viewed as prejudicial, particularly given Dow's representation that it will not argue any wrongdoing on the part of Carpenter.

Next, Plaintiffs argue that questions at pages 99-100 and 141 call for legal conclusions.  Pls.' Br. at 3.  Of course, Plaintiffs' counsel did not object to these questions during the deposition.  Nor did Mr. Watson offer legal opinions in his answers.  He simply testified to a series of facts within his personal knowledge:  that he maintained multifaceted relationships with polyol competitors (*i.e.*, they were also suppliers and customers); that he met with them at trade association meetings; and that he had no agreement with them on the prices that would be charged to their respective polyol customers.  This testimony is relevant and admissible.

Finally, in a footnote, Plaintiffs argue that "[s]ome of the testimony Dow designates is unclear as to whether it relates to Carpenter's manufacture of polyols or downstream sales of polyurethane foam." Pls.' Br. at 3 n.5.  As a review of the transcript demonstrates, however, there is no lack of clarity here:  the testimony Dow designated unambiguously concerns

3

Carpenter's role as a seller of polyols, not as a buyer. If the Court has any doubt on that point, Mr. Watson testified that he had no role in the sale of foam, *see* Watson Dep. (Dkt. No. 307-Ex. A) at 24:17-19, and Dow would be willing to add these lines to its designations to avoid any potential for confusion.

## II. JUDGE PISANO CORRECTLY OVERRULED PLAINTIFFS' OBJECTIONS TO THE TESTIMONY OF BRUCE O'BRIEN (WOODBRIDGE), GEORGE HARRICK (BAYER), JOHN PHELPS (BASF), AND DEL FELTER (CARPENTER).

Plaintiffs challenge certain testimony as improper "pass-through" evidence. But, as set forth below, what Plaintiffs call "pass-through" evidence is nothing of the sort.

### A. O'Brien, Harrick, and Phelps

Among the evidence Plaintiffs seek to exclude is testimony from a Woodbridge employee regarding a letter he sent to BASF in 1994 in which Woodbridge refused to accept price increases for urethane chemicals, *see* O'Brien Dep. (Dkt. No. 307-Ex. D) at 261-65; and testimony from a Bayer employee describing how in 1998 Woodbridge refused to accept any price increases for urethane chemicals, *see* Harrick Dep. (Dkt. No. 307-Ex. E) at 147:1-11. In the same vein is testimony from a Bayer executive that a customer's inability to increase its prices makes it more difficult for a chemical supplier to obtain a price increase. *See* Phelps Dep. (Dkt. No. 307-Ex. C) at 85. This is not evidence of "pass-through" but rather its opposite: instead of showing that Plaintiffs passed price increases through to their own downstream customers,[2] the evidence demonstrates that at times Plaintiffs refused to accept price increases from suppliers (the alleged conspirators in this case) because they could not recoup those costs.

---

[2] Dow recognizes that as a general rule an "antitrust defendant is not permitted to introduce evidence that indirect [*i.e.*, downstream] purchasers were in fact injured by an illegal overcharge." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724-25 (1977). But for the reasons explained, that rule is not implicated here.

4

The fact that price increase announcements were ineffective, and the reasons they were ineffective, is highly relevant to show both the lack of a conspiracy and to show that if there was a conspiracy it had no little or no effect. As Judge Pisano recognized, it would be inappropriate to curtail this examination.

Indeed, Plaintiffs' objections have nothing whatsoever to do with "spar[ing] Plaintiffs the burden of litigating the intricacies of pass-on," Pls.' Br. at 5, and everything to do with denying the jury the opportunity to see exactly how specific Plaintiffs could and did refuse to accept price increases from their urethanes suppliers. In these instances, the Plaintiffs explained to the chemical suppliers that they were refusing to accept price increases because their own customers would, themselves, not accept those price increases. That does not make the evidence inadmissible: there is by definition no pass-through where price increases are refused.[3] Plaintiffs' communications with their suppliers about the prices they would or would not pay, and the ways in which they resisted higher prices for urethane chemicals are relevant aspects of the dynamic between Plaintiffs and Dow, and indeed Plaintiffs admit as much. *See* Pls.' Br. at 6 (acknowledging that "what is relevant is the dynamic between Plaintiffs on the one hand, and Dow and its [alleged] co-conspirators on the other").

**B.     Felter**

Plaintiffs also object to the admission of certain testimony regarding Carpenter's activities in selling MDI – one of the products at issue in this case – in competition with Dow. *See* Felter Dep. (Dkt. No. 307-Ex. F) at 201, 203. As Dow explained to Judge Pisano, this testimony was not designated for the purpose of showing "pass-through" as a defense to

---

[3] Plaintiffs argue that "[i]t does not matter whether Dow claims it is trying to prove that pass-through occurred or that it did not," Pls.' Br. at 6, but they cite no authority whatsoever for this proposition, which does not reflect the law.

Plaintiffs' claims, but rather to show that Carpenter competed with Dow for sales of MDI. *See id.* As noted above, and according to Plaintiffs' own expert Dr. Marx, evidence of other participants in the market tends to undermine the plausibility that there could have been a cartel in the relevant market. The testimony also provides context for statements made in an exhibit about which there is considerable other testimony to which Plaintiffs did not object. *See id.* at 198-200, 205-08. The challenged testimony is relevant and there is nothing unfairly prejudicial about it. Judge Pisano's assessment was correct and should be affirmed.

### III.  JUDGE PISANO CORRECTLY OVERRULED PLAINTIFFS' OBJECTIONS TO STANLEY PAULEY'S TESTIMONY.

Plaintiffs object to certain testimony by Stanley Pauley, the Chief Executive Officer and Chairman of the Board of Carpenter Company. Mr. Pauley owns 100% of Carpenter, one of the largest plaintiffs, and is suing Dow for more than $100 million, yet Plaintiffs have refused to present him (or any representative from nine of the ten other plaintiffs) as a live witness. Dow was entitled to cross-examine Mr. Pauley to the full extent that would be allowed at trial, Fed. R. Civ. P. 32(a)(1)(B), and Judge Pisano correctly ruled that the testimony is admissible at this trial.

#### A.  Mr. Pauley's Testimony That He Saw Nothing Wrong With Certain Practices Is Admissible.

Plaintiffs argue that Mr. Pauley's testimony that he saw "nothing wrong" or "illegal" with Dow and the other chemical suppliers issuing similar price increases at the same time, refusing to reduce or cancel their announced price increases, or competing for business should be excluded. Pls.' Br. at 8-9; Pauley Dep. (Dkt. No. 307-Ex. G) at 65-69, 81-83. Mr. Pauley merely testified to his understanding, as the CEO of Carpenter for more than thirty years, of what was appropriate conduct with regard to price increases in his industry. Judge Pisano correctly concluded that as the owner of Carpenter, Mr. Pauley is "certainly competent to testify about

6

price increase announcements and how they came about." March 9, 2016 Tr. of Proceedings (Dkt. No. 307-Ex. B) at 5.  Indeed, the plaintiffs have repeatedly, over Dow's objection before Judge Pisano, presented witness testimony about whether they thought something was "illegal" to this jury.  Plaintiffs cannot have it both ways.  For example, in the deposition of Stephanie Barbour played during plaintiffs' case, Dow objected to the follow passage:  "Q: And you told – told us a minute ago that you understood that discussion of pricing with competitors was flatly illegal, right.  A: That's my interpretation.  I'm not a lawyer."  Barbour Dep. (Dkt. No. 269-Ex. E) at 339.  Dow objected to this testimony as calling for a legal conclusion, and a wrong one, since it is an agreement to fix prices, not discussion of pricing with competitors, that is illegal.  Plaintiffs took the position that Ms. Barbour could give this testimony, Judge Pisano allowed it, and that passage was played for this jury.  Now that it is time for Dow's case, Plaintiffs cannot reverse the rules and prevent Dow from doing the very same thing that Plaintiffs insisted on presenting during their case.

Moreover, the testimony to which Plaintiffs object is not, as Plaintiffs contend, similar to testimony to which Dow previously objected in its motion *in limine* regarding antitrust policies.  In that motion, Dow objected to testimony about whether certain conduct violated Dow's own internal antitrust policies.  The basis of the objection was that Dow's own policies go far beyond the requirements of the law, and prohibit conduct that is not illegal and does not violate the antitrust laws.  Dow's Br. in Support of Mot. in Limine Concerning Antitrust Compliance Policies (Dkt. No. 116-1) at 3.  Dow argued that allowing testimony about violations of those policies might confuse the jury into believing that the antitrust laws themselves were violated – the central issue to be decided in this case.  In granting Dow's motion, this Court observed that this case involves allegations that Dow violated antitrust laws, not whether it violated antitrust

policies that imposed a higher standard of conduct than that required by law. Op. and Order (Dkt. No. 236) at 2. Dow employees' opinions as to whether a policy (as opposed to the law) was violated are irrelevant and could "confuse the jury." *Id.* Mr. Pauley's testimony presents no such risk and is certainly accurate – issuing simultaneous price increase announcements standing alone is not improper or illegal, and indeed occurs in many industries without a price fixing agreement.

Plaintiffs next try to argue that certain of these designations violate the Court's Order prohibiting evidence of "Plaintiffs' anticompetitive conduct as a seller of foam products in the downstream market." Downstream Order at 1. Specifically they cite Pauley Dep. at 81:6-14 and 83:9-1. Plaintiffs are wrong. While there is testimony in the Pauley transcript about downstream conduct, Dow did not designate it, and none of the actual designated testimony so much as mentions the Plaintiffs' conduct in the downstream market. The objected to designation and the designated testimony leading up to it read as follows:

> *Q.   There's nothing wrong in the business for an MDI or TDI supplier to go after -- no quotes -- the business to get it back.  Correct?*
> *...*
> *THE WITNESS:  ... Yes.*
> *Q.   Okay.  Nothing wrong with it?*
> *A.   No.*
> *Q.   Okay.  So all these things --*
> *A.   That's called business.*
> *Q.   That's called business?*
> *A.   Yes.*
> *Q.   That's called competition.  Right?*
> *A.   That's right.*
> *...*
> *Q.   So price increase announcements being the same, that was something that was known and observed by Carpenter in the MDI and TDI supply market.  Correct?*
> *A.   Yes.*
> *Q.   Nothing wrong with it.  Correct?*
> *A.   Yes.*
> *...*

8

*Q. Price sticking -- sticking with price over volume. Known in the market. Nothing wrong with that?*

*…*

*THE WITNESS: Yes.*

*Q. Maximizing volume or not losing volume by trying to get back the business of another -- that went to another supplier. Saw that in the market. Nothing wrong with that either. Correct?*

*…*

*THE WITNESS: Yes. Nothing wrong with it.*

…

Q. And likewise, you wouldn't think it would be correct for somebody to say that Dow or one of the other MDI or TDI suppliers engaged in a conspiracy because they did these things. You wouldn't believe that that would be correct to say either?

…

THE WITNESS: I would say that's normal business.

…

Q. Well, but from your own point of view as the head of Carpenter, you don't think it's right for somebody to be accused of conspiracy based upon doing things that you have acknowledged are done throughout the business for competitive reasons?

…

A. That's why we never yelled before. We never suspected that they were colluding.

Pauley Dep. (Dkt. No. 307-Ex.G) at 76:4-6, 74:10-19, 76:25-77:6, 77:9-11, 77:14-20, 77:23-24, 81:5-10, 81:13-14, 83:9-14, 83:17-19 (italics not objected to).

This is perfectly appropriate testimony and makes no reference to downstream conduct – rather it refers to the conduct of Dow and the other suppliers, which is the subject matter of this litigation.

### B. Evidence Of Mr. Pauley's Financial Interest In This Case Is Clearly Admissible.

Plaintiffs object to Mr. Pauley's own testimony that he will be the primary beneficiary of any damages received by Carpenter in this case. That objection should obviously be overruled, as Judge Pisano ruled. As the sole owner of Carpenter, Mr. Pauley's financial stake in the litigation, and any bias flowing therefrom, is highly relevant and admissible. *See, e.g., United States v. Green*, 617 F.3d 233, 251 (3d Cir. 2010) (stating that "[p]roof of bias is almost always

9

relevant"); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473-74 (11th Cir. 1992) (district court properly admitted evidence of plaintiff's chairman's income and financial dealings with plaintiff because such evidence "was relevant . . . to show [his] bias or interest in the outcome of the case"); *see also Miller UK Ltd. v. Caterpillar Inc.*, 17 F. Supp. 3d 711, 723 (N.D. Ill. 2014) ("Financial interest in a case is always relevant to the question of bias, either of a judge or a witness." (citing *Tumey v. Ohio*, 273 U.S. 510 (1927))); *Solaia Tech. LLC v. Arvinmeritor, Inc.*, No. 02-4704, 2004 WL 549449, at *2 (N.D. Ill. Jan. 28. 2004) ("[Witness'] financial interest in the outcome of litigation is clearly relevant to his potential bias."). Indeed, the Advisory Committee Notes to Federal Rule of Evidence 601 state: "Interest in the outcome of litigation and mental capacity are, of course, highly relevant to credibility and require no special treatment to render them admissible along with other matters bearing upon the perception, memory, and narration of witnesses."

Plaintiffs improperly analogize this testimony to testimony regarding the cost of hotel rooms and expensive industry trips, as to which the Court gave a limiting instruction at Dow's request. As the Court correctly concluded, evidence about lavish accommodations has no bearing on the credibility of any individual's testimony and risked prejudicing the jury. Evidence of Mr. Pauley's interest in the outcome of this litigation, in contrast, is directly relevant to his bias, and the law is clear that it is admissible, as Judge Pisano correctly held.

## IV. JUDGE PISANO CORRECTLY RULED THAT GEORGE HARRICK AND GERALD MACCLEARY ARE COMPETENT TO TESTIFY ABOUT WHETHER BAYER WAS INVOLVED IN THE ALLEGED CONSPIRACY.

Plaintiffs object to the admission of testimony by two Bayer employees about whether Bayer was involved in the alleged conspiracy. They claim that George Harrick and Gerald MacCleary — two Bayer executives with urethanes pricing responsibility during the conspiracy period — lack personal knowledge to testify about whether those prices were the result of an

agreement among suppliers. They argue that Mr. Harrick and Mr. MacCleary were impermissibly "purporting to speak on Bayer's behalf" or speculating about other suppliers. Pls.' Br. at 13.

Dow's designations clearly establish that both Mr. Harrick and Mr. MacCleary were intimately involved in Bayer's pricing decisions and had personal knowledge of what their competitors were doing. From 1989-1999, Mr. Harrick personally reviewed pricing recommendations for TDI, MDI, and polyols, and decided whether to approve or reject them. *See* Harrick Dep. (Dkt. No. 307-Ex. E) at 11:17-12:1; 48:3-23; 52:2-7; 53:10-58:1. Mr. Harrick was also "always concerned about competitive activity" and followed what Bayer's competitors were doing in the marketplace. *Id.* at 50:6-51:14. Mr. MacCleary had pricing responsibility for MDI in 2003-04 and likewise testified about what he observed of the activities of competitors in the marketplace. MacCleary Dep. (Dkt. No. 307-Ex. I) at 40:4-14; 46:12-16; 105:20-106:6; 106:20-107:10. As Judge Pisano held, they had both the requisite personal knowledge, and were competent to testify. *See, e.g.,* March 21, 2016 Tr. of Proceedings at 3-4 (Ex. A) ("Mr. Harrick was in charge of the polyurethane business at Bayer and he is testifying at great length in all of his testimony throughout this transcript about all kinds of aspects of that business and in many instances is testifying without objection to his knowledge of what some of the other players in the industry were doing."); March 21, 2016 Tr. of Proceedings at 16 (Ex. A) (noting that MacCleary is "competent to testify based upon his background and experience in the industry, and for the exact same reasons that I have overruled all those other objections, he is competent…").

11

Moreover, every single one of these objections relates to a high-level *Bayer* employee being asked about whether *Bayer's* price increases were the result of an agreement *involving Bayer* :

- Harrick Dep. at 70:16-20 (Question: "When you say support an increase, are you describing a process where ICI, Dow, or BASF would agree *with Bayer* about what a price increase should be?")
- Harrick Dep. at 86:3-6 (Question: "Were any of those attempted price increases the result of an agreement *between Bayer and its competitors* to increase pricing?")
- Harrick Dep. at 100:17-20 (Question: "Were any of those attempted price increases the result of an agreement *between Bayer and its competitors* to increase pricing?")
- Harrick Dep. at 104:11-15 (Question: "Can you tell us, was the improvement in pricing that you described in your notes caused by an agreement *among Bayer and its competitor*s to raise prices to its customers?")
- Harrick Dep. at 158:12-15 (Question: "Were any of those attempted price increases the result of an agreement *between Bayer and its competitors* to increase pricing?")
- MacCleary Dep. at 213:3-9 (Question: "Were any of those price increases between January 1, 2003 and December 31st, 2004 the result of any agreement or understanding *among competitors and Bayer?*")

Testimony from Bayer witnesses involved in pricing is not only highly relevant, but it is critical evidence, admitted so that the jury may assess whether Bayer was involved in the alleged conspiracy. *See United States v. Standard Oil Co.*, 316 F.2d 884, 889 (7th Cir. 1963) ("The defendants are corporations. At the trial, the defendants could deny the charge of an unlawful agreement or understanding only through the testimony of their employees who were supposed to have entered the agreement charged."). Just as the Plaintiffs attempt to hold Dow and the other chemical supplier companies liable through the conduct and testimony of their employees, those same employees can deny the allegations in this case.

Nor are Mr. Harrick and Mr. MacCleary in any way "purport[ing] to speak for all of the co-conspirators." Pls.' Br. at 13. In every single instance they were asked whether price increases were the result of a conspiracy involving Bayer - where they were responsible for pricing - and they said no. *See, e.g.*, Harrick Dep. (Dkt. No. 307-Ex. E) at 158:12-15 (Question:

"Were any of those attempted price increases the result of an agreement between Bayer and its competitors to increase pricing?" Answer: "No."). There is no speculation about what Dow, BASF, or anyone else was "thinking." The Court's decision at trial to bar certain questions posed to Mr. Underdown - specifically, when he was asked about BASF, rather than his own company - have no bearing on whether Bayer employees can testify about their own company's involvement in conspiracy.

Mr. Harrick and Mr. MacCleary clearly have the personal knowledge required under Rule 602 to deny Bayer's involvement in a conspiracy, and Judge Pisano's ruling allowing the testimony at Harrick Dep. (Dkt. No. 307-Ex. I) at 70:16-20; 86:3-6; 100:17-20; 104:11-15; 158:12-15 and MacCleary Dep. (Dkt. No. 307-Ex. E) at 213:3-9 should stand.

## V.  DOW AGREES TO USE CERTAIN EXHIBITS AS DEMONSTRATIVES

Plaintiffs have asked the court to order that certain Dow documents may be used as demonstratives but not entered into evidence. *See* Pls.' Br. 14-16; Dkt. 307-Ex. M (exhibits at issue). Dow does not object and will use the documents contained in Plaintiffs' Exhibit M solely as demonstratives.

## **CONCLUSION**

For the foregoing reasons, this court should affirm Judge Pisano and overrule Plaintiffs' Objections to Judge Pisano's Second and Third Set of Findings.

Respectfully submitted,

Dated: March 24, 2016  
Newark, New Jersey

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545

David M. Bernick (*admitted pro hac vice*)
Jonathan R. Streeter (*admitted pro hac vice*)
**Dechert LLP**
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Fascimile: (212) 698-3599

*Attorneys for Defendant*
*The Dow Chemical Company*