```
1                     IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEW JERSEY
2                         Civil No. 2:08-cv-05169(WJM)-MF

3

4        - - - - - - - - - - - - - -x
         IN RE URETHANE ANTITRUST   :   TRANSCRIPT OF PROCEEDINGS
5        LITIGATION                  :        - Trial -
         - - - - - - - - - - - - - - x
6

7                                    Newark, New Jersey
                                     March 23, 2016
8

9
         B E F O R E:
10
                           THE HONORABLE WILLIAM J. MARTINI,
11                          UNITED STATES DISTRICT JUDGE,
                                    And a Jury
12

13

14
         Pursuant to Section 753 Title 28 United States Code, the
15       following transcript is certified to be an accurate record as
         taken stenographically in the above entitled proceedings.
16

17
         S/WALTER J. PERELLI
18

19
         WALTER J. PERELLI, CCR, CRR
20       Official Court Reporter

21

22

23

24

25
```

A P P E A R A N C E S:

    CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, PC
    BY:  LINDSEY H. TAYLOR, ESQ.
       - and -
    BLANK ROME LLP
    BY:  JEFFREY M. JOHNSON, ESQ.
        ALEX E. HASSID, ESQ.
        DANIEL P. SCHAEFER, ESQ.
       - and -
    ZELLE LLP
    BY:  JAMES R. MARTIN, ESQ.
    Attorneys for Plaintiffs


    GIBBONS P.C.
    BY:  LAWRENCE S. LUSTBERG, ESQ.
       - and -
    DECHERT LLP
    BY:  DAVID M. BERNICK, ESQ.
        CAROLYN M. HAZARD, ESQ.
        JONATHAN STREETER, ESQ.
        WILLIAM T. McENROE, ESQ.
    Attorneys for Defendant

```
 1                          I N D E X

 2   WITNESS              DIRECT    CROSS    REDIRECT    RECROSS
     LESLIE MARX
 3       By Mr. Martin      4                  224
         By Mr. Bernick             89/142                 226
 4

 5

 6   VIDEOTAPED DEPOSITION PLAYED
         Videotaped Deposition of Bruce O'Brien.........page 228
 7       Videotaped Deposition of Helen Sarah Ebert ....page 228
         Videotaped Deposition of Martin Cosgrove.......page 229
 8

 9

10                Colloquy Between Court and Counsel
                          Jury not Present
11                Starting Page    Ending Page
                       136             141
12                     204             206
                       230             231
13

14

15                     Sidebar Discussions
                  Starting Page    Ending Page
16                     28              29
                       102             103
17                     123             124
                       190             193
18

19

20

21

22

23

24

25
```

```
 1                        March 23, 2016
 2                (Trial resumes - Jury not present.)
 3                THE LAW CLERK:  All rise.
 4                THE COURT:  Everybody be seated.  Good morning.
 5                MR. JOHNSON:  Good morning, your Honor.
 6                THE COURT:  We were waiting for a juror.  They're all
 7     here I believe.
 8                Would you bring them out, please.
 9                THE DEPUTY CLERK:  Please rise for the Jury.
10                (Jury present.)
11                THE COURT:  Good morning, please be seated.
12                Mr. Johnson, do you have a witness?
13                MR. JOHNSON:  We do.  Dr. Leslie Marx, and Mr. Martin
14     will be conducting the examination this morning.
15                THE COURT:  Okay.
16                MR. BERNICK:  Your Honor, good morning.  Could I just
17     sit over there so I can see?
18                THE COURT:  Sure.
19                MR. BERNICK:  Thank you.
20                THE COURT:  Is Dr. Marx here?
21                MR. JOHNSON:  She is.
22                MR. MARTIN:  While she's walking up, I'm the person
23     who was on the board earlier in opening arguments.  I've been
24     sitting here and you actually heard me during some of the
25     testimony.  So it's a pleasure to finally talk to you.
```

```
 1    L E S L I E   M A R X, called as a witness, having been first

 2        duly sworn, is examined and testifies as follows:

 3

 4            THE LAW CLERK:  Please state your name for the record.

 5            THE WITNESS:  Leslie Marx.

 6            THE DEPUTY CLERK:  Spell it.

 7            THE WITNESS:  L-e-s-l-i-e; M-a-r-x.

 8            THE DEPUTY CLERK:  You may be seated.

 9            THE COURT:  Good morning.  If you would, just make

10    sure you speak into the microphone and wait until the question

11    is fully asked before you answer it.  Okay?

12            THE WITNESS:  I'll do my best.

13                         DIRECT EXAMINATION

14    BY MR. MARTIN:

15    Q   Good morning, Dr. Marx.

16    A   Good morning.

17    Q   So before I want to ask you some questions, I want to do a

18    little preliminary part and ask you if you prepared some

19    demonstrative pictures to help to explain to the jury your

20    investigation and your analysis for your opinions.

21    A   I did.

22    Q   And some of those are going to be on a commuter screen and

23    we have some on the board here.

24            Were all those prepared by you or under your

25    supervision?
```

 1    A    Yes.

 2    Q    You also have next to you a stack of expert reports if you

 3    need them.  Okay?

 4    A    Great, thanks.

 5    Q    I'm going to ask you first if you could give the jury first

 6    a sense of your educational background.

 7    A    Yes.  I have an undergraduate degree from Duke University

 8    in mathematics and a master's degree and Ph.D in economics from

 9    Northwestern University.

10    Q    So when I look at this chart with your credentials up there

11    I see the word "econometrics."  Can you explain what the word

12    "econometrics" means?

13    A    Yes, down at the bottom it has econometrics.  Econometrics

14    is the statistical analysis of economic data.  It's a field in

15    economics.  It's a part of economics.

16    Q    Is it different from economics?

17    A    I think of it of being a subset of economics, one of the

18    fields within economics.

19    Q    There's also a reference up there to a "field exam."  Would

20    you explain what a field examine is?

21    A    Yeah.  In a Ph.D program in economics, it would be typical

22    to ask the students to take field exams, to take qualifying

23    exams.  And at Northwestern you would be required to take

24    these -- take and pass the qualifying exams in econometrics,

25    micro economics and macroeconomics.

 1    Q    And did you take and pass a field exam in econometrics?

 2    A    Yes.

 3    Q    Does everybody who gets a Ph.D in economics take a field

 4    exam in econometrics?

 5    A    No, the Ph.D programs differ.  Some you might only be

 6    required to do take one or pass one field exam.  If requested,

 7    you would take all three.  But you need to pass the

 8    econometrics, micro-economics and macroeconomics.  It's their

 9    kind of a stamp of approval kind of certifying that you've met

10    the standards that you qualify in those different areas of

11    economics.

12    Q    Let me ask you some questions then about your professional

13    background following your education.

14              Just give the jury a sense of your profession.  What

15    happened after you graduated with your Ph.D.?

16    A    Sure.  I was first an Assistant Professor and then

17    Associate Professor at the University of Rochester, at the

18    Business School at the University of Rochester.  Then I moved

19    to Duke University to the Business School, the Fuqua School of

20    Business at Duke University.  And I've been -- I've been at

21    Duke since 2002, with the exception of a period in 2005-2006

22    when I served as the Chief Economist at the Federal

23    Communications Commission in Washington, D.C.

24    Q    So, could you give the jury a little bit of flavor about

25    what you were doing at the FCC?

 1    A    Sure.

 2          The Chief Economist at the Federal Communications

 3    Commission is in charge of overseeing all of the economics

 4    coming out of the Commission, and so the kinds of things that

 5    might come up there are issues with competition among the

 6    telecommunications firms, whether there might be concerns about

 7    the effectiveness of competition among telecommunications

 8    providers.  There were some issues with respect to competition

 9    among the cable -- cable television providers while I was

10    there.  So that's an overview.

11    Q    Why was it only for a year?

12    A    Oh.  The program -- there's a program in the U.S. that

13    allows government agencies like the Federal Communications

14    Commission to essentially borrow a professor, borrow someone

15    from academics and bring them in to serve, for example, as the

16    chief economist, and that program only lets you do it for one,

17    or a maximum of two years.

18    Q    There's also a reference to the Robert Dandeen Professor.

19    What does that mean?

20    A    My title at Duke now is the Robert Bandeen Professor of

21    Economics.  It's an endowed chair.  It's a chaired

22    professorship or a distinguished professorship.  So the

23    particular title is maybe not so important but it signifies

24    that I'm at the top of the professorial ladder at Duke

25    University.

 1    Q    How does one become the Robert Bandeen professor?

 2    A    There's a process where you would be nominated by the

 3    faculty of the school, and then as part of the process they

 4    would also ask outside academics at other universities to

 5    evaluate whether you are viewed as a leader in the profession

 6    and qualified to be named as a distinguished professor.

 7    Q    Typically, who are your students at Duke?

 8    A    I teach mainly Ph.D students and MBA students.  I'm at the

 9    Business School so a lot of my business are MBA students there.

10    Q    And what are your duties as a professor at Duke?

11    A    As a faculty member there, we would typically divide the

12    responsibilities into teaching and research and service.  And

13    for teaching I teach courses to MBA and Ph.D students there at

14    Duke University.  For research, my research focuses on

15    anti-competitive behavior.  So we're looking at competition and

16    the suppression of competition among firms.  So I study cartels

17    and price-fixing conspiracies and bid-rigging, and also look at

18    auctions and procurements and the design of auctions and

19    procurements and work to publish my research in the

20    peer-reviewed journals in economics.

21         And then for service, there are a number of things in

22    that bucket, but in particular, I do work as a peer reviewer

23    for other people's work for the academic journals and also

24    serve on editorial boards for the peer review journals.

25    Q    Could you explain what a peer review is or a peer reviewer?

```
 1    A    Yeah.  So in economics, the way research progresses is the
 2    research would be submitted.  If you have research that you
 3    would like to have published, you would submit it to one of the
 4    peer reviewed journals.  And the editors there would take it
 5    and then send it out to independent other academics to review
 6    it, to look at it and to provide critique and criticism and to
 7    assess the quality of the work.  And then the reviewers would
 8    send that back to the editors, and then the editors would look
 9    at the original research and the critiques that they received
10    from the peer reviewers and make a decision about whether the
11    work is reliable and whether it should be published in the
12    journal.
13    Q    Have you served as an editor for a peer-reviewed
14    publications?
15    A    Yes, I'm on a couple editorial boards now and I've been on
16    some others in the past.
17    Q    Have you also published articles in the area of collusion
18    or econometrics in peer-reviewed journals?
19    A    Yes.
20    Q    If you could ask you to take a look, you have next to you
21    your disclosure --
22    A    Yeah.
23    Q    -- the appendix that would be your curriculum vitae.
24    A    Yes, I see it here.
25    Q    Is that a correct copy of your CV?
```

1    A   Yes.

2    Q   Ask you explain what a CV is?

3    A   Yeah.  In academics we use -- it's just a resume.  So the

4    professors tend to use the word curriculum vitae or the

5    academic resume.  It would be a list of publications and your

6    academic credentials.

7    Q   If we could pull up PX 535, which is a copy of your CV.  I

8    would like you to look at -- first of all, how many research

9    papers and academic journals have you published?

10   A   In the peer-reviewed journals, more than 30, plus a number

11   of book chapters and other things.

12   Q   I ask you to focus in on a couple of these articles.

13           The first one is titled: Plus Factors and Agreement in

14   Antitrust Law."  Do you see that?

15   A   I see it.

16   Q   Can you describe to the jury what that article is about?

17   A   That paper is about using economic evidence to detect

18   collusion.  How an economist would look at the evidence

19   available to them and ask whether the evidenced provides a

20   strong inference of collusion.

21   Q   How was that received in the academic community?

22   A   That paper received an award for the best antitrust writing

23   of 2011.

24   Q   And before I ask you another question about these

25   publications, in the classes you teach, do you also -- do those

 1    also involve econometrics as well?

 2    A    I do.  I don't teach a class that's specifically focused on

 3    econometrics, but in all of my classes we do econometrics and

 4    do -- it covers material that includes econometrics.

 5    Q    Okay.  And if we could look at the next page of your CV,

 6    and focus in on the one titled "Cartel Price Announcements."

 7    A    Yeah.  This paper, it's "Cartel Price Announcements:  The

 8    Vitamins Industry."

 9          There were a price-fixing conspiracy among the major

10    manufacturers of vitamins, just Vitamin A and B.  The usual

11    vitamins.  But they're made by large chemical companies and

12    there was an admitted price-fixing conspiracy for most of the

13    1990s.  And this paper looks at the coordinated price increase

14    announcements that were issued by the firms in the cartel and

15    looks at how you might use a look at those price increase

16    announcements to assess whether there was collusion by looking

17    at the price increase announcement outside the conspiracy

18    period and comparing it to the conduct within the conspiracy

19    period.

20    Q    And just to clarify:  What is a cartel?

21    A    Sorry.  Collusion among firms is when the firms form an

22    agreement to suppress competition.  And so I tend to use,

23    "collusion" or a "cartel" is just the set of firms that have

24    gotten together to agree to suppress competition.  It's the

25    same thing as a price-fixing conspiracy.  The different --

 1    "collusion" and "cartel" and "price-fixing conspiracy" tend to
 2    get used interchangeably.
 3    Q    How was that article received by the academic community?
 4    A    And that article won a price for being one of the best two
 5    papers that were published in that journal, the International
 6    Journal of Industrial Organization in that year.
 7    Q    In addition to all those articles, have you also written a
 8    book?
 9    A    I have.  There's the title or the cover page.
10    Q    What is this book about?
11    A    The book is "The Economics of Collusion:  Cartels and
12    Bidding rings."  And it's about the economics of collusion.
13    It's about how an economist -- how an economist would think
14    about a price-fixing conspiracy and also about bidding rings.
15    So how an economist would think about collusion, how a
16    economist would look at the economic evidence in order to
17    detect collusion, and it also provides some discussion of how
18    economists would look at data in order to assess the effect of
19    collusion, the price increase associated with a price-fixing
20    conspiracy.
21    Q    Does that book also include a discussion of econometrics?
22    A    Yeah.  I don't think of it as a econometrics book or a
23    econometric textbook but it does include some discussion of the
24    types of econometric techniques that tend to get used in
25    assessing the effects of price-fixing conspiracies.

1    Q    What is that quote from?

2    A    Oh, the quote there is -- Professor Elzinga is one of Dow's

3    experts in this case, and in one of the reports that he

4    produced as part of this case he referred to the book as a

5    "valuable piece of scholarship."

6    Q    In addition to your academic work, do you do anything else

7    for a living?

8    A    I also do some consulting work, like being here today.

9    Q    Where do you do that?

10   A    I work with a consulting firm called Bates White.

11   Q    And how often have -- have you testified in court before?

12   A    I've been in court twice before but only with a judge.

13   I've never been presenting to a jury before.

14   Q    So you've testified in court before?

15   A    I've been in court before twice but only in front of a

16   judge, not with a jury.

17   Q    Were you qualified as an expert in those cases?

18   A    Yes.

19   Q    Have you worked on other price-fixing cases?

20   A    I have.

21   Q    How many of those?

22   A    About ten.

23   Q    What did you do in those cases?

24   A    I played different roles in some of the cases.  Sometimes I

25   was a consulting expert, other cases the testifying expert.

 1    Some of them had to do with looking at the economic evidence to
 2    reach an opinion about whether there was collusion, and others,
 3    about assessing the effects, the extent to which the prices
 4    were elevated as a result of the collusion.
 5    Q    Did that work involve the application of econometrics?
 6    A    Yes.
 7    Q    What's your hourly rate?
 8    A    Right now it's 950.  I've been working on this case for
 9    about three years now, so back when I started it was 750.
10    Q    And approximately how many hours have you worked on this
11    case?
12    A    Approximately 300 hours.
13              MR. MARTIN:  Your Honor, we would tender Dr. Marx as
14    an expert in economics and econometrics.
15              THE COURT:  Ladies and gentlemen, typically in a trial
16    people testify who have knowledge of facts either through their
17    senses, what they observe, what they know, what they hear.  The
18    law permits, however, that when somebody has a particular
19    expertise or skill or training in education, they may testify
20    as to opinions that they have regarding that discipline that
21    they're an expert or skilled in.  And in this case, Dr. Marx is
22    being offered as an expert to testify in the area of economics
23    and econometrics, and the Court finds based on her
24    qualifications that she's an expert in that area and permitted
25    to testify as to her opinions in that area.

 1          All right.

 2          MR. MARTIN:  Thank you, your Honor.

 3    BY MR. MARTIN:

 4    Q   So let's turn to this case.  Can you tell the jury how you

 5    got involved in this case?

 6    A   Yes.  When I first got involved in this case, it had

 7    already been going on, and there was an economist before me who

 8    had been working on the case, and his name was Dr. Raiff, and

 9    for medical reasons he was no longer able to continue to work

10    as the expert.

11          And so I was asked to come in and look at the work

12    that had already been done by Dr. Raiff and others, and look at

13    the evidence in the case and to reach a conclusion about

14    whether I would be able to step in and sponsor and defend the

15    analysis and conclusions that Dr. Raiff had reached.

16    Q   And just to give the jury a sense of where in the process

17    this was, when you say "what work had been done to date," just

18    what work had been done to date?

19    A   Yeah.  When I first got involved in the case -- Dr. Raiff

20    is an economist, and he had -- he had done an analysis, he had

21    written a report, he had developed estimates of the -- to the

22    extent to which prices were elevated as a result of the

23    conspiracy, and that report had been provided to Dow's economic

24    experts.

25          And Dow's experts had that report for about 11 months,

 1    and during that time they were able to go through Dr. Raiff's

 2    report and offer critiques and criticisms of that report.  Kind

 3    of like in the refereeing process.  So they were able to review

 4    the work that Dr. Raiff had done, and each of Dows experts

 5    produced a report.  Dr. Ugone and Professor Elzinga, the two

 6    experts for Dow, they each produced a report offering their

 7    criticisms of Dr. Raiff's initial report, and then Dr. Raiff

 8    was allowed to respond.

 9            So he wrote another report responding to -- making

10    some adjustments and doing some additional work and responding

11    to the criticisms offered by Dow's experts.

12            So when I came into the case, there was the initial

13    report, a set of criticisms and critiques by Dow's experts and

14    a response to them, plus I had access to all of the materials

15    and evidence that was available in the case.

16    Q   Were you able to draw on your academic background and

17    familiarity with the peer review process to fulfill your

18    assignment?

19    A   Yeah.  It felt a little bit -- it was a little bit unusual

20    for -- to be in that situation, but it felt a lot like the peer

21    review process.  Where as an editor of the journal I would get

22    a piece of research and I would get my outside reviewers to

23    look at and sometimes I'll ask the author to make some changes

24    or do some additional work, and so then I'll have in front of

25    me the research and the critiques and I would be evaluating

 1    that body of work as a whole.  So it felt a little bit like

 2    that process.

 3    Q   To perform your assignment, did you have to know what Dr.

 4    Raiff's assignment was?

 5    A   Oh, definitely.

 6    Q   Can we talk through that a little bit?

 7    A   I have a slide here.

 8        So Dr. Raiff's assignment was to determine whether the

 9    plaintiffs were overcharged as a result of the conspiracy to

10    elevate the prices of TDI, MDI and polyether polyols; and if

11    so, if they were overcharged, to quantify the amount of the

12    harm suffered by the plaintiffs.

13    Q   Now, during today's questioning I may refer to it as "your

14    report," but when that happens we all understand that it's Dr.

15    Raiff's report.

16    A   That's fine.

17    Q   And it's your opinions.

18        I'd like to have you explain a couple of the words

19    that are in this assignment if I could.

20        "Overcharged"; what does that mean in economics?

21    A   For an overcharge here is going to be the extent to which

22    the prices that were paid by the plaintiffs were higher than

23    the prices would have been if there hadn't been a conspiracy.

24    Q   And what does a conspiracy mean?

25    A   Again, it's collusion; it means a group of firms that have

 1    an agreement to suppress competition.

 2    Q    Were you asked to form an opinion on the existence of

 3    conspiracy?

 4    A    No.   I was instructed to assume that the jury -- make the

 5    assumption that the jury has found that there was a conspiracy,

 6    and to take that as a given, and to, from that starting point,

 7    assess whether the conspiracy was affected, whether it did

 8    elevate prices above what they otherwise would have been, and

 9    to quantify the extent to which the prices were elevated.

10    Q    Based on your experience, is that assumption unusual in

11    price-fixing cases?

12    A    No, it's -- it's a typical way these cases proceed.   We

13    want to -- in the event that the jury should decide that they

14    view that there was a conspiracy, to then provide you with an

15    opinion that would guide you in thinking about whether the

16    conspiracy was effective and the amount to which it affected

17    the plaintiffs.

18    Q    Does that mean that you took the existence of a conspiracy

19    as a given without doing any additional work?

20    A    No, no.   So I -- in thinking about that assumption, I

21    reviewed the evidence available to me and did a study to make

22    sure that given the evidence that I saw, that it was reasonable

23    to proceed under the assumption that there was a conspiracy.

24    Q    And did you gain an understanding of the behavior of the

25    alleged conspiracy through your investigation?

 1    A    Yes.

 2    Q    How did you gain that understanding?

 3    A    I think -- okay, yeah, this supplied just has a summary of

 4    the kinds of materials that I reviewed.  So there were again

 5    the reports:  Dr. Raiff's report, the Plaintiffs' report, Dow's

 6    reports, and also, they were -- they were deposed as well, so

 7    there was testimony from deposition for all of these economic

 8    experts.  I reviewed business records, depositions, interviews

 9    and other information regarding the structure of the industry

10    the behavior of the conspirators and market performance, and

11    also I looked at all the data.

12    Q    Did the expert reports for Dr. Raiff and for Dr. Ugone and

13    Professor Elzinga, did they cite to documents and testimony?

14    A    Yeah.  So they were -- they were also incorporating and

15    citing to large numbers of documents and evidence that's in the

16    record in this case.  And so I looked at the reports and also

17    the things that were being cited and referred to in those

18    reports.

19    Q    Now, you talked a little bit about Dow's experts' reports

20    and the criticisms.  How important were those criticisms to you

21    as you fulfilled your assignment?

22    A    I mean, it was really important to me.  It was really

23    helpful to me to see the criticisms that were being offered, so

24    it was helpful for me to see where the points of concern were,

25    what these experts' criticisms were; and also to see the areas

1    where they didn't have any particular concerns, that indicated

2    to me areas of more consensus about the way to proceed.

3    Q    After doing all this work, what was the understanding that

4    you gained of the behavior of the conspiracy?

5    A    My understanding is that it was an agreement to suppress

6    competition, efforts to achieve consensus about price increase

7    and efforts to try to make those price increases effective.

8    Q    Were you able to fulfill your assignment?

9    A    Yes.

10   Q    Were you able to reach any opinions?

11   A    I did.

12   Q    I'd like --

13   A    I think there's a slide with a summary.

14         Oh, I guess they'll come up one-by-one.

15   Q    There we go.

16         Can you tell the jury the first opinion here?

17   A    That the industry was prone to successful collusion.

18   Q    What does that mean?

19   A    What I mean by that is that, I want to look at the industry

20   and ask the question:  If there were a conspiracy in this

21   particular industry, is it sensible to think that it would have

22   been able to be effective in elevating prices.

23   Q    Are there certain industry characteristics that economists

24   view as making an industry more or less prone to collusion?

25   A    Yes.

1   Q    Just high level; what are those?

2   A    I'm thinking about smaller numbers of firms, high barriers

3   to entry, homogeneous products, those kinds of things.  We have

4   a slide to talk about that later in more detail I think.

5   Q    Was this opinion important to you?

6   A    It was important to me, because I'm being asked for an

7   opinion about whether there was effective collusion, whether

8   the price-fixing conspiracy was actually able to elevate prices

9   above what they otherwise would have been, and I want to make

10  sure that that makes sense that you would see that kind of

11  thing in this particular industry.

12  Q    Let's turn to your next opinion.

13       Can you tell the jury what that was?

14  A    There was an effective conspiracy that caused higher prices

15  market-wide for urethane chemicals.

16  Q    What do you mean by an "effective conspiracy"?

17  A    I mean the result of the conspiracy, the effect of the

18  conspiracy was actually to elevate prices above what they

19  otherwise would have been.

20  Q    What does "market-wide" mean in that opinion?

21  A    Encompassing all of the -- the market-wide price, all of

22  the -- affecting all of the buyers and sellers in the market.

23  Q    Does that include the plaintiffs in this case?

24  A    It includes the plaintiffs, but also a larger set of

25  purchasers.

1    Q    Okay.  Let's take a look at your third opinion.

2    A    The plaintiffs suffered harm as a result of the alleged

3    conspiracy.

4    Q    What does that mean?

5    A    Well, there I'm singling out the plaintiffs in particular,

6    so the second bullet there was about a market-wide elevation in

7    price.  But I also need to dig down and ask specifically with

8    the plaintiffs:  Were the plaintiffs at issue in this case

9    affected by the increase in prices.

10   Q    And we're going to talk about all these opinions more

11   throughout the day.  But high level, how did you reach that

12   opinion?

13   A    There I was using an econometric analysis of the data and

14   evaluation of the evidence in the case.

15   Q    And your last opinion that?

16   A    The plaintiffs paid over $608 million more than they would

17   have paid but-for the conspiracy.

18   Q    And how did you reach that opinion?

19   A    Again, this was an analysis of the data and evaluation of

20   the evidence in the case.

21   Q    Did you estimate damages for every plaintiff here?

22   A    I did.  I estimated the overcharges associated with each

23   transaction by each of the plaintiffs.

24   Q    And last -- I would ask you actually to look at the damage

25   figures and ask you if you could explain this to the jury.

 1                    THE WITNESS:  Judge Martini?  Judge?

 2                    MR. MARTIN:  Your Honor, if it's okay, can she stand

 3        up?

 4                    THE WITNESS:  Would it be okay if I pointed?

 5                    THE COURT:  So long as you keep your voice up.

 6                    MR. MARTIN:  And if you turn the mic a little bit, it

 7        will pick you up.

 8                    THE WITNESS:  I have a microphone here.  But if I just

 9        stand here --

10                    THE COURT:  Do you want to use this?  No?

11                    THE WITNESS:  Would you mind if I just pointed?

12                    MR. MARTIN:  She's a professor, she's used to

13        standing.

14                    THE COURT:  Okay.

15        A    This is a table, and so it's showing in this table for the

16        three products at issue -- what I'm -- when I'm talking about

17        urethane chemicals I mean specifically these three:  TDI, MDI

18        and polyols.  And the table is showing you in the first column

19        the total purchases by the plaintiffs in the time period from

20        1994 to 2003.

21                    And so the plaintiffs purchased in that period $2.217

22        billion in TDI.  And the other number over here, this is the

23        estimate of the amount to which they overpaid, the overcharges

24        associated with TDI, and it's $272.6 million.  And that is

25        repeated for MDI and for polyols.

 1              The overcharge percentage in the middle is just -- in
 2     case it's useful to see as a benchmark what these percentages
 3     are, you can take the overcharges and divide by the total
 4     purchases to get these percentages in the middle.
 5              The total at the bottom shows you total purchases by
 6     plaintiffs from the alleged conspirators in this period of time
 7     of $5.2 billion, and the estimated overcharges of $608 million.
 8     Q    And we're going to at the very end of this presentation
 9     talk about exactly how that number was calculated.
10              Is the $608 million the number that Dr. Raiff provided
11     in his last set of numbers?
12     A    No.
13              So, when Dr. Raiff did his work initially, he had a
14     somewhat higher number, but I -- I think it's appropriate to
15     make an adjustment that I want to talk to you about.  So my
16     opinion is that the appropriate overcharge number is 608
17     million, and we'll talk about that this morning.
18     Q    So the average overcharge market-wide is what?
19     A    You're asking --
20     Q    The total, the red one.  No, the percentage.
21     A    The percentage overall is 11.7 percent.
22     Q    Are there academic studies regarding the amounts of
23     overcharges that are found in successful conspiracies?
24     A    There are.  There are a number of papers in the economics
25     literature that look back on price-fixing conspiracies that

```
 1    have been discovered and look at what happened in the course of
 2    those conspiracies, and a number of them developed estimates of
 3    what the overcharge percentage was in those past conspiracies.
 4    And it's not uncommon in those studies to see numbers between
 5    10 percent and 30 percent.
 6    Q    So as an economist, does this 11.7 percent number tell you
 7    anything about the effectiveness of the alleged conspiracy in
 8    this case?
 9    A    It tells me that it was effective, but -- but, you know,
10    not among the most effective conspiracies.  It had an effect
11    but not at the high end.
12    Q    Okay.  If we can then now start actually turning and diving
13    into your four opinions.  I'm going to ask you about the very
14    first one --
15    A    Sure.
16    Q    -- which was the industry was prone to successful
17    collusion.
18              I think the first thing we want to talk about is:
19    What is collusion?
20    A    Again, collusion is an agreement among suppliers to
21    suppress competition.
22    Q    And what is -- is that the opposite of competition?
23    A    I think of it as the opposite of competition, yes.  So you
24    have here on this slide, competition is a process that would
25    lead to lower prices.
```

1    Q    Could you explain the process for the jury?

2    A    Yeah.  Competition is suppliers acting independently, not

3    attempting to coordinate with one another.

4    Q    Do the buyers play a role in that process?

5    A    The buyers play a role, of course, but if the suppliers are

6    coordinating, acting together to elevate prices, not competing

7    against one another, then there may not be very much a buyer

8    can do to try to secure lower prices.

9    Q    How does collusion, in an economic theory, interfere with

10   that competitive process?

11   A    The collusion, the suppression of competition means that

12   you're not going to have buyers -- sorry -- you're not going to

13   have the suppliers being willing to take profitable

14   opportunities to get more business, so you're not going to be

15   able to have the usual pressure keeping prices low for the

16   buyers.

17   Q    If there's collusion does, that means there no competition?

18   A    No.  When I talk about collusion as a suppression of

19   competition, you can have very effective suppression of

20   competition and somewhat less effective, it's a matter of

21   degree.  So you can have periods of time where you're able to

22   very effectively suppress competition and other periods of time

23   where the attempts to suppress competition were less effective.

24   So it's not on or off, it's a matter of the level of

25   effectiveness.

 1    Q    One of the words the jury heard at the start of this case

 2    was "oligopoly."  Can you explain what oligopoly is?

 3    A    Yes.  This is a picture I often draw for my students in

 4    economics on the first day of class.  Economists tend to think

 5    of markets in terms of a spectrum where at one end of the

 6    spectrum you have a monopoly.  And a monopoly is where there's

 7    only one supplier, there's just one firm, just your monopolist,

 8    and so there's no competition there.  And at the other end of

 9    the spectrum we have perfect competition.  It's a world where

10    you have very many suppliers each of which is small relative to

11    the market, so you have lots of small producers.  That's a

12    world of perfect competition.  And then economists use the

13    label oligopoly for the things in the middle.

14          So an oligopoly is a market where you have more than

15    one firm, but not just -- not a very large number of small

16    firms, you've got a few significant players in the market.

17    That would be a oligopoly.

18    Q    You said in the beginning of this case that in oligopolies,

19    when somebody takes price up, a producer takes price up, by and

20    large other producers go along with it.

21          Do you agree with that?

22    A    No, I don't.  So in an oligopoly, if there's competition

23    among firms in an oligopoly, if other firms, if your rivals

24    attempt to raise your price and you see a profitable

25    opportunity to undercut them to capture business, you would

 1    expect in an oligopoly that firms would attempt to undercut one

 2    another.

 3    Q    Why don't producers have an incentive to always match a

 4    price increase announcement and everybody wins?

 5    A    Remember, in the absence of an agreement, if your rivals

 6    are raising their price, you have an opportunity as a

 7    competitor to come in at a slightly lower price and potentially

 8    capture a significant amount of business.  That's the force of

 9    competition.

10    Q    Now, there were a number of other factors that you

11    previewed when you were talking about the first opinion.  I'd

12    like to see if you could go through them for the jury.

13    A    Sure.

14    Q    Could you tell the jury what this first one is?

15    A    The first one, again, these are characteristics of -- this

16    particular -- the industry here, the urethanes industry, that

17    lead to the conclusion that if there were a conspiracy, it

18    would be reasonable to expect they might have an effect on the

19    prices.  And the first one here is "Alleged cartel participants

20    included all market leaders and controlled nearly all urethane

21    production."

22              MR. BERNICK:  Excuse me, your Honor.  If I could just

23    be heard at sidebar with respect to this chart?

24              THE COURT:  All right.  Let's go.

25              (At the sidebar.)

 1          MR. BERNICK:  I am sorry to interrupt things.  I don't
 2     like to do that.
 3          THE COURT:  That's okay.
 4          MR. BERNICK:  So the chart indicates and I was handed
 5     a set of slides before it began that did not --
 6          THE COURT:  We can talk.  We can talk.  We're out
 7     here.  That's why we're out here.
 8          MR. BERNICK:  It did not include the conclusions
 9     slide, it was black.
10          THE COURT:  This slide?
11          MR. BERNICK:  The slide that's now -- the slide that
12     was being shown --
13          MR. JOHNSON:  We --
14          THE COURT:  Wait.
15          MR. BERNICK:  Just wait.
16          That's okay.
17          THE COURT:  Go ahead.
18          MR. BERNICK:  So I'm saying, when it saw it flash up
19     and heard her testify, her second conclusion is that there was
20     a conspiracy that was effective in raising prices.
21          THE COURT:  Right.
22          MR. BERNICK:  That is completely outside the scope of
23     Dr. Raiff's opinion, it's completely outside the scope of her
24     own opinion, including the opinion that she indicated during
25     the course of the Daubert proceeding.  She did no liability

 1    analysis, she did no --

 2              THE COURT:  You're talking about a slide she's already

 3    testified to?

 4              MR. BERNICK:  Well, it's up there still.  No, it's up

 5    there right now.

 6              So all I want to say is that they can go forward, but

 7    this is completely outside the scope of the Order appointing

 8    her or allowing her to proceed, which is that she solely

 9    endorsed the opinions and the approach of Dr. Raiff.

10              There is no -- I mean, it's down in black and white in

11    her own deposition.  She did not do a liability analysis, did

12    not, and she simply assumed a conspiracy.

13              THE COURT:  Okay.

14              MR. BERNICK:  Now -- I'm sorry.

15              THE COURT:  Finish up.

16              MR. BERNICK:  So, the most that they've gotten is that

17    she now attributes post-model, she have attributes the variance

18    to evidence of the conspiracy as a whole, which is different

19    from what I'm saying, attributes it to a conspiracy that she's

20    found.  That slide says:  "There was an effective conspiracy

21    that was effective in raising prices."

22              THE COURT:  Go ahead.

23              MR. MARTIN:  It's taken straight out of one of the

24    reports.  The language is literally verbatim from one of the

25    expert reports, Dr. Raiff's reports, there was an effective

```
 1    conspiracy.  It's in his reports.  And if you need to see it I
 2    can find it.
 3              THE COURT:  Do you have -- I looked at the -- I don't
 4    recall.
 5              Do you have that?
 6              MR. MARTIN:  I believe it's in the reply report.  I
 7    have to go back and get it.  Give me two seconds.  Do you mind
 8    if I go back?
 9              THE COURT:  What's that?
10              MR. MARTIN:  Do you mind if I go back and get it?
11              THE COURT:  Do you have it back there?
12              MR. MARTIN:  Yes, because there is the wrong one.
13              (Mr. Martin steps away from sidebar, and returns.)
14              THE COURT:  What do we have?
15              MR. MARTIN:  We have a number of them but this is the
16    easiest to read.
17              THE COURT:  I see what you're -- you're objecting.
18    (Reading) These low probabilities are evidence that there was
19    an effective conspiracy that caused plaintiffs economic harm in
20    the amounts estimated by my models.
21              And your arguments is that this graph says there was a
22    conspiracy --
23              MR. BERNICK:  Yes.
24              THE COURT:  -- instead of saying it was evidence --
25              MR. MARTIN:  But this has an effective conspiracy.
```

```
 1    She focused on "effective."
 2              MR. BERNICK:  But there was an effective conspiracy.
 3              All she can address is based on the assumption that
 4    she was given.  She didn't do did liability analysis.  So
 5    they've used this language which does deal with impact, but the
 6    way that it's worded and that way she's now testifying suggests
 7    that she has an opinion.  So I'm objecting --
 8              THE COURT:  No, you can deal with this on
 9    cross-examination.
10              MR. BERNICK:  Okay.
11              THE COURT:  Okay
12              MR. MARTIN:  Thank you.
13              THE COURT:  If there are any subtle differences there,
14    and you think there are, you can deal with -- you think they're
15    more than subtle?
16              MR. BERNICK:  It's her own words.
17              THE COURT:  -- deal with it on cross.  I don't think
18    it's so misleading.
19              MR. BERNICK:  Then I don't have to keep on objecting?
20              THE COURT:  No.
21              MR. BERNICK:  Okay.
22              (In open court.)
23              THE COURT:  You can proceed.
24              THE WITNESS:  Can I just ask a question?  There's like
25    a ticking sound.  It's kind of irritating.
```

```
 1                  THE COURT:  There's a sound?

 2                  MR. MARTIN:  It's like a metronome.

 3                  THE WITNESS:  If there's nothing to be done about it,

 4       I just --

 5                  MR. JOHNSON:  We have suffered from that on and off

 6       throughout the trial.

 7                  THE COURT:  Yeah.

 8                  Hold on.  Can you hear?

 9                  THE WITNESS:  No, it stopped now.

10                  THE COURT:  I think it's the ventilation.

11                  THE WITNESS:  Oh, okay.

12                  THE COURT:  I think it goes on and off depending on

13       the temperature.  That's the best I can figure out.

14                  All right.

15                  MR. MARTIN:  Or leprechauns.

16                  THE COURT:  That was last week.

17                  (Laughter.)

18       BY MR. MARTIN:

19       Q   I'm sorry.  Were we still talking about this opinion, or

20       had we moved to the next one?

21       A   I think we were on the first one here, "Alleged cartel

22       participants included all market leaders and controlled nearly

23       all urethanes production."

24       Q   Can you explain what that means?

25       A   Yes.  Take an example:  Suppose that -- suppose that you
```

 1    were trying to get your house painted or your roof fixed and
 2    you were looking -- you were getting quotes from contractors
 3    for prices.  Suppose that there were half a dozen contractors
 4    that would be candidates, and suppose that two of them, just
 5    two of them decided to get together and agree to raise their
 6    prices.  You're just going to use one of their competitors.
 7    They're not going to be effective at being able to raise their
 8    price because you have other options.

 9            So if you're trying to be effective in elevating the
10    price, it's going to be helpful if you control a large portion,
11    all or a large portion of the market.

12            And that was something that was true in urethanes
13    where the alleged cartel participants included all of the
14    market leaders and controlled nearly all of the urethanes
15    production.

16    Q   Could we ask you to look at the next part of your opinion
17    there.  It helps if I push the button.

18    A   Thanks.  The next one says, "Entry by new suppliers was
19    difficult, expensive and time consuming in the urethanes
20    industry."

21            So again, going back to our roofing contractors, now
22    suppose that all six in your area agree to get together and
23    raise the prices.  If it's relatively easy for someone else to
24    enter the area and offer you a good price, then again it's
25    still going to be hard for those firms to succeed in elevating

 1    the prices.

 2           But in the urethanes industry, entry by new suppliers

 3    was difficult, expensive and time consuming.  I think you've

 4    heard some about the large chemical plants that are used to

 5    produce these products.  It's what an economist would refer to

 6    as "barriers to entry."  There were barriers to new firms just

 7    coming in in a short period of time and competing.

 8    Q    You stole my question.

 9           Could we have the next one.

10    A    The next one says:  "Urethanes are commodity type

11    products."

12           And so a commodity type product is, the products are

13    relatively interchangeable across producers.  You think of

14    commodities as flour and sugar and things that are a

15    well-defined commodity.  So then you have the core TDI, MDI and

16    polyols products were relatively interchangeable across the

17    producers.

18           That means that the producers are trying to get

19    together and agree to elevate prices it makes sense for them

20    just to agree on a common price increase because the products

21    are essentially the same cross the producers so they can agree

22    on a single common increase in price.

23    Q    Look at I think the last aspect of that opinion.

24    A    "Poor substitutes for most applications of urethanes."

25           This is going to the buyers' side.  So the buyers in

 1    this industry, if you want to make flexible foam, you really
 2    need TDI and polyols.  So if the suppliers of these urethanes
 3    products raise price, there's very little that the buyers can
 4    do.  There aren't good substitutes that they could buy
 5    instead -- they couldn't buy something instead of TDI and still
 6    be able to make the flexible foam.

 7         So in this industry there are poor substitutes.  The
 8    buyers, they're really kind of stuck if they can't get access
 9    to these chemicals.

10    Q    I was wrong, there's one more.

11    A    "Opportunities to communicate."

12         As you can imagine, if the suppliers are attempting to
13    coordinate among themselves, it's going to be helpful to have
14    opportunities to communicate.

15    Q    Do you see evidence of opportunities to communicate in the
16    record of this case?

17    A    Yes.  There's evidence in the record of telephone calls and
18    meetings and direct communication, and also trade associations
19    that provided opportunities for communication and meetings and
20    a trade press.

21    Q    In the academic literature, is there discussion about how
22    trade associations play a role in price-fixing conspiracies?

23    A    There are certainly legitimate purposes for trade
24    association meetings but there's also a literature in economics
25    that looks at the role that trade associations have played in

 1  past conspiracies that have been discovered as facilitating

 2  communication among the cartel members.

 3  Q   So when you say that the industry structure was conducive

 4  to collusion, does that mean that there was a conspiracy?

 5  A   No, it doesn't mean there was a conspiracy.  This is all

 6  about whether, if there were a conspiracy, does it make sense

 7  that they would be able to effectively elevate the price.

 8  Q   Okay.  So let's turn to your second opinion, if we can.

 9  A   Yes.  There was an effective conspiracy that caused higher

10  prices market-wide for urethane chemicals.

11  Q   So in this case, the assignment of Dr. Raiff was to

12  estimate overcharges.  Is that a common assignment in

13  price-fixing cases?

14  A   Yes.

15  Q   Are there ways to deal with that?

16  A   Yes, there are well accepted ways of using econometric

17  techniques to estimate whether the prices were elevated above

18  what they otherwise would have been.

19  Q   How does econometrics help?

20  A   Econometrics is going to allow us to take a systematic and

21  scientific approach to the data and use these statistical

22  techniques to understand and make predictions about what the

23  prices would have been in the absence of the conspiracy.

24  Q   Why do that when you can just look at the documents and the

25  testimony and evidence of negotiations?

1   A    Again, that kind of look -- it's going to be hard from that

2   kind of look to get a measure of whether the prices were

3   actually effected and the extent to which they're affected.

4   And by using econometrics we'll be able to bring in all of the

5   data and analyze it in a systematic way.

6   Q    Was econometrics used in this case?

7   A    Yes.

8   Q    How?

9   A    It was used to develop an estimate of what the prices would

10  have been in the absence of the conspiracy.

11  Q    Was there something called a model created?

12  A    A model was developed.  An econometric model was developed,

13  and that model was used to predict what the prices would have

14  been if there hadn't been a conspiracy.

15  Q    Can you just describe what a model is for the jury?

16  A    Yeah.

17       Economists use the word "model" to signify that the

18  way prices are formed is a complicated process, but we're going

19  to distill the key elements, how the prices are responding to

20  the economy, to the cost factors, the demand factors and the

21  economy; the key drivers of these prices.

22  Q    And the model in this case was called a benchmark product

23  model?

24  A    Yes.

25  Q    So are there standard ways to develop --

1    A    Actually there are three.  There was a benchmark product
2    model for TDI, one for MDI, and one for polyols.
3    Q    And are there standard steps that are used to develop a
4    benchmark product model?
5    A    Yes.
6    Q    I'm going to ask you to look to those.
7    A    I have a slide that summarizes these.
8    Q    I'm asking --
9    A    These are the steps associated with developing the
10   benchmark model.
11   Q    So I'm going to ask you one-by-one questions as we go
12   through this.  Okay?
13   A    Yes.
14   Q    The first one is "Collect and organize the data."
15        How much data are we talking about?
16   A    We're talking about hundreds of thousands of transactions
17   for these chemicals.
18   Q    What kind of transactions, all different kind of -- how
19   many products?
20   A    Hundreds of products.  And these are all the transactions
21   for the time period we have between -- all the sales by the
22   alleged conspirators.
23   Q    How did you organize that data?
24   A    I had the data in electronic form, so I'm using computers
25   and spreadsheets and statistical programs to help me organize

```
 1    and analyze the data.

 2    Q    The next step is to choose an appropriate benchmark period.

 3              I think that now it would be helpful if we can put up

 4    this board.

 5              THE WITNESS:  May I stand up and --

 6              THE COURT:  Sure.

 7              THE WITNESS:  Great.

 8              I'm going to take the microphone in case it helps.

 9              THE COURT:  Is it on?

10              THE WITNESS:  It is now.

11              THE COURT:  You need to hold it close to your mouth in

12    order for it to pick up.

13              THE WITNESS:  I'll do my best.

14              THE COURT:  That's good.

15    A    (Continuing)  I think you saw a figure like this in the

16    opening remarks but it had lines on it.  We're going to add the

17    lines as we go.

18    Q    So, can you tell me, first of all, how you're going to

19    develop the lines?

20    A    Yeah.  Let me just orient you to this graph.

21              So, this has years on the horizontal axis.  It starts

22    in 1992 and goes to the end of 2008.  And it has identified on

23    here the conspiracy period.  So the conspiracy is alleged to

24    have run from the beginning of 1994 through the end of 2003.

25    So that's the yellow shaded area there.
```

 1   Q   So you had all of this data, you organized this data.  How
 2   did you convert that into something useful?
 3   A   So what I'm going to do with -- we're just going to talk
 4   about TDI for a moment, and we'll run through TDI and then
 5   we'll need to talk about MDI and polyols also.
 6          But the first thing I did was take all of the
 7   transactions and calculate the weighted median.  So I'm going
 8   to look at the price that's the middle price or the central
 9   price for this TDI 80/20 product.
10          TDI 80/20 is -- I'm not sure how much detail you've
11   gotten into, but there are some different TDI products.  The
12   main one where most of the volume is, is called TDI 80/20.
13   It's the biggest product by volume.  It was sold through this
14   whole period of time.  It's a commodity-like product, and it
15   serves as kind of an anchor for the other TDI prices.
16          Should we put the price line on?
17   Q   If that would help you, let's do that.
18          Tell the jury what this is.
19   A   The blue line here is the weighted median price for TDI
20   80/20.  So looking at all of the alleged conspirators'
21   transactions in this period of time and looking at the weighted
22   median price, and you can see this blue line with all the
23   prices through here, it's denominated in dollars per pound
24   here.  And -- yeah, I'll just stop there.
25   Q   Why use median prices?

 1   A    The prices at which these transactions happened, all the
 2   transactions weren't at exactly the same price, there were some
 3   different prices paid.

 4         If you look at -- if you look at the prices paid
 5   weighted by volume, almost all of the volume of transaction
 6   happens in a band right around this blue line.  So this
 7   captures where the weight of all the transactions happened.
 8   And there's some transactions that happened at some higher
 9   prices and a few at lower prices, but almost all the volume of
10   transactions are happening right around this blue line.
11   Q    In general, is the use of median prices a standard way to
12   implement an econometric analysis?
13   A    It's a standard way to approach this.
14         Q    What about in this case, did it make sense in this
15   case?
16   A    Oh, yeah, it makes sense in this case.  We're thinking
17   about -- this is the market-wide price.  You probably heard
18   about price announcements that would be targeted at market-wide
19   prices.  This gives us a sense of where the market was at each
20   point in time.
21   Q    How many transactions are used to develop that line?
22   A    There are hundreds of thousands of transactions in that
23   line.
24   Q    And they weren't all at the same price.  Right?
25   A    No, they weren't at the same price.  The weight of the

1    volume was right around this line.  You see some small volume

2    purchases at some higher prices.

3    Q    So before we go further, the thing that sticks out is the

4    jump up there in 2006.  Can you explain for the jury what's

5    happening there?

6    A    Yeah, we should talk about this.  I know it kind of stands

7    out when you look at the graph.

8         This -- this jump is happening in 2005.  And in 2005,

9    in the fall of 2005 -- I don't remember -- but there were two

10   big hurricanes that hit the Gulf Coast.  Hurricane Katrina hit

11   New Orleans and Hurricane Rita hit near Houston along the Gulf

12   Coast.  And that area along the Gulf Coast is where a lot of

13   the manufacturing for this product is.  It's where their

14   refineries are along the Gulf Coast.

15        And so the hurricanes had a big impact, direct impact

16   on the production facilities and also on the transportation

17   network and their ability to get materials in and out.

18        So there was a big disruption as a result of the two

19   hurricanes.  And also in this period of time there was a

20   reduction in the number of manufacturers of this product from

21   five down to three, and a loss of about 30 percent of the

22   capacity in the market.

23        And those are the kinds of changes that you might

24   expect to affect prices.  There are also some sharp increases

25   in the input factor, the chemicals that are used to make these

 1    products.  So there's some things going on in that period of
 2    time that we're going to need to pay attention to later.
 3    Q   If we look just at this line, just at this line, can you
 4    draw an inference whether or not there was an effective
 5    conspiracy during the alleged period?
 6    A   Looking just at that line, no.  I mean, you can't tell
 7    whether there's a conspiracy by looking at that line, you need
 8    to know what the prices would have been without the conspiracy.
 9    Q   Let's talk then about the next step, which is "Choosing the
10    appropriate benchmark period."  Can you explain why that's so
11    important?
12    A   Yes.

13         In order to get an estimate of what prices would have
14    been in the absence of a conspiracy, we're going to need to
15    look at a period of time where there was no conspiracy.  We're
16    going to need to have a benchmark, we're going to need to have
17    a control period and look at what the competitive process looks
18    like when there's no conspiracy and then use what we learn
19    there to estimate what the prices would have been in this
20    conspiracy period if the competitive process had been the same
21    as it was outside the conspiracy period.
22    Q   How was the benchmark period chosen?
23    A   I had available the data from 1992 through the end of 2008.
24    This period in here from '94 through the end of 2003, in that
25    period there's evidence of conspiracy, so I -- I don't want to

```
 1    use that as my benchmark period.  But there are these periods
 2    '92, '93, the white period to the left and the white period to
 3    the right that offer a possibility to use those as the
 4    benchmark period.  And I looked at the evidence, and I don't
 5    see evidence of conspiracy affecting this earlier period, I see
 6    evidence that the conspiracy was essentially at an end in late
 7    2003, and so that leaves these periods before and after as a
 8    control period, as a period when they're unlikely to have been
 9    affected by the conspiracy.
10    Q   So you've chosen the benchmark period.
11            The next step is "Cost and demand variables."
12    A   Yes.
13    Q   So, could you talk about what those are?  This is a big
14    list.
15    A   Yeah,
16            THE WITNESS:  Can you guys see it?
17            I'm not sure they can see past the screen.  It's over
18    here, too.
19    A   (Continuing) Economics tell us that these prices are going
20    to be related to the underlying cost and demand factors, and
21    so --
22    Q   Do you want this?
23    A   That would be great.
24            THE WITNESS:  Is it easier for you guys to look at the
25    TV or to look -- the TV is better?
```

 1   Q    I'll take that back.  I need it.

 2   A    All right.  This list has some different categories of

 3   prices -- of cost and demand variables here.

 4         This first group, these are the chemicals that are

 5   used to make TDI, MDI and polyols.

 6         Okay.  So, toluene is a chemical that's used to make

 7   TDI.  If you want to make TDI, you need this toluene.  And so

 8   how much it cost to buy the toluene is going to affect how much

 9   it costs you to make TDI.

10         So we'll have as cost factors:  The toluene; you need

11   benzene to make MDI; you need propylene to make polyols.  And

12   these are other chemicals and inputs that you're going to need

13   to make these products.  And so the prices of these inputs is

14   going to matter for how much it costs to make the urethanes

15   chemicals.

16         I have wages down here.  You have to pay your work

17   force; and then last month's prices.

18         In this industry, I think you probably have seen some

19   evidence that there would be price increase announcements

20   issued, and so they would be benchmarked against what the price

21   was in the past.

22         Price is going up by $.06 or $.03, relative to the

23   previous price.  And so we'll have last month's price in here.

24   And think about how these cost demand factors are going to

25   move -- how they're going to cause the price to change.

 1              We need demand, so we need to think about what these
 2     chemicals are used for.  They're used to make flexible foam,
 3     sealants, they're used in building materials, they're used to
 4     make oriented strand board, they're used in the cushions in the
 5     seats.  And so we have a number of demand variables here.
 6              This is an index of U.S. carpeting and furniture
 7     production.
 8              This next one includes appliances.  MDI in particular
 9     is used in the insulation in some of the household appliances;
10     U.S. motor vehicle assemblies; the foam is used in the cars in
11     the automobile seats; U.S. housing starts, that catches the
12     building materials that these are used in too.
13              So you've got cost factors, we've got demand factors.
14              The next couple here relate to the things that
15     happened in 2005.  So we're going to need to have variables in
16     there to take into account the hurricanes and the effects in
17     2005.
18              And then the last three are capturing macroeconomics
19     effects, the overall economy.  So there are two exchange rates,
20     and this 10-year Treasury rate, that's an interest rate.  So
21     it's a measure of the overall economy.
22              This list also has -- you see the asterisk on -- some
23     of these variables have an asterisk next to them and those are
24     labeled the bottom as core variables.  So we're going to need
25     to draw the model, so we're going know need to make a choice

 1    about which variables to include in the model.

 2           We're going to need to keep --

 3    Q   Well, let me just ask you:  Are these all the variables

 4    that were considered?

 5    A   No, a larger set of variables was considered.  It was

 6    distilled down to this as the relevant set of variables to use

 7    in the model.

 8    Q   Then were all these variables actually used to develop the

 9    model?

10    A   They were all used for the model, yes.

11    Q   Was the list narrowed down for particular products in any

12    way?

13    A   Oh.  For example, where it has just TDI in parenthesis,

14    here the toluene is only relevant for TDI, so it would be used

15    in the TDI model, not in MDI or polyols.

16           And benzene is for MDI.  So not all of these variables

17    are relevant for all of TDI, MDI and polyols.  You use the

18    right ones for each product.

19    Q   And what's the difference between a core variable and the

20    other ones?

21    A   Yes.  We have to keep in mind what we're trying to do here.

22    We're trying to predict what prices would have been in the

23    absence of a conspiracy.  So we're going to develop a

24    predictive model.  And we know from economics that when you're

25    trying to develop a predictive model you don't want to just

 1    throw everything into the model.

 2              So, think about if you're making a cake.  You know you

 3    want sugar and flour and eggs, and then you can make a

 4    chocolate cake or a strawberry cake or a lemon cake.  So you're

 5    going to start with your core ingredients.  And then you need

 6    to make some choices about other ingredients.  And you don't

 7    want to throw everything in; that's a terrible cake.  But you

 8    want to choose wisely the other ingredients to put in.

 9              The variables here with the asterisk, those are our

10    "flour" and "sugar" and "eggs," those are the core ingredients.

11    And then we need to choose which other variables to include to

12    get the best most reliable prediction.

13    Q    How do you choose them?

14    A    Thank you.

15              Dr. Raiff used a statistical technique that's called

16    AIC.  That's designed to provide an objective way of

17    determining which variables to include to get the best

18    predictive model.  AIC -- AIC stands for Akaike Informatoin

19    Criterion.  It's a well-accepted technique in the literature.

20    It provides -- it makes sure that you are not biasing the

21    choice, you're not using your own opinion, you have an

22    objective criterion for determining which variables to include

23    in the model.  And so that's what was applied to select, in

24    addition to these core variables, which additional ones to add.

25              You don't want to throw everything in, so you need

 1    some way to discipline what the choice -- which variables are
 2    going to be included.
 3    Q    I have one more question on that.  But before that, you
 4    used the word "predictive model."  Could you explain what that
 5    means?  Because this doesn't look like you're making a
 6    prediction.
 7    A    Okay, that's a good question.
 8    Q    Thank you.
 9         (Laughter.)
10    A    Normally when you think of predicting, you think of having
11    some data and then estimating what's going to happen in the
12    future.  That would be a prediction.
13         Okay.  I'm using the word "prediction" here, but what
14    I mean is, we're going to use data from before and after to
15    estimate what's going to happen in the middle; so a middle
16    prediction, but I'm going to call it a prediction.
17         But what I mean here is we're going to use data from
18    the benchmark period before and after to estimate what's going
19    to happen in the middle.  What would have happened in the
20    middle if the competitive process had been the same in the
21    conspiracy period as it was in the benchmark period.
22    Q    Now back to the other question:  The AIC, how does it
23    actually work?  Is it somebody goes through it?  How does that
24    happen?
25    A    No.  The way AIC, the procedure, what AIC does is it runs

 1    the model with all the different possible combinations of
 2    variables and provides a score for each of those relative to
 3    their predictive performance and selects the combination of
 4    variables that gives you the best predictive performance.  You
 5    use a computer -- a computer would do the work.
 6    Q   Okay.  Now, we've got this list here, you've explained how
 7    they are chosen.  There's one that's not there.  That's
 8    capacity.  The jury has heard a lot about capacity.  Why wasn't
 9    capacity in here?
10    A   Good question.
11          Oh, good, I have a slide.
12          So as this slide says, as a general principle, factors
13    under control of the alleged cartel should not be included as a
14    variable.
15          Remember what we're trying to do, we're trying to
16    estimate what the prices would have been if there wasn't a
17    conspiracy.  If you include variables that were under the
18    control of the conspiracy or manipulated by the conspiracy,
19    you're not going to get an estimate of what the price would
20    have been in the absence of a conspiracy.
21          So it's understood in the economics literature that
22    for an exercise like this, you wouldn't want to include
23    variables, something like capacity that's under the control of
24    the conspiracy.
25    Q   That's a theoretical view that economists hold?

 1    A    It is.

 2    Q    Now, what about in this case; was there any reason to

 3    exclude capacity in this case, based on your evaluation?

 4    A    In this particular case I saw evidence that suggested

 5    agreement among the alleged conspirators to restrict capacity.

 6    So in this particular case I would have a special concern about

 7    including a variable like capacity in the model.

 8    Q    As an economist, what actually drives capacity decisions

 9    that businesses make?

10    A    We would normally think of the kinds of things that are

11    going to drive a firm's capacity choices.  We think of the cost

12    and demand factors that would drive the capacity forward; the

13    same factors that are going to affect prices.  So to the extent

14    the model is going to capture cost and demand factors, and

15    these are the same factors that are going to affect capacity

16    choices, we expect that to already be accounted for in the

17    model.

18    Q    So the title of this slide is "The model accounts for

19    capacity."

20         What does "accounts for" mean?

21    A    It means that whatever effect there is of capacity on

22    prices, that's already being captured by the other variables

23    that are explicitly included in the model.

24    Q    Was any test done to confirm that the model does account

25    for capacity?

```
 1    A    Yes.   Remember I talked about the different reports, so I
 2    had the Dr. Raiff report and he had a model.   And he provided
 3    that -- that model was provided to Dow's economic experts.
 4    They raised the question about whether capacity should be
 5    included in the model.
 6              So, Dr. Raiff, although he didn't include it for the
 7    reasons we already talked about, since he faced that criticism,
 8    the concern that maybe it should be included, he put it in the
 9    model; and when he put it in the model, the results didn't
10    change.   So that tells me as an economist that whatever
11    contribution there was of capacity to prices, that was already
12    being captured by the variables that were already in the model.
13              MR. MARTIN:   Your Honor, we're going to turn to the
14    next step of the thing.   I don't know when you want to have a
15    break, but that this probably be another ten minutes.
16              THE COURT:   Dr. Marx, are you okay for another 15
17    minutes or so?
18              THE WITNESS:   Definitely, yes.
19              THE COURT:   We'll go to about 10:15.
20              MR. MARTIN:    Thank you.
21    Q    The next step, the benchmark -- the next step of developing
22    the benchmark product model is to develop a mathematical
23    equation.   Can you explain what that means for the jury?
24    A    Yes.
25              We're going to need to develop an equation that tells
```

```
 1    us, for the benchmark period, how did these cost and demand
 2    factors generate these prices, and we're going to use a
 3    statistical technique called regression.  So it's a technique
 4    that's going to allow us to take the data about the cost and
 5    demand factors and the data about -- about prices and estimate
 6    what that relationship is between the cost and demand factors
 7    and the prices in the benchmark period, in the white periods of
 8    time there.
 9    Q   Is regression something that's only used in price-fixing
10    cases?
11    A   No.  Regression is a standard tool used in statistics.
12    It's used in medicine, and agriculture, in estimating housing
13    prices.  It's the kind of -- that's the right statistical
14    technique to be using to relate these underlying costs and
15    demand factors to these prices.
16    Q   So, for those of us who are not that well versed in
17    regression, could you show us an equation?  We.
18            Have a marker, we have paper.  You're all set.
19    A   Yeah.
20            Let me just give you an idea of what this equation is
21    that we're going to be estimating with regression.  What we're
22    interested in are prices.  So we're interested in -- let's
23    write -- let's focus on TDI here.
24            MR. MARTIN:  Do you want me to turn that for you?
25            THE COURT:  I can see it.  Is it dark enough?
```

 1          Ladies and gentlemen, can you see it on the board?

 2          Okay.  I can see it, too.

 3   A    I'll try to use my good teacher handwriting so we can

 4   understand this.

 5          So, the first thing we need is we're interested in the

 6   competitive prices.  Let's write competitive price this month.

 7          And we're going to think of the competitive price this

 8   month as being equal to some number, which we'll have to figure

 9   out, times the competitive price last month, with adjustment.

10          So we'll have to have some adjustment for changes in

11   the price of toluene.

12          And we're going to need adjustments for demand, so

13   we'll need some number times.  Let's work with auto.  So auto

14   demand.

15          And we're going to need all the other cost and demand

16   factors that we're going to put in this model, so we'll have

17   plus more cost factors; plus more demand factors.

18          And what the regression, what the statistical

19   techniques are going to tell us are what numbers go in these

20   boxes.  They're going to give us an equation that tells us:  If

21   we know competitive price last month, we know the input cost of

22   all the relevant cost factors, we know the demand factors,

23   we'll be able to estimate what the competitive price this month

24   should be.

25   Q    What data do you use to develop this equation?

 1    A    We're interested in understanding the competitive process

 2    in the benchmark period.  So we're going to use the data just

 3    from the white periods of time, just from the benchmark period

 4    to estimate this equation to use the regression technique to

 5    give us this equation, and then we'll use this as capturing the

 6    competitive process in the benchmark period and ask:  What does

 7    it tell us about what prices should have been in the conspiracy

 8    period?

 9    Q    So once you've got the equation developed, the next step is

10    to apply the model to the conspiracy period.  Right?

11    A    Yes.

12    Q    Would that help if I flip the page?

13    A    The best way to explain this is with the next slide.

14              All right.  So now we've got red dots.

15              The red dots on this are showing the prediction of

16    what prices would have been using the equation that tells us

17    what the competitive process looks like in the benchmark

18    period.

19              So notice that we have to -- to start this prediction,

20    we have to tell it what the competitive price was last month.

21    So we have to start this somewhere.  And what this red line is

22    doing is starting with the price from December of 1993 and

23    saying, starting from this price in December of 1993, let's

24    ask:  What would our prediction tell us the price should be,

25    the competitive price should be in January of 1994?

 1            And then we'll feed in this red dot our prediction of
 2    the competitive price in January of 1994 back into the equation
 3    and ask what the price for February would be.  And we're going
 4    to roll forward one month to the next and ask what the
 5    prediction is going forward.
 6            So it's important here that in this prediction we're
 7    not going to use the blue line.  We're not using the actual
 8    prices, we're only rolling forward one month to the next using
 9    last month's predictive competitive price to see what next
10    month's predictive competitive price will be.  And that's going
11    to roll forward, and we'll get a prediction of what the prices
12    would have been in the conspiracy period if the competitive
13    process had been the same as in the benchmark period.
14            And when you do this, this -- remember, this red line,
15    it's never seeing what the blue line is.  It doesn't know what
16    the blue line is here, it's just making a prediction one month
17    to the next.  And when you get to the end here, in order to
18    calculate the overcharges, we only need the prediction during
19    the yellow period.  But it will be interesting for us in order
20    to assess the reliability of the model to keep the prediction
21    going and see what it would have predicted out here in the
22    benchmark period after the conspiracy.
23            And you see that even after all this time it matches
24    up well out here.  It's doing a good job of capturing the
25    competitive process both -- or here in the period after the

 1    conspiracy.

 2    Q    So when we looked at the list of variables, one of them was

 3    called "Last month's price."

 4    A    Yes.

 5    Q    When you're rolling this model out, was it last month's

 6    price or last month's predicted price?

 7    A    It's last month's predicted price.  Because remember, we

 8    want to ask what the competitive price this month is based on

 9    the competitive price last month.  So we're going to use what

10    was predicted as the competitive price last month.

11    So this is using last month's predictive price to move forward.

12    Q    So after you start it, the very first red dot there, is the

13    blue prices, the actual prices ever used in the equation again?

14    A    No.

15    Q    Now, this runs starting in 1994.  Was there a check made to

16    see what would happen if it was started earlier?

17    A    Yes.

18         Another thing you can do to make sure that your model

19    of the competitive process is doing a good job and you've done

20    a good job capturing the competitive process is to start the

21    prediction back here at the beginning and see how it does.  So

22    that's on this next slide.

23    Q    Can you explain what's going on here?

24    A    Yes.  So now you've got both green little dashes and red

25    dots.  The green is starting the prediction from the very

 1    beginning.  So we give it one price from the blue line, give it
 2    January of 1992 and launch the prediction from here.  And you
 3    see that it's doing a good job of capturing the competitive
 4    process here at the beginning; and here at the end also doing a
 5    good job of capturing the benchmark prices.
 6            So that's a measure of the reliability of the model.
 7    It helps us see that we've got a good model that is doing a
 8    good job of capturing what we wanted it to, and that's the
 9    competitive process in the benchmark period.
10    Q    Now I've heard the term "model results."  What's the model
11    results here?
12    A    The model results are what's going to be relevant for our
13    calculations.  It is this distance; the difference between what
14    the prices actually were, the blue line, and what they would be
15    predicted to do be if there had been no conspiracy.
16    Q    So the gap gets wider in various time periods.  Do you have
17    an opinion why that is?  And narrower.
18    A    Yes.
19            As we know from looking at past conspiracies that have
20    been detected, you often see periods where the conspiracy is
21    relatively more effective or relatively ineffective, and you
22    see that happening here.  You see periods where the conspiracy
23    appears to be relatively more effective at getting prices up or
24    keeping prices up relative to what they otherwise would have
25    been; and then other periods of time, for example, here in

 1    2001-2002, where it appears -- in this period of time the
 2    predictive price matches up exactly with what the actual prices
 3    were.

 4             And remember, this line didn't know what the blue line
 5    was.  It wasn't connected to the blue line.  But the prediction
 6    is right on top of what the actual prices were.  And that
 7    suggests that this is a period of time where the conspiracy was
 8    not effective in that period of time.

 9             So seeing evidence of what looks like more competitive
10    conduct in that period of time wouldn't be particularly
11    surprising given this prediction.
12    Q    So there are some periods of time, the jury has heard a
13    little bit about right here, where there's an increase, maybe
14    there's an increase here.  Does the model explain why those
15    prices go up, the actual prices?
16    A    No.  So, if you look at these increases right here, you see
17    this is a period of time where the model, based on the cost and
18    demand factors that were in place at that period of time, the
19    model predicts basically flat prices.  But what you see in the
20    actual prices are these spikes up.  And this is a period of
21    time here where you see the model predicting down or flat
22    prices, but you see the actual prices bumping up.
23    Q    Do you have an opinion as to why there's a difference
24    between the actual and the predictive price lines?
25    A    I attribute this difference between the actual prices and

 1    the predictive prices to the effects of the conspiracy.

 2    Q   Did you perform a statistical analysis of the effectiveness

 3    of -- we haven't seen any price increases.  There's been no

 4    discussion of price increases.

 5    A   The announcements?

 6    Q   Yeah.  Did you do a statistical analysis of the price

 7    announcements?

 8    A   No, I didn't do a statistical analysis of the price

 9    increase announcements.

10    Q   Why not?

11    A   Remember what I was asked to do or what Dr. Raiff's

12    assignment was?  The question was:  Was the conspiracy

13    effective?  And if so, did it elevate prices relative to what

14    they otherwise would have been?  And if so, by how much?

15            And in order to answer that question, I didn't have to

16    answer the different question, different but related question

17    of trying to associate any individual price increase

18    announcement with its particular effect.  So it wasn't

19    necessary for me to do that.

20    Q   Okay.  So this is -- we've been talking about TDI this

21    whole time.

22            Have you done, or was this process repeated for

23    polyols and MDI?

24    A   Yes, I did the same thing, the same methodology again for

25    MDI and for polyols.

 1   Q    So we have it on the screen.

 2   A    We have to look at the TV now for this.

 3            So this one is CFS Polyols.  So the blue line here is

 4   looking at a particular polyol product called CFS polyols.  It

 5   stands for conventional flexible slab polyols.  It's the

 6   biggest volume of the polyols product.  It's kind of the anchor

 7   product for polyols, like TDI 80/20 is for the TDI products.

 8   So that's what the blue line is here.

 9            And then taking a similar approach, estimating what

10   the competitive process would be in the benchmark period, we

11   have the prediction of what prices would have been in the

12   absence of the conspiracy.  And you can see for polyols,

13   there's a period of time here at the beginning of the

14   conspiracy where it looks like there really wasn't very much

15   effect of the conspiracy.  The predictive prices and the actual

16   prices are more or less on top of each other in that earlier

17   period, and that's not particularly surprising.  Economists

18   will sometimes refer to the early period of a conspiracy as the

19   transition period, and sometimes you see a period of time

20   before you actually see effects.

21            And it looks through here that the conspiracy was

22   essentially able to keep prices roughly flat in a period of

23   time where cost and demand factors would have suggested

24   declining prices.

25   Q    And let's also look at the MDI model, if we can.

 1    A    This is the MDI model.  The benchmark product for MDI is
 2    called polymeric MDI or pMDI.  It's again the highest volume
 3    product.  It's kind of the anchor product for MDI.  So that's
 4    what the blue line is here.
 5            And we have again the prediction, and it's -- it has a
 6    similar look, similar characteristics.  It performs well in
 7    terms of matching the benchmark period.  Prices.  It predicts
 8    prices very similar to actual prices in the early period.
 9    Again, a period of time where prices were relatively flat where
10    cost and demand factors would have suggested declining prices.
11            You see that the kind of character of the estimates
12    are very similar across these three products.
13    Q    So I want to go back just for a moment to the polyols
14    model.  I'd like you to focus on the 2001 time period.  It
15    looks similar to TDI.  Do you have an explanation for that?
16    A    Right.  So we're looking at here, see how the actual and
17    predictive price match in this period just like they did in the
18    TDI model there?  And remember, TDI and polyols are often
19    purchased together.  You mix them together to make flexible
20    foam.  So the products are purchased together, they're
21    manufactured by a lot of the same firms, and in many cases it's
22    the same executives and the same pricing procurement officials
23    that are involved in setting the prices for both the TDI
24    product and the polyols product.
25            So it makes sense to me that you would see similar

```
 1    pricing in these two models.
 2              MR. MARTIN:  Your Honor, it's 10:15.  We're about to
 3    move to a slightly different part of this.
 4              THE COURT:  We'll take a recess then.
 5              All right.  Ladies and gentlemen, please don't discuss
 6    anything about the case and we'll see you in about 15 minutes.
 7    Okay.  Thanks very much.
 8              THE LAW CLERK:  Please rise for the Jury.
 9              (The Jury leaves the courtroom.)
10              THE COURT:  Dr. Marx, you can step down.  We're going
11    to take a break.
12              THE WITNESS:  Thanks.
13              THE COURT:  Twenty of or so.  Okay?
14              MR. MARTIN:  Thank you, your Honor.
15              How much longer do you think you have, Mr. Martin?
16              MR. MARTIN:  Forty-five minutes.
17              THE COURT:  Okay.  I'm just trying to get an idea.
18              (A recess is taken.)
19              (Witness temporarily excused.)
20
21    L E S L I E   M A R X, resumes testifies further as follows:
22
23              (Proceedings resume - Jury not present.)
24              THE LAW CLERK:  All rise.
25              THE COURT:  Are we all set?
```

 1              Do you want to bring out the jury.

 2              THE LAW CLERK:  Please remain standing for the jury.

 3              (Jury present.)

 4              THE COURT:  Everyone, be seated, please.

 5              You can continue, Mr. Martin.

 6                      DIRECT EXAMINATION CONTINUES

 7    BY MR. MARTIN:

 8    Q    Welcome back.  Thank you, Dr. Marx, thank you for coming

 9    back.

10    A    Absolutely.

11    Q    A couple of questions more on the chart.  It got a little

12    scratched here a bit.

13              This section here, is that called "overcharges"?

14              (The Witness approaches the easel.)

15    A    Yes.  The overcharges -- the overcharge is the

16    difference -- the gap between the actual price and the price

17    that would be predicted in the absence of the conspiracy.

18    That's the overcharge.

19    Q    If there were no effective conspiracy, what would you

20    expect to see?

21    A    If there were no effective conspiracy you would expect to

22    see the actual price in the predictive -- you would expect to

23    see the actual price following right along the predictive

24    price.  You would expect to see these right on top of each

25    other.  So the fact that they're different tells you that the

 1   prices are higher than they would be predicted to be based on

 2   the competitive process in the benchmark period.

 3   Q   Okay.  Then let's turn to the last part of your steps on

 4   developing the benchmark product models inspecting for

 5   liability.

 6   A   "Inspect results for liability."

 7          And this slide talks about the factors that support

 8   the opinion that this prediction, that this model is reliable.

 9   The first one says, "A methodology grounded in the literature

10   and the facts of the case."

11          So this, the methodology here, the techniques that are

12   being used are standard well accepted techniques in the

13   literature, and the approach is grounded in the facts of the

14   case.

15   Q   What about the next one, "model performs well"?

16   A   Number two, the model performs well.

17          And one of the key measures of the model performing

18   well is that when we use a prediction, when -- we don't tell

19   what the blue line is and ask it to predict the prices, it fits

20   well in the benchmark period.  So we see our model is capturing

21   what we want it to, it's capturing the competitive process in

22   the benchmark period, and there are also a number of standard

23   statistical tests that you can -- standard diagnostics that you

24   can calculate and look at.

25   Q   How --

 1    A    I'm going to spare you the details of those statistics, but
 2    there are standard diagnostics that are applied as well, and it
 3    performs well on those measures.
 4    Q    How important is the fact that the model matches back up in
 5    the post-conspiracy period in determining the reliability of
 6    the model?
 7    A    I think that's very important.  A key measure of the
 8    reliability of the model is looking at its ability to predict
 9    prices in the benchmark period, that it is doing a good job
10    capturing the competitive process in the benchmark period, that
11    it matches up before and after.  That's important to me in
12    seeing that this is going to give us a reliable measure of what
13    prices should have been in the absence of the conspiracy.
14    Q    Then "Produces sensible results."  What's that mean?
15    A    You also want to just look at the results with the
16    background of what you've seen in the evidence, what you know
17    about prices, what you know about the evidence in this case and
18    ask yourself:  Does it make sense?
19         And so you're getting reasonable estimates of prices.
20    It's very similar at the beginning of the conspiracy,
21    particularly in polyols and MDI, similar at the end of the
22    conspiracy, it matches up in a period here when there is more
23    evidence of more conduct that looks like competitive conduct.
24    So the results match with what you see in the evidence.
25    Q    And "Consistent results across the models"; what does that

 1    mean?

 2    A    Remember, these products are linked.  TDI, MDI and polyols,

 3    they're produced and purchased by the same firms.  The prices

 4    are set by some of the same individuals, the same executives.

 5    So we wouldn't expect wildly different results.

 6         It gives me comfort and additional confidence to see

 7    these models producing similar results across the different

 8    products.  And remember, there are different variables in the

 9    different models.  We're using cost factors for TDI and demand

10    factors for TDI in this model, and we're using the cost factors

11    and demand factors for MDI in that model.  So the models have

12    different variables in them but they're giving different

13    results across the models.

14    Q    So before we go to the next point, there is a little bump

15    right here.

16    A    Yeah.  I wanted to talk about -- yeah, let me talk about

17    this.

18    Q    Tell us about that.

19    A    There's -- you see here, the prediction in the early period

20    here is that it's predicting that prices would actually be

21    above what they actually were right here at the beginning of

22    the conspiracy.  And you can probably -- you can see the little

23    gap there.

24         So remember from looking at polyols and MDI, that in

25    that early period the predictive price was pretty much the same

 1    as the actual price.  So this early period is one where
 2    predictive prices and actual prices are basically the same.  So
 3    now remember, this is a prediction, so you can end up with a
 4    prediction that might be a little bit above.

 5         When they're close to the same, your prediction can be
 6    a little bit above or a little bit below.  And we're getting a
 7    prediction slightly above here.  And so what I do just to be
 8    conservative, I credit the conspiracy back with these as
 9    negative overcharges.  So I'm going to subtract off, in a
10    sense, give them credit for having priced below what they
11    otherwise would have been.

12         So anything associated with this period would be
13    deducted off the overcharges in the end.

14    Q    Do you expect as an econometrician to see the predictive
15    results to match up perfectly?

16    A    No, it's a prediction, but this is -- this is impressive.
17    That after running this prediction all the way through the
18    conspiracy period, it hits -- I mean, it kind of nails the
19    actual prices in the benchmark period at the end.  So this
20    is -- I was very pleased with the performance of this model.

21    Q    Okay.  One of the issues that was raised was statistical
22    significance.

23    A    Yes.

24    Q    Are you familiar with statistical significance?

25    A    Yes.

1    Q    Do you think it's an important measure of reliability of
2    the model?
3    A    No.  I don't -- I don't think of statistical significance
4    as being about the reliability of the model.  It tells you
5    about how precisely your overcharges here are measured.  So
6    it's an important thing to look at, but it's more about the
7    precision with which you're able to estimate the overcharges.
8    Q    Can we talk about statistical significance for a minute?
9    A    Yes.
10   Q    First of all, what is statistical significance?  Let's
11   figure out what that label is.
12   A    Yeah.  Statistical significance -- this is a statistical
13   model, and so there can be statistical error in the model.  But
14   with statistical error we can quantify the error rate.  We can
15   ask the question:  Could these results have happened due to
16   chance?  We can ask:  With what confidence can we say that
17   these results -- that there really is a gap here?  That there
18   really was an overcharge?  And you can ask that question in a
19   formal statistical sense.
20          And this slide shows you, for using the standard
21   statistical techniques for assessing statistical significance,
22   you can ask the question:  Could the 80, the TDI 80/20
23   overcharge, could that be zero?  Could it just be by chance
24   that we're seeing this actual gap, the overcharge here?
25          And you can say for that model that with 99.4 percent

1    confidence that result is not due to chance.  And so there's --

2    this is a very strong result for the TDI model.

3          For CFS polyols you can ask the same question and you

4    can show that with 92.8 percent confidence you can say the

5    result there is not due to chance, that there really was an

6    overcharge there.

7          And with pMDI, the confidence level is 80.8 percent.

8    Q    Now, do you look at those confidence levels in isolation?

9    A    No.  Remember, the products are linked to one another, we

10   have the body of evidence in this case, so this is -- this is

11   one thing.  But it's one piece.

12   Q    Are there standards, thresholds that statisticians use to

13   define -- to use the label "statistically significant"?

14   A    Yeah, it's common in the economics literature to see

15   confidence levels of 99 percent, 95 percent, or 90 percent, and

16   the most common level you would see would be at 95 percent

17   confidence level.  So it would be very common to see the 95

18   percent called out as a threshold for saying that you have a

19   statistically significant result.

20         So you can see that TDI, no matter what threshold

21   you're using, we have a statistically significant result for

22   TDI.

23         For CFS polyols, it would be viewed as statistically

24   significant at the 90 percent level, so in one of the commonly

25   used levels; pMDI is statistically significant only at the 80

 1    percent level.

 2    Q    What's the difference between, like, a 94 percent and a 95

 3    percent and a 96 percent level?

 4    A    You know, these are -- there's not much difference, but it

 5    is -- 95 percent, for example, or 90 percent, these would be

 6    fairly common thresholds to be a threshold that you would -- if

 7    someone tells you that a result is statistically significant,

 8    probably what they have in mind, that it's met a 90 or 95

 9    percent threshold level.  And we have again, TDI, we have no

10    issue with that;

11             CFC polyols above the 90 percent level;

12             The prediction on the MDI, we have an 80 percent level

13    for pMDI.

14    Q    In the world of statistics, is there something called

15    "practical significance"?

16    A    Yes, there is.

17    Q    Could you explain that to the jury?

18    A    Yes.  There's this idea of practical significance which

19    just says you want to take it all in context.  And for -- given

20    the analysis that I have done and the evidence that I have seen

21    of conspiracy, 80 percent is certainly high enough for me to

22    not have any questions about whether these overcharges are

23    really there.

24    Q    Do these numbers -- I guess the only one we can talk about

25    is the MDI -- do they cause you to question the reliability of

 1    the model?

 2    A    No.  Again, it's not really a statement about the

 3    reliability of the model, it's a statement about the precision

 4    with which you're able to estimate that there were overcharges.

 5    Q    One last set of questions on this and then we're going to

 6    turn to a slightly different subject.

 7         Does this market-wide model account in any way for

 8    negotiating skill or bargaining power?

 9    A    Yes.

10    Q    How?

11    A    I think you've heard some discussion about how negotiations

12    were part of how prices were formed in this industry.  And to

13    the extent that negotiations were part of how the prices get

14    agreed upon, then to the extent that the negotiations affect

15    industry-wide price levels, they're in the prices.  So those

16    are going to be captured in this industry-wide price line.

17    Q    That doesn't account for specific negotiating power of any

18    particular buyer, does it?

19    A    No, it doesn't.

20    Q    Did you deal with that in your -- in another step of your

21    opinions?

22    A    Yes.  So I still at this point haven't done anything

23    specific to the plaintiffs and I haven't done anything to

24    capture whether there might be some particular negotiating

25    skill or particular considerations affecting individual

```
 1   transactions, so I need to do that.  So there's going to be
 2   another step that I'm going to have to do to take care of that.
 3   Q   Let's stalk about that third opinion:  "Plaintiffs suffered
 4   harm as a result of the alleged conspiracy."
 5        Did you estimate plaintiffs' specific overcharges?
 6   A   Yes.
 7   Q   How?
 8   A   I think I have some slides to discuss to help illustrate
 9   that.  I'm going to look at all of the transactions, I'm going
10   to look at all of the transactions for each of the plaintiffs,
11   so I'm going to dig down into the plaintiffs in this case and
12   their transactions to look at their prices specifically.
13   Q   And before we go to that picture, is the purpose -- well,
14   what's the purpose of this second step?
15   A   It's to take into account in particular how the conspiracy
16   affected the plaintiffs in this case and to allow me to take
17   into account any particular factors that might have affected
18   individual negotiations.  I want to be able to take that into
19   count as well.
20   Q   So the next one is going to come from that slide there.
21   You might want to go bark.
22   A   So this graph is showing you that blue line.  That same
23   blue line that's over there, but the time period is different.
24   It's only showing the conspiracy period.  So it's just running
25   from '94 to the end of 2003, and it's zoomed in.  So the price
```

```
 1    is starting at $.40 instead of at zero like over there.

 2              So we've kind of zoomed in on the price line here.

 3    Okay?

 4    Q    So that blue is this blue?

 5    A    It's the -- yeah, the same blue line.  You can kind of

 6    compare it.  It's the same line between the two.

 7    Q    And then what's this?

 8    A    Good.

 9              Each of these green dots represents a transaction

10    where Leggett & Platt, which is one of the plaintiffs,

11    purchased Voranate T80, which is one of Dow's TDI products.  So

12    each of these is a purchase by Leggett & Platt of this TDI

13    product.

14              And you can see each of the dot shows you on the time

15    dimension when the transaction happened, and the height of it

16    shows you the price at which the trade, the sale was made.

17    Q    What's going on with the line of green that's way up there

18    at the top?

19    A    Good.

20              Yes.  Notice that these transaction prices are

21    following along the industry-wide price line, so they have a

22    relationship to the industry-wide price line.  When the

23    industry-wide price go down, they go down.  And then we have

24    these -- this cluster of dots up here.

25              I think you've heard some about rebates and discounts.
```

1    The way the prices were negotiated in this industry, there were

2    sometimes a price negotiated and then additional rebates or

3    discounts applied to the price.

4           In the data, for all the cases where I could match a

5    rebate or a discount to a particular invoice, to a particular

6    transaction, I just calculated the net price.  I just took into

7    account the rebates to get the actual price.  And so these are

8    showing where the rebates are incorporated, the net price,

9    taking into account the rebates.

10          But there are some cases where you might have a rebate

11   at the end of a quarter.  So there might have been a number of

12   transactions over a few months, and then at the end of the

13   quarter you see a rebate.  So I had the data on the rebate, but

14   I don't have a way to associate that end-of-quarter rebate.  I

15   don't know which of the individual transactions during the

16   quarter it should be associated with and what in proportions.

17          And so in that case I just waited until the end and

18   then deducted the overcharges associated with that rebate at

19   the end.  So I'm going to take it into account but I don't have

20   a good way of adjusting the green dot.

21          So these transactions here, if you look in the data,

22   there's a rebate in this period, the end of this period of

23   time, that you apply it to these, it brings them down right to

24   the basic price level.

25          So whenever I can associate a rebate with a

 1     transaction, that's already incorporated.  But there are going

 2     to be some cases -- it's not -- it's not a big effect overall

 3     but it can loom large if you zoom in on a particular

 4     transaction.

 5             If you focus on this particular transaction, you can

 6     see that the issue that the rebate is not incorporated shows up

 7     there.  It's not a big issue overall in the data, but it needs

 8     to be taken into account.

 9     Q   So this deals with Leggett & Platt's purchases of Voranate

10     T80.  How many of these analyses were done?

11     A   Oh, there was an analysis like this done for every product

12     purchased by every plaintiff.  So I'm going to do this for

13     each -- an analysis like this for each of the transactions,

14     every purchase by the plaintiffs in this case from the alleged

15     conspirators.

16     Q   Does this picture that you're looking at here tell you

17     anything about the relationship between the actual prices that

18     Leggett & Platt paid for Voranate T80, and the market-wide

19     price that you estimate?

20     A   Yeah.  You can see from this that the prices that Leggett &

21     Platt are paying are -- are following pretty closely with

22     industry-wide prices, although their prices for this particular

23     product, it looks like they tend to be slightly above the

24     market-wide price for this product.  You can see these green

25     dots tend to be a little bit above the market-wide price line

 1    most of the time.

 2    Q    What's the next step?

 3    A    We still haven't done anything to ask whether these prices

 4    were above what they would otherwise have been, so we need to

 5    add the layer of putting our predictive price line in there.

 6              So again, these are the red dots, they're the same red

 7    dots from over there.  So they're our estimate of what the

 8    market-wide price would have been in the absence of a

 9    conspiracy.

10              And now what we're going to do is we're going to look

11    at the relationship of Leggett & Platt's prices to the

12    industry-wide price line and we're going to model each of those

13    transactions as being related to the overall level of price,

14    the extent to which it's benchmarked off the industry-wide

15    price, and we'll allow a transaction-specific effect for each

16    transaction to capture the particular differences that are

17    associated with that transaction.

18              In order to estimate a but-for price, what the price

19    should have been for each of these transactions, what we'll do

20    is assume that instead of these transactions being benchmarked

21    off the industry-wide price, assume that they're benchmarked

22    off the but-for price, off the red line.  And that gives us --

23    the little purple diamonds give us for each of the transactions

24    what the price would have been if that transaction, instead of

25    being benchmarked off the industry-wide price was, instead,

 1    benchmarked off the predictive price, the but-for price.

 2              And we're going to keep in place any of these

 3    particular factors.  If one transaction, it had high volume and

 4    so there was a particular low price for that transaction, or

 5    there's particularly high negotiating skill applied to one

 6    transaction, we're going to keep that -- that special effect

 7    for each transaction, we're going to assume that that would

 8    still have been in place in the but-for world.

 9              So if they were getting an extra discount in the

10    actual prices, we'll assume they still would have gotten those

11    extra discounts in the but-for world, but that the price would

12    have been benchmarked off a different industry-wide price.

13    Q    So does this take into account Leggett & Platt's specific

14    negotiating power, bargaining skill, specific factors for that

15    particular plaintiff?

16    A    Yes.

17    Q    Is this use of a two-step approach unusual?

18    A    No, this kind of approach of dealing with things in

19    two-step, it's been used before in cases like this, it's a well

20    accepted approach to this.

21    Q    Do you think it makes sense in this case?

22    A    Yeah.  You know, and I think it's a particularly good fit

23    in this case because we know in urethane's you tend to see

24    market-wide price announcements, so a benchmarking against a

25    market-wide price followed by individual negotiations.  So this

 1    two-step of thinking in terms of market-wide prices and effects

 2    there, and then the negotiation, the transaction-specific

 3    effects is a particularly nice match for the facts in this

 4    case.

 5    Q   Okay.  So I think we're now onto your fourth opinion, which

 6    is, what do you do next?

 7    A   Plaintiffs suffered over $608 million, or paid more than

 8    $608 million more than they would have paid.

 9            So what I'm going to do is, for each of these

10    transactions, for each of the green dots, I'm going to look at

11    the difference between what they did pay and what they would

12    have paid in the absence of the conspiracy and multiply by the

13    quantity, by how much volume was in that transaction, and I'm

14    going to add those up across all of the transactions.  And the

15    computer is going to ad them up.  I mean, I didn't do it with a

16    calculator, but you can automate there.  So I can add up all of

17    the overcharges for all of the individual transactions.  And

18    when you add them up and adding up across all the plaintiffs,

19    you get to the 608 million.

20    Q   So were you given some instructions about who the

21    plaintiffs are?

22    A   Yes, I was, from the -- the counsel, the lawyers gave me

23    instructions about which -- who -- which entities, which firms

24    were the plaintiffs at issue in this particular case, so they

25    told me which ones to consider.

1    Q    I'm now going to ask you to read out those names.

2    A    Oh my.  I'm just going sit down here.

3    Q    I would recommend that.

4    A    The British Vita plaintiffs --

5    Q    Who are they?

6    A    They are British Vita, Unlimited; Vitafoam Incorporated;

7    Vitafoam Products Canada Limited; Vita Industrial, Inc.;

8    Pathway Polymers Inc.; Crest Foam Industries, Inc.; Crest Foam

9    Corp., Synair Corp.; and Hyperlast North America.

10        Carpenter plaintiffs.  I'm really sorry, but it seems

11   to be important that they be read into the record so I'm just

12   going to read these:  Carpenter Company; E.R. Carpenter

13   Company, Inc.; E.R. Carpenter LP; E.R. Carpenter Expert

14   Company, Inc.; Carpenter Canada Ltd.; Carpenter Chemical Co.

15        The Flexible Foam plaintiffs are:  Flexible Foam

16   Products; Flexible Foam Company; Flexible Foam Inc.; High

17   Standard Pad, Inc.; Nu-Foam Products, Inc.; Ohio Decorative

18   Products, Inc., Burkart Foam Inc.; Universal Urethanes, Inc.;

19        foam supplies plaintiffs: Foam Supplies, Inc.; Archway

20   Sales, Inc.; National Polyurethane Inc.

21        Hickory Springs plaintiffs:  Hickory Springs

22   Manufacturing Company; Hickory Springs of California, Inc.;

23   Carpet Cushion Company, Inc.; Eastern Foam, Inc.

24        Huber plaintiffs:  Huber Engineered Woods LLC; J.M.

25   Huber Corporation; J.M. Huber Co.

1          Oh my.

2     Q    Sorry.

3     A    Leggett & Platt plaintiffs:  Leggett & Platt Incorporated;

4     Leggett Partners, L.P.; Leggett & Platt Components Co., Inc.;

5     L & P Financial Services Company; Leaving Taos, Inc.;

6     Crest-Foam Corp.; Crest-Hood Foam Company, Inc.; Crest-Foam

7     Corp.; GFC Dura Bond LLC; Met Displays, Inc.; N-Sag Foam

8     Products Company, Inc.; No-Sag Products; Southwest Carpet Pad,

9     Inc.; Iredell Fiber, Inc.; Fairmont Corp.; Hi-Life Products,

10    Inc.; PMC Inc.; MPI Inc., Texas Fibers, Inc.

11          Lubrizol plaintiffs:  Lubrizol Advanced Materials,

12    Inc.; Lubrizol Corporation; Noveon, Inc.; PMD Group Inc.; BF

13    Goodrich Company; BP Performance Materials.

14          Dash-MarChem plaintiffs:  MarChem Corporation; MarChem

15    Southeast; MarChem Pacific; MarChem Inc.; Dash Multi-Corp.

16    Inc.; Archway Sales Company; Archway Sales, Inc.

17          The Skypark plaintiffs:

18          Skypark Manufacturing, LLP; Burtin Urethane

19    Corporation; Burtin Polyurethane LLC.

20          Woodbridge plaintiffs:  Woodbridge Foam Corporation;

21    Woodbridge Holdings, Inc.; Wood Services; Woodbridge Corp;

22    Woodbridge Services Inc; Woodbridge Foam Fabricating;

23    Woodbridge Sales & Engineering; Woodbridge Inoac Inc. Michigan;

24    Johnson Controls, Inc.; Dynaflex Plastics; SW Foam LP; Cartex

25    Corporation.

 1    Q    I was going to give you a second to breathe.

 2    A    Whew.

 3    Q    All right.  Now that we've read those into the record:

 4    Plaintiffs' damages.

 5         This is a chart of the plaintiffs' damages from Dr.

 6    Raiff's most recent report.  Could you just walk the jury

 7    through what this is and how to read it?

 8    A    Yeah.  This table is showing for the first set of

 9    plaintiffs, for each of the plaintiffs, it shows you the

10    different products, TDI, MDI and polyols, and shows their

11    purchases, and then overcharges.

12         So if we start at the top here, for British Vita, they

13    had 230 million plus dollars of purchases in TDI, pre-1994 to

14    2003, from the alleged conspirators, and the overcharges

15    associated with those transactions are $28.5 million.  And if

16    you take the overcharges and divide by the net purchases you

17    can calculate what the percent is.

18         And this is done for each of the plaintiffs.  There's

19    another page that has the rest of them.

20         This finishes off the list of the different plaintiff

21    groups.  And then at the bottom it has the total.  So it shows

22    the total transactions, 5,431,000 -- sorry -- transactions,

23    it's $5,431,281,860.  And this overcharge number, this is --

24    this is Dr. Raiff's overcharge number, this 616, and we need to

25    make an adjustment.  So let -- I'm going to draw on this screen

 1    here.

 2              Shall I talk about the adjustment?

 3    Q    Actually I'm going to hand you -- you can draw on the

 4    screen; I'm also going to hand you a hard copy of what you just

 5    looked at and described.

 6    A    Okay.

 7    Q    But tell us about Carpenter polyols.

 8    A    Yes.  So Carpenter, we have Carpenter polyols here, and

 9    then we have $226 million in purchases and 11 million in

10    overcharges here.

11              When Dr. Raiff was doing this calculation, the

12    understanding was that these were the appropriate set of

13    products to be looking at.  It came to my attention recently

14    that included in the products that Carpenter purchased from

15    Lyondell were three products that were not polyols, that were

16    propylene oxide, which is a related product.  It's also made

17    from propylene, it has a similar name, it has similar prices,

18    so it was in there in the data but it doesn't belong there.  So

19    we need to take it out.

20              So I would like to -- this -- this number here is too

21    high.  And so, in my opinion, the correct overcharges is $8.2

22    million lower than this.

23    Q    Could I just ask you to change that?  And here's a pen.

24    Just change that on the hard copy.

25              (Witness complies.)

```
 1    A    So I'm going to -- that number for polyols needs to be

 2    adjusted, and also the total for Carpenter.

 3              I've done it on the paper.

 4    Q    What about the final total?

 5    A    Can you flip to the next slide.

 6              Great.  Oh.  I guess I need to -- here we go.

 7              So, and then it affects of course this number down

 8    here at the bottom.  So this number should instead be eight --

 9    oops -- 608.5 million.

10    Q    Let me ask you -- and you've written that on the hard copy

11    as well.

12    A    Let me get it on the hard copy.

13              Okay.  I've got that written down.

14              MR. MARTIN:  Your Honor, we would move the admission

15    of this document as PX-1417.

16              MR. BERNICK:  I would object to that, your Honor, for

17    the reasons previously --

18              THE COURT:  What was that?

19              MR. BERNICK:  I'm sorry.  I'm sitting down with all

20    these papers in my lap.

21              THE COURT:  Don't lose your papers.

22              MR. BERNICK:  I'm going to object to that for the

23    reasons previously stated with the papers we filed with the

24    Court.

25              THE COURT:  Your objection is noted.  Go ahead.
```

 1    BY MR. MARTIN:

 2    Q   We're almost done.  I just want to ask you a few questions

 3    about the chart itself.

 4            I think I can do it with my little thing here, but you

 5    might want to go there.

 6            If we look at Woodbridge, for example, this number

 7    here, 7.3 percent for polyols; and then we look at MarChem, 8.3

 8    for polyols; and Leggett & Platt, 13.2 percent for polyols, why

 9    are they different?

10    A   Yeah.  Remember, these -- the different plaintiffs are

11    purchasing different amounts of product from different of the

12    alleged conspirators, they're purchasing products at different

13    periods of time.  So remember, there are periods of time when

14    the overcharges are zero or small, and there are periods of

15    time when the overcharges are larger.  So it matters when the

16    bulk of their purchases were happening.  And for some of the

17    plaintiffs, their price was not affected very much by movement

18    in the industry-wide price line; perhaps due to negotiating

19    skill or something else, and in that case there's not much of

20    an overcharge assigned to it.

21    Q   When we talk about the plaintiff up here, is that the

22    plaintiff that we just read the long list?

23    A   Yes.  So, each of the plaintiffs' names in this table

24    corresponds to one of those pages of all of those names.

25    Q   And then net purchases, does that include -- well, what is

 1    net purchases?

 2    A    That's the purchases taking into account the rebates.

 3    Q    Okay.

 4    A    And the overcharges also.  In these numbers, I've taken off

 5    any overcharges associated with those rebates, so that

 6    adjustment has been made in these numbers.

 7    Q    And then you talked a little bit about this negative

 8    overcharge.  Is that factored in here somewhere?

 9    A    Yes.  So whenever there were purchases -- whenever an

10    individual plaintiff had a period with negative overcharges,

11    those are deducted off the overcharges, so I in a sense give

12    them credit for those negative overcharges.

13    Q    And my last question:  My math is -- I usually take this

14    and I multiply it times that and I get that.  Is that how you

15    came up that those numbers?

16    A    No.  The way this was calculated was, the overcharges were

17    calculated using -- adding up the overcharges for each

18    individual transaction.  Those were added up, and then if you

19    want to know the percentage, you can take that total and divide

20    by the purchases.

21          But it's not like I calculated a percentage and then

22    just multiplied by the total purchases.  I calculated the

23    overcharges on a transaction-by-transaction basis and added

24    them up.  And in case it's useful to have as a reference, you

25    can calculate the percentage.  So that's in the table as well.

```
 1      Q    Okay.

 2           MR. MARTIN:  Your Honor, I pass the witness.

 3           THE COURT:  All right.  Thank you.

 4           Mr. Bernick.

 5           MR. BERNICK:  I'm going to need a few minutes to set

 6      up, if I can have that, your Honor.

 7           THE COURT:  Just a few minutes.

 8           Ladies and gentlemen, just retire to the jury room for

 9      five minutes, and as soon as Mr. Bernick is set up we'll get

10      going.

11           THE LAW CLERK:  Please rise for the Jury.

12           (The Jury leaves the courtroom.)

13           THE COURT:  Dr. Marx, you can step down for a couple

14      of minutes.

15           THE WITNESS:    Thank you.

16           (Witness temporarily excused.)

17           (A recess is taken.)

18           (Proceedings resume - Jury not present.)

19           THE COURT:  All right.  The jury is all set, so let's

20      bring them out.

21           Dr. Marx, thanks.

22           MR. MARTIN:  Your Honor, I may move around just so I

23      can see.  Is that okay?

24           THE COURT:  Yes.

25
```

```
 1      L E S L I E   M A R X, resumes, testified furthter as follows:
 2
 3                THE LAW CLERK:  Please rise for the Jury.
 4                (Jury present.)
 5                THE COURT:  Okay.  Be seated, everyone.
 6                Mr. Bernick, proceed with cross-examination, please.
 7                MR. BERNICK:  Yes.
 8                             CROSS-EXAMINATION
 9      BY MR. BERNICK:
10      Q    Good morning, Dr. Marx.
11      A    Good morning, Mr. Bernick.
12                MR. BERNICK:  Good morning, ladies and gentlemen.
13      Q    I think you mentioned on direct examination that you worked
14      for an economics consulting firm.  Is that right?
15      A    Yes, sir.
16      Q    And the name of that firm is the Bates White firm?
17      A    Bates White economic consulting I think is the name.  And
18      it's not the same Bates, as the Bates numbers that show up on
19      these documents, it's a different Bates.
20      Q    Right, that would make it legal.  This is economics.
21      Right?
22                So, and you took over from Dr. Raiff due to
23      circumstances that had nothing to do with this case in about
24      2013.  Right?
25      A    Yes.
```

1    Q    And since then I think Dr. Raiff had been working on the
2    case for roughly how many years?
3    A    I think his initial reports were 2011.  So multiple years
4    at that point I think.
5    Q    And it's true, is it not, that Mr. Raiff made some errors
6    in his work that affected the content of his reports.  Correct?
7    A    Not the revised reports.  I think there were mistakes that
8    were identified and corrected.
9    Q    Well, that's what I'm asking about.
10   A    Oh.
11   Q    He wrote a report.  Before there was a revised report there
12   was an initial report.  Correct?
13   A    Yes.
14   Q    There was an expert report.  Right?
15   A    It probably said that on the title, yeah.
16   Q    Okay.  And you have all his reports around there someplace,
17   don't you?
18   A    There's a pile here, yes.
19   Q    Okay.  And is it true that Mr. Raiff in his first reports
20   did not do any analysis or tests for statistical significance?
21   A    Are you asking -- I'm sorry.  Are you asking me about the
22   reports, the unrevised reports?  Because I didn't look at them.
23   Q    Okay.  So you've never looked at Dr. Raiff's first expert
24   report?
25   A    The one before he -- okay.  There was -- Dr. Raiff had an

 1   initial report and then a mistake was identified and then he
 2   produced a revised report.  I didn't feel the need to look at
 3   the one that was wrong.
 4   Q    That answers my question.  So you never read his first
 5   expert report?
 6   A    Again, I read -- there was the initial report, and then the
 7   reports by Dow's experts, and the reply report.  I read the
 8   initial report, the corrected one, and the reply report, the
 9   corrected one, but not the ones -- not the first version.
10   Q    The original version?
11   A    Yes.
12   Q    Okay.  And so he made -- he didn't do a statistical
13   analysis in that -- I mean, a statistical analysis for
14   statistical significance in that report, did he?
15   A    That's right, he didn't.
16   Q    And then when he issued his revised report, isn't it true
17   that he -- he did an analysis or a test for statistical
18   significance?
19   A    I think you're talking about the reply report.
20   Q    Yes.
21   A    Right.  Okay.  So there was the initial report, and then
22   Dow's experts raised the issue that they thought there should
23   be some look at statistical significance.  And so then in Dr.
24   Raiff's response he did that.
25   Q    Right.  So his first report didn't look -- didn't test for

```
 1    statistical significance?

 2    A    That's right.

 3    Q    Dow's experts raised the issue.  He then did another report

 4    that did look for statistical significance?

 5    A    Yes.

 6    Q    And it actually turns out that that report also contained

 7    an error.  Correct?

 8    A    That's my understanding.  I didn't look at the one where

 9    they said there was a mistake.

10    Q    But he made a mistake in the calculation.  And that, too,

11    was pointed out by actually Dow's counsel in the case.  Right?

12    A    That's my understanding, yes.

13    Q    And so then he had to issue yet another revised report.

14    Right?

15    A    Yes.

16    Q    So it would be fair to say that Dr. Raiff -- I mean,

17    statistical significance is a significant part of the work you

18    looked at in this case.  Correct?

19    A    It's a part of it.

20    Q    Well, is it a significant part of it?

21    A    I just think of it as one piece of everything I looked at.

22    Q    Well, I guess I'm just asking you:  Is it significant or

23    not?

24              MR. MARTIN:  Asked answered.

25              THE COURT:  I think she's answered it.
```

1           MR. BERNICK:  Okay.

2    Q    So, for whatever significance it had, you have talked to

3    the jury about it for some length here this morning.  Correct?

4    A    Yes, I talked about it here, yes.

5    Q    And so Mr. Raiff didn't simply make a clerical error, he

6    never did the analysis to begin with, and when he did it, he

7    did it wrong.  Correct?

8    A    He didn't do it in his initial report.  It was pointed out

9    as a criticism and so then he did it.  And my understanding is

10   the first time he did it, it was not done correctly, so then he

11   did it correctly.

12   Q    Yet, we read his report, in fact, because of that error.

13   Correct?

14   A    I only looked at the revised report.

15   Q    Now we see today -- you've been involved in this case

16   for -- I guess it's 2013 -- so you've been involved in the case

17   for about three years.  Correct?

18   A    That's right.

19   Q    And isn't it true that since you've been involved in the

20   case, you've taken a look at Mr. Raiff's, Dr. Raiff's work.

21   Correct?

22   A    Oh, yes.

23   Q    And you -- actually your role in the case, when you became

24   involved, when you substituted in for Dr. Raiff, your role was

25   spelled out by a court order.  Correct?

 1    A    That's right.

 2    Q    And what that order said was that when you became -- if you

 3    decided to become involved as the -- as Dr. Raiff's successor,

 4    that you could only do so if you were prepared to endorse and

 5    approve Dr. Raiff's work.  Correct?

 6    A    I don't remember exactly what the language was, but it was

 7    something to that effect; to step into his shoes, yes.

 8    Q    Right.

 9              MR. MARTIN:  I object, that's not the actual language

10    of the Order.

11              THE COURT:  Right.  Well, the objection is sustained.

12    But to who -- you have the Order.  Correct?

13              MR. BERNICK:  Yes, I do.

14              THE COURT:  Why don't you show the witness.

15              MR. BERNICK:  I could have --

16              THE COURT:  Show the witness the Order.

17              MR. BERNICK:  Oh, it's a -- I'm happy to do that, your

18    Honor.

19    BY MR. BERNICK:

20    Q    If you would just read, Dr. Marx, I think I've highlighted

21    the relevant language (handing document).

22    A    (Reading) Accordingly, the Court grant's Plaintiffs'

23    request and orders that Dr. Marx, the new expert, will not be

24    permitted to develop her own models or methodologies, but must

25    endorse and defend Dr. Raiff's opinions.

```
1    Q    So you had a choice; you did work, a significant amount of
2    work, and then you decided that you were prepared to -- what
3    were the words -- endorse and defend?
4    A    Yes, sir.
5    Q    -- endorse and defend Dr. Raiff's work.  Correct?
6    A    Yes.
7    Q    Okay.  And you did work and, in fact, since that time,
8    you've testified on two different occasions.  Correct?
9    A    I'm sorry.  Since when?
10   Q    Since the time that you became involved in the case, you've
11   testified under oath on two different occasions?
12   A    Are you talking about the deposition and the Daubert
13   hearing?
14   Q    Yes, I am.
15   A    Sorry.  Yes, twice.
16   Q    Okay.  So you testified at your deposition and you
17   testified all about the numbers and all about your model.
18   Correct?
19   A    That's right.
20   Q    It was a long deposition as I recall, wasn't it?
21   A    It was quite long.
22   Q    And it was probably my responsibility.
23        And then you testified again about, I think it was
24   about a month ago before the Court, again under oath, regarding
25   your work.  Correct?
```

1    A    That's right.

2    Q    And yet, here this morning, I guess it must be five years

3    or so after Bates White became involved, you found still

4    further errors.  Correct?

5    A    Are you're talking about the propylene oxide?  Yes.

6    Q    Yes.

7          In fact, the charts that you showed, you actually

8    corrected on the stand after five years of Bates White work.

9    Correct?

10   A    I made the correction, yes.

11   Q    And isn't it true, Dr. Marx, that Bates White is the firm,

12   it's kind of the common denominator between Dr. Raiff and

13   yourself?  You were both involved with the same firm.  Correct?

14   A    He's also a co-author of mine, but, yes, we were both

15   working at Bates White.

16   Q    Now, based upon what you now have done and made the

17   correction, do you now think that those numbers and your

18   testimony that you gave to the jury this morning is complete

19   and accurate?

20   A    Yes, I do.

21   Q    Okay.  I want to talk a little bit about conspiracy and the

22   conspiracy claim in this case.

23          In opening, plaintiffs' counsel -- I apologize to the

24   jury and the witness for having my back to them.

25          THE COURT:  That's okay, they understand.

```
 1        MR. BERNICK:  Okay.
 2   Q   So that Dow conspired with other suppliers to raise prices
 3   above what they would have been.
 4        Is that your understanding of the claim that's being
 5   made in this case?
 6   A   Yes.
 7   Q   Now, as I understand it, Dr. Raiff was instructed to assume
 8   that there was a conspiracy.  Right?
 9   A   Yes.
10   Q   Is it also true that Dr. Raiff did not do any analysis to
11   reach an opinion that there was a conspiracy?
12   A   That's correct.  He reached an opinion that it was
13   reasonable to go forward with the assumption of a conspiracy.
14   Q   Just focus on my questions, please --
15        THE COURT:  I think she did.  She did.  Her answer was
16   there.
17   Q   Let me just ask it very, very simply:  Isn't it true that
18   Dr. Raiff offered no opinion that there was a conspiracy?
19   Correct?
20   A   It's correct that he did not offer any expert opinion that
21   there was a conspiracy.
22   Q   Thank you.
23        And isn't it true that Dr. Raiff, again consistent
24   with the engagement that you had to become involved in the
25   case -- isn't it true that you have offered no opinion that
```

1     there was a conspiracy?

2               MR. MARTIN:  I'm going to object to the phrase

3     "opinion."  I think that has a dual meaning in the terms of

4     art, that is --

5               THE COURT:  Overruled.  If she can answer it.

6               Go ahead.

7               MR. MARTIN:  Okay.

8     A    I'm not offering an expert opinion that there was a

9     conspiracy.

10    Q    So no opinion that there was a conspiracy.

11              Now, I thought that that's what you had said, and

12    therefore I was a little surprised at the language of the

13    slides.

14              MR. BERNICK:  And do you have over there their slides

15    Number 5 and -- show 5 first.

16    Q    Now, this was your assignment.  Correct?

17    A    That was Dr. Raiff's assignment, yes.

18    Q    And that was your assignment too.  Because you're stepping

19    into his shoes.

20    A    Yes.

21    Q    Now, I read these to ask for basically two different

22    things:  One is to determine whether plaintiffs were

23    overcharged as a result of a conspiracy to elevate prices of

24    TDI, MDI and polyether polyols.  Do you see that?

25    A    I see that.

```
 1   Q    And that basically is a question about whether there was

 2   impact of the conspiracy that you were asked to assume took

 3   place?

 4   A    Yes.

 5   Q    So that's the impact question.

 6         And the second question is damages.  Right?

 7   A    Yes.

 8   Q    So we have the conspiracy is assumed, you had to make that

 9   assumption when you stepped into Dr. Raiff's shoes; you were

10   then asked to determine, as he did, whether there was an impact

11   or an overcharge, and whether -- what the damages were.

12   Correct?

13   A    Yes.

14   Q    Okay.  Now, on the slide that you showed for your

15   conclusions --

16         MR. BERNICK:  If you could show 2.

17   Q    -- I see in the third and fourth conclusions --

18         MR. BERNICK:  If you could highlight those for a

19   second.

20   Q    -- the third conclusion relates to your assignment to look

21   for the impact.  Right?

22   A    That's right.

23   Q    And the fourth relates to your assignment to look for and

24   calculate damages.  Correct?

25   A    Yes.
```

 1    Q    But the second point doesn't relate to either one of those
 2    assignments, did it?
 3    A    What I was meaning in that second point was that there was
 4    an effective conspiracy.  So under the assumption that there
 5    was a conspiracy, the analysis that I did and evidence I saw
 6    supports the conclusion that the assumed conspiracy was
 7    effective.
 8    Q    But again, that is -- that second conclusion actually says:
 9    "There was an effective conspiracy," even though you told us in
10    your deposition under oath that you had no opinion that there
11    was a conspiracy.  Correct?
12    A    What I mean is that the analysis I did and the evidence I
13    saw supports the conclusion that the conspiracy that I assumed
14    to have been in place was effective.
15    Q    That's not what that says.  It says that there was a
16    conspiracy.  Correct?
17         Let me just ask you flat out:  Did you draft that
18    conclusion?
19    A    I did.
20    Q    Would you now say, recognizing the way that it reads, that
21    it is at least a little unclear and maybe a little bit wrong?
22    A    I don't mean to be offering to the jury an expert report
23    that there was a conspiracy.
24    Q    Thank you.
25         Now, beyond the question of whether a claim of

```
 1    conspiracy, I believe you've also told us this morning
 2    something more specific.
 3              MR. BERNICK:  If I could have a hand here.
 4              (The easel is repositioned.)
 5    Q   You also testified this morning, we have the general
 6    claim --
 7              MR. BERNICK:  Just leave it in front there, if you
 8    could.  Thank you.
 9    Q   But we have something else, we have a very specific
10    contention in this case.  Right?  I mean, that's a general
11    statement of law about this case.  But I think you recited a
12    very specific contention.
13              And if I've got this correct, it was this:  And we
14    actually have a handy dandy little --
15              MR. BERNICK:  I don't think -- do you have this up?
16              Okay.  If you could pull it up, it's a rough
17    transcript of what you just said a few minutes ago.
18              Modern technology.
19              I'll blow that up.
20    Q   I think you said that the specific contention in this case,
21    it says:  (Reading) After doing all this work, what was the
22    understanding that you gained of the behavior of the
23    conspiracy?
24              So you said:  My understanding is that it was an
25    agreement --
```

 1           MR. MARTIN:  I pause.  I'll interject.  I can't read

 2      that from here.  Do you have a hard copy?  My eyes aren't good

 3      enough.

 4      Q    (Reading) That there was an agreement to suppress

 5      competition, effort -- this is a rough transcript -- to achieve

 6      consensus about price increases -- price increase and efforts

 7      to make those price increases effective.

 8           Does that pretty much capture what you said?

 9      A    I think it's what I said.

10      Q    Okay.

11           MR. MARTIN:  Your Honor, I have an objection I think

12      I'd like to raise it at sidebar.

13           THE COURT:  All right.  I'll see you at sidebar.

14           (At the sidebar.)

15           MR. MARTIN:  That language that he's referring to and

16      that she based her opinion on comes from information provided

17      by Bayer.  I want to make sure that he's aware of that.  She's

18      not allowed to talk about the Proger proffer, but it is part of

19      the basis of her opinions.

20           I want to give you warning that if you start talking

21      about it, it could open the door.

22           THE COURT:  That's part of what she reviewed?

23           MR. MARTIN:  Yes.

24           THE COURT:  The Bayer discussions is part of it?

25           At this point I don't know what the objection is to

1    this.  He's just --

2          MR. MARTIN:  I just want to make sure that he's going

3    to walk the line --

4          THE COURT:  He hasn't gotten there yet.

5          MR. BERNICK:  I had no idea.  When he -- he elicited

6    this from her.  So to the extent that the witness is now

7    talking about it, it was at his request.

8          THE COURT:  Okay.  I think you're making your point.

9    She said was; and you're saying there was --

10         MR. BERNICK:  This is a different point now.

11         THE COURT:  Then go ahead.

12         MR. BERNICK:  Thank you.

13         THE COURT:  There's no objection at this point that

14   I'll sustain.

15         MR. MARTIN:  That's fine.  I just want to make sure

16   it's clear.  I didn't want to do it in front of the jury.

17         (In open court.)

18         THE COURT:  All right.  The objection is overruled at

19   this point.

20   BY MR. BERNICK:

21   Q    Now, Dr. Marx, this particular contention, do you see that

22   there is the effort to achieve consensus about price increase

23   announcements --

24   A    It doesn't say "announcements."

25   Q    Oh, price increases.  Okay, fair enough.

 1    A    There probably should be an "s" on price increase.

 2         I know the reporter is trying real hard, but it should

 3    be:  "...to achieve consensus about price increases," with an

 4    "s."

 5    Q    Okay.

 6         "Price increases."  Anything else?

 7    A    No, I think that's all.

 8    Q    And "efforts to make those price increases effective."

 9         So there's two elements of this specific contention.

10    Right?

11    A    Do you want to include "suppress competition" as part of

12    the elements?  I'm not sure how you're trying to break this

13    down.

14    Q    Suppress competition is what the basic claim is.  Right?

15    A    Yes.

16    Q    So the specific facts that are referenced here are

17    consensus about the price increases.  The jury has heard a lot

18    about price increases; and to make those price increases

19    effective.  Those are two elements of the contention.  Right?

20    A    Yes.

21    Q    Okay.  Let me see if we can agree on a couple of things as

22    a matter of fact in this case.

23         Isn't it true that the price increase announcements in

24    this industry are not the same as actual prices charged?  Do

25    you agree with that?

1    A    I agree.

2    Q    Would you also agree that price increase announcements more

3    or less reflect industry-wide factors?  True?

4    A    I don't agree that they include industry-wide cost and

5    demand factors, particularly during the conspiracy period.

6    Q    Yes.

7              Let me show you --

8              MR. BERNICK:  If we could -- if we could pull up page

9    359 of the deposition.

10             Blow that up.

11   Q    Did I ask you this question and did you give this answer at

12   your deposition:

13             (Reading) That is, the price increase announcements,

14   you would agree, tend to be driven by industry-wide factors

15   because the same announcement is made to everybody.  Right?

16             And your answer was, "Yes."

17             Was that your testimony?

18   A    Yeah, in a competitive -- in a competitive environment,

19   yes.

20   Q    But you didn't say that, you just said, industry-wide

21   factors because the same announcement is made to everybody.

22   Correct?

23   A    This is part of a very long deposition and part of a long

24   line of questioning.  What I meant there was, in a competitive

25   environment you would expect those price increase announcements

1      to tend to be driven by that underlying cost and demand

2      factors.

3    Q    So that's what you meant by what you said here?

4    A    Yes.

5    Q    So they would be industry-wide factors.  Right?

6    A    What I understand that to mean is things like the

7      underlying cost and demand factors.

8    Q    Right.

9    A    Yes.

10   Q    Is it also true that with respect to the price increase

11     announcements; the price increase announcements, I'll just say,

12     price, PIA, were not a variable in your model or Dr. Raiff's

13     model?

14   A    If you're thinking about the list of variables that are

15     included in the model, no, it's not one of those variables.

16   Q    Well, those are the list of variables in the model.  So my

17     question to you is very simple:  Isn't it true that price

18     increase announcements were not a variable in the model?

19   A    That's correct.

20   Q    Okay.  Isn't it also true that you have done no -- you have

21     done no quantitative assessment of the relationship between the

22     price increase announcements and their effect?

23   A    Only to the extent that the price increase announcements

24     are incorporated in the actual prices, because I focused on the

25     actual prices.

 1   Q   But you never did -- you have no quantitative analysis that
 2   draws a relationship between the price increase announcements
 3   and their effects.  Correct?
 4           MR. MARTIN:  Asked and answered.
 5   A   You know, you keep pointing to the things you've circled in
 6   red.
 7           I didn't say "price increase announcements."  I wasn't
 8   talking about the price increase announcements.
 9   Q   But let me ask you about that.  If the price increases
10   refer to the actual price increases there would be no point in
11   saying that the issue is whether the price increases are
12   effective.
13   A   My understanding of the conspiracy is that it involved
14   efforts to achieve consensus about price increases and then
15   efforts to make that -- those agreements about increasing
16   prices effective.
17   Q   So let's be clear:  It's your understanding of this case
18   that the agreement was not with respect to the announcements
19   but with respect to the actual prices?
20   A   No.  It's that there was an agreement to -- there were
21   attempts to achieve consensus about increasing prices and
22   undertaking efforts to make those price increases effective.
23   Q   The price increases were all announced in price increase
24   announcements, were they not?
25   A   No, not necessarily.

1   Q    Well, are you -- are you aware of -- I mean, wasn't it a

2   standard practice in this industry -- the jury has heard about

3   it for quite a while -- of sending out letters that made price

4   increase announcements?

5   A    Yes.

6   Q    Okay.  Now, are you aware of any other mechanism by which

7   the suppliers actually proposed raised prices to the customers

8   other than the price increase announcements?

9   A    Yes.  I saw evidence of agreement to restrict capacity, of

10  prices before tonnage strategies, evidence of communications of

11  meetings, of phone calls.  I saw lots of evidence that speaks

12  to reaching consensus about price increases and efforts to make

13  those price increases effective.

14  Q    I want to be very clear about this.  We have price increase

15  announcements.  Just the announcements in the letter, okay?

16  Price increase letters.  And then it's correct, is it not, that

17  these price increase announcements by letter initiated a

18  negotiation process?

19  A    That's my understanding, yes.

20  Q    And the negotiation process led to actual prices charged to

21  customers.  Correct?

22  A    Yes.

23  Q    Now, as you understood the contention about agreement in

24  the case, is the contention that you understood when you did

25  all your work the contention that there was an effort or an

 1   agreement to achieve consensus about the price increase

 2   announcements, or not?

 3   A    One -- my understanding is that one component of trying to

 4   achieve consensus about price increases and making those

 5   effective was to coordinate price increase announcements.

 6   Q    Coordinated price -- so you're saying that there was an

 7   agreement to coordinate price increase announcements.  Right?

 8   A    I'm saying that it's my understanding that that was part of

 9   the efforts to make price increases effective.

10   Q    So is the consensus here about price increase

11   announcements, or not?

12   A    It was about price increases.

13   Q    But did that include price increase announcements or not?

14   A    I think of those as some of the things they did in their

15   effort to make the price increases effective.

16   Q    I'll just focus on the price increase announcements.  Okay?

17   That is, that you think that the conspiracy or the agreement

18   that you were assuming was to achieve consensus about the price

19   increase announcements.  Is that true or not?

20   A    No.  You just wrote a word in what I said.

21   Q    Sure.

22   A    I didn't say that.

23            THE COURT:  She answered that question.

24            MR. BERNICK:  What?

25            THE COURT:  She did answer the question.

 1              MR. BERNICK:  Well, I'm asking --

 2              THE COURT:  She's answered it again.

 3              So ahead and answer it again if you'd like, Doctor.

 4              Go ahead.

 5              MR. BERNICK:  Go ahead.

 6      Q    My question very simply is whether you proceeded with the

 7      understanding that there was an agreement as to price increase

 8      announcements or not?

 9      A    My understanding is that the conspiracy involved achieving

10      consensus about price increases, and then efforts to make those

11      price increases effective.  And included in those efforts to

12      make the price increases effective were coordinated price

13      increase announcements, I saw evidence related to agreements to

14      restrict capacity, agreements related to price before tonnage

15      strategies, evidence of communications, meetings, you know,

16      phone calls.  It's in the set of things that I view as being

17      part of the efforts to make the price increases effective.

18      Q    So I'm going to just focus on what you just said:

19      Coordination of the price increase announcements.  Okay?

20      A    Okay.

21      Q    Isn't it a fact that you have done no quantitative analysis

22      of the relationship between the announcements that were made

23      that were in the letters and the actual customer prices?

24      A    I didn't try to connect any individual price increase

25      announcement with any particular movement in the actual prices.

 1   Q    I'll make it broader.  Isn't it true that if we go to your
 2   report and we go to your model, we will not find the
 3   quantification of any relationship between the price increase
 4   announcements generally and actual prices?
 5   A    Well, to the extent that generally they were affecting
 6   prices, I looked at the actual prices.  So generally it's in
 7   there, because the point of the price increase announcements is
 8   to try to have an effect on prices, and I looked at the actual
 9   prices.
10   Q    Relationship, Dr. Marx:  Price increase announcements;
11   actual prices.  Did you -- not just one price increase
12   announcement.  Price increase announcements generally, does
13   your model analyze the relationship between the price increase
14   announcements generally and actual prices?  Yes or no.
15             MR. MARTIN:  Your Honor, I'm going to object; asked
16   and answered.
17             THE COURT:  I think it's been asked and answered
18   several times and you asked the question a variety of different
19   ways, but she's answered the question.
20             MR. BERNICK:  Okay.
21   Q    Where in the report --
22             THE COURT:  Sustained.
23   Q    Where in your report do you set out the relationship
24   between the price increase announcements and the actual prices?
25             MR. MARTIN:  Objection.  That's not what she said.

 1              MR. BERNICK:  Your Honor, that's that --

 2              THE COURT:  I'll overruled that objection.

 3              If it's in your report.  Go ahead.

 4    A    I didn't try to connect the individual price increase

 5    announcements with particular changes in the prices.

 6    Q    Well, now you just said "individual."  I'm not asking about

 7    individual.  I'm saying:  Where in your report can we find your

 8    analysis of the relationship between price increase

 9    announcements generally and actual prices?

10    A    Okay.  It's probably useful to think of -- remember,

11    there's the benchmark period and then there's the conspiracy

12    period.  To the extent that in the benchmark period there were

13    as part of the competitive process there were price increase

14    announcements and to the extent that they were effective, those

15    are in the prices in the benchmark period.  So they're captured

16    in the model.

17              To the extent that price increase announcements were

18    coordinated by the conspiracy during the conspiracy period, I

19    don't want to have them in the model.  I'm trying to estimate

20    what the prices would have been in the absence of coordinated

21    activity, in the absence of collusion.

22              So I'm not trying to connect price increase

23    announcements that were made during the conspiracy with

24    particular changes in the price.  That wasn't necessary for

25    what I was trying to do.  I'm trying to estimate the effect of

```
 1    the conspiracy and quantify the effect of the conspiracy.  So
 2    I've captured the extent to which price increase announcements
 3    are part of the competitive process, they're in the prices for
 4    the benchmark period, and those are captured in the model.
 5    Q   My question --
 6              MR. BERNICK:  If I could just have the answer read
 7    back, I think the answer was in there someplace but --
 8              THE COURT:  Don't say that.
 9              MR. BERNICK:  I would like to have the answer read
10    back.
11    Q   And I want to focus very carefully on one part of what you
12    said.
13              MR. BERNICK:  So if we could just have it read back.
14              THE COURT:  Go ahead, Walter, read it back.
15              (The last answer is read.)
16              MR. BERNICK:  That's what I want to focus on, Dr.
17    Marx.
18    Q   You were not trying to connect price increase announcements
19    during the conspiracy period with particular changes in price.
20    Correct?
21    A   Correct.
22    Q   This is all the conspiracy period.  All my questions are
23    going to be conspiracy period.  Okay?
24    A   Okay.
25    Q   Price increase announcements during the conspiracy period
```

 1    with actual prices.  Right?

 2    A    That's correct.

 3    Q    We can't find that in your report.  Correct?

 4    A    That's a different question.

 5    Q    We cannot find that in your report.  Correct?

 6    A    I didn't do that.

 7    Q    You didn't do it?

 8    A    That's correct.

 9    Q    Okay.  So if the issue is whether there was an impact of

10    these price increase announcements with respect to actual

11    prices during the conspiracy period, you could think of

12    developing a model that actually looked to the relationship

13    between the two during the conspiracy period and compared it to

14    the relationship between the two in the benchmark period.

15    Right?

16    A    You could think about doing that, yes.

17    Q    Well, in fact, isn't it true that other econometricians

18    have developed those kinds of models that specifically focus on

19    the price increase announcements?

20    A    Are you talking about other economists in this case?

21    Q    No.

22    A    I'm not sure what you're referring to.

23    Q    Is there anything that stopped you from doing just that

24    analysis; to compare how price increase announcements affected

25    prices during the conspiracy period with how they affected

 1    prices outside the conspiracy period?  Anything to stop you
 2    from doing that?
 3    A    Just the fact that my assignment was to look at whether the
 4    conspiracy was effective and quantify the extent to which it
 5    was effective.  I think if you were trying to have an opinion
 6    about whether there was a conspiracy, a liability opinion, you
 7    might be interested in doing that kind of analysis.
 8    Q    Okay.  That's also fair.
 9         So certainly, Doctor, there was nothing stopping Dr.
10    Raiff from doing that analysis of the price increase
11    announcements and prices in his work, was there?
12    A    Well, yeah.  I mean, there was, because we know from your
13    expert's interview of Mr. Bernstein at BASF, that sometimes
14    they issued price increase announcements of 10 percent hoping
15    for 5 percent and then being happy with 4 percent, and
16    sometimes they issued price increase announcements just in an
17    attempt to keep the prices from going down.  And I think you
18    heard testimony from Mr. Dhanis who said the same thing, that
19    sometimes they would issue the price increase announcements
20    just to keep the prices from going down.
21         So if you're looking for price increase announcements
22    and you see there was no change in price, that might have been
23    effective, that might be exactly what they were trying to do.
24    So it's not even clear to me what you would be looking for in
25    the analysis, and I don't think it was clear to Dr. Raiff

 1    either.

 2    Q    Well, you just told us that this kind of work would have

 3    been part of a liability analysis.  Right?

 4    A    I think it might be the kind of thing you might see in a

 5    liability analysis, yes.

 6    Q    Okay.  And that analysis, just so we're clear what we're

 7    talking about --

 8    A    I'm sorry, sir.  You said to focus just on the conspiracy

 9    period.  But for the liability analysis you would need to go --

10    you would need to have a benchmark, a control period.

11    Q    Right.  But we do both.  So the whole idea -- let's make

12    sure we're being straight with what we're talking about.  I'm

13    sure you are, I'm not sure I am.

14              Price increase announcement.  You have an existing

15    price.  Price increase announcement comes out saying:  We want

16    to go up $.06.  That's what they do.  Right?

17    A    You see letters that will announce a proposed price

18    increase, yes.

19    Q    And then at the point of the effective date, the question

20    is whether the prices actually go up, or stay the same or go

21    down.  Right?

22    A    The question is whether the price changed in a way that's

23    different from what it would have --

24    Q    Yes.

25    A    -- in the absence of the price increase announcement.

 1    Q   Sure.  Sure.  Exactly.

 2             These relationships you could study.  Correct?

 3             MR. MARTIN:  Objection.  It goes beyond the scope of

 4    her substitution order.

 5             THE COURT:  She can answer it.

 6             Go ahead.

 7             MR. MARTIN:  Sure.

 8    Q   These are relationships you can study both during the

 9    conspiracy period and outside the conspiracy period.  Correct?

10    A   If by "study" you mean you can look at the graphs, yes, the

11    jury can look at the graphs.

12    Q   But you could do a quantitative analysis, a quantitative

13    analysis too if you want to.

14    A   I'm not sure what you're suggesting specifically.

15    Q   Could you do a quantitative analysis on whether the price

16    increase announcements were more effective, either partially

17    effective or wholly effective, during the conspiracy period

18    than they were outside the conspiracy period?  Could you could

19    that analysis if you wanted to?

20    A   Only if you knew what it meant for it to be effective.

21    Only if you knew what their goals were.  If they were using the

22    price increase announcements to prevent the price from going

23    down or from going down as much or as fast, if you knew what

24    that goal was, you could measure -- you could measure it

25    against that objective, yes.

 1    Q    Even if you knew what the goal was, if you have the two

 2    different periods, the conspiracy period and the non conspiracy

 3    period, you can see whether these price increase announcements

 4    worked more, had more of an effect during the conspiracy period

 5    than during the non conspiracy period.  Correct?

 6    A    I guess you could do the comparison, yes.

 7    Q    Okay.  And the point is that nothing stopped Dr. Raiff from

 8    doing that comparison.  Correct?

 9    A    Well, yeah, of course he didn't do it, he wasn't trying to

10    assess whether there was a conspiracy.  His -- the task that he

11    had was to ask whether the assumed conspiracy was effective,

12    and if it was effective, to quantify the extent to which it was

13    effective.

14         This is the kind of thing that would speak to whether

15    there was a conspiracy, and that wasn't part of what he was

16    asked to do.

17    Q    And not part of what you're addressing.  Right?

18    A    I didn't understand what you said.

19    Q    And not part of what you're addressing.  Correct?

20    A    Right.

21    Q    Okay.  But even if your goal is just to find the effect of

22    the conspiracy, if you did your analysis and said, during the

23    benchmark period there was, let's say, a 50 percent impact and

24    during the conspiracy period there's a 75 percent impact, you

25    could quantify damages just on the basis of that, couldn't you?

 1    A    Absolutely not.  You don't -- suppose in the conspiracy
 2    period prices would have been going down in the absence of
 3    aggressive attempts to coordinate price increases and to show
 4    the industry that, you know, we're going to maintain higher
 5    prices, coordinated collusive price increases, unless you have
 6    a model that tells you that in the absence of those price
 7    increases prices would have otherwise been going down, this
 8    type of thing does not allow you to quantify the effects of the
 9    conspiracy.
10    Q    But you would have that, because all you have to do is
11    include your price increase announcement in your multiple
12    regression model along with manned and cost and have two
13    different periods, the benchmark period and the conspiracy
14    period, you could tease out whether the price increase
15    announcements were more effective, couldn't you?  I mean, other
16    people have done it.  Right?
17    A    I don't know whether you'd be able to be successful in
18    teasing that out or not.  Dr. Raiff didn't do that.  He took a
19    different approach to quantifying the effects of the
20    conspiracy.
21    Q    So bottom line:  Price increase announcements about which
22    the jury has heard, we cannot find them in your model as a
23    variable.  True or not?
24    A    I think you've already asked that.  They're not a variable
25    in the model.

1    Q    Did you ever consider -- sorry.

2    A    I'm -- you already wrote it there.

3    Q    No quantitative analysis.  Not a variable in the model,

4    you're right, I repeated myself.  The Court is very familiar

5    with this failing of mine.

6              So, and if we want to know from the plaintiff -- are

7    you aware of anybody who has analyzed for the plaintiffs in

8    this case whether the price increase announcements were

9    effective or not?

10   A    What do you mean, quantitative analysis?  No, nobody's done

11   that.

12   Q    And you are of the view, are you not, Dr. Marx, that if you

13   don't have a quantitative analysis, you're dealing with second

14   best?  In your field, the quantitative analysis is the first

15   best and non quantitative is the second best.  Correct?

16   A    You're asking me about whether there's a quantitative

17   analysis addressing the question that I wasn't asked to address

18   and Dr. Raiff wasn't asked to address, so that analysis hasn't

19   been done.

20             The analysis that I reviewed and that Dr. Raiff did is

21   focused on whether the assumed conspiracy was effective and

22   quantifying the extent to which it was effective.

23   Q    And therefore you did not get down into the details of this

24   particular contention.  Correct?

25   A    I'm not sure what you mean.

 1   Q    I'm saying, you didn't get down into the contention that
 2   there was an agreement to suppress competition in an effort to
 3   achieve consensus about price increases and efforts to make
 4   those prices effective, you didn't get down into the specifics
 5   of how this was achieved or not achieved in your analysis.
 6   Fair?
 7   A    I'm not exactly sure what you mean.  I looked at the
 8   evidence related to what was done and the coordinated activity,
 9   but I didn't try to connect in the model any individual, for
10   example, price increase announcements to particular changes in
11   the price.
12   Q    Nor did you in the model try to connect -- and I think you
13   have said this -- you didn't try to connect price increases
14   generally to actual prices.  Correct?
15   A    I'm not sure what you mean by the difference between prices
16   and price -- price increases and prices.
17   Q    A price; you did not seek to connect price increase
18   announcements generally to actual prices.  Correct?
19             MR. MARTIN:  Your Honor, asked and answered.
20             THE COURT:  I think it's been asked and answered.
21   Sustained.
22             MR. BERNICK:  That's fair, I'll press on.
23   BY MR. BERNICK:
24   Q    Let me go on to the model itself just to indicate that we
25   are making some progress here.

```
 1              MR. BERNICK:  You can switch the charts.
 2    Q   I want now to ask you about the model or models.
 3              It's true, is it not, that the models are really the
 4    heart of your work and Dr. Raiff's work in this case.  Fair?
 5    A   I agree.
 6    Q   And is it also true, is it also true that the models are
 7    essential to the plaintiffs' case?
 8    A   I don't think I can speak to that.  I don't know.
 9    Q   Okay.  Well, that's fine.
10              THE COURT:  I don't think that's in the realm of her
11    opinions.
12              MR. BERNICK:  Okay.  Fair enough, your Honor.
13    Q   Let me get at it this way:  Is it fair to say -- I'll erase
14    it.
15              You said that you had two assignments:  One assignment
16    was to determine the impact of the alleged conspiracy and the
17    other was to determine damages.  Do you recall that?
18    A   I think of the two as being, first, whether the conspiracy
19    had an effect.
20    Q   Okay.
21    A   And then second, quantify what that effect was.  So it's
22    kind of whether there was an impact, and if so, what was the
23    impact.
24    Q   Whether the alleged conspiracy had an impact -- or effect?
25    Is that better?
```

```
 1    A    Effect would be the word I would use.

 2    Q    Had an effect?

 3    A    I'm not sure it's that important.

 4    Q    And if so, the damages.  Right?

 5    A    Yes.

 6    Q    If there is no model in this case, are you aware of any

 7    alternative, any alternative for establishing whether the

 8    alleged conspiracy had an effect?  Without the model, can you

 9    do it?

10    A    My opinion that it has an effect is based on the model; my

11    analysis, the model, and my review of the evidence.

12    Q    Okay.  Is that true for -- this is a 10-year conspiracy.

13    Right?

14    A    Yes.

15    Q    And you say that you can demonstrate that the conspiracy,

16    or that someone could demonstrate the conspiracy had an impact

17    across the board, all products, all 10 years without doing a

18    quantitative analysis.  Is that your testimony?

19    A    No.  I'm sorry --

20              THE COURT:  Excuse me.  Can I see you at sidebar?

21              MR. BERNICK:  Sure.

22              (At the sidebar.)

23              THE COURT:  What concerns me is that you're starting

24    to ask her about legal things.  She's not a lawyer.

25              And you didn't object.
```

```
 1                  But whether or not there's other evidence in the case
 2      that would establish certain things.  Unless -- she's not a
 3      lawyer and I'm getting -- there seems to be areas where you're
 4      going to opining about the case, whether or not without this,
 5      is there a case.
 6                  How would she know that?  I don't know.  Maybe there
 7      is a case.
 8                  MR. BERNICK:  I'll rephrase the question because my
 9      intent is not to do that.
10                  THE COURT:  Okay:
11                  MR. BERNICK:  My intent is to focus on the idea to be
12      able to quantitatively establish an impact on an informed
13      basis, that's where I'm going.
14                  THE COURT:  Maybe ask it a different way.
15                  MR. BERNICK:  Sure.
16                  THE COURT:  But areas that are asking her to render
17      what I think are legal opinions --
18                  MR. BERNICK:  Right.
19                  THE COURT:  -- as to the overall case, et cetera, are
20      objectionable.  But I thought I would bring it up.
21                  MR. BERNICK:  I appreciate that.
22                  MR. MARTIN:  Thank you.
23                  (In open court.)
24      BY MR. BERNICK:
25                  MR. BERNICK:  Thank you, your Honor.
```

 1    Q    Dr. Marx, are you aware of any way to do these things,

 2    these assignments quantitatively; that is, determine whether

 3    the alleged conspiracy had an effect, and if so, the damages?

 4    Is there any way to do that quantitatively without a model?

 5    A    Well, I'd have to think about that.  You could certainly do

 6    it with a model.  I suppose there might be some way that's not

 7    coming to my mind to do it.  The obvious way to do it is with a

 8    model, to do a statistical model.  Nothing is coming to my mind

 9    right now.

10    Q    Okay.  Now I want to talk a little bit about the modeling

11    approach and then I'm going to come back and talk about some

12    aspects of that.  So just the approach in general.

13         As I understand it, to do the model you need data

14    sets.  Right?

15    A    It's a statistical model so you're pretty much lost unless

16    you have data to work with.

17    Q    And Dr. Raiff put those together?

18    A    Yes, sir.

19    Q    Then you need the --

20    A    Well, let me just say, they were provided by the alleged

21    conspirators.

22    Q    Well, the data was --

23    A    Right.

24    Q    But the data, not all the data makes its way into the

25    model.  Right?

1   A   They're all in model.  I'm sorry, I don't --

2   Q   Well, for example --

3   A   -- understand you're asking.

4   Q   In the benchmark model, the benchmark model, the industry

5   model --

6   A   Yeah.

7   Q   -- that requires a data set that doesn't include all the

8   data.  Right?

9   A   Are you -- are you making the point that when I do the

10  estimation of what the competitive process is I'm only using

11  the benchmark period?

12  Q   No.

13  A   Oh.

14  Q   Not all prices are included, not all industry prices are

15  included in the data set for the industry.  Correct?

16  A   Are you making the point that I focus on TDI 80/20 and --

17  Q   No.

18  A   I don't understand what you're asking.

19  Q   You have all kinds of things.  All the transactions came

20  through as data.

21  A   Yes.

22  Q   And that came from the defendants, and Dr. Raiff also got

23  information from the plaintiffs, and he compared the two.

24  Correct?

25  A   Yes.

 1    Q    Okay.  And in order to make the model go for the industry

 2    as a whole, the first step model, he used not all of the data

 3    but a selection of the data.  Correct?

 4    A    He used all of the data.

 5    Q    Well, he didn't -- first of all, he only worked with

 6    benchmark products.  Right?

 7    A    That is what I asked you before.  When he did the

 8    industry-wide model for TDI he's focusing on TDI 80/20.

 9    Q    Right.

10    A    That particular product.

11    Q    Right.  He also took out outlier price transactions.

12    Correct?

13    A    Yes.

14    Q    Okay.  So that's all I'm saying, is that not all of the

15    data ended up getting used in the model.  He made judgments

16    about what to include.  Fair?  I don't want to get hung up on

17    it --

18    A    I think of it as including all of the data.

19    Q    That's fine.

20              Then there are the variables.  Right?

21    A    Yes.

22    Q    And then with the data sets and the variables, the

23    regression is run, and that's that kind of calculation.

24    A    Yes.

25    Q    And then you end up with a formula, an equation.  Right?

 1    A    Yes.

 2    Q    Okay.  And that formula together with the data and the

 3    variables, that formula, in essence, it's the model.  Am I

 4    right about that?

 5    A    Yes.  Sometimes people use the model to refer to kind of

 6    holistically all of this, some people use it to refer just to

 7    the equation.  I'm not sure it's that important.

 8    Q    Now, this approach was the same approach used for all three

 9    models:  TDI, MDI and polyols.  Correct?

10    A    The approach is the same.

11    Q    Okay.  So this is a common denominator for his work.  Is

12    that fair?

13    A    That's right.

14    Q    Okay.  Is it also true that in the case of all of the

15    models, the industry models, the data sets ran for 10 years,

16    the conspiracy period alleged, 10 years?

17    A    The conspiracy period is 10 years, yes.

18    Q    Ten years.  Then the benchmark periods were even longer?

19    A    Yes.

20    Q    Okay.  And all of the suppliers were allegedly

21    co-conspirators.  That would be the five companies.  Right?

22    A    Yes.

23    Q    So it would be 10 years, all suppliers.  All the data sets

24    were geared towards an assumed 10-year conspiracy and all of

25    the suppliers:  Dow, Huntsman, BASF, Bayer, Lyondell.  Correct?

 1   A    Yes.  You've got 10 years written there.  You make it look
 2   like there were only 10 years of data.  There's 17 years of
 3   data.
 4   Q    This is just the conspiracy period.
 5   A    Okay.
 6   Q    And there's another seven for the benchmark period.  It's
 7   all that thing.
 8   A    Yes.
 9   Q    Okay.  Now, isn't it true that the model that comes out of
10   all of this is, in a sense, custom made to that data?  That is,
11   you have variables, but the equation that comes out of here,
12   the formula is driven by the data that you have, the stuff, and
13   then the variables.  Correct?
14   A    Well, it's a regression, so you're using the data to
15   estimate the -- the equation to estimate the relationship
16   between the underlying cost and demand factors and the price.
17        Maybe I'm not understanding what you're asking.
18   Q    No, no, it's a very simple concept.  The data drives the
19   formula; that is, the formula that comes out is kind of
20   tailored made to the data sets that you're working with.
21   A    I disagree with what you're saying, "tailor made."
22        I mean, the data -- the data tell you what the
23   relationship is between the price and demand, the cost and
24   demand factors, and the price.
25   Q    Okay.  The data tell you.  So you've got to -- it drives --

 1    that's fine.  The data tells you what the result is going to be
 2    once you select the variables.  Correct?
 3    A    I mean, it's awkward how you're saying the data tells you
 4    what the results are going to be.
 5         You're using the data to estimate what that
 6    relationship is --
 7    Q    Okay.
 8    A    -- between the cost and demand factors and the prices.
 9    Q    And if you -- this is the key point.  This -- this data
10    set, the 10 years for the alleged conspiracy and the seven for
11    the benchmark period is based on an assumption that you were
12    given.  The assumption being, it's a 10-year conspiracy
13    involving these five suppliers.  Correct?
14    A    Okay.  I was assumed to -- I was instructed to assume the
15    existence of the conspiracy.
16    Q    Right.
17    A    I was told that the allegation is of conspiracy between
18    1993 -- sorry -- 1994 to the end of 2003.  But I wasn't
19    required to assume any particular periods to be used as the
20    conspiracy period or the benchmark period.  I looked at the
21    evidence to tell me what would be an appropriate period of time
22    to hold out as the conspiracy period and which periods of time
23    would be appropriate to use as the benchmark period.
24    Q    Okay.  So I'm not really -- I'm just saying, you made --
25    you were given an instruction and then you did some homework on

 1    your own and you decided 10 years is the right period, and then

 2    you have the benchmark period as well.  Fair?

 3    A    I think it's a bit unfair to characterize what I did as

 4    "doing my homework."

 5            I spent a long period of time doing a great deal of

 6    work in this case.

 7    Q    No offense.  When it comes to lawyers and economists and

 8    experts, I feel that myself.

 9            So you did a lot of work.  Right?

10    A    Yes, sir.

11    Q    And on the basis of the instructions that you were given

12    but also then a lot of work, you developed a model that you

13    looked at and analyzed a model that assumed -- or that was

14    based upon a 10-year conspiracy period of all of the suppliers.

15    Fair?

16    A    Yes.

17    Q    Okay.  Now, you left it up to the jury ultimately to

18    decide, as they should, whether there is a conspiracy; and if

19    so, how long it lasted.  Again, that's not something -- as you

20    said, that's not something you expressed an opinion on.

21    Correct?

22    A    Right.

23    Q    Okay.  So if the jury were to conclude in this case that

24    the conspiracy period is different or involved different

25    people, this model would be based upon a data set that doesn't

 1    reflect the conspiracy years.  Correct?

 2    A    Okay, that's wrong.

 3          So, remember, the model that I have looks at the

 4    benchmark period, and so it's estimating the competitive

 5    process in the benchmark period and then predicting what prices

 6    would have been in the absence of a conspiracy.

 7          So if there's no conspiracy, it's still a prediction

 8    of what the prices would have been.  If one of the individual

 9    alleged conspirators is not part of the conspiracy it doesn't

10    change that because the model is based on the benchmark period,

11    the period that's free from the effects of the conspiracy.

12    Q    Okay.

13    A    So I suppose that -- well, I'll just stop there.

14    Q    Right.  So I understand that.  You did the model on the

15    basis of the information that you had, and you used 10 years

16    based upon that information.  I'm not questioning that.

17    A    I didn't use the 10 years that were part of the alleged

18    conspiracy.  The model, the estimation of what the competitive

19    process is uses the benchmark period.

20    Q    Okay.  I keep on -- I'll say that all the time.  You used

21    the model based upon 10 years conspiracy and seven years

22    benchmark.  Correct?

23    A    Again, the model doesn't use the data from the conspiracy

24    period, it holds that out.

25    Q    Yes.  Yes, okay.

1            So -- we're going to get to all of that, trust me.

2            So now the question is:  If the jury were to conclude

3       that the conspiracy was only two years or five years and it

4       concluded only certain suppliers -- okay?  Are you with me?

5       A    I think so.

6       Q    -- the model would not tell you the overcharges

7       specifically in connection with that period, would it?

8       A    No, the model is the same.  The model is still looking at a

9       period that I think everyone agrees is relatively free of

10      effects of conspiracy and looking at what the competitive

11      process is in that period, and then estimating what the price

12      would have been.

13           Now, if a decision is made that it's not appropriate

14      to associate overcharges with particular transactions, you just

15      wouldn't add them in.

16           Remember when I added up the transactions, the

17      overcharge from each of the transactions, if there's some that

18      for whatever reason you don't think should be included, they

19      wouldn't be added in.  It doesn't change the model.

20      Q    That's my whole point, Dr. Marx.  What the jury does or

21      says or concludes doesn't change the model.  The model just

22      remains exactly as it was before.  Fair?

23      A    Yes.  It's based on a period of time, it's based on the

24      benchmark period.

25      Q    It's based on the benchmark period.  But the overcharges

 1    are based upon the data from the full 10 years.

 2    A    Oh, that's right.

 3    Q    Okay.  So just so we're real clear, this model is based

 4    both on the seven years of benchmark, that data, and it's based

 5    upon 10 years that are assumed -- with your confirmation based

 6    upon what you've done -- are assumed to be the conspiracy

 7    period, and the overcharges that come out are 10-year

 8    overcharges.  Correct?

 9    A    Okay.  No.

10            So, you see where you've got the word "model" there by

11    the formula?  If that's what you mean by the model, that it's

12    the formula, it does not depend on the 10 years of data that

13    are in the conspiracy.

14    Q    The overcharge does.

15    A    Oh, sure, because the overcharge is the difference between

16    the price they actually paid and the price that's predicted.

17    Q    All right.  So, the benchmark model is what you're saying,

18    the other periods, is not based upon the data from the

19    conspiracy years.  Fair?

20    A    That's right.

21    Q    Okay.  But the overcharges, all the big numbers there are

22    based upon the data from the 10 years of the alleged

23    conspiracy.  True?

24    A    Sure, yeah.  You have to look at what they actually paid

25    and compare it to what they would have paid in the absence of

1    the conspiracy.

2    Q    And so this gives you 10 years, all five of overcharges,

3    and you listed them on the screen.   Correct?

4    A    That's the calculation I did, yes.

5    Q    Now, if the jury were to conclude that the conspiracy is

6    for a shorter period of time or doesn't include Lyondell, the

7    model doesn't tell you what the overcharges are for a shorter

8    period of time and a more limited number of suppliers.

9    Correct?

10   A    Sure it does.  You would just only add up the transactions,

11   the overcharges associated with the transactions that you think

12   should be included.

13   Q    But you haven't done that.

14   A    Well, I mean it -- it would be straightforward for me to

15   only add up a certain number of years.

16   Q    Nowhere in your report do you specify a lesser period of

17   time or a smaller number of suppliers and alternative damage

18   figures.  Correct?

19             MR. MARTIN:   Your Honor, I'm going to object and I

20   would like to talk to you.

21             THE COURT:   Why don't we take a recess right now for

22   lunch, ladies and gentlemen.  We'll see you back here at 1:25.

23             Thanks very much.

24             THE LAW CLERK:   All rise for the Jury.

25             (The Jury leaves the courtroom.)

```
 1                    THE COURT:  Doctor, you can step down.  Thank you.
 2                    (Witness temporarily excused.)
 3                    THE COURT:  Go ahead, let's hear your objection before
 4          we break for lunch.
 5                    MR. MARTIN:  We weren't going to be talking about --
 6          we weren't going to challenge the benchmark period.  This is
 7          effectively challenging the benchmark period.  What the jury
 8          finds will be based on a subset of evidence.
 9                    Dr. Marx's knows facts that she's not allowed to tell
10          this jury, that tells her this is a 10-year conspiracy.
11          Economically that's the right period of time.  The benchmark
12          period should include '94, '95, and '96.
13                    If we're going to go down this road she'll have to
14          have an opportunity to explain why she believes as a economist
15          that's the time period that should be excluded.  Everything
16          he's doing now is talking about a benchmark period.
17                    THE COURT:  Hold on.
18                    Go ahead.
19                    MR. BERNICK:  We've scrupulously avoided challenging
20          the benchmark period.  I've not said a word about how the
21          benchmark period was set.  What I've said is that they've
22          let -- I'm sorry.
23                    THE COURT:  Go ahead.  Let's hear.
24                    MR. BERNICK:  What I've said is that the benchmark
25          period is, like I said, all that is fine.
```

 1            The question is, it's up to the jury as she herself
 2    acknowledges and she says in her testimony, to decide what the
 3    actual conspiracy is.  And it's a property of the model that it
 4    doesn't work that way.  And our experts will testify about the
 5    whole model fails if you change the data set.
 6            She's now testifying -- I'm asking her, is there
 7    anywhere where the model has been used to calculate shorter
 8    periods of time?
 9            And she's saying no.
10            And that's correct.  So I'm not challenging the
11    benchmark period -- I didn't say a word precisely because of
12    this argument.
13            THE COURT:  So what are you implying, there's evidence
14    that there's a limited -- a lesser term of the conspiracy?
15            MR. BERNICK:  I'm saying that the jury has the
16    latitude to find it.
17            THE COURT:  I know.  Go ahead, let me hear you, Mr.
18    Martin.
19            MR. MARTIN:  That's the thing.  He's saying what the
20    conspiracy period is.  By definition, that's exclusive.
21            What the jury decides will be based on the evidence
22    before the jury.  What her decision is is an economic decision.
23    There are facts there that if he keeps going down the road I
24    would say he's opening the door.
25            MR. BERNICK:  I did not ask her --

1           THE COURT:  Open the door to, what would you want to
2      bring?
3           MR. MARTIN:  The information she learned about when
4      the conspiracy started and the evidence of --
5           THE COURT:  You mean the Bayer conversations?
6           MR. MARTIN:  The stuff that the Court is very
7      reluctant to admit.  But again, it is an issue, and that is her
8      response, it's at least an economic response.
9           MR. BERNICK:  Again, I'm not challenging her choice of
10     the benchmark period, I'm not challenging even her attribution,
11     as you'll see, of the variance to the conspiracy as a whole.
12     All I'm saying is the model doesn't work piecemeal.  That is
13     the only proposition that I'm going for, is the model does not
14     work piecemeal.  That's a characteristic of the model.
15          If you want me to put -- I'll be happy to put my
16     questions solely in those terms.
17          MR. MARTIN:  Why would it work piecemeal?  She knows
18     what the evidence is.  Why would she as an economist develop
19     something that includes a conspiratorial time period
20     effectively?  If it's not in the conspiracy, it is in the
21     benchmark period.  There's no -- it's one or the other.
22          THE COURT:  What if he argues based on the evidence,
23     not the expert, but based on the evidence that, whatever, maybe
24     if he argues that if there's evidence to support it, that the
25     conspiracy was a more limited time?

 1              MR. MARTIN:  Then that's the thing.  From her
 2     perspective she would say, okay, you can argue that, but I as
 3     an economist kept that data out of the benchmark period because
 4     I satisfied myself it was tainted by collusive conduct.  And
 5     she did a lot of work for that.
 6              MR. BERNICK:  I didn't question that at all.  I said
 7     simply:  If the jury decides -- and I'm happy to put it in any
 8     way that doesn't implicate the benchmark period --
 9              MR. MARTIN:  It's unfair, because now he's asking --
10     he's putting on her what the jury will decide based on evidence
11     that it will see and she knows is different.
12              THE COURT:  Go ahead.
13              MR. BERNICK:  It's not about the collusive evidence,
14     it's about just how the model was built.  The model was built
15     in a certain way --
16              THE COURT:  What if data were taken out -- what if,
17     for instance, Lyondell or one of them was not in the -- you
18     know, for some reason the jury concluded they were not a
19     co-conspirator, would that affect your opinion?
20              MR. MARTIN:  I'd have to ask her.  I know that her
21     first answer is:  I know there's evidence that Lyondell was a
22     conspirator so it was right for me to include that information.
23              THE COURT:  Right, okay.
24              MR. BERNICK:  But the answer to your Honor's question
25     is, what would that do to the model if the jury were to

```
 1    conclude that Lyondell is not a supplier?

 2              The model fails.  Because the model is based on a

 3    regression that uses all of this data.  That's the problem.

 4              We've talked about this before, your Honor.  I

 5    can't -- but I need this information from her because she's the

 6    architect -- not the architect, but she's the proponent of the

 7    model.  And that's all that I'm going for, that's how I set

 8    this whole thing up is just how the model works.  I didn't ask

 9    her a word about the evidence of collusion.

10              THE COURT:  I'll see you back here at 20 after.  See

11    you back at 20 after.  thanks.

12              (A luncheon recess is taken.)

13

14              A F T E R N O O N   S E S S I O N

15

16              (Proceedings resume - Jury not present.)

17

18    L E S L I E   M A R X, resumes testifies further as follows:

19

20              THE COURT:  Before we get started it looks like we're

21    okay with Juror No. 10.  His employer has worked out something

22    with him.  Okay.

23              Mr. Bernick, I think if you rephrase your question,

24    instead of saying, "If the jury were to conclude or take out

25    certain dates or take out information, what would happen to the
```

```
 1   model," if you would just ask her:  "If certain information,
 2   certain years might have been -- what affect would that have on
 3   the model," I think that's what you're trying to get to, isn't
 4   it?
 5              MR. BERNICK:  Well, the question is --
 6              THE COURT:  I think it's inappropriate to ask the
 7   question:  "If the jury were to take out," or "if the jury were
 8   to conclude."  Okay?
 9              MR. BERNICK:  Okay, I've got it.
10              THE COURT:  But you can ask her --
11              MR. BERNICK:  Sure.
12              THE COURT:  -- if data were taken out or if
13   information or years were taken out, what the effect is on the
14   model, I think that would be appropriate.
15              MR. BERNICK:  Remember that, Dr. Marx, that's what I'm
16   going to ask you in a minute.
17              THE COURT:  She has good memory, don't worry about
18   that.
19              (Laughter.)
20              THE COURT:  You don't have to remind her of that.
21              THE DEPUTY CLERK:  All rise for the Jury.
22              (Jury present.)
23              THE COURT:  Please be seated.  Welcome back.
24                         CROSS-EXAMINATION CONTINUES
25   BY MR. BERNICK:
```

 1   Q    Good afternoon, Dr. Marx.

 2   A    Good afternoon, Mr. Bernick.

 3             MR. BERNICK:   Good afternoon, ladies and gentlemen.

 4   Q    Dr. Marx, where we left off, I was asking some questions

 5   that got back to the seven-year benchmark period and the

 6   10-year conspiracy period that are built into -- that are part

 7   of the design of the model.  You remember that?

 8   A    Yes.

 9   Q    Okay.  And the question, I just followed up on some

10   questions that talked about the data sets that were used that

11   tell you in some fashion or tell -- inform the model, the

12   variables and then the benchmark model itself.  Do you recall

13   that?

14   A    Yes.

15   Q    So now my question -- I was almost done writing it:  If you

16   take years or suppliers out of these data sets -- let's say you

17   take a year out and you take a supplier out -- does the model

18   work?

19   A    If you -- remember, the model is only estimated on the

20   benchmark period.

21   Q    Yes.

22   A    So, if you take something out of the conspiracy period it's

23   not going to affect the prediction.

24   Q    Right.  But if -- okay.  But will it tell you, if you

25   remove the data with respect to the conspiracy, alleged

 1    conspiracy years, if you take that data out, will the

 2    overcharge calculation change?

 3    A    If you take the conspiracy data out it doesn't have any

 4    affect on the model because it's based on the benchmark --

 5    Q    I understand that.

 6    A    But now when you would go to calculate whether there was an

 7    overcharge, if you didn't have a price for a particular --

 8    remember the calculation, the overcharge is by

 9    transaction-by-transaction.  So if you had taken a transaction

10    out, then when you went to calculate an overcharge for that

11    transaction it wouldn't be there.  So you wouldn't -- if you

12    took it out, when you were adding up the overcharges from the

13    different transactions, you just wouldn't have an overcharge

14    for that missing transaction.

15    Q    Okay.  So let me just -- let me just get there.  I'll use

16    another...

17         So we've got the pMDI board up.  So if we took and we

18    only -- let's say we took out '94 to '97.  Okay.  Are you with

19    me?  Can you see that?

20    A    Not exactly.  If you could move the podium.

21         That helps.  Thank you.

22    Q    If you took those out, does the model tell you what the

23    change to the overcharge is?

24    A    There wouldn't be any change to the predictive price

25    because remember that the red line is based on the control

 1    period, it's based on the prices and costs and demand in the
 2    benchmark period.  But when in the second stage, when we looked
 3    over here at the individual transactions, when you went to look
 4    at individual transactions, if you've taken those transactions
 5    out of the data, then they just won't be there.  So you won't
 6    be calculating an overcharge for them for the missing stuff.
 7    Q   Let me ask you about that.  This is a predictive model as
 8    you told the jury.  Right?
 9    A   Yes, sir.
10    Q   And the way a predictive model works, at the least as I've
11    come to understand it, is that you can literally kind of start
12    at the beginning with that formula, and as the data gets -- the
13    data year-by-year or month by month gets processed in the
14    model, through the model, this but-for line is predictive.
15    Right?
16    A   Yes.
17    Q   Okay.  Now, you have said that -- you pointed out that the
18    model starts, the model predicts beginning here and it connects
19    back up every there.  Right?
20    A   That's right.
21    Q   Okay.  But let me just ask this because this is kind of a
22    little bit of an aside.  When Dr. Raiff developed this model in
23    the first instance, you weren't involved.  Right?
24    A   That's correct.
25    Q   Okay.  And when Dr. Raiff developed that model, he had all

 1    of this data in front of him.  Right?

 2    A    When you mean "all of this data," I'm not sure --

 3    Q    I'll rephrase.  That's not so good.

 4              So when you talked to the jury on direct examination,

 5    you mentioned that this is not prediction like when you think

 6    about prediction in the future, you're kind of predicting

 7    something that's already there.

 8    A    You're predicting something in the middle, yeah.  It's a

 9    little awkward to use the word "prediction."

10    Q    So when Dr. Raiff set out to do his work here, you weren't

11    involved in all that we know of his work is the final model and

12    the result of that model.  Correct?

13    A    Well, I have the work that's embodied in his report and I

14    also was able to talk with his support team.

15    Q    Okay.  Was that something that happened recently?

16    A    No.

17    Q    Okay.  So, but you don't have -- for example, he had the

18    opportunity to look at all of this data and develop different

19    alternative models.  Correct?

20    A    All I know is the model that he produced.

21    Q    That's what I'm saying.  Is that you know the model that he

22    produced, but you don't know all the work that he did leading

23    up to that model.  Correct?

24    A    I don't know.

25    Q    Right.  And so if he's got, you know, a high-powered

1    computer, which he does, he can -- you've indicated that the

2    model enables him, or the method enables him to kind of go

3    along and see how he's doing to match up or track.  Right?

4    A    No, the method -- he's just running a regression.

5    Q    Right.

6    A    He's just using the data, and objective criteria for

7    determining which variables to include.  So he doesn't have

8    control over what it's going to predict.

9    Q    Well, sure, he can pick different variables.

10   A    He used an objective criterion for selecting the variables.

11   Q    For the mandatory variables he just used his judgment.

12   Right?

13   A    Oh, you mean for the core variables?

14   Q    Yes.

15   A    Yeah, that's like the flour and the eggs and sugar.  He

16   included the key -- he included toluene for TDI, the core cost

17   and demand enables for each one.

18   Q    But he include -- you could say that, but he also included

19   other factors that he had the ability to select different kinds

20   of demand variables.  Correct?

21   A    I -- I just know the ones he included as his core variables

22   and then the process he used to select the rest.

23   Q    So how many times he experimented with this model, whether

24   he did or not, you just don't know.  Correct?

25   A    I don't know.

1  Q  Okay.  So we now have this prediction line going along, and

2  it links back up.

3        Isn't it true that one of the important aspects of

4  this prediction line is that it has a variable called a lag

5  variable?

6  A  Yes.  Remember when I did the equation, it was the previous

7  month's price?  That's what is often called a lag price.  It's

8  the price from the month before.

9        THE COURT:  Just a moment.  You just -- yeah.  That's

10  better.

11  A  Sorry.

12  Q  What that variable does is it provides kind of a --

13  something of a continuity from time period to time period.

14  Correct?

15  A  Yes.

16  Q  So whether that lag variable is run beginning at the

17  beginning of the alleged conspiracy period, it kind of backs up

18  a little bit and gives some weight to what the price was the

19  day before.  Correct?  Or the time before?

20  A  Right.  It's -- when you say "lag variable," you mean the

21  price from the previous month?

22  Q  Right.

23  A  And so it's calculating the prediction of next month's

24  price based on this month's price and the cost and demand

25  factors.

 1    Q    Okay.  So now I want you to assume that the data with
 2    respect to three years is gone.  Wouldn't that affect the lag
 3    price right here?
 4    A    No, because the -- remember, okay.
 5              THE WITNESS:  Could I stand up and point?
 6    Q    Well --
 7    A    I'll try to do it without -- I know you don't want me to
 8    stand up.
 9              Okay.  The model, the equation that's trying to
10    capture the competitive process in the benchmark period only
11    relies on the benchmark data.  So that equation has not
12    changed.  And so all it -- all it needs is the one price in
13    December of 1993, and that begins the prediction.  Or you can
14    start it at the beginning of 1992, wherever you start it.
15    Q    Right over here.
16    A    It doesn't ever use the information in the blue line during
17    the conspiracy period.  So if you were to take data out of the
18    blue line in the conspiracy period, it has no effect on the
19    prediction.
20    Q    Would it use the lag price of this dot right back here?
21    A    It's going to -- you have to start it somewhere.  And so
22    the red dots that we looked at before start in December of
23    1993, and the green dots were started from January of 1992.
24    Q    Yes.  But the lag -- to do the lag price here --
25    A    Yes.

 1    Q    -- you'd have to have a prior price.

 2    A    It's using the prior prediction.  You know, it's -- what

 3    you want to do is capture the prediction about what the price

 4    would have been in the absence of the conspiracy.  And so you

 5    need in each month to estimate what the competitive price would

 6    be, and then for the next month you look back at what the

 7    estimated -- what the predicted competitive price was in the

 8    appeared before and go forward.

 9         So it's looking back only at the prediction from the

10    period before, it's not referencing the blue line.

11    Q    Okay, that's fine.

12         So now the question is, if you took these years out,

13    if -you took them out, what would your model say -- could your

14    model say anything about overcharge for that period of time

15    with the remaining period of time only?

16              MR. MARTIN:  I'll object.  This has been asked and

17    answered.

18              MR. BERNICK:  No.

19              THE COURT:  No.  If she can answer it, go ahead.

20    A    Again, in this stage where we estimate what the overcharges

21    would be, you're adding up the overcharges from each individual

22    transaction.  So to the extent you're saying these transactions

23    are no longer there, when you go to add them up they just don't

24    get added in.  So if you took out data in the conspiracy period

25    and there were overcharges associated with that period of time,

 1    then you get a lower number when you add up the overcharges.

 2    Q   What if you didn't know there were overcharges during that

 3    period of time?

 4    A   Regardless of what's going on in that period of time, if

 5    you don't have that data, there won't be any overcharges for

 6    that period of time.

 7    Q   Would the absence of that data affect the statistical

 8    significance of the difference between the two curves?

 9    A   Let me think.

10         I think it would be -- are you saying I don't have the

11    blue line for that period of time?

12    Q   Right.

13    A   Then you'd have to -- when you did the calculation of

14    statistical significance you'd have to use the data that you do

15    have.  And so I don't have any reason to think that it would

16    change the statistical significance.  But it's true, you would

17    need to -- you wouldn't -- right now the statistical

18    significance that calculation is using is that information.

19    Q   The statistical significance calculation is based upon the

20    totality of the difference between these two curves.  Correct?

21    A   Actually, no.

22         The P value calculation that Dr. Raiff -- I'm sorry

23    about getting into the statistics here.  But the confidence

24    level calculation that Dr. Raiff is doing is based on the

25    following experiment:  Suppose there's no conspiracy, suppose

 1    there was no conspiracy at all.  Suppose it had no effect.

 2    What is the probability that we could have gotten an overcharge

 3    like the one that he got?

 4              And the result is that for TDI there's no way you

 5    could have gotten his result if there was no overcharge.

 6    That's the 99.4 confidence level.

 7              And so that calculation of his confidence levels, it

 8    doesn't use the conspiracy period blue line at all.

 9    Q    So -- that's fine.  So you're saying that the difference

10    between -- the difference between the red line and the blue

11    line, which is -- well, the difference at each point represents

12    the overcharge.  Right?

13    A    That's -- well, this is the industry-wide -- when I'm doing

14    the calculation of overcharges for the plaintiffs I'm not using

15    that difference.

16    Q    I'm talking about this.

17    A    Okay.

18    Q    So the overcharge is measured at a particular time and

19    represents the difference between the blue line and the red

20    line.  Right?

21    A    That's right.

22    Q    Okay.  And that difference, whether that -- that difference

23    is statistically significant, is measured by reference to just

24    these two data points?

25    A    No.  The calculation --

 1   Q   Let me rephrase it.  I'm sorry.

 2       Is judged solely by reference to this point in time.

 3   Right?

 4   A   The question that I was looking at when I was talking about

 5   statistical significance is the overcharge as a whole.

 6   Q   No, I'm not talking about that.

 7   A   Okay.

 8   Q   I'm just talking about this model.

 9       Does this model determine statistical significance by

10   looking at the whole 10 years, or part of the 10 years?

11   A   It's asking the question:  Could you have gotten the

12   overall overcharge over the whole 10 years?  Could you have

13   gotten the estimate that Dr. Raiff got if, in fact, there was

14   no conspiracy.

15   Q   It's whether there is statistically significant difference

16   between this line, which shows overcharge, and this line which

17   shows no overcharge; that is, that if, in fact, the model was

18   right here on the actual price line, the overcharge would have

19   been zero.  That's the Null (phonetic) case.  Right?

20   A   If the prediction for that month was on top of the blue

21   line, yes, then you have no overcharge then.

22   Q   Right.  And so the statistical test says:  Is there a

23   statistically significant difference between the red line and

24   the blue line with respect to this model.  Correct?

25   A   The exercise that Dr. Raiff did in quantifying the

1    statistical significance is looking at the overcharge as a

2    whole.

3    Q    Right.  And so to determine whether the overcharge as a

4    whole, this whole area here is statistically significant, you

5    take all 10 years of actual prices and all 10 years of but-for

6    prices and you ask the question:  Is there a statistically

7    significant difference between the two.  Correct?

8    A    Not exactly.  The way these statistical tests are done is

9    you have it with reference to some baseline hypothesis.  And

10   the baseline here is if there were no conspiracy.  So if there

11   had been no conspiracy, if there were no overcharges, could we

12   have gotten an estimate like this.

13   Q    Right.

14   A    And those confidence levels speak to that and show that it

15   would be extremely unlikely to have gotten results that we got

16   if there had been no conspiracy, or no effective conspiracy.

17   Q    Bear with me for a second, Dr. Marx.

18        This is the overcharge, the distance between the two.

19   Right?

20   A    For that month, yes.

21   Q    And the Null case where there's no overcharge would be

22   where the two lines overlap completely.  Correct?

23   A    If the two lines overlap completely, then you don't have an

24   overcharge in that month.  It's a little bit different from now

25   you described the --

1  Q   If this whole line were to overlap with the blue line,

2  there would be no overcharge.  Right?

3  A   That's right.

4  Q   Okay.  And so now the question is, as the red line moves

5  away, is there, given all the data that's around here, is there

6  a statistically significant difference between the data -- I'm

7  sorry -- is there a statistically significant different between

8  the actual price data and this line down here?  Correct?

9  A   The calculation that Dr. Raiff did was looking at the

10  overcharge as a whole over the 10 years.

11  Q   Right.  So my question is:  If you took out three of those

12  years, wouldn't that have an effect on the statistical

13  significance of the two lines?

14  A   No, because the exercise that he's doing in the calculation

15  of those confidence levels is, suppose that there were no

16  conspiracy.  And so would it be possible to get a predictive

17  price line that deviated that much from the actual price line

18  if there was no conspiracy?

19       And the answer is definitely not for TDI; and very

20  unlikely for the others.

21  Q   But that determination is made with respect to all 10

22  years.  And if you don't have --

23  A   It is --

24  Q   I'm sorry.  If you don't have all 10 years of data, you'd

25  have to run the test again to see if it would change.  Correct?

1    You'd have different data to use in making the assessment of

2    statistical significance.  True?

3    A    Again, I've said this a couple of types, the estimate of

4    the statistical significance is based on what economists or a

5    statistician would call the Null hypothesis, and it's going off

6    the benchmark of:  Suppose there is no conspiracy, and could

7    you have gotten as a result an overcharge estimate like Dr.

8    Raiff got if there had been no conspiracy.

9          So that test is not actually referencing the blue line

10   during the conspiracy period.

11   Q    Let me go on to then ask about this particular case of

12   statistical significance, that is pMDI.  There's something

13   that's not on the chart here.  Right?  Not shown.  One of the

14   things that's not shown is what the confidence interval is.

15   Correct?

16   A    The confidence interval is not on that picture.

17   Q    Right.  In fact, there is no indication of the data, where

18   the data is for statistical significance with respect to this

19   chart.  Right?

20   A    It's not on that particular.

21   Q    Right.  You can't tell at all from this chart anything

22   about statistical significance.  Correct?

23   A    No, I don't think you could tell just from looking at that

24   picture.

25   Q    Right.  So there are charts that have been done for pMDI.

 1          MR. BERNICK:  I'm going to pull up Demo Exhibit -- or
 2     Demo 10 for Dr. Marx.
 3     Q    And do you recall that this is Dr. Ugone's graphic
 4     representation of the confidence intervals?
 5     A    I do recall.
 6     Q    Okay.  And you may -- or Dr. Raiff may have disagreed with
 7     exactly how broad it was, but is it fair to say that with
 8     respect to pMDI, we see that the error band or the confidence
 9     intervals include both the blue line actual price, and the red
10     dashed line, the but-for price.  Correct?
11     A    The disagreement goes well beyond whether that is too wide
12     or not.  It's not correctly calculated --
13     Q    Well --
14     A    -- again, and it doesn't make any sense.
15     Q    Again, all I'm asking you is:  The disagreement about how
16     to calculate it I recognize.  What I'm getting at is, that if
17     the confidence intervals include both lines?  Then the --
18     include both lines.  Then statistics at 95 percent confidence
19     says that there's no statistical difference between the two.
20     Correct?
21     A    This doesn't make sense the way it's portrayed.  And the
22     easiest way to see that is that this is making it look like the
23     urethanes price, the price for pMDI could be way at the bottom
24     of the pink area down at $.20 one month and then the next month
25     be up at $.90, and then the next month it could come back down.

1    It just -- it doesn't make sense for what we know about the

2    industry.  It's not the right way to capture statistical

3    significance here, and it wasn't done correctly.

4    Q   Well, but, Dr. Marx, what this graphic shows and what I

5    want to get at is that the actual data that we have relating to

6    these curves is not just the single line that's shown here for

7    but-for.  Correct?

8    A   There is only one but-for line.

9    Q   I know that.  But the data -- there are data points

10   relating to actual prices that are -- that include -- that are

11   much more widely dispersed.  This is simply a point estimate.

12   Correct?

13   A   The but-for price is a point and the blue line is the

14   weighted median.

15   Q   All right.  But the fact of the matter is that there's a

16   lot of data that ranges both above and below this one line.

17   Correct?

18   A   I don't think that's right.  If you look at the volume

19   weighted transactions --

20   Q   Yes.

21   A   -- they're pretty tight right around that blue line.  I

22   don't think there's anything down there where you've drawn

23   that.

24   Q   Yes.  But the results of the regression model themselves

25   have dispersion, do they not?

 1    A    I'm not sure what you mean.

 2    Q    Both the price line -- the actual price line clearly has

 3    dispersion around it.  Correct?

 4    A    That price line is the weighted median.  So there are other

 5    transactions at different prices, but the weight of the volume

 6    of transactions is right around that line.

 7    Q    Well, I know that's the weight.  I'm talking about the

 8    dispersion.  Statistical significance also is driven by the

 9    dispersion of the data as opposed to the weight of the data.

10    Correct?

11    A    The dispersion of the data could affect it, yes.

12    Q    Okay.  And this data, the actual price data is dispersed.

13    Correct?

14    A    If you look at the weighted, volume weighted transactions

15    there's not a lot of dispersion.

16    Q    I didn't ask about volume weighted.  I'm just saying -- I

17    know this is volume weighted.  I also know this is the weighted

18    median average.  That's not what I'm asking.

19    A    No, it's not weighted median average, it's weighted median.

20    Q    I thought I said "median."

21    A    You said "weighted median average."

22    Q    "Weighted median."

23    A    Yes.

24    Q    Thank you.  I'm only going to get a C minus rather than a

25    D.

 1              So this dispersion means that there is no neat single
 2     relationship between these two lines.  Correct?  There's
 3     uncertainty associated with the relationship.  Correct?
 4     A    I'm not sure what you're asking me when you're saying the
 5     relationship between the two lines.
 6              The two lines are what they are.  The relationship is
 7     the difference between them.
 8     Q    Okay.  There is uncertainty associated with the model and
 9     there's -- there's uncertainty associated with the model line
10     itself.  Correct?
11     A    It's a prediction so, yes, that's the statistical
12     uncertainty.
13     Q    Okay.  And then if we wanted to express that uncertainty as
14     a band around the but-for price, it would say that the
15     uncertainty means that the true answer is somewhere between an
16     even lower line and a greater overcharge, and a higher line and
17     a lesser overcharge.  Correct?
18     A    You could try to do that, but it wouldn't be that.
19     Q    Let's just work with this just because we're not -- I'm not
20     going to tackle you, Dr. Marx, with respect to the particulars
21     of the difference between Dr. Ugone and yourself.  I'm going to
22     use your numbers.  Okay?
23              I'm just trying to get to the jury that because
24     there's uncertainty associated with the model, there's a range
25     of potential values that all of which could be consistent with

 1    the statistical test that's being applied.  Correct?

 2    A    Yes.  We know from the fact that the pMDI model has an 80

 3    percent confidence level, that the bands aren't nearly as large

 4    as what you've drawn there.

 5    Q    Again, I'm just trying to get to the concept.  I'm going to

 6    get to the numbers in just a moment.

 7              If the confidence interval as the range of uncertainty

 8    includes zero; that is, that there's no overcharge, that would

 9    be said to be statistically -- statistically non significant at

10    the confidence level that's being chosen.  Correct?

11    A    Let me just be clear.  If you have -- if you're interested

12    in 95 percent confidence level and you draw a 95 percent

13    confidence band, and if that includes no overcharges, that's

14    when you would say that result is not statistically

15    significant.

16    Q    Correct.  So if I'm just grossly representing a confidence

17    band here with respect to MDI, the confidence band includes no

18    overcharges; that is, it says that the actual overcharge number

19    here is -- may be -- may be within confidence intervals the

20    same as the actual number, then that would say that those

21    confidence levels, there's no statistically significant

22    difference.  Correct?

23    A    Okay.  I don't agree that that's what the confidence band

24    looks like.  But if that was the confidence band for that month

25    the way that you've drawn it, you would say that it's not --

1      the overcharge in that month is not statistically significant.

2      Q    Now let's talk about MDI.  Very specific.

3           With respect to MDI, you said that if 95 percent

4      confidence -- at 95 percent confidence interval the -- it's

5      around here some place -- at 95 percent confidence interval,

6      this is not a statistically significant difference; that is,

7      for MDI.  Correct?

8      A    Now you're comparing apples and oranges here.  Because what

9      I was talking about was looking at the overcharges as a whole.

10     And you can say that with 80 percent confidence for MDI, the

11     overcharge -- there really was an effective conspiracy, that

12     the actual prices were above what would have been predicted in

13     the absence of the conspiracy.

14     Q    Okay.  So if we're just working with the -- you tell me

15     what the number is for that pMDI.  So in the industry model, at

16     95 percent, at what level -- is this significant, is the

17     difference significant or not at 95 percent confidence --

18     A    Not at 95.

19     Q    What?

20     A    No not at 95.  PMDI is significant at 80 percent.

21     Q    That's what I thought.

22     A    Yeah.

23     Q    Okay.  So if you're using a 95 percent confidence interval,

24     the variance for MDI is not significant statistically.

25     Correct?  Right?

1    A    The overcharge as a whole -- you've kind of written it

2    above the bar for the single month so it's not the right way to

3    think about it.  But when you look at the overcharge as a

4    whole, for MDI it's only statistically significant at the 80

5    percent level, not 95.

6    Q    Right.  Okay.  So that's fair because I'm kind of

7    pinpointing something.

8         So if we take the period of time as a whole -- right?

9    A    Yes.

10   Q    -- then the overcharge, the variance here, the overcharge

11   for pMDI is not statistically significant.  Fair?

12   A    At the 95 percent level.

13   Q    At the 95 --

14   A    Right.

15   Q    In fact, you would have to go down to 80 percent for it to

16   be significant.  Correct?

17   A    That's right.

18   Q    Okay.  So if you go to 80 percent it becomes statistically

19   significant.

20        Now, my question is this:  Isn't it true that the 95

21   percent confidence test is the typical test that's used in

22   scientific studies?

23   A    I think -- I don't know about all scientific studies, but

24   in economics I think of it as being the most common.

25   Q    The most common.

1              Now, have you ever published a paper -- first of all

2     let me ask:  When you come in to testify as an expert in court,

3     do you follow the rules that apply to your work as a professor;

4     that is, you know, the scientific rules and principles that

5     apply to your work as a professor, or do you have a different

6     set of rules that you use in court?

7     A    I think of myself as using the same rules.

8     Q    Okay.  And so the question is -- I guess I have is:  Would

9     you ever -- have you ever published a paper on economics in

10    your field that uses an 80 percent confidence interval?

11    A    I have papers where I just state the confidence level

12    sometimes referred to as the P value.  So instead of declaring

13    it to be statistically significant or not, I just say the

14    confidence level is 80 percent.

15    Q    Is 80 percent.  So you have published peer review papers

16    where in your research you use an 80 percent confidence

17    interval?

18    A    No.  No, it's not that I would calculate an 80 percent

19    confidence interval.  I would just report in my work what the

20    confidence levels were, just like I had on the screen here --

21    Q    Okay.

22    A    -- where I had the 99, 92 and the 80.

23    Q    Sure.

24    A    So I would just -- one way to approach this is to tell your

25    reader, look, it was statistically significant or not, and then

1    you're telling your reader it was above whatever you specify,

2    above 95 or below 95.  The other way to approach it is just to

3    tell your reader in the published work what the confidence

4    levels were.  And I've done that in my published research.

5    Q    Okay.  So now the question is this:  Have you ever

6    published a peer review paper where at 80 percent confidence

7    you have said this is statistically significant?

8    A    No, I don't think so.

9    Q    Okay.  Are you aware of anybody else in your field who has

10   published a peer-reviewed paper that at 80 percent says the

11   result is statistically significant?

12   A    I know there are papers that sometimes do use 80 percent

13   and they'll say -- they'll say it's statistically significant

14   at that 80 percent level.

15          It's true that 95 would be the most common threshold

16   to apply, but there are papers that go down as low as 80.

17   Mostly, the most information would be provided just by telling

18   a reader what the confidence level is and then they can make a

19   judgment about whether it's high enough for their purposes.

20   Q    Would you say here in this court that 80 percent is

21   statistically significant or not?

22   A    Well, it's not a matter of 80 percent being statistically

23   significant, the results are statistically significant at the

24   80 percent level.

25   Q    Yes.  But would you say that that's an appropriate standard

```
 1    to use for statistical significance in this case?
 2    A    Absolutely, given all the analysis that I have done and the
 3    evidence that I have seen, I'm perfectly comfortable with the
 4    80 percent level.
 5    Q    Are you familiar with --
 6              MR. MARTIN:  Your Honor, could she just finish her
 7    answer?
 8              THE COURT:  I'm sorry?
 9              MR. MARTIN:  Could she finish her answer?
10              THE COURT:  I think she finished her answer.
11              MR. MARTIN:  Yeah.
12    Q    So I guess we're not totally communicating because I
13    misunderstood your prior testimony.
14              Are you -- have you published any paper where you used
15    data and report results where you have used a confidence
16    interval at the 80 percent level?  Have you?
17    A    Have I produced a confidence interval -- no, I don't think
18    I would have produced an 80 percent confidence interval.
19    Probably not.
20    Q    You wouldn't have published it.  Right?
21    A    I don't think I would have -- it would be unusual to
22    produce an 80 percent confidence interval.  If you're going to
23    produce the confidential interval you would usually use 95
24    percent.  I mean, the standard -- if you tell someone in the
25    literature, look, this is the confidence interval, they're
```

```
 1    going to assume that what you've done is you've produced the 95

 2    percent confidence level.  It's the most common level to use.

 3               So I don't -- I don't think I would have

 4    constructed -- I guess I might have, but I don't think -- I

 5    don't think in my research I've ever constructed for

 6    publication an 80 percent confidence interval.

 7    Q    That's my question:  Have you ever for research purposes

 8    constructed a confidence interval and published it at 80

 9    percent?

10    A    Not that I recall.  It would be unusual to do a confidence

11    interval at that level.  It would be perfectly typical to

12    announce your confidence levels and type 80 percent to be

13    there.  But to actually construct an 80 percent confidence

14    level I think would be a little bit unusual.  I don't think

15    I've done it.

16    Q    And again, let's take just your faculty at Duke.  Are you

17    aware of anybody in the economics department that has done

18    that?

19    A    Constructed an 80 percent confidence interval?

20    Q    Right.

21    A    That seems like it would be kind of unusual.  At the level

22    of doing that I think you would just report the confidence

23    levels.

24    Q    Let's talk about the next board, and it will be pretty fast

25    because I think it's the same.
```

 1          MR. MARTIN:  Your Honor, could I just give her a laser
 2     pointer in case she needs it?
 3          THE COURT:   Sure.
 4     Q   Let's talk about the CFS polyols.
 5          I'm not going to put it up here.  Are these
 6     statistically significant at 95 percent confidence interval?
 7     A   No.  92 percent for those.
 8     Q   Let's talk about TDI.  I want to ask you a different series
 9     of questions with respect to TDI.
10          I want to talk about business conditions.  You're
11     familiar, are you not, with the trade press in the urethanes
12     business?
13     A   Yes.
14     Q   Things like Chemical Weekly and things of that nature?
15     A   Yes.
16     Q   Okay.  And are you familiar that there are witnesses in
17     this case who have testified as business people to the business
18     conditions that existed at various points in time throughout
19     the 10 years of TDI?
20     A   Yes.
21     Q   Okay.  Whose testimony are you familiar with?
22     A   I've read all of the parts of these depositions that were
23     cited at the various reports, some of the same people that
24     you've seen here, Mr. Dhanis, Mr. Pauley, I saw the testimony
25     of Mr. Underdown, Mr. Ho.  I don't have in my memory a full

 1    list of --

 2    Q   I'll be sure not to tax you too much, it's probably better

 3    than mine.

 4          But you're familiar, are you not, with the fact that

 5    according to, for example, Mr. Ho and the trade press at the

 6    time, and I think Mr. Pauley as well, but it's their view and

 7    the trade press reflects that under this period of 1994 to

 8    1996, during this period of time there was a strong demand for

 9    TDI.  Are you familiar with that?

10    A   Actually demand for the industrial production indices that

11    I look at and as far as I know, it was going down in 95.

12    Q   No, you're looking at auto.  I'm talking about the demand

13    for TDI.

14    A   Yes, the demand for TDI would be driven by automobile

15    assemblies and things like the carpet and furniture production,

16    and those are going down in '95.

17    Q   That's now talking about the model and what you looked at,

18    that's my whole point.

19    A   I sure looked at that data, that's in the model.

20    Q   I understand that.  I'm asking you a different question.

21    I'm asking for what the people who were in the business at the

22    time were observing with respect to the demands for their

23    particular products.  Okay?  You can talk about consumer demand

24    for autos and carpets and all the rest of that.  But the people

25    who are the business people that are selling the polyurethanes,

1    they have the opportunity to take a look at the demand for

2    their product.  Correct?

3    A    This is the demand for their products.

4         The reason I'm using autos is automobile assemblies.

5    So every time you make a car you've got to use these products

6    in the car.  So more building of automobiles is demand for TDI;

7    and similarly, more production of carpets and furniture is more

8    demand for TDI.  So I am capturing the demand for this product.

9    Q    But the product that is being bought when they buy

10   polyurethanes is not automobiles or carpeting, the product

11   that's being bought is the polyurethane materials that are

12   being sold that ultimately will be used in the cars and the

13   carpeting.  So when I'm asking about demand, I'm asking for the

14   immediate demand for the stuff that's going out the door at the

15   factory, which is the chemical.  That demand.

16   A    I think it's the same thing though.  Because --

17   Q    Well, that's my real question to you.  Okay?  My real

18   question to you is:  The business people at this point in time,

19   they're getting the orders for the rail cars that go out the

20   door with their product.  They see it because a customer calls

21   up and says:  I want four tank cars.  And they write down "four

22   tank cars."  And the customer -- the sellers and the customers

23   are reporting in the trade press and in their sworn testimony

24   that you've read that there was strong demand for those tank

25   cars during this period of time.

 1          You've read that, haven't you?

 2    A    I don't recall specifically right now, but I do know that

 3    the data showed declining demand for auto assemblies and carpet

 4    production, carpet and furniture production in 1995.

 5    Q    How many hands does -- you've got the chemical that's in

 6    the little tank car.  Okay?  And it goes into a factory that

 7    makes foam.  And then the foam is sold to -- for use in beds

 8    and use in cars, and people who are the consumers for beds and

 9    cars, they make a demand that could well be felt all the way

10    back here.  I understand --

11          MR. MARTIN:  Your Honor, this is testifying.

12          THE COURT:  No, he's not.  Okay.

13          I think that's what you understand too, Dr. Marx.

14    Correct?

15          THE WITNESS:  It is.

16          THE COURT:  That's what she's been saying.  There's a

17    demand, and the auto market dropped off during that period of

18    time.

19          MR. BERNICK:  Right.

20    BY MR. BERNICK:

21    Q    So the question though is:  You're talking about the demand

22    that's in your model.  The demand in your model is demand for

23    cars and beds.  Correct?

24    A    I mean, that's a little bit shorthand.  It's the carpet and

25    furniture, industrial production index.  There's housing

 1    starts.  We're talking about TDI, there's the automobile

 2    assemblies for MDI, there's appliance and carpeting and

 3    furniture production.

 4    Q    Those are all demand indices for the ultimate consumer.

 5    Right?

 6    A    Those are measures of production of those things, of the

 7    cars and the carpeting and furniture.

 8    Q    So, the business people over here who are at the chemical

 9    companies selling the stuff in the rail cars, they record the

10    demand by the people here, like the plaintiffs in this case,

11    for those rail cars.  They see that demand.  Correct?

12    A    They see the orders, yes.

13    Q    Okay.  And so these people here are saying:  My orders are

14    going up.

15              Are you saying that they're wrong?  Is the model

16    saying that they're wrong?

17    A    I'm just saying that in the data, demand, the demand

18    variables which I think are appropriate demand variables and

19    which your economists have not objected to as appropriate

20    demand variables, I think they're capturing the demand, and

21    they're going down in 1995.

22    Q    Well, just focus on my question.  I'm asking you a very

23    narrow question.  I know what your model does, I know what the

24    experts have said about it.  I'm asking about the business

25    people who are the ones who are reporting strong demand and

 1    strong prices, that's who I'm talking about.

 2            Forget about the model for a minute.  I'm going to ask

 3    you about the model.  Okay?  Just -- I just want to know about

 4    the demand.

 5            Are you saying that the people who are in the business

 6    and who are quoted in the trade press were simply wrong when

 7    they said that the demand for the tank cars was going up?  Are

 8    you saying that they're wrong?

 9    A    I'm not sure exactly which testimony you're pointing to

10    that's saying specifically the demand was strong in 1995.

11    Q    Mr. Ho is a good example.

12    A    If there was someone that was saying that demand was going

13    up in 1995, I would wonder if they were misremembering what was

14    happening in that period of time.  Because when you look at the

15    data on auto assemblies, for example, and the production of

16    these products that include flexible foam, it's going down in

17    1995.

18    Q    Chemical Week, 1995:  Urethanes looking strong.  Talking

19    about the expansion of facilities to make enough urethanes, TDI

20    to go around.  It's in the trade press.

21    A    I don't know what you're looking at up there.

22    Q    Well, did you look at the trade press to see what kind of

23    demand was being reported for polyurethanes during this period

24    of time?

25    A    I looked at the trade press.  It's often quite vague as to

1    whatever -- which product they're talking about, which period
2    of time.
3    Q    Not only does it report strong demand, isn't it a fact that
4    capacity is being built during this period of time?  Hundreds
5    of millions of dollars being spent to build TDI capacity to
6    serve that demand during that period of time?
7    A    The increase in -- it's kind of a slow, small increasing
8    capacity through 1997, and then a larger increase in capacity
9    in 1998.
10   Q    Right.  In fact, throughout this period of time, because of
11   the report that the demand is strong, the industry starts
12   de-bottlenecking and then builds over a period of years a
13   substantial amount of capacity that starts to come on stream
14   roughly about there.  Right?
15   A    Yeah.  From my recollection, the big increase in capacity
16   comes in 1998.
17   Q    Right.  Dow's plant came on stream in 1998.  Right?
18   A    I think that's right.
19   Q    And isn't it a fact, Mr. Ho testifies that the reason that
20   the company spent hundreds of millions of dollars to build all
21   these new factories, it took three years, is precisely because
22   of the strong demand and the tight capacity that existed back
23   here in 1994 and 1995?  Isn't that what he says?
24           MR. MARTIN:  Your Honor, Mr. Ho hasn't testified in
25   this case yet.

1          MR. BERNICK:  She just said she reviewed his

2     testimony.

3          THE COURT:  No, I'll object -- I'll sustain the

4     objection.  Rephrase the question.  Or if you can, I don't know

5     if -- I don't know if she even has the basis of that witness.

6          MR. BERNICK:  I think she mentioned Mr. Ho

7     specifically.

8          THE COURT:  Go ahead.  Reask the question.

9          MR. BERNICK:  That's okay.

10    BY MR. BERNICK:

11    Q    So, the business people are building capacity, not because

12    they think it won't be used, because demand is going down;

13    they're building capacity because they think it will be used

14    because demand is going up.  That's what they're saying.

15    Right?

16    A    You're asking me what the business people --

17    Q    Yes, yes.

18    A    Are you talking about Mr. Ho specifically?

19         I don't have a strong recollection of what he said in

20    his deposition.

21    Q    That's what the trade press is saying too.  That's what the

22    capacity figures -- you know the capacity figures in the mid

23    '90s.  Right?

24         MR. MARTIN:  Your Honor --

25    A    Look, the capacity is pretty close to total production in

```
 1   '96 and '97, so you would expect given that capacity you might
 2   expect prices to be going up.  But oddly the actual prices are
 3   going down in that period of time.
 4           When you get to 1998 and there's a big expansion in
 5   capacity, and you look what happens to actual prices, with the
 6   big capacity expansion in 1998, the economics might suggest
 7   prices would go down, but instead that's where you see that
 8   kind of hump in the prices, in the actual prices.
 9   Q   We'll get to '98 if we get past '94 and '95.
10           Can you say -- can you say that what is reported in
11   the trade press and in the depositions, which is that the
12   reason --
13           MR. MARTIN:  Your Honor, these questions are without
14   foundation.  He's just telling people what's in the trade
15   press.
16           THE COURT:  You have to lay a better foundation.  When
17   you say "the trade press," I don't know which one you're
18   referring to.
19           MR. BERNICK:  We'll show the witness Exhibit DX-6828.
20           MR. MARTIN:  Is this in evidence?
21           MR. BERNICK:  Pre-admitted.
22           MR. MARTIN:  May we talk at sidebar, please?
23           THE COURT:  Well, is this pre-admitted?
24           MR. BERNICK:  It is pre-admitted.
25           Your Honor, I really would like to keep on going here
```

 1   because I know it's getting late.

 2              THE COURT:  We don't need a sidebar right now.

 3              MR. MARTIN:  Fine, fine.

 4              THE COURT:  But if you're going to refer to a trade

 5   journal, then show it to her and ask her if she's familiar with

 6   it.  If she's not, then there's no foundation.

 7   BY MR. BERNICK:

 8   Q   6828, Defendant's Exhibit.  Just take a time to read it,

 9   Dr. Marx.

10   A   It's going to take me a minute to read this.

11              THE COURT:  Do you need to read it?

12              THE WITNESS:  Yes.  I don't just recognize it.

13              THE COURT:  Just take a few moments to read it and see

14   if you recognize it.

15              (There is a pause for the witness.)

16   A   I don't specifically recognize it.  I can see it says

17   they're looking for good growth into the next century.  It's

18   dated toward the end of 1995.

19   Q   Have you read the second page?

20   A   I have not.

21              This isn't the best setting for me to concentrate and

22   read carefully what's here.  But would you like me to try to

23   read carefully the second page?

24   Q   Well, what I really would like is to ask you a question and

25   I'll try to frame it so that we don't get bogged down and we

1    can move along.

2             Business people are reporting -- I want you to assume

3    for purposes of my question, just assume it -- you're an

4    expert, you can be asked hypotheticals -- I want you to assume

5    for purposes of my question that both the trade press and the

6    testimony of business people will be that there was strong

7    demand --

8             THE COURT:  Is there going to be evidence to this

9    effect?

10            MR. BERNICK:  Yes, absolutely.

11   A    This doesn't say anything about 1994 or most of 1995, so

12   don't rely on this to put that strong demand right there in

13   '94, '95.

14   Q    It is a 1994 and 1995 trade journal.  Correct?

15   A    No, it's dated October 4th, 1995.

16   Q    Okay.  So 1995 --

17   A    It's looking forward past that point.

18   Q    But it's talking about what the business condition have

19   been.

20   A    That's not how I read it.  It looks like it's looking

21   forward to me.

22            THE COURT:  Just a moment, gentlemen.

23            You're going to have to lay -- if you're going to ask

24   her questions about particular journals or particular

25   depositions you're going to have to lay a better foundation.

1          Are you making a representation to me that there's
2   going to be evidence of a strong demand in that period of time?
3          MR. BERNICK:  That's absolutely correct.
4          THE COURT:  You're making that representation?
5          MR. BERNICK:  Yes.
6          THE COURT:  Assuming there's that evidence; now what?
7   Go ahead.
8   BY MR. BERNICK:
9   Q   So my question is:  Assuming that the business people are
10  reporting strong demand and as a result are opening up,
11  creating new capacity.  I want you to assume that for purposes
12  of my question.  Okay?
13  A   I'm assuming that there's new capacity?
14          I mean, I've looked at the capacity numbers.  There's
15  not big expansion in capacity then.
16  Q   That's not really what I said.  I said, I want you to
17  assume that there's strong demand and that's the reason why
18  people are building the new capacity.  Okay?
19  A   Okay.
20  Q   And that as a result, they say that capacity -- during this
21  period capacity is tight.  Capacity being "tight," do you know
22  what that means?
23  A   I don't know what you mean.
24  Q   Okay.  Well, I'll tell you what I mean so it's clear.  That
25  given the size of the factories at that point in time, the

 1    demand is high enough that they're operating at very high

 2    rates.  Okay?

 3    A    Okay.

 4    Q    Okay.  So, and they will say that's the reason why actual

 5    prices were rising.  I want you to assume that.  Okay?  At

 6    least for my client.  I'll be producing Mr. -- we'll be

 7    producing Mr. Ho.

 8         Okay.  At that same time we can see that your model,

 9    or Dr. Raiff's model is indicating that prices should be going

10    in exactly the opposite direction.  Correct?

11    A    The prices in the but-for look pretty flat.  You seem to

12    have drawn a downward slipping line through them.  And my

13    recollection of the capacity is that capacity does not get

14    particularly tight until 1996 and 1997, which is exactly what

15    the but-for model predicts prices going up, consistent with the

16    capacity, and where the actual prices are coming down is

17    inconsistent with your representation of what's going on here.

18    Q    We're saying that the evidence will show this.

19         My question to you is very simple.  Isn't it a fact

20    that there's nowhere in your report, whatever these -- whatever

21    the facts might be with respect to business conditions -- I've

22    told you what our witness, I believe our witness in good faith

23    is going to say -- but isn't it a fact that in your report you

24    never actually analyzed how it can be that prices are going in

25    one direction, whereas your model is saying or going in a

 1    different direction?

 2    A    Because there's a conspiracy to elevate prices.

 3    Q    No, you're report never says that.  Correct?

 4    A    I attribute the difference between the actual prices and

 5    the but-for prices to the conspiracy.

 6    Q    That is in the aggregate.  I don't see anything in your

 7    report where you take and focus on periods of time where the

 8    model is out of sync with the prices in this way and ask the

 9    question why.  I don't see -- I don't see any of it in your

10    report.  Am I wrong?

11    A    What do you mean "out of sync"?  You mean the conspiracy

12    was effective?

13    Q    No.

14         With due respect, Dr. Marx, I'm asking a very simple

15    question.  You're saying the reason is the conspiracy.  I

16    understand you have that view.

17         I'm asking a factual question:  In your report, do you

18    anywhere analyze how it can be that when your model is

19    predicting that prices should go down, prices are, in fact,

20    going the other way -- at a time?  Do we find that in your

21    report?

22    A    Yes.  I talk about it in the report how the result of my

23    model are consistent with a conspiracy to elevate prices.

24    Q    I'm talking right here, right where the business is taking

25    place.  Your model says one thing, the prices say another.  I'm

1    just asking you:  Is that something, this period of time, '94

2    to '96, is that something that is addressed at all in your

3    report?

4              MR. MARTIN:  This is asked and answered three times.

5              THE COURT:  It's been asked and answered several

6    times, so sustained.

7              MR. BERNICK:  I don't think -- okay, I'm not going to

8    argue with you.

9              THE COURT:  She's answered it, that it's a result of

10   the model versus the actual prices.

11             MR. BERNICK:  No, my question really is the why for

12   this period of time.

13   Q   Let me just ask you this:

14             During this period of time prices are coming down on

15   the actual prices, and there's a trend going up the other way

16   for the but-for prices --

17   A   The but-for prices there make perfect sense to me given how

18   tight the capacity was in '96 and '97.

19   Q   I'm not done with the question, Dr. Marx.

20             THE COURT:  That's okay.  The answer stands.  The

21   answer stands.

22             MR. BERNICK:  Okay.

23   Q   So now we see it going down again, and price is coming down

24   but not so much.  Right?

25   A   Overall, yes.

1    Q    Right.  Again, does your report deal with the difference
2    between these trends, or any other trends along this line,
3    specific variances?  Does your report address the historical
4    circumstances surrounding specific variances?
5    A    I looked in great detail at the cost and demand factors and
6    how they evolved over time, and I find the but-for line to be
7    consistent with what I know about capacity, demand, other
8    things going on, but I attribute that difference to the
9    conspiracy as a whole.
10   Q    I'm going to show you -- I'm going to ask you this
11   question:  Isn't it a fact that during your -- the examination
12   before the Court about a month ago, you were asked
13   specifically:  (Reading) Why it is that your model price is
14   going down and the prices are going up?
15        Do you recall that?
16        MR. MARTIN:  What page?
17        MR. BERNICK:  Page 174.
18   A    Not specifically.
19        Okay, I'm on page 174.
20   Q    Right.  Do you recall having a discussion before the Court
21   at that point in time about why it was that the price trends
22   were different?
23   A    Not specifically -- I don't specifically recall it but I
24   can see it here in the transcript.
25   Q    Okay.  So my question is:  Isn't it a fact that during

 1    that, even a few weeks ago you were not in a position to

 2    explain why these trends were going in a different direction?

 3    A    Again, I say here:  "I've spent a long time studying supply

 4    and demand and capacity in this case in all these periods of

 5    times."

 6         It's a sensible price pack to me given the analysis

 7    I've done, the study I've done of the supply and demand

 8    variables in this case given the evidence that I've seen.  I

 9    attribute the gap between the actual prices and the predictive

10    prices to the conspiracy.

11    Q    Where did you attribute this particular gap in your report?

12    A    I didn't make an attempt in my report to attribute

13    differences in the overcharges in any different months to any

14    specific acts or specific changes, I looked at the model as a

15    whole and attribute the overcharges as a whole to the

16    conspiracy.

17    Q    That is exactly why I'm going down this road.

18         This distance between these two lines depends on

19    one-by-one-by-one transactions taking place where the price

20    being charged is different from your but-for price.  Correct?

21    The total aggregate overcharge is a function of what is

22    happening at each and every different one of these points.

23    Correct?

24    A    I'm adding up the overcharges on a

25    transaction-by-transaction basis, yes.

 1    Q    And at the same time, isn't it true that in your report you
 2    never analyzed the facts on the ground, the business facts on
 3    the ground as this process unfolds?  In your report you don't
 4    analyze exactly what is happening with the business people for
 5    polyurethanes during these different periods of time?
 6    A    That's wrong.
 7    Q    That's wrong.
 8         So can you tell me exactly what was happening in 1997
 9    when these two curves diverged?
10    A    I would like to discuss the evidence that I've seen in that
11    period of time.  I'm not sure that I'm allowed to in front of
12    this Court.
13         THE COURT:  Okay.
14    Q    I'm asking you about the business facts on the ground.  Do
15    you --
16    A    These are interviews with business people.
17    Q    I'm talking about business people doing business, not
18    business --
19    A    My business people were doing business.
20         MR. MARTIN:  Your Honor --
21         MR. BERNICK:  I'll skip on.
22         THE COURT:  Move on.
23    Q    This variance that takes place here, that's what it is, a
24    variance or a gap.  Right?
25    A    I think of it as overcharges.

 1   Q    The overcharges come out of the other model.  Right?  This
 2   is just the industry model.
 3   A    It's the industry model, yes.
 4   Q    It's a variance or a gap.  Right?
 5   A    I think of it as the measure of overcharges.
 6   Q    Isn't it true that your model doesn't tell us, doesn't tell
 7   us the cause of that variance?
 8   A    I attribute the variance, the gap, the overcharges to the
 9   conspiracy.
10   Q    The model does not tell cause (writing on chart).
11        Right?
12   A    I mean, it's not quite right.  What it tells you is that
13   there is something different about the competitive process that
14   caused the prices to be higher than they otherwise would have
15   been.  And then what is it that caused the competitive process
16   to be different in a way that elevated the prices?
17        To me the reason that fits is the conspiracy.
18        MR. BERNICK:  Your Honor, I'd like to show the witness
19   page 128 of her examination during the hearing that took place
20   before the Court at line 9.  This is a few weeks ago.
21   Q    Do you recall the question as follows:
22        (Reading) Now, isn't it true that the model does not
23   determine the cause, what it is that caused the variance?  The
24   model itself does not determine the cause of the variance?
25        And your answer was, "That's correct."

1       Do you recall giving that answer under oath at that

2    time?

3    A    I agree with it.

4         I don't specifically recall.  I mean, I agree that

5    that's what I said.

6    Q    And did I get this down right:  The model does not tell the

7    cause of this variance?  Did I get that right?  That's what you

8    said.  Right?

9    A    It tells you that there is -- the model tells you that

10   there's something different about the competitive process in a

11   way that caused prices to be higher than they otherwise would

12   have been, but what that thing was that caused prices to be

13   higher than they otherwise would have been, the model doesn't

14   tell you what that was.

15   Q    The model doesn't tell you, for example, that the cause of

16   the variance is a conspiracy, does it?

17   A    That's correct, that's my inference.

18   Q    So, and I'm going to put -- talk a little bit about that

19   inference in a minute.  But so we get back to it, the model

20   that you have done or that you have endorsed for purposes of

21   this case -- it's around here someplace -- the model is the

22   heart of your work in this case.  True?

23   A    I think we already had that question.  Yes.

24   Q    I'm getting back.

25        And if we take a look at the model, the model shows

 1    that there is a variance, but the model is not designed to tell
 2    you the cause of the variance, including whether conspiracy is
 3    the cause of the variance.  Fair?
 4    A    Again, it tells you that something has changed about the
 5    competitive process in a particular way, in a way that caused
 6    prices to be higher than they otherwise would have been, but it
 7    can't tell you what that was.
 8    Q    Now, so in order to find out, in order to go to what you've
 9    talked about, which is you attribute the variance to evidence
10    of the conspiracy as a whole -- right?  Did I get that right?
11    A    I attribute it to the conspiracy as whole.  I don't
12    attribute it to the evidence.
13    Q    I could show you.
14         Do you not recall testifying repeatedly that you
15    attribute the variance to evidence of the conspiracy as a
16    whole?
17    A    No, I don't recall.  What I mean is, I attribute it to the
18    conspiracy as a whole.
19    Q    But you don't have an opinion in this case as to whether
20    there's a conspiracy to begin with.  Right?
21    A    I'm going from the assumption -- doing this work on the
22    assumption that the jury will find that there was a conspiracy,
23    and to me, when I see a change in the competitive process that
24    causes the prices to be higher, I've looked at all of the other
25    causes that have been raised as a possibility, and none of them

 1    hold water.  The thing that fits as an explanation is the

 2    conspiracy.

 3    Q    You started out with the direction to assume that there was

 4    a conspiracy.  Correct?

 5    A    Yes.

 6    Q    During the course of your work, you didn't do the work that

 7    was necessary, that would have been necessary to reach an

 8    opinion regarding whether the conspiracy did, in fact, exist.

 9    True?

10    A    I don't have an expert opinion to present to the jury about

11    whether there was a conspiracy.

12    Q    If you don't have the expert opinion to present to the jury

13    that there was the conspiracy, how can you say that the

14    variance was caused by the conspiracy that you don't know

15    exists?

16    A    In looking at the difference, I've looked at a lot -- done

17    a lot of analysis, looked at a lot of evidence, and through

18    that I'm able to attribute this difference I see to the alleged

19    conspiracy, which I'm working under the assumption that the

20    jury will find sufficient evidence to conclude that conspiracy

21    existed.

22    Q    So do you have an opinion that there's a conspiracy, or do

23    you not have an opinion that there's a conspiracy?

24    A    I have a personal opinion that there was a conspiracy.  I

25    haven't done the kind of work required to present an expert

1    opinion and analysis to the jury about it.

2    Q   I see.  So are you here to testify to your personal views

3    or your views as an expert?

4    A   I'm here as an expert.

5    Q   And as an expert, can you tell this jury that you have

6    found that there's a conspiracy?

7    A   No.

8    Q   If you haven't found there's a conspiracy you can't very

9    well say the conspiracy caused the variance, can you?

10   A   I attribute the difference, the overcharges there to the

11   conspiracy.

12   Q   I don't know if that's an answer to my question.

13       Can you say the conspiracy caused the variance?  Or

14   can you not because you don't have an opinion that there is a

15   conspiracy?

16   A   Again, saying that it caused it is stronger than what I'm

17   prepared to say, because the model -- in theory there could be

18   something else that caused the competitive process to change in

19   a way that elevates the prices.  I don't know what that would

20   be.  To me, the logical explanation is that there was a

21   conspiracy.

22   Q   So we're clear:  Where you are today, to say "cause" is too

23   strong.  Right?  That's just what you said.

24   A   Yes.

25   Q   So you say:  "I attribute, but I can't say 'cause'"?

 1    A    Yes.

 2    Q    Doesn't "attribute" mean "cause"?

 3    A    To me, if I were going to present an opinion to the jury

 4    that says:  "I know there's a conspiracy and it caused this

 5    difference," I think I would need to do some more digging and

 6    more analysis.  But given the work that I've done and the

 7    evidence that I've seen, I'm happy to say that when you ask me

 8    why, you know, why do you think that gap is there, I think the

 9    logical explanation is the conspiracy.

10    Q    "Happy to say."

11         So in a case where the plaintiffs are seeking $600

12    million on the basis of the model that you've endorsed, you are

13    happy to say that you can attribute the variance and the

14    damages to evidence of a conspiracy, even though you can't use

15    so strong a word as "cause."  Is that your testimony?

16              MR. MARTIN:  Your Honor, the phrase "cause" is a legal

17    opinion.  I assume he's asking it in some other kind of a way.

18              MR. BERNICK:  It just --

19              THE COURT:  Okay, okay.  I'll see you at sidebar.

20              (At the sidebar.)

21              THE COURT:  Who has her report?

22              THE LAW CLERK:  I have it.  These are the Raiff

23    reports and Dr. Marx.

24              THE COURT:  Hold it there.

25              THE LAW CLERK:  Sure.

1              (The Court confers with the Law Clerk off the record.)

2              MR. JOHNSON:  I think Mr. Martin went to get it for

3    you.

4              THE COURT:  That part of her report where she opines

5    on the actual word she used.  It's come up early in his

6    examination, your examination.

7              (Mr. Martin steps away from sidebar, and returns.)

8              THE COURT:  Somebody had it highlighted.

9              MR. MARTIN:  Are you looking for effective conspiracy

10   language?

11             MR. BERNICK:  Statistical significance.

12             THE COURT:  Along the line of what he's examining her

13   on.  And she made an opinion and the actual language in that

14   was...  We had it here a couple of hours ago, I know that.  I

15   looked at it.  We were referring to it back then.

16             MR. JOHNSON:  You showed it to the Court, Jim.

17             MR. MARTIN:  Yes, I know.

18             MR. BERNICK:  Your Honor, I'm prepared in order to

19   move on to get to the next step.

20             THE COURT:  No.

21             MR. BERNICK:  Yeah.

22             THE COURT:  Well, this is her language.  Right?

23   "These low probabilities are evidence that there was an

24   effective conspiracy that caused plaintiffs' economic harm in

25   the amounts estimated by my models."

```
 1              Now, whether that means there was a conspiracy --
 2    look, I assume you're going to cross or redirect her having
 3    looked at a number of things, depositions, all the data.
 4              MR. MARTIN:  The problem we're now entering --
 5              THE COURT:  Go ahead.
 6              MR. MARTIN:  -- is that once again so much of what she
 7    relied on was the Proger information, and this is the
 8    information she alluded to --
 9              THE COURT:  The Bayer information?
10              MR. MARTIN:  The Bayer information.  Which was the
11    starting point for evaluating all of the other evidence.  I
12    mean, there was a fact-intensive analysis to see was there --
13              THE COURT:  She also read depositions of Stephanie
14    Barbour, Stern.
15              MR. JOHNSON:  Sure.
16              THE COURT:  I'm assuming.
17              MR. JOHNSON:  But she's got --
18              THE COURT:  Wait.
19              MR. JOHNSON:  We have one of the co-conspirators
20    coming to her and telling her "We did the investigation" --
21              THE COURT:  I know the issue.  Go ahead.
22              MR. BERNICK:  I just -- I wonder what the objection
23    is.  I mean, this doesn't call for a legal conclusion.  She
24    uses the word as an economist.  So I don't think that there's
25    any proper objection as to whether she can -- she's now made a
```

```
 1    very important admission, and I don't think that it's up to --

 2    I don't think that it's appropriate now for them to be arguing

 3    that they can rehabilitate her, and they can't rehabilitate

 4    her.  She said what she said.

 5              THE COURT:  Where was that language?

 6              Well...

 7              MR. BERNICK:  She said just.

 8              THE COURT:  It's your case.

 9              On redirect, if you want to bring up that she made

10    this opinion back -- or this was Dr. Raiff's opinion, right?

11    But she adopted it.

12              MR. MARTIN:  Yeah.

13              THE COURT:  Okay.  Now we're getting into semantics

14    whether or not it's cause or effect or --

15              MR. BERNICK:  But the semantics makes an enormous

16    difference.

17              THE COURT:  I understand.  I'm allowing you to get

18    night, didn't I?  You got into it.

19              MR. BERNICK:  Yes.

20              THE COURT:  But what you do on redirect with that,

21    it's up to you, because I remember reading that.  Okay.

22              (In open court.)

23              THE COURT:  Okay.  You can proceed.

24              MR. BERNICK:  Thank you.

25    BY MR. BERNICK:
```

 1    Q    So, Dr. Marx, as a scientist, I think you were about to
 2    tell us what "attribute" meant that "cause" does not mean.
 3    A    To me, if I were to say that the conspiracy had caused the
 4    overcharges, to me that's making a statement that -- that I
 5    know, that I have ruled out every possible other thing and that
 6    I'm telling you is a fact that it caused the overcharges.

 7           I'm not saying something that strong.  I'm saying that
 8    I see the overcharges and I don't have any other explanation.
 9    I've ruled out other possible explanations that have been
10    proposed, and when I look at what fits as an explanation, the
11    conspiracy is a fit.  So that is the explanation I have
12    available to me.  So I attribute those overcharges to the
13    conspiracy.

14    Q    That's fair enough.

15           So I want to go on from there then to -- you said that
16    "attribute" means that you have not ruled out other causes, but
17    conspiracy fits best.

18           I tried to take that down as you said.  Is that about
19    right?

20    A    I can rule out all of the causes that have been proposed.
21    They don't hold water.  But in theory there could be something
22    else that I don't know.  But when I look for a fit, the
23    conspiracy is a fit.

24    Q    Okay.

25           THE COURT:  You just put down "have not ruled out

1    other causes."

2              MR. BERNICK:  Yes, "have not ruled out other causes."

3    Well, she put it the other way around.

4              THE COURT:  She said -- well, go --

5              MR. BERNICK:  Okay.  Have ruled out other causes but

6    she has not -- I think that she has not ruled out all possible

7    causes.  Whatever it is, there's alternatives out there that

8    she hasn't been able to eliminate.

9              Whatever she said, she said.

10             THE COURT:  I know.  But you have -- okay.

11   Q   So I want to now ask:  Isn't it true that this attribution

12   I think you said was an inference.  Right?

13   A   Yes.

14   Q   It's not the model?  The model doesn't make the

15   attribution.  Right?

16   A   That's correct.

17   Q   So this inference I think you have referred to as a process

18   of elimination.  Right?

19   A   Yes.

20   Q   I think most of us know what process of elimination is.

21             Isn't it a fact that if we want to know what

22   scientific method you followed, what expert method you followed

23   in making this inference, we wouldn't find a method that's

24   written down anywhere that describes what you did.  Correct?

25   There's no protocol for the inference that you made.  Correct?

 1    A    I mean, it's exactly the kind of thing that's done all the
 2    time in science.  For example, suppose that you have a drug and
 3    you give the medicine to a thousand people and they get better.
 4    Do you know that the drug caused them to get better?  No.  I
 5    guess in theory it could be something else.  But you've ruled
 6    out -- you control for diet and exercise and how old they are,
 7    and you control for those things.  And that's the kind of thing
 8    I'm doing here.

 9              I have something that tells me that -- the model tells
10    me that something changed about the competitive process in a
11    way that caused prices to be higher than they otherwise would
12    have been.  So now I have to look for what the cause is.  The
13    only thing that's been raised that fits those facts is the
14    conspiracy.  So I -- I attribute the overcharges to the
15    conspiracy.

16    Q    But in the case of the drug trial, the drug trial actually
17    has two groups; one has the drug, one has the placebo, and you
18    do the trial and watch it happen and it's tested to 95 percent
19    confidence.  Right?

20    A    Well, I mean, that's not true of all studies of drugs.  But
21    the benefit of what we have here is we have a control period.
22    So just like in the controlled studies, we have the benchmark
23    period, we have the white periods of time.  So we have a
24    control group to tell us what the competitive process would
25    look like in the absence of the conspiracy, and then we can

 1    compare that to actual prices during the conspiracy period.
 2    Q    Didn't you testify four weeks ago that drug trials have
 3    nothing to do with the work that you've done in this case?
 4    A    I don't think that a drug trial has much to do with the
 5    urethane chemicals.
 6    Q    Yes.
 7              THE COURT:  You brought it up, Mr. Bernick.
 8              MR. BERNICK:  No, but she brought it up.  I didn't
 9    bring it up.
10              THE COURT:  Well, okay, but...
11    Q    And isn't it true that in a drug trial you actually have
12    control groups that you treat differently and you do a careful
13    statistical comparison to 95 percent confidence?  Isn't all
14    that true?
15    A    Well, no, it depends on what you're doing.  Like I have a
16    paper published in a medicine journal that looks at a study of
17    a drug that's given to children, and it's called a pediatric
18    paralytic, and you give this drug to the really -- it's really
19    sad -- you give it to the really sick children and it paralyzes
20    them, which is bad, but it keeps them from pulling out the
21    tubes and other things that are keeping them alive.  And we did
22    a study of the optimal dosage of these pediatric paralytics.
23              And you're not going to do a controlled study there.
24    You're not going to give children a dangerous drug like that.
25              So sometimes, and often in economics, you just have to

1    work with the data you have.  Sometimes you're lucky enough to

2    be able to do a controlled trial.  But we're lucky enough here

3    to have the control period, at least we have the benchmark

4    period to look to tell us what the competitive process would

5    have looked like in the absence of the conspiracy.

6    Q    In any drug trial, including the one that you just referred

7    to, there's a written protocol that's approved by a board of

8    scientists and it's run on the basis of publishable scientific

9    standards.  Correct?  Otherwise it wouldn't be done.

10   A    My work is published and it was based on the data from what

11   had been done --

12   Q    Right.

13   A    -- not an organized trial, because nobody was go to try

14   these drugs on these kids.

15   Q    And in this case there is no written protocol for your

16   process of elimination.  Correct?

17   A    Of course not.  We're looking at the actual data for

18   urethanes.

19   Q    I just asked a question, Dr. Marx.  There is no written

20   protocol for your process of elimination.  True or not?

21   A    Not that I know of.

22   Q    If we go to your report we will not find the different

23   possibilities that you considered and eliminated, will we?

24   A    I think you will see that because, for example, it --

25   Q    No --

1           THE COURT:  Let her answer, please.

2    A    It goes through the possibilities that Dow's experts

3    raised.  For example, they raised, they think it's capacity,

4    maybe it's something else, maybe there's a demand variable

5    missing, and they have raised various possibilities.  And I've

6    looked at all of those, and none of those explain the

7    difference.

8    Q    Those were just the ones that they raised.  I'm talking

9    about the method that you followed, the protocol that you

10   followed in order to satisfy yourself that you had considered

11   alternatives and you had -- and you were able to -- you were

12   able to determine that they were not good alternatives.  We

13   can't find any methodology that you set out like you would have

14   if you did the test that you had on children that is set out in

15   writing exactly what your scientific method was going to be and

16   the steps that you were going to follow.  We don't have that in

17   this case.  Right?

18   A    You keep suggesting that I must have had this methodology

19   written out for the study of pediatric paralytics.  We didn't

20   have that.  We were just looking at the data.

21   Q    You wrote -- I'm just -- forget about that study.  I'm

22   sorry I went down that road.

23           THE COURT:  I think we're going far afield with the

24   pharmaceutical studies.

25           By the way, wouldn't the benchmark area be comparable

 1    to a control in a pharmaceutical setting?

 2            THE WITNESS:  It plays exactly the same role here,

 3    it's the control group.

 4            THE COURT:  Okay.

 5            MR. BERNICK:  Okay.  I'm not going to...

 6    Q   The process of elimination you followed is nowhere set out

 7    in your report as a methodology -- as a methodical process of

 8    thinking about alternatives and eliminating them.  True or not?

 9            MR. MARTIN:  Asked and answered.

10    A   I don't think there's a sentence in there that says:  What

11    I'm going to do is look at the possibilities, and if they're

12    not -- if they don't -- I don't think there's a sentence that

13    says I'm going to look at all the possibilities and rule out

14    the ones that don't fit the facts.

15    Q   That's what I'm asking.

16    A   But it's obvious that that's what I'm doing.

17            But remember when I came into this case, Dr. Raiff had

18    already done the work and I already had two very long reports

19    from Dow's experts laying out their thoughts about what might

20    be the cause.  And so I had all of those to look at, so I've

21    looked at a lot of ideas posed by Dow's experts about what

22    might be the cause, and none of them do the job.

23    Q    I understand that you responded to the experts.

24            But I just hear you say that if we go through all of

25    your -- all the reports that Dr. Raiff did and your own report,

```
 1    we will never find a section that's called "process of
 2    elimination:  Here is how I've concluded that the variance is
 3    attributable to conspiracy."  We will not find that section
 4    anywhere.  Correct?
 5               MR. MARTIN:  Objection.  Asked and answered.
 6               THE COURT:  Yeah.  One more time, if you can answer
 7    it, go ahead.
 8    A    There's not a section with that title.
 9    Q    Okay.  And, in fact, will we find a list of all the
10    alternatives that you've considered anywhere?
11               THE COURT:  Sustained.
12               MR. MARTIN:  Thank you.
13               THE COURT:  It's the same question, Mr. Bernick.
14               MR. BERNICK:  Okay.
15    Q    So I now want to talk about the -- when is the first time
16    actually in this case that you've used the words "process of
17    elimination"?
18    A    Gosh, I don't know.
19    Q    Do you recall it was when I asked you questions at the end
20    of a long evening of your deposition as to:  If it wasn't in
21    the model, where was it?  And for the first time in the years
22    of this case you said, "I did a process of elimination"?
23    Wasn't that the first time?
24               MR. MARTIN:  Objection.  This is the same territory.
25    A    No, I'm sure I said that many times.  I mean, not -- not in
```

 1    any way that's recorded in a document.  But --

 2    Q    That's the first time that it's recorded anywhere.  Right?

 3    A    I mean, I would have said -- that is what I was doing, and

 4    I probably used those words, and then when you asked me what I

 5    was doing, I told you that's what I was doing.

 6    Q    Now, there are things, there are variables that you've

 7    acknowledged are of potential importance that are not in your

 8    model.  Correct?

 9    A    Of potential importance?

10           I've looked at all of the variables that people have

11    raised as being of potential importance, and they're not of

12    importance.

13    Q    Okay.  Well, the negotiation skills of the customers, you

14    have written extensively that those are important in assessing

15    competitive conduct.  Correct?

16    A    Well, I mean, they're part of the process by which the

17    prices are determined in this market.

18    Q    That's right.  And if we go to not the final model, the

19    customer model, but the industry model that produces the

20    initial variance, the variance from the industry model carries

21    over to the customer model.  Right?

22    A    Yes.

23    Q    Okay.  And in determining whether there is a variance; that

24    is, this gap, negotiation, power or skills of people like Mr.

25    Pauley or Mr. Underdown, those -- that is not a variable in

 1    your industry model.  Correct?

 2    A    It's not one of the variables, that's correct.

 3    Q    And so how is it that you eliminated as an alternative -- I

 4    don't see anywhere where you have eliminated as an alternative

 5    explanation for this variance in the industry model where

 6    you've eliminated as an alternative your failure -- Dr. Raiff's

 7    failure to include negotiation skills in the industry model.  I

 8    don't see any analysis that you've done of that.

 9         Can you point it out to me?

10    A    Okay.  First, I don't think of it as a failure that there's

11    not a variable for negotiation skill.  I'm not sure what that

12    would be, so I don't think of that as a failure of the model.

13         Second of all, to the extent that negotiations are

14    part of forming the prices, I'm looking at the actual prices,

15    so I'm looking at the -- there are negotiations in the

16    benchmark period, they are part of the process that determines

17    the prices, so they are captured in the model.

18         And then as I said in the direct examination, to the

19    extent that there was something different about the negotiation

20    skill applied to any individual transaction, maybe they bought

21    a higher volume so they were able to negotiate a lower price.

22    That I take into account in the second stage model.  We had it

23    up here.  And if there were something different about a

24    particular transaction, maybe they got it in an especially good

25    price, I assume that they would have gotten that same

```
 1    especially good price, that same benefit in the but-for world,
 2    but just that the price would have been benchmarked off the red
 3    line there instead of the blue line.
 4              THE COURT:  All right.  Why don't we take a break for
 5    the afternoon.  Fifteen minutes.
 6              MR. BERNICK:  I'm almost done.
 7              THE COURT:  Are you?
 8              MR. BERNICK:  Well, I shouldn't say that --
 9              THE COURT:  No, if you are --
10              MR. BERNICK:  I'll get myself into trouble because
11    I'll ask more questions and I won't be done.
12              THE COURT:  Okay.  I won't scold you.
13              All right.  Ladies and gentlemen, we'll take a
14    15-minute break.  Until 3:15, please.
15              THE DEPUTY CLERK:  Please rise for the Jury.
16              (The Jury leaves the courtroom.)
17              (Witness temporarily excused.)
18              THE COURT:  Okay.  You can step down, Doctor, thanks.
19              MR. JOHNSON:  Your Honor, just one thing, I didn't
20    want to raise this before the jury, but Mr. Bernick represented
21    to this Court that DX-6828 was pre-admitted.
22              THE COURT:  Was?
23              MR. JOHNSON:  Pre-admitted.
24              THE COURT:  Right.
25              MR. JOHNSON:  It was not.  And that's not the only
```

```
 1    time that has happened in this case.  He's shown me documents

 2    saying they were pre-admitted when they were not.

 3              THE COURT:  Which one was that again?

 4              MR. JOHNSON:  This was the trade article.  I didn't

 5    raise it before the jury, but I want him to be more careful.

 6              THE COURT:  All right.  I think both of you have been

 7    pretty careful about that but let's continue to be careful.

 8    Okay?

 9              MR. BERNICK:  Thank you.

10              THE COURT:  And also, when you ask someone a question

11    about a journal or something, you were very vague in terms of

12    how you asked the question as far as I'm concerned.  You have

13    to lay a better foundation if you're going to do that.  Okay?

14              MR. BERNICK:  I will, your Honor.  I was just trying

15    to get through it, frankly.

16              THE COURT:  I know, but it's still better to say:  Oh,

17    did you read this?  Isn't it true this journal says the

18    following, you know.

19              MR. BERNICK:  I know.

20              THE COURT:  Okay.  You know that.  I know you know

21    that.

22              Okay.  We'll see you back here in 15 minutes.

23              (A recess is taken.)

24              (Proceedings resume -- Jury not present.)

25              MR. BERNICK:  I should apologize to you all.  We were
```

```
 1   mistaken on that trade press article.  Our spread sheet was
 2   off, so it was not pre-admitted and we won't offer it.
 3            THE LAW CLERK:  Please rise for the Jury.
 4            (Jury present.)
 5
 6   L E S L I E   M A R X, resumes, testifies further as follows:
 7
 8            THE COURT:  Be seated, please.  Thank you.
 9            MR. BERNICK:  We've been redecorating.
10            I guess that's not enough room for me to get to the
11   podium here.
12                    CROSS-EXAMINATION CONTINUES
13   BY MR. BERNICK:
14   Q   My questions I will try to finish up here so we can get you
15   out of here and go about our business.
16            So I just have two questions left.
17            First of all, the variance here, the reason I put
18   these together, the variance -- this is the industry model.
19   Right?
20   A   Yes, looks like it's polyols.
21   Q   It's polyols.  Right.
22            The variance that's found here, whatever it is, gets
23   put into the second stage model.  Right?
24   A   Well, when you say "put into," I explained earlier how it
25   works.  Do you want me to explain it again?
```

 1   Q    Sure, go ahead.

 2   A    What we do is look at the transactions.

 3   Q    Right.

 4   A    So, for example, is that Leggett & Platt's again?

 5   Q    Yes.

 6   A    So these are -- they were green circles on the graph over

 7   here.  So it's Leggett & Platt's purchase of this TDI from Dow.

 8   Q    That's correct.

 9   A    So we're going to look at their purchases and break those

10   prices into different components; a component that allows for

11   the level to change, there's some high-end products that are

12   just priced at a higher level; the component of the price that

13   is benchmarked off the industry-wide price; and then we'll have

14   a component for each transaction, that's the component that's

15   specific to that transaction.

16          And then in order to calculate the but-for price for

17   each transaction, we're going to use the same overall level,

18   the same part that's specific to that transaction, but instead

19   of having it be benchmarked off the industry-wide price, we'll

20   have it be benchmarked off the red line, off the but-for price.

21   Q    What you do is you have a relationship that's going to

22   develop between the industry actual prices and in the industry

23   model --

24          THE COURT:  Mr. Bernick, I don't think the jury can

25   see.  So try to turn the other way.

 1          Yeah, thank you.

 2     Q    In the industry model, you develop a relationship between

 3     the actual prices on the industry average basis and the but-for

 4     prices.   That's the overcharge.   Right?

 5     A    Okay.   I'm going to -- understand what the relationship is

 6     between the actual transaction prices and the industry-wide

 7     prices, and then I'm going to assume that instead of having

 8     whatever that relationship was to the industry-wide prices,

 9     they instead have that relationship to the but-for price.

10     Q    Right.   It's like, maybe just to cut through it, it's a

11     proportion?

12     A    No, not at all.

13     Q    I guess not.

14     A    No.   Suppose that -- suppose that you had a product where

15     the prices weren't sensitive to the industry-wide line at all,

16     the prices were moving with the industry-wide line.   Well, then

17     there wouldn't be any overcharges, because whether the

18     industry-wide line changes to be the but-for line, it wouldn't

19     affect a product like that because that product wasn't

20     sensitive to the industry-wide price.

21          But if you have a product like the one here where its

22     prices are moving with the industry-wide line, you're -- we're

23     going to look at the data and estimate the extent to which the

24     prices are sensitive to the industry-wide line.   And to the

25     extent that they're sensitive to movements in the industry-wide

```
 1   line, then they would be sensitive to a change if the
 2   industry-wide line were lower.
 3   Q    So, again, in an industry level you develop a relationship
 4   that shows variance or you believe to be overcharge.  Right?
 5   But on an industry-wide average basis.  Correct?
 6   A    That's right.
 7   Q    Okay.  And here you're not getting customer-specific?
 8   A    That's right.
 9   Q    So you take the variance from the industry model and you're
10   now going to calculate a customer specific overcharge.  Right?
11   A    Yes, a transaction-specific overcharge, yes.
12   Q    A transaction-specific overcharge.
13        So that's why I say, the variance doesn't just sit
14   here and do nothing, it becomes part of the calculation in the
15   second stage model.  Correct?
16   A    Yeah, definitely.
17        But maybe I should be more specific.  We're going to
18   run a regression, look at the analysis, look at the
19   relationship of a particular -- here, the particular
20   transaction prices here, their relationship to the
21   industry-wide price line.  And to the extent that they are
22   moving with the industry-wide price line, when you run that
23   regression, we're going to assume that same relationship held,
24   only benchmarked off the different price.
25   Q    Now it turns out to be a little bit more complicated than
```

1    that, right, because the regression only works, produces a

2    sufficiently robust result for less than all the transactions.

3    Right?

4    A    There's some transactions where we have very few

5    observations or the model doesn't allow you to reliably say

6    what those but-for prices would be, and those prices we just

7    look at similar transactions.  It's not very -- it's not the

8    bulk of the transactions, but in those cases we just look at

9    similar transactions to estimate what the overcharge would be.

10   Q    So when your regression has an R-squared of -- what is it,

11   60 or above?

12   A    .6.

13   Q    .6 or above, you go with that.

14        If it doesn't have that, then you kind of do -- it's

15   almost a little bit like real estate -- you look for

16   comparables.  There's the ones that don't satisfy that

17   requirement, you see if there are comparables among the

18   transactions that do and you use those prices.  Is that fair?

19   A    That's right.

20   Q    Okay.  Now, having done all that, that's not my question.

21   I just wanted to get a transition.

22        That this variance doesn't disappear.  Whatever --

23   whatever its value is as the jury finds it to be, whatever it

24   is, this now carries forward.  This is not -- this is a

25   separate step but it builds on the work of the first step.

1    Fair?

2    A    It builds on it.  But again, if you have it for a

3    particular product, if t's not moving around with the

4    industry-wide price line, then you wouldn't expect, when the

5    industry-wide line is replaced by the but-for line, it's not

6    going to change.  If it wasn't sensitive to the industry-wide

7    price line in the first place, then when you substitute -- when

8    you change instead of the industry-wide prices the but-for

9    price, there's no overcharge.

10   Q    So, this model -- in this model, it was -- the difference

11   between the two lines was not significant at 95 percent.

12   Correct?

13   A    Right.  Polyols was the one at 90 percent.

14   Q    Okay.  Now, did you do a statistical significant test on

15   the final overcharge?

16   A    No.

17   Q    I'm sorry?

18   A    No.

19        I'm not sure that would make sense, but, no, I didn't

20   do it.

21   Q    Now I want to get to the last point that I'd like to cover

22   with you, which is, both of these charts have something in

23   common, right, which is that they don't reflect the prices

24   being charged by the different suppliers separately; that is,

25   this is an industry average.  Right?

```
 1    A    Median, yes.

 2    Q    Okay.  Dow, Huntsman, et cetera, Bayer, BASF, those would

 3    all -- if we wanted to, we could display --

 4    A    Lyondell is in there, too.

 5    Q    Right.  I was making a subliminal suggestion about

 6    Lyondell.

 7         So they all have their own price lines that are not

 8    reflected separately.  Right?

 9    A    It's just one median, yes.  Those aren't separate.

10    Q    Likewise here, we only have one set of prices,

11    customer-specific prices.  Those are these dots.  Right?

12    A    Those dots are just the Leggett & Platt, yeah, just for

13    that particular product from Dow.

14    Q    Right.  So on both charts the jury can't tell whether the

15    prices being charged by the suppliers were different from the

16    average or different from each other.  Right?

17    A    You can't tell from those charts.

18    Q    And over here we just have Leggett & Platt.  We can't

19    tell -- Leggett & Platt -- prices to Leggett & Platt, but we

20    don't have Leggett & Platt -- these are purchases by Leggett &

21    Platt.  Right?

22    A    Yeah.  Voranate is the name of Dow's product, so it's

23    Leggett & Platt buying from Dow.  Voranate is just the name of

24    Dow's TDI product.

25    Q    Okay.  So here too we can't tell what prices were being
```

1    charged by the other suppliers and whether they were the same

2    or different.  Right?

3  A    You can't tell from those graphs, it just has the one

4    buyer.

5  Q    So, now would you expect, Dr. Marx, that, in fact, the

6    prices being charged by industry-wide, by Lyondell, BASF,

7    Bayer, Dow and Huntsman differed from one another?

8  A    Oh, yeah.  I mean, we know from talking to -- like Mr.

9    Underdown, for example, said he paid different prices when he

10   purchased different volumes from different suppliers.  So,

11   yeah, the prices are going to differ.

12 Q    Right.  And so these prices are going to be different, and

13   the prices being charged to Leggett & Platt by Dow versus the

14   others are going to be different.  Right?

15 A    Yep.

16 Q    Okay.

17 A    I mean, they could be the same too.  But, you know, for

18   example, with line differences or something you're going to

19   have some differences in prices.

20 Q    Now here when it came to the variance, you were very

21   focused on the gap between the actuals and the but-fors.

22   Right?

23 A    That's one of the things I looked at.

24 Q    Right.  But if we go to the different prices that are being

25   charged by the different companies to the same customer, your

 1    model doesn't study those gaps.  Correct?

 2    A    I didn't produce graphs showing them, but they're all -- I

 3    mean, all the data is in there, so that whatever differences

 4    are in the prices are in the model.

 5    Q    So I know that the data and the transactions are in the

 6    model, I know that.  My question is different.

 7         My question is:  We've got another one here which is a

 8    demonstrative, this was taken from Mr. Pauley's dep.  Do you

 9    recall that?

10    A    I read Mr. -- the transcript of Mr. Pauley's deposition.

11    That was a while back.  That was a couple of years ago.

12    Q    In fact, this was marked -- I showed this document to you

13    when I took your deposition back in 2013.  Correct?

14    A    I think that's right.

15    Q    Right.  And what this shows is that for the same customer,

16    Carpenter, we have the purple or lavender is BASF, the Huntsman

17    is the -- I don't know if there's any Huntsman on here -- maybe

18    way back over here; Bayer is red, so they're here; and Lyondell

19    is yellow, and then my client didn't do very well with Mr.

20    Pauley and Carpenter, we got -- that's it.  I think.

21         I think that that's all the product that my client

22    managed to sell to Carpenter.

23         But -- and these are the weighted median prices taken

24    from Mr. Raiff's data, but these are -- the averages were

25    calculated by our experts, and that's what I showed you.

 1           And now I've got a question for you.  You can see here
 2      that for the same customer at the same time, different
 3      companies are charging different prices.  Right?
 4      A    Actually you can't tell from that because they're not the
 5      net prices.  Those aren't taking into account the discounts and
 6      the rebates.
 7      Q    Sure.
 8      A    But that said, we know, for example, from what Mr.
 9      Underdown said, he paid different prices to different suppliers
10      depending on the volumes that he purchased.
11      Q    Right.  So this would be consistent really with what Mr.
12      Underdown testified to, which is that he had a range of
13      different suppliers, and they charged and he paid different
14      prices to the different suppliers.  Right?
15      A    I think he said like usually like maybe one to two cents or
16      so different.  I think he mentioned something like that.
17      Q    Right.  But these are actually much more substantial.
18      A    Well, they're not the net prices.  You don't have --
19      Q    I said, these are the differences.
20      A    No, you don't have --
21      Q    I understand.
22      A    No, no, listen.  The data have rebates already incorporated
23      for some periods of time for some suppliers, and it might be
24      that for some other supplier for that same period of time that
25      data -- that supplier is using quarterly rebates or something

 1   like that.

 2        And so you can have a problem when you try to compare

 3   suppliers that perhaps Lyondell data, the yellow line that's

 4   kind of high, maybe that doesn't have the rebates included, and

 5   Lyondell was Carpenter's biggest supplier so you would have

 6   expected it to have a lower price; whereas, in a lot of the

 7   other data, the Bayer data I think in that period of time, it

 8   had the rebates already incorporated in the data.

 9        So you're comparing net prices from one -- in that

10   graph you're comparing the net prices from some suppliers to

11   the not net price from other suppliers, and I'm not sure what

12   you're going to be able to make of a graph like that.

13   Q   Except that we did -- they did these -- they plotted these

14   prices using precisely the same weighted median price process

15   that Mr. -- that Dr. Raiff used.

16   A   Yeah, but he wouldn't have used that --

17        MR. MARTIN:  Objection.

18   A   -- to compare different suppliers' prices.  You don't have

19   the rebates in there.

20        MR. MARTIN:  I'll object to foundation too.  He's

21   talking about what somebody else did with these documents.

22        MR. BERNICK:  What I want to get to --

23        THE COURT:  Rephrase the question.

24        MR. BERNICK:  I'll get to it.

25   BY MR. BERNICK:

 1   Q   Mr. Pauley described in vivid terms the negotiation process
 2   that took place between him and his variance suppliers.  Right?
 3   A   I recall reading the deposition.  It was quite some time
 4   ago now.  It was a couple of years ago, three years ago.
 5   Q   Your model, your model does not explain; does not explain
 6   these gaps (writing on chart).
 7   A   I'm not sure those gaps are even real because those aren't
 8   the net prices.
 9   Q   Just bear with me.
10       Your model doesn't address and explain them.  Correct?
11   A   I don't try to explain gaps that I don't think are there.
12   Q   But you never studied these gaps to find out if they were
13   there.  Correct?
14   A   I looked at all the data and all the transactions and I
15   took into account all of the rebates, and I've looked at --
16   I've looked at a lot of these graphs like these, and the times
17   when I've looked at particular instances where they were
18   different and looked at whether there were, for example, end of
19   quarter rebates, we know Lyondell's prices is going to be the
20   lower one, that's their highest volume purchaser.  What I've
21   got and tried to attribute particular rebates to particular
22   transaction, I typically end up coming up with net prices that
23   are within one or two cents of each other.
24   Q   The fact of the matter is that you have never done a
25   comparative study for a given customer to see how these prices

 1    ended up being different, if they were different.  Correct?

 2    A    I don't think I've done that study.

 3    Q    The model does not explain these gaps, does it?

 4    A    Okay.  Again, I'm not sure the gaps are even there.  But

 5    the model is not trying to explain why there would be a volume

 6    discount.

 7    Q    And is it also true here, the model does not explain price

 8    differences between the different suppliers on an industry-wide

 9    basis?

10    A    I'm not sure what you mean by "explain them."

11    Q    Well, explain.  If they're there, and if so, why they're

12    there.  That's what I mean by "explain."

13    A    Well, I've looked at a lot of the data.  There are things

14    like volume discounts and early payment discounts that are --

15    Q    I'm not fighting -- I'm sorry.

16    A    -- that explain the differences.

17    Q    I'm not fighting you.

18             THE COURT:  Let her go ahead and finish.

19    A    There are a different -- I mean, we're mostly looking at

20    TDI here, right?  This is all TDI.

21             But in polyols and MDI, there are lots of different

22    products.  So there are high-end more expensive MDI, more

23    expensive polyols, and so some of the differences in prices are

24    just because they're buying different products, they're buying

25    a higher end or a more expensive product.  You've got the early

 1    payment discounts that have been mentioned, volume discounts.

 2          So there are -- there are a number of things that I

 3    understand as explaining why you might see different prices,

 4    and they make sense to me.

 5    Q   I'll go back to my question and I will put it to you this

 6    way:  Mr. Pauley or Mr. Hurst were in charge of purchasing and

 7    setting prices for Carpenter purchases.  Do you know that?

 8    A   No, I don't know Mr. Hurst.

 9    Q   Well, his deposition was played here in court.  You've read

10    Mr. Pauley's deposition.  Right?

11    A   Yes, sir.

12    Q   Okay.  And as they described it and as others have

13    described it, every one of these prices for Carpenter, they

14    were the result of a negotiation process.  Right?

15    A   Yes, that's my understanding.

16    Q   Okay.  So negotiated prices.  And you have not studied, you

17    have not studied -- I'm not talking about whether the data is

18    in there or it's accounted for or whether it's included, I'm

19    talking about study, analyzed -- you have not studied how it is

20    that these negotiations took place and how it is that the

21    prices ended up being different.  Correct?

22    A   I'm not sure what you're asking about studying the

23    negotiations.

24          I've read a lot of materials in this case talking

25    about the negotiations.  I feel like I have an understanding

1    that there was this negotiation process.  I know where the

2    prices started and I know where they ended up.  I don't know

3    all the details of the back-and-forth of any individual

4    negotiation.

5    Q    Well, negotiation is the back-and-forth.  Right?

6    A    What's important for me in analyzing this is what the price

7    was, so where it ended up.

8    Q    I know for purposes of your model what you did.  I'm not

9    asking for what you did in your model.  We know that the

10   model -- the model does not explain these gaps.  We just

11   established that.  So I'm asking you a different question.

12        I'm saying, isn't it a fact, just as you said you

13   looked at the -- you looked at the final price that took place

14   and you didn't study, analyze how those prices came to be

15   different, did you?

16        MR. MARTIN:  Objection, asked and answered.

17        THE COURT:  Yeah, sustained.  It's been asked and

18   answered.  It has.  Several times.

19        MR. BERNICK:  Well, okay.  Maybe I'm losing track.

20   It's late in the day, your Honor.

21        THE COURT:  Different ways, but several times.

22        MR. BERNICK:  Okay.

23   BY MR. BERNICK:

24   Q    And the same thing is true, is it not, on an industry

25   basis; that is, that you ever -- you haven't studied to analyze

 1    why the different suppliers on an industry-wide basis had

 2    different prices, have you?

 3              MR. MARTIN:  Asked and answered again.

 4    A    I just gave a long list of why they were different.

 5              THE COURT:  Yeah, she did.  Sustained.

 6              MR. BERNICK:  Okay.  Well, you never end on a

 7    sustained note, but maybe I will.

 8              THE COURT:  Try another one.

 9              MR. BERNICK:  Maybe I'll make an experiment.  Let me

10    just check my notes.

11    Q    Is there a section of your report that you can direct us to

12    that addresses these particular issues; that is, the different

13    prices charged to the same customer?  Can we find it in your

14    report?

15    A    Well, there are discussions in the reports of the fact that

16    there were rebates and discounts, volumes documents and these

17    types of things that we've been talking about which I think of

18    as explaining why you see different prices, those are in the

19    report.

20    Q    But will we find your explanation with respect to a single

21    customer in this case?  Your explanation of how their prices

22    came to be different?

23              MR. MARTIN:  Objection.  Asked and answered.

24    A    It will be the same long listed of explanations.

25    Q    Where would we find it?  Where would we find a single

 1    customer being discussed in your report if it is in the report?

 2              MR. MARTIN:  Asked and answered.

 3              THE COURT:  This is it.  Last question.  Go ahead.

 4    Q    Where will we find it in your report, a single customer?

 5    A    Because I viewed these explanations for why these prices

 6    are -- why a supplier might pay different -- sorry -- why a

 7    buyer might pay different prices to different suppliers.  I

 8    view that as the same set of explanations that apply to all the

 9    customers.  So I don't believe I've isolated Leggett & Platt,

10    it was all about volume discounts and somebody else, it was all

11    about early payment.  I don't think I haven't done that.

12              THE COURT:  Okay.

13              (Mr. Bernick confers with co-counsel off the record.)

14    Q    This is a totally separate matter.  You remember you were

15    going through the list of all the plaintiffs that you read so

16    clearly and ably?

17    A    Yes.

18    Q    My question is:  Do you have damage numbers for all of

19    those plaintiffs?

20    A    It would be straight forward to calculate it, but I didn't

21    list it on that table.  I didn't -- I just had one British Vita

22    number on the table that I had.  It would be straightforward to

23    break it out by each of these individually because they're

24    calculated on a transaction-by-transaction basis.  I don't have

25    it here with me right now.

1    Q    Is it in your report?

2    A    No, it's not in the report.

3    Q    Is it in your testimony?

4    A    No, it's not in my testimony.

5    Q    Was --

6    A    It would be straightforward to calculate it.  I haven't

7    done it broken out by these individual parties.

8    Q    Did Dr. Raiff calculate those for all those people?

9    A    Again, in the process of calculating the overcharges,

10   you're adding up all of the British Vita, Limited overcharges

11   and adding them to the Vita Foam, Incorporated overcharges, so

12   it's being done, but I don't think any of us have produced a

13   table that has the numbers broken out by the individual

14   sub-units of British Vita.

15   Q    And they're all included in the overall --

16   A    That's right.

17               MR. BERNICK:  That's all I have, your Honor.

18               THE COURT:  Thank you.

19               Mr. Martin, redirect.

20               MR. MARTIN:  I'm going to try to run the gauntlet

21   here.

22               MR. BERNICK:  That's okay.

23               THE COURT:  Leave it there, Mr. Bernick.  I think he

24   wants them.

25               MR. MARTIN:  No, no, no.

```
 1                 MR. BERNICK:  Oh.  I'm not that clever.

 2                 MR. MARTIN:  I have a space for them.

 3                 (Laughter.)

 4                          REDIRECT EXAMINATION

 5     BY MR. MARTIN:

 6     Q    I have one page of questions.

 7     A    Okay.

 8     Q    Thank you for being with us all day.

 9     A    No worries.

10     Q    And I'm going to try go in chronological order.  So we're

11     going to go from the oldest stuff to the most new stuff, but it

12     should still be quick.

13                 You were asked a lot of questions about quantitative

14     analysis, of price increase announcements verse all prices.  Do

15     you recall those questions?

16     A    Yes.

17     Q    Now, you also talked about how when you got into this case

18     you had Dow's expert reports, Dow's expert testimony and you

19     reviewed that.

20     A    Yes.

21     Q    And that was important to you?

22     A    Yes, it was.

23     Q    Okay.  And you discussed all that.

24                 In those reports, did either Dr. Ugone one of their

25     experts or Professor Elzinga, their other expert, say that Dr.
```

 1    Raiff should have conducted a quantitative analysis of price

 2    increase announcements versus actual prices?

 3  A    No.

 4  Q    Did either one of them do that analysis?

 5  A    No.

 6  Q    In those reports did either Dr. Ugone or Professor Elzinga

 7    suggest that Dr. Raiff should have included a variable for

 8    negotiating power or skill in the market-wide model?

 9  A    No.

10  Q    Did either one of them do that?

11  A    No.

12  Q    In those reports did either Dr. Ugone or Professor Elzinga

13    suggest that Dr. Raiff should have done some sort of

14    statistical significance testing on the second level model,

15    second step model?

16  A    No.

17  Q    Did either one of them do that?

18  A    No.

19  Q    Okay, the last question is:  There was some discussion

20    about the 80 percent confidence level, confidence interval,

21    confidence level.

22        Having the benefit of cross-examination, does anything

23    change your opinion about whether your model is reliable given

24    the 80 percent confidence level for pMDI?

25  A    No.

 1              MR. MARTIN:  I'm done.

 2              MR. BERNICK:  I just have a couple of questions.

 3              MR. MARTIN:  How could that be?

 4              (Laughter.)

 5              MR. BERNICK:  Well, if he I feel if I don't ask them

 6    then it will be pointed out that I didn't ask them.  Right?

 7              THE COURT:  It's limited to those questions.

 8              MR. BERNICK:  I carefully limited it.

 9              THE COURT:  It should take you about a minute.

10              MR. BERNICK:  A minute.  Okay.

11                       RECROSS EXAMINATION

12    BY MR. BERNICK

13    Q    Forgive me if this is a little long.

14              So with respect to Dr. Raiff's reports, we went

15    through at the outset of your examination that Dr. Raiff

16    revised his reports twice to respond to comments that were made

17    by experts or by lawyers.  Do you recall that?

18    A    Okay.  By saying it was twice, so there was an initial

19    report which had a mistake that was corrected.  Then that --

20    there was the responses of Dow's experts, and to them Dr. Raiff

21    wrote another report, which had a mistake that was corrected.

22    Q    Yes.  So twice.

23              Now, counsel just asked whether Dr. Ugone or Dr.

24    Elzinga asked you about negotiation skills or commented about

25    negotiation skills and the like.  I guess the question is kind

 1    of the same.

 2              Do you feel it's necessary for you to do work that

 3    covers all of these different issues that the defense experts

 4    be pointing out these issues so that you can respond to them?

 5    Or do you feel that as part of the your own responsibility to

 6    have a process that's thorough to cover these issues?

 7    A    I think with few exceptions Dr. Raiff thoroughly responded

 8    to the criticisms and issues that were raised by Dow's experts,

 9    and then there was one remaining issue that I looked at as well

10    and I thought to myself, is there anything else I would like to

11    do?

12              And it seemed to me it had all been pretty thoroughly

13    covered with all of these experts in the long period of time

14    they've worked on it.

15    Q    Thank you.

16              MR. BERNICK:  That's all I have.

17              THE COURT:  Okay.  Nothing further?

18              MR. MARTIN:  Nothing further, your Honor.

19              THE COURT:  Okay.  Can I see you at sidebar?  We don't

20    need Walter right now.  Counsel, we don't need Walter.

21              (Sidebar discussion off the record.)

22              (Witness excused.)

23              THE COURT:  Ladies and gentlemen, we're just going to

24    take a five-minute break so we can clear all of the this and

25    then we're going to the continue for a bit more this afternoon.

```
 1      Okay?  Thanks very much.
 2                THE DEPUTY CLERK:  Please rise for the Jury.
 3                (The Jury leaves the courtroom.)
 4                (Proceedings resume - Jury not present.)
 5                THE COURT:  Let's go.
 6                THE LAW CLERK:  Please rise for the Jury.
 7                THE COURT:  Be seated thank you.
 8                Mr. Johnson, you have another witness?
 9                MR. JOHNSON:  After that I hate to say "let's go to
10      the video," but here we are again.
11                (Laughter.)
12                MR. JOHNSON:  We're going to hear from Bruce O'Brien.
13      He's a Woodbridge employee; and 15 minutes.
14                (The above described videotaped deposition of Bruce
15      O'Brien is played in open court.)
16                (Playing of the videotaped deposition is stopped.)
17                MR. JOHNSON:  Your Honor, that completes Mr. O'Brien.
18      And there are were no exhibits with that.
19                We now move to Helen Ebert, and believe it or not, in
20      four minutes we're actually going to hit two volumes of
21      depositions for her.  First introduce her, she's a
22      representative from the Vita Company, and then a little bit
23      from her appearing as representative of Pathway Polymers, which
24      is also a Vita company.
25                THE COURT:  Thank you.
```

1               (The above described videotaped deposition of Helen
2       Sarah Ebert is played in open court.)
3               (Playing of the videotaped deposition is stopped.)
4               MR. JOHNSON:  That was the first volume.
5               (Laughter.)
6               THE COURT:  Okay.
7               (The second videotaped deposition of Helen Sarah Ebert
8       is played in open court.)
9               (The playing of videotaped deposition is stopped.)
10              MR. JOHNSON:  That's it for Ms. Ebert.
11              THE COURT:  Okay.
12              MR. JOHNSON:  And we're now going to turn to Martin
13      Cosgrove taken June 29th, 2010.  12 minutes.
14              (The above described videotaped deposition of Martin
15      Cosgrove is played in open court.)
16              (Playing of the videotaped deposition is stopped.)
17              MR. JOHNSON:  We have a glitch in the 12-minute one.
18              THE COURT:  Is there...
19              MR. JOHNSON:  Can we take it up tomorrow?
20              THE COURT:  Ladies and gentlemen, we'll recess for the
21      day.  Okay?
22              Please don't discuss anything about the case.  And
23      we'll start promptly at 8:30 tomorrow and have it similar to
24      today.  As you know, Friday we're off.  So thanks again for
25      your patience and it's been a long day today.  We'll see you

1    tomorrow morning at 8:30, please.

2              THE LAW CLERK:  Please rise for the Jury.

3              (The Jury leaves the courtroom.)

4              THE COURT:  Okay.  We'll see you tomorrow morning for

5    8:30.

6              MR. JOHNSON:  Just for your planning purposes, your

7    Honor, we have a limit more than two hours of video to go and

8    then we're going to be resting.

9              THE COURT:  Okay.

10             MR. JOHNSON:  So I just wanted to let you know that.

11             And do you know yet what you're schedule is for

12   Monday?

13             THE COURT:  I'll know tomorrow morning.

14             MR. JOHNSON:  Thank you.

15             THE COURT:  Okay?

16             I know -- sit down, everyone, please.

17             I know that the morning I'm committed.  Whether I get

18   here at 12 o'clock and we work 12 to 5, I'll let you know

19   tomorrow.  Okay?  But the morning you can plan accordingly if

20   you have to.

21             If you rest tomorrow you'll be resting around 10:30,

22   around our break.

23             And you'll be prepared to go forward?

24             MR. STREETER:  Yes, your Honor.  We put together about

25   three and a half hours worth of video.  The problem is that

1    they've objected to ten of our designations so we can't play

2    those.  But we've put together about three and a half hours

3    worth, and I think that should get us through most of the day.

4             THE COURT:  Do you have any live witnesses?

5             MR. STREETER:  Well, we had thought we were going to

6    start with them on Monday and they're coming from far away

7    places, and we just don't have them here tomorrow.

8             THE COURT:  Don't tell them otherwise for Monday until

9    tomorrow.  Okay?

10            MR. STREETER:  Absolutely.

11            THE COURT:  Don't have them change their plans.  And

12   then I'll -- we have three and a half hours, and -- do we have

13   the objections?  Have we gotten objections?

14            (The Court and the Law Clerk confer off the record.)

15            THE COURT:  Okay.  All right.

16            MR. STREETER:  So we'll have almost six hours of

17   material for the jury between their two and a half hours and

18   our three and a half.

19            THE COURT:  All right.  Okay.  We'll see you tomorrow

20   morning at 8:30.  Thanks.

21            MR. MARTIN:  Thank you.

22            THE COURT:  Okay.

23            (At 4:27 p.m., an adjournment is taken to Thursday,

24   March 24, 2016, at 8:30 a.m.)

25