1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
2                     Civil No. 2:08-cv-05169(WJM)-MF

3

4       - - - - - - - - - - - - - -x
        IN RE URETHANE ANTITRUST   :    TRANSCRIPT OF PROCEEDINGS
5       LITIGATION                 :         - Trial -
        - - - - - - - - - - - - - - x
6

7
                                   Newark, New Jersey
8                                  March 29, 2016

9

10      B E F O R E:

11                     THE HONORABLE WILLIAM J. MARTINI,
                        UNITED STATES DISTRICT JUDGE,
12                           And a Jury

13

14
        Pursuant to Section 753 Title 28 United States Code, the
15      following transcript is certified to be an accurate record as
        taken stenographically in the above entitled proceedings.
16

17

18
        S/WALTER J. PERELLI
19

20

21      WALTER J. PERELLI, CCR, CRR
        Official Court Reporter
22

23

24

25

```
1      A P P E A R A N C E S:

2           BLANK ROME LLP
            BY:   JEFFREY M. JOHNSON, ESQ.
3                 DANIEL SCHAEFER, ESQ.
            Attorneys for Plaintiffs
4                 - and -
            ZELLE, LLP
5           BY:   JAMES R. MARTIN, ESQ.
                  ALLISON M. VISSICHELLI, ESQ.
6                 - and -
            ADAMS HOLCOMB LLP
7           BY:   RICHARD J. LEVERIDGE, ESQ.
            Attorneys for Plaintiffs
8

9           GIBBONS P.C.
            BY:   LAWRENCE S. LUSTBERG, ESQ.
10                DANIEL J. McGRADY, ESQ.
                  - and -
11          DECHERT LLP
            BY:   DAVID M. BERNICK, ESQ.
12                CAROLYN M. HAZARD, ESQ.
                  JULIA CHAPMAN, ESQ.
13                JONATHAN STREETER, ESQ.
                  WILLIIAM T. McENROE, ESQ.
14          Attorneys for Defendant

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2    WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS
      KENNETH G. ELZINGA
 3      By Mr. Martin                   3 (cont'd)
        By Mr. Bernick                              65
 4
      PATRICK HO
 5      By Mr. Streeter      123/171               246/248
        By Mr. Leveridge                209                      247
 6

 7
      VIDEOTAPED DEPOSITION OF MR. PAULEY
 8        PLAYED......................................page 249

 9

10                       Sidebar Discussions
                     Starting Page   Ending Page
11                        108            112

12

13

14                Colloquy Between Court and Counsel
                     Starting Page   Ending Page
15                        113            121
                          144            170
16                        216            216

17

18

19

20

21

22

23

24

25
```

```
 1                          March 29, 2016
 2                (Trial resumes - Jury not present.)
 3
 4    K E N N E T H   G.   E L Z I N G A, recalled as a witness,
 5         having been previously duly sworn, is examined and
 6         testifies further as follows:
 7
 8                THE COURT:  Good morning.  Be seated, please.
 9                We're all set?
10                Good morning.
11                THE DEPUTY CLERK:  Yes.
12                THE COURT:  Bring out the jury, please.
13                THE DEPUTY CLERK:  Please rise for the Jury.
14                (Jury present.)
15                THE COURT:  Good morning.  Please be seated.
16                Thanks.
17                Mr. Martin, you may continue.
18                MR. MARTIN:  Thank you.
19                     CROSS-EXAMINATION CONTINUES
20    BY MR. MARTIN:
21    Q    Good morning, Professor Elzinga.
22    A    Good morning, Mr. Martin.
23    Q    Just a couple of questions.  Maybe more than a couple.
24         As a matter of economic theory, if a cartel is
25    effective in increasing prices, let's say it's over one month,
```

1    they get prices to go up 20 percent and then they just hold on

2    to that price over what they could have charged in a

3    competitive market, that would be consistent with collusion.

4    Correct?

5    A    I'm not sure I follow your question --

6         MR. BERNICK:    I'm sorry, I'm going to object to the

7    form of the question.

8         THE COURT:    No, the objection is overruled.    That

9    question I understood.

10   Q    Would you like me to say it again for you?

11   A    Please.    Thank you.

12   Q    As an economic theory, if a cartel is effective in

13   increasing prices, let's say one month they get prices to go up

14   20 percent and then they just hold on to that price over what

15   they could have charged in a competitive market, that would be

16   consistent with collusion.    Correct?

17   A    In other words, what they could have charged -- is it what

18   they could have charged or what they would have charged absent

19   collusion?

20   Q    What they could have charged in a competitive market.    That

21   would be consistent with collusion?

22        Would you like it read back one more time?

23   A    Yeah.    I think the word "could" throws me as opposed to

24   "would."

25        THE COURT:    Read it back one more time.

1    Q   As a matter of economic theory, if a cartel is effective in

2    increasing prices, let's say it's one month, they get prices to

3    go up over 20 percent, go up 20 percent and then they just hold

4    on to that price over what they could have charged in a

5    competitive market, that would be consistent with collusion.

6    Correct?

7    A   The question is confusing to me because what you could

8    charge in a competitive market is anything.  If you mean what

9    the market would have been at a competitive level, then I think

10   I understand your question, and the answer would be yes.  But

11   what you could charge in a free enterprise economy; that is,

12   when you have a -- when you have agreed on a price with your

13   rivals, it's whatever you think the market would bear or

14   whatever would be in your strategic interest to charge.  It

15   could be anything.

16   Q   So is your answer "yes"?

17        MR. BERNICK:  Asked and answered.

18        THE COURT:  No, I'll allow the follow-up.

19   A   It's yes with my amendment as to what I mean by "could."

20   Because in a market economy where the game is not rigged, a

21   seller can charge whatever the seller wants to.  There may not

22   be a buyer willing to buy at that price, but you could charge

23   whatever you wanted to.  That's the nature of a free market.

24   Q   I actually asked you this question once before.  Let me ask

25   you to take the "could" out.

1            As matter of economic theory, if a cartel is effective
2      in increasing prices 20 percent over one month, they get prices
3      to go up 20 percent and they just hold onto that price over
4      what they would have charged in a competitive market, that
5      would be consistent with collusion.  Right?
6      A    That would be consistent with what the cartel had
7      accomplished, if by collusion you mean the same thing as a
8      cartel.
9      Q    That's right.  Thank you.
10           I want to go to a couple more hypotheticals, if
11     possible.
12           I want you to assume, Professor Elzinga,
13     hypothetically that the suppliers did agree to raise prices.
14     They agreed to send out that price increase announcement at
15     $.06 a pound, and let's suppose we have that agreement on tape.
16     And after the suppliers send out the announcement there's a
17     negotiation, and the suppliers get all $.06 of that increase.
18     That would leave the customers paying higher prices than they
19     would have paid in a competitive market.  Is that correct?
20     A    If I understand your question, that's true by assumption,
21     yes, sir.
22     Q    And what I just described to you, that would be cartel
23     behavior.  Correct?
24     A    As I understand your description, it would be.  If the
25     sellers all got together and agreed upon the $.06 price

 1    increase and they had some mechanism to check on that and

 2    police it, that would be a cartel.

 3    Q    Let's change that assumption a little bit.

 4         Now let's assume, Professor, hypothetically, suppliers

 5    did agree to raise prices to send out that price increase

 6    announcement at $.06 a pound.  Let's suppose again that we have

 7    the agreement on video.  And after the suppliers send out the

 8    announcement there is a negotiation, and through that

 9    negotiation $.03 of that price increase was not implemented.

10    That would still leave the customers paying higher prices than

11    they would have paid in the absence of collusion.  Is that

12    right?

13    A    I don't know that that's true.  Was the price increase in

14    your hypothetical strictly as a result of the cartel, or were

15    there other market forces that might have pushed up the price

16    $.03?

17    Q    Just these facts.

18    A    I'm sorry?

19    Q    Just these facts.  There was an agreement to send out a

20    price increase announcement of $.06 a pound, we know it's an

21    agreement, it's on video.  They send it out.  The suppliers

22    then go out and they negotiate prices, and through that

23    negotiation process they only get $.03 of the $.06 that they

24    agreed upon.  That would still leave the consumers paying more

25    than they would have paid in a fully competitive market.

1    Correct?

2    A    I don't think we know for sure from your hypothetical.

3    If -- if there were market forces pushing price up and they

4    were negotiating, the price may well have come up $.03 as a

5    result of market forces.  If there were no market forces

6    pushing the price up, then the answer is yes to your question

7    as a matter of arithmetic.

8    Q    Okay.  What I've described to you is cartel behavior.

9    Right?

10   A    The first part of it, yes, the agreement on the price

11   increase announcement.

12          The negotiations that follow are not part of cartel

13   behavior.  Negotiations usually mean competitive behavior.  I

14   mean, if you've agreed to raise the price, why then negotiate?

15          THE COURT:  Could -- could the -- I have a question.

16          Could the negotiations be part of cheating?  In other

17   words, you've referred to cartel conduct and then you also

18   referred to the fact that members of the cartel could cheat

19   each other.  So, could what you just indicated, would that

20   be -- that could be -- the negotiations, if they were behind

21   the scenes, and the rebates, that could be cheating part of the

22   cartel.  Correct?

23          THE WITNESS:  It could be.  As I indicated yesterday,

24   once you kick that price up to $.06, if it really is a supra

25   competitive price, every member of the cartel has got an

 1    incentive to cheat on that.  And if you see that price coming
 2    down, it could be cheating.  And then an economist must ask the
 3    question:  Well, what has the cartel done?  What is there to
 4    try to monitor those prices so that each member of the cartel
 5    would know about the cheating, and then what might be done to
 6    try and thwart or deter the cheating.
 7              THE COURT:  Okay, thank you.  Thank you, Doctor.
 8    BY MR. MARTIN:
 9    Q    I'm going to try to keep going with a couple more of these
10    hypotheticals and just refine it a little bit.  Okay?
11    A    Sure.
12    Q    Now, let's assume that in this hypothetical -- again the
13    suppliers agreed to raise price, we've got it on video, and
14    they agree to send out a price increase announcement of $.06 a
15    pound --
16    A    Can I interrupt you just a minute to make sure I understand
17    the hypothetical.
18              You say they agree to raise prices.  You're not
19    talking about the transaction price that the customer pays,
20    you're at this stage of your hypothetical simply talking about
21    an agreement on the price increase announcement.  Is that
22    correct?
23    Q    Let's do it that way, okay?  Let's make it your
24    hypothetical where they agree on the price announcement.
25    They're all going to go out and agree on a $.06 per pound price

 1    announcement.

 2    A    Okay.

 3    Q    Let's also assume that in this agreement there was a

 4    consensus reached among the members of the cartel to try and

 5    help that price increase stick.  Okay?  And again this is all

 6    on videotape so we're assuming this is true.

 7         And then suppose the reasons that the suppliers did

 8    this is that they wanted to prevent the price from decreasing

 9    because supply and demand conditions at that time were actually

10    heading in the wrong direction.

11    A    Now you're talking about the transaction price.  Is that

12    correct?  Not the price announcement?

13    Q    No, I'm talking about market conditions.  I'm talking about

14    they agree on a $.06 per pound price increase, they have

15    consensus to try and make that price increase stick.  They're

16    doing that to prevent a price decrease from current levels

17    because supply and demand conditions do not favor a price

18    increase.  So the suppliers send out the price announcement,

19    and there's negotiation, and the customers resist, and the

20    suppliers are only able to get one cent of their six-cent

21    announced price increase.

22         That would still leave the customers paying higher

23    prices than they would have paid in a competitive market.  Is

24    that right?

25    A    I think that follows just as a matter of arithmetic, yes,

1    sir.

2    Q    And that would be cartel behavior.  Correct?

3    A    Well, that -- I think if I did the math correctly, that

4    one-cent difference is a result of cartel behavior in your

5    hypothetical, yes, sir.

6    Q    Okay, thank you.

7            A couple more.  Let's assume the same scenario:

8    Suppliers agrees to raise prices -- to send out price

9    announcements and to reach a consensus on making those

10   announcements stick.  Let's suppose again, on video.  And now

11   let's suppose that one of the suppliers was desperate to

12   increase their market share and they gave some of the customers

13   a better price by building in a big signing bonus and a rebate

14   which took away $.02 of that $.06 price increase.

15           That would still leave the customers paying higher

16   prices than they would have paid in a competitive market.  Is

17   that right?

18   A    In other words, one of the members of the cartel violates

19   the agreement that was videotaped and cheats.  Is that correct?

20   Q    Yes.  The supplier says, I'll give you a rebate and a

21   signing bonus, does slightly undercut the agreed on price so

22   that the price that is paid is $.04 instead of 6.  That would

23   still leave the customer paying a higher price.  Correct?

24   A    Yes.  The arithmetic of your hypothetical is that the

25   customer pays a higher price than that customer would have paid

1    under competitive conditions, the lower price than the cartel

2    had agreed to because of either the cheating or the

3    negotiations.  I'm not sure which you're attributing the

4    deviation from the cartel agreed price to be in response to.

5    Q    What I've just described, that would be cartel behavior as

6    well.  Correct?

7    A    Well, what you describe is a deviation from cartel

8    behavior; that is, the cheating is a deviation from what the

9    cartel wants to accomplish.  That's why cartels to be effective

10   need to know:  What is that transaction price that the customer

11   is paying?  And if somebody is cheating on it, how can we stop

12   it?  Otherwise the cartel unravels.

13   Q    Even with that cheating, that customer that paid $.04 is

14   paying a higher price than he would have paid in a competitive

15   market?

16   A    In your hypothetical, yes, sir, that's true.

17   Q    Last one.  Same hypothetical:  Suppliers agree to raise

18   prices, issue a six-cent a pound price announcement --

19   A    I'm sorry, I'm going to stop you.  I didn't hear the first

20   part of your hypothetical.  It was very rapid.  Thanks.

21   Q    Let's assume that the suppliers agreed to raise prices,

22   send out price announcements in the amount of $.06.  They have

23   that same consensus to try and make that price announcement

24   stick.  But let's suppose that the suppliers also agreed not to

25   go after any competitor's business in the market so long as

1     that competitor was supporting the price increase announcement.

2     And let's again suppose we have it on videotape.  And now

3     without any competitive offers because the suppliers agreed not

4     to go after each other's business, that would leave the

5     customers with no option but to pay the higher prices.  Is that

6     right?

7     A     Let me just make sure that the hypothetical didn't change.

8           The initial agreement is on the price increase

9     announcement.  Is that correct?  Or when you say "price," do

10    you mean they have agreed not just to announce a simultaneous

11    and equal price increase, but they have agreed on the

12    transaction prices that the customers will pay?  That's what I

13    find a little confusing in your hypothetical.

14    Q     Okay, let me try and clean it up for you.

15    A     Thanks.

16    Q     Suppliers agree to send out a six-cent a pound price

17    announcement.  They have a consensus to try to make that

18    announcement stick.  They also as part of this agreement agree

19    not to go after any competitor's business so long as that

20    competitor was supporting the price increase, and again we have

21    this on videotape.

22          Now, without any competitive offers because the

23    suppliers agreed not to go after each other's business, the

24    customers would have no option but to pay those higher prices.

25    Correct?

 1    A    You used the word -- when you switch from "agreement" to
 2    "consensus," are those just synonyms?
 3    Q    No.  In the first part there's an agreement to issue the
 4    price announcement and a consensus among those cartel
 5    members --
 6         THE COURT:  Or agreement, or agreement.
 7    Q    Which is part of the agreement.
 8    A    Okay.  I just want to be sure because you switched terms
 9    from "agreement" to "consensus," and I didn't know if
10    "consensus" was something different.
11         THE COURT:  They're the same thing.  He's right,
12    they're synonyms.  I mean, consensus, agreement.
13         THE WITNESS:  Okay.  Thanks, your Honor.
14         THE COURT:  Go, go ahead, rephrase it.  Ask the
15    question again.
16    Q    I'll ask it again.  So we have the same agreement to issue
17    price announcements to try to make them stick and there's this
18    additional component that the suppliers also agree not to go
19    after any competitor's business in the marketplace so long as
20    that competitor was supporting the price increase.  And let's
21    suppose, again, videotape, and without any competitive offers,
22    because the suppliers agreed not to go after each other's
23    business, the customers would have no option but to pay higher
24    prices.  Is that right?
25    A    That sounds like a cartel.  If I understand your question,

 1    they agree to raise not only the price increase announcement

 2    but the transaction price and they stick to it, they don't

 3    offer anybody else any lower prices in which case the customers

 4    have no option but to buy at the cartel price.

 5    Q   Thank you.

 6            I want to ask you a couple of questions about a

 7    document you were shown yesterday.

 8            MR. MARTIN:  Could we pull up Slide 19, please, Todd.

 9    Q   And this is a chart that you showed, or was showed to you

10    when you talked about during your testimony yesterday.  Right?

11    A   Yes, sir.

12    Q   I have some questions about this particular document, if I

13    could.

14            The title is "Average monthly price of TDI products

15    sold by Defendants."

16            Do you see that?

17    A   It's "sold by producers," is what it says.

18    Q   I'm looking -- I'm sorry, I was looking at this part right

19    here, but I'll use "producers," that's fine.

20            The first question is:  What is average?  What does

21    "average monthly price" mean?

22    A   This is taken from the court records.  I don't know if

23    people can read this at the bottom:  The price calculations

24    exclude sales to entities whose billing location and shipping

25    location -- I can read the whole thing if you want, but it's an

 1    attempt to indicate as a note that the data, it indicates that
 2    Lyondell is incomplete for a certain time period because it was
 3    acquired by ARCO.  It's an attempt and try and explain where
 4    the price records came from in the record.
 5    Q    Is this price, this is the blue price line we're talking
 6    about, right?  That's the average monthly price of TDI
 7    products?
 8    A    That's correct.
 9    Q    And is that price line supposed to include all of the
10    transactions involving Bayer, BASF, Dow, ICI, and Lyondell?
11    A    Well, with the exception of what's said here, outlier
12    prices have been excluded.  It excludes Dow, Foamex, zero
13    volume transactions for those months where for some reason we
14    had prices but there was no volume associated with them.  It
15    excludes Lyondell because when it was acquired by ARCO we
16    couldn't get the data for that.  But it's -- maybe I'll put it
17    this way:  It's our best effort to come up with an average for
18    TDI prices to see what the general trend was over time during
19    this period.
20    Q    Okay.  And why did you want to see the average trend over
21    time in that period of industry-wide prices?
22    A    As I indicated yesterday, I was interested in trying to
23    explore what is visually kind of an oddity in that there was an
24    allegation of a cartel, and instead of prices going up they
25    were flat.  And as I tried to explain yesterday, that could

 1    happen with a cartel, it could happen, but it would only happen
 2    that you'd find flat prices at a time when either demand was
 3    falling and somehow the cartel was propping up prices and just
 4    keeping them flat; or costs were falling, but in response to
 5    that the cartel didn't respond to those cost decreases but,
 6    instead, kept the prices flat.  But other than, that typically
 7    when you have a cartel, price go up.
 8    Q    My question is really focused on why you used that average
 9    market-wide price and the information that was provided to you.
10    Is that what you just gave me in your answer?
11    A    Yes, sir.
12    Q    Okay.  There's a note at the bottom in that note section
13    that you were trying to read that's really small.  The second
14    to last line says:  "Prices are net of returns that could be
15    tied back to sales adjustments and rebates."  Do you see that?
16    A    Yes, sir.
17    Q    What does that mean?
18    A    If there was product returned, then we eliminated that from
19    the calculation.  This was for product that somebody bought and
20    used, not returned.
21    Q    What if a buyer received a rebate and it couldn't be tied
22    to a specific transaction?
23    A    Give me just a minute to look at this.
24         (After pause) My recollection is, if we couldn't tie
25    it to a transaction, we excluded that.

1    Q    Okay.  Did you do the same thing with signing bonuses?

2    A    Yes.  I don't think we knew about signing bonuses until --

3    I learned about them in trial deposition.  I may have heard

4    about them before, but as I mentioned yesterday, signing

5    bonuses are unusual in my experience.

6    Q    Okay.  Even though those rebates and signing bonuses can't

7    be tied back to the specific transactions, aren't in your

8    average price line, is it still a reliable line?

9    A    I think it is, yes.  I mean, I'm just looking at general

10   prices, that they're fairly flat and looking at costs and

11   looking at the trend of those.

12   Q    Now, you pointed to this period right here, it's costs

13   flat.  Right?  Right here, "Costs flat."

14   A    I'm sorry.  I'm looking at my screen but I don't -- all

15   right, I'm looking right here.

16   Q    I can't do that to your screen.  I'm sorry.

17   A    Now I see what you're looking at.

18   Q    That's "Costs flat"?

19   A    Relatively flat.  I mean, there are some ups and downs, but

20   if you look at that general period there's a downward trend, it

21   goes up a bit, goes down, goes back up a bit, ends up a little

22   bit higher during the period you singled out on the screen, a

23   little bit higher.  But if you look overall it says costs are

24   flat, or if anything, going up.

25            MR. MARTIN:  Can you pull that down just a little bit,

 1    Todd.  Okay.  Keep it zoomed in.  Just pull it down a touch.

 2         Perfect.

 3    Q   So I'm going to look at this time period here.  I'd like

 4    you to look at it with me.  Say it's '94 to '96.  Would you

 5    agree that that is downward trend?

 6    A   Yes, sir.

 7    Q   These are the average prices that you used.  Would you

 8    agree that is an upward trend?

 9    A   Slightly, yes, sir.

10    Q   Okay.  So for this period of time from, this time, say,

11    '94-ish, or '95, through '96 starting in '96, those two things

12    move in different directions.  Right?

13    A   They appear to, yes, sir.

14    Q   As a matter of economic theory in a competitive market,

15    wouldn't -- and assuming that this is an important cost for

16    TDI -- wouldn't the price of TDI follow the price of costs

17    downward?

18         MR. BERNICK:  I'm going to object.  I think it's an

19    incomplete hypothetical.

20         THE COURT:  Overruled.  I'll allow it.

21         If you can answer it.

22    A   Sure.

23         When you say "in a competitive market," for me as an

24    economist, that means perfectly competitive market.  If there's

25    no lags, yes, I would expect that to happen.

 1   Q    How about in an oligopolistic market?  Perfect competition

 2   is lots of sellers.  Now we're talking about oligopoly.  Let's

 3   make it more specific.  Let's make it our market, a market just

 4   like the urethanes market, five sellers.

 5           In the absence of collusion or an agreement, a cartel,

 6   wouldn't the actual prices follow costs, all else equal?

 7   A    Oh, wow, how I do answer this without a lecture?  So I'm

 8   trying not to give a lecture to you.

 9           First of all, these are accounting data, and

10   accounting data are quarterly, annual, they don't adjust

11   immediately to market forces.

12           Secondly, oligopolies are markets with lags.  As I

13   explained yesterday, there's lots of negotiations that go on

14   that don't happen in a perfectly competitive market.  So within

15   that short time period that you've singled out, that would not

16   astonish me to find a particular price of -- the transaction

17   price slightly going up when one of the costs -- and I'll grant

18   you it's an important cost but it's not the only cost -- one of

19   the costs is going down.

20           But I will go back to what I consider the bigger

21   picture, which is to look at the whole period of the allegation

22   of the cartel.  And I will just repeat myself and say,

23   eyeballing that, if anything, prices have gone up, and if

24   anything -- that is, costs have gone up.  And if anything,

25   during the period in which you allege there was a cartel,

1    prices have gone down or stable.

2    Q    Okay.  You said there were many costs.  This is the only

3    cost you used.  Right?  Toluene?

4    A    It's an important cost, yes, sir.

5    Q    Okay.  And you didn't focus on that shorter time period in

6    your analysis.  Right?

7    A    No, I took the time period that I was given, which was the

8    cartel allegation period.

9    Q    Do you know if during that time period, late '94 through

10   January '96, there were any coordinated price increase

11   announcements?

12   A    I'm not sure I know what you mean by "coordinated."  I

13   testified yesterday that during that time period, indeed during

14   most of the time period that I studied in this industry, the

15   price increase announcements were, if not simultaneous, they

16   were very similar in both their timing and amounts.

17   Q    Do you call those lock-step price increases?

18   A    I can't remember if I used that term yesterday or not.

19   Q    Is it a fair term?

20   A    Yeah, I think it is.

21   Q    Okay.

22   A    For the price increase announcements, not the transaction

23   prices, the price increase announcements.  I didn't say they

24   were coordinated, I said that they could happen as a result of

25   oligopoly interaction or strategic interdependence.  If by

 1    "coordinated" you mean they were collusively ordained, that I

 2    don't have an opinion on.

 3    Q   I accept that.

 4        I meant it in the way of lock-step, so I'll ask the

 5    question again.  During that time period when costs, the

 6    measure of costs on the picture is going down, actual prices

 7    are going up, did you look for lock-step price increases?

 8    A   Well, the way you're now -- I think we've agreed upon how I

 9    looked at price increase announcements.  That's the pattern

10    over the whole cartel allegation period.  I don't think there's

11    anything special about that particular time period.

12    Q   Do you know if there were any lock-step price increase

13    announcements during that time period?

14    A   I believe there were.  I indicated yesterday that if you

15    generally look at the price increase announcements, what the

16    major producers are announcing their intention to be, they're

17    not always identical but they're very similar.

18    Q   Okay.  Now --

19    A   Not just for that time period that you singled out but

20    basically for the whole cartel allegation period.  That's the

21    way this industry generally operates with regard to price

22    increase announcements.

23    Q   Do you remember we talked about OPEC and there was a wonder

24    why we did it?

25        As a matter of theory, if this is an effective -- just

1    assume with me this is an effective conspiracy and it elevates
2    prices at the start and it never falls back down to what the
3    prices would have been in the absence of a cartel, isn't that
4    evidence of a cartel?

5    A    Yeah, that's true by definition.  If you have OPEC raising
6    the price and it never falls, the price of crude oil never
7    falls again even though there might have been market forces
8    that would have otherwise driven such a price decrease, then
9    you have a price increase that's been driven or coordinated by
10   the cartel.

11   Q    Now, you recall that Dr. Raiff actually --

12        MR. MARTIN:  Can we get rid of that.

13   Q    Dr. Raiff actually had a criticism of this chart that you
14   drew because of the use of the index.  Why did you use an
15   index?

16   A    I used an index because that's the way we often show trends
17   in prices over time when people want to know what's happening
18   to overall inflation, we look at consumer price index.  Here it
19   was a price index of toluene.

20   Q    Do you know what the actual prices were for toluene during
21   that time period, the conspiracy period?

22   A    As I sit here, no.

23   Q    Okay.

24        MR. MARTIN:  Todd, could we pull up Figure 1 from the
25   Raiff Reply.

1    Q    This is from Dr. Raiff's report and it was provided in
2    response to this.  You've seen this before.  Right?
3    A    I may have.  I don't recall having seen it before, but if
4    you tell me I have, then I perhaps have.  I don't recall it
5    right now.
6              MR. MARTIN:  Oh, here it is.
7    Q    I don't want to tell you, Professor, I want you to confirm
8    for yourself.
9              If you look at paragraph 23, read the next two
10   paragraphs and turn the page (handing document).
11   A    (After pause) I'm sorry.  You're asking me to read
12   paragraph 23 and 24 and turn the page?
13   Q    23 to 24 and turn the page, please.
14   A    Mr. Martin, I'm not sure I've seen this before.  I've
15   looked at it today.
16   Q    You haven't seen Dr. Raiff's Reply Report in which he says
17   that this chart you provided in your report was misleading?
18              That's the first time you've seen it?
19   A    I believe so.  My understanding is that Dr. Ugone responded
20   to Dr. Raiff, I did not.  So I'm not sure I read Dr. Raiff's
21   reply report.
22   Q    Do you see that you are specifically called out in that
23   reply report, don't you?
24   A    Well, I see that today, yes, sir.
25   Q    Have you seen this document over here?  Figure 1, the one I

1    asked you to turn the page to?  Right over here.

2    A    Which one are you pointing to, the one on the left?

3    Q    Right here on the left, yes.

4    A    I'm not sure I've seen it before, no, sir.

5    Q    Okay.  You can look at -- you have knowledge though of what

6    the toluene prices were that were used to make this index,

7    don't you?

8    A    Yes.

9    Q    Okay.  If we look down here --

10   A    When you say "this index," you mean the index on my

11   exhibit?

12   Q    Yes, your red index of toluene.

13   A    Okay.

14   Q    Over here, these are actual prices.  The green line is

15   actual prices of toluene per pound, and the red line --

16   A    Can you put that on my screen over here, please, just so I

17   can see?

18        Thank you, I appreciate it.

19        Okay.  Give me a minute to look at this because I'm

20   not sure I've ever seen it before.

21        (There is a pause for the witness.)

22   A    I think I understand the green line.  U.S. dollars per

23   pound.  The red line, is that a percentage per pound of TDI?

24        I don't see a percentage on the axis.  I'm not sure I

25   understand the red line.  I think I understand green.

```
 1    Q    Okay.  Tell us --

 2    A    The blue line is similar to what I had on my exhibit.  Is

 3    that correct?

 4    Q    That's correct.

 5         So the blue line is, remember, you had an average

 6    market-wide price?  This one way up here.

 7    A    Yes.  I'm just asking:  Is the blue line on Dr. Raiff's

 8    exhibit the same as or similar to the line I had on mine?  Just

 9    TDI --

10    Q    The difference is he used a median instead of an average.

11    A    Well, a median is an average.

12    Q    Okay.  Then they're the same.

13    A    There are three averages:  There's mean, median and mode.

14    Q    So for all intents and purposes, that line there because

15    it's a median and your line which was on the other board which

16    is an average are roughly equivalent.  Correct?  The same data?

17    A    They probably are.  I don't know for sure, I never checked

18    the median versus the --

19         THE COURT:  Excuse me, excuse me.  The two lines are

20    the same by just looking at them.  Aren't they?

21         MR. MARTIN:  Well, that's --

22         THE COURT:  The blue lines, the blue lines, both of

23    those are the same.

24         MR. MARTIN:  The blue line and the blue line.

25         THE COURT:  I mean -- okay.
```

```
 1                    THE WITNESS:  They appear to be the same.  That's why
 2      I was asking, are they -- did Dr. Raiff use my numbers --
 3                    THE COURT:  Mr. Martin, they look the same on the
 4      graphs and they start out at the same point on both graphs.
 5                    MR. MARTIN:  I'm satisfied with that.  That's all I
 6      wanted to get to.
 7      BY MR. MARTIN:
 8      Q    And just to wrap this part up:  The green prices are
 9      toluene per pound.  Right?
10      A    That's my understanding.  That's what it says.
11      Q    Okay.
12      A    My question was about the red line.  That's unclear to me
13      what it means "per pound of TDI."  That suggests to me a
14      percentage of toluene to TDI, but I'm not sure about that.
15      Q    For purposes for now, the green line is fine.
16                    You accept it's a different representation of the
17      relationship of toluene to market-wide prices than your index,
18      wouldn't you?
19      A    I'm sorry.  Was there a question?
20      Q    Yes.
21      A    I didn't hear the question then.
22      Q    Do you accept it's a very different representation of the
23      relationship between toluene prices and your index and actual
24      toluene prices to TDI prices?
25                    If it helps, it's my last question on this.
```

1    A    It would help me compare them if we could put the same time
2    frame together.  It's a little hard for me to see from here.
3    I've got one on the screen that I can readily see the other
4    one...
5          Certainly the green line during the period '92 to
6    2003, so let me look over here on what I have on the screen,
7    the green line, 2000.
8          I didn't know that my price index looks very similar
9    to the price trend that Dr. Raiff has in the green line.
10   Q    Okay.  They look the same to you?
11   A    Well, I'm picking up more jags than he does.  That may be a
12   function of the fact that he's got years and I've got months.
13   So when you're plotting by months you may pick up more
14   variation than you do if you're plotting by years, if that's,
15   in fact, the way he's plotting it.  I don't know what sort of
16   Excel program he's using on the plotting.  But it seems to be
17   flatter than mine.  I don't know if that's by months or by
18   years.  It could be, I just don't know.
19   Q    I promise that's the last question.
20         I'm going to ask you to look at Exhibit 7 from your
21   expert report.  It's going to pop up on the screen right in
22   front of you.
23   A    Okay.
24   Q    Now yesterday you talked about -- we just saw your TDI
25   version of this.  Right?

 1    A    Yes, sir.

 2    Q    And you presented TDI and MDI to the Court yesterday.

 3    Right?

 4    A    Yes.

 5    Q    And the jury.

 6         You didn't show us polyols.  Why not?

 7    A    I don't know.  Mr. Bernick didn't show me that.  I'm not

 8    sure how to respond.  We have to ask Mr. Bernick that.

 9    Q    I don't think he'll let me.

10    A    Okay.

11    Q    So let me just ask you a couple of quick questions about

12    this and we'll be done with it.

13         Here we have -- can you see this over here?  This

14    again is your average market-wide price, the black line?

15    A    Let me get just a sense to acquaint myself with this.

16         The black line is polyol, yes, sir.

17    Q    And then the red line is an index of propylene.  Right?

18    A    That's correct.

19    Q    I'm going to ask you to do something which I asked you to

20    do before which is to focus on a time period.  We look at from

21    July -- January '96 through --

22    A    I'm sorry.  January '96 --

23    Q    We're going to highlight it for you.

24         All the way out to January 2000.  And you see right

25    here there's a pretty big decrease in propylene prices.  Right?

1    A    Yes, there's a drop from July '97 to I think January '99,

2    and then again a fairly, a little more rapid increase back to

3    where it was before.

4    Q    The actual prices appear to be relatively flat.  Is that

5    fair?

6    A    Yes, sir.

7    Q    The same question I had about TDI before.  In a competitive

8    oligopoly, wouldn't the primary cost of that product exert

9    downward pressure on the price?

10   A    Well, your question put two terms together, so I'll break

11   them up.  Under perfect competitions where there's no lags and

12   markets adjust very quickly, then that would be surprise to the

13   extent this cost is the only cost and nothing is happening to

14   the other cost.  In an oligopoly I would not find this

15   surprising given the fact that we're dealing with accounting

16   data here and oligopoly prices can be sticky in response to

17   cost.

18   Q    Do you know in your analysis whether there were lock-step,

19   not coordinated, lock-step price increases in this time period?

20   A    Mr. Martin, I don't recall for that specific time period.

21   As I said earlier, this industry and other oligopolies has been

22   characterized historically with similar or lock-step price

23   increase announcements.

24   Q    So the answer is, you don't know the answer to the question

25   I asked?

 1    A    Not to that particular time period, no.

 2    Q    Okay.  Now, yesterday -- I'm going the turn to a different

 3    subject -- you showed a number of charts --

 4              MR. MARTIN:  Can I see Slide 21, Todd?

 5    Q    And this will be an example.

 6              You were shown a number of these charts with the red

 7    sticks and the price lines averaged on this.  This is for Dow,

 8    TDI.  Right?

 9    A    Yes, sir.

10    Q    The red sticks are based on price announcements that are in

11    the record?

12    A    Yes.

13    Q    And they lean to the right, so the top right part is the

14    effective date?

15    A    Yes.  In the one that's illustrated here, for example, we

16    see the June price is $.75 over on the left-hand axis.  There's

17    announced price increase of $.09 for July, 2002.  Then we have

18    the arrow pointing to ways the July price of $.76, a penny

19    more.

20    Q    All right.  So the bottom, bottom left, the very bottom

21    part is actually a month beforehand.  Right?

22    A    That's correct.

23    Q    So you're measuring from the prior month to the next month?

24    A    Yes, sir.  If I understand your question correctly, that

25    would be accurate.

 1    Q    And the data, the data that you used to create those red
 2    stick was based on a stipulated series of price increases in
 3    this case.  Right?
 4    A    (No response.)
 5    Q    Let me ask it a different way.  Do you know what the data
 6    is?
 7    A    The data that were used is drawn from the record in the
 8    case.  There's a note that tries to indicate, you know, what
 9    happens with foreign sales and transactions.  I'm not sure I
10    know what you mean by "stipulated".
11    Q    Okay.  I'm going to tell you.  In this case there are a
12    stipulated set of price announcements.  It's marked as PX-1414.
13    I'll give you a copy so you can see it (handing document)
14              MR. MARTIN:  You can pop it up, too, Todd, PX-1414.
15              Todd, if you can go down to TDI on October 1st, '94.
16    A    I see MDI for March 1, '94.  You may have to help me where
17    I'm supposed to go with the document.
18    Q    Let's --
19              MR. MARTIN:  Todd, I'm sorry.  Could we go back to the
20    top, that way we can follow what those headings are.
21    Q    The left column is "Effective Date."  That's the right side
22    of your flag.  Right?
23    A    I believe so, yes, sir.
24    Q    Okay.  And then the next column is "Product Class."  And it
25    lists MDI, polyols and TDI.  You see that?

1    A    Yes, sir.

2    Q    And then the next column says "Supplier," and it lists

3    BASF, Dow, Miles and so on.  Do you see that?

4    A    Yes, sir.

5    Q    And then go over to "Price Change," do you see there's

6    increments, $.05 a pound, $.05 a pound, that the price announce

7    increased.  Okay?

8    A    That's my understanding, yes, sir.

9    Q    And then the last line, the last column is "Announcement

10   Date."  That's when the price announcement was actually issued.

11   Right?

12   A    Yes, sir.

13   Q    Okay.  Now, if you look down the product class to the first

14   line entry that says TDI.

15            Are you there?

16   A    Yes, sir.

17   Q    Okay.  There's a TDI price announcement by BASF, Dow, ICI

18   and Miles.  You see that?

19   A    Yes, each one for $.06.

20   Q    Okay.  And the effective date for all of those was October

21   1st, 1994.  Right?

22   A    Yes, sir, that's in the far left column on my sheet.

23   Q    And in your price chart, the ones that you showed on a

24   company-by-company basis, you used that Dow line item to draw

25   your flag.  Right?

```
 1    A    Well, I think the answer is yes.  I mean, if you'll tell me
 2    that this is the document that everybody agreed to use, then
 3    this would be the document on which my exhibits were drawn,
 4    yes, sir.
 5    Q    This is the document.  Okay.
 6         So that is what was used to make your line.  Yes?
 7    A    I believe so, yes.
 8    Q    Okay.  Now, you only looked at those price announcements on
 9    a company-by-company basis.  Right?
10    A    That's correct.
11    Q    Could you have looked at them on a group-wide basis?
12    A    I think that could be done.  I'm just trying to sort
13    through why you would do that if you're looking at a cartel and
14    you're trying to analyze whether an allegation that a group of
15    firms agreed upon a price increase in a way that was going to
16    affect the price that customers paid.  Because that's
17    ultimately what a cartel needs to do.  That's the money, as I
18    said yesterday, you take to the bank.
19    Q    Okay.
20    A    And so to look at each company would help me understand
21    whether the announced price increase had a connection to the
22    money that that company can take to the bank in terms of the
23    price that it received from its customers.
24    Q    Let me show you what's marked as PX-1413A.  It will be on
25    your screen.  And I'll just first describe to you what this is.
```

```
 1    That red line is the average, is the median price line from Dr.
 2    Raiff's reports, the same one we saw earlier on that toluene
 3    index chart.
 4    A    Okay.  Go a little more slowly, please, because I haven't
 5    seen this before.
 6    Q    Well, you have seen the red line.  The red line is Dr.
 7    Raiff's TDI market-wide price line.  It's the same price line
 8    that was shown in that toluene index one we saw earlier but
 9    it's only for the conspiracy period.
10    A    Okay.  So it's the one you just showed me a few minutes
11    ago?
12    Q    Correct.
13    A    Okay.
14    Q    The difference is, it doesn't go '92 to 2008?
15    A    Thank you for clarifying that.  That was not patently clear
16    to me when you put it up, that it was the same one that was
17    before.
18    Q    That's why I'm here.
19    A    Thank you.
20    Q    On the bottom you can see there's a legend, a diamond.  A
21    blue diamond is where four or more suppliers issue a price
22    announcement for the same effective date.  You see that?
23    A    I see one supplier, two suppliers, four -- four or more
24    suppliers.  I don't -- I wouldn't know from that that that's
25    what you just said.
```

1            So could you tell me again what it means?

2    Q    I'll tell you.  That means four or more suppliers.  This is

3    taken directly from 1414, so I'm going to walk you through an

4    example in a second -- where four or more suppliers announced a

5    price increase for the same effective date.

6    A    That would be a blue diamond?

7    Q    Yes.  Okay.

8            A green triangle is when three suppliers announced a

9    price increase for the same effective date.  Okay?

10   A    Yes, I see the green -- I see a number.  Let's see, one,

11   two, three, four green triangles.

12   Q    Okay.  And two suppliers, same principle:  One supplier,

13   same principle.  There are a couple of instances where the red

14   line is just where a supplier is issuing a price announcement?

15   A    So two suppliers.  There's one, two, three, four.  Is that

16   correct?

17   Q    That's correct.

18   A    And then one supplier -- there's one, two, three, four,

19   five?

20   Q    That's right.

21   A    Okay.

22   Q    So now --

23   A    In another question you said this was from some number.  I

24   wasn't sure I knew what that meant or whether that was

25   important for me to know that.

1    Q    Okay.  So remember I gave you that chart 1414.  It's that

2    chart we just went through with the columns and the lines.

3         This one.  We just looked at it?

4    A    Oh, I just don't keep these numbers -- this is 1414?

5    Q    It's the chart we just went through with the columns and

6    the effective date?

7    A    Oh, I see the number, PX-1414.

8         THE WITNESS:  Sorry, Mr. Perelli.

9    Q    Okay.  Now I just want to walk through one example, and

10   actually we're going to walk through a couple but I just want

11   to make sure we get this right.

12        So if you look at your line items, the one we looked

13   at before for TDI for October 1st, 1994, you see that?  And

14   then you see BASF, Dow, ICI and Miles all issuing a $.06 a

15   pound price announcement for October 1994.  You see that?

16   A    October '94 -- yes, I see that.

17   Q    And that's that blue diamond.  And the blue diamond is put

18   in the same methodology that you used, it's a $.06 increase

19   over the price from a month beforehand.  Same data.  Okay?  You

20   understand how this works?

21   A    I'm not positive, but I hope I do for purposes of answering

22   your questions.

23   Q    Well, you can see for this dot right here that that matches

24   up with the TDI entry for October 1st, 1994.  Correct?

25   A    Well, I don't know if it matches up.  It looks like it's

 1    higher.

 2              Can I have the numbers behind it?

 3    Q    I can tell you the $.06 a pound.  If you want to know what

 4    these numbers are you could cross-reference to the scale.  So

 5    for this one you would go -- whatever this number is the month

 6    beforehand, the number is right there, plus $.06.

 7    A    So is the difference between the blue diamond and the red

 8    line, $.02, $.06?  Do we know?  Are they meant to be identical?

 9    Q    They're just plotted there.  There's no -- they're not

10    related in any way.  Those -- this line is there because that's

11    the price line, and then these are just price increase

12    increments over the price line.

13    A    And they're not related in any way?

14    Q    Other than we're using the -- we're using this line here to

15    decide where to calculate the $.06 from.  Right?  Just like

16    when you had your charts and you had your red stick that

17    started from the line, the same principle, but instead of a

18    stick we're using a diamond.

19              THE COURT:  What's the question?

20              MR. MARTIN:  Well, my --

21              THE COURT:  No, you don't have to have a dialogue with

22    him, just ask a question and see what his answer is.

23    Q    Does that appear to accurately reflect the same data that

24    you used in your price announcement charts for October 1994?

25    A    In other words, does the red line reflect the data in my

```
 1    chart?

 2    Q   No, sir.  Does the blue dot -- you remember your red flags?

 3    A   Yes, sir.

 4    Q   Does the blue dot reflect the same data that you used to

 5    calculate your red flag for that same set of price

 6    announcements from that same set of data?

 7              MR. BERNICK:  I think if --

 8              THE WITNESS:  If --

 9              THE COURT:  No, no, no.  He's trying to answer.  Let's

10    see what his answer is.

11    A   Let me just look at this a second.

12    Q   Of course.

13              (There is a pause for the witness.)

14    A   And you're focusing on October '94, and this is TDI.

15    Forgive me because I haven't looked -- I'm not sure I've ever

16    seen this before.

17              Dow --

18              MR. BERNICK:  Your Honor, I don't have an objection

19    but it might clarify -- this is the stipulation.  I think his

20    charts were done before the stipulation was entered into.  So

21    that's probably part of the problem.

22              THE COURT:  Mr. Martin, go ahead, whatever -- ask

23    whatever questions.

24    A   If your chart is accurate, then I'm assuming Dow is within

25    one -- it's one of the companies within the blue diamond.
```

1    Q    Right.  And then the other companies that are in that same

2    lock-step price increase are also included in that diamond.

3    Right?

4    A    I'm assuming they are, yes.  I didn't compare the chart.

5    Q    I'm asking you to look at it and make sure you agree that

6    that is exactly what the data says.

7    A    Well, I can't confirm from this whether the October '94 --

8    can I see the whole chart again?  Is this the whole chart?

9    Q    You have it in your hands.  The paper copy is the whole

10   chart.

11   A    No, I have in my hand PX---

12   Q    The document is PX-1414 in your hand is the chart of price

13   announcements.  It's the same one that was used to create your

14   charts.

15   A    I'm asking about the graph.

16        MR. BERNICK:  I'm sorry, your Honor --

17   Q    Do you want to see this graph?

18        MR. BERNICK:  That's not accurate, that's not

19   accurate.

20        MR. MARTIN:  It is.

21   A    I'm sorry.  What I have in my hand is this, not that.

22   Q    Okay.

23   A    And my question was about that.

24   Q    Okay.

25   A    So, is the TDI actual from this chart that I'm looking at

1    on the screen the same as my TDI price, or is this Dr. Raiff's
2    price and it's a different one?  That's what I'm not sure
3    about.

4           So when you ask me:  Is this similar to what I have in
5    my exhibits, I'm not positive because you told me earlier that
6    Dr. Raiff used a different measure of central tendency than I
7    did.

8    Q   Right.

9    A   So I don't know whether that different measure of central
10   tendency causes a different price -- how shall I put this -- a
11   different delta or change between the price change announcement
12   number and the actual price.  I just can't know that.

13   Q   Okay.

14   A   I haven't studied this chart.  I've never seen it before,
15   to my knowledge.

16   Q   Well, you've seen your price data, you have seen your price
17   data before.  Right?

18   A   I've seen my price data.  I haven't seen Dr. Raiff's price
19   data.  And you indicated to me a moment ago, he used a
20   different measure of central tendency than I did to come up
21   with average prices.  So I believe -- and I'm under oath -- I
22   can't say, oh, yeah, this is same as mine.  I don't know if
23   that's the case or not.

24   Q   I think you're focusing on the red line and I'm asking you
25   about the blue dots.

 1    A    The blue dots --

 2              THE COURT:   What are you asking him?

 3    Q    If the blue dot accurately represents the same data that

 4    was used to create your red flags for the October 1994 TDI

 5    price announcement.  This stuff (indicating).  October '94.

 6    October '94.

 7    A    My understanding is that the price increase announcements

 8    on my charts are drawn from the same price increase

 9    announcements reflected on PX-1414.  And for the period that

10    you've asked me about, the October 1, '94, just eyeballing it

11    here, this would be the number, $.05 per pound that we would

12    use for Dow.

13              And your blue diamond presumably has all four of them,

14    and that would include Dow, the four or more suppliers.

15    Q    Right.  So is that -- are you telling me then it is

16    consistent and accurate with the data that you used to make

17    these charts?

18    A    I can't tell you whether it's consistent and accurate all

19    the way across.  The October '94 appears to be.  I can't vouch

20    for the accuracy of the whole chart.  I'm not saying it's not

21    accurate, I just don't know.

22    Q    Okay.  And I don't want to go down the rabbit hole, I think

23    we're already halfway down, so let's just ask one more question

24    about '94 and we'll move on.

25              Assume, assume that's an accurate representation of

 1    the weighted median price that Dr. Raiff used.  And assume that

 2    dot actually and accurately portrays the same data that you

 3    used to make your lines.  Would you agree that that is

 4    correlated with a price increase?

 5    A    It appears to be, yes; that is, I don't know what the price

 6    announcements were before, but -- and I don't know if there's a

 7    gap between the blue diamond and the red line because they

 8    don't overlap.  But they certainly -- the price moved up almost

 9    touching the blue diamond.  I mean, visually that's all I can

10    say at this point.

11    Q    And that's perfect, that's all I'm asking.

12             And if we use the same assumption for the next one,

13    does that appear to be correlated with a market-wide price

14    increase?

15             (There is a pause for the witness.)

16             THE COURT:  Okay.  We need an answer either way,

17    Doctor.

18             No, I know you're looking at it, but...

19    A    So you're asking about April 1, '95?

20    Q    Yes, I am, Professor.

21    A    Well, the way it's charted here, there's -- it appears as

22    though -- I'm not sure the lag, whether the price went up

23    before the price increase announcement, but certainly the blue

24    diamond is on the red line.

25             MR. BERNICK:  This is simply referring to the

 1    right-hand exhibit.

 2            THE COURT:  He's referring I think to the chart on the

 3    right.

 4            MR. MARTIN:  Yeah.

 5    A   Yeah, I'm looking at your exhibit, not mine at this point.

 6    Q   Okay.  I'm going to ask you one more question on this.

 7            MR. MARTIN:  Can we take those down, Todd, just the

 8    highlights, and let's bring up this one.

 9    Q   This is April 1999, and it's in that same data chart you

10    have, and that's an announcement by four suppliers.  And you

11    can see -- and assume for purposes of this question that that

12    red line is an accurate depiction of the median market-wide

13    price line for TDI.  Would you consider that to be an effective

14    price increase?

15    A   If this is an accurate portrayal of the TDI prices -- and

16    I'm not vouching that it is -- it's not one I used --

17    Q   I understand.

18    A   -- but if this is the one Dr. Raiff has used you're telling

19    me, then there was a price increase in April '99 and the price

20    went up and then it fell again.  It looks like it fell to a

21    lower level than it had been before.

22    Q   Is it an effective price increase, in your view?

23    A   It doesn't look very effective to me.  It went up and then

24    it went right back down again in terms of what the people are

25    paying.

1    Q    Now, you wouldn't expect to see in a cartel, in a cartel,

2    assume a cartel -- you wouldn't expect to see a hundred percent

3    implementation of price increase announcements, would you?

4    A    If by "a hundred percent implementation" you mean that the

5    price increase that was announced was always reflected in a one

6    hundred percent implementation to the actual transaction price,

7    is that what you mean?

8    Q    Yes, that's what I mean.

9    A    No.   If there was cheating I wouldn't expect to see that.

10   What I would expect to find, however, is that evidence that the

11   cartel was somehow monitoring those transaction prices and

12   trying to thwart the cheating that is part of your

13   hypothetical.

14   Q    Yesterday you were asked -- let me remind you if you

15   started lecturing.   That was a volunteered answer.

16          In many cases the suppliers themselves didn't expect

17   to be completely successful.   Correct?

18          MR. BERNICK:   Your Honor, I think that statement to

19   the witness is improper.   That's for the Court to determine.

20          THE COURT:   All right.   Go ahead.

21   Q    The suppliers, the suppliers themselves didn't expect to

22   see a hundred percent implementation of price increase

23   announcements, did they?

24   A    Are you talking about in an oligopoly now?

25   Q    I'm talking about in the urethanes industry.

```
 1   A    In the urethane industry -- it's typical of oligopolies.
 2   As I indicated yesterday, sellers don't always expect to get
 3   everything they ask for through a price increase announcement.
 4   Whether they get all or a portion of that depends upon market
 5   conditions and negotiating skills and the buyer resistance of
 6   their customers.
 7   Q    Now, you talked yesterday a little bit about a BASF
 8   executive named William Bernstein.  Do you recall that?
 9   A    Yes, sir.
10   Q    Okay.  And you summarized what he told us -- or what he
11   told you -- I'm sorry -- you summarized what he told you in
12   court yesterday.  Correct?
13   A    I had questions about that.  I don't know if I summarized
14   all that he told me.  There were some questions about my notes.
15   Q    Okay.  You're ahead of me, sir.  I'm going to hand you your
16   notes and I've opened it to page 8.  I'm going to ask you to
17   look at 11B and 11C (handing documents).
18        And these are notes that were made of your interview
19   with Mr. Bernstein.  Right?
20   A    Yes.  Excuse me.  They're my notes.
21   Q    And what does it say there under 11B?
22   A    Wait, I'm sorry, I haven't read it yet.
23   Q    Oh, I'm sorry.
24   A    (After pause)  Okay.  I've read my notes on 11, which is
25   entitled "Realized prices after announcements."
```

1    Q    Can you read what it says in 11B.

2    A    Sure.  (Reading) Sometimes BASF would make price increase

3    announcements in excess of what the company anticipated

4    achieving.  For example, BASF might want 5 percent, would ask

5    for 10 percent, and when it got 4 percent would conclude that

6    was -- and this is in quotes, Mr. Perelli -- pretty close,

7    closed quotes -- and, quote, not too bad, closed quotes.

8    Q    And could you read the next sentence, 11C?

9    A    (Reading) In some cases, BASF would make price increase

10   announcements to forestall price declines.

11   Q    So in the urethanes industry there are producers that

12   believed price increase announcements could be issued with the

13   sole purpose of keeping prices from going down.  Correct?

14   A    Well, that might be the hope.  That's what the company

15   might anticipate achieving.  You'd ask for 5 percent -- excuse

16   me -- you'd ask for 10 percent, and understanding that when you

17   went into the negotiations with the customer and the market

18   conditions that were in existence at the time, that you might

19   only get 5 percent or 4 percent.  That was pretty close to 5

20   percent.  But this type of conversation about hoping to get 10

21   percent, settling for 5, maybe only getting 4, that to me as an

22   economist is what I would expect to find in an oligopoly where

23   the game isn't rigged and where Mr. Bernstein with BASF is

24   having to negotiate with customers over prices.

25   Q    Professor, the question I asked you was:  Isn't it true

 1   that at least some suppliers would make price announcements for

 2   the purpose of preventing price declines?  Correct?  Yes or no.

 3   A    That's what my notes reflect here.  Mr. Bernstein told me

 4   that.

 5   Q    That's not the only information you have on that subject,

 6   is it?

 7   A    No.  On the note it says:  "Dow sometimes would announce

 8   price increases and then they'd immediately undercut the prices

 9   they had just announced."

10   Q    What about Mr. Dineen, did you read his testimony or do you

11   remember Mr. Dineen?

12   A    We're leaving my notes right now I gather?

13   Q    We're leaving the notes.

14         You read Mr. Dineen's testimony to form your opinion.

15   Correct?

16   A    I believe I read either all or part of his testimony.

17   Q    Let me ask you if you read this part of his testimony:

18         (Reading) QUESTION:  Does a price increase

19   announcement always mean that there will actually be a price

20   increase?

21         ANSWER, or Mr. Dineen:  No, it's sometimes only to

22   stop a price increase -- a price decrease, and many price

23   increase was to stop price decrease.

24         That's almost the same thing Mr. Bernstein told you,

25   isn't it?

 1    A    That's correct.

 2    Q    So, hypothetically, if the suppliers agreed to issue price

 3    announcements and through a consensus tried to make them stick

 4    in the hope that they would prevent a price decrease, that

 5    would be evidence of cartel behavior, wouldn't it?

 6    A    If I saw evidence that the price increase announcement

 7    carried over to the transaction price and that that price was

 8    being monitored and cheating was being deterred, yes, then

 9    you'd have a cartel agreement that connected the price increase

10    announcement to the actual transaction price.

11         Otherwise it seems to me you get what Mr. Bernstein is

12    describing, you issue a price increase -- he's not contending

13    this is done -- in conjunction with other sellers, they issue

14    of price increase, other sellers issue a price increase, the

15    negotiations begin and you might end up somewhere in between.

16    Q    Professor, that wasn't my hypothetical.  My hypothetical

17    was:   Assume that the suppliers agreed to issue price

18    announcements and to work together to try to make that price

19    announcement effective.  And by "effective," they meant prices

20    stayed the same, they just didn't go down.  That would be

21    evidence of cartel behavior on that assumption, that

22    hypothetical?

23    A    The way you set that up, yes, the answer would be yes.

24    Q    Thank you.

25    A    Because you've indicated that they have something that

 1   makes the agreement on transaction prices effective.

 2   Q    Thank you.

 3        MR. MARTIN:   Todd, can we pull up page 29 of his

 4   initial report and highlight the first paragraph.

 5   Q    This is from your report, Professor.  You see that?

 6   A    Is this the first one or the supplemental --

 7   Q    The first one.

 8   A    The first one?  Thank you.

 9   Q    And you say:   (Reading) To determine a cartel's existence,

10   an antitrust economist must find evidence of business conduct

11   that cannot be explained as the result of non cooperative

12   interdependent behavior.

13        Right?

14        Then you go on:   "Absent such evidence, the inference

15   of a cartel agreement should be rejected."

16        Now, yesterday you talked a little bit about asking

17   your team of economists to go in search of documents.  Do you

18   remember that?

19   A    Yes, sir.

20   Q    And you asked them to look for documents showing

21   negotiation or competition for a customer or the danger of

22   losing a customer.  Do you recall that?

23   A    Yes, sir.

24   Q    You didn't ask them to find any documents showing no

25   competition, did you?

 1    A    No, sir, that was not the purpose of my analysis on that.

 2    Q    At any point in your examination of this case, did you ask

 3    for documents that showed that these firms for which you're

 4    trying to find there was a cartel or not a cartel, were in fact

 5    not competing for customers?

 6    A    Well, as I explained yesterday, I certainly seen documents

 7    that you allege in this case are evidence of the sellers

 8    agreeing to something on price.  And I know that Dow denies

 9    that they engaged in that type of an agreement.

10    Q    Not my question.

11    A    As I indicated yesterday, I'm not here as an economist to

12    assess that type of information, I just don't have the skills

13    to do that.  That's what the Court and the Jury does.

14    Q    You're talking about gum shoe?

15    A    Gum shoe evidence, yes, sir.

16    Q    My question was this:  At any point in your examination of

17    this case, did you ask for documents that showed that these

18    firms were not competing for customers?

19    A    No.  The purpose of my analysis for this component was to

20    say, let's look at the business records and see if they reflect

21    in the trenches active competition for new accounts or concerns

22    that accounts were being lost.  I'm just looking for evidence

23    of:  What's the nature of the negotiations that are going on

24    here --

25              MR. MARTIN:  Todd --

 1    A    Let me finish my answer, if I might.

 2         Are sellers concerned about gaining new customers or

 3    are they concerned about losing customers?  Because if the game

 4    is rigged by a cartel you wouldn't expect to find that type of

 5    evidence.

 6              MR. MARTIN:  May 3rd.

 7              (Mr. Martin confers with the tech off the record.)

 8    Q    Here's a question and answer you were asked in deposition.

 9              MR. BERNICK:  Could we have the whole answer shown?

10    Q    (Reading) How about at any point in your examination in

11    this case, in the thorough examination that you have testified

12    that you wanted to do in this case, did you seek out documents

13    that showed that these firms were not competing for customers?

14              ANSWER:  Not as I understand your question.

15              MR. BERNICK:  Could we have the rest of the text

16    shown?

17              MR. MARTIN:  That's it.  The next thing is a question.

18              MR. BERNICK:  Obviously he didn't finish his answer.

19              MR. MARTIN:  That's not --

20              THE COURT:  Is that the complete answer to that?

21              MR. MARTIN:  That's the complete answer.

22              Is that the complete answer, Todd?

23              The next one is a question.

24              THE COURT:  That's fine.

25              MR. BERNICK:  I would like to see it.

 1    BY MR. MARTIN:

 2    Q    Do you stand by that answer?

 3    A    Yes, that's what I said, "not as I understand your

 4    question."  I think I was starting to say something more and I

 5    don't know whether I was cut off or not.

 6    Q    We'll find out when Mr. Bernick is here.

 7    A    All right.  Thank you.

 8    Q    You've now said that you were aware of gum shoe evidence.

 9    Right?

10    A    Yes, sir.

11    Q    And that's evidence like what this jury has heard about,

12    competitors reaching agreements to fix prices, stabilize

13    prices, which is part of the plaintiffs' theory.  Right?

14    A    I'm a little handicapped because I don't know what the jury

15    has heard.

16    Q    Okay.  Evidence like what you've seen in the record, of

17    what you're aware.  Right?

18    A    Yes.  The answer to that is yes.

19    Q    And the jury is certainly allowed and will be asked to

20    consider that gum shoe evidence.  Right?

21    A    That's my understanding, yes.

22              MR. BERNICK:  Your Honor, what the jury can consider

23    is up to the Court to determine.  I object.

24              THE COURT:  I agree.  Objection sustained.

25              Rephrase question.

 1    Q    Gum shoe evidence is important if you're not an antitrust

 2    economist, if you're just a detective trying to figure out

 3    whether a cartel was in existence.  Right?

 4    A    It's my understanding.  When I was at the Antitrust

 5    Division, lawyers trying to ferret out cartel behavior used

 6    what I maybe casually call gum shoe evidence.

 7    Q    Let's talk about some of the gum shoe evidence you didn't

 8    consider in reaching your opinions.  Okay?

 9         Ms. Stephanie Barbour, have you heard of her?

10    A    Yes, sir.

11    Q    You didn't read her deposition in forming your opinion, did

12    you?

13    A    I can't recall if I read her deposition or not.  I

14    certainly have seen references to what she said in -- I don't

15    know if this is the right term -- legal documents in the case.

16         MR. MARTIN:  Todd, could we pull up his deposition,

17    Volume 1, 69, 18 to 22.

18    Q    (Reading) QUESTION:  How about Ms. Barbour, I don't see the

19    deposition of Ms. Barbour on the list.  Did you read any of the

20    depositions of Ms. Barbour?

21         ANSWER:  I don't believe so.

22         Does that help?  Did you read Ms. Barbour's deposition

23    to form your opinion?

24    A    At that point in time I did not believe that I had.  At

25    some point I've read at least excerpts of it because you had

 1    put it in legal documents, or somewhere I read excerpts of her

 2    deposition testimony but I don't believe I read the deposition

 3    itself.

 4    Q    Okay.  Well, this -- I want to find out if it's gum shoe.

 5             (Reading) The jury has heard some of the testimony.

 6    Ms. Barbour testified that Marco Levi, another Dow executive,

 7    made her aware that Mr. Levi and Uwe Harwig of BASF had a

 8    meeting in which they discussed future pricing.

 9             Right here on the board in front of you.

10             And did Mr. Hartwig and Mr. Levi talk about future

11    pricing in the industry at that meeting?

12             Not in front of me.

13             Okay.  And did they talk about future pricing in the

14    industry at a side meeting at the meeting?

15             Did anyone make you aware subsequently that Mr. Levi

16    and Mr. Hartwig had a future pricing conversation at that

17    meeting?

18             Yes.

19             Who was that?

20             Mr. Levi.

21             That's gum shoe evidence?

22    A    Well, yes, it's the type of evidence that I have no

23    particular expertise to analyze as an economist.

24    Q    Okay.  Ms. Barbour went on to testify:

25             (Reading) Mr. Hartwig asked for me to leave the room,

 1    he wanted to have a private conversation with Marco.  And I
 2    left the room.  And Mr. Levi came back out and said, "Uwe would
 3    like to see you now."
 4              And I said, "What about?"
 5              And he said, he would like to discuss pricing.
 6              Gum shoe evidence?
 7    A    Yes, I would consider that gum shoe evidence.  It's sort of
 8    the one person said something, another person said another
 9    thing.  And I don't have the tools as an economist to say, oh,
10    that one person is telling the truth and the other person is
11    not telling the truth, or that's what this conversation means.
12    Q    One more for Ms. Barbour:
13              (Reading) Marco Levi told her.  He said he had met
14    with competition and that there was an agreement, that they
15    were all in a bad situation financially, and that they were
16    going to make sure that these price increases stuck.
17              And did he say which competitors he talked to?
18              Bayer and BASF.
19              You didn't consider that testimony in forming your
20    opinion.  Right?
21    A    Not as an economist, no, sir.
22    Q    Let's talk about Larry Stern.
23              You only considered one of the four volumes created in
24    the deposition of Larry Stern.  Is that right?
25    A    I'll take your representation as accurate, that there were

1    four volumes.  I wasn't sure of that.

2    Q    Okay.  Because you were provided what you were provided by

3    your team.  Correct?

4    A    I've looked at portions of Mr. Stern.  I don't believe I've

5    read all of his testimony, especially if there were four

6    volumes of it.

7    Q    Well, this is from the first volume:

8              (Reading) Did you discuss future pricing?

9              This is Mr. Stern, former executive at Bayer.

10             (Reading) Yes, we did.

11             Did you discuss the possibility of raising prices for

12   urethane products?

13             Yes, we did.

14             Did you discuss prying at any particular customer?

15             I believe we discussed Foamex and Carpenter, although

16   again that's a general belief.

17             You didn't take that testimony into account in forming

18   your opinions, did you?

19   A    No, sir.

20   Q    Another portion of Mr. Stern's deposition involved a

21   conversation at a golf outing with Dow's CEO, Mr. Parker, Mr.

22   Bob Wood from Dow and Dr. Attila Molnar from Bayer.

23             And here's the testimony:

24             (Reading) Did you discuss future pricing?

25             (There is a pause for the Plaintiffs' tech.)

1          MR. MARTIN:  I'll just read it.

2     Q    (Reading) Did you discuss future pricing?

3          Yes, we did.

4          Did you discuss the possibility of raising prices for

5     urethane products?

6          Yes, we did.

7          Did you discuss -- oh, this is the prior one.

8          I apologize.  That was the error.

9          Ms. Blumberg; you didn't read her deposition, isn't

10    that right?  She was a former Bayer executive.

11    A    I don't believe so.

12    Q    You didn't -- let me tell what you Ms. Blumberg testified

13    in her deposition:

14    A    I'm sorry.  She's with Bayer?

15    Q    She was with Bayer and she had a conversation with a Bayer

16    executive named Wolfgang Friedrich.

17         And she was asked:  (Reading) Tell me what Mr.

18    Friedrich told you.

19         And she said:  We were talking about pricing.  He was

20    asking me thousand things were going in the Wood market.  I

21    said pricing was very low from the competition.  And he said,

22    well, you don't have to worry about that, I've already talked

23    to the competition.

24         And I said to him, "Isn't that illegal?"

25         He said, "Not in this country."

1           You didn't rely on that to form your opinion.  Right?

2               MR. BERNICK:  Your Honor, at this point I'd object.

3       There's obviously a demonstrative that's being marked off.

4       It's not reflected in the questions that are being asked of the

5       witness, it's simply an argument to the jury.  It should be

6       taken down.  The one on the left.  That's just a closing

7       argument.

8               THE COURT:  I'm sorry.  It's overruled.  The jury will

9       understand.  It's consistent with the line of questioning that

10      he's asking this witness.

11      A    The answer is yes.

12      BY MR. MARTIN:

13      Q    Okay.  You didn't review the deposition of Ed Dineen, a

14      line executive, in reaching your opinions either, did you?

15      A    I don't believe so, no, sir.

16      Q    So where Mr. Dineen testified about a dinner he had The

17      Swan Restaurant with Jean-Pierre Dhanis -- you read his

18      deposition of BASF -- and Robert Wood.  Do you remember that?

19      You didn't --

20      A    I remember the reference to The Swan Restaurant.

21      Q    Okay.

22      A    That stuck in my mind.

23      Q    During Mr. Dineen's deposition, the following exchange

24      occurred:

25              (Reading) Mr. Dhanis said that the industry as a whole

 1    needed to get prices up.

 2         I believe so, yes, was the answer for, from Mr.

 3    Dhanis.

 4         Mr. Dhanis said that profits were too low?

 5         Mr. Dineen answered yes.

 6         And Mr. Dhanis said to you that if BASF raised prices,

 7    he needed some assurance that BASF would not lose volume.   Is

 8    that accurate?

 9         Mr. Dineen said, yes.

10         You understood Mr. Dhanis to be looking for some

11    assurance that if BASF raised prices, you and Dow would do the

12    same, you would also rise prices?

13         I'm not sure what he was looking for, but what could

14    infer that, was Mr. Dineen's answer.

15         That's the way you understood it?

16         Mr. Dineen said:  Well, I recall being very

17    uncomfortable with the discussion.  I wasn't sure where he was

18    going with it.

19         He was asked:  What was it about this discussion where

20    he's saying that he needs assurances that BASF wouldn't lose

21    volume?  What was it about that that made you uncomfortable?

22         And Mr. Dineen responded:  It's not the type of

23    discussions competitors should be having.

24         You didn't consider that testimony in forming your

25    opinion.  Correct?

1    A    That's correct.

2    Q    You also didn't think it was important for purposes of your

3    investigation to consider evidence that certain executives made

4    phone calls from pay phones or used calling cards, did you?

5    A    Not for the purposes of my analysis.

6    Q    And you didn't read the depositions of individuals like

7    Bill long of Dow, or Bob Lawrence of BASF in which they

8    testified regarding discussions that they had about the

9    urethane industry, that they had with each other and Bayer

10   executives.  Right?

11   A    That's correct.

12   Q    Last question:  If the jury accepts all of that gum shoe

13   evidence, they could have a reason to reach a different

14   conclusion than you did.  Correct?

15             MR. BERNICK:  Objection.  That calls for --

16             THE COURT:  Sustained.  It's argumentative.

17             MR. MARTIN:  No more.

18             THE COURT:  All right.

19             Redirect?

20             MR. BERNICK:  Yes.  We'll need a little bit of time to

21   set up.  If you give us five minutes -- if you just want to

22   wait I can probably stand up and do it.

23             THE COURT:  All right.  We'll take a short break.

24             Ladies and gentlemen, if you would retire to the jury

25   room, we'll take about a 10-minute break, that's all.

```
1              THE DEPUTY CLERK:  Please rise for the Jury.

2              MR. BERNICK:  Can we be seen at sidebar?

3              THE COURT:  Well, the jury will step out.

4              Thank you.

5              (The Jury leaves the courtroom.)

6              THE COURT:  Walter?

7              I guess, do you still want to see me at sidebar?

8              MR. BERNICK:  Just do it here.

9              THE COURT:  Okay.

10             (In open court.)

11             THE WITNESS:  Your Honor, can I take a break?

12             THE COURT:  Sure, go ahead.  Step down for a few

13   minutes.

14             (Witness temporarily excused.)

15             MR. BERNICK:  Your Honor, I just want to say, Mr.

16   Elzinga has to catch a plane a little bit later on and I'll try

17   to move through quickly but some pretty big doors were opened

18   and I think that my redirect is going to go for a little while.

19   I just wanted to alert the Court.

20             THE COURT:  We'll see how long it goes and we'll see

21   how many doors were opened.

22             MR. BERNICK:  I just have to begin with the last

23   one --

24             MR. MARTIN:  I'll tell you, your Honor, you I stayed

25   away from the one we talked about yesterday.
```

 1              MR. BERNICK:  I don't think there's any way that that
 2     is accurate.  But we'll see where it goes.
 3              THE COURT:  All right.
 4              MR. BERNICK:  I'm not going -- I'm not looking to push
 5     any doors open, that's clear.  I'm going to keep myself within
 6     the confines of our discussion yesterday if I possibly can.
 7              THE COURT:  Which one were you referring to yesterday,
 8     just briefly?
 9              MR. MARTIN:  Regarding commenting on the econometric
10     model.  We took the model results out.
11              THE COURT:  Okay.
12              MR. BERNICK:  Well, (a) that is not accurate, and (b),
13     we still have this problem where he's now gotten into the
14     conspiracy and all the rest of that, this gets back to
15     attribution.  I'll be very brief about that, but that is
16     clearly on the table and it's in my supplemental report.  But
17     rather than anticipate, your Honor, I just want to say I'm
18     going to take a little bit of time, I thought you would
19     probably want to know that.
20              THE COURT:  All right.  Fine.  Set up.  And this will
21     be a short break.
22              (A recess is taken.)
23              (Proceedings resume - Jury not present.)
24
25

```
 1    K E N N E T H   G.   E L Z I N G A, resumes, testifies further
 2         as follows:
 3
 4              THE DEPUTY CLERK:  Please remain seated.
 5              THE COURT:  Wait, wait, wait, wait.  Gail, wait.
 6              Both counsel, redirect is limited to what was said.  I
 7    know you said you think a lot of doors were opened.  But
 8    just -- I'm not going to get into lengthy arguments here in
 9    front of the jury.  So just be careful, that's all.  Okay?
10              MR. BERNICK:  I will religiously stick to it.
11              THE COURT:  We're not going through another whole
12    reexamination of Dr. Elzinga.  Okay?
13              You can argue all you want as to what doors were
14    opened, I'll hear you.  But we'll see.
15              MR. BERNICK:  It will be completely confined to what
16    he did --
17              THE COURT:  We'll see.
18              Your version of confined and mine may be different,
19    that's all.
20              MR. BERNICK:  I hope not.
21              THE COURT:  Me too.
22              MR. BERNICK:  The intent is not to do that.
23              THE COURT:  I know that.
24              MR. BERNICK:  But it's really a question of time.
25              THE COURT:  I understand.
```

 1          MR. BERNICK:  Maybe I shouldn't have said "door
 2   opening," maybe I should have said, whoa, that was a long
 3   cross-examination.
 4          THE COURT:  We're not running a truck through the
 5   door.
 6          MR. BERNICK:  No trucks.  We need to get Dr. Elzinga
 7   out of here.
 8          THE COURT:  Okay.
 9          THE WITNESS:  Your Honor, I'm on your side.
10          MR. BERNICK:  What did he say?
11          THE WITNESS:  I said, I'm on Judge Martini's side.
12          THE DEPUTY CLERK:  Bring out the jury?
13          Please rise for jury.
14          (Jury present.)
15          THE COURT:  All right.  Be seated.  Thank you.
16                    REDIRECT EXAMINATION
17   BY MR. BERNICK:
18   Q   Good morning, Dr. Elzinga.
19   A   Good morning.
20          MR. BERNICK:  Good morning, ladies and gentlemen.
21   Q   So I want to begin kind of where things ended, Dr. Elzinga.
22          MR. BERNICK:  And if we could have the plaintiffs' big
23   Xs on the screen.
24          (Mr. Bernick confers with if tech off the record.)
25   Q   Counsel had you go through gum shoe evidence that you

1    didn't consider.  And for the sake of completeness I would like
2    to cover a couple of these things and find out whether you also
3    didn't look at certain gum shoe evidence.
4             So if we take Ms. Blumberg, for example, you saw
5    testimony regarding a conversation that she had with somebody
6    else at Bayer where he made some statement to the effect:  You
7    know, things are different here in Germany.
8             Do you recall that?
9    A    Yeah.  I don't recall if it was specifically Germany, it
10   said "in this country."  I guess it would have been Germany for
11   Bayer.
12   Q    And you said you didn't see it I believe.  That you had not
13   seen that testimony?
14   A    Until it was shown on the screen.
15   Q    Yes.  But you had not seen that previously?
16   A    I don't believe so, no.
17   Q    And again, that's gum shoe evidence?
18   A    Yes.
19   Q    Okay.
20   A    In my characterization, yes, it is.
21   Q    Let me ask you whether you saw something else.  Ms.
22   Blumberg testified that the conversation had no affect on her
23   own conduct with respect to prices for an account at Huber.
24   Did you read that testimony?
25   A    No, sir.

 1   Q   He showed you Mr. Dineen, and he said:  Were you familiar
 2   with the fact that there was a dinner where Mr. Dhanis made
 3   certain statements to Mr. Dineen, and you said no.  Right?
 4   A   That's correct, unless that's the dinner.  I remember
 5   reading somewhere about a dinner The Swan Restaurant.
 6   Q   Is it also true, tell us whether or not you saw Mr.
 7   Dineen's own declaration, own declaration that he was
 8   uncomfortable with that, that he had a subsequent conversation
 9   with Mr. Wood who also was uncomfortable, and the dinner had no
10   impact on price increase announcements coming from Lyondell?
11              MR. MARTIN:  Your Honor.
12   Q   Did you review that either?
13              MR. MARTIN:  I object.  That mischaracterizes the
14   evidence.
15              MR. BERNICK:  I'd be happy to show it.
16              THE COURT:  Overruled at this point.
17              I trust counsel is accurately representing the --
18              MR. BERNICK:  That's at DX-5891.  I'm happy to show
19   it, your Honor.
20              THE COURT:  Go ahead if you need to.  I've overruled
21   objection for now.  But if you start to quote too much
22   testimony we'll see what it is.
23              MR. BERNICK:  That's fine.  And Blumberg was at page
24   110 and 111 of this trial.
25   Q   Let's take Mr. Stern.  There were questions that were asked

1   whether you were familiar with the fact that Mr. Stern used a
2   pay phone.  Do you remember that?
3   A    Yes.
4   Q    You were asked whether you were familiar with Mr. Stern's
5   testimony about things that were said on a golf course.  Do you
6   remember that?
7   A    Yes.
8   Q    Okay.  Did you also review Mr. Stern's testimony in this
9   case that he entered into no agreement to fix prices?  This is
10  at page 216, between lines 5 and 15.
11  A    All I can say, Mr. Bernick, is I remember reading somewhere
12  that Mr. Stern said there was no agreement.  Again, that's the
13  type of language that I don't use in my analytical framework
14  and research as an economist.
15  Q    We have the testimony:  (Reading) Did you ever agree with a
16  competitor to fix prices for MDI?
17            No, sir.
18            Did you ever agree to fix prices with any competitor
19  for systems?
20            No, sir.
21            The latter is not actually involved in this case.
22            Again, this is now evidence that might be against the
23  cartel, but you didn't consider that either.  Would that be
24  fair?
25  A    That's correct.

 1    Q    There were questions about Ms. Barbour and statements that
 2    she testified to about a meeting at a hotel -- or excuse me --
 3    at an airport with Mr. Hartwig.  Do you recall that?
 4    A    Yes.
 5    Q    That he asked you about it.
 6    A    Yes?
 7    Q    Again, did you consider the other gum shoe evidence which
 8    says that Ms. Barbour during the course -- according to Mr.
 9    Schefsky, Ms. Barbour during the course of her work at Dow
10    never told her own in-house lawyer about any of these things
11    when she was there.  Did you read that?
12              MR. MARTIN:  Objection, again, that mischaracterizes
13    the evidence.
14              MR. BERNICK:  This is at page 53 -- I'm sorry, that's
15    fine.
16              THE COURT:  I'll allow it.  Go ahead.
17    Q    Did you read that evidence which tended to suggest that she
18    was wrong?
19    A    I don't remember reading that, but if I did it's not part
20    of the way I as an economist assess allegations.  If it's a
21    spitting match, he said/she said, I just don't have the tools
22    or the principles to sort that out.  I take a different
23    approach in my analysis.
24    Q    That's just -- neither the pros or the cons of that kind of
25    evidence --

1    A    That's correct.

2    Q    -- are relevant to you?

3           MR. MARTIN:  Your Honor, I think he's explained this

4    like nine times.

5           THE COURT:  All right.  That's it, go ahead to a new

6    subject.

7           MR. BERNICK:  I'd be happy to.  That's fine.

8    Q    I want to ask a little bit about competition.  Again, you

9    were asked about whether you or your people looked at documents

10   relating to competition -- I'm sorry -- whether you also looked

11   at documents or you asked them to look for documents that

12   showed no competition.  Do you recall that?

13   A    That's correct.

14   Q    And you were shown this question.  This is at page 80 of

15   his deposition.

16          MR. BERNICK:  If we could show that.

17          MR. JOHNSON:  Which deposition?

18          MR. BERNICK:  Mr. Elzinga's deposition.  It was the

19   one that was shown by plaintiffs, and it was not -- page 80.

20          And this would be at line 3 of page 80.  Yes.

21          I want you to go all the way down to the middle of the

22   page.

23   Q    And this I believe is the portion --

24          MR. BERNICK:  If you could blow that up.

25   Q    -- of your answer that was actually shown to the jury.

 1          MR. BERNICK:  If you could blow that up.

 2          Thanks.

 3  BY MR. BERNICK:

 4  Q   It says:  "Did you -- did you want to look for documents

 5  that suggested that there was not competition among these

 6  defendants for customers?"

 7          And your answer was:  "Not for the purpose of this

 8  appendix, no."

 9          Let me just ask right there:  Did you tell your team

10  to avoid looking for those documents?

11  A   No, I did not.  I go into this kind of like testing a

12  hypothesis or an allegation.  The allegation is, the game is

13  rigged, prices are fixed.  And so I said, well, let's look at

14  the corporate documents and see if there's evidence that

15  they're not fixed.

16          That was what was -- that part in my assignment.  I

17  wasn't trying to hide something or mask anything, it's just

18  that there was an allegation that the game was rigged, there

19  was a cartel.

20          So I said, well, is there evidence that there's not a

21  cartel?  Let's look at business documents of people in the

22  trenches and see how they're communicating with each other.

23  Q   If we go down, you'll see the line 14 and 15 there's a

24  couple dashes, and Mr. Martin invited me to show the rest of

25  it, so I'll take him up on that.

 1              Let's take a look at the he rest of your answer
 2      beginning at 17 down to 25.
 3              (Reading) Not as I understand your question.  For
 4      purposes of my analysis, I'm trying to examine a hypothesis
 5      that there's a cartel operating in this industry or in these
 6      markets, and to try and understand the validity of that
 7      hypothesis to test that hypothesis as it were, I wanted to look
 8      at documents that were contrary to that hypothesis, to see
 9      whether the evidence indicated that the hypothesis that the
10      plaintiffs have put forward -- and there's a small spillover --
11      about how a cartel is operating, whether that's a valid
12      hypothesis or not.
13              And then there's an interjection, and it continues on:
14              One way of test ago hypothesis is to see what evidence
15      there is that's inconsistent with that hypothesis.
16              Is that consistent or inconsistent with what you've
17      now described to the jury as the approach that you took?
18      A    It's the same thing.
19      Q    Thank you.
20              I want to go back for a moment to the testimony that
21      you gave the first thing this morning with regard to --
22              MR. BERNICK:   In fact, if I could just -- can I get
23      just a small board?
24              (Mr. Bernick confers with the tech off the record.)
25      Q    With respect to a hypothetical that Mr. Martin gave you to

 1        answer.  And if I get this right -- and it came out a couple of
 2        different times so it may not be exact.  I'm sure we'll get
 3        clarification.

 4             But I think he asked you to assume -- I'm vertically
 5        challenged -- so we had a price, the price increase
 6        announcements, and the hypothetical said:  I want you to assume
 7        that there's a videotape in a room and it captures a hundred
 8        percent that there's an agreement to increase price increase
 9        announcements, or to make price increase announcements for the
10        same price and then try to make them work.

11             You remember that?

12        A    Yes.

13        Q    And the hypothetical was that the announcement would be --
14        you have an existing price, and the announcement would say:
15        Let's take it up $.06.  And again, the videotape is running for
16        this agreement.  Video agreement (writing on board.)

17             And he said, I want you to further assume that when
18        the dust all settles it comes in -- and this is just for one
19        customer, we'll call it customer A who let's say has an
20        existing price of $.80 a pound.  So when the dust all settles
21        it comes in at plus 3 rather than 6, which would mean a total
22        price of $.83.

23             Do you remember that he didn't ask about the $.80, but
24        remember the hypothetical was, announce for 6, comes in at 3?

25        A    Yes, sir.

 1    Q    Okay.  And I think the first question that he asked you --
 2    I want to distinguish between two questions -- the first
 3    question that he asked you is:  I want you to assume -- or he
 4    asked you whether, if this happened, this wouldn't -- wouldn't
 5    this be greater than what the price would have been absent the
 6    agreement?
 7         Do you remember that?
 8    A    Yes.
 9    Q    Okay.  Now, we got to cheating in a minute.  We'll get to
10    that in a minute.  But just with respect to this:  Is the
11    $.03 -- even if you assume the videotaped agreement -- is the
12    3 -- figure out whether the $.03 more is greater than the price
13    would have been absent an agreement, how do you go about as an
14    economist figuring out the answer to that question?
15    A    Well, I'll respond at two different levels.  If the
16    question that Mr. Martin is asking me is:  If you're trying to
17    get a six-cent price increase and you only get a three-cent
18    price increase and you wouldn't have gotten any price increase
19    otherwise, are you better off?  And the answer is yes, that's
20    true as a matter of arithmetic.
21         What I'm unclear on in this hypothetical is whether
22    the $.80 is the competitive price and whether it would have
23    changed or not.  Because it may be an oligopoly that that 6
24    percent price increase was a view on the part of sellers that
25    the market was strong and might be ready for a price increase.

 1    But the sellers may have misunderstood how strong the market
 2    was or how much buyer resistance there would be from their
 3    customers, and so then the negotiations begin.  And the
 4    negotiations end up at $.03.  And that for all I know could
 5    have been the market price.
 6    Q    Right.
 7         So if you want to know whether the $.83 or the $.03
 8    plus is greater than the price would have been, you've got to
 9    look at the market.  Would that be fair?
10    A    That's correct.
11    Q    And, in fact, have you done precisely that during the
12    course of your work; that is, examine the market?
13    A    I have done an analysis of how negotiations take place
14    between buyers and sellers, yes, sir.
15    Q    Okay.  Now, he then asked questions about cheating.  Do you
16    remember that?
17    A    Yes.
18    Q    Suggesting that, well, if the negotiations worked -- or if
19    the price ended up three, he said, well, couldn't that also be,
20    given the fact that there is this videotape, couldn't that also
21    be simply cheating?  And he referred to your testimony
22    yesterday that says:  All cartels are imperfect and there's
23    cheating.
24         Do you remember that?
25    A    Yes, sir.

 1    Q    Okay.  If the market price, if you look at the market
 2    conditions and the negotiation and $.03 really is the new
 3    market price, how do you know that the market price didn't
 4    simply represent -- yes, it's the market price, but how do you
 5    know that that still is consistent with an agreement, it just
 6    means that they were cheating?
 7              MR. MARTIN:  This is no longer my hypothetical.
 8              MR. BERNICK:  That's the whole point.  It is directly
 9    responsive --
10              THE COURT:  Overruled.  Overruled.
11              MR. MARTIN:  Okay.
12    Q    So you're assuming that the market price, that you looked
13    at it and $.03 extra is the market price, and this question
14    then becomes:  Well, couldn't that still be cheating?  Remember
15    he asked you that question?
16              What do you say to that?
17    A    Well, it's not cheating if it's a result of negotiations
18    between the buyers and the sellers, because that's what happens
19    in competition.  When it's cheating is when they had agreed to
20    go up to a certain level and the cartel has a cheater problem,
21    and as an economist I want to know, well, if there's a cheater
22    problem there has to be some way that you know people are
23    cheating, otherwise cheating is -- I don't know what it is.  If
24    you don't know what cheating means, so there's got to be some
25    way of looking and seeing what the cheating is.  And because

 1    cartels can unravel because of that cheating, cartels that are

 2    affected have some method, not just of monitoring the cheating

 3    price, but to somehow thwart it or deter it.

 4    Q    Now this then gets to another question that I want to ask

 5    you and I'm going to come back to your point here.

 6            But I showed the jury in opening --

 7            MR. BERNICK:  If we can show Slides 5 and 6, beginning

 8    with 5.

 9    Q    And just very briefly, I think it's fairly

10    self-explanatory, we have the price increase announcements

11    which we assume to be $.06, and there are four suppliers who

12    have it; we have a series of existing prices; we have some

13    proposed new prices which are simply the sums; and we have the

14    actual new prices.

15            If you look at that for a minute.

16            MR. MARTIN:  Your Honor, I object, this is beyond the

17    scope, something we didn't go into.

18            THE COURT:  No, I'll allow it.

19            Let's see where you go.  Go ahead.

20            MR. BERNICK:  All right.

21    A    I'm sorry.  These are the lawyers' pictures?

22    Q    Yes, I used them -- I think it was just a way of kind of

23    getting people's interest, but we used them to stand for the

24    different suppliers.

25    A    Okay.  And I'm sorry, I'm not sure what your question is.

1    Q    My question is:  If we go back -- well, the point is this:
2    We've got the price increase announcements, and under your
3    hypothetical it's $.06.  I'll just ask you the question:  Would
4    a $.06 price increase in a market where there are existing
5    prices that are different, would that or would that not produce
6    different proposed prices?
7    A    Oh, I see.
8              MR. MARTIN:  Now I'm going to object.  There's also no
9    foundation.  We're talking about opening arguments.
10             THE COURT:  Okay.  This is the last question along
11   this line.
12             Go ahead.  Can you answer that?
13   A    Yes, it would produce different prices because the price
14   increase announcement is the same, $.06, and they start with
15   different existing prices.  So as a matter of arithmetic the
16   proposed new prices would differ.
17   Q    Okay.  Take it down.
18             Now my question is:  Are you aware -- so, in essence,
19   depending upon where the prices start, the actual prices being
20   proposed and reached are different.  Would that be fair?
21   Foundational.
22   A    Yes, in this instance that would be true.
23   Q    Now, monitoring.  You talked about monitoring.
24             Are you aware of any device that's been pointed out to
25   you in this case where the suppliers actually learned of the

 1    final prices that were negotiated by their competitors for
 2    given customers?
 3              MR. MARTIN:  Your Honor, it exceeds the scope again,
 4    now we're talking about monitoring.  There was no monitoring in
 5    my examination.
 6              THE COURT:  I don't recall any discussion of
 7    monitoring on cross-examination.
 8              MR. BERNICK:  Your Honor, I took him down the road of
 9    saying --
10              THE COURT:  No, no.
11              MR. BERNICK:  -- this hypothetical and whether it's
12    cheating, and he said just now five minutes ago --
13              THE COURT:  He might have said that right now.
14              MR. BERNICK:  Yeah.
15              THE COURT:  I don't recall any discussion of
16    monitoring on the cross-examination.
17              MR. BERNICK:  That's because the hypothetical was
18    incomplete.  So all I pointed out --
19              THE COURT:  Get to the point then.
20              MR. BERNICK:  Okay.
21    BY MR. BERNICK:
22    Q    So, did you see any mechanism in your work on this case
23    whereby the different suppliers could, in fact, monitor the
24    actual prices being charged to customers?
25    A    No, sir.

 1    Q    And absent that monitoring would you have a basis, based
 2    upon your understanding of economics, for saying that there
 3    could be an effective cartel?
 4    A    If you don't have monitoring, you don't know how to even
 5    deter cheating.  So the answer would be yes, you would not have
 6    an effective cartel without monitoring and some mechanism of
 7    preventing cheating.  I think Dr. Marx and I are both in
 8    agreement on that.
 9    Q    Okay.  I now want to pursue OPEC and ask you some questions
10    about OPEC.
11         So this is one hypothetical.  When you talk about
12    cheating and monitoring, are those not characteristics of a
13    cartel?
14    A    They are the characteristics of a cartel.  As I indicated,
15    a cartel has a cheater problem.  To solve it you have to start
16    by monitoring what the prices being charged are to see if the
17    agreement of the cartel is being maintained or not, and then if
18    it's not, you have to have some kind of mechanism to try and
19    penalize or thwart the cheater.
20         MR. MARTIN:  Your Honor, I only have one question.  I
21    mean, this is well beyond the scope again.
22         THE COURT:  Okay, go ahead.
23         MR. BERNICK:  I'm going to another --
24         THE COURT:  Doctor, I have a question.  I think --
25    when you talk about cheating, you're talking about the

1    suppliers hypothetically who have made an agreement,

2    hypothetically, if the suppliers agreed that on a specific date

3    they were going to increase prices to a certain agreed upon

4    amount, and then after that they make the announcement, whether

5    or not there's monitoring, to see if they cheated.  In most

6    situations you're not going to have the monitoring.  Isn't that

7    correct?

8              THE WITNESS:  No, in most cartels there is a way of

9    monitoring.

10             THE COURT:  Well, what was the way of monitoring?

11             THE WITNESS:  Well, I'll give you an example of a

12   market that's most susceptible to cartelization, and that's a

13   sealed bid.  So there's going to be a bunch of bids to repair

14   some roads in New Jersey, and some contractors bid on that, but

15   they've agreed beforehand that they're going to be in a cartel,

16   and one particular contractor is going to get the bid this

17   time, and all the others are going to submit fictitious high

18   bids.  So then it comes to a time, and typically in these types

19   of contracts the bids not only have to be opened but

20   revealed --

21             THE COURT:  But that's part of their initial

22   agreement.  In other words, part of their agreement is they're

23   going to agree to the bidding process.  That's in a bidding

24   context.

25             THE WITNESS:  But they have a way of monitoring as

 1    well through the way the bids are opened.

 2             THE COURT:  Oh, the way the bids are opened.  One is

 3    going to be a better bid and the others are going to be higher.

 4             THE WITNESS:  Exactly.  So if someone cheats, you're

 5    aware of it.

 6             THE COURT:  But they've agreed on that, but they

 7    agreed on how they're going to do the bidding.

 8             This is not a bidding context.  This is not a bidding

 9    context.

10             MR. BERNICK:  Well --

11             THE COURT:  And I guess I don't want to get too long.

12    But when I hear about monitoring and cheating, if the parties

13    agreed hypothetically to do the act of raising the prices,

14    subsequent there could be negotiations -- we've -- all of this

15    testimony by both sides -- subsequently there are negotiations,

16    there might be rebates and the prices may all be different

17    amongst the different purchasers.

18             THE WITNESS:  That's correct.

19             THE COURT:  But if the negotiations began with a price

20    that the parties thought they could maintain, does that destroy

21    the cartel?

22             THE WITNESS:  Well, it certainly weakens the cartel if

23    the cartel can't monitor what those transaction prices are, and

24    if they learn that there's a cheater, try and penalize the

25    cheater.  That's why in sealed bid cartels it's much easier to

 1    do that.

 2            THE COURT:  Let's not confuse -- there's a totally --

 3    sealed bids context is very different than an open marketplace.

 4            MR. BERNICK:  Well --

 5            THE COURT:  So let's not confuse it with that

 6    analysis, okay, with that analogy.

 7            No, I just -- when you talk about monitoring and

 8    cheating --

 9            MR. BERNICK:  Maybe I can ask a question.

10            THE COURT:  -- does it destroy the whole cartel?

11            THE WITNESS:  No, it doesn't destroy it.  It makes it

12    harder --

13            THE COURT:  It makes it less effective?

14            THE WITNESS:  Yes.

15            THE COURT:  Go ahead.

16            MR. BERNICK:  And with respect to closed bid,

17    understanding --

18            THE COURT:  I don't want to get into closed bids

19    because I don't want to confuse the jury.  We can get into a

20    whole thing about what closed bids mean.  Let's not do that.

21            MR. BERNICK:  I won't use the word --

22            THE COURT:  He offered that.  I didn't get into closed

23    bids.

24            And, by the way, ladies and gentlemen, when I ask a

25    question it's no different than if the lawyers ask a question,

 1    so don't give it any more weight.  But sometimes if I feel
 2    there is an issue that could be better amplified or better
 3    elaborated on I have a right to do that.  But again, if you
 4    don't agree with the answers to those questions or even my
 5    questions, please disregard them.  Okay?
 6    BY MR. BERNICK:
 7    Q    The proposed prices, $.86.  If you had a price increase and
 8    an existing price, the proposed price to any individual
 9    customer, is that public or not?
10    A    Only the announcement is public here.  The transaction
11    price is not public.
12    Q    The proposed price to an individual customer -- just
13    proposed not the actual -- is that known publicly?
14    A    No, only the announcement is.  The amount of the
15    announcement.  You don't know publicly what the existing price
16    was to which the price increase announcement will be added.
17    Q    Now, where you have the situation, you have these proposed
18    bids -- not bids -- proposed prices and the actual prices --
19    and I think you said yesterday these are private.  In your
20    view, Dr. Elzinga, is there any way that there can be an
21    effective cartel, one that works if you don't have monitoring?
22              MR. MARTIN:  Objection.  We're now leading too.
23              MR. BERNICK:  No.
24              THE COURT:  Yeah, we are.  And I think he's answered
25    that question.

 1            MR. BERNICK:  Well, I think that this now is --
 2            THE COURT:  I know.  But it was leading so I'm going
 3       to sustain the objection.
 4       BY MR. BERNICK:
 5       Q   Tell us whether or not, just what your view is about
 6       whether or not there can be -- whether there can be an
 7       effective cartel without monitoring.
 8            THE COURT:  He answered that.
 9            MR. MARTIN:  Yeah.
10            THE COURT:  He answered that when I asked those
11       questions.  He said it makes it less effective in the cartel.
12       It doesn't mean the cartel may not be there.
13            Am I right, Doctor?
14            THE WITNESS:  That's correct.
15       BY MR. BERNICK:
16       Q   But an effective --
17            THE COURT:  I thought I heard that answer.
18            MR. BERNICK:  I guess it comes out to -- I'll pursue
19       it a different way.  I won't go back over it.
20            THE COURT:  I purposely asked those questions to try
21       to just see -- I have questions in my mind -- whether or not it
22       destroys the whole cartel or just makes it less effective.
23            MR. BERNICK:  Okay.
24            THE COURT:  I don't want to get into it anymore.
25            MR. BERNICK:  I'm not going to get into it, I promise,

 1    I'm not going to get into it.

 2    BY MR. BERNICK:

 3    Q    Now, did you have the opportunity -- we talked about a

 4    hypothetical -- did you have the opportunity in your work to

 5    observe over the entire 10-year period of the alleged

 6    conspiracy, to observe not just one transaction, but a number

 7    of transactions?

 8    A    I did, yes, sir.

 9    Q    Okay.  And I'd like to begin with OPEC for just a moment

10    here.

11         So, on OPEC I believe that you were shown

12    demonstrative -- Elzinga Demonstrative Number 33.  Do you

13    recall that?

14    A    Yes, sir.

15    Q    And I believe that counsel asked you whether that --

16    whether -- I think the questioning went along the lines of your

17    testimony was that prices were flat rather than being raised.

18    The question was:  Well, isn't that true of OPEC?  And he

19    showed you a portion of one of your charts that showed crude

20    petroleum PPI going back to 1990.  Do you recall that?

21    A    Yes, sir.

22    Q    And there was some examination that took place, and I want

23    to bring up the February 14 deposition at page 259 on the other

24    screen.

25         I'm going to use this in a minute here.

 1            MR. BERNICK:  You know what, Josh, I don't want to

 2    deal with that, just put it on the ELMO, on the left side.

 3    Q    There was some focus on this testimony that you gave with a

 4    long answer:  (Reading) Does OPEC make an excellent example of

 5    a cartel?

 6            And the answer is:  It's been a long time since I

 7    studied a cartel.

 8            Then you go way down, and I want to show you a portion

 9    of your answer relating to this chart.

10            And that is, where:  "I mean if you look at a price

11    that's already been escalated because of OPEC, I mean, when did

12    OPEC start?  In the 1970s I think?

13            And the answer was, uh-huh.

14            And I don't know that this was ever shown to the jury.

15

16            ANSWER:  So it may be flat because it's already

17    escalated.  But if you go back to the formation of OPEC, you

18    did not find that the cartel started and prices were flat.

19    They jumped up.

20            Do you remember that?

21    A    Yes, sir.

22            MR. BERNICK:  The jury can read the rest of the answer

23    as desirable.

24            MR. MARTIN:  Your Honor, that was actually shown to

25    him.

1          MR. BERNICK:  I don't think it actually it was, but in

2     any event --

3          THE COURT:  All right, all right.

4     Q    So I now want to go back to --

5          (Mr. Bernick confers with the tech off the record.)

6          MR. BERNICK:  I'm go back to this which is

7     Demonstrative 30.

8     Q    And this was the one that was shown, and the left side of

9     this chart is January 1990.  You see that?

10    A    Yes, sir.

11    Q    Now, OPEC started when?

12    A    Some time in the '70s.  I think it was 1974.

13    Q    We wanted to show what happened at the beginning of the

14    OPEC cartel -- and I just want to make a note here or a kind

15    of -- would we have seen this go all the way back before OPEC,

16    or would we see that when OPEC started there was a jump?

17    A    Oh, when OPEC started there was a real price shock in crude

18    oil.

19    Q    Now, if we take a look at this case, this case -- and I

20    want to show you now Demonstrative 13 -- Elzinga Demonstrative

21    13, which is not the clearest thing in the world but it's

22    okay -- and we can see where this particular alleged conspiracy

23    began, we go back to January 1994.

24         Now, just tell us whether or not you have observed in

25    your charts a cartel that jumps up and then continues for 10

```
 1   years like OPEC did for 30.
 2   A    No.  As indicated, prices that are reflected here are flat.
 3   Q    Now, did you also consider the possibility that while the
 4   prices were flat, but for the -- but for the alleged
 5   conspiracy, they would have gone the other way, which is down,
 6   and then back up?
 7   A    Yes, I did.
 8              MR. MARTIN:  Your Honor, wasn't this his initial
 9   testimony?
10              THE COURT:  Yeah.  We're getting far beyond the --
11              MR. BERNICK:  Your Honor --
12              THE COURT:  -- cross.  We're not going to repeat
13   everything that happened on cross.  Okay?
14              MR. BERNICK:  I understand that.
15              THE COURT:  On redirect -- on direct rather.
16              MR. BERNICK:  I understand.  I've got his
17   cross-examination which says:  "In those situations, those
18   desperation cartels, those cartels form to keep prices from
19   falling further than they would have if there was an
20   unrestrained competition."
21              And the answer was, yes.
22              And all I'm trying to do is to connect up one
23   question.
24              THE COURT:  Go ahead.
25   BY MR. BERNICK:
```

1    Q    Did you specifically consider the possibility of a

2    defensive, a desperation cartel which if it didn't happen would

3    have produced prices like that?  Did you consider that and

4    study that?

5    A    Yes, I did.  That was the purpose of looking at what

6    happened to overall demand and overall costs.

7              MR. MARTIN:  There's no foundation for -- that's what

8    prices would have been.

9              THE COURT:  All right.

10             MR. BERNICK:  That's what your own expert says.

11             THE COURT:  I understood the question.  Go ahead.

12             MR. BERNICK:  Your Honor, in all fairness -- I'll just

13   go ahead.

14             THE COURT:  Go ahead.

15   BY MR. BERNICK:

16   Q    So, now is that -- when you talk about that analysis, was

17   that what you reviewed yesterday when you talked about actual

18   prices and costs and demand factors?

19   A    Yes, sir.

20   Q    And what was your conclusion?  Was there that kind of

21   cartel?

22   A    My conclusion, based on the demand and cost analysis that I

23   did, was that the evidence of prices was inconsistent with the

24   operation of a cartel in urethanes.

25   Q    Now I want to get to a particular -- a series of particular

 1      questions.  First of all, there were questions that were asked

 2      about, by Mr. Martin, concerning your analysis of demand.  Do

 3      you remember that?  He asked you about sofas and cushions and

 4      stuff like that and whether those were demand factors.

 5      A    Yes.

 6      Q    I want to show you Demonstrative Exhibit 15, which was the

 7      demonstrative that showed how you looked at demand.  Okay?

 8           Does this reflect how you looked at demand?

 9      A    Yes, this reflects the changes in volume over time of MDI,

10      TDI and polyol.

11      Q    Now, let's deal with consumers and consumer demand, which

12      are the sofas, the cars that Mr. Martin asked you about.  And

13      then let's deal with wholesale or factory demand from the

14      customers in this case.

15           Who are Dow's -- were Dow's customers?  We'll call

16      them, what, wholesale or factory demand?  What is that?

17      A    The foamers?

18      Q    Yeah.  What kind of demand would that be as opposed to

19      consumer demand.  Is there a name for it?

20      A    Well, the term we use in economists is derived demand.  So

21      if you and I want to buy a refrigerator -- and refrigerators

22      have a lot of this product in it, surprisingly large amount --

23      the demand backwards is derived from our demand for a

24      refrigerator.

25      Q    Okay.  So we'll call it the derived demand.  What we're

 1    talking about is not sofas or tank cars, it's rail cars of the
 2    chemical "soup."  Right?
 3         Now, which did you choose to use for purposes of your
 4    chart?
 5    A    I'm looking at the volume of the MDI, the TDI and the
 6    polyol, I'm not looking at the number of refrigerators and
 7    shoes and cushions.
 8    Q    Okay.
 9    A    But the two are obviously linked in the sense that one is
10    derived from the other.
11    Q    Ways the demand that the individual supplier sees
12    immediately and everyday in prices?
13    A    Well, the supplier immediately, if that's the right term,
14    sees its own customers as reflecting demand.  Those customers
15    have behind it the people who are demanding the ultimate
16    products.
17    Q    Okay.  In order to find out the scope of this demand as a
18    whole, do you have to go through all the details of all the
19    different kinds of consumer products, or do you have a
20    different approach?
21    A    Well, I can't really testify to Dr. Raiff's approach.  My
22    understanding from what's been said is he was looking at
23    refrigerators and sofas.  I'm looking at what the major
24    producers of urethanes are selling to their customers, which is
25    MDI, TDI and polyol, and looking here at what happened to the

1    demand for those products over time.

2    Q    Okay.  There's a related question I want to make sure that

3    we get clarity on.  Are you looking in this chart at the total

4    demand for the suppliers, or is it U.S. based demand for

5    suppliers?

6    A    This is U.S.

7    Q    So you didn't factor in the other -- of the other customers

8    who were making demands on the same suppliers' capacity?

9              MR. MARTIN:  Objection.  Leading.

10   A    I'm not sure I understand your question.

11   Q    Yeah.  We're talking about the total demand on the

12   suppliers' capacity.  They could be seeing demand from the U.S.

13   or they may be able to see demand from other countries.  That's

14   all I'm asking about, whether you considered that.

15   A    Yeah, there is some export business for American producers.

16   Q    Okay.  Now, based upon this approach here; that is, you're

17   now looking for demand, we talked about two scenarios, one was

18   the OPEC type approach, the other was the desperation.  We've

19   dealt with those.  I now want to go to a third type of analysis

20   or type of inquiry which is what Mr. Martin pursued in his

21   examination.

22              So, let's now go back to a more micro view.  This was

23   kind of macro.  You dealt with the whole period of the

24   conspiracy, is it up, is it under.  Let's talk about more

25   detail -- a more detailed focus on the bumps and the dips.

1           Because I think he asked you a bunch of questions

2    about bumps and dips.  You remember that?  He asked you for --

3    A    I don't remember questions about bumps and dips, I'm sorry.

4    Q    What happened -- well, you say that the prices were

5    essentially -- essentially flat, they went up and down but

6    they're kind of started and they ended at the same place.

7    Would that be fair?

8                MR. MARTIN:  Your Honor, this is leading.

9                MR. BERNICK:  I'm trying to create a foundation.

10               THE COURT:  Go ahead.

11   A    I think I was the one who mentioned there were bumps and

12   dips, but as I looked at this it was essentially flat during

13   the cartel allegation period.

14   Q    But there are bumps and dips.  Right?

15   A    Yes, they're obvious on the chart.

16   Q    And this is TDI, and lo and behold TDI goes up, it comes

17   down, it flattens out.  It then --

18               THE COURT:  Mr. Bernick, there are shorter ways to get

19   to the point.  This is redirect.

20               MR. BERNICK:  Well, I understand that.

21               THE COURT:  This is not a full analysis with

22   everything.  Okay?  Get to the points.

23               MR. BERNICK:  I've got two graphics that deal with the

24   whole thing.

25               THE COURT:  I'm saying to you, get to the points.

1    This is not a full representation of everything the Doctor

2    testified to.

3              MR. BERNICK:  I understand, Judge.

4              THE COURT:  Go ahead.

5    BY MR. BERNICK:

6    Q   So you were shown this graphic, Plaintiffs' Exhibit 1413,

7    page 3.  And this was again the whole 10 years.  Right?

8    A   Yes, sir.

9    Q   And Mr. Martin picked out a total of three price increase

10   announcements.  One was October, the other was -- I think it

11   was April -- October '94 -- October '94 and then April '95, and

12   the last one was in July.  You remember that?

13   A   Yes, sir.

14   Q   I think that we -- you were then shown at the same time on

15   the left side your own chart, and we went through MDI

16   yesterday, that's this one here.  And remember I asked you

17   about how prices seemed to rise in this same period of time?

18   We talked about that.

19   A   Yes, sir.

20   Q   Okay.  And he points out that there are these price

21   increase announcements.

22             MR. BERNICK:  If we could put that up -- well, this is

23   good enough.

24   Q   Now, just as we talked about here where you talked about

25   the fact, if you end up partway you have to ask the question:

1    Is it greater than what the price would have been absent the
2    agreement?  Do you recall that?
3    A   Yes, sir.
4    Q   Okay.  Now, could you take a look at this trend during this
5    period of time for these first two increases.  What is the
6    overall trend that you see during this period from '94 through
7    '95?
8    A   I'm sorry, I can't see the dates down below so I'm not
9    sure --
10   Q   This is '94, and this is October '95.
11   A   Could you slide it up just a little bit so I can see the
12   dates on my screen?
13   Q   Sure.  I told you before.
14       What's the overall trend during this period?
15   A   Thank you.
16       And the period again is?
17   Q   From here to here (indicating).
18   A   The overall price trend?
19   Q   Yes.
20   A   I would say generally up but with a lot of ups and downs.
21   Q   And we can put a line through this just like I did
22   yesterday.
23       Based upon that overall price trend, do you have any
24   commentary on what the impact of market forces, market forces
25   were on the efficacy of the price increases?

 1   A    Well, I don't have a recollection of what the market forces
 2   were specifically during that historic time period, but if the
 3   market forces were generally a strong market, then I would
 4   expect the price increases to be more likely to stick than they
 5   would otherwise.
 6   Q    If we go to a period -- I think you have talked about the
 7   fact that there was this recessionary period -- first of all,
 8   let's deal with this one.  This is April '99.
 9            MR. MARTIN:  Your Honor, my questions weren't really
10   about this.  We're now moving off into a new world.
11            MR. BERNICK:  That's the whole point, is he didn't ask
12   about the market forces, he just asked about whether the
13   increases --
14            MR. MARTIN:  It's getting very long.
15            THE COURT:  Go ahead.
16   Q    This one right here he showed you as being a dot like over
17   here.  But your price increase announcement chart actually
18   attaches the price increase announcement on a particular date
19   right there.  If you take a look at that, that one, it looks
20   like prices come down, there's a price increase announcement
21   that would take it to here, but then prices go further.
22            What is your view about the -- what the -- whether the
23   price increase announcement is what caused that spike in
24   prices?
25   A    Well, the price increase announcement could not have caused

 1    the spike to go up that high because it goes up higher than the
 2    announcement itself.  So I'm presuming that this was some time
 3    in which market forces drove prices up higher than the
 4    announced increase.
 5    Q    Correlation is what Mr. Martin asked you about.  As an
 6    economist, tell us whether or not there's any difference
 7    between correlation and causation.  Are they the same or
 8    different, as an economist?
 9    A    Well, they can be different; that is, you could find a
10    correlation between something and there is no causation between
11    the two variables.
12    Q    In the particular case of the April 1999 TDI price
13    increase, he asked you about correlation.  Based upon what you
14    see here, can you say that the price increase announcement was
15    a cause of the price increase?  Can you say that?
16              MR. MARTIN:  Objection, no foundation.  All he had
17    were presumptions and speculations for what the movements
18    are --
19              MR. BERNICK:  I move to strike the argument.
20              THE COURT:  If he can answer it --
21              THE WITNESS:  I'm not really sure I can answer, your
22    Honor.
23    A    (Continuing) The price went up more than the -- the
24    transaction price went up more than the price increase
25    announcement.  So when I'm thinking about this in terms of a

```
1    cartel, that would seem to be an anomaly.
2             THE COURT:  You can't say, could you, definitively,
3    that the price increase announcement didn't affect -- even if
4    it went up more, didn't affect the price going up even more?
5    Maybe not as high --
6             THE WITNESS:  I can't say one way or the other.
7             THE COURT:  Okay.
8    Q    Well, the price increase above that, is there any tie to
9    the price increase announcement?
10   A    Well, it clearly isn't tied to the price increase
11   announcement because it went several cents above the
12   announcement.
13   Q    Okay.  Now, you were then asked about this chart.  And this
14   chart --
15            MR. BERNICK:  If you could -- there we go.
16   Q    This chart is a chart that I used in opening.  And the
17   question was whether you systematically looked at capacity.  Do
18   you recall that?
19   A    Yes, sir.
20   Q    And I believe your testimony was that you did not.
21   A    That's correct.
22   Q    Okay.  Now, you were, however, shown this chart that
23   relates to the same price line -- this is your -- not the
24   same -- similar price line, and it was brought out that costs
25   dropped during some of this period of time.  Mr. Martin showed
```

1    you that.  You remember that?

2    A    They fell at times, they went up at times.

3    Q    Does the fact -- if we just focused on costs, tell us

4    whether or not costs are the only factor that you would have to

5    consider in figuring out whether these prices were caused by

6    market forces as opposed to a cartel.

7    A    No, costs are not the only factor.  I looked at demand and

8    costs.

9    Q    Okay.  Just tell us right now whether or not, for purposes

10   of your own analysis back here on the defensive cartel, your

11   analysis of the defensive cartel, the one that showed this --

12   did you need to look at capacity in order to complete that

13   analysis?

14   A    Not to do that analysis, no.

15   Q    Okay.  Now, if somebody wanted to do a complete analysis of

16   all market factors, all market factors that are associated with

17   this price line, all market factors, tell us whether or not

18   capacity would be an important factor to consider.

19   A    Yeah, if you're going to look at everything, you look at

20   everything.  Capacity would be one thing you might add to that

21   list.

22   Q    Now, you haven't looked at capacity specifically, but I

23   understand from your supplemental report that you reviewed the

24   deposition of Mr. Pauley, who's one of the plaintiffs, whose

25   company is one of the plaintiffs in the case?

 1    A   Yes, sir.

 2    Q   I want to show you PX-8622, which is the same price line

 3    that we've been talking about, but I brought it to the

 4    deposition and then he marked on it, and I'm not --

 5         MR. JOHNSON:  Your Honor, we have an objection to

 6    this.  This is one you're going to rule on later.

 7         THE COURT:  Yes.

 8         MR. BERNICK:  I'm not offering it, your Honor.

 9         THE COURT:  I know, I know, he's just using it as a

10    demonstrative right now with this witness.  Okay?

11         MR. JOHNSON:  Thank you, your Honor.

12    BY MR. BERNICK:

13    Q   In focusing on Mr. Pauley's testimony, Mr. Pauley will

14    testify that there was increased demand in this period of time,

15    and here there was more capacity and less capacity, and these

16    affected prices.  That will be what his testimony is.

17         MR. MARTIN:  Your Honor, there's no question.  This is

18    a narrative.

19         MR. BERNICK:  I'm just saying --

20         THE COURT:  He's going to ask the question.

21         Go ahead.

22    Q   And my question is:  Are the views of the plaintiffs in

23    this case, the business people about what was causing these

24    changes in prices, are those views that as an economist you

25    would consider to be of consequence?

 1    A    Yeah.   If those views are accurate, that demand was
 2    increasing during that period, I would expect prices to go up.
 3    If the view is accurate that there was excess capacity, I would
 4    expect that to pull down prices.   If there's a time when
 5    capacity somehow really decreased and there's no supply, I
 6    would expect prices to respond in an upward fashion.
 7    Q    You testified that -- now kind of looking back over all of
 8    what we talked about; that is, the bumps, the price increase
 9    announcements, the low line, the high line, potential cartels,
10    all of these different things, based not just on one example or
11    a hypothetical, is the difference between $.03 and $.06 as you
12    have seen from the evidence, is that due to cheating, or is
13    that due to a competition?   What's your testimony?   And I have
14    a follow-up question.
15    A    My view is it's due to competition.
16    Q    Now, given the totality of evidence, is that difference
17    kind of subtle, or narrow, or hard to see?
18    A    No, sir.
19    Q    And why not?
20    A    Well, again, just putting on my economist hat here, I've
21    seen no evidence as to how the transaction prices are
22    monitored, and if they're not monitored I don't see how you can
23    have a mechanism in place to prevent cheating.
24    Q    Okay.
25              MR. BERNICK:   I'm very close to being done, your

 1    Honor, I can finish up very promptly.

 2    Q    Going back to this board here where Dr. Marx has her model

 3    and she then after the model is done makes an inference that

 4    attributes the model results to a conspiracy and she uses a

 5    process of elimination.  I'm not going to ask you about the

 6    model, I just want to ask you about factors that are out there

 7    that are important to an economist in examining a marketplace

 8    and looking at prices.

 9              MR. MARTIN:  Your Honor, this is beyond the scope.

10              MR. BERNICK:  No, this is absolutely -- capacity was

11    one, and there are others.

12              THE COURT:  He's already talked about capacity.

13              MR. BERNICK:  What?

14              THE COURT:  He's already talked about capacity.

15              MR. BERNICK:  I know, but there are others and they're

16    all in his report, the same paragraph that deals with capacity.

17    It will be a very quick question.

18              THE COURT:  All right.  I think I know where you're

19    going, but let me hear the question.

20              MR. BERNICK:  Okay.

21    BY MR. BERNICK:

22    Q    Tell us whether or not the following factors should be

23    included in a competitive analysis of the industry:  One is

24    capacity.  We already covered that.  Buyer behavior.  Is that a

25    factor that should be included in a competitive analysis?

 1    A    Yes, sir.

 2    Q    Capacity utilization.  Tell us whether or not that should

 3    be used in a competitive analysis.

 4    A    Isn't that what you just asked me about prior to that?

 5    Q    I said capacity.  I just want to make sure capacity

 6    utilization, if they're different.

 7    A    Is there a difference between the two?

 8    Q    Well, one is the rated capacity and the other is the

 9    utilization of the capacity.

10    A    Okay.  You might consider both, yes, sir.

11    Q    Industry cycles; should they or should they not be included

12    in a competitive analysis?

13    A    Yes, I think to understand competition in the industry you

14    look at times of strong and weak demand.

15    Q    Interdependence among the manufacturers.  Should that be

16    considered?

17            MR. MARTIN:  Could I get a clarification of what a

18    competitive analysis is?  So it's not the model?

19            MR. BERNICK:  It's right what is in his report.

20            THE COURT:  You're not referring -- this has nothing

21    to do with what went into or should be in a model.  Correct?

22            THE WITNESS:  That's correct.

23            THE COURT:  You're not a econometrician?

24            THE WITNESS:  I'm not econometrician analyzing Dr.

25    Marx's model.

1          MR. BERNICK:  Just to be clear to the question, my

2    question is not tied to the model.  That's for another day.

3    But as an economist --

4          THE COURT:  That's what I'm saying.  He's not

5    testifying to what should or should not be in a model, why it's

6    included, why certain things aren't included in the model

7    because he's not here to opine on that.

8          MR. BERNICK:  Then I really should be just very

9    briefly --

10          THE COURT:  You can continue, and afterwards when you

11    complete we'll --

12          MR. BERNICK:  That's fine.

13          THE COURT:  You can ask, from within his discipline

14    what factors should be considered.

15    BY MR. BERNICK:

16    Q    Economics, antitrust economics, that's my perspective.

17    Antitrust economics for my question.

18          Are all of those factors -- tell me whether or not

19    each of those factors:  Buyer behavior, capacity utilization,

20    industry cycles and changing interdependence among the

21    manufacturers, tell us whether or not they should be included

22    in a competitive analysis.

23    A    Well, I think the question may be a little more complicated

24    than you might imagine.  It depends in the competitive analysis

25    what the allegation is that was anti-competitive.  In this case

 1    I have allegations about how this market supposedly worked

 2    under a cartel and I studied the type of evidence that I would

 3    look at as an economist to test that hypothesis.  If you're

 4    modeling the market as Dr. Marx did, I don't have an opinion on

 5    that.

 6              THE COURT:  Doctor, Doctor, we're not getting into

 7    your opinions as to modeling the market.

 8              MR. BERNICK:  I think he tried --

 9              THE WITNESS:  That's what I just said.

10              MR. BERNICK:  He tried to just say he wasn't going to

11    get --

12              THE COURT:  I just want to be sure we're not going

13    into an area that we shouldn't be going into.

14    BY MR. BERNICK:

15    Q    So you were asked whether Dr. Marx's book --

16              MR. BERNICK:  Do we have the book here?  --

17    Q    -- was a piece of good scholarship or whatever the language

18    was, you had laudatory things to say about it?

19    A    Yes, sir.

20    Q    Do you believe that the principles set forth in this book

21    have been followed by the plaintiffs' expert evidence in this

22    case?

23    A    No, sir.

24              THE COURT:  Sustained.  You know, that's a -- the book

25    is how many pages?

 1          MR. BERNICK:  But he -- he had a praise for it all,

 2    however many pages it is.

 3          THE COURT:  We're not going to -- he, you know --

 4          MR. BERNICK:  Okay, okay.

 5          THE COURT:  Okay.  That's not an appropriate question

 6    to just say, "This book, do you agree with everything, or do

 7    you agree with this book?"

 8    BY MR. BERNICK:

 9    Q    Have you in your slides talked about specific principles

10    that are in the book that you believe were not complied with?

11          THE COURT:  He did.  I think he did in his direct.

12          MR. BERNICK:  Yes.

13          THE COURT:  So that's it.

14          MR. BERNICK:  Okay.

15    Q    Margin.  There was testimony that was brought out that in

16    your interview with Mr. English, that the margin from Dow, the

17    margin was very important to the company.  Tell us whether or

18    not that has any bearing on a competitive antitrust analysis.

19    A    Well, I guess in some cases it could.  I don't think it

20    does here.

21    Q    Okay.  And why is that?

22    A    Well, if the allegation that you have a group of firms and

23    they had agreed to set a common margin, say you had a group of

24    retailers and they all got together and they said, okay, we buy

25    women's fashion accessories at such and such a price, let's all

 1    agree to a 40 percent margin.  That would have real

 2    implications for me as an antitrust economist.

 3         In this case I don't know of any allegation that the

 4    margins were set.  So when I was learning about the industry

 5    and talking with executives I was interested in their view on

 6    margins, because if margins are affected by negotiations, then

 7    that is of interest to me because the negotiations ought not to

 8    be taking place if the game is rigged.

 9         MR. BERNICK:  I have one more question, your Honor,

10    but I don't want to ask it unless we talk at sidebar.

11         THE COURT:  Let's see.

12         (At the sidebar.)

13         THE COURT:  Go ahead.

14         MR. BERNICK:  The first thing is that with respect to

15    his hourly rate, they brought it out, it's a high rate, it

16    sounds like he spent a lot of time and a lot of money.

17         THE COURT:  All right.

18         MR. BERNICK:  He actually doesn't keep any of that.

19    All of his consulting fees go to charities.  He's a very

20    religious man.  And so they've created the sense that his

21    testimony is important to him financially, and it gives a bias,

22    and absolutely the opposite is true.  I didn't want to raise

23    that without flagging it with your Honor first.

24         THE COURT:  Right.

25         MR. BERNICK:  So that's really the principal reason

```
 1    for coming out here.  I am a little concerned and I appreciate
 2    your Honor's telling the jury that your views are, you know,
 3    just like a lawyer's, et cetera.  But, you know, I have to tell
 4    you, watching it -- I'm saying this with complete respect --
 5    you know, it's -- you know, you can see the juries react to it,
 6    and they are I think very focused on your Honor's views.  So
 7    maybe perhaps something further, not right now but something
 8    further at some point in time.  I'm just worried about the feel
 9    of the courtroom, you know?  And I understand all the
10    questions, the questions are great questions.  It's just --
11            THE COURT:  Well, they're questions, quite frankly, I
12    alerted you both yesterday --
13            MR. BERNICK:  Yeah.
14            THE COURT:  -- they're on my mind.  I don't think
15    they're beyond the scope of what the jury is hearing.
16            MR. BERNICK:  No.
17            THE COURT:  You know, and they're questions that I
18    thought while he's here they should be asked.  You kind of both
19    touched on them, but in my opinion they needed to be clarified.
20    And I immediately gave them an instruction that they're to
21    disregard the fact that they came from me, you heard the
22    instruction.  I thought it was a pretty forceful instruction.
23    And I think in total in this case I think I've asked three
24    questions, and those were in an area that you're both talking
25    about that I still had questions of in my mind and I think the
```

```
 1    jury probably still did too.  So that was why I asked those
 2    questions.
 3            In my final charge I always give an instruction, and
 4    I'll make it very strong as I always do --
 5            MR. BERNICK:  I appreciate that.
 6            THE COURT:  -- that not to be influenced by me
 7    comments.
 8            MR. BERNICK:  On the hourly rate --
 9            THE COURT:  Yeah.  On the hourly rate.
10            MR. MARTIN:  I asked one question of my own economist,
11    she gave me an answer, $900.  I said in fairness to you I'll
12    ask you, he gave me an answer and that was it.
13            THE COURT:  On balance, look, they didn't get into --
14            MR. JOHNSON:  How much.
15            THE COURT:  -- what was the total amount or anything
16    like that.  And on balance the overall bias or prejudice it may
17    cause to get into, he's a philanthropist and he gives money to
18    charities is far beyond the scope of what they -- they didn't
19    open that up.  And the jury has heard more so how much Dr. Marx
20    got paid.  So I don't think it will be an issue.  And I'm not
21    going to allow that question to say he's a philanthropist, he
22    gives his money to charities, et cetera, et cetera, no.
23            MR. BERNICK:  Okay.
24            THE COURT:  Okay.
25            MR. BERNICK:  With that, I'm done.
```

1          THE COURT:  Okay.  All right.  Thanks.

2          Who is your next witness?

3          MR. BERNICK:  Well, you have to talk about Ms. Ginn.

4          THE COURT:  Do you have a video or --

5          MR. BERNICK:  Well, that would be -- I'll ask.  I'm

6    not so sure.  She actually can stay a little while longer, but

7    I'm actually prepared, I don't know if your Honor or counsel

8    is, you know, we can also do it before the jury.  It will not

9    take that long.

10         THE COURT:  We're not going to do it before the jury,

11   no, we're going to do it outside of the jury.

12         MR. JOHNSON:  Don't you have Mr. Ho available?

13         MR. BERNICK:  He is available.  The problem is Ms.

14   Ginn --

15         THE COURT:  She's not?

16         MR. BERNICK:  She is now, but her daughter,

17   one-year-old, only child has got pneumonia.

18         THE COURT:  Where is she?

19         MR. BERNICK:  She's from Montreal so she's very

20   anxious to get back.

21         THE COURT:  I'll leave it up to you.  If you want to

22   take -- we'll tell the jury go out and have a long lunch.

23         MR. BERNICK:  We'll see about Mr. Ho -- maybe we can

24   get them both done.

25         THE COURT:  Yeah.  I mean,

1          MR. BERNICK:  That is, we would do Ho, then --

2          THE COURT:  He's a live witness?

3          MR. BERNICK:  He's a live witness.

4          THE COURT:  Then is Pauley next?

5          MR. LUSTBERG:  Yes.

6          MR. BERNICK:  We'll do Pauley on video, and then -- I

7     don't know how it would work, your Honor.

8          THE COURT:  I could give the jury a longer lunch and

9     we could deal with Ginn for a half -- you know, then we'll take

10    our lunch.

11         MR. LUSTBERG:  That sounds like a good idea.

12         MR. BERNICK:  Why don't we do that.  I appreciate

13    that.

14         THE COURT:  No, I'm fine.  Okay.  Let's do it that

15    way.  Thanks.

16         MR. BERNICK:  Okay.

17         (In open court.).

18         MR. BERNICK:  The only thing that I have left is to

19    offer in a list of exhibits, and I can read them off here.  I

20    think they've already been given to the other side.

21         THE COURT:  If there's no objection to those

22    exhibits --

23         MR. JOHNSON:  There is.

24         THE COURT:  -- lets do it on a piece of paper and it

25    makes it faster.

```
 1              MR. JOHNSON:  There are objections, your Honor.
 2              THE COURT:  There are?
 3              MR. JOHNSON:  Yes.
 4              THE COURT:  On the last line?
 5              MR. JOHNSON:  On quite a number of these.
 6              THE COURT:  All right.
 7              MR. BERNICK:  Well, then we have an issue with the
 8   witness.
 9              THE COURT:  Offer them up and tell me which ones you
10   object to.
11              MR. JOHNSON:  We haven't actually been given a list.
12              MR. BERNICK:  Yes, you have, you have been given the
13   list.  It's the same list --
14              MR. JOHNSON:  We have not been given the list.
15              THE COURT:  Ladies and gentlemen, why don't you step
16   into the jury room, please.  Okay?
17              Thank you.
18              Let's try not to get too comfortable.  I hope to get
19   you back out in five minutes or so.  Okay?
20              (The Jury leaves the courtroom.)
21              THE COURT:  On the other hand, why don't I do this:
22   I'll reserve on those and when we have the jury go out for
23   lunch we'll deal with that as well.  Okay?
24              MR. JOHNSON:  Great.
25              THE COURT:  Oh --
```

 1            MR. BERNICK:  Dr. Elzinga --

 2            THE COURT:  -- Dr. Elzinga is still here.

 3            MR. BERNICK:  He has his own family situation.

 4            THE COURT:  What's that?

 5            MR. BERNICK:  They're all just his, all the things the

 6     jury has seen, they're all of his charts, that's what they are.

 7            THE COURT:  He testified to all of those?

 8            MR. BERNICK:  Absolutely every single one of them.  In

 9     fact, I asked --

10            THE COURT:  Don't interrupt each other.  Let's not get

11     out of control.  Okay?

12            MR. BERNICK:  So, in fact, we've taken --

13            THE COURT:  Sit down.

14            MR. BERNICK:  We've taken stuff off, so all it does is

15     the cartel allegation period.  It's right out of his report,

16     every single one of them.  And yes, he actually testified with

17     respect to all of them that they were accurate summaries.

18            THE COURT:  Mr. Martin, I don't know which ones he's

19     referring to.  There have been a lot of charts referred to.

20     But has he testified to these charts?

21            MR. MARTIN:  So there was testimony yesterday, right,

22     whether this is true and accurate --

23            THE COURT:  Speak up please.

24            MR. MARTIN:  If I recall correctly, there was

25     testimony whether this was a true and accurate reflection of

 1    information that his team assembled.  I have questions about
 2    that having talked to him today and him not being sure what the
 3    data really was and whether he actually can authenticate it.
 4    So I would like to put a pause on it.  I'm just saying --
 5          THE COURT:  I don't recall too many objections to
 6    things that -- when he was testifying, I mean I don't recall
 7    that there were many objections to these --
 8          MR. JOHNSON:  Your Honor, during his testimony, his
 9    direct, Mr. Bernick, every time he put one of those up he said,
10    "here's a demonstrative," representing to the jury it was a
11    demonstrative and took evidence with respect to the
12    demonstrative.
13          And at no time did he indicate that this was a summary
14    exhibit or that it was something that had been vetted or
15    pre-admitted with us.  And so we did not have the
16    opportunity -- we had objections to some of these based upon
17    the data that was used and the way it was presented, which he
18    never cleared with us.  And having represented to the jury
19    these were demonstratives, he now wants to create -- put them
20    in as evidence, and we had problems with it that he didn't deal
21    with in advance.
22          MR. BERNICK:  I'm going to keep my cool on this.
23          These are all directly out of his report.  I asked --
24          THE COURT:  Use the microphone, please.
25          MR. BERNICK:  They're all directly out of his report.

 1    Counsel have had these things for months, these are all
 2    summaries.  I have asked him specifically whether they were
 3    summaries.  I referred to them by D-E-M number, DEM number.
 4    They all have exhibit numbers, they've got the exhibits.
 5    They've had them for a very long time.  They represent -- I'm
 6    sorry.

 7              THE COURT:  Were these objected to during the final
 8    pretrial conference?  Did they have them at the final pretrial
 9    conference?

10              MR. BERNICK:  They had them at the final pretrial
11    conference.  They made certain comments on the labeling, and we
12    changed those comments to accommodate them with respect to
13    that.  They were all shown in that fashion.  These documents
14    have been out there literally for years, your Honor.

15              The only reason we're facing this flack is that we've
16    offered them in as summaries.  And he is most certainly capable
17    of testifying that they were summaries of the data because
18    that's exactly what he asked his people to do.  Not everybody
19    sits there and does by hand or on their computer all these
20    things, they have people do them.  And so this is all of his
21    data.

22              If you want, we can, Mr. Bigalow is here, he can talk
23    about the data because his firm put them together.

24              THE COURT:  Can I see them for a second?

25              MR. BERNICK:  It's all stated at the bottom what they

 1    are.  And Mr. Elzinga really needs to be gone.

 2              (There is a pause for the Court.)

 3              THE COURT:  How long have you had these, Mr. Johnson?

 4              MR. JOHNSON:  We've had those I assume for a long

 5    time.  We did raise objections to them in the Pretrial Order.

 6    That was specified in the Pretrial Order.  Those objections

 7    were not resolved, and there was no effort made to resolve

 8    those objections by Dow.

 9              THE COURT:  What was your objection?

10              MR. JOHNSON:  Many times it was the labeling.  He

11    seemed to suggest here that he changed some of the labeling.  I

12    don't know that --

13              MR. BERNICK:  It was shown.

14              MR. JOHNSON:  -- because --

15              MR. BERNICK:  It was shown.

16              MR. JOHNSON:  -- I don't have in front of me the

17    precise objections we made.  We also had objections as to some

18    of the data in terms of its collection, what was there or not

19    there, in terms of its accuracy and what it was purporting to

20    represent.  It was the same types of objections that we had to

21    some of the summary exhibits that continued to be offered --

22              THE COURT:  I know.  But Dr. Elzinga has now testified

23    to these.

24              MR. JOHNSON:  Yes, he has.  And he represented that

25    they were demonstratives to the jury over and over again.  The

```
 1    record will reflect he said, "This is a demonstrative."

 2              And for that reason I didn't say anything, or we

 3    didn't say anything with respect to his use of those because I

 4    thought that was fair use --

 5              THE COURT:  Well.

 6              MR. JOHNSON:  -- as a demonstrative.

 7              Had I thought he was going to seek to put them into

 8    evidence I would have stood up.  At no time during the

 9    examination did he say:  "We seek the admission of X."  He

10    called them demonstratives.

11              MR. BERNICK:  This is all entirely --

12              MR. JOHNSON:  So now we get to the end, and suddenly,

13    I want to stick all these in.

14              MR. BERNICK:  Your Honor, everything he said so far is

15    false.  It's just false.

16              THE COURT:  Use the microphone, please.

17              MR. BERNICK:  It's just false what he's saying.  We

18    tried for weeks, we tried for months to get them to engage on

19    this and to agree to it.  These were all admitted as summaries

20    in the Class trial, and so what we had to do was we had to take

21    the demarcation of the Class period off.  Those were the

22    changes that were made.

23              Mr. Elzinga specifically testified on my examination

24    that they were summaries.  We referred to them as

25    demonstratives because that's the way they were labeled on our
```

 1    system.  He's now representing that he's been sandbagged.

 2    That's just -- it's just utterly false.

 3         We have been pushing them for months to agree to it,

 4    just like the Class plaintiffs did even before we picked the

 5    jury in the Class case.  They agreed to pre-admit all of these

 6    things because they are summaries.

 7         MR. JOHNSON:  Your Honor, I'm told that actually the

 8    slides themselves say "Demonstrative" on them.

 9         MR. BERNICK:  No, they did not.  That is because --

10         THE COURT:  Wait, wait, wait, wait.  The slides right

11    here say "Defendant's Exhibit."

12         MR. BERNICK:  And they are marked in the Pretrial

13    Order as exhibits.  We just put on "DEM" because it was part of

14    a whole sequence of DEMs.

15         THE COURT:  And Dr. Elzinga has now testified that

16    these are charts that were made under your direction.

17         Correct?

18         THE WITNESS:  Yes, some time ago.

19         THE COURT:  Yeah.

20         MR. JOHNSON:  Your Honor, if I may, when it was put on

21    the screen and shown to the jury it said on the top

22    "Demonstrative 11; Demonstrative 12."

23         THE COURT:  Okay.  Mr. Johnson, you could have raised

24    objections to these somewhere along the line.  You've had these

25    for quite some time.  And if you did, you didn't bring them up

 1    to me.  This is the first time I'm hearing about objections to

 2    these.  Okay?

 3              MR. JOHNSON:   True.

 4              THE COURT:  So I didn't have an opportunity to fully

 5    vett what the objection -- but now that he's testified and he's

 6    testified that these are charts that were made under his

 7    direction based on data that he and his team put together, even

 8    though -- and they were put in front of the jury and I didn't

 9    know you were going to have an objection to these until now.

10    So the jury has seen them, so they're going to be admitted.

11              MR. BERNICK:   Thank you.

12              THE COURT:  The jury has seen them and there was no

13    timely objection made to me.  They may have been made elsewhere

14    but not in the court.

15              So, and I'm satisfied they're reliable.  The Doctor

16    has testified he's the person that's responsible for making

17    them with his team, and so -- and he's referred to them

18    repeatedly on his examination here.  So there's no reason to

19    keep them out at this point.

20              All right.  They're admitted into evidence.

21              (Various documents are received in evidence.)

22              THE COURT:  What do we have next?

23              MR. BERNICK:  Just a moment, your Honor.

24              (Mr. Bernick confers with co-counsel off the record.)

25              MR. BERNICK:  I can call Mr. Ho.

1           THE COURT:  How long will Mr. Ho be?

2           MR. STREETER:  It will probably be an hour and a half

3    or two hours, your Honor.

4           THE COURT:  He will be?

5           MR. MARTIN:  Your Honor, just to be clear, I don't

6    have any redirect.

7           THE COURT:  Okay.  Doctor, thank you very much.

8           MR. JOHNSON:  Actually can that be heard when the jury

9    comes out?

10          THE COURT:  Yes.

11          Stay there for a moment.

12          THE WITNESS:  Sorry.

13          MR. BERNICK:  So we have redirect --

14          MR. JOHNSON:  Recross.

15          MR. MARTIN:  I have none.

16          MR. BERNICK:  Oh.

17          THE COURT:  He has none.

18          MR. BERNICK:  Sorry.

19          MR. STREETER:  Can we clean up a little bit?

20          THE COURT:  Yeah, keep doing that while we get the

21   jury out.  Come on.

22          THE DEPUTY CLERK:  Judge, I'm bringing out the jury.

23   Right?

24          THE COURT:  All right.  Let's bring out the jury.

25   Thanks.

```
 1                THE DEPUTY CLERK:  Please rise for the Jury.
 2                (Jury present.)
 3                THE COURT:  All right.  Thank you for your
 4     cooperation.  Ladies and gentlemen.  Please be seated.  Okay.
 5                All right.  Mr. Bernick -- Mr. Bernick?  Mr. Bernick,
 6     you've completed your cross-examination -- your redirect
 7     rather.  Correct?
 8                MR. BERNICK:  Yes.
 9                THE COURT:  Okay.  Mr. Martin, do you have any reexam?
10                MR. MARTIN:  I have nothing further, your Honor.
11                THE COURT:  No redirect?
12                Okay.  Doctor, you are excused.  Thank you very much.
13                THE WITNESS:  Thank you, your Honor.
14                THE COURT:  Have a safe flight back.
15                (Witness excused.)
16                THE COURT:  All right.  Mr. Bernick.
17                MR. BERNICK:  Mr. Streeter will be doing the
18     examination.
19                THE COURT:  Mr. Streeter, okay.
20                MR. STREETER:  Thank you, your Honor.
21                Dow calls Patrick Ho has a witness.
22
23     P A T R I C K   H O, called as a witness, having been first
24         duly sworn, is examined and testifies as follows:
25
```

```
 1                  THE DEPUTY CLERK:  Please state and spell your name
 2      for the record.
 3                  THE WITNESS:  Patrick Ho.  P-a-t-r-i-c-k; last name is
 4      spelled H-o.
 5                  THE DEPUTY CLERK:  Thank you.  You can be seated.
 6                  THE WITNESS:  Good morning.
 7                  THE COURT:  Good morning, Mr. Ho.  Be sure to speak
 8      into the microphone.
 9                  THE WITNESS:  All right.
10                  THE COURT:  Thank you.
11                  All right.  Mr. Streeter, go ahead, please.
12                  MR. STREETER:  Good morning, lady and gentlemen.
13                             DIRECT EXAMINATION
14      BY MR. STREETER
15      Q    And good morning, Mr. Ho.
16                  Could you start by telling the jury briefly where you
17      grew up?
18      A    I was born and raised in Hong Kong.
19      Q    And where did you go to college?
20      A    I was in Canada, Queens University in Kingston, Ontario.
21      Q    What did you study in college?
22      A    Chemical engineering.
23      Q    And when did you graduate from college?
24      A    That was back in 1978.
25      Q    Do you have any family?
```

 1    A    I am happily married for 35 years, and three kids.

 2    Q    And where did you go to work after college?

 3    A    I joined the company two weeks after I graduate, and I

 4    first joined in Hong Kong.

 5    Q    "The company," being Dow?

 6    A    Dow Chemical.

 7    Q    And for purposes of your examination here today, I'm going

 8    to focus on for the most part the period of 1994 to 1998, but I

 9    want you to just briefly tell the jury what you did at Dow

10    between 1978 and 1994.

11    A    All right.  I've been at the company for 36 years now.

12    Like I say, when I first joined the company it was in Hong

13    Kong.  Being a chemical engineer by graduate, I spend my first

14    10 years in the factory, running manufacturing plants in Hong

15    Kong, in Canada, and also in Taiwan.  Before I moved to our

16    headquarters in Midland, Michigan I was the Group Marketing

17    Manager for our Plastic business in Asia-Pacific, and then I

18    moved to Midland as the Global Business Director for the

19    Polyurethane business.

20    Q    Let me stop you right there just for a minute.

21         You said you were the group managing -- marketing

22    manager.  Just describe briefly what that was and where it was.

23    A    I had the responsibility for our group of plastic business,

24    which is polystyrene, polyethylene and poly carbon at that

25    time.

 1   Q   And what does "marketing" mean?

 2   A   Marketing essentially means how we market and sell our

 3   product in to the Asia-Pacific region, and I also have direct

 4   responsibility on a group of marketing managers and sales

 5   managers.

 6   Q   And I think after that period of time is when we get to the

 7   '94 through '98 period?

 8   A   Yes.

 9   Q   And briefly for now -- we'll go into some more details

10   later -- but briefly for now can you tell the jury what your

11   responsibilities were and what your title was at that time.

12   A   When I first arrive Midland, Michigan, I was the North

13   America Business Director for Polyurethane business.

14   Polyurethane is polyol, MDI and TDI.

15       After six months I was on the job the company

16   restructure into a global business.  At that point I was

17   appointed as the Global Business Director for MDI and TDI.

18   Q   And then just briefly, bring us from -- did you leave that

19   job at the end of 1997?

20   A   I did.

21   Q   And briefly, just bring us from 1997 to the present.

22   A   All right.  After my assignment in Midland, I went back to

23   Asia-Pacific, and I was the area President for our Asia-Pacific

24   operation, responsible for all businesses.  And I did that for

25   four years, and then move into a global business job for

 1   epoxies business.  And then now I'm doing -- I'm the VP for

 2   Manufacturing and Engineering for Asia-Pacific.

 3   Q   All right.  I want to go back to January '94 to -- was it

 4   August of '97 that you left the job in Midland?

 5   A   Yes.

 6   Q   During the January '94 to August '97 period, can you

 7   describe for the jury in a little bit more detail what your

 8   responsibilities were as the Business Director for MDI and TDI

 9   A   As the Business Director for the business, my

10   responsibility is to develop and execute a business strategy

11   that maximized the profitability for the business on a global

12   basis.

13   Q   And who did you report to at that time?

14   A   At the time I report to Mr. Bill Long who was the Senior VP

15   for the business.

16   Q   And you understand that the three products are at issue in

17   this case are MDI, TDI and polyols.  Correct?

18   A   Yes, I do.

19   Q   And there was a -- am I correct that there was a six-month

20   period where you had polyols, and then when the global

21   conversion happened you kept MDI and TDI?

22   A   For the first six month I have the total business, which is

23   polyols, MDI and TDI.

24   Q   And when the global restructuring happened, who took over

25   polyols?

 1    A    It was Mr. David Fischer.

 2    Q    And did you have to work collaboratively with him as the

 3    head of MDI, TDI, and him in charge of polyols?

 4    A    We work closely as a team, because in the marketplace

 5    polyol, MDI and TDI, they are being used together.

 6    Q    And where physically were your offices?

 7    A    We were in a building called 2030, in Midland, Michigan,

 8    and our offices are just right next to each other.

 9    Q    And where was Mr. Long's office?

10    A    Mr. Long was just next to us, adjacent to us.

11    Q    And then describe a little bit for the jury who the other

12    members of the Dow team were that you worked with in your job

13    as Business Director for MDI and TDI?

14    A    As the Global Business Director I worked very closely, of

15    course, with David Fischer who is business director for polyol.

16    I also worked closely with our geographic regional commercial

17    directors, and we operate on four different region:  North

18    America, Latin America, Pacific and Europe.

19    Q    And when you say regional commercial directors, what did

20    the regional commercial directors do?

21    A    The regional commercial director has responsibility for a

22    team of marketing manager and sales manager.  They are the one

23    would are responsible to service the market and interact with

24    the customer on the regional basis.

25    Q    So let's focus in on what you were doing.

1              Did you interact with the customers?

2    A    I don't directly interact with the customers because those

3    are mostly handled by the commercial folks.

4    Q    What role did you have in connection with pricing from the

5    period 1994 to August '97?

6    A    I have direct responsibility on setting the pricing

7    direction and initiating pricing changes during those period.

8    Q    And when you say "setting pricing direction," can you

9    explain what you mean by that?

10   A    What I do as the business director is that I look at our

11   quality of businesses and also the market dynamics on supply

12   and demand and cost position, and then I set a goal and a

13   target for each of the individual regions.

14   Q    How often generally would you do that?

15   A    We would have -- we would on the average do it on a

16   quarterly basis.  However, when the market change very fast we

17   actually had many experiences that we do it more often.

18   Q    And when you say you'd set a goal for the commercial

19   directors, can you give us an example of how that would work?

20   A    After doing my own analysis on the market and cost, for

21   example, I would give my Asia-Pacific commercial director a

22   target to increase price, let's say, for example, by $.09 a

23   pound.  And that would be the direction I give to them.

24   Q    And then what was their job to do with that?

25   A    Their responsibility is to take my target price increase

1    and work within the region and understand the different

2    dynamics within different market segments and countries, and

3    then they decide on how much would apply to individual

4    customers.  So they would manage it down to the customer level.

5  Q    Did you negotiate directly with customers?

6  A    I don't.

7  Q    Who decided to initiate a price increase or decrease?

8  A    I do as the global business director.

9  Q    And who decided the overall goal magnitude of the price

10   increase?

11  A    I do as the business director.

12  Q    And would you -- who, by the way, was the person who you

13   gave this direction to in North America at that time?

14  A    At the time the commercial director was Rick Beitel.

15  Q    And how about in Asia, who did you give direction to?

16  A    Asia, it was Dave Pasachiladai.

17  Q    And how about in Europe?

18  A    Mr. Charles Churet.

19  Q    And after the commercial people would go out and negotiate

20   with the customers, they would report back to you about what

21   was happening in the marketplace?

22          MR. LEVERIDGE:  Leading, your Honor.  Objection.

23          THE COURT:  Go ahead, I'll allow it.

24  Q    You can answer the question.

25  A    Definitely, because their feedback from the marketplace is

 1    very, very important for my strategy and development.

 2    Q   What would they tell you about what was happening?  Give me

 3    an example of the kinds of feedback you would get from them.

 4    A   They would typically be telling me what the reaction from

 5    the customers are.  They would also feedback to me what the

 6    real orders are, because that would be a very good indication

 7    as to whether the price change is effective or not.

 8    Q   In the time when you were in charge of initiating price

 9    increases on MDI and TDI, did you ever talk to a competitor

10    about the prices you were going to send to your team?

11    A   No.

12    Q   Did you ever agree with a competitor about the prices you

13    would aim for?

14              MR. LEVERIDGE:  Objection, leading, your Honor.

15              THE COURT:  No, I'll allow it.

16    A   No.

17    Q   Did you ever hear of that happening at Dow, period?

18              MR. LEVERIDGE:  Objection, calling for hearsay.

19              THE COURT:  Rephrase the question.  Mr. Streeter.

20    Q   While you were in charge of setting the price and direction

21    for MDI and TDI, the period 1994 to 1997, did you ever hear of

22    any instance where people at Dow were collaborating with

23    competitors about what price to charge?

24              MR. LEVERIDGE:  Same objection, your Honor.

25              THE COURT:  All right.  I'll allow it.

 1          Go ahead.

 2     A    Can I answer?

 3     Q    Yes.

 4     A    No.

 5     Q    And do you understand that the period of time that you were

 6     in charge of that is the first almost four years of the alleged

 7     conspiracy in this case?

 8     A    Yes, I do.

 9     Q    And I want you to describe for the jury how you came up

10     with the direction that you gave.  How did you decide what to

11     tell the commercial people to do?

12     A    As part of my job I have the responsibility to understand

13     the cost of making the product.  So I followed the raw material

14     cost, the utility cost and the way we run the plant.  I also

15     tracked and analyzed the supply and demand in the industry, and

16     that give us a good indication on how the supply situation is

17     in the marketplace.  And based on those information, I make

18     decisions and recommendations on how much price increase that

19     we would want to target within the different geographies.

20     Q    Why was supply and demand relevant to your decision about

21     what price increase to impose?

22     A    From a business standpoint, supply and demand is the

23     fundamental of how we run the business.  Because when supply is

24     tight you have a better chance to increase the price in the

25     marketplace.  So we followed that supply and demand very

 1    closely.

 2    Q    How about when demand is high, what opportunities does that

 3    present in terms of prices?

 4    A    When demand is high, we have a chance to again increase

 5    pricing, and then the reverse happen.

 6    Q    I'm sorry.  What was the lasts thing you said?

 7    A    I said, then the reverse also happen.  That means when the

 8    demand is slow, then you have pressure on pricing.

 9    Q    And by "pressure on pricing," you mean what?

10    A    When the demand is slow then you may have to cut price.

11    Q    And what about when there's a glut of supply, what effect

12    does that have on your pricing decisions?

13    A    When there is a lot of product, supplying into the

14    marketplace, then you would have price decrease pressure.

15    Q    I want to now talk about where you got the information that

16    you used to evaluate these factors, demand, supply and costs.

17    Okay?

18    A    Yes.

19    Q    All right.  Let's talk about demand first.  What were your

20    sources of information about what the demand was out there in

21    the marketplace?

22    A    We operate our business on a global basis, so we look at

23    the market dynamics across the world.  Of course we rely on our

24    commercial people to give us input from the marketplace, where

25    they pick up from the market and from our customer.  We also

 1    get a lot of information through the trade association

 2    publications and government reports and all that.

 3    Q    What, if anything, would you learn about the actual orders

 4    for your product?

 5    A    Absolutely.  The real orders that we have on our order book

 6    is a good indication on how tight the market is.  When we have

 7    a full order situation on our order book, that means the market

 8    is demanding more products.

 9    Q    And you mentioned trade publications.  What do you mean by

10    that?  Give us examples of what you mean.

11    A    There are quite a number of these very credible trade

12    publication out there, like the Chemical Week, like the

13    industry publications.

14    Q    And what -- what role did those play in your thinking about

15    what was going on out there in the marketplace?

16    A    These publications are a good source of information.

17    Because we operate on a global basis, a lot of times they

18    provide us with information on the state of the economy in the

19    country, and they also give us on top of the investment that

20    goes on in our market in our business, they also give us

21    information on the downstream industry.  These are activities

22    of our customers' customers.

23    Q    And did, or how did those trade publications inform your

24    thinking about the marketplace?

25    A    Well, the information that we got from these sources, they,

 1    one, add to the information source that we have; two, it
 2    validates some of the assumptions that we have, and it
 3    significantly affects our decision on things.
 4    Q   I now want to turn -- you've been talking about sources on
 5    demand.  I now want to talk about sources on supply.
 6        What did you do to go out there and gather information
 7    about what the supply situation was in the market?
 8    A   Many of our factories, very significant investments, and
 9    with we invest or when the industry invest, they have to apply
10    for local production permits and all that from the government
11    from the city.  And we find that always as a good information
12    source on informations as to how new capacity or existing
13    facilities are being made.  So that's a good source of
14    information.
15        We also look at important statistics on things,
16    because by understanding how much raw material is being shipped
17    into a particular country we can do a good assessment on how
18    that -- how that convert into product and end up being on the
19    supply side.
20    Q   You mentioned the word "capacity" in your answer.  What's
21    the relationship between capacity and supply?
22    A   Essentially capacity within our industry is the production
23    volume that would come out of each factories.  So what we do is
24    we look at each of the factories around the world, we estimate
25    what are their production on an annual basis, we add it up, and

1    that give us an indication on what the supply is available

2    within the industry.

3    Q    And when you're describing that, did you just do that for

4    Dow or did you also do it for your competitors?

5    A    We do it for both.

6    Q    And what role, if any, did trade publications play in your

7    evaluation of what the supply was out there in the market?

8    A    The trade publications, again, is a good source of

9    information on new investment because they do track that, and

10   they also would give us indication on how some of these

11   factories are running.

12   Q    When you say "new investment," what are you referring to

13   there?

14   A    For example, if -- if a competitor is building a new plant

15   in a certain country, because they need to apply for local

16   permit to do this, and many times these publication will pick

17   up from the local office what that investment is and report on

18   it.  So it is a good source of those information.

19   Q    I want you to take a look at Defendant's Exhibit 2020.  Can

20   we put that up on the screen.

21            MR. STREETER:  If we could blow up the text part of

22   that first.  Actually, if you can blow up the whole text.

23   Q    I just want to look at -- it says, subject:  FW, and then

24   it says, "Competitively speaking."

25            You see that?

 1    A    Yes, I do.

 2    Q    What is this document?

 3    A    This is a regular report that comes out of our Business

 4    Technology Center.

 5    Q    And right below that, what's the date on it?  Do you see

 6    the date?

 7    A    Yeah.  November '97.

 8    Q    Okay.  And is this document center to you.

 9         MR. STREETER:  If you highlight, I think the name is

10    there at the bottom of the send list.  I'm sorry, on the bottom

11    of the screen.

12    Q    You were a recipient of this on a regular basis?

13    A    Yes.

14    Q    So, what is this?  I mean, what -- who created it, what's

15    it used for?  Please explain that.

16    A    As I said, we are -- we run a global business.  Our

17    Technology Center Team, they will collect informations from

18    many publications and put it together in a form that we would

19    get our business team update.

20    Q    And I'm going to ask you to turn to certain parts of it.

21    Let's look at, on the third page of the document in the middle

22    of the page where it says BASF.

23         MR. STREETER:  Can you blow that up?

24    Q    So looking through the document.  There are sort of

25    sections on different competitors in the document?

 1    A    Yes.

 2    Q    And this is the section on BASF?

 3    A    Yes.

 4    Q    One of your competitors?

 5    A    Yes.

 6    Q    Go ahead and read just the second paragraph there.

 7              MR. STREETER:  Can you just focus on that?

 8    A    (Reading) BASF is expending their Geismer pMDI capacity by

 9    308 million tons.  And they are expanding TDI in -- sorry, I

10    can't read that -- by 8 million tons to 10 million tons per

11    year.  Both expansions are to be completed by year 2000.

12    European Chemical News.

13    Q    First of all, what's it indicating is the source of this

14    information?

15    A    It said European Chemical News.

16    Q    And how is a piece of information like this useful to you

17    in evaluating supply that's out there in the market?

18    A    It is very important information, because to see our major

19    competitor spending significant money to expand into MDI and

20    TDI, one, it indicates that they are looking at an increase in

21    market demand; and, two, as the article said, they indicating

22    what year they are targeting to have the unit start up so that

23    we can plan our business accordingly.

24    Q    What affect does it have on your pricing if there's a whole

25    lot more capacity in the marketplace?

 1    A    From a supply and demand standpoint as I mentioned earlier,

 2    when there is abundancy of supply, then the pricing -- pricing

 3    pressure to go down is there.  So that's an indication that by,

 4    in this case by year 2000, there will be additional production

 5    that comes into the marketplace from BASF.

 6    Q    And let me ask you now to go down to the next section

 7    indicted "Bayer."

 8              MR. STREETER:  And blow that up.

 9    Q    So is this the section of the document devoted to another

10    competitor of yours?

11    A    Yes.

12    Q    And I'll go ahead and read.  It says -- I'll try to get

13    this right:  (Reading) Bayer, Dormagen, had a spill of 12 mega

14    tons TDA when a feed line in the hydrogen reactor blocked.  The

15    reactor overpressured and vented TDA to the atmosphere.  The

16    spill affected numerous autos and a train that was passing by.

17    Cost estimate -- it looks like a hundred million something, and

18    then there's a reference to some people.

19              Did you also monitor this kind of activity of your

20    competitor?

21    A    Yes, we do.

22    Q    And what significance does it have to you if one of your

23    competitors has a problem at one of its facilities?

24    A    When a customer has -- when a competitor has a significant

25    production interruption, what that means is the supply will be

 1    short because they are not able to run their plant and supply
 2    the market.
 3    Q   I now want to turn to the costs, this third variable you
 4    identified that's important for your pricing decisions.
 5            What did you look to to figure out what your costs
 6    were?
 7    A   One of my responsibility as business director is to ensure
 8    that our manufacturing facilities is run -- run well and run
 9    cost competitively.  So my responsibility is to monitor the raw
10    materials that goes into our production, understand the costs
11    of utilities, these are power and gas, and also our operating
12    costs within the facilities.
13    Q   Let's talk about the raw materials.
14            What is the primary raw material for TDI?
15    A   It will be toluene.
16    Q   And how about for MDI, what's the primary raw material?
17    A   Benzene.
18    Q   And what he affect does it have on your pricing decisions
19    when the cost of either one of those goes up?
20    A   When the raw material goes up, our profit margin will be
21    squeezed if we don't changes the price.  So it is my
22    responsibility to ensure that our pricing direction is
23    supporting the change in raw materials.
24    Q   And what sources of information did you go to to learn
25    information about costs, raw material costs, et cetera?

 1   A    Raw materials like benzene and toluene are significant raw
 2   material for the industry, and those are very much published
 3   informations.
 4   Q    And what, if anything, do you use trade publications for in
 5   connection with costs?
 6   A    Trade publications, they publish the pricing and the trend
 7   for these major raw materials.
 8   Q    And when you sat down to make up a direction as to what to
 9   do with prices, what did you do?  Describe a little bit about
10   your mechanics to the jury.
11   A    Again, because we run the business on a global basis, it
12   does take a team effort to make it happen.  So as the business
13   director, I do my basic research on the cost, on the supply and
14   demand as we talked about.  Then I would reach out to all the
15   commercial directors and we would discuss the local market
16   dynamics in the region.  Once we have the good understanding,
17   then I would be making the decision and the recommendations on
18   what price changes that will apply to each of the geography.
19   Q    I want to focus now on what the actual conditions were when
20   you showed up in the job January 1994.
21        What did you observe -- did you study the conditions
22   that had existed for the years just before you got there?
23   A    Absolutely.
24   Q    Do you have data that you could look at about what had
25   happened in '91, '92, '93?

 1    A    Yes.

 2    Q    And what did you see in that data about supply and demand?

 3    A    When I first came into the job early '94, I studied the

 4    industry for the years before.  During the period of '91, '92,

 5    '93 it was a very difficult time for the industry.  The

 6    industry was not profitable because the market was slow, the

 7    U.S. economy was not doing well at that time, and then the rest

 8    of the world was not doing great.

 9             So it was a time that the industry was not profitable,

10    and as a result there was little new investment that go into

11    the industry during that period.

12    Q    When you say "little new investment going into the

13    industry," what do you mean by that?

14    A    There was no investment on new production factories for

15    both MDI and TDI.

16    Q    And I want to get into the details in a minute about each

17    year and what you observed and what you learned, but generally,

18    between the period '94 up through at least midway through '96,

19    what did you see happening in the marketplace while you were

20    there as the business director?

21    A    When I first walk into the business '94, the U.S. economy

22    was starting to improve.  During those two, three years the

23    U.S. economy was tracking at one to two and a half percent kind

24    of growth rate, but what really was the significant growth and

25    in demand was in Asia.  Because of Asia, because of the

 1    continuing opening up of the China market, there were huge
 2    increase in demands, in cars, in washing machines and all that,
 3    and we saw a tremendous growth on TDI and MDI demand during
 4    that three years period from Asia-Pacific.
 5    Q   And what affect does growth in demand for your product in
 6    Asia have on the prices you charge in the United States?
 7    A   As I said, we run our business on a global basis, and our
 8    factory in Freeport, Texas supply the world.  When Asia-Pacific
 9    demand is high and the pricing is high on that side, we end up
10    putting more product into Asia.  And that as a result cause
11    shortage of supply in North American market.
12    Q   And what affect does that have on the prices charged here
13    in North America?
14    A   It support a strong pricing, which is pricing increase.
15    Q   I want to now focus on the year 1994.
16        We showed you the 1994.  And what did you see
17    happening in the marketplace?
18    A   Two dynamics there:  One, I just spoke to the increase in
19    demand.  From Asia and from U.S. the other dynamics is, because
20    the year, the three years before, because there was no new
21    investment in factories, the supply was very, very limited and
22    tight.
23    Q   I want to turn to one of those trade publications.
24        MR. STREETER:  If we could put DX-2422 up on the
25    screen.  Just highlight the very top where it says the title

1    and the date.

2    Q    So what publication is this?

3    A    This is the Chemical Week publication.

4    Q    And what's the date of this one?

5    A    This is June 1st, '94.

6    Q    Is this one of the trade publications you got?

7    A    Yes.

8    Q    And what's the title of the article?

9    A    It said, "Thermosets bounce back after a tough period:

10   North America recovery drives the industry."

11   Q    What are Thermosets?

12   A    Thermosets are two groups of products.  If you look at it,

13   Thermoset is a plastic group that when you put heat into it it

14   would take a shape.  Like a bottle would be a Thermoset

15   plastic.  And polyurethane is one of the Thermoset group of

16   business.

17   Q    Meaning MDI, TDI, polyol are Thermosets?

18   A    Yes.

19   Q    They're a subset of that bigger group?

20   A    Yes.

21        MR. STREETER:  If we could highlight the first

22   sentence.

23   Q    What does this tell you about what's going on in your

24   marketplace that you sell into?

25        MR. LEVERIDGE:  Objection, your Honor.  This document

 1   has not been pre-admitted and we've objected.  And to the

 2   extent that Mr. Streeter is asking the witness for information

 3   that's hearsay from this document which is hearsay itself, we

 4   object.

 5           THE COURT:  All right.  Ladies and gentlemen, we'll

 6   take a break.

 7           We're going to have a longer than usual lunch recess,

 8   so to your benefit as well, because we have some legal issues

 9   to resolve during the lunchtime.  So if you could get back here

10   at 1:30.

11           Please don't discuss anything about the case, but

12   we'll see you back here at 1:30.  Okay.  Thanks very much.

13           THE DEPUTY CLERK:  Please rise for the Jury.

14           (The Jury leaves the courtroom.)

15           THE COURT:  Everyone, be seated, please.

16           Could I see that again, please?

17           MR. STREETER:  Put it back up.

18           Your Honor, a couple things about this.  We submitted

19   a bench brief about these.  There are multiple bases on which

20   this comes into evidence.  Number one, the witness has

21   testified that this informed his view of the marketplace and,

22   you know, this is certainly in that category as are other

23   articles that I want to use.

24           The second thing is, multiple witnesses, Mr.

25   Underdown, multiple of the plaintiffs in their videotaped

 1   deposition, Mr. Pauley, others have testified, Mr. Cook I
 2   believe -- I'm sorry -- Mr. Wood I believe have testified that
 3   they relied on these and they've used them.  And there's a
 4   hearsay exception for this kind of thing.
 5        The third thing with respect to this one, your Honor,
 6   is this is more than 20 years old.  There's an exception for
 7   ancient documents.  There's nothing -- you know, there can't be
 8   any allegation that someone made up the things in these
 9   documents to help this litigation.  The document was created 14
10   years before this lawsuit was filed.
11        THE COURT:  This is from Chemical Week, this article?
12        MR. STREETER:  This is an article from Chemical Week.
13        MR. LEVERIDGE:  Your Honor, I'm not suggesting for a
14   minute that Mr. Streeter made this up for the litigation.
15        THE COURT:  No, I know that.
16        MR. LEVERIDGE:  But the point is, all this does is
17   this is a reporter's view of what the reporter is seeing.  And
18   to the extent it's being offered for the truth of what is being
19   asserted here, it's hearsay.
20        THE COURT:  All right.  Well, I can give an
21   instruction along that line.
22        It's a document, it's a journal that Mr. Ho and people
23   in his industry rely on to get information.  Is that correct?
24        MR. STREETER:  Absolutely.
25        THE COURT:  Okay.  All right.  So I'll admit it and

 1    I'll give a cautionary instruction.

 2           MR. LEVERIDGE:  Thank you, your Honor.

 3           THE COURT:  You know.

 4           MR. STREETER:  There are going to be a number of

 5    these.  I don't know whether you want to wait until the end.

 6           MR. LEVERIDGE:  I'd like to do it first and then I

 7    won't repeat it.  I'll have a standing objection.

 8           THE COURT:  You'll have a standing objection and I'll

 9    give them that instruction.

10           MR. LEVERIDGE:  Thank you very much.

11           THE COURT:  I'm mindful of our commitment, but we're

12    trying to get time in, and I am.

13           So we'll take a break.  Why don't you get back here

14    ten after, no later than quarter after and then we'll deal with

15    Ms. Ginn.

16           MR. McENROE:  Yes.

17           THE COURT:  We'll do that out of turn without the

18    jury.  Okay?

19           MR. BERNICK:  Yes.

20           THE COURT:  All right.  We'll see you then.  Thanks.

21           MR. STREETER:  Thank you.

22           MR. LEVERIDGE:  Thank you, your Honor.

23           (Witness temporarily excused.)

24              A F T E R N O O N   S E S S I O N

25

1           (Proceedings resume - Jury not present.)

2                THE DEPUTY CLERK:  Remain seated.

3                THE COURT:  Just a moment.

4                All right.  You know, I wanted to hear you with regard

5      to the summaries.  Now, when I say "summaries," I'm using that

6      in a very loose term, quite frankly.  I want to hear you with

7      respect to these submissions that Dow has presented to

8      plaintiffs' counsel.

9                As I understand it, Easter Sunday four new submissions

10     referred to as Exhibit A through E were served on plaintiffs'

11     count.

12               Correct, Mr. Johnson?

13               MR. JOHNSON:  That is correct, your Honor.

14               THE COURT:  Okay.  And prior thereto, some time before

15     March 14th, a number of other similar submissions were served

16     on you.  I don't know the exact date, but I know that the

17     plaintiffs filed a motion objecting to those proposed summary

18     exhibits.

19               MR. JOHNSON:  Yes, we did, your Honor.

20               THE COURT:  Your motion was filed on March 14th

21     setting forth in detail what your objections were to those

22     proposed exhibits.

23               Correct?

24               MR. JOHNSON:  Yes.

25               THE COURT:  Okay.  So we have the ones that were

1    previously submitted prior to March 14th which you had an

2    opportunity to object to, and then you have the ones that were

3    just submitted on Sunday, Easter Sunday which you presented a

4    letter dated March 28th, 2016, by Carella Byrne outlining your

5    objections to the new ones.  Correct?  And the old ones?

6              MR. JOHNSON:  Yes, your Honor.

7              THE COURT:  Okay.  All right.  I'll hear you, Mr.

8    Johnson.  Let me hear what you have to say.

9              MR. JOHNSON:  With respect to the letter of March

10   28th, 2016, that was actually -- you said four, it was five

11   sets --

12             THE COURT:  I said six.

13             MR. JOHNSON:  It was actually six originally but

14   during the evening of Easter Sunday they withdrew one.

15             THE COURT:  Okay.  So there's five.

16             MR. JOHNSON:  So we're down to five, which I think I

17   attached to the letter as an exhibit, Exhibits A through E.

18             THE COURT:  Yes, you did.  I have that.

19             MR. JOHNSON:  And obviously in our view this comes far

20   too late in this process to be entertaining new summary

21   exhibits.  I'm particularly concerned about the fact that these

22   were only presented to us after we had closed our case and

23   after Dr. Marx had already testified.

24             THE COURT:  Why don't we start with:  What are they?

25   I know -- no.  I know Mr. Bernick, you argue these are simply

1    summaries.

2              MR. BERNICK:  But they are --

3              THE COURT:  Right?  And you're saying they're

4    summaries pursuant to Rule 1006.  Correct?

5              MR. BERNICK:  That's correct.

6              THE COURT:  Okay.  You agree with that?

7              MR. JOHNSON:  I do not agree that they accurately

8    represent some of the prices outlined in this thing because

9    they are taken from a source that was really not intended for

10   this purpose, which is to try to divide up the suppliers and

11   try to distinguish between prices, between the suppliers.

12   We've never used them in that fashion.  We used them as the

13   weighted median of the entire industry.

14             The problem is that when you do this you run into

15   issues of really what is reflected in that first level data,

16   and that first level data does not reflect actually the net net

17   price.  It does not include the rebates and the signing bonus,

18   bonuses --

19             THE COURT:  By the way, is Dr. Ginn, is she in court?

20             MR. BERNICK:  Yes, she is.

21             THE COURT:  Oh.  Ask her to step outside.

22             MR. STREETER:  She's outside, your Honor.

23             THE COURT:  She's outside?  For purposes of this

24   argument, ask her to step outside.

25             Go ahead.

 1          MR. JOHNSON:  So it is not reflective -- it's an

 2     unfair use of a summary exhibit, it's misleading in that it

 3     does not really reflect -- when you say and you try to compare

 4     BASF, Bayer, Dow, Huntsman and Lyondell and claim these lines

 5     are a proper comparison between prices, it's just simply not

 6     true.  So it's a misleading representation to the jury with

 7     respect to these prices.

 8          But even -- and in addition, your Honor, as I said,

 9     I'm troubled because if they, you know, if they wanted to use

10     such things, it wasn't the time to wait until after our

11     case-in-chief was closed to present these kind of things and

12     giving us no opportunity to respond at all.  And this has been,

13     as your Honor knows, this has been a sort of repeating pattern.

14     And I hate to -- I hate to even mention this, your Honor, but

15     we literally received still another summary exhibit while we

16     were sitting in trial this morning supposedly that Dow wants to

17     use with a witness tomorrow.

18          Now, given that your Honor chastised me a bit for not

19     raising the issue of our objection to some exhibits used by Dr.

20     Elzinga, I immediately, I sent an email -- and I don't know if

21     your clerks have even seen it yet -- I sent them an email with

22     this new exhibit that we literally got while we were sitting

23     here this morning taking testimony for a witness to be

24     presented tomorrow.

25          And we have this repeating pattern.  You remember with

1      Mr. Underdown they did the same thing.  They presented a new
2      summary exhibit --
3              THE COURT:  Let's not get sidetracked with that.
4      Let's focus on what this is.  Okay?
5              MR. JOHNSON:  Yes, your Honor.
6              So what we have here is exhibits that do not reflect
7      actual prices with all the rebates and with all the signing
8      bonuses and the other things built in.  And these vary somewhat
9      from exhibit to exhibit.  But having come so late in the day,
10     we haven't really even had the chance to go back to our experts
11     and really bear down on them because we're in the midst of
12     trial and trying to present testimony to your Honor.  So we
13     just think -- certainly as to these --
14             THE COURT:  Do you agree that these are summaries?
15             MR. JOHNSON:  They're an attempt at summaries.  They
16     are an attempt to gather admissible evidence --
17             THE COURT:  Are you falling asleep, Mr. Bernick, or
18     are you just annoyed?
19             MR. BERNICK:  Yes, I'm annoyed.  I'm trying not to
20     look annoyed, but I'm annoyed.
21             (Laughter.)
22             MR. JOHNSON:  They're an attempt at a summary, but a
23     summary, of course, has to be based on admissible evidence.
24             THE COURT:  Go ahead, Mr. Bernick, let me hear from
25     you.

```
1              MR. BERNICK:  So, your Honor --
2              THE COURT:  By the way, I have gone back and reviewed
3      Dr. Ginn's affidavit or declaration dated March 6th, 2016.
4      Okay?
5              MR. BERNICK:  And I think I may have a way of making
6      this very easy to understand.  First, with respect to whether
7      they're summaries.  They are clearly summaries, just as much as
8      this document here which is their display of that blue line
9      which is their weighted median industry line for TDI, that's a
10     summary.  That is comprised of and reflects all of the
11     underlying data, does so accurately.
12             If we were to prepare a tabulation of it, it would go
13     on for several pages.  The jury would never be able to
14     understand it.  And the case law that's in our brief that we
15     filed on March the 11th --
16             THE COURT:  Who's chart is that?
17             MR. BERNICK:  That is Raiff's chart.  Raiff's chart --
18             THE COURT:  Which you had for how long?
19             MR. BERNICK:  Which we've had for quite some time.
20             THE COURT:  Okay.
21             MR. BERNICK:  So the Raiff chart is a median, it's an
22     average.  It's an industry --
23             THE COURT:  Okay, okay.
24             MR. BERNICK:  So that's a summary.  So I mean, to hear
25     a question about whether these documents, although they look
```

 1    like demonstratives are summaries, they most certainly are.

 2    They are a compilation of data in a way the jury can

 3    understand.  The jury, just like with the Underdown

 4    compilation, they're never going to understand it.

 5         THE COURT:  Why didn't you provide these to plaintiffs

 6    significantly before March of this year?

 7         MR. BERNICK:  I'll explain exactly why.  So we did --

 8         THE COURT:  Well, not -- okay, the five that came in

 9    on Sunday.

10         MR. BERNICK:  No, this actually -- a smaller subset

11    than that.

12         So what we supplied before the Pretrial Order and we

13    called them summaries were a whole bunch of charts, including

14    various charts that are no longer before you -- well, Dr.

15    Elzinga's charts were among those, you admitted those this

16    morning.

17         And so we supplied other charts that were earlier

18    iterations of some of the documents you have.  Some of what we

19    submitted over the weekend was submitted prior to the Pretrial

20    Order, and I can tell you exactly which ones they are.  So we

21    submitted a lot before the Pretrial Order that they're saying

22    they didn't get until recently.

23         The effort on Sunday was to give them everything,

24    including some new things, but to give them everything even if

25    we hadn't given it to them before, in part because we changed a

1      couple of labels and we also dramatically shortened the list.

2      So this was an effort.  We knew Ms. Ginn was going to be here.

3      We know your Honor was going to take it up.  We knew it was

4      part of our case now not the other side's case, so we went

5      through and gave them the full list so they would have

6      everything in front of them.

7            And I can explain to your Honor just very quickly, it

8      will take a minute and we can show these very quickly, I'll

9      tell you exactly what they are and whether they're new so that

10     you'll have a list of what's new and what's old.

11           So this chart here that I put up, the Raiff chart is a

12     weighted median chart per Dr. Marx's data.

13           If you could show, Josh, 8710.

14           This is now one of the new charts.  And all we did was

15     we took the same line, that blue line and we show it by

16     supplier.  It is otherwise identical.  They have a whole

17     consulting firm, they can do this chart in half a heartbeat

18     just like our people did.  The idea was to get away from

19     earlier charts before the Pretrial Order that were slightly

20     different because we wanted to remove the issue and remove the

21     controversy.

22           So they chose to do it industry-wide.  We're very

23     focused on doing it supplier specific so that you can see the

24     differences, just as I did in the opening.  So when I showed

25     the version of this chart in opening, your Honor, it was based

1    upon a slightly different average than they use.  So all I did

2    was take what I used in opening which had been given to them --

3    that is, that is 87 -- show 8699.

4               8699 is the identical chart.  This was shown to them

5    before the pretrial order.  It was used in my opening.  So

6    that's old.

7               What we did to go to 8710 was to eliminate all issues,

8    because this is not a benchmark, this is all MDI; whereas

9    theirs is only pMDI which is a benchmark product for their

10   model.  So if you look at 8710, all we did was do the identical

11   chart but we did it exactly like their line using only pMDI

12   which is the benchmark product.  So that there is no difference

13   between those two other than this shows the suppliers, in order

14   to eliminate the issue.

15              So it's the same concept, the same presentation,

16   everything as we had before the Pretrial Order and in my

17   opening statement except that we've removed a point of

18   controversy by working with the benchmark products.

19              We then have after 8710, we have TDI -- 8710, just

20   give us the last two, the other two for this, the other two

21   pages.

22              That's TDI, and then we have polyols, they're all

23   absolutely identical.  They are the same thing as they're

24   using, they're just showing the different suppliers.

25              If we go to 8711, this also is new.  8711 is the same

1    exact chart as you just saw, 8710, but we've added in the
2    industry average; their industry average.  It's the same line
3    and their but-for line.  So it's their industry line for
4    actual, their industry line for but-for, and exactly the same
5    chart.  Those are the new ones.
6         Virtually everything else here that we have, we have
7    87 -- 8694 is old, that's not brand new.  That just simply
8    picks out Dow from the whole industry for MDI.
9         86 -- then we have customers.  So 8696 is Dow, but
10   it's just the plaintiffs, the line for the plaintiffs.  All Dr.
11   Raiff's data.
12        And this enables the jury -- and here's the other
13   critical thing that is new.
14        Could we show 80 -- 86 -- where is my little folder?
15        86 -- 8715.
16        This is the transaction one.  Remember that Dr. Marx
17   showed this chart.  That was one of her boards.  And this is
18   from her in their case.  And I brought out the fact that this
19   only reflected the price by one supplier.  This was Leggett &
20   Platt, and it only showed the prices of one supplier which I
21   think was -- it may have been -- it was Dow.  And so you
22   couldn't see the fact that Leggett & Platt -- these are
23   individual transactions.  However, they are -- they're actually
24   not all net net net notwithstanding what's been said.  But,
25   however, Dr. Marx did that, we just wanted to show the other

1    suppliers.

2            So on 8715 we have used the identical approach.  The

3    line, the big line is identical.  We have not shown but-for,

4    but all the dots are done exactly the same way, and they're on

5    this chart.  And all that we've added to 8715 is the other

6    suppliers' prices so that the jury can see not just one

7    supplier's prices, but the other prices, because that bears on

8    the question of whether everybody was charging the same price.

9            So all the charts that are new that I've shown your

10   Honor, the new ones are absolutely totally identical in terms

11   of data and approach to their charts, they just show more.

12   They bring out suppliers and they --

13           THE COURT:  How long did you have their charts?

14           MR. BERNICK:  I had --

15           THE COURT:  How long ago did you have their charts?

16           MR. BERNICK:  Their charts?  We've had --

17           THE COURT:  You had them when Dr. Raiff gave his

18   report?

19           MR. BERNICK:  Oh, they're not --

20           THE COURT:  So you had a chance to depose Dr. Raiff

21   about his charts?  Right?

22           MR. BERNICK:  Sure, absolutely.

23           THE COURT:  Well.

24           MR. BERNICK:  We took our best shot before the

25   Pretrial Order to get it done, what we thought would be good,

 1     and it wasn't good enough.  So we corrected it.

 2             THE COURT:  Before the Pretrial Order, a week before

 3     this trial began?

 4             MR. BERNICK:  No, these charts are actually, some of

 5     the charts -- not these, these are new -- but some of the

 6     charts are significantly older.  And some of these charts

 7     actually go back even in the depositions they were used, in the

 8     Pauley deposition.  I'm going to show you the Pauley

 9     deposition.  That's three years old.

10             THE COURT:  I allowed you to use the Pauley --

11             MR. BERNICK:  No, they're still objecting to the

12     charts themselves coming into evidence.

13             THE COURT:  That's different, okay.

14             MR. BERNICK:  So on the prices --

15             THE COURT:  But you had those charts.  Okay.

16             MR. BERNICK:  We did.  So I can't say, your Honor,

17     that we've been as diligent as we should have been perhaps, but

18     the whole effort here is that they've known about the approach,

19     they've known exactly what we've done, and all that we've done

20     that's new since the Pretrial Order is we have conformed all of

21     our data and all of our approaches with theirs to show simple

22     differences:  Multiple suppliers; customers; multiple suppliers

23     at the customer level; multiple suppliers at the industry

24     level.  There's all kinds of things, and Dr. Elzinga's charts

25     are another example of that.

```
 1              THE COURT:  What?
 2              MR. BERNICK:  Those are older, those are older.
 3              But these are all presentations, different
 4     presentations of data, and they're very, very important.  And
 5     it's not like they -- they say that they can't figure this
 6     out --
 7              THE COURT:  When Dr. Ugone -- Ugone, right?  When he
 8     testifies he's going to be referring to charts that were
 9     utilized during his deposition I assume.  Correct?
10              MR. BERNICK:  That's correct, yes.
11              THE COURT:  So you had charts when he was deposed as
12     an expert that he'll refer to in -- when he was deposed.
13     Correct?
14              MR. BERNICK:  That's correct.
15              THE COURT:  Okay.
16              MR. BERNICK:  But all this is designed -- yeah.
17              THE COURT:  And you're intending to use these charts
18     with him --
19              MR. BERNICK:  With either with him or with company
20     witnesses.  See, the problem is, take Mr. Pauley and take Mr.
21     Underdown.  The practical --
22              THE COURT:  You know, I guess the timeliness of this
23     is troubling.  I'm sorry, it's just troubling, even if it was a
24     few weeks ago.  Because they did raise an objection to this.
25              MR. BERNICK:  We tried to get this resolved much
```

```
 1    earlier.
 2              THE COURT:  What's that?
 3              MR. BERNICK:  We did try to raise all of these things.
 4              THE COURT:  Use the microphone.
 5              MR. BERNICK:  We did try to get all of these resolved
 6    earlier.
 7              The problem is, your Honor, that if you take Mr.
 8    Underdown as an example, okay -- Mr. Streeter actually has --
 9    the Pretrial Order specifically reserves --
10              THE COURT:  I saw that.  I have that.
11              MR. BERNICK:  And so, but you take like the Underdown
12    exhibits.  If you want to examine any witness, any business
13    person with respect to what happened in the industry, indeed,
14    what happened with them, like a customer, there's no way as a
15    practical matter you can begin to examine them meaningfully in
16    front of the jury unless they're working with a summary of what
17    happened.  And if you've got an inch of paper that's all of the
18    data.  It's never going to work.  These are as a practical --
19    I'm sorry, your Honor --
20              THE COURT:  No, I -- I hear you.
21              MR. BERNICK:  Now we have some other summaries -- I
22    mean, the most important ones for us, your Honor, I'll just
23    say, are the ones that show in the identical mode the other
24    suppliers' prices for the same customer, just like this one
25    here, 8715.  It's the same line that not only includes Dow, it
```

1      includes the other suppliers so the jury can see the

2      differences.  And then 8710, which is -- if you can show --

3      that's the one that simply breaks out of their price line the

4      four suppliers.  Those are the most important new ones.  The

5      old ones, we have the two that are part of the Pauley

6      deposition, and then we have the capacity charts, 8692, which

7      is U.S. capacity, for -- and this comes from the database.

8              THE COURT:  All right.

9              MR. BERNICK:  And then we have the scatter plot, which

10     is just their data plotted as a scatter plot.  And then the

11     margin chart, 8693, this is identical, the same financial

12     summary that was used in the Class trial for the Class period.

13     Identical.  Nothing has changed, it's all Dow financial data

14     and it's simply presented in a form the jury can see.  This has

15     been out there for a very, very long time, there's no surprise

16     about this.  So --

17             THE COURT:  Are you objecting to that one, Mr.

18     Johnson?

19             MR. JOHNSON:  Yes.  I didn't try the Class case, I'm

20     in this case.

21             THE COURT:  Okay.

22             MR. JOHNSON:  This was not produced in this case.

23             MR. BERNICK:  Yes, it was.

24             MR. JOHNSON:  In a timely fashion.

25             MR. BERNICK:  When was it produced?

1           Before the Pretrial Order this was produced.

2           MR. JOHNSON:  Yes, the day before.

3           And, your Honor, if I could, may I?

4           THE COURT:  Yes.

5           MR. JOHNSON:  Could I have the floor for a moment?

6           THE COURT:  I'll allow you, Mr. Johnson.  Go ahead.

7           MR. JOHNSON:  I heard a couple of things there in that

8    presentation.  First and foremost, the six -- the five sets

9    that you have in front of you that came with the letter --

10          THE COURT:  Use the microphone.

11          MR. JOHNSON:  -- those were totally new, totally new

12   to us, they were not given to us before.  In fact, it came in

13   an email that said on the top of it:  New summary exhibits.

14          So to say that we had those before, that we knew about

15   those is just wrong.

16          The second thing I heard Mr. Bernick say, that they

17   apparently made changes to some of these that were shown to the

18   jury in his opening.

19          They made adjustments to slides that were shown to the

20   jury.

21          You may remember --

22          THE COURT:  I remember that.

23          MR. JOHNSON:  -- you cautioned Mr. Bernick about

24   showing stuff that they couldn't prove up later, and he's gone

25   ahead and done it.  And of course it will be very difficult to

1    show the jury exactly what he has done, but he just admitted it

2    right here, and we're dealing with these new exhibits in an

3    untimely manner.

4           The third thing he said which was astounding to me, is

5    they took some slides that were Dr. Marx's slides and added new

6    information to them, new things they want to show, and they

7    waited until after Dr. Marx was finished so that she had no

8    ability to see what they had done and respond to it and say:

9    They have a summary exhibit that does this.  This is wrong.

10          You remember when Dr. Marx was testifying and they

11   tried to put up one of these exhibits in front of her which

12   tried to show that the producer-by-producer prices?  And she

13   had seen that one before because she had that one, and she

14   said, that's totally wrong.  You got Lyondell there with the

15   higher price, and everybody knows that Lyondell was the lowest

16   price to that particular customer.  You haven't built in the

17   net net price on any of these exhibits.

18          So that was an exhibit that she was able to respond

19   to, she was able to critique when they tried to use it in front

20   of her.  Now we want a whole bunch of new exhibits that they're

21   apparently going to use with lay witnesses to undermine her

22   testimony after she's no longer here.

23          That's not right.  It's not supposed to be trial by

24   ambush.  You're supposed to present to the other side what

25   you're going to use, particularly in the way of summary

 1    exhibits which are so important and have to be verified against
 2    many underlying things because in their nature they're not
 3    simple.
 4         And so when they take a median price and they divide
 5    it up into all the different producers, it's inherently
 6    misleading because it's not necessary net net prices.  So the
 7    differences he points to in those lines is an illusion.  It is
 8    not based on fact and it will mislead the jury as to the true
 9    differences between the prices which, frankly, only comes as a
10    result of different volumes and different terms that are
11    granted within those contracts.
12         Just like Dr. Marx said when she saw that exhibit:
13    That's not right.  Lyondell should be at the bottom of that
14    chart, and you've got it at the top.
15         Because they aren't accurate, and they will present a
16    misleading picture to the jury.
17         So we object to all of these new exhibits on the basis
18    of what they have in them, on the basis of timeliness in this
19    trial, and on the basis of what has happened in the past
20    already here with respect to the presentation of summary
21    exhibits in an untimely manner.
22         MR. BERNICK:  If I could be heard just very, very
23    briefly, your Honor.
24         First again, the six sets are not all new.  I told
25    your Honor very specifically what's new and what's old, and I'm

1    sure that your Honor has that down.

2           This has been sitting out there for a very long time,

3    prior to the Pretrial Order which as you know creates the

4    opportunity to have these issues resolved later on.  We've been

5    very diligent in trying to get them resolved, and maybe not

6    diligent enough, but it is what it is.

7           With respect to the question of timing and Dr. Marx.

8    Yeah, she presented only one supplier's prices.  And I examined

9    her on that and she admitted she had only presented one

10   supplier's prices.  She had the opportunity to say that that

11   was all that was necessary.  And all that we've done -- you

12   can't sit there -- well, all that we've done is to present on

13   the same chart the additional data.  They can't say it's

14   inaccurate because it's not inaccurate.

15          So this all really comes down to one thing.  If we can

16   show 86 I think it is 94.  It's the -- 86 --

17                MR. McENROE:  Which one?

18                MR. BERNICK:  No, it's the one that's --

19                THE COURT:  Listen, both of you, everybody.  I don't

20   know who got what, when exactly, all I know is I got this on

21   Sunday.  Okay?  I got this Sunday.  All right.  At least five

22   of the exhibits proposed I got Sunday.  Sunday.  Sunday.

23                MR. BERNICK:  Yeah, I'm sure, that's true.

24                THE COURT:  That's when I got them, that's when I was

25   first alerted to this whole issue.  Okay?

1          This wasn't brought up during the plaintiffs' case as

2     far as -- well...

3          MR. BERNICK:  I'm sorry.

4          THE COURT:  It wasn't brought up in any significant

5     way to me, it really wasn't.  I would have a recollection if it

6     was brought up in a significant way to me.

7          It's now 1:50 and the jury was supposed to be back

8     here at 1:30.  One of the problems I'm having with this right

9     now is whether they're really summaries or whether they are a

10    supplement to an expert report.  I know your different

11    positions.  Okay?

12         I know you're strongly arguing they're summaries.

13    Even reading Dr. Ginn's declaration, she uses the term

14    "calculate."  There's some evidence in her own declaration that

15    would suggest they're more than just a summary.  Okay?

16         Now, if I'm going to listen to Dr. Ginn, I'm not going

17    to keep this jury sitting in the jury room listening to --

18    because I suspect if we put Dr. Ginn on the stand it's going to

19    be a while, this is not going to be a 10-minute hearing, I

20    don't expect it would be.  Okay?

21         MR. BERNICK:  Right.

22         THE COURT:  I would like to bring the jury out and get

23    more testimony today on something else.

24         MR. BERNICK:  I think that that --

25         THE COURT:  If Dr. Ginn has to stay over, I'm sorry,

```
1    this was not my doing.  Okay?  I need some time myself to go

2    back through these charts and their brief and your position.

3              So let's get on with something else --

4              MR. BERNICK:  Sure.

5              THE COURT:  -- and then we'll deal with this some time

6    maybe tomorrow, we'll deal with the final version of it.

7              MR. BERNICK:  That's fine.  Just to be sure, there was

8    a brief that we filed, that's what they're -- you probably know

9    that, that's what they responded to as our original bench brief

10   on March the 11th.

11             THE COURT:  I'm sure I have it.  I have their brief as

12   well.  But if that's an extra copy -- I'm sure we have it

13   but --

14             MR. BERNICK:  And this is what made the original -- I

15   know a lot of things were going on, your Honor.

16             THE COURT:  Okay.

17             MR. BERNICK:  That's fine.

18             THE COURT:  All right.  Let's proceed that way.

19             MR. BERNICK:  Thank you.

20             THE COURT:  So none of us -- and, Dr. Ginn, if we're

21   going to hear testimony from her it will have to be another

22   day.

23             MR. BERNICK:  Thank you.  Okay.

24             MR. JOHNSON:  Your Honor, I hate to even mention it,

25   but just so you have it in your mind, we got another summary
```

1    exhibit during court today.

2              MR. BERNICK:  I told him that we're withdrawing it --

3              MR. JOHNSON:  For a witness tomorrow --

4              THE COURT:  What's that?

5         Look, you've all been very cooperative, let's not

6    start interrupting each other.

7              MR. BERNICK:  I told Mr. Johnson that in light of his

8    concern, again it's the same thing as an old one but a new

9    version, we would not use it as a summary.  We'll simply use it

10   as a demonstrative in connection with his testimony.  So that

11   is not being proposed as a summary.

12             MR. JOHNSON:  Your Honor, I object to the use of it as

13   a demonstrative, I object to the use of it as a summary.  I

14   object to having an examination of a witness and the day before

15   to get new evidence, which as your Honor correctly said, looks

16   more like an expert addition, getting new evidence before the

17   jury.

18             THE COURT:  I don't know what the new chart is, so let

19   me know about it, let me see it.

20             MR. JOHNSON:  I forwarded it to your clerks.  I did

21   not have a hard copy at the time.  I do now.  If I may hand it

22   up.

23             MR. BERNICK:  Your Honor, this is a new version.

24             MR. JOHNSON:  I apologize for that.

25             THE COURT:  Slowly, everybody.

```
 1            MR. JOHNSON:  I don't want this to hit you tomorrow.
 2            MR. BERNICK:  This is a new version of an almost
 3     identical slide that was used in the Class trial in the
 4     examination of Mr. Dawson.  All we did was to clean it up a
 5     little bit.  But it's the same --
 6            THE COURT:  In the future don't make reference to the
 7     Class trial.  Mr. Johnson is quite right, there was a different
 8     trial, different litigants I assume.
 9            MR. BERNICK:  But they've used the Class trial all the
10     time in cross-examination.
11            THE COURT:  Okay.  But I'm not so sure that's... all
12     right.
13            MR. BERNICK:  This is our price increase
14     announcements.  He was there --
15            MR. JOHNSON:  I didn't have the pleasure of Mr.
16     Bernick's company at the Class trial, I was not there.
17            THE COURT:  Okay, all right.  I'll look at it.
18            You just got this?
19            MR. JOHNSON:  Just got it.  And if you'll notice, your
20     Honor, the number --
21            THE COURT:  Who's the witness that --
22            MR. BERNICK:  It's Mr. Dawson, Pat Dawson, he's a
23     witness for tomorrow.  And if your Honor has a problem with it
24     we just won't use it, but it's not like it's something that's
25     revolutionary.
```

 1              THE COURT:  Okay.

 2              MR. JOHNSON:  I would just note for your Honor, if you

 3    look down at the bottom at the number, it's source documents

 4    apparently used to create this thing.  It will take me all

 5    night just to track all of those down.

 6              MR. BERNICK:  I'm told that before Judge Pisano the

 7    Class trial was used as a precedent overwhelmingly to get

 8    documents in for the plaintiffs.  That is what actually came in

 9    in the Class trial.  So this is not -- Mr. Streeter was

10    there --

11              MR. STREETER:  The point is, your Honor, it's not new

12    to Mr. Johnson, he's studied the Class transcripts a year ago.

13              THE COURT:  Okay.

14              MR. STREETER:  He used it against us in front of Judge

15    Pisano repeatedly, and the notion that this is new to him is

16    just false.

17              THE COURT:  Okay.

18              MR. JOHNSON:  All right.  That -- I'm sorry, I must

19    respond to that.

20              I have not seen that exhibit before this morning.  I

21    have never seen that exhibit.  I did not go back and look at

22    all of the exhibits which may or may not have been used in the

23    Class trial.  I do not have those exhibits.  And for him to

24    stand here and say that I did is just flat wrong.

25              THE COURT:  Okay.  I've heard you all.

1           Let's bring out the jury.

2           Who are you going to call next? -- oh, you still have

3     Mr. Ho.

4           MR. BERNICK:  Mr. Ho, and then we have a deposition.

5           THE COURT:  Okay.

6           THE DEPUTY CLERK:  Mr. Ho, do you want to take the

7     stand, please.

8

9     P A T R I C K   H O, resumes, testifies further as follows:

10

11          THE DEPUTY CLERK:  Please rise for the Jury.

12          (Jury present.)

13          THE COURT:  Okay.  Thank you for being patient.  We

14    have been out here working since 1:15.  And again, when we do

15    that -- be seated, everyone -- when we do that hopefully it

16    makes things run smoother when you're in here and saves us

17    time, we hope.

18          All right.  Thanks very much.

19          Go ahead, Mr. Streeter, continue your examination.

20          MR. STREETER:  Thank you, your Honor.

21          Good afternoon.

22          MR. STREETER:  At the time we broke we had DX-2422 up

23    on the screen and I believe your Honor was going to rule on an

24    objection.

25          THE COURT:  All right.  Are you going to ask him

```
 1    questions about that?

 2              MR. STREETER:  I am.

 3              THE COURT:  Okay.  Go ahead, ask the questions and

 4    then I'll rule on it.  There was an objection -- well, there's

 5    an objection to using it.

 6              Ladies and gentlemen, I've ruled that Mr. Ho is

 7    permitted to answer questions regarding this journal.  This is

 8    a journal by the name of Chemical Week, 1994.  It's a trade

 9    journal that's used in the industry.  And he'll testify that he

10    read that and took that into consideration, I'm assuming.

11              Correct, Mr. Streeter?

12              MR. STREETER:  Yes.

13              THE COURT:  Okay.  What you should understand is the

14    journal itself is not being offered for the truth of what's in

15    the journal, it's being offered to show that Mr. Ho relied on

16    that information in making his decisions.  Whether or not

17    that's true or not, we don't know because that it's hearsay.

18    But it's being offered not for the truth but being offered to

19    show what Mr. Ho did upon reading it.

20              Correct?

21              MR. STREETER:  Thank you, your Honor.

22              MR. LEVERIDGE:  Thank you, your Honor.

23              THE COURT:  Okay.

24                        DIRECT EXAMINATION CONTINUES.

25    BY MR. STREETER:
```

 1    Q   So let's look, first of all, at the title.  It says
 2    "Thermosets bounce back after a tough period:  North American
 3    recovery drives the industry."

 4        So what role does a piece of information like that
 5    have on you when you're making a decision about the prices
 6    you're going to propose?

 7    A   Information like that will give us the market information.
 8    More from a independent look into the marketplace, it will
 9    allow us to add to our information base and also validate the
10    assumptions that we have.

11        In this particular case, back in '94, we were really
12    projecting an increase in demand in the industry supported by
13    an improving market.  So this document essentially support some
14    of the assumptions that we made.

15    Q   And when you say "in an improving market or increasing
16    demand," what does that mean in terms of what you're going to
17    do with respect to prices?

18    A   As demand improve, we see opportunities to increase our
19    pricing.

20    Q   And in the years '91, '92, '93, how was the business
21    performing in terms of profitability?

22    A   It was pretty bad.

23    Q   And so what are you looking for opportunities to do going
24    into this up market?

25    A   As we look into the up market, we were looking for

1    opportunities to improve our pricing in order to improve our
2    profitability.
3    Q   I want to turn the page 3 of the document and I want to go
4    to this paragraph right here.
5         So that says:  (Reading) That, combined with strong
6    demand for ridged urethanes used in home appliances, is
7    squeezing feed stock capacity, especially Methylene
8    diisocyante, MDI, where material is being imported to balance
9    the market.  Miles and ICI Polyurethanes are believed to be
10   considering expansions.  Miles is also considering its Baytown,
11   Texas site for a world-scale toluene diisocyanate expansion
12   of -- a TDI expansion.
13        Now, when you see this kind of information --  first
14   of all, what does that mean, "squeezing feed stocks"?  What
15   does that mean?
16   A   This is essentially tightening the supply industry.
17   Q   And when you see one of your competitors -- tell me what
18   that second sentence means.  What does that sentence that
19   starts with the word "Miles and ICI."  What does that tell you?
20   A   What that said is, our competitors looking at a very
21   positive demand forecast and they are making investment to
22   increase their production ability.
23   Q   When you say, "making an investment to increase their
24   production ability," how does one go about doing that?
25   A   Typically there are two-ways to do it.  You can

1    incrementally improve on your existing facilities to make more

2    product, and by that we would call it de-bottlenecking.  But

3    there's only a limit of how much you can do that.  The other

4    way is to do a whole new facility, a new factory.

5    Q   Let me start with the de-bottlenecking.  Can you give us a

6    concrete example of how you'd go about de-bottlenecking a

7    facility?

8    A    In the chemical industries there are equipments like

9    reactors, compressors that there are opportunities that if you

10   add a reactor or add equipment, like a compressor, to the

11   existing machine, you can actually make more product out of it.

12   And that's what we would call de-bottlenecking.

13   Q   You said add a reactor.  Right?

14   A   Yes.

15   Q   Okay.  And a whole new facility, what are you referring to

16   there?

17   A   A whole new facility will be a whole new production line

18   where you are talking very substantial investment.

19           MR. STREETER:  And I just want you to highlight the

20   last sentence of that paragraph:  Miles is also considering...

21   Q   So now this is TDI.  Right?

22   A   Yes.

23   Q   The first sentence we looked at was one of your competitors

24   was talking about expanding its ability to produce MDI.  Now

25   what's this last sentence telling us?

 1   A    This last sentence is about a competitor considering

 2   building an all new TDI facilities.

 3   Q    Is this something that you would expect to happen in a weak

 4   market?

 5   A    No, because a TDI new plant, you are talking hundreds of

 6   millions of dollars, and it would take typically two and a half

 7   years, three years to build.  So for an investment of that size

 8   you want to be pretty certain that when you start up the plant

 9   that there is demand for your product.  So you would not do it

10   in a projected down market.

11   Q    And what are you seeing at this time right when you show up

12   at your job, 1994, what are you seeing right then happening

13   with demand?

14   A    The demand was really starting to pick up.

15   Q    And how about, what had the recession that preceded your

16   showing up, what impact had that had on the capacity that the

17   whole industry had to produce?

18   A    As I indicated this morning, back in the '91 -'93 days, the

19   business was nonprofitable and nobody was putting new capacity

20   in.  So the projection at that time was, at least we feel in

21   two, three years period there will be no new facilities that

22   come into play.

23   Q    And what does that mean when no new capacity, but big

24   demand?

25   A    Well, what that means is when the demand for the product

1    continue to increase and your production is limited by your

2    current facility, then the supply and demand become very tight.

3    Q    And did -- what is PO?

4    A    Propylene oxide is a raw material that goes in to produce

5    polyol.

6    Q    One of the three polyurethanes.  Right?

7    A    Yes.

8    Q    Actually the one that Mr. Fischer at the time was in charge

9    of.  Correct?

10   A    Yes, that is polyol product.

11   Q    And focusing your attention on October of 1994, what

12   announcement, if any, did Dow make about PO capacity?

13   A    We were projecting a very tight market and we were looking

14   at expanding our PO facilities.

15   Q    And did you, in fact, plan to do that?

16   A    We did.

17   Q    And did you announce it to the marketplace?

18   A    Yes, we did.

19   Q    And what affect does an announcement like that have

20   , if you know -- when you get an announcement like that from

21   one of your competitors, what affect does it have on you?

22   A    It confirms our forecast on a high growth, high demand

23   projection.

24        MR. STREETER:  Okay.  I want to put up DX-6817, and

25   we're offering this for the same limited purpose, your Honor,

 1    as the prior exhibit.

 2              MR. LEVERIDGE:  Your Honor, given that representation

 3    and the instruction you gave the jury I won't object each time,

 4    but I hope that won't be seen as a waiver of the objection.

 5              THE COURT:  No, it's not a waiver unless it's

 6    something new, but otherwise your objection is noted.

 7              MR. LEVERIDGE:  Thank you, sir.

 8              MR. STREETER:  Okay.  If we could blow up just the top

 9    so that we can see the title, first of all.

10              Just blow up the top.

11              There we go.

12    BY MR. STREETER:

13    Q    So this is Chemical Week again, October 1994.  Right?  Is

14    that right --

15    A    Yes.

16    Q    -- Mr. Ho?

17              And what is the headline here?

18    A    It said, "Tightening PO market prompts major expansion by

19    Dow."

20    Q    And this is the expansion that you're talking about?

21    A    Yes.

22    Q    This is a new factory?

23    A    Yes.

24              MR. STREETER:  And I just ask you to highlight the

25    first paragraph.  I'm not going to read the whole thing.

 1    Q    Can you just read the first sentence a loud for us?

 2    A    (Reading) Dow Chemical's decision to expand its worldwide

 3    propylene oxide operation by more than 500 million pounds a

 4    year highlights growing tightness in the marketplace for PO and

 5    its derivatives.

 6              MR. STREETER:  Then if we could just do the first

 7    sentence of the second paragraph, highlight that.

 8    A    Do you want me the read it?

 9    Q    Yes, if you would.

10    A    (Reading) At the same time the company says polyol and

11    isocyanate, the two component of the polyurethanes, are both

12    growing at more than 10 percent annually.

13    Q    Let me ask you:  Give me an order of magnitude, I don't

14    want the exact figure, just the order of magnitude how much it

15    costs to build a facility like this.

16    A    It will be more than $350 million.

17    Q    And is that something that you would do if you didn't think

18    that the demand was increasing in the marketplace?

19    A    No.

20    Q    And now I want to turn to TDI and I want to turn to early

21    1995.

22              With respect to TDI, what decisions did Dow announce

23    to the marketplace about a TDI facility?

24    A    We were -- we announced to produce -- or we announced to

25    build a second TDI production unit, all new facilities in

1    Freeport, Texas.

2    Q    The same order of magnitude in terms of cost?

3    A    Yes, 350, plus.

4    Q    And did you announce that to the marketplace?

5    A    We did.

6    Q    I'm going to put up DX-6102 with the same proviso.

7         And this is Chemical Week, February 22, 1995.  Right?

8    A    Yes.

9    Q    Titled "Dow to build U.S. TDI plant:  Miles still committed

10   to U.S."

11        Miles is a competitor?

12   A    Yes.

13   Q    And this article basically explains that you're about to

14   build a new plant.  When, by the way, were you involved in the

15   decision to build this plant?

16   A    Yes, I was the business director that approved the project.

17   Q    And when, by the way, did you expect this plant to go live?

18   A    At the time we make the announcement the projection was --

19   we were going to start up in the middle of 1997.

20   Q    And is this something you would do if you didn't see

21   increased profits available to pay for it?

22   A    No.

23   Q    Do you want to take a look just at the last sentence.

24        By the way, before we ask you about that:  Miles, was

25   Miles eventually acquired by Bayer?

1    A    Yes.

2    Q    Okay.  Taking a look at the last sentence, it says:

3    "Pricing improves $.06 a pound in the last quarter of 1994 and

4    producers say demand pressure should edge prices upward through

5    the first half of 1995."

6         What role does that kind of information make in your

7    decision to invest all this money in a plant?

8    A    What that does is it did confirm our projection that the

9    market will continue to grow and the supply will continue to

10   remain tight.

11   Q    Okay.

12        MR. STREETER:  I want to put up the second page of

13   DX-8692, and I believe we have no objection to this going into

14   evidence.

15        MR. LEVERIDGE:  No objection, your Honor.

16        MR. STREETER:  Thank you.

17        THE COURT:  All right.

18   Q    So, Mr. Ho, have you had a chance to study this chart up on

19   the screen?

20   A    Yes.

21   Q    And what is this?

22   A    This is a TDI capacity chart over the years.

23   Q    And does it start at 1992?

24   A    It does.

25   Q    And it goes all the way through to 2008?

 1   A   Yes.

 2   Q   And I'm going to ask you to focus -- maybe I'll use the

 3   pointer.  And what is the orange line?

 4   A   That is the Dow production capacity.

 5   Q   So you add up all the factories Dow's got and that's how

 6   much they can produce?

 7   A   Yes.

 8   Q   And what's the light blue line?

 9   A   That is the Bayer production capacity.

10   Q   And BASF is the green?

11   A   Yes.

12   Q   Lyondell red.  Is that right?

13   A   Yes.

14   Q   And Huntsman is the black?

15   A   Yes.

16   Q   I want you to focus first off on this period right here

17   (indicating), which is '92, right before you got there.

18           What's happening with capacity during that period?

19   A   There was little increase, little investment at that time

20   because the market was very challenging.

21           MR. STREETER:  If you could highlight '94 up to '97.

22   Highlight that period.  '93 to '97.

23   Q   You mentioned before de-bottlenecking.

24   A   Yes.

25   Q   What are we seeing here in the highlighted portion from '93

1    to the beginning of '97?

2            MR. LEVERIDGE:  Your Honor, I would object to, there's

3    no foundation for this witness to be able to talk about what

4    the charts related to any other producer other than Dow in

5    terms of the question that Mr. Streeter is asking in terms of

6    de-bottlenecking.

7            MR. STREETER:  I can lay some foundation.

8            THE COURT:  Let me see your next question then.

9    Q    My question is:  This period of time -- first of all, were

10   you watching what's happening in the marketplace in terms of

11   what kind of capacity your competitors have?

12   A    Yes.

13   Q    Is that relevant to your pricing decisions?

14   A    Absolutely.

15   Q    How much stuff is going to be in the market influences how

16   much you think you're going to be able to charge?

17   A    Yes.

18   Q    Did you go try to get information about what everybody else

19   had the ability to produce?

20   A    Yes, that's my job.

21   Q    Did you read trade adjourns about what additions they were

22   making?

23   A    Yes, I did.

24   Q    So what do you understand this period, this changes in

25   capacity to be?

1    A    In the '93-'94, the global market demand for the product

2    was really increasing, and some of the producers went into

3    de-bottlenecking, and that's what you see in a few of the

4    competitors, that they were putting money in, increasing

5    production capacity of their existing plants.

6    Q    And when you say this de-bottlenecking, these sort of

7    smaller increases in capacity --

8    A    Yes.

9    Q    -- that's what you're referring to?

10   A    Yes.

11   Q    Okay.  Now let's look at this increase if capacity right

12   here from '97 to '98.  That one in particular for Dow.  What is

13   that right there?

14   A    We announced this second production facility in Freeport,

15   Texas back in '94, end of '94, and it does -- it did take two

16   and a half years to build.  So after we announce it, by the

17   time we start up, it come on stream, it comes into production

18   in '97.  That's where you see the step jump.

19   Q    So that jump on the orange line for Dow is you adding a new

20   factory?

21   A    Yes.

22   Q    Roughly doubling your ability to produce the stuff?

23   A    Yes.

24   Q    So you can sell more of it?

25   A    Yes.

1    Q    And was that production facility delayed?

2    A    It was delayed because of some production technology

3    problems that we had.

4    Q    And was that a good thing for Dow to have a delay in a

5    production facility?

6    A    No, because with the significant investment that we made

7    and also all the fixed costs that is associated with a factory,

8    any time we delayed the plant it cost the company a lot of

9    money.

10              MR. STREETER:  And I'm going to ask, Josh, if you can

11   put the sort of -- that '97 to 2001 period, if you could

12   highlight that.

13              MR. LEVERIDGE:  Your Honor, I'm going to object to the

14   foundation with this witness.  Mr. Ho has testified from the

15   beginning of his testimony that he was done with the business

16   in I believe it's August of 1997.  So going into 2000 and

17   asking this witness questions about capacity in TDI when he was

18   no longer in the TDI business in August of '97, there's no

19   foundation for it.

20              MR. STREETER:  I think I can lay some foundation, your

21   Honor.

22              THE COURT:  Let me see.  Otherwise the objection is

23   sustained.  But let me see if there's another question.

24   BY MR. STREETER:

25   Q    When you were there in 1997, were you monitoring the plans

1    of your competitors to built new facilities?

2    A    Yes.

3    Q    How long does it take your competitors to put them on line?

4    A    Typically it's two and a half to three years.

5    Q    And did you know of instances where your competitors such

6    as Bayer had plans to add new facilities?

7    A    At that time they have announced a new building.

8    Q    And so are we seeing here some of those new builds by your

9    competitors?

10   A    Yes.

11   Q    I want to pull up the first page now of DX-8692.

12        This one here, the first one we had up was TDI.

13   Right?

14   A    Yes.

15   Q    Okay.  And this is DX-8692, and this is pMDI, which is a

16   type of MDI.  Correct?

17   A    Yes.

18   Q    It's a benchmark product of MDI?

19   A    Yes.

20   Q    What does that mean, a benchmark product?

21   A    It is the foundation product for MDI.

22   Q    The one that everyone looks at to figure out what's going

23   on in the market?

24   A    Yes.

25   Q    What do we see again in the '92-'93 period in terms of

 1    increasing in capacity?

 2    A    Again, during those few years, market was extremely

 3    difficult and there was little or new investment that went in

 4    at that time.

 5    Q    And what's happening in the subsequent period, '93 to '97?

 6    A    Those were the years when the increase in demand both in

 7    U.S. and in Asia was really pulling up the demand, and

 8    competitors including Dow putting new investment in to increase

 9    their production capabilities.

10    Q    De-bottlenecking, or new facilities?

11    A    A bit of both.

12    Q    And in the subsequent period did you learn about new

13    facilities of your competitor putting up a building?

14    A    Yes.

15    Q    And do we see new facilities coming on?

16    A    Yes.

17    Q    And, by the way, when you put all this new capacity into

18    the marketplace, you go from 1992 with the capacity there up to

19    the capacity you've got in around 2000, what affect does that

20    have on the prices?

21    A    When you have significant new production that comes into

22    the marketplace, that means supply is going to be long, and

23    what that would do is it put a down pressure on pricing.

24    Q    And I want to move into 1995 and what the demand that you

25    saw in the marketplace in 1995.  We focused on '94 already.  I

 1    just want a spend a little time on 1995.

 2              And I want to know, first of all, what did you see

 3    just generally before we get into specifics, what did you see

 4    in the TDI and MDI marketplace in terms of demand in 1995?

 5    A    It was really running at a very high rate, growing at a

 6    high rate.

 7              MR. STREETER:  I want to put pup DX-5797 with the same

 8    limitation.  I ask you to just do the top half of that before

 9    the biline.

10    Q    Okay.  This is a publication called Urethanes Technology?

11    A    Yes.

12    Q    And is this another trade publication you looked at?

13    A    Yes.

14    Q    And this is April of 1995.

15              MR. STREETER:  If you can pull up that whole title

16    there.

17    Q    And, Mr. Ho, could you read that aloud that title.

18    A    (Reading) Raw materials:  The demand, the pricing, the

19    supply and the future.  Rising demand for polyurethane raw

20    material is helping suppliers rebuild profit margin but creates

21    capacity problem within the major.

22    Q    So let's start with the capacity problems first.  What --

23    what did you understand that to mean?

24    A    What that means is the demand is growing so fast that we

25    just don't have the production to meet all the demands.

 1   Q   And what does it mean, "rising demand is helping suppliers
 2   rebuilt profit margins"?
 3   A   What that means is, with the increase in demand we have the
 4   opportunity and the ability to increase pricing which will help
 5   our profit margin.
 6           MR. STREETER:  And now I want to just highlight that
 7   first paragraph, that first -- those two paragraphs right
 8   there.  All the way down to there.  All the way down.  I'm
 9   sorry.  1995.
10           Perfect, there you go.
11   Q   Okay.  This is all we're going to focus on right here.  It
12   says:  (Reading) Rising demand for polyurethane raw materials
13   is helping suppliers rebuild profit margins but creates
14   capacity problems forcing them to make some difficult decisions
15   on supplying customers.  While most have announced plant
16   expansions, most of these are at least two years from
17   completion.  So supply remains tight while demand continues to
18   grow.  The problem is most acute with MDI, but supplies of TDI
19   and polyols have also been short.
20           The world MDI market rose nearly 20 percent in 1994,
21   or over 240,000 tons, according to Richard Clasuius.
22           Growth in Asia-Pacific rose 42 percent, equal to the
23   18 percent demand growth in North America.
24           I want to ask you about growth in Asia.
25           Let's say that the growth in the United States was

 1   zero.  It says it was 18 percent in North America.  Let's say
 2   it was zero, and you have a 42 percent growth in Asia.  What
 3   affect is that going to have on prices in the United States?
 4           MR. LEVERIDGE:  Your Honor, I'm going to object to
 5   that question.  He's now taking what this document says and
 6   asserting it as the truth of the matter for purposes of framing
 7   his question to Mr. Ho, and that's not proper.
 8           THE COURT:  Let me -- rephrase the question.
 9           MR. STREETER:  I'll rephrase the question.  You know,
10   I'll just take the document out.
11   Q   Mr. Ho, when you were the business director for MDI and TDI
12   in 1994 and 1995 and 1996, what did you see with demand from
13   Asia?
14   A   During those few years the demand from Asia was
15   exceptionally strong driven by a number of factors.  The
16   domestic consumption because of the increase in middle class in
17   countries in China really drive significant growth and demand
18   on the product, because all these demands on electrical
19   appliances, washing machines where our product goes into, and
20   new cars in the country was driving the demand.
21           And, the huge call for product in Asia-Pacific really
22   pulled some of our production from our U.S. facilities to
23   supply it, and in the process of that, the supply to the U.S.
24   market itself got shortened, and as a result it creates a very
25   tight supply situation in North America which drove the pricing

1    up.

2    Q   Let me sort of unpack that a bit.  Just, where did you

3    produce all of Dow's TDI?

4    A   It is one production facility in Freeport, Texas.

5    Q   And you were adding a second one --

6    A   In the same location.

7    Q   -- in subsequent years?

8    A   Yes.

9    Q   And when you -- do you sell into Asia?

10   A   Yes, we do.

11   Q   Did you want to meet that huge demand that was happening in

12   Asia?

13              MR. LEVERIDGE:  Objection.  Leading.

14              THE COURT:  Overruled.  I'll allow it.

15              Go ahead.

16   A   Because we run our business on a global basis and Asia at

17   that time has high demand and good margin, so we shipped the

18   product to Asia.

19   Q   And what does that mean in terms of how much product is

20   available here?

21   A   As we ship more to Asia, the product that is available in

22   the North American market becomes tight.

23   Q   And in the -- in the sort of 1995 time period, was Dow -- I

24   want to ask you to focus on PO, propylene oxide.  Right?  Is

25   that what it is?

 1    A    Yes.

 2    Q    And that's one of the things that goes into polyols?

 3    A    Yes.

 4    Q    And so even though you were running the polyols business,

 5    were you aware of what was going on generally in terms of the

 6    company's expansion plans?

 7    A    Yes.

 8    Q    And what was happening with respect to the company's

 9    expansion plans with respect to its facilities in 1995 for PO?

10    A    Because the market demand for polyurethane as a whole was

11    growing very fast, we were aggressively looking for

12    opportunities and investing in new production capabilities.

13    Q    And what about de-bottlenecking, what were you doing in

14    that regard?

15    A    We start off de-bottlenecking because that's easier to do

16    with lower cost, and then when that is done we went into a new

17    building.

18    Q    And did you yourself, in addition to this quarterly

19    analysis you did or maybe more often to determine what kind of

20    prices to propose out to the commercial team, did you also

21    generate business plans for the businesses that you ran?

22    A    Yes, I did.

23         MR. STREETER:   And I'm going to ask that DX-2409 be

24    pulled up.

25         The first thing I want to do is, can you highlight

 1    right down here what that says.

 2  Q    What does that say?

 3  A    P-H-O.  That's Patrick Ho, March '96.

 4  Q    So is this a document you created?

 5  A    Yes.

 6  Q    And when did you create it?

 7  A    March of '96.

 8  Q    Okay.  I want to now look at the product.  What product is

 9  it for?

10  A    This is for MDI.

11  Q    Okay.  And this is the global business plan?

12  A    Yes.

13  Q    If.

14        MR. STREETER:  If you could blow up this "Industry

15  Overview" section of the document.  Just the overview.

16  Q    Now, this document is not a trade publication, this is your

17  own document.  You create it.  Right?

18  A    Yes.

19  Q    Okay.

20        MR. STREETER:  I offer it with no limitation.

21        MR. LEVERIDGE:  Did you say you're offering it?

22        MR. STREETER:  I want to make clear to the jury that

23  there's no limitation on its uses.

24        THE COURT:  You're objecting to what?

25        MR. LEVERIDGE:  There is no objection, your Honor, I

 1    just didn't hear him, I'm sorry.

 2               THE COURT:  That's fine, go ahead.

 3    Q    The first sentence.  Global demand of MDI in 1995 is

 4    estimated at 3.8 billion pounds with the industry operating at

 5    close to 95 percent capacity.

 6               What does 95 percent capacity mean?

 7    A    What that means is, on a theoretical full running basis,

 8    the factories are running at 95 percent of its maximum rate.

 9    Q    Is that high or low based on your experience?

10    A    That's very, very high.

11    Q    And then the second paragraph:  Both Asian --

12               MR. STREETER:  Could you blow up that or highlight

13    that.

14    Q    (Reading) Both Asian and Latin American markets will

15    continue to see higher than average growth rate for the next 5

16    to 10 years.  North America and Europe are expected to grow at

17    1 to 2 percentage points above GNP.

18               This is your analysis of what you saw in the

19    marketplace?

20    A    Yes.

21    Q    The next paragraph:  (Reading) Significant production

22    de-bottleneck and new capacity additions have been announced by

23    major producers in North American and Europe.  The new capacity

24    will drive global asset utilization to a low of 84 percent.

25               What does that mean?

 1    A    What that means is, because these new facilities are big

 2    production volume facilities, so when they come on stream, when

 3    they start up, they will increase the supply into the industry.

 4    And because the demand was not going at the same rate, so the

 5    operating rate of the total will come down a bit.

 6    Q    And some of the predictions that are made here, did some of

 7    them turn out to be wrong?

 8    A    I think we did a very good job in predicting it.

 9    Q    Right.  But in terms of -- first of all, the backward

10    looking things, those are based on actual data that you had.

11    Right?

12    A    Those are based on actual sales, revenue and industry

13    statistics.

14    Q    But, for instance, this last paragraph:  "Global players

15    like ICI, Bayer and BASF have announced plans to build

16    facilities in China in the year 2000 plus," do you know one way

17    or another whether they did that?

18    A    They all went through.

19    Q    Okay.  All right.  Now I want to turn to the second page.

20         MR. STREETER:  And I want to blow up this paragraph:

21    "During."  And this paragraph here.  These two paragraphs right

22    there.

23         Perfect.

24    Q    (Reading) During the last low point in the business cycle,

25    1992-'93, the majority of MDI producers are economically

```
 1    unprofitable due to low capacity utilization, depressed
 2    pricing, and high raw material cost.
 3              You wrote this March of 1996?
 4    A    Yes.
 5    Q    Was it accurate?
 6    A    Yes.
 7    Q    Okay.  Then the next paragraph begins:  (Reading) 1995 saw
 8    a business upturn.  Improved world economy and change in
 9    foam-blowing agent technology drove up MDI demand and pricing.
10              You wrote that March of 1996, looking back at what
11    happened in 1995?
12    A    Yes.
13    Q    Accurate?
14    A    Yes.
15    Q    Based on data?
16    A    Based on data.
17    Q    About your industry?
18    A    About our sales and also the industry.
19    Q    The actual number of tank cars that you sent out of your
20    facilities?
21    A    Yes.
22    Q    Did you do a similar business plan for TDI?
23    A    I did.
24              MR. STREETER:  Pull up DX-5593.
25    Q    If you could just highlight again your initials, or your
```

1     first initial and your last name there.

2     A    Yes.

3     Q    You created this document?

4     A    March of '96.

5     Q    March of 1996.  This is the global business plan for TDI?

6     A    Yes.

7               MR. STREETER:  We offer it.

8               MR. LEVERIDGE:  No objection, your Honor.

9               THE COURT:  Okay.

10    Q    The first thing that's mentioned:  Critical issues.  Start

11    up new TDI plant in Freeport, January 1998.

12              You see that?

13    A    Yes.

14    Q    Delayed slightly from January 1998.  Is that right?

15    A    Yes.

16    Q    I want to turn over to the second page of the document and

17    I want to focus on the paragraphs at the bottom of the page.

18              MR. STREETER:  If you could just blow up the bottom of

19    the page.

20    Q    Industry profitability:  Industry is, and has been,

21    profitable due to high word wide capacity utilization rate.

22              What does that mean?

23    A    Because the industry is very tight on supply, as a result,

24    we were able to increase pricing which improve our profit.

25    Q    Were you -- in the '91 '92 time period, what were the

 1    profits like?

 2    A    It was -- I think the industry was not profitable in the

 3    '91-'92 times.

 4    Q    Part of your job was to try to make MDI and TDI profitable?

 5    A    Yes.

 6    Q    And how do you do that in a market like this, where you've

 7    got lots of demand and tight capacity?

 8    A    We increase our pricing and improve our profit.

 9    Q    And then the bottom paragraph:  (Reading) Industry growth:

10    Demand is projected to grow at 4 percent CGR for the next five

11    years.  While the mature markets in North America and Europe

12    will see slower growth rate of 2 to 3 percent, developing

13    regions like Asia is expecting growth at 8 to 10 percent level.

14              You wrote that?

15    A    Yes.

16    Q    And those were your expectations at the time?

17    A    Yes.

18    Q    And was that based in part on what you had seen in the

19    preceding years?

20    A    Yes.

21    Q    I want to ask you now about costs during this time period.

22    You talked about how supply and demand affect the pricing

23    situation.  How about costs?  As a general matter, what did you

24    see in terms of costs for TDI in the '94 to '97 time period?

25    A    When we look at the cost for these products, raw material

```
 1    is a big part of it and utilities to run the factory is another
 2    component.  During the '94 to '97 days the raw material of
 3    benzene and toluene was relatively very solid and it was not
 4    dropping pricing wise.
 5    Q    When you say it was not dropping, what does that mean in
 6    terms of your pricing decisions?
 7    A    What that means is, if raw material is not dropping there's
 8    no reason for us to cut price.  There's no pressure for us to
 9    do that.
10    Q    And when you say -- you said it was relatively, what was
11    the word you said?  That raw material prices were relatively
12    what?
13    A    Solid.
14    Q    Solid?
15    A    Solid means it stay at a very steady, relatively steady
16    level.
17    Q    When you say "relatively," you don't mean there weren't
18    some ups and downs, you just mean that there weren't huge
19    spikes up and down?
20    A    Yeah, there was not a major ups and downs.
21    Q    In the '94 to '97 time period?
22    A    Yes.
23    Q    I want to ask you what --
24              MR. STREETER:  I actually want to put up, if I could,
25    a demonstrative exhibit, which is, I believe it's Exhibit
```

1    Number 3.

2    Q    So the jury has seen a lot of this chart in various forms.

3    The source is the Rule 26 disclosure of Leslie Marx as an

4    expert witness who testified here.  This is actual and

5    predictive prices for TDI over a period from 1992 to, it looks

6    like, 2009, and the blue is the alleged conspiracy period.

7         And you were there at the very beginning of the

8    alleged conspiracy period.  Right?

9    A    Yes.

10   Q    You were in charge of pricing direction for MDI and TDI

11   from '94 basically through about '98 right there.  Right?

12        MR. LEVERIDGE:  Objection.  Mischaracterizes his

13   testimony.  He testified that he left in August of 1997.

14        MR. STREETER:  I'll correct it.

15        THE COURT:  All right.

16   Q    '94 to August of 1997.  You see that?  Is that about right?

17   A    Yes.

18        MR. STREETER:  Can we go to Demonstrative Exhibit 4.

19   Q    Does this roughly carve out the period of time when you

20   were in charge of pricing direction?

21   A    Yes.

22   Q    And first of all, what did you see happened with the prices

23   during that time period for TDI?

24   A    It went up quite a bit in the period of '94 to in this

25   case, '97 time.

 1    Q    And what -- as a business person who was working on this

 2    and deciding about what to charge and where to build and all

 3    those kinds of things, is it surprising to you that given the

 4    economic environment, that the prices went up?

 5              MR. LEVERIDGE:  Objection, leading.

 6              THE COURT:  I'll allow that.

 7              Go ahead.

 8    Q    You can answer it.

 9    A    Okay.  From a business look, during that period the demand

10    was exceptionally strong and there wasn't much new capacity

11    that coming to the supply side, together with a very steady raw

12    material cost.  I am not surprised, I was not surprised that

13    the pricing went up.

14    Q    And the new capacity starts to come on in that period

15    (indicating)?

16    A    It came on '97.

17    Q    And, well, your big now plant -- your big new plant went on

18    in right about the end of '97, '98?

19    A    Yes.

20    Q    And but other de-bottlenecking capacity is happening at

21    that time?

22    A    There was some minor de-bottlenecking that came in I think

23    '96.

24    Q    And does it surprise you that there would be a little bit

25    of softening in the prices when there's more capacity, more

 1    supply?

 2    A    Not at all, from a supply and demand standpoint.

 3    Q    And this red line right here, this red and orange line, the

 4    jury has heard a lot about that.  Tell us from a business

 5    perspective, would you have invested hundreds of millions of

 6    dollars in new plants if the market condition suggested that

 7    the prices were going to be going down?

 8              MR. LEVERIDGE:  Objection, leading and argumentative,

 9    your Honor.

10              THE COURT:  No, I'll overrule it.

11              MR. STREETER:  I'm sorry?

12              THE COURT:  He can answer.

13              MR. STREETER:  Thank you.

14    A    We would not be investing if the projection was that the

15    pricing was going to go down then.

16    Q    And as a business person, if demand is strong and supply is

17    tight, do you expect the price to go down?

18    A    No.

19    Q    I now want to turn to Demonstrative Exhibit 1.  This is the

20    same kind of chart for MDI.  Right?

21    A    Yes.

22    Q    Again, Dr. Marx, conspiracy period '94 - 2004.  And once

23    again you're in charge of MDI pricing direction from '94 to the

24    end of '97.  Right?

25    A    Yes.

```
 1                    MR. STREETER:  Can we --

 2                    MR. LEVERIDGE:  Your Honor, again I'm sorry to be a

 3         stickler, but the testimony was August of '97.

 4                    MR. STREETER:  I stand corrected.

 5                    THE COURT:  So correct it.

 6         Q    You were in charge of pricing direction from '94 to August

 7         of 1997?

 8         A    Yes.

 9                    MR. STREETER:  I'll ask to turn to Demonstrative 2.

10         Q    Does this call out that period basically?

11         A    Yes.

12         Q    And what was happening with demand for MDI starting in 1994

13         and going into 1996?

14         A    The demand was very strong, driven by global demand for the

15         product.

16         Q    And had the new capacity come on line yet?

17         A    Not in the early part of it.

18         Q    And is this what you were projecting and expecting to

19         happen when you decided to spend money on new plants?

20         A    Yes.

21         Q    And would you have spent that money if you thought that

22         prices were going to go down because of the market conditions?

23                    MR. LEVERIDGE:  Again, argumentative, your Honor.

24                    THE COURT:  Overruled.

25         A    No.
```

 1   Q   The last thing that I want to do with you is I want to show

 2   you some testimony of Dr. Marx in which you were mentioned and

 3   discussed, and I want to ask you about it.

 4        MR. STREETER:  If we could blow up page 168 of Dr.

 5   Marx's testimony, and if we could blow up the paragraph, the

 6   lines from 6 through 13.

 7   Q   And the question that she was asked -- this was during

 8   cross-examination, was:

 9        (Reading) But you're familiar, are you not, with the

10   fact that according to, for example, Mr. Ho and the trade press

11   at the time, and I think Mr. Pauley as well, but it's their

12   view and the trade press reflects that under this period of '94

13   to 1996, during this period of time there was a strong demand

14   for TDI.  Are you familiar with that?

15        ANSWER:  Actually demand for the industrial production

16   indices that I look at and as far as I know, it was going down

17   in 1995.

18        Do you see that?

19   A   Yes.

20   Q   Was the demand for MDI going down during that time period?

21   A   Definitely not.

22   Q   Was the demand for TDI going down?

23        MR. LEVERIDGE:  Your Honor, that's not what Dr. Marx

24   testified.  She's looking at the industrial production indices,

25   that's what she testified to.

1          MR. STREETER:  I'm happy to ask him questions about

2    that.  That's where I was going.

3          THE COURT:  Go ahead.

4    Q   This answer:  "Actually demand for the industrial

5    production indices that I look at, and as far as I know it was

6    going down in 1995."

7          First of all, what do you understand "industrial

8    production indices" to mean?

9    A   I'm not aware of the details in Dr. Marx's model so I can't

10   comment on the indexes that she was referring to.

11   Q   But what generally do you understand "industrial production

12   indices" to be?

13   A   Generally that would indicate the kind of manufacturing

14   activities that is within that particular segment.

15   Q   Not MDI and TDI?

16   A   No.

17   Q   Other things?

18   A   No.

19   Q   Other goods that are sold in the marketplace?

20   A   Yes.

21   Q   Do you know one way or another whether or not the indices

22   she's referring to here was focused just on the United States

23   or whether it was global?

24         MR. LEVERIDGE:  He's already testified, your Honor, he

25   doesn't know what Dr. Marx looked at.

 1   Q   Do you know one way or another?

 2         THE COURT:  All right.  Okay.

 3   A   It is my understanding that her report was more based on

 4   U.S. indexes.

 5   Q   You read that from the testimony you read?

 6   A   Yes.

 7   Q   And what were you focused on, global or U.S.?

 8   A   We were looking at a global market.

 9   Q   And what was happening with the market in Asia at this

10   time?

11   A   The Asian market was booming.

12   Q   What affect does that have on the demand for your product?

13   A   It will demand a lot of our product going that way.

14   Q   And if Dr. Marx was looking at just U.S. demand, would she

15   accurately capture what the demand for your product was?

16         MR. LEVERIDGE:  Objection, argumentative and leading.

17         THE COURT:  No, I'll allow it.

18         Go ahead.

19   A   It did not.

20   Q   It would not?

21   A   Yeah, it would not.

22         MR. STREETER:  I want to turn to page 169 and blow up

23   lines 19 through line 6 on page 170.

24   Q   Okay.  On page 169:

25         (Reading) QUESTION:  Well, that's my real question to

 1    you.

 2              This is when Mr. Bernick was cross-examining her.

 3              (Reading) Okay.  My real question to you is this:  The

 4    business people at this point in time -- you're one of those

 5    business people?

 6    A    Yes.

 7    Q    -- they're getting the orders for the rail cars that go out

 8    the door with their product.  They see it because a customer

 9    call up and says:  I want four tank cars.  And they write down

10    "four tank cars."  And the customer -- the sellers and the

11    customers are reporting in the trade press and in their sworn

12    testimony that you've read that there was strong demand for

13    those tank cars during this time period.

14              You've read that, haven't you?

15    A    Yes.

16    Q    And then it says:  (Reading) I don't recall specifically

17    right now, but I do know that the data showed declining demand

18    for auto assemblies and carpet production, carpet and furniture

19    production in 1995.

20              First of all, looking at the data that you had about

21    your own demand, was it going up at this time period?

22    A    Absolutely.

23    Q    And the fact that the indices for auto assemblies and

24    carpet production isn't going up, what does that tell you?

25    A    What that said is, in the U.S. market, some of these

 1    industry may not be producing as much.

 2    Q    The last one.  Page 172, lines 7 through 19.  And you are

 3    mentioned in this one.

 4         The question was:  (Reading) Are you saying that the

 5    people who are in the business and who are quoted in the trade

 6    press were simply wrong when they said that the demand for tank

 7    cars was going up?  Are you saying that they're wrong?

 8         Ms. Marks -- Dr. Marx's answer:  I'm not sure exactly

 9    which testimony you're pointing to that's saying specifically

10    the demand was strong in 1995.

11         QUESTION:  Mr. Ho is an example.

12         ANSWER:  If there was someone that was saying that

13    demand was going up in 1995, I would wonder if they were

14    misremembering what was happening in that period of time.

15    Because when you look at the data on auto assemblies, for

16    example, and the production of these products that include

17    flexible foam, is going down in 1995.

18         When you testified here in this courtroom that demand

19    was going up, were you misremembering?

20    A    No.

21    Q    When you wrote it in your document in March of 1996, long

22    before this lawsuit was ever filed, were you misremembering?

23    A    No.

24         MR. STREETER:  I'll pass the witness.

25         THE COURT:  All right.  Mr. Leveridge.

 1              MR. LEVERIDGE:  Yes, thank you.

 2              Good afternoon, ma'am, good afternoon, gentlemen.

 3                          CROSS-EXAMINATION

 4    BY MR. LEVERIDGE:

 5    Q    Mr. Ho, good to see you again.

 6    A    Thank you.

 7    Q    You recall that you and I met one other time, you gave

 8    testimony under oath in a deposition in San Francisco in

 9    January of this year?

10    A    Yes.

11    Q    Do you recall that?

12    A    I do.

13    Q    And that was under oath.  Do you recall that?

14    A    Yes.

15    Q    So we may return from time to time to some of that

16    testimony today as I ask you questions.

17              MR. LEVERIDGE:  Could we put up the document that has

18    been identified as PX-524, which is a pre-admitted exhibit,

19    your Honor.

20              And if it be possible, to blow up the box that's up at

21    the top, January '94 through 12/95.

22              And what I'd ask you to do is actually on the last two

23    lines on that box, would you highlight those please, Todd, and

24    blow them up just so everybody can see them.

25    Q    So, Mr. Ho, I think you probably will remember this from

 1    the deposition.  Do you?

 2    A    Yes.

 3    Q    Do you recall that?

 4         And do you recognize this as an organizational chart

 5    that you said reflected the organization at the time you were

 6    there?

 7    A    Other than David Fischer on the polyol, I was the

 8    polyurethane total business director for six month.

 9    Q    So can we just go to his deposition, page 16, line 13

10    through page 17, line 8.

11         MR. LEVERIDGE:  I think I must have given you the

12    wrong page.  Is this page 16, Todd?

13         Yeah.

14         Could you go down to page 17, please, Todd?  I'm

15    sorry.  Could you start with line 4 and go down to the bottom

16    and then just highlight.

17    Q    This is the document that we were talking about right now

18    and I asked you whether you saw it before.  But you say:  "I

19    don't recall seeing this but the information that I'm looking

20    at reflects the organizational structure at that time."

21         At that time you didn't tell me that Mr. Fischer was

22    not responsible for polyols for the first six months.  Correct?

23    A    I must have missed that one.

24    Q    Okay.  So but today your testimony is that you were

25    responsible for polyols for six months and then Mr. Fischer

1    took it over?

2    A    Yes.

3         MR. LEVERIDGE:  And so the other thing I'd like to do,

4    going back to Exhibit 524, Todd, if you would.

5         And to highlight those, particularly Mr. Ho's line, if

6    you would, from January through December 1995.

7    Q    Mr. Ho, this reflects that you were the business manager

8    for Isocyanates North America for January '94 through December

9    1995.  Correct?

10   A    I believe the restructuring actually happened before '95,

11   December.

12   Q    That's not what the chart says though, is it?

13   A    I understand.

14   Q    And the chart says that you served as the North American

15   Business Manager through December 1995.  Correct?

16   A    That's what the chart say.

17        MR. LEVERIDGE:  Okay.  So now if we go down to the

18   middle section, and the middle section and identify Mr. Ho's --

19   yes, perfect.  Thank you.

20   Q    This says that you became the business manager for the

21   global business in December of '95 and had that job until

22   August of 1997.  Is that correct?

23   A    That's what the chart say.

24   Q    Okay.  So now when you're the business manager for

25   isocyanates, that's MDI and TDI.  Right?

1    A    Yes.

2    Q    And your testimony today is that you had the responsibility

3    for polyols for the first six months of '94, and then Mr.

4    Fischer took over polyols.  Is that correct?

5    A    Yes.

6    Q    And he had -- but you didn't have any more responsibility

7    for polyols after, according to you today, after June of '94?

8    A    Yes.

9    Q    Is that correct?

10        So, during the period --

11        MR. LEVERIDGE:  And, Todd, if we could just go up just

12   above Mr. Ho.  Keep Mr. Ho highlighted and then go to Global VP

13   of Polyurethanes.  It's two lines up.

14        Thank you.  And then highlight both the first line and

15   then the second line, please.

16        Thank you.

17        MR. LEVERIDGE:  So, when you had the job with respect

18   to the global -- and actually, if you don't mind, could you

19   just, I'd like to add one more.

20        Todd, I'm sorry.  And that goes to the first box, the

21   period '94 through 12/95.  And there's also a VP of

22   Polyurethanes, it's Mr. Long.  Can you highlight that.  Yes.

23        And just please go all the way over to the period.

24   Okay.  Thank you.

25        Just keep that up for a minute.

1    Q    So when you were the business manager for North America for
2    the entirety of the time you were there, '94 through December
3    of 1995, you reported to Mr. Long.  Is that correct?
4    A    Yes.
5    Q    He was your boss?
6    A    Yes.
7    Q    And so after the global reorganization and you became the
8    business manager for isocyanates globally in December of 1995,
9    you initially reported to Mr. Long until he was dismissed in
10   May of 1997 by Dow, and then Mr. Wood took over as your boss.
11   Is that correct?
12   A    Yes.
13   Q    But you only stayed in the business another three or four
14   months until August of '97 when Mr. Tan took your position.  Is
15   that correct?
16   A    Yes.
17   Q    So now just staying on this, and forgive me for jumping,
18   but since we have it up I'd like to take advantage of it.
19        MR. LEVERIDGE:  If we could go down a little bit in
20   the '95 through 2000 time frame, Todd.
21   Q    So business manager for PO and polyols was David Fischer
22   during the --
23        MR. LEVERIDGE:  Let's just -- yeah, that's good.
24   Let's highlight Mr. Fischer.
25   Q    He was the business manager for polyols and PO from

1    December of '95 through 12/97.  Is that correct?

2    A    Yes.

3    Q    And he ultimately took over responsibility for both the

4    polyols, which he had, and if you look just above Mr. Fischer's

5    name, there's another reference to Mr. Fischer that starts

6    November of '98 through July of 2000.  Is that correct?

7    A    That's, what the chart say.

8    Q    And do you have any reason to disagree that that's what Mr.

9    Fischer's responsibilities were?

10   A    Because I have already move out of the business, so I'm

11   just reading the chart.

12   Q    Okay.  Okay.  So let's go back a little -- now we'll focus

13   on your job.

14            When you were the business manager for isocyanates --

15   and I may go back-and-forth between isocyanates and saying MDI

16   and TDI just because it might be a little easier for me, okay?

17   But when you were the business manager for isocyanates, it's

18   true, is it not, that you had no direct reports?  You didn't

19   have any employees other than a secretary.  Isn't that correct?

20   A    Yes.

21   Q    Okay.  And you didn't have any manufacturing

22   responsibilities when you were the business manager, both for

23   North America and then later globally.  Is that correct?

24   A    No direct report.

25   Q    Okay.  And you weren't responsible during the '94 through

 1    '97 time period, responsible for implementing price increases

 2    or interacting with customers on pricing for MDI or TDI.  Isn't

 3    that correct?

 4    A    As the business director, I did --

 5    Q    It's a yes or no, sir.

 6    A    No.

 7    Q    Thank you.

 8              And that's because the pricing interactions with the

 9    customers were handled by what you referred to earlier today,

10    and also at your deposition, as the commercial organization or

11    the commercial leaders within the applicable geographic areas.

12    Isn't that correct?

13    A    They implement based on my directive.

14    Q    But they did it on a geographic basis.  Is that correct?

15    A    Yes.

16              THE COURT:  Mr. Leveridge, we'll take a break right

17    now.

18              MR. LEVERIDGE:  That's great.

19              THE COURT:  Ladies and gentlemen, we'll take a break

20    for 15 minutes.  We'll see you back here at 3:20.  Thank you.

21              (The Jury leaves the courtroom.)

22              THE COURT:  You can step down, Mr. Ho.

23              (Witness temporarily excused.)

24              THE COURT:  We'll see you back here at 3:20, please.

25              (A recess is taken.)

1              (Proceedings resume - Jury not present.)

2              THE COURT:  Before re bring out the jury, on the issue

3       of the admissibility of these charts and everything, I don't

4       need the testimony of Dr. Ginn.  I'll make my rulings tomorrow

5       without her testimony.  I have her affidavit or declaration.

6       So I know she has some urgency to get going, so she can leave.

7       Okay?

8              MR. BERNICK:  Okay, that's fine.

9              THE COURT:  And also, I don't need any more briefs on

10      this subject matter tonight.  Okay?

11             (Laughter.)

12             THE COURT:  No more letters on it, no more briefs.

13      I'll rule tomorrow.

14             Okay.  Let's go.

15             MR. BERNICK:  Thank you.

16

17      P A T R I C K   H O, resumes, testifies further as follows:

18

19             THE DEPUTY CLERK:  Please rise for the Jury.

20             (Jury present.)

21             THE COURT:  All right.  Be seated, welcome back,

22      thanks.

23                      CROSS-EXAMINATION CONTINUES

24      BY MR. LEVERIDGE:

25      Q   Mr. Ho.  Hi.

 1   A   Yes.

 2   Q   So when we broke just to kind of bring us back, I think

 3   that we were talking about interaction, who interacted with the

 4   customers with respect to pricing, and I believe you said that

 5   you would direct the commercial leaders to implement price

 6   changes as they saw fit based on their geographic locations.

 7   Is that right?

 8   A   Yes.

 9   Q   Okay.  And each of the commercial directors or the people

10   in the commercial groups would have to look at what was

11   appropriate for their region and develop their own plan for

12   dealing with customers because they might have different

13   talking points, I think is the word you used, with respect to

14   their market segments, but that the execution of the pricing

15   was done at the commercial level.  Is that right?

16   A   Yes.

17   Q   Okay.  So in North America, was the marketing managers and

18   the sales managers who were the Dow people responsible for

19   implementing the business strategy and interacting with the

20   customers and negotiating prices with customers?  Is that

21   correct?

22   A   Yes, they were.

23   Q   Okay.  So now I think you testified on direct but I just

24   want to confirm it, that the commercial person for TDI and MDI

25   in North America from January of '94 through December 1995, was

```
1    Richard Beitel.  Is that correct?

2    A   Yes.

3    Q   Okay.

4              MR. LEVERIDGE:  Can we just --

5    Q   Before we go to it, Mr. Beitel was responsible for setting

6    the prices and communicating with the customers in North

7    America that.  Is that right?

8    A   Yes.

9    Q   Okay.

10             MR. LEVERIDGE:  Could with just go to Exhibit PX-524

11   again.

12             And I'd like to just highlight for the jury where Mr.

13   Beitel fell into it.  And I think we have a box at the top.

14   And Todd, if you would be kind enough to find Mr. Beitel, he's

15   right above Mr. Ho.

16   Q   And it says that his title was Director of Sales, Epoxies

17   and Polyurethanes North America from January 1994 through

18   December 1995, the same two years you were responsible for

19   North America it appears.  Is that correct?

20   A   Yes.

21   Q   Okay.

22             MR. LEVERIDGE:  Could we go down to the next box,

23   please, Todd.

24   Q   And let's identify Mr. Beitel again.

25             So the next box I believe says, Sales and Marketing
```

1    Director for North America, and this time it picks up -- and

2    this is now once you've switched to global.  Is that correct?

3    A    Yes.

4    Q    And it picks up with Mr. Beitel taking the responsibilities

5    for Sales and Marketing Director North America from December

6    1995 through August of 2000.

7              Is it your understanding that he stayed in that job

8    well past after you left?

9    A    I believe so.

10   Q    Okay.  You have no reason to disagree with the time frame

11   that's there for Mr. Beitel.  Is that right?

12   A    No.

13   Q    Okay.  Thank you.

14             So Mr. Beitel, he didn't report to you, did he?

15   A    No, he did not.

16   Q    He reported to Mr. Long first, and then after Mr. Long

17   left, to Mr. Wood.  Correct?

18   A    Yes.

19   Q    Okay.  And Charles Churet was the commercial manager in

20   Europe.  Is that correct?

21   A    Yes.

22   Q    Okay.  And he didn't report to you either, did he?

23   A    No.

24   Q    Okay.  You characterized your job in the deposition as

25   looking at the fundamentals of the business which includes how

1    you run your plants, how you make investment decisions, how you

2    analyze raw material costs and costs of your operations, and

3    based on that information you develop a strategy on pricing

4    that you put forward to the commercial organization for

5    implementation.

6              Is that a fair summary?

7    A    Yes.

8    Q    Thank you.

9              I think you summed it up at one point by saying that

10   it was your job to set the direction for pricing and the

11   commercial people's job was to implement it.  Is that right?

12   A    I set both the direction and also give the directors what

13   price changes need to go in.

14   Q    And it was the commercial people's job the implement that

15   based on their geographic situation.  Correct?

16   A    Yes.

17   Q    Okay.  You didn't have management authority over anybody in

18   the commercial organization, did you?

19   A    No.

20   Q    Commercial leaders reported to Mr. Long while he was there,

21   and then Mr. Wood.  Correct?

22   A    Yes.

23   Q    Not you?

24   A    No.

25   Q    All right.  As I recall it, you and Mr. Beitel were

 1    equivalent executives at Dow while you were there.  Is that

 2    correct?

 3    A    We were peers and we both sit on the Business Leadership

 4    Team.

 5    Q    You had different roles in the business.  Is that right?

 6    A    Yes.

 7    Q    Okay.  I think I asked you this before, but just to -- you

 8    didn't have a large staff as the business leader, did you?

 9    A    No.

10    Q    It was just you and a secretary.  Right?

11    A    Yes.

12    Q    Now, on the other hand, the commercial leader had a full

13    line of people reporting to him, like the marketing manager,

14    the sales manager, district managers and the like.  Correct?

15    A    Yes.

16    Q    You made recommendations for apprising strategy based on

17    your analysis and planning on a going forward basis.  Correct?

18    A    Is more than a recommendation, it is a directions to the

19    regional leaders to implement.

20    Q    Right.  But it was up to them to do it.  Right?

21    A    They have to deliver back to the business to the

22    expectation and targets.

23    Q    Yes.  Now, if they didn't deliver, it was not your job to

24    determine whether they had met their responsibilities, was it?

25    It was Mr. Long's and then Mr. Wood's.  Right?

 1    A    Yes.

 2    Q    Okay.

 3         MR. LEVERIDGE:  So, could we -- we'll use the DX-2409,

 4    which is an exhibit that Mr. Streeter used with you earlier, if

 5    we could.

 6    Q    This was an exhibit to your deposition and you and I spent

 7    a little bit time on it back in January in San Francisco.  I

 8    don't expect to do that today, I'll just...

 9         Was this a final document?  Is this a completed

10    document exhibit, 2409?

11    A    This is a document that we use on an annual basis, so --

12    Q    Let me ask you --

13         MR. LEVERIDGE:  Can we go to pages 13 and 14 of this

14    exhibit, please.  Actually let's just stay on 13 for a minute.

15    Q    And if I could, I'd just like to ask you:

16         So on this page, it says "Consolidated global income

17    statement," and then it says, "Sample format."  And then down

18    below it says, "Consolidated Global Balance Sheet.  Sample

19    format."

20         Does this suggest that there was going to be more

21    information included in this document before it went final?

22    A    The final document will have all the income and financial

23    information in it.

24    Q    So this document as we're looking at it as it's been marked

25    as an exhibit by Dow is not a complete document.  Is that

```
 1    correct?

 2    A    This is not the final document.

 3    Q    Okay.  So this version of the document --

 4              MR. LEVERIDGE:  We highlighted this, but I just want

 5    to go back to it for a minute.  It's got your -- could we go

 6    back to the first page?  I'm sorry for skipping around.

 7    Q    At the bottom of the first page on the left-hand side it

 8    has your "PHo."  That's you?

 9    A    Yes.

10    Q    And it looks like this is a draft as of March 1996.

11    Correct?

12    A    Yes.

13    Q    So you were responsible for North America through December

14    of '95 according to the organizational chart.  So you're in the

15    beginning of the global, the first quarter of the transition to

16    the global organization when you're doing the planning document

17    that is marked 2409.  Correct?

18    A    Yes.

19    Q    Okay.  And again, this is a global document because now

20    you're responsible for the global MDI.  Correct?

21    A    Yes.

22    Q    Okay.

23              MR. LEVERIDGE:  The reference to, on page 1 under

24    "Industry Overview," could you just highlight that first

25    paragraph.
```

1    Q    By the time this document was prepared, this draft we're
2    looking at of March of '96, you had '95 figures in.  Correct?
3    A    Yes.
4    Q    Okay.  This refers to global demand, but there's nothing in
5    here that identifies what the demand for the United States
6    market was in 1995, is there?
7    A    Not in this document.
8    Q    Okay.
9    A    But it was --
10   Q    Okay, that's my question.  This document which Dow has put
11   forward as an exhibit, there's no reference to the United
12   States demand.  Correct?
13   A    Not in this page.
14   Q    Thank you.
15         In the second paragraph on this page, the last
16   sentence of that paragraph you're noting that North America and
17   Europe are expected to grow at a much slower rate than the rest
18   of the world.  Correct?
19   A    What it said is, it is going to be 1, 2 percent above GNP.
20   Q    And is it -- was my question not a fair question?  I mean,
21   you were projecting more growth in other markets than the
22   United States and Europe.  Is that correct?
23   A    Yes.  Yes.
24   Q    Okay.  The sentence, the last sentence in the paragraph
25   above says that you're forecasting a down business cycle in

 1    1998 and 1999.  Do you see that?

 2    A   I saw that.

 3    Q   Now, I know you were no longer involved in this business at

 4    that point.  You weren't around to see whether that happened or

 5    not, were you, in this business?

 6    A   From a business projection standpoint, we were expecting

 7    new capacity to come in during that period, and as a result we

 8    expect the industry to be along in supply, so we were

 9    forecasting a down cycle.

10    Q   Thank you.

11        My question really is:  You just weren't there to see

12    what happened at this time.  Is that correct?

13    A   Yes.

14    Q   And as soon as you moved out of your position you were

15    moving on to the next assignment.  Correct?

16    A   Yes.

17    Q   Okay.  So looking at the first page here, there's a box

18    that is entitled "Industry Structure."  You see that?

19    A   Yeah.

20    Q   So as I understand this from our previous conversation, the

21    circles that are not filled in are based on 1995 information,

22    and the circles that are filled in are your projections for the

23    future.  Is that correct?

24    A   Yes.

25    Q   And "ROC" stands for Return on Capital.  Is that correct?

1    A   Yes.

2    Q   You see the second line down under "Direct Forces," it

3    says, "Customer Pressure"?

4    A   Yeah, I see it.

5    Q   So do I read that correctly that in 1995, customer pressure

6    was neutral?

7    A   Yes.

8    Q   And you were projecting going forward that Dow would have

9    more leverage over your customers going into the future.  Is

10   that correct?

11   A   Yes.

12   Q   Okay.  So let's turn to the second page, the first

13   paragraph.

14        It talks about industry profitability, the first

15   sentence.

16        It makes reference to "lack of product

17   differentiation."

18        That's another way of saying that MDI is a commodity.

19   Correct?

20   A   Part of MDI is a commodity.

21   Q   Thank you for that clarification.  We're talking about pMDI

22   is a commodity.  Right?

23   A   Yes.

24   Q   Right.  Mr. Streeter asked you, he showed you the pMDI and

25   he said that's the benchmark and that's what everybody looked

 1    at for prices.  That's the commodity product.  Correct?

 2    A    That's the major volume of the product.

 3    Q    And it's a commodity.  Correct?

 4    A    Some part of it.

 5    Q    pMDI?

 6    A    Not all of it, some part of it.

 7    Q    Okay.  So is it fair to say that the document that's been

 8    marked as DX-2409 and the document that was also shown with

 9    respect to TDI were put together with the intention of

10    forecasting and driving Dow's continued investment plan?  Is

11    that correct?

12    A    This is what we call our five-year business plan.

13    Q    Okay.  And is it fair to say that as the Business Director

14    for Isocyanates, you wanted to encourage additional investment

15    in MDI and TDI?

16    A    At that period because of the high demand, we were

17    forecasting higher investment.

18    Q    And it was an area that you had a responsibility, and I

19    take it you were interested in advocating for additional

20    investment.  Is that correct?

21    A    At that period, yes.

22    Q    Have you ever heard the phrase "chop the tail" at Dow?

23    A    I'm not familiar with it.

24    Q    Okay.  You haven't heard that as a way of saying, you know,

25    if the business isn't performing we're going to cut the

1    business?

2         MR. STREETER:  Objection.

3    A    I'm not aware of it.

4    Q    Okay.

5         THE COURT:  All right.

6    Q    So, you did make some demand forecasting here.  Correct?

7    A    Yes.

8    Q    You might recall we had a conversation about that, and as I

9    recall it, you said that the demand forecast is a combination

10   of downstream industries, meaning furniture, automotive,

11   appliances and recreational goods.  Is that correct?

12   A    Yes.

13   Q    Okay.  And you, as we saw, you've testified that you looked

14   at industry publications and other indices with respect to the

15   market, and I take it you looked at industry publications with

16   respect to automobile, the automobile industry, the furniture

17   industry or the like in order to determine what demand was

18   going to be.  Isn't that correct?

19   A    That's one part of the information base that we collect.

20   Q    Okay.  And indeed, during your deposition Mr. Bernick asked

21   you that question, and you testified that you'd look at the

22   markets like the auto business, the housing markets, the white

23   goods market because you needed to understand how each of those

24   markets were applying your chemicals to their applications.  Is

25   that correct?

1    A    We use those.

2    Q    So my question is correct?  Right?

3    A    Yes.

4    Q    Thank you.

5              He asked you to give -- you even gave him an example,

6    Mr. Bernick, when we were having the deposition of how you used

7    the automobile industry as an example, and you testified, you

8    look at how many cars are expected to be produced in each of

9    the major countries, and then you look at how much consumption

10   of your product would go into each car and then you add it up

11   and that gives you a demand outlook from the auto industry on

12   your product.  Is that correct?

13   A    That is one of the method that we use it for.

14   Q    So, on page 2, Mr. Streeter asked you about this a little

15   bit, there is an industry profitability section, and in the

16   third paragraph of that section it says:  "During the last low

17   point in the business cycle."  You see that?

18   A    Yes, I'm seeing it.

19   Q    So I have two questions.  The first question is:  You were

20   saying that '92-'93 was a low point in the last business cycle.

21   Correct?

22   A    That was because of the slower demand during that period.

23   Q    But it was a low point in the business cycle?

24   A    Yes.

25   Q    Correct?

 1          And you make a reference to economically.  The

 2  majority of the MDI producers were economically unprofitable.

 3  Do you see that phrase?

 4  A    Yes.

 5  Q    When you said that, you didn't mean they weren't covering

 6  their incremental or marginal cost in production, did you?

 7  A    No.

 8  Q    Economic profitability is a term of art for you, is it not?

 9  A    It is a term that we use to reflect the cost of capital

10  that would go into the investment.

11  Q    And as I recall your testimony at your deposition -- and

12  please correct me if I'm wrong -- at Dow that means you expect

13  to recoup an internally set 13 percent return on capital.  Is

14  that correct?

15  A    That was the target that we had.

16  Q    At that time.

17          Now, if you look at the industry growth box also on

18  that page, page 2, you see that?

19  A    Yeah, I see it.

20  Q    It says that the North American market is expected to grow

21  less in 1995 through 2000 than in the period 1990 through '94.

22          Is that a correct reading of what that box says?

23  A    Yes.

24  Q    Okay.  And that period, 1990 through 1994 included the

25  '92 -'93 period which you called the last slow period in the

```
 1    business cycle.  Isn't that correct?

 2    A    Yes.

 3    Q    Let's turn to page 6 of Exhibit 2409.

 4              So there's a box that says, "Dow Product - Market

 5    Participation 2000."  Do you see that?

 6    A    I'm looking at it.

 7    Q    I take it that this is your projection for where you hope

 8    to be in MDI in these respective markets by 2000.  Is that

 9    correct?

10    A    These are the market segments that we play in.

11    Q    So when you say these are the market segments that you play

12    in, for instance, when you -- appliances deal with white goods

13    like refrigerators and the like where MDI is used for the

14    insulation.  Is that correct?

15    A    Yes.

16    Q    And auto for MDI, is steering wheels, dash boards, the

17    harder aspects of the car.  Is that correct?

18    A    Right.

19    Q    And then to the extent that you are in the automobile

20    industry with TDI, it's the seats and headliners and other

21    things.  Is that right?

22    A    That's the soft part.

23    Q    Okay.  So, and then you go all the way through.  And you've

24    got CASE -- could you tell the jury what CASE stands for,

25    please?
```

1    A    That's -- that's Construction Adhesive Sealant and

2    Elastomers.

3    Q    It's used as an MDI is used as the binder in certain --

4    A    As a binder and as a sealer.

5    Q    Okay.  And construction, what is MDI used for in the

6    construction industry?

7    A    In a number of application, but the big part is the

8    insulation.  MDI goes into the insulation, foam that goes

9    between the dry walls.

10   Q    In houses?

11   A    In houses.

12   Q    Okay.  And it looks like at least your projections was you

13   were projecting that industry to be the largest application for

14   you.  Is that correct?

15   A    Yes.

16   Q    Okay.  I would like to focus now on page 9, please.  There

17   is a section that begins about halfway down called "Pricing."

18   so I'd just like to -- so the first thing, it says:  "Pricing

19   is very competitive due to product non differentiation."

20        Again, is that when you refer to non differentiation,

21   you're referring to the commodity aspects of the product.  Is

22   that correct?

23   A    We are referring to products that has a non differentiated

24   performance.

25   Q    Is that different than it's a commodity?

 1   A    I would not call that a commodity, because even high tech

 2   products you could have similar products that are not

 3   differentiated.

 4   Q    Okay.  So, you say in the second sentence:  "Consistent

 5   with our strategy, we will not lower prices to gain market

 6   share."  Do you see that?

 7   A    Yes.

 8   Q    And was that Dow's strategy with respect to MDI alone, or

 9   MDI and TDI, do you remember?

10   A    I believe that's a comment that would apply to both

11   product, because at that time we were very tight on supply, we

12   just don't have enough to sell.  So there is no reason for us

13   to cut price in order to gain market.

14   Q    So it applies to both?

15   A    I believe it does.  It did.

16         MR. LEVERIDGE:  Could we put up DX-5598 side-by-side

17   and go to page 10 of that.

18   Q    And the other document that's being put up was also a

19   document that Mr. Streeter showed you, which was the business

20   plan for TDI, and I think we'll see that you're saying similar

21   things, and I just figured we would cover it once.  Okay?

22         If I could, I'd like to have 2409 and...

23         (Mr. Leveridge covers with co-counsel off the record.)

24         MR. LEVERIDGE:  I'm having a technical glitch so I

25   think we'll just stick with this one.

```
 1   Q   So your first statement here:  "Is consistent with our
 2   strategy, we will not lower prices to gain market share."
 3            But then you go on to say:  "Dow will maintain share
 4   and grow with the industry in mature markets."  Do you see
 5   that?
 6   A   Yes.
 7   Q   Mature markets included the United States.  Correct?
 8   A   Yes.
 9   Q   So your plan with respect to -- and just hearing your
10   testimony, even though I couldn't pull up the other one -- is,
11   assuming that it was for both -- is that your plan in both MDI
12   and TDI was not to compete on price while still trying to
13   maintain your market share.  Is that correct?
14   A   Yes.
15   Q   Yes?  Thank you.
16            So staying with Exhibit 2409, page 10.
17            MR. LEVERIDGE:  If you could go to page 10.
18            Actually you know what, I'm sorry, Todd, I jumped
19   ahead.  Let's just stay on page 9 for a minute.
20   Q   Forgive me, Mr. Ho and lady and gentlemen.
21            The second line -- there's -- at the bottom there's
22   one that says "Organizational Initiatives."  You see that?
23   A   I see it.
24   Q   This is playing on your screen too.  I have to sometimes
25   turn around to make sure it's there.
```

1    A    I understand.

2    Q    But you got it, so that's good.

3         The second line down:  "Organization is de-layered to

4    empower teams and individual."

5         You see that?

6    A    Yes.

7    Q    And we talked a little bit about that in your deposition, I

8    don't know whether you recall, I hope you do, about this.  You

9    described that as a company-wide initiative because Dow had too

10   many layers and as a result decision-making was taking too

11   long.  Do you recall that?

12   A    One of the -- one of the main initiative when we

13   restructure the company was to go through a de-layering in

14   order to drive empowerment.

15   Q    So, and I think you testified that this, doing this, the

16   de-layering, to use your word, was reflective of a big drive

17   for efficiency and productivity improvement that you were

18   trying to achieve at the time.  That's right?

19   A    It was done at the corporate level, and every business is

20   part of it.

21   Q    So this approach applied to Dow's commercial people as well

22   as others.  Correct?

23   A    Yes.

24   Q    And it gave more autonomy to the individual.  Correct?

25   A    Yes.

 1   Q   So I am told that we can now go to DX-5598.

 2           MR. LEVERIDGE:  So if we could do that, I would like

 3   that.

 4           Again, I'd like you to turn back, if you would, Todd,

 5   to some of the later pages.  Let's try 13 and 14, or 14 and 15,

 6   please.

 7           Yes, this one.  Thank you.

 8   Q   Mr. Ho, based on what we talked about when we looked at the

 9   draft MDI plan, I take it that this was -- this document is

10   still a draft with respect to TDI.  Is that correct?

11   A   Yes.

12   Q   Okay.  And again, going back to the first page, this was

13   the draft that you had as of March of 1996.  Correct?

14   A   Yes.

15   Q   Okay.  So on page 1 -- actually, yes, let's go to the next

16   page.  I'm sorry, I have two page 1s.  Forgive me, I don't --

17   maybe that's just reflecting that it's a draft.

18           So this page 1 is what I wanted to focus on.  There's

19   a section called "Industry Overview."

20           MR. LEVERIDGE:  Could you highlight that, please.

21   Q   It talks about TDI capacity being at 88 percent.  Is that

22   correct?

23   A   Yes.

24   Q   And is that worldwide?

25   A   Yes.

1    Q   Okay.  And it talks about Dow and Olin are expanding their
2    production facilities in the United States and it will increase
3    capacity.  Do you see that?
4    A   Yes.
5    Q   And I think on direct you testified that, but when that
6    happened, capacity was going to -- capacity utilization was
7    going to go down.  Correct?
8    A   Yes.
9    Q   Now, by the time those plants came on line, I think you
10   testified on direct that Dow's plant came on line some time in
11   1998.  You were gone.  Right?
12   A   Yes.
13   Q   Okay.  So the next thing says, "Industry Profitability."
14        The first sentence says:  "Industry is and has been
15   profitable due to high worldwide capacity utilization rate."
16   That was a true statement?
17   A   Yes.
18   Q   So the next one is "Industry Growth."
19        It is true, is it not, that as of March 1996, you were
20   predicting that the demand for TDI in the United States or
21   Europe would grow slower over the next five years than for the
22   rest of the world.  Is that right?
23   A   Yes.
24   Q   Okay.  And back to the industry structure box up at the
25   top.  We talked about the filled-in circles and the blank

```
1   circles.  The blank being 1995 actual, and the filled-in ones

2   being the future.  You see that?  Again, I want to focus on

3   customer pressure.

4            This is saying that you expected to have more leverage

5   with respect to your customers going forward.  Is that correct?

6   A   Yes.

7   Q   Okay.  So let's look at page 7, if we could.

8            So let's focus on the market participation box,

9   please.

10           Again, these -- this is a chart like we saw with MDI.

11  Correct?

12  A   Yeah.

13  Q   And this relates to the various markets that you sell TDI

14  into.  Is that right?

15  A   Correct.

16  Q   Okay.  So we talked about CASE, Cushioning.  What is that?

17  A   That's the furniture, mattresses and all the cushion

18  related applications.

19  Q   And what about Seating?

20  A   Seating specifically refers to car seatings.

21  Q   Automobile seats?

22  A   Automobile seats.

23  Q   Okay.  Okay.  So these were the broad categories that you

24  would look at to look for demand, among other things?

25  A   Yes.
```

 1   Q    Okay.  So, we've talked previously -- we're going to put

 2   that away.  We can stop with that.

 3            We've talked about what you do when you do a business

 4   plan like the one we've reviewed, the drafts we reviewed for

 5   MDI and TDI, and you make a thorough, detailed assessment of

 6   the market sectors.  Now, when you were doing these charts, you

 7   weren't trying to do them by individual market, it was more a

 8   global plan.  Correct?

 9   A    Actually, this is a collective teamwork.  Each of the

10   regional marketing manager will feed information to us and we

11   would do the aggregate.  So it is a blow-up from the regional

12   market segment association.

13   Q    But with respect to specific items for specific markets, we

14   didn't see any, or many markets singled out.  Is that correct?

15   A    Because this document is meant to be a five-year summary

16   plan, so there is a lot of other information that goes behind

17   it which was not part of the document.

18   Q    But it's not in the document, it's not there for the jury

19   to see.  Correct?

20   A    Yes.

21   Q    Okay.  So, you previously testified that you make a

22   thorough detailed assessment of the market sectors to

23   understand by applications what's happening in the

24   marketplaces, and I think you used the term, "in which you

25   play."  Is that correct?  That means the markets to which you

```
 1    supplied TDI and MDI.  Correct?
 2    A    Which we participate in.
 3    Q    Participate in.  Okay.
 4              And you also said you look at macro economics because
 5    this line of business has a lot to do with GPN growth. Correct?
 6    A    Yes.
 7    Q    And you would do a high level look at supply and demand
 8    dynamics based on all the announced information that you could
 9    get from the marketplace.  Correct?
10    A    Yes.
11    Q    And I made reference to Mr. Bernick, but during the
12    deposition I was there and he was there, and I asked you
13    questions and then he did, and he asked you some questions
14    about how the marketplace worked, and you mentioned macro
15    economics.  And he interrupted you so you could explain that.
16    He wanted to break that down.  And you testified that for the
17    polyurethanes business, the big markets are the construction
18    market.  We saw that with respect to MDI; a lot of it which
19    goes into housing; the auto business and the white goods like
20    refrigerators and the like.  That's correct, isn't it?
21    A    Yes.
22    Q    So looking at information about auto assemblies and
23    furniture and appliances would be useful to you in determining
24    demand.  Right?
25    A    It's useful and we need to do it on a global basis.
```

1    Q   We'll focus on that in a minute.

2        When Mr. Bernick asked you to tell the jury the source

3    for demand for polyurethanes, you said the housing market,

4    white goods, beds, cushions, mattresses and the like.  Correct?

5    A   In addition to our service people's input.

6    Q   Okay.  So I'd like to go to what was marked as Figure 55 in

7    the revised expert report of plaintiffs' original expert,

8    Matthew Raiff.  Mr. Ho, I will represent to you that this is a

9    chart that was provided to Dow's counsel on May 13th, 2011,

10   almost five years ago.

11       And this -- what this chart represents is total United

12   States motor vehicle assemblies for the period 1992 through

13   2008 as reported by the Federal Reserve.

14       So what I'd like you to do is I'd like you to focus on

15   1995, please.  And I've asked Mr. Goldberg to draw lines at the

16   start of '95 and the end of '95.

17       It is true, is it not, that for 1995, the Federal

18   Reserve is reporting that U.S. motor vehicle assemblies were

19   declining in 1995.  Correct?

20   A   I -- I actually don't understand some of these statistics.

21   The other thing that I would also say --

22   Q   Mr. Ho, forgive me.  It's a simple question.  If you start

23   in January of '95, it shows what the demand, what the auto

24   assembly statistics show, and then you go to the end of '95,

25   and you can look visually, I'll use Mr. Elzinga's, "eyeball,"

  1    okay, I'll ask you to eyeball the production is going down in

  2    1995.  Correct?

  3              MR. STREETER:  Objection.  Foundation.  The witness

  4    just said he doesn't understand these statistics.

  5              THE COURT:  Go ahead.

  6    Q    Please answer my question.

  7    A    From the data it said it goes down.

  8    Q    Okay.  So now I'd like to focus on Figure 54, also from Dr.

  9    Raiff's revised report, also provided to Dow's counsel in May

 10    of 2011.

 11              I'll represent to you that Figure 54 represents U.S.

 12    industrial production indices reported by the Federal Reserve

 13    for appliances, carpeting and furniture, which is the blue

 14    line, and separate indices for just carpeting and furniture,

 15    this is the green line.

 16              Do you see those?

 17    A    I see it.

 18    Q    And they track pretty close.  And these are items that

 19    you've testified are part of the demand analysis for your

 20    business.  Correct?

 21    A    Yes.

 22    Q    So I'm also going to ask you, this is -- I've asked Mr.

 23    Goldberg to put the lines up to make it easier for you,

 24    starting in January of '95 and ending in --

 25              MR. LEVERIDGE:  The lines are not in '95.

 1             Thank you.

 2             Those lines are, but -- okay.  Thank you.

 3    Q    So, I'd ask you again, like I asked just before:  It is

 4    true, is it not, that the production of those products was

 5    going down in 1995.  Correct?

 6    A    That's what the data say.

 7    Q    Okay.  So, I'd like to put up a document that Mr. Streeter

 8    used or it's a variation on a document that Mr. Streeter used,

 9    it also was Exhibit 23 to your deposition, and it's the

10    document that has the prices of TDI 80/20 through the period

11    along with the but-for line.

12             MR. LEVERIDGE:  Could you please put that up, Todd.

13             Thank you.

14    Q    This is a slight variation on the one that Mr. Streeter

15    showed, and it just shows another level of analysis between a

16    prediction and a but-for, but the dots are all on top of the

17    green line.  So I just ask you to focus on that.

18             I'd ask you to please take a look at the period 1995

19    with respect to this.

20             So, looking at the period 1995, the blue line which is

21    the actual median price goes up in 1995.  Correct?

22    A    Yes.

23    Q    And the but-for line goes down in 1995.  Do you see that?

24    A    I see it.

25    Q    Okay.  So I'd also ask you to just -- I'd like to get

1    Figure 1 from the revised reply report from Dr. Raiff which was
2    provided to Dow's counsel in 2012.
3           So this purports to be TDI prices are the blue line up
4    at the top.  And let's just focus on the -- let's just focus on
5    the green line for now.
6           And I'd like to focus again on the period 1995.  These
7    are toluene prices per pound in 1995.
8           Mr. Ho, it is true, is it not, that toluene is going
9    down in 1995?
10   A    From a business standpoint I won't characterize it like
11   that because when you look at the industry, when we buy it, we
12   don't buy it on a spot basis, we buy it on a contract basis.
13   So this may be a spot pricing that you show, and if you compare
14   point to point it seems like it is going down.  But --
15   Q    Thank you.
16   A    To me, it's a steady pricing.
17   Q    And you could have bought it at a lower price for all you
18   know.  Right?
19   A    But we don't buy it on spot.
20   Q    I understand that.
21   A    Yeah.
22   Q    I understand that.  But the prices you pay, it could have
23   been even lower than what are reflected here.  Correct?  This
24   is an industry-wide set of statistics and it shows that at
25   least industry-wide it was going down in 1995.  Correct?

1    A    On a -- on an industry basis, that looks pretty steady.

2    Q    It's certainly not going up, is it, in 1995?

3    A    Point to point it went down a bit.

4    Q    Thank you, Mr. Ho.

5         So, I want to go back to something you said earlier in

6    your testimony, your direct testimony.  When you gave your

7    deposition you testified that Dow announced its plan to build

8    its TDI plant in Freeport, its sector TDI plant in 1993.  Isn't

9    that correct?

10   A    I think we -- I believe it was announced in 1994

11   officially.

12        MR. LEVERIDGE:  Can we go to transcript page 236,

13   lines 2 through 8, please.

14   Q    So, it says:  (Reading) What about TDI, what was your

15   approach on expansion, or capacity, or whatever?  What was your

16   approach with regard to capacity during this period of time?

17        These are Mr. Bernick -- this is Mr. Bernick's

18   question.

19        And you said:  (Reading) We -- as I said, we just

20   announced in '93 our plan to build a new TDI unit in Freeport,

21   Texas.

22        That's your testimony.  Correct?

23   A    Yes.

24   Q    Okay.  And 1993 was what you described as the last low

25   period in the business cycle.  Correct?

```
 1    A    Yes.
 2              MR. LEVERIDGE:  No further questions at this time.
 3    Your Honor.
 4              THE COURT:  All right.  Mr. Streeter, any redirect?
 5              MR. STREETER:  Very briefly, your Honor.
 6              THE COURT:  Okay.
 7                         REDIRECT EXAMINATION
 8    BY MR. STREETER:
 9    Q    Mr. Leveridge, in front of you are four different charts
10    about U.S. domestic indices.  Do you see those?
11    A    Yes.
12    Q    When you were trying to figure out how much of your product
13    was going to be bought, did you look at global statistics, or
14    U.S. statistics?
15    A    We look at global.
16    Q    Why?
17    A    Because we ship our product everywhere.
18    Q    And at this time, where was the largest growth in demand?
19    A    It was in Asia-Pacific.
20    Q    Mr. Leveridge also asked you some questions about how there
21    are some parts at the end of the business plans that include
22    places to insert some other documents.  Do you remember that
23    testimony?
24    A    Yes.
25    Q    The first couple of pages of the document, were those
```

 1   accurate?

 2   A    Those are the final documents that goes in.

 3   Q    And then you just insert other documents to attach to it.

 4   Correct?

 5   A    Right.

 6   Q    Okay.  Last question, or series of questions.  You were

 7   asked some questions about your five-year plan and projections

 8   you were making over a five-year period for what you're going

 9   to do five years from now.  When you're deciding what prices to

10   charge this quarter, what information is most important to you?

11   A    When we decide on price changes for the quarter, the

12   information that we would take in is the cost, the supply and

13   demand, and our order book.  Are we actually shipping products?

14   Is the customer buying products?  So those the three big

15   things.

16   Q    And is that from what you think is going to happen five

17   years from now, or from today, yesterday, recent?

18   A    Price changes are very instantaneous, so you do it on

19   today's evaluation.

20   Q    Thank you, Mr. Ho.

21   A    Thank you.

22               MR. LEVERIDGE:  One or two.

23               THE COURT:  Go ahead.

24                         RECROSS-EXAMINATION

25   BY MR. LEVERIDGE:

 1   Q   Mr. Ho, you testified earlier that price changes -- we're
 2   just focusing on price changes -- that price changes were
 3   directed to the commercial people who were supposed to
 4   implement it on a geographic basis.  Isn't that correct?
 5   A   Yes.
 6             MR. STREETER:  Beyond the scope, your Honor.
 7             MR. LEVERIDGE:  Oh, contrare.  He --
 8             THE COURT:  I'll allow it.
 9             Go ahead.
10   Q   Would you please answer my question?  I couldn't hear you.
11   A   Can you repeat the question?
12             (The pending question is read back.)
13   A   Yes.
14             MR. LEVERIDGE:  No, thank you, no further questions,
15   your Honor
16             MR. STREETER:  One question:
17                      REDIRECT EXAMINATION
18   BY MR. STREETER:
19   Q   Who set the magnitude of the price increases that they were
20   supposed to implement on a geographic basis?
21   A   I do.
22             MR. STREETER:  Thank you.
23             THE COURT:  Okay.  This is it.
24             MR. LEVERIDGE:  No, I'm not going to bother.  Thank
25   you.

1          THE COURT:  Okay.  All right.  Thank you, Mr. Ho.  You

2     can step down.

3          THE WITNESS:  Thank you.

4          (Witness excused.)

5          THE COURT:  Mr. Bernick or Mr. Streeter, I'd like to

6     continue for a little while longer.  Do you have a video

7     deposition next I think?

8          MR. STREETER:  Yes, we can start Mr. Pauley, your

9     Honor.

10          THE COURT:  Let's get started with it and then we'll

11     continue with it tomorrow.

12          By the way, ladies and gentlemen, I was thinking as

13     far as the schedule for like tomorrow -- and I don't want to

14     get into a dialogue with you now, but does anyone have a

15     problem if we started at 8:30 and went to about 3 o'clock

16     tomorrow?  We would take two breaks and then you'd be free at

17     2:30, 3.  It's a little longer day but we get in almost the

18     same amount of time, and I have an idea of how much more time

19     we need on the case.  Okay?  If anybody has a real problem with

20     that just let Gail before you leave tonight.  Okay.

21          The lawyers don't have a problem with that tomorrow,

22     do you?

23          MR. JOHNSON:  Not at all, your Honor.

24          THE COURT:  Okay.

25          (The videotaped deposition of Mr. Pauley is played in

1     open court.)

2             (The playing of the videotaped deposition is stopped.)

3             THE COURT:  Who is this?

4             MR. STREETER:  I'm sorry, your Honor.

5             If we could stop it.

6             This is Stanley Pauley of Carpenter, who's the owner

7     of the business, and I think his whole deposition runs about

8     two hours long.

9             THE COURT:  All right.  Well, we'll get a little time

10    in today and then we'll break for the day.

11            MR. LEVERIDGE:  Your Honor, before Mr. Pauley starts,

12    could I just -- I just wanted to tender Exhibit PX-524 which

13    was pre-admitted.

14            THE COURT:  Okay.

15            MR. STREETER:  Your Honor, I have a list of exhibits

16    that we just put in.  I'll give it to the clerk now or later?

17            THE COURT:  If there's no objection --

18            MR. JOHNSON:  Maybe you want to go ahead and start.

19    They want to look at the list.

20            THE COURT:  All right.  Let's do that.

21            (The playing of the videotaped deposition resumes

22    being played in open court.)

23            (The playing of the videotaped deposition is stopped.)

24            THE COURT:  Counsel, why don't we stop here for the

25    day and we'll continue tomorrow with Mr. Pauley.

1          All right.  Ladies and gentlemen, if that's acceptable

2     to you, we'll start at 8:30 and recess 2:30, between 2:30 and

3     3.  Okay?  Bring something if you're hungry.

4          Be safe going home.  Please don't discuss anything

5     about the case, and we'll see you tomorrow morning at 8:30.

6     Thanks a lot.

7               THE DEPUTY CLERK:  Please rise for the Jury.

8               (The Jury leaves the courtroom.)

9               THE COURT:  Okay, you can be seated.

10          I guess we'll see you tomorrow morning at -- the way

11     I'm figuring out with the time -- now I don't know how it's

12     allocated, but it would appear to me, considering that we're

13     taking next week we have three days.  You're going home for

14     your wedding.

15               MR. JOHNSON:  Thank you, your Honor.

16               THE COURT:  Your daughter's wedding.

17               MR. JOHNSON:  My wife keeps reminding me.

18               THE COURT:  I'm sure.

19          And Monday I would not be here.  So we have three days

20     next week, and this week we're right through the week.  But the

21     way I'm figuring, if we get in five or six hours a day, in all

22     likelihood by the end of April 7th, we'll have 15 hours left.

23     So that means -- in all likelihood we'll be -- you'll be

24     summing up and charging some time the week.  Make sure you

25     leave enough time for your summations, that's why I'm telling

1    you that.  Okay?  It seems like -- and we have Juror No. 2

2    unavailable on the 15th, so we'll see where we are at that

3    point.  Okay?

4              Okay.  Thanks.  We'll see you tomorrow morning at

5    8:30.

6              MR. STREETER:  Thank you, your Honor.

7              MR. JOHNSON:  Thank you, your Honor.

8              (At 4:45 p.m., an adjournment is taken to Wednesday,

9    March 30, 2016, at 8:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25