1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
2                    Civil No. 2:08-cv-05169(WJM)-MF

3    - - - - - - - - - - - - - -x
     IN RE URETHANE ANTITRUST   :   TRANSCRIPT OF PROCEEDINGS
4    LITIGATION                 :            - Trial -
     - - - - - - - - - - - - - x
5
                                   Newark, New Jersey
6                                  March 30, 2016

7    B E F O R E:

8                    THE HONORABLE WILLIAM J. MARTINI,
                     UNITED STATES DISTRICT JUDGE,
9                          And a Jury

10   A P P E A R A N C E S:

11       BLANK ROME LLP
         BY:   JEFFREY M. JOHNSON, ESQ.
12             ALEX E. HASSIC, ESQ.
               DANIEL SCHAEFER, ESQ.
13             MEGAN WOOD, ESQ.
               - and-
14       ADAMS HOLCOMB LLP
         BY:   RICHARD J. LEVERIDGE, ESQ.
15       Attorneys for Plaintiffs

16       GIBBONS P.C.
         BY:   LAWRENCE S. LUSTBERG, ESQ.
17             DANIEL J. McGRADY, ESQ.
               - and -
18       DECHERT LLP
         BY:   DAVID M. BERNICK, ESQ.
19             CAROLYN M. HAZARD, ESQ.
               JONATHAN STREETER, ESQ.
20             KENNETH J. HOLLOWAY, ESQ.
         Attorneys for Defendant
21
     Pursuant to Section 753 Title 28 United States Code, the
22   following transcript is certified to be an accurate record as
     taken stenographically in the above entitled proceedings.
23
     S/WALTER J. PERELLI
24
     WALTER J. PERELLI, CCR, CRR
25   Official Court Reporter

```
 1                          I N D E X

 2  WITNESS                 DIRECT    CROSS    REDIRECT   RECROSS
    PAT DAWSON
 3      By Mr. Bernick        24                 119
        By Mr. Schaefer                89
 4

 5  VIDEOTAPED DEPOSITION PLAYED IN OPEN COURT
            Stan Pauley...................page 8
 6          William Long..................page 8/23

 7

 8

 9              Colloquy Between Court and Counsel
                  Starting Page     Ending Page
10                      3                7
                        9               22
11                     77               *-
                      133               *-
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        March 30, 2016
 2              (Trial resumes - Jury not present.)
 3              THE DEPUTY CLERK:  All rise.
 4              THE COURT:  Good morning.
 5              MR. JOHNSON:  Good morning.
 6              THE COURT:  Be seated, please.
 7              We were waiting for a juror, so while we're doing that
 8      I thought I would address the charts and the submissions by the
 9      defendant.  Just a moment.
10              Just in summary, Dow is offering a number of exhibits
11      and charts which were prepared by Dr. Ginn, who also provided
12      an affidavit as to how she went about to prepare those charts
13      and summaries, and they're being offered pursuant to Rule 1006,
14      the rule dealing with summaries.
15              These charts, as best I can discern, some of which
16      were submitted to plaintiff as recently as Sunday of this past
17      week and others which were submitted, let's say, within several
18      weeks as best I can estimate as to when they were actually
19      submitted, by that, it was -- but it was close to the date this
20      trial was to begin that they were submitted.  Rule 1006
21      requires that the summaries be based on data that's
22      discernible, and that's data that underlies the proposed
23      summaries.
24              The Court -- the concern I have with these summaries,
25      and I've expressed them yesterday, was they're not in this
```

 1     Court's opinion simply summaries.  If you read Dr. Ginn's
 2     affidavit it would appear certainly that she uses the term
 3     "calculate," she expresses there that she did not include all
 4     of the data.  I note Dow states that the data is the same as
 5     the data of Dr. Marx that was used in compiling these charts
 6     and exhibits.

 7          The problem is the plaintiffs have not had a chance to
 8     provide them to Dr. Marx to confirm what's in these summaries
 9     and the accuracy of the summaries and whether or not the manner
10     in which Dr. Ginn compiled them was simply a summary or was it
11     an expression of an expert opinion.

12          I think it leans more towards a supplement of an
13     expert opinion than a summary.  They are not the types of
14     summaries I think most of us are familiar with, which are
15     easily discernible based on submissions of some underlying data
16     and then the summary simply summarizes; that's the best term I
17     think I can use.  I mean, typically what we have with phone
18     records, you would have hundreds of phone calls made and then
19     the summary would reflect in January of a certain year there
20     were 50 phone calls made to this phone number, and you don't
21     have to go through all the 50 phone calls and add them up; or
22     bank records, where typically you have hundreds of checks being
23     made out to a certain person or a party in a case, a fraud, and
24     then the summary simply says what clearly what everybody
25     understood to be the underlying data:  In January, 10 checks

1    went to Bob Jones; 15 checks went to Mary Smith.  That's not
2    the case here in this Court's opinion.

3          And there's legal authority in this circuit which
4    talks to this situation where the calculations are better
5    described as a synthesis rather than a summary of underlying
6    evidence, and those cases are Einhorn vs. AT&T Corp., and
7    College Source, both of which I can give you the cites to or my
8    clerks will give you the cites to.

9          The real concern I have is that the plaintiffs never
10   had a timely situation -- or a time to analyze these graphs in
11   any detail, and we were not going to do it -- and that's why I
12   didn't need to have Dr. Ginn here -- we were not going to do it
13   by way of almost like a deposition or a Daubert hearing
14   regarding the underlying basis for these charts.

15         I don't know, and I haven't heard a good reason why
16   these charts weren't provided to plaintiff in a more timely
17   manner.  I know the Pretrial Order.  I know Mr. Streeter said
18   yesterday the Pretrial Order allowed them to submit summaries
19   subsequent to the Order, but that doesn't mean the summaries
20   are admissible in evidence, it just allowed me to, if you have
21   a reasonable summary and it's really a summary, it could be
22   provided, but that's not the case here in this Court's opinion.
23   So for that reason, those summaries will not be admitted into
24   evidence.

25         All right.  Go ahead, Mr. Bernick.

 1          MR. BERNICK:  If I could just ask a question, your

 2    Honor.

 3          With respect to Dr. Raiff's data, I understand the

 4    Court's ruling.  For the record, I think that a lot of them are

 5    summaries and I think we designated which ones were prior to

 6    the Pretrial Order, but I can see it's not really material to

 7    your Honor's decision and I understand your Honor's decision.

 8    The exception that I want to point out -- and I'm assuming your

 9    Honor has ruled on this -- but I want to be clear -- 8693 are

10    the financial data charts, and these are simply charts that

11    chart the financial data from Dow's financial reports and these

12    were furnished prior to the Pretrial Order.  They do not

13    involve -- they are literally a summary of the data points from

14    the underlying financials which the plaintiffs have had.  This

15    document is identical except it extends back in time to 1995.

16    It's identical to the summaries that were used in the Class

17    trial, including specifically with Mr. Dawson who is here to

18    testify this morning.  I would say that we can provide the

19    foundation through him.

20          MR. JOHNSON:  If I may, we have no objection --

21          THE COURT:  Don't interrupt.

22          MR. JOHNSON:  I was going to say, we have no

23    objection.

24          THE COURT:  Oh, okay.

25          MR. JOHNSON:  So I thought we could end this.

```
 1                THE COURT:  That's a good interruption.

 2                MR. JOHNSON:  Thank you, your Honor.

 3                THE COURT:  That makes a good interruption.

 4                I think you're satisfied.  Right.

 5                MR. BERNICK:  I'm always satisfied.

 6                So can we offer and have received 8693 as a summary?

 7                THE COURT:  Yes.

 8                MR. JOHNSON:  Yes.

 9                MR. BERNICK:  On that note --

10                THE COURT:  No, no, thanks.

11                All right.  Then let's bring out the jury.

12                After this deposition, this video, Mr. Bernick or Mr.

13      Streeter, what do you have next?

14                MR. STREETER:  We have one more video about a half

15      hour long of Mr. Long, and then Mr. Dawson is going to testify

16      live.

17                THE COURT:  And how much longer do we have on this

18      video, about 45 minutes?

19                MR. STREETER:  About an hour and a half.  It was two

20      hours total.

21                THE COURT:  We only did a half hour yesterday.

22                Fine.  Let's bring out the jury.

23                THE DEPUTY CLERK:  Please rise for the Jury.

24                (Jury Present.)

25                THE COURT:  Good morning.  Please be seated.  Thanks
```

1      for being here.

2                All right.  We're going to continue with the video,

3      please.

4                (The videotaped deposition of Stan Pauley resumes

5      being played in open court.)

6                (The playing of the videotaped deposition is stopped.)

7                MR. BERNICK:  Your Honor, if we could just have a

8      very, very brief sidebar, it will just take half a minute.

9                (Off the record discussion at the sidebar.)

10               (In open court.)

11               THE COURT:  All right.  Let's proceed.

12               (The videotaped deposition resumes being played in

13     open court.)

14               (The playing of the videotaped deposition is stopped.)

15               THE COURT:  That concludes the testimony?

16               MR. STREETER:  Your Honor, next we'd like to play the

17     testimony of William Long who worked at Dow, and part of his

18     testimony was previously played.

19               THE COURT:  All right.  Do that for a few more minutes

20     and then we'll a take break.  Okay?

21               (The videotaped deposition of William Long is played

22     in open court.)

23               (The playing of the videotaped deposition is stopped.)

24               THE COURT:  Mr. Streeter.  How much longer do we have

25     of Mr. Long?

1           MR. STREETER:  I think it's about 12 minutes.

2           THE COURT:  Well take a break then.

3           Ladies and gentlemen, we'll take a break until 11:00

4      o'clock.  Okay.  Thank you for your attention.  We'll see you

5      then.

6           THE DEPUTY CLERK:  Please rise for the Jury.

7           (The Jury leaves the courtroom.)

8           THE COURT:  Who do we have after Mr. Long?

9           MR. BERNICK:  Mr. Dawson who is waiting outside.

10          THE COURT:  How long will that be?

11          MR. BERNICK:  I think I'll probably be an hour and 15

12     or 20 minutes on direct.

13          THE COURT:  Okay.  All right.  Then you'll have cross?

14     Who is going to do the cross?

15          MR. JOHNSON:  Mr. Schaefer is going to take the cross.

16          THE COURT:  All right.  Then after Mr. Dawson?

17          MR. BERNICK:  We're back to videos.

18          THE COURT:  Okay.

19          MR. JOHNSON:  Your Honor, if I may, as you may recall,

20     we had an off-the-record discussion about the two charts that

21     appeared in Mr. Pauley's deposition.

22          THE COURT:  Oh.

23          MR. JOHNSON:  Yes, Mr. Pauley's deposition that your

24     Honor is going to be ruling on to their admissibility, the

25     charts that Mr. Bernick got him to write on --

```
1              THE COURT:  Yeah.

2              MR. JOHNSON:  -- that we looked at earlier.

3              THE COURT:  Number 28?

4              MR. JOHNSON:  Right.

5              THE COURT:  Or 23.  Right?  23?

6              MR. BERNICK:  23.

7              MR. JOHNSON:  23 is one of them.

8              THE COURT:  What was the other one again?

9              MR. BERNICK:  18.  That just had a couple things on

10     it.  Capacity.

11             THE COURT:  I have 23.

12             MR. STREETER:  I will hand you up --

13             THE COURT:  Let me see -- or 18.

14             MR. STREETER:  We can put it on the screen.  This is

15     8622.

16             MR. JOHNSON:  I'm just adding to the record.  They

17     suggested they would submit to you the relevant transcript

18     pages and that you could look at that with the exhibit and

19     decide whether you were going to allow that to go to the jury.

20             And I just want to make another comment with respect

21     to 23 -- if you could put that up, please -- which I think is

22     pertinent to your decision, your Honor.

23             Now, Mr. Bernick represented to Mr. Pauley that this

24     chart represented the actual prices paid by Carpenter from

25     these various suppliers during the time periods indicated.
```

1          That was a totally false representation.  It is not,
2     in fact, the net net prices.
3          You may recall, your Honor, this is the exact same
4     chart that Mr. Bernick tried to use with Dr. Marx during her
5     testimony in this court before this jury, and Dr. Marx pointed
6     out that this chart was totally wrong in that it showed the
7     Lyondell prices, the yellow line, to be the highest price.
8     And, in fact, Lyondell was the lowest price during this time
9     period.
10          Then in the course of the examination by Mr. Bernick,
11     he proved through looking at a contract that Lyondell was, in
12     fact, the lowest cost producer that Carpenter bought from.  He
13     established that through a contract that he showed Mr. Pauley,
14     and then he turns back to this exhibit and makes Mr. Pauley
15     write on there the Lyondell/Carpenter advantage at the top of
16     the chart, which plainly shows the Lyondell price being higher
17     than any of the competitors at the time.
18          It is stunning to me.  I understand why Mr. Pauley
19     would have been confused.  He didn't remember much about this
20     and he was just following the instructions.  But Mr. Bernick
21     had just gotten from this man that Lyondell was the lowest
22     price during the period, proved it from a contract, then turned
23     to this chart which shows them at the highest price of the
24     period and made him write that on there.
25          And I wanted to bring that to the attention of the

```
1    Court because this exhibit should not go to the jury.
2              MR. BERNICK:  Your Honor, very briefly.  If you'll
3    actual -- actually what was said -- what was said to the jury
4    is not -- it's just pages 214 and 215 --
5              This is page 214 going over to 215.  And it's right
6    after the Exhibit 23 -- no, that's not -- that's not the same.
7              (Mr. Bernick confers with the tech off the record.)
8              THE COURT:  What are you reading from?
9              MR. BERNICK:  This is designations.
10             MR. STREETER:  The Pauley deposition.
11             THE COURT:  Oh, the deposition?
12             MR. BERNICK:  Yes, the deposition.
13             And I was very careful, and interestingly -- well --
14             THE COURT:  You'll have to keep your voice up.  I
15   can't see it.
16             MR. BERNICK:  You can't see it?  I'll just read it,
17   your Honor.  Or I can -- I think we can read it.
18             It says:  (Reading) I want to show you -- maybe that
19   is where you picked up.
20             THE COURT:  Keep your voice up.
21             MR. BERNICK:  (Reading) I want to show you another
22   document that reflects data from Dr. Raiff's report, and it was
23   prepared by our expert using the -- and I think you're going to
24   find this chart an interesting chart -- using the data from Dr.
25   Raiff with respect to median prices.
```

1          I didn't say "actual prices," I said "median prices."
2          And I'm going to modify it when I give it to you
3     because it has one error that is actually our error, so I will
4     confess to it being an error.  23 says Dr. Raiff's weighted
5     median prices versus Dr. Elzinga's price increase
6     announcements.
7          I'm going to scratch off Dr. Elzinga's price
8     announcements because we've taken that off the chart.  This
9     just reflects Dr. Raiff's weighted median prices charged to
10    customer for TDI.
11         That's all that it says, and this is 100 percent
12    accurate.
13         Now, there are all kinds of ways to show price.  You
14    can show price as a median average, which is what he used, but
15    this is what was used in the model, it was used in the model;
16    that is, this whole way of calculating is the industry number.
17    All we did is take the same industry number and put it here.
18    That's number one.
19         Number two, while it's true that there are further
20    deducts, that's true even of their own charts they showed to
21    the jury that we talked about yesterday.  There are always
22    further deducts.  Not all of the deducts can even be traced
23    back to individual transactions and individual prices.  So when
24    they say these are the actuals, net net net, even the chart
25    they showed your Honor yesterday is not actually the actual net

1     net net for many of the transactions.

2            So I simply use the same methodology to create this

3     document.  Never represented that it was the actual net net

4     cost.

5            If we go back to then Exhibit 23 -- if we can just

6     blow it up.

7            Your Honor observed exactly how those entries were

8     made, exactly.  And in each and every single case "non

9     supplier" was the word that he used.  In fact, I said -- what

10    did you say?

11           THE COURT:  All right, that part, I heard that, I

12    heard that.

13           MR. BERNICK:  So when it comes to Lyondell, that was

14    simply the date of the purchase order.  In terms of when those

15    prices started to kick in, I don't know that they started to

16    kick in right away, but you can see the Lyondell price line

17    starts to be lower.  And as it comes along now, right here you

18    can see it starts to skim inside all of the other prices and

19    for the most part stay below them.

20           Why?  That's exactly what the Lyondell purchase order

21    said.  It says that Lyondell always has to be 2 percent below

22    market.  That's exactly where they started to go, exactly.  But

23    the purchase order is dated here, and that's why it was marked

24    there.

25           And I will further add, further add, I never used the

```
 1    actual differences.  I simply showed that there were
 2    differences, and he agreed that there were differences.  I used
 3    this to summarize exactly what was going on.  Bayer:  Non
 4    supplier; BASF:  Non supplier --
 5              THE COURT:  All right.
 6              MR. BERNICK:  -- and the like.  That's what its
 7    purpose was, and the jury saw it all.
 8              THE COURT:  That Exhibit Number 23, is that the same
 9    one as DX-8627?
10              MR. STREETER:  Yes.
11              THE COURT:  How come you didn't object to it during
12    the Pretrial Order?
13              MR. JOHNSON:  I think we did.  I think we did, your
14    Honor.
15              THE COURT:  Not that I'm reading, unless you can show
16    me.  I don't see it.
17              So why don't you tell me where in the Pretrial Order
18    it shows that you objected to that.
19              By the way, I mean, you had considerable time -- when
20    was this video deposition taken?
21              MR. BERNICK:  I was going to say 2013.
22              THE COURT:  Right, okay.
23              MR. BERNICK:  And I showed this to Dr. --
24              THE COURT:  Okay, Mr. Bernick, I heard, I heard.
25              When you -- you know --
```

1          MR. JOHNSON:  While they're checking on that, may I
2    respond though?
3          THE COURT:  Briefly.  But go ahead.
4          I mean, if it wasn't objected to in the Pretrial
5    Order, you know, I'll determine whether it's admissible.  It's
6    certainly going to be usable as demonstrative evidence at the
7    very least, okay?  At the very least it's going to be that.
8          MR. JOHNSON:  We did have an objection in the Pretrial
9    Order, your Honor.
10         THE COURT:  Not the one I was looking at.  Page 10?
11         MR. JOHNSON:  This is in our exhibit -- on the exhibit
12   list we set forth all the objections in the Pretrial Order.
13   It's an attachment to the Pretrial Order.
14         THE COURT:  All right.  I'll double-check, but --
15         MR. JOHNSON:  And if I may, your Honor --
16         THE COURT:  Go ahead.
17         MR. JOHNSON:  -- there was a bit of disassembling
18   there.  The first point Mr. Bernick made is irrelevant, and
19   that is, he removed the Elzinga flags, and that wasn't the
20   focus of my point that I was making.
21         Rather, the focus of my point was that this chart,
22   this whole examination was intended to portray the actual
23   prices paid by Carpenter from these individual suppliers during
24   this time period and how different they were.  And when this
25   chart, the very same chart was shown to Dr. Marx -- could we

1       bring up 215, page 215 from the transcript of Dr. Marx's

2       testimony before this Court?  Can you do that?

3               The top of this page, please.

4               And Mr. Bernick presented this to Dr. Marx, and she

5       said to him then:  "Actually you can't tell from that because

6       they're not the net prices.  Those aren't taking into account

7       the discounts and rebates."

8               And it goes on to say --

9               MR. SCHAEFER:  Keep going down actually to 216, top of

10      216.

11              THE COURT:  When you did the deposition of Mr.

12      Pauley --

13              MR. JOHNSON:  Yes.

14              THE COURT:  -- did you bring that out in the

15      deposition?

16              MR. JOHNSON:  Mr. Leveridge objected to the entire

17      examination on this exhibit and we objected to the use of this

18      exhibit, and we thought it was deceptive then.  I obviously

19      didn't know then that he was going to put it before the jury.

20      But this is why we brought this up before with your Honor, to

21      say that.  Before this deposition was played we brought this

22      question up to your Honor's attention and said that we wanted

23      to keep these out.  And you decided -- and we understood your

24      decision -- that you were going to allow it to be shown but

25      that you would reserve --

1          THE COURT:  I still am.

2          MR. JOHNSON:  -- on whether or not this stuff would

3     come in.

4          But the point is, Mr. Bernick then went through an

5     examination to show that Lyondell was the bottom rock lowest

6     cost producer that Carpenter bought from during this time

7     period, so-called displaying the Carpenter advantage, and then

8     he had him write that down on that exhibit at a higher price

9     point.

10         And for him to disassemble and say that that price

11    wasn't in effect during the time period when the yellow line

12    was shown above everybody else's is simply incorrect.  And he's

13    using a deceptive, wrong chart to establish what points through

14    Mr. Pauley that should not come before the jury.

15         These are exactly the same types of charts that your

16    Honor has just excluded.

17         THE COURT:  When you had the conference with Judge

18    Pisano --

19         MR. JOHNSON:  Yes.

20         THE COURT:  -- you conferred with Judge Pisano, did

21    you bring out the fact that through -- was there testimony in

22    the record that this chart doesn't include discounts and

23    rebates?  Did you bring that out?

24         MR. JOHNSON:  The --

25         THE COURT:  I mean, was there anything in the

1    record --

2              MR. JOHNSON:  No.  The procedure --

3              THE COURT:  Wait, wait.

4              MR. JOHNSON:  Sure.

5              THE COURT:  Was there anything in the record for Judge

6    Pisano to consider regarding this objection that you may have

7    had with the line of questioning of Mr. Pauley?

8              MR. JOHNSON:  No, Judge Pisano was not ruling on the

9    admissibility of exhibits.

10             THE COURT:  I understand that.

11             MR. JOHNSON:  And we didn't -- no, we did not bring

12   that to his attention.

13             THE COURT:  Okay.  I mean, was there anything in the

14   deposition testimony by way of redirecting of Mr. Pauley or --

15   you know, who's deposition was it of Mr. Pauley?

16             MR. BERNICK:  It was our deposition, and Ms. Trulove

17   conducted an examination at the conclusion of the examination.

18             THE COURT:  For the plaintiff?

19             MR. BERNICK:  For the plaintiff.

20             THE COURT:  So did the plaintiffs' counsel at that

21   time try to rehabilitate Mr. Pauley by showing him and

22   saying --

23             MR. JOHNSON:  No.  It was Mr. --

24             THE COURT:  Wait -- do you understand that this median

25   price doesn't reflect the highest price, it reflects -- it

1    doesn't take into account -- it's the highest price, it doesn't

2    take into account rebates or discounts?

3            MR. JOHNSON:  It was Mr. Leveridge who did the

4    examination.

5            THE COURT:  Right.

6            MR. JOHNSON:  And the answer is no.  Because remember,

7    this is being presented at a deposition and it's the first time

8    Mr. Leveridge has seen this thing.

9            THE COURT:  Okay.

10           MR. JOHNSON:  He doesn't have his experts there to

11   tell him that it's wrong.  He doesn't know that.

12           It is only after we later examine this thing with our

13   experts that we realize what they're doing is misusing the

14   median price information to divide it between the suppliers in

15   an improper way and not using the rebates and the signing

16   bonuses, which he brought out very well in the examination, the

17   500,000 and the $600,000, those checks that were written, and

18   all of that stuff is not reflected in these numbers, which

19   makes this whole chart improper for trying to tell the jury

20   that these were the prices that Carpenter actually paid.

21           And we have maintained that objection throughout these

22   proceedings.  And we recognize we had to deal with this

23   deposition and it was there and so we brought it up to your

24   Honor.  We told you what our problem was and we asked you to

25   rule on it.  And you said, well, we'll show it and see where it

1      goes.

2              You have now seen it and I'm making the argument to

3      you as to why it should not be given to the jury in evidence.

4      They've seen it, I recognize that.  But he shouldn't be able to

5      make a closing from that document.

6              MR. BERNICK:  Your Honor, that -- that's the whole

7      problem with the argument, is that they have an expert, the

8      expert has known about it for three years and specifically

9      testified and set out their position in this case before the

10     jury, so they heard her answer to this document.  We disagree

11     with it, but they've heard her answer.  This data, again, was

12     used directly in the first stage of the model without

13     alterations.  But --

14             THE COURT:  When was the deposition taken again?  What

15     year?

16             MR. BERNICK:  This deposition was I believe -- I know

17     it was in 2013 at the end of the year.

18             And it was then put into -- it was then used in the

19     examination of Dr. Marx I believe towards the early part of the

20     following year.  It was then put into --

21             THE COURT:  During that examination did she state that

22     this was not an accurate reflection of the actual prices that

23     were paid?

24             MR. BERNICK:  No.  She said that she didn't know, she

25     wasn't familiar with the document.  She said she didn't know.

1           But she had the document.  And, in fact, your Honor,

2      actually the sequence is, she got the deposition.  She then

3      incorporated the deposition of Mr. Pauley into her report.  She

4      had a report that specifically refers to this.  And nowhere in

5      the report does she take on these kinds of issues.  She

6      actually refers to it.  After she did the report I then took

7      her deposition and she insisted that notwithstanding the fact

8      that the deposition was in her report, she didn't understand

9      what the data was.

10          The jury has now heard her view.  The jury is now

11     seeing our view.  This is directly evidence that comes from

12     their expert as part of their model.

13          Counsel says, the jury should not be able to consider

14     it as evidence.  That's basically an argument that says:  We

15     don't like this evidence.  It goes -- their position goes to

16     the weight but they're saying:  We don't like it so it can't go

17     back.

18          Well, but they already have Dr. Marx's testimony.  If

19     they want to say that this chart is misleading, they can -- Dr.

20     Marx has already said it.  We disagree with her but she's

21     already said it.

22          THE COURT:  We'll take a 15-minute break.  We'll see

23     you back here at 11:20.  Okay.

24          MR. JOHNSON:  Thank you, your Honor.

25          (A recess is taken.)

```
 1                    (Proceedings resume - Jury not present.)
 2               THE DEPUTY CLERK:  Please remain seated.
 3               THE COURT:  Are we all set?
 4               We'll bring out the jury.  We'll finish up with the
 5     video, right.
 6               Okay, Gail.
 7               THE DEPUTY CLERK:  Please rise for the Jury.
 8               (Jury present.)
 9               THE COURT:  All right.  Be seated, thank you.
10               (The playing of the videotaped deposition of William
11     Long resumes being played in open court.)
12               (The playing of the videotaped deposition is stopped.)
13               THE COURT:  That completes it?
14               MR. BERNICK:  Yes.  We're ready to call our next
15     witness, Mr. Pat Dawson, if that's okay with the Court.
16               THE COURT:  Sure.
17
18     P A T   D A W S O N, called as a witness, having been first
19          duly sworn, is examined and testifies as follows:
20
21               THE DEPUTY CLERK:  Please state and spell your name
22     for the record.
23               THE WITNESS:  It's Pat Dawson.  D-a-w-s-o-n.
24               THE COURT:  Good morning.
25               THE WITNESS:  Good morning.
```

```
 1              THE COURT:  If you can, just be sure to speak know the
 2    microphone as you answer the questions, please.
 3              THE WITNESS:  All right.
 4              THE COURT:  You can proceed.
 5              MR. BERNICK:  Thank you very much.
 6              (Counsel confer off the record.)
 7                         DIRECT EXAMINATION
 8    BY MR. BERNICK:
 9    Q    I'm sorry, Mr. Dawson.
10              MR. BERNICK:  I apologize to the Court and to the
11    jury.
12              Good morning to all.
13    Q    Mr. Dawson, could you tell us where it is that you work?
14    A    I currently work at the Olin Corporatoin.
15    Q    Okay.  And where is that located?
16    A    It's located in St. Louis, Missouri.
17    Q    I see.  And where are you actually based?
18    A    I'm based in Chicago, Illinois.
19    Q    So now you're talking to a Windy City boy here myself.  So
20    are you a Cubs fan?
21    A    Yes, I am.
22    Q    Okay.  What's your position at Olin?
23    A    I'm the Executive Vice President for Olin along with being
24    the President of the Epoxy Division and Olin International.
25    Q    How long have you held that position?
```

1    A    Since October 6th, 2015.

2    Q    Okay.  And what is the business of Olin?

3    A    Olin is in the chlorine caustic soda business, a variety of

4    other types of chlorine products like bleach.  They also have a

5    Winchester Division, which is used for, you know, making

6    shotgun shells and ammunitions, and they've been in that

7    business for over 150 years.

8    Q    Okay.  What was your job before you joined Olin?

9    A    Before I joined Olin, I was President of the Epoxy business

10   for Dow Chemical and also in charge of working on special

11   projects in Asia-Pacific.

12   Q    How long did you work for the Dow Chemical Company?

13   A    Thirty-five years.

14   Q    And where were you based at the Dow Chemical Company at the

15   time that you left in 2015?

16   A    I was based in Chicago, Illinois.

17   Q    Why did you decide to leave Dow?

18   A    I worked on a part of a carve-out of the chlor-alkali

19   business and the epoxy business from Dow Chemical, and working

20   on that carve-out and separating that business out of Dow, Olin

21   Corporation bought that business and I decided at that point in

22   time to leave Dow and go with the business that I had been

23   running along with the rest of the chlorine envelope that Olin

24   then purchased from Dow Chemical.

25   Q    Were you able to take with you the people who were part of

1    your team at Dow?

2    A    I took my entire team with me from Dow to Olin.

3    Q    Today, do you have ties or relationships with the Dow

4    Chemical Company?

5    A    Yes.  The relationship is a buy/sell relationship.  Dow

6    Chemical is actually a customer of Olin and Olin is a customer

7    of Dow.  We also have a very significant relationship at our

8    manufacturing sites in Freeport, Texas where these assets have

9    always been located.  So we work very closely with Dow and Olin

10   at some large manufacturing sites, such as Freeport, Texas.

11   Q    You say "assets."  Are you talking about --

12   A    Manufacturing plants.

13   Q    Manufacturing plants.

14        Have you come here to testify at Dow's request?

15   A    Yes, I have.

16   Q    Could you tell the jury why it is that you decided to come

17   and testify at Dow's request?

18   A    Well, Dow was a great place for me to work for 35 years,

19   and I know this is an important issue and I wanted to support

20   Dow in this case.

21   Q    Also good for the customer relationship?

22   A    Of course.

23   Q    Okay.

24        What was your -- I think you told us, but if you could

25   just go back over it again -- your last position at Dow was in

1    Asia-Pacific?

2    A    Yes.   That was before -- I was the President of

3    Asia-Pacific for Dow Chemical from 2009 until about October of

4    2013, and then in '13 is when I came back to work on the

5    special projects along with running the epoxy business as the

6    president of epoxy.

7    Q    Okay.   Were you -- did you know Patrick, another Patrick,

8    also in Asia, Patrick Ho during the course of your work at Dow?

9    A    Very well.   Patrick and I worked together in different

10   capacities over a number of years.

11   Q    Were you aware that Mr. Ho himself worked in Polyurethanes

12   at a point in time in the past?

13   A    Yes, I was aware of that.

14   Q    I'd like to get you situated in time.

15            MR. BERNICK:   If we could pull up one of the boards,

16   please.   Thanks very much.

17   Q    And I'm simply going to use the TDI board that we have

18   here, and I think you're familiar with these, the jury is as

19   well.   These are -- these boards reflect prices for TDI and a

20   bur-for price that Dr. Raiff worked on and Dr. Marx worked on,

21   and I'm going to ask you about it.   But the first thing I want

22   is for you to just find out time periods.

23            So the jury has heard from Mr. Ho, who is in the '94

24   to late '97 time period; and Mr. Wood who is there after and

25   ultimately leaves at the end of 2003.

1           And Mr. Fischer; did you know Mr. Fischer?

2    A    Yes, I did.

3    Q    The jury has heard he worked for Mr. Wood.

4           Stephanie Barbour; did you know Stephanie Barbour?

5    A    Yes.

6    Q    Did you know that she used to work for David Fischer?

7    A    Yes, I'm aware of that.

8    Q    And then Marco Levi, we also heard from Marco Levi by

9    videotape.  Did you know Marco?

10   A    Yes, I knew Marco.

11   Q    And you knew he used to work for David Fischer at the same

12   time?

13   A    That's correct.

14   Q    So when was it that you became involved in urethanes,

15   polyurethanes?

16   A    I was appointed as a Vice President of Polyurethanes in

17   January of 2004.

18   Q    And how long did you stay in that position?

19   A    I was in that position from 2004 until about September of

20   2009.

21   Q    Okay.  So it goes off the chart here.  This is '09.

22           You were there at least for the end of '08?

23   A    Yes.

24   Q    Okay.  I'm going to ask you -- all my questions are going

25   to be focused on this period of time.

 1              Let me kind of get to this by talking about
 2     circumstances that existed when you became involved at the
 3     beginning of 2004.
 4              At that time was it this team of Fischer, Levi and
 5     Barbour that had been in place?
 6     A    They had been in place.  And when I came into that job they
 7     were going to different -- Bob Wood was moving on to a
 8     different company, Stephanie Barbour was moving on somewhere
 9     else, and David Fischer was still working on special projects,
10     and we were in the process working together transitioning.
11     Q    Okay.  I think the jury has heard about a restructuring.
12     Were you familiar with the restructuring that took place at Dow
13     Chemical at that time; that is, in the early part of 2004?
14     A    Yes, it was a major restructuring of the entire company, it
15     was also a major restructuring of the polyurethanes business
16     within Dow Chemical at that point in time.
17     Q    We'll talk about this in a little more detail in a minute,
18     but what kind of shape was the polyurethanes business, in
19     particular, in when you took over the beginning of 2004?
20     A    It was in bad shape.  The performance of the business from
21     a profitability standpoint was not acceptable, and
22     fundamentally I was brought in and then brought a team in to
23     correct that, to improve the business.
24     Q    Okay.  Now I want to get down to the details of your role
25     and also a few questions relating to Ms. Barbour.

1          With respect to your role, you told us that David

2     Fischer -- that Stephanie Barbour had already -- was already

3     essentially gone from the company.  David Fischer was kind of

4     in a transition role.  What was your connection to the jobs

5     that they used to have, if any?

6     A    Yeah.  It's very common when you go through any transition

7     to want to spend a little bit of time with the people who had

8     been there, right, to learn from them, to learn what was going

9     on, their thoughts, how they were running the business.  And so

10    I probably spent the most time with David Fischer; I spent a

11    little bit of time with Bob Wood; and did talk on the telephone

12    with Stephanie Barbour just to get a knowledge of their current

13    thinking of the business and what their thoughts were about

14    what needed to be done to improve the business, what they had

15    tried to do in the past to improve it.

16          So it was a -- it was a transitional period there of

17    probably 20 to 30 to 45 type days.

18    Q    Okay.  In terms of your job, what was the relationship

19    between the job that you took on and the duties that Bob Wood

20    used to have?

21    A    They were pretty much the same responsibilities that Bob

22    had.  We did restructure -- my role was restructured in a

23    little bit different way than the way Bob did the job.  My role

24    was not just to run the entire -- and have the responsibility

25    for the profit/loss of polyurethanes, but my responsibility was

1    also to run the day-to-day business of the isocyanates

2    business, the TDI and the MDI.  So it was more like a

3    player/coach type of a role in running the polyurethanes

4    business, which was different than the way Bob Wood had run the

5    business.

6    Q    Okay.  So you had part -- did you have all of Bob Wood's

7    job or the polyurethanes part of it?

8    A    The polyurethanes part, I had that responsibility.

9    Q    And David Fischer's job, did you have all or a part of

10   David Fischer's job?

11   A    I had -- that job was also being done by people who then

12   reported to me.

13   Q    Right.  Okay.  So part of his duties gets split down --

14   A    Gets split down with other people.  And then I took the

15   direct responsibilities of Stephanie Barbour.

16   Q    Okay.  And then what about Marco?

17   A    Marco, that job was eliminated and Marco actually moved on

18   to take a different roll over in Europe.

19   Q    Okay.

20   A    And that job was, again, restructured in a way that I had

21   other people who were reporting to me who had that

22   responsibility that Marco had had before.

23   Q    With respect to Stephanie Barbour, the jury has heard some

24   testimony regarding her files or what used to be her files.

25         What contact, if any, did you have with what used to

1    be Stephanie Barbour's files when you came on board during this
2    transition period, if you could just tell the jury?
3    A    Sure.  I eventually had access to all of Stephanie's files.
4    Stephanie and I did spend some time on the telephone talking
5    about those files and what she had been doing.  It took me a
6    few weeks to get access to those files simply because some of
7    the systems, the information systems in Dow had not been
8    changed yet.  And David Fischer was still there, she had been
9    reporting to David.  So I actually had to have David give
10   permission to our Information Technology Group to release those
11   files to me, which eventually I had access to those files after
12   a few weeks.
13   Q    With respect to those files, who -- you said David Fischer
14   was the person you had to get approval from.  But who actually
15   had custody of those files?
16   A    Stephanie had custody of those files, and it was in a file
17   server, you know, so there was a section in the Polyurethanes
18   Data Information Group where those files resided.  And she had
19   custody of that, those files when I came in, and I just needed
20   computer access to get to those files.  And it was just a short
21   transition period that it took in order to get access to those
22   files through David and our Information Technology Group.
23   Q    But it was the Information Technology Group that kind of
24   had to give you the keys?
25   A    Yes, they had the keys to have to put the right pass codes

1    in for me to eventually then get that information.

2    Q    Did you come to learn that a preservation -- a

3    preservation -- I don't want to say "order," but a preservation

4    hold had been put on those files prior to the time that you

5    accessed them?

6    A    Yeah, they were being preserved and they were being

7    preserved for the transition so that the new team coming in

8    would have access to those files.

9    Q    Now, obviously you're not suggesting that somehow you knew

10   what the history of those files had been prior to that time?

11   A    I did not.

12   Q    Okay.

13   A    I did not know any history.  I had never been in

14   Polyurethanes before -- before taking the responsibility in

15   January of '04.

16   Q    Did you come to work with those files over time?

17   A    Yes, I did.

18   Q    Did you find anything that gave you a concern about

19   antitrust or competition issues?

20   A    No concerns about antitrust issues, but a lot of concerns

21   about the health of the business and the profitability of the

22   business.

23   Q    Okay.  So, I now want to go to this period of time and fill

24   out this chart here.  And the questions that I want to pose to

25   you basically deal with the condition of the business when you

```
 1    took it over.  And we'll kind of make -- we'll create a box
 2    something like this when you took it over (writing on board),
 3    and then another box that basically deals with any changes that
 4    took place that you observed when you were there.
 5              So it's kind of "take over" --
 6              THE COURT:  Mr. Bernick, when did he take over, 2004?
 7              THE WITNESS:  Yes.
 8              MR. BERNICK:  Yes.
 9              THE COURT:  All right.  Are those boxes supposed to
10    relate to this chart in any way?
11              MR. BERNICK:  Yeah, the whole purpose is, he's going
12    to talk about this price line.
13              THE COURT:  Okay.  Well, on the box on the left it
14    says he took over in 2000 -- I can't see it.
15              MR. BERNICK:  Took over -- "take off" it actually
16    said.  Took over.  So he took over -- I'm kind of trying to
17    draw the arrow --
18              THE COURT:  I don't see the numbers on the bottom.
19              MR. BERNICK:  It says the beginning of 2004.
20              THE COURT:  That's 2004?
21              MR. BERNICK:  Yes, 2004.  I'm going up from 2004 and
22    I'll have him talk about the condition of the company when he
23    took over, and then the condition of the company, the PU
24    business.
25              THE COURT:  All right.
```

 1          MR. BERNICK:  And then afterwards, what changes if
 2     any --
 3          THE COURT:  No, I just was wondering what the boxes
 4     reflected.
 5          MR. BERNICK:  This is during --
 6          MR. SCHAEFER:  Your Honor, sorry to interrupt.  And
 7     we'll see where this goes.  But the box on the left -- and I
 8     can't exactly see where the box on the left starts and
 9     finishes, but if Mr. Bernick is planning to ask the witness
10     about conditions in the business prior to January of 2004 when
11     he wasn't involved, this witness doesn't have any personal
12     knowledge of what was going on prior to his taking over the
13     business.
14          THE COURT:  Let's see what the questions are.
15          MR. BERNICK:  I'll lay the foundation.
16          THE COURT:  Let's hear the questions.
17     BY MR. BERNICK:
18     Q    So, Mr. Dawson, tell us whether or not it was part of your
19     duties when you took over to learn the condition of the
20     business that you were taking over.
21     A    Yes.  It's very standard protocol when you take on a job to
22     try to learn from the past of what the market conditions were,
23     what was going on in the marketplace so you can get a really
24     good feel for where the business had been, and then it gave you
25     a very good understanding of where you didn't have knowledge

 1    currently coming into the business in January of '04, to

 2    basically say, well, what's the present situation.  And then

 3    that's the basis where you start formulating a future strategy

 4    to change and improve the profitability of the business.

 5    Q    So again, would it be fair to review documents for that

 6    purpose?

 7    A    Absolutely.  A lot of documents for that.

 8    Q    Did those documents predate your involvement in

 9    Polyurethanes?

10    A    Yes.

11    Q    Did you talk with people who were involved in the business?

12    I think you already told us the fact you talked to Mr. Fischer?

13    A    I talked to many people who had been in the business over

14    the years to learn from them, to learn about the business, to

15    learn about customers, to learn about how -- the market

16    conditions.  So that's very common to do when you're taking

17    over a business to run

18    Q    Can you run a business when you're taking over; can you run

19    a business without undertaking the responsibility to learn its

20    condition and its history?

21    A    It wouldn't be advisable to not take the time to study

22    history before you start making decisions about what you're

23    going to do today or tomorrow.

24    Q    The facilities that were involved in the polyurethanes

25    business when you took over, were those facilities, did they

 1    just come into existence or did they have a history?

 2    A    The facilities were unchanged.  The facilities were pretty

 3    much the same in the past as the ones that I was inheriting

 4    coming into the job in January of '04.

 5    Q    Okay.  What about the customer relationships, were they all

 6    of a sudden brand new or did they have a history as well?

 7    A    A long history, those were all very long customer

 8    relationships, which is not uncommon at all in a business like

 9    this.

10    Q    The technology, was the technology all brand new or did it

11    have a history?

12    A    The same technology fundamentally.  There was no -- no real

13    differences in the technology.

14    Q    The market conditions; we're going to talk about the extent

15    to which they changed, but did you have to learn about the

16    history of market conditions?

17    A    Yeah.  It's really important to understand, you know, how

18    much capacity or how much supply of product is out there in the

19    marketplace, very important to understand the demand for that

20    supply or capacity that you have in your plants, very important

21    to know both sides, the supply and the demand, not just on a

22    U.S. basis, but on a global basis.  So you really have to

23    understand that, whether it be in Europe, Asia, Latin America

24    or in the U.S.

25    Q    Now, you told the jury that part of your job was to try to

 1    correct conditions or problems that existed.  Do you recall
 2    saying that to the jury just now?
 3    A    That's right.
 4    Q    Is there any way you could do that without learning the
 5    history of those problems?
 6    A    It would be very hard to do that.  And again, you could be
 7    very shortsighted and you could miss opportunities to improve
 8    the business if you didn't have a good understanding of the
 9    past.
10    Q    Okay.  When you came on board and you undertook to learn
11    this history, I think you've told us how it is that you went
12    about doing it, but could you give us an overview of what you
13    found concerning the condition of the business in polyurethanes
14    beginning with -- give me an overview because we're going to
15    get into it in more detail -- but TDI, MDI, and polyols?
16    A    Right.  The conditions that I observed is that in TDI there
17    was a lot of excess capacity.  People had built too much
18    capacity in TDI and that capacity was not being utilized.  And
19    I also observed that that was a time when some of us may recall
20    the price of oil and gasoline was going up a lot.  And so a lot
21    of our raw materials that we make these products from come from
22    oil, which also is a source for gasoline.  So those raw
23    material prices were going up tremendously, there was excess
24    capacity of TDI, and prices were very depressed as well as
25    profit margins being very depressed.

1    Q    What about MDI and polyols?

2    A    MDI also had been overbuilt but not as bad as TDI.  So it

3    also had excess capacity.  One thing that was a little bit

4    different about MDI versus TDI is MDI, there was better demand

5    for that product.  Because in MDI, you use MDI combined with

6    the polyol to make products that go into, like, refrigerators

7    or automotive, areas that were growing.  So MDI had better

8    growth and demand for it, but it was still an excess -- excess

9    supply but not as bad as TDI.

10        The polyols I would say were also in oversupply.  And

11   in polyols the demand was growing tremendously at that time out

12   in Asia-Pacific, so we were shipping a lot of that polyol out

13   to Asia-Pacific to help better utilize those assets in the

14   United States.

15   Q    Okay.  I want to ask you some specific questions.  First of

16   all, with respect to customers:

17        What was your observation concerning what had happened

18   to the customer base for polyurethanes as of the time that you

19   took over?

20   A    Yeah.  The customer base was getting smaller from the

21   standpoint that there were fewer customers, but there were

22   bigger customers.  So there was a lot of consolidation that was

23   going on with these customers.  So a lot of these customers

24   were consolidating in order to get more pricing leverage to try

25   to get better prices from suppliers, and they were

 1    consolidating too because they needed to improve their cost
 2    position to be more competitive.
 3            So it's very common, you know, as you get bigger to be
 4    able to lower your cost, and that's what the customers were
 5    doing.
 6    Q   Okay.  So the customers -- let me just ask -- were these --
 7    were these facts that you observed, were they all of a sudden
 8    new or was it your understanding that they had gone back over a
 9    period of time?
10            MR. SCHAEFER:  Objection, your Honor, to the extent
11    he's asking the witness about what the customers were trying to
12    do or what their motivations were, he can't testify to that.
13            MR. BERNICK:  I'm not asking that at all, I'm asking
14    about the way in which they were doing business as he observed
15    it.
16            THE COURT:  I'll allow the question.
17            Go ahead.
18    BY MR. BERNICK:
19    Q   As you understood those facts, did you understand that they
20    were brand new, or did you understand that they had a history?
21    A   These are facts that had been evolving over the past
22    several years.  So as I talked to customers in my role of
23    understanding what their demand would be, what kind of outlook
24    they had, my observation is this consolidation had been
25    occurring for a number of years and was continuing at the time

1    I came into the job.

2    Q   I want to show you Defendant's Exhibit 1170, the first

3    page.  It's already in evidence.

4         MR. BERNICK:  If we could pull up -- if you could pull

5    up in the third section there where it says "Second."

6         MR. SCHAEFER:  I'm going to object to that.  To the

7    extent Mr. Bernick was asking just some general questions about

8    what the witness saw when he was reviewing the documents, I

9    think that would be okay and I didn't object there.  But now if

10   we're going to start going through specific documents that were

11   prepared and generated three years prior to this witness'

12   involvement in the business, I think that's too much.  And he

13   couldn't possibly testify to specific supply and demand

14   conditions at that point in time or what customers were doing.

15        THE COURT:  All right, counsel.

16        Just one moment.

17        Mr. Bernick, this document is in evidence.  Correct?

18        MR. BERNICK:  Yes.

19        THE COURT:  All right.

20        MR. SCHAEFER:  Well, it's in evidence and we don't

21   object to the document itself, but --

22        THE COURT:  Let me hear the question.  Go ahead.

23   BY MR. BERNICK:

24   Q   Do you see where it says, "Second, the commanding position

25   of our customers who, due to their size, have tremendous

1    leverage on price"?  And that's Mr. Fischer in MDI.  You see

2    that?

3    A    Yes, I do.

4    Q    Was that consistent or inconsistent with the understanding

5    that you came to about the history of this issue when you

6    joined the polyurethanes business?

7              THE COURT:  This document was produced in October 16,

8    2001.  Correct?

9              MR. BERNICK:  That's correct.  He's talking about the

10   history and his understanding, and all I'm asking if this was

11   consistent with what he learned and understood we came into the

12   job.

13             THE COURT:  I'll allow it.  Go ahead.

14   A    So again, coming into the job, part of what you do is you

15   go out and you talk to your customers.  And as I talked to our

16   customers it was very clear that the statement rang very true

17   with a number of customers in the automotive industry, which is

18   a very competitive industry, and they talked about why they

19   were consolidating.  And one of the obvious reasons that, you

20   know, you consolidate too is to improve your cost position.

21   And so this was very common knowledge in the industry, very

22   common -- it was a very common dialogue within the industry

23   associations that this trend continued to intensify as I came

24   into this role.

25   Q    Okay.  I want to talk now about competition.

 1          Did you come to have an understanding of the
 2    competitive -- competitive conditions in the market and how
 3    they had evolved over time?
 4    A    Of course.
 5    Q    And how did you become familiar with that?
 6    A    We do a lot of market research.  It's very common to do
 7    market research on your competitors, it's very common to get
 8    information through your customers about your competitors'
 9    capabilities.  Any time you compete you need to know what's
10    happening with your competition.  So this is a very common,
11    routine procedure to learn about the strengths, the weaknesses,
12    the opportunities, the threats that your competition creates.
13    Q    Okay.  What was your own understanding as you joined about
14    whether this was a competitive business or not, polyurethanes?
15    A    Highly competitive business.  You had BASF and Bayer, two
16    very strong German companies.  Actually the father of the
17    isocyanates business was Otto Bayer who discovered and invented
18    isocyanates 70, 80 years ago, and so they were very strong
19    competitors.
20          Huntsman was another very strong competitor.  Huntsman
21    had bought the polyurethanes business from a company by the
22    name of ICI, which is Imperial Chemicals out of Great Britain,
23    and they were also an excellent, strong competitor.  And so
24    between Bayer, BASF, Huntsman and Dow Chemical, those four
25    companies competed vigorously in all aspects of the

1    polyurethanes industry and the value chain.

2    Q    If we go up one paragraph in Exhibit DX-1170, this is again

3    Mr. Fischer writing in October of 2001 --

4              MR. SCHAEFER:  Your Honor, I'm going to object again

5    here, that it's a very different situation.  If he's talking

6    about what the competitive conditions were when he took over,

7    that's one thing.  But here again he's asking the witness about

8    what the competitive situation was back in October 2001, which

9    was three years before he got involved.  And there's no

10   foundation for the fact that he even reviewed this specific

11   document at any point in time, although of course anyone could

12   do that.

13             MR. BERNICK:  My question again will not -- will be

14   simply the understanding that he came to when he joined the

15   company in January -- joined Polyurethanes in January of 2004.

16   It's exactly the same.

17             THE COURT:  When did you first see this document?

18   Have you ever seen it before today, Mr. Dawson?

19             THE WITNESS:  I've seen this document before today.

20   And, quite frankly, this is a part of the transition that David

21   Fischer and I went through when I was taking on the job.  He

22   was trying to help me come up to speed on the fundamentals of

23   what was going on out there.  So this was a pretty standard

24   procedural type of a document to want to cover when you're

25   transitioning.

 1            THE COURT:  Even though it goes back to 2001 and you
 2    came in in 2004?
 3            THE WITNESS:  Of course.  Of course.  It's not
 4    uncommon to review that kind of history.  It's very important
 5    to understand that kind of history.
 6            MR. SCHAEFER:  Your Honor, there's a gap in this chart
 7    here where they've had a witness who came and testified about
 8    '94 to '97 --
 9            MR. BERNICK:  Your Honor, this is --
10            MR. SCHAEFER:  -- and Mr. Bernick testified -- not
11    testified -- rather represented --
12            THE COURT:  Okay, counsel, counsel, okay.
13            Go ahead, Mr. Bernick.
14    BY MR. BERNICK:
15    Q   So again, we'll go back to the same question.  Was the
16    competition in the industry important, an important area for
17    you to study when you joined in 2004?
18    A   It's critical to know who your competition is and what you
19    can do to beat your competition in order to improve the
20    performance of your business.
21    Q   In order to understand the nature of the competition, tell
22    the jury whether or not you can do that by just taking a look
23    at the last quarter or the last six months, or would you have
24    to go back in time to understand how competition came to be
25    that way?

1    A    It's very important to know the history.  Just as I stated

2    about Otto Bayer being the father of isocyanates, MDI and TDI,

3    it's important to know that kind of heritage because that gives

4    you a very good insight into what the strengths of your

5    competitors are.  And so it's a very fundamental part of

6    competing, understanding your business, and in this case,

7    making changes to improve the profitability of the business.

8    Q    Is this what we see from this exhibit; that is, in 2001,

9    DX-1170, is it consistent or inconsistent with your

10   understanding of the history of competition in the few years

11   that preceded you?

12        MR. SCHAEFER:  Objection, foundation, lack of personal

13   knowledge.

14        THE COURT:  All right.  Go ahead.

15   Q    Go ahead.

16   A    Please restate your question.

17   Q    Is it consistent or inconsistent with the understanding

18   that you formed when you joined the business?

19   A    It's very consistent.

20   Q    Okay.

21        MR. BERNICK:  I think, your Honor, in the interest of

22   time I'll move on.  I've got more documents but I'm prepared to

23   try to expedite this.

24   Q    So, I want you to -- I want to ask the question about the

25   TDI, the condition of the TDI market in particular.

1          What was the condition, as you understood it -- I'm
2    going to show you -- maybe just do it this way.  Exhibit 5280
3    in evidence.
4          MR. BERNICK:  If we could, first of all, go up to the
5    top and just get the date.
6    Q    This is June 12 of 2003.  Right, Mr. Dawson?
7    A    Yes, that's correct.
8          MR. BERNICK:  And if we could go back down to the --
9    that heading right there.
10   Q    That's from Mr. Fischer to the DL PU PLT.
11         What that would that be?
12   A    That was the Polyurethanes Leadership Team.  So this is the
13   leadership team that David Fischer was sending this memo to
14   within Dow Chemical.
15   Q    And this is three -- six months before you took over?
16   A    That's correct.
17         MR. BERNICK:  If we could take us to first paragraph.
18   Q    It says:  "Attached is a message from Bob."
19         That would be Bob Wood?
20   A    That's right.
21   Q    "...on his current perspective on the performance of his
22   business portfolio.  As a major contributor to the overall
23   portfolio, this is a call to arms for polyurethanes, PU.  We,
24   for a variety of reasons such as hydrocarbons costs" -- and we
25   talked about that?

1    A    That's right.

2    Q    They're going up, down or staying the same?

3    A    Up.

4    Q    -- "...TDI in general, weak market demand, we are dismally

5    behind where we need to be in 2003.  With five months down, we

6    are clearly in a crisis over our performance and need to act

7    upon it as the leadership of the business."

8         Do you see that?

9    A    Yes.

10   Q    Was that consistent with what you saw and found when you

11   came on board in the beginning of 2004?

12             MR. SCHAEFER:  Objection.  Foundation.

13             THE COURT:  I understand.

14             You can --

15   A    Yes, that's way found.  Actually the business was losing

16   almost a million dollars a day.

17   Q    I want to go to DX-5596, which is in evidence --

18             MR. BERNICK:  Actually it's pre-admitted.  I guess

19   we'll offer it.

20             MR. SCHAEFER:  The same objection on foundation basis,

21   but there's no objection to the document itself.

22             THE COURT:  The document is in evidence.  Go ahead.

23             MR. BERNICK:  I said it's pre-admitted, so we're

24   offering it.

25             THE COURT:  Okay.

1              MR. BERNICK:  Okay, thank you.

2     BY MR. BERNICK:

3     Q    Showing you DX-5596, is this a month later from Mr. Fischer

4     to Mr. Wood?

5     A    That's correct.

6     Q    And as you see it's July 19 of 2003?

7     A    That's right.

8              MR. BERNICK:  Again, let's go down to the second

9     paragraph, third sentence.  Actually the last sentence where it

10    says, "More than."  The second paragraph, "More than."  Right?

11    Q    It says:  "More than anything, we can't seem to outrun the

12    damages from TDI each quarter and remain in a desperate state

13    of needing the assets to run."

14             What does "assets to run" mean?

15    A    That's our plants, the plants that make TDI.

16    Q    -- "...and run reliably to get out from under much of the

17    costs which hit our books."

18             Again, is that consistent with what you found when you

19    came on board?

20    A    Yes.

21    Q    I want to show you what is marked as DX-4754.  I'll just

22    put it up on the screen.

23             MR. BERNICK:  And just highlight that first -- yeah.

24    Down, down.

25             This is not in evidence, your Honor.  Not

1    pre-admitted.

2    Q    And is this a document that you reviewed at our request?

3    A    Yes.

4    Q    At our request before you came here to testify?

5    A    Yes.

6         MR. SCHAEFER:  Your Honor, we're going to object again

7    here on two grounds:  First --

8         MR. BERNICK:  Your Honor --

9         MR. SCHAEFER:  -- the date.  Again it's four years

10   before he took over; and in this particular document it's not

11   pre-admitted and we have objections to the document also.

12        MR. BERNICK:  I'll create a foundation for making the

13   proffer.

14        THE COURT:  Let me see the question.  Go ahead.

15        MR. BERNICK:  He wants to see the question.

16        Do you want to rehear the question?

17        THE COURT:  Yes, please.

18   Q    The question is:  Is this a document that was generated and

19   maintained in the ordinary course of business by Dow Chemical?

20   A    Very common.

21   Q    Okay.  It says:  "Polyurethanes Business Review Document."

22   Is that the kind of document that's generated in the ordinary

23   course of business at Dow?

24   A    Very standard procedure.

25   Q    Having a look at the document, is this a document that you

1    know specifically based upon its content, its format and the
2    author on behalf of the Polyurethanes Leadership Team, is this
3    a document specifically which you -- which is a document that
4    was generated and maintained in the ordinary course of
5    business?
6    A    Yes.
7    Q    Have you reviewed the document to determine whether this
8    relates to the matters that you came on board to deal with in
9    January of 2004?
10   A    Yes.
11           MR. BERNICK:  We offer it.
12           THE COURT:  All right.  I'll allow it.  It's in
13   evidence.  Go ahead.
14           MR. BERNICK:  Thanks.
15   Q    I only want to show one thing, which is on page 3, under
16   "Raw material consolidation - a necessary evolution," and I
17   want to focus on the last two sentences of that paragraph.
18           It says: (Reading) We now have four global players,
19   BASF, Bayer, Huntsman-ICI, and Dow, which are fairly equal in
20   the eyes of all of the customers, achieving equal price
21   realization and supplying nearly 70 percent of global demand.
22   All three global competitors and three others are capable of
23   matching Dow's broad product offering."
24           Did that remain true when you were there?
25   A    Yes.

1    Q    Then going down to "Competitive Advantage."  It's on the
2    third paragraph under that same section.
3              MR. BERNICK:  Third paragraph, same section.
4              Third paragraph.  There you go.
5              (Mr. Bernick confers with the tech off the record.)
6    Q    It says:  "The competitive advantage of our integrated PO
7    position..."
8              What's the integrated PO position?
9    A    It means that you have your manufacturing plants connected
10   to each other through, you know, like pipeline relationships.
11   They're not separated physically, they're connected closely.
12   And the reason you want to do that is to improve your cost
13   position so you don't have separate facilities or separate
14   buildings and you can do everything together on an integrated
15   basis for cost -- cost reasons, but also for good environmental
16   health and safety practices to have a smaller footprint so you
17   can better manage environmental issues or health and safety
18   issues.
19   Q    Is there competitive significance -- tell us whether or not
20   there's competitive significance to that integrated position.
21   A    Yes, it's very significant, competitive advantage to be
22   very grated.  That was one of the great strengths of BASF,
23   really another great strength of Bayer and also Dow.  We all
24   believe in this integration in order to be more competitive
25   with our cost position.

 1    Q    This says, "The competitive advantage of our integrated PO
 2    position that Dow has historically enjoyed is declining, with
 3    the advent of POSM technology by Shell and the licensing of
 4    both Repsol and SKOC (without expansion limitations) by
 5    Lyondell (ARCO).  The proliferation of PO sources beyond the
 6    traditional duopoly" -- that's two.  Right?
 7    A    Two, right.
 8    Q    Two companies, "...of Lyondell (ARCO) and Dow has allowed
 9    BASF and Bayer to acquire producer economics via alliances
10    and/or acquisition of PO producers.  This tactic of alliances
11    is one that we will mimic in Isocyanates to improve our
12    competitive position."
13         Competitive position; as against whom?
14    A    Against BASF and Bayer and ICI.
15    Q    Again, do these remain active issues and dynamics when you
16    came on board at the beginning of '04?
17    A    Absolutely.
18    Q    Now, I want to show you, talking about the condition of the
19    business, I want to show you DX-8693, which has been proffered
20    and is in evidence, to you.  I'm just going to go through a few
21    slides.
22         MR. BERNICK:  If we can blow that up a little bit so
23    it stands out a little bit more just to read it.
24    Q    And you're going to need to explain a little bit.
25         Are you familiar with this kind of chart, Mr. Dawson?

 1    A    Yes.

 2    Q    Okay.  It says down below if you look at the bottom, at the

 3    bottom left corner, it says:  Trade --

 4         MR. BERNICK:  Would you blow that up a little bit,

 5    please.  It's the color coding right above that.

 6         (Mr. Bernick confers with the tech off the record.)

 7    Q    Could you just briefly explain to the jury what these terms

 8    mean?

 9    A    Sure.  These are all measurements of how much money you're

10    making at different levels of the business.  The Trade Standard

11    Margin is based on your trade sales and how much it costs you

12    to make that product.  And when you make product you have a

13    variable cost.  Cost varies.  Like raw materials can move up

14    and down as raw materials move up and down.  That variable cost

15    will move up and down.  And then you have fixed costs in which

16    in these businesses are very high.

17         Here fixed costs are labor, the people who are making

18    that product there everyday.  And so it's simply the Trade

19    Standard Margin is the difference between what you're selling

20    that product at and those standard costs being variable and

21    fixed costs.

22         Your Gross Margin then is also what -- the price that

23    you're selling at, but then not only do you subtract your

24    standard -- your standard cost, you also subtract out any

25    variances that you had, like if the plant had a maintenance

1    turnaround, you had to maintain the plant.  You add those

2    maintenance costs in to get to a Gross Margin Cost.

3            Then the Contribution Margin is really the amount of

4    money you're making based on your selling price and what it

5    costs you then to get your product to your customer.  So that's

6    your freight, your distribution cost, warehousing cost.  And

7    that's again a good measurement of how much money you're making

8    at a customer level.

9            And in your EBIT is your earnings before you pay your

10   income taxes.  So after you pay for your freight and logistics

11   cost, then you have to pay for your sales, people out selling

12   the product, people who do the research and development on the

13   product, you have to pay for any legal or HR support for your

14   business to get that at earnings before income tax.

15           And once you get to your earnings before income tax,

16   then you've got to pay your taxes, right?  And once you pay

17   those taxes you get to a net operating profit after tax.  But

18   then the difference between EBIT and economic profit is you've

19   got to spend cash and money on these big plants in the form of

20   capital to -- you know, it's just like your car.  You know, the

21   car has a problem, you've got to fix it, you need a new

22   radiator or whatever you have to go spend some capital money on

23   that new radiator.

24           So the economic profit really then reflects the amount

25   of capital or cash you've got to put in these plants.  It also

 1    reflects your inventories, because once you make product, you

 2    put it inventory, it costs you money to carry those

 3    inventories, right?  That's not free.

 4              And eventually once you take all that capital or cash

 5    from your earnings before income tax, you're left with Economic

 6    Profit.  And that economic profit is really the true measure

 7    and value of that business to your company.

 8    Q   Now, the different things that you've given us, are

 9    these -- are these kind of, you know -- what relationship, if

10    any, do they have to how Dow looks at its own profitability

11    internally?

12    A   This would be my "scorecard" that I get held accountable

13    for in running the business like this.  These are my

14    statistics, equivalent to your batting average, you're on-base

15    percentage.  This is how I got graded was by these types of

16    measurements.  It's very common in Dow Chemical.

17    Q   Does Dow -- did Dow during this period of time regularly

18    keep track of the performance of its businesses and gather and

19    do these calculations for purposes of its ongoing business?

20    A   Of course.

21    Q   Okay.  Going back to the big chart, does the big chart show

22    with respect to MDI, going back from 1995 all the way forward

23    through 2007, does it show the performance of, in dollars and

24    cents, in terms of margin per pound, dollar per pound sold

25    reflected in Dow's financials?

 1   A    Right.  That's what it's reflecting.

 2   Q    So if we go to the very top line, is that the trade

 3   standard margin?

 4   A    Yes.

 5   Q    And if we see in 1995 it's a little bit of a -- $.33 a

 6   pound.  Would that then be the difference, the margin between

 7   trade revenue and your variable costs of production for that

 8   pound at that time?  That's roughly $.33 out of every pound was

 9   your margin?

10   A    Yeah.

11             MR. SCHAEFER:  Objection.  Leading.

12             MR. BERNICK:  I'm just trying get to it.

13             THE COURT:  I'll allow it at this point.

14             MR. BERNICK:  All right.

15             THE COURT:  go ahead.

16   A    So, yes, that trade standard margin reflects the selling

17   price that we sell to a customer, and then taking out the

18   variable cost of those raw materials along with some fixed

19   costs of the labor that it takes to make that product.  That's

20   what the trade standard margin represents.

21   Q    Okay.  And I can go get my little pointer here.

22             We can follow that over time.

23             And so you start out in 1995 around $.33.  And if you

24   go all the way through, you end up in 2007 at less than $.30?

25   A    Correct.

 1   Q    What's your observation about how good that is?

 2   A    Well, it's -- fundamentally it's -- it's not improving to

 3   getting a little bit worse on your trade standard margin.

 4   Q    If you go down and include more and more costs, so if you

 5   do gross margin by 2004 when you came on board, what was the

 6   gross margin?

 7   A    The gross margin was negative as you can see.  So it means

 8   that you're losing money on a gross margin basis.  Once you

 9   make your profit and you have some problems or issues with your

10   plant that causes you to add additional cost, that gross margin

11   is now in the red, as we would say, it's gone negative.

12   Q    You see it goes down and makes a sharp turn in 2006, where

13   we can also see from Dr. Raiff's chart that the actual prices

14   take a big spike in 2006.  We'll talk about that in a minute.

15   Right?

16   A    Yes.

17   Q    Let's go to the next slide because I think this will then

18   move pretty quickly.

19        If you take a look at TDI, again at the top line,

20   1995, the margin here, trade margin is only about -- it looks

21   like actually it's about maybe close to 30 -- the scale is a

22   little different -- and that then dips down and comes up.

23        As of what point in time did the other margins turn

24   negative?

25   A    The other margins turned negative -- well, the economic

1    profit turned negative in about 1996, 1997.  And as you can

2    see, the margins continued to go down and hit an all time low

3    in 2001.  And then you started to see, you know, a pretty flat

4    period of time where you're very low depressed margins.  And I

5    also recall, you know, at that point in time that was the

6    lowest pricing in 20 years of TDI.

7    Q    Am I here?

8    A    Yes.

9    Q    And by the time you came on board in 2004, on all of these

10   different measures except the top one, TDI had been negative

11   for I guess it's about six years?

12   A    That's right.

13   Q    And you were going to go turn that around.  Right?

14   A    That was my job.

15   Q    Okay.  Polyols.  Here again the scale has changed a little

16   bit in order to capture some of the high points.  Polyols look

17   a little bit better.  It stayed positive for most of the

18   measures -- remained positive at all points.  Once you include

19   the cost of the plants -- am I right to say it became negative

20   in '01, and actually snapped back -- did you take credit for

21   popping above zero when you joined?

22   A    Of course.

23              MR. SCHAEFER:  Objection.  Just that Mr. Bernick is

24   pretty much testifying.

25              THE COURT:  All right.

1    Q   So is that an accurate characterization of economic profit;

2    that is, in the case of polyols, economic profit was the only

3    one that -- I think that's that cost of the plants again?

4    A   Yeah, that's right.  And as you spend more money on the

5    plants, more cash on your plants to make them more reliable,

6    that could be one of the reasons why your economic profit goes

7    down.

8    Q   Let me ask you a question:  When you came on board in 2004,

9    at that point in time who was the CEO of the company?

10   A   The CEO at that time was Bill Stavraopulos, and Andrew

11   Liveris had been named the COO of Dow Chemical.

12   Q   And did he ultimately become the CEO?

13   A   That's correct, CEO and Chairman.

14   Q   And is that still true today?

15   A   Yes, it is.

16   Q   Okay.  Now, at that point in time, could you -- could you

17   tell the jury whether consideration was given to actually just

18   getting out of the business altogether?

19   A   Yeah.  When you see these kind of results you can't just

20   continue to let things bleed that way.  So all options were on

21   the table, the options of either try to sell the business, shut

22   down assets that weren't profitable, but to do whatever it took

23   to improve the profitability of the business.  It was not a

24   sustainable business with these kind of results and so we were

25   considering all possibilities to improve profitability.

 1    Q    Okay.  Including?

 2    A    Selling or shutting down assets.

 3    Q    Okay.  I want to turn now and go forward from 2004, and

 4    we'll do TDI on this one and maybe if we have time we'll fill

 5    out the others, but I'm concerned about time.  I know you have

 6    your own time pressures too and we all want to push forward to

 7    conclusion here.

 8            I want you to talk about the changes that took place,

 9    if any, in the market, the supply and demand factors, the

10    business, anything you want to talk about that relates to

11    prices in TDI from the time that that you came on board going

12    forward.

13    A    So, there's several points to be made about, there was what

14    I call a tipping point or an inflection point that some of the

15    fundamentals were starting to change.  One of the big changes

16    at that point in time was in 2004 you had continuing increases

17    in raw material cost that went into making TDI.  So oil was

18    going up tremendously at that time along with the cost of our

19    products.  So that continued on.  But what happened in that

20    period is that profitability got so bad that a lot of producers

21    were talking about shutting down assets to their customers.

22            And in August of 2005, there was a Hurricane Katrina

23    that hit the Texas/Louisiana area, and it hit Lyondell's plant,

24    which at that time Lyondell was making a lot of TDI, and then

25    in September of that same year, Hurricane Rita came in and hit

```
 1    a similar area of Texas/Louisiana.  And at that point in time
 2    Lyondell decided to shut down about 300 million pounds of their
 3    capacity because that plant, we speculated in the press, wasn't
 4    making money and their CEO came out with a statement that said:
 5    We're not going to restart that plant up again.
 6            And that took out a lot of capacity that was excess
 7    product out in the market.  It took it out overnight when that
 8    second hurricane hit.  And that's why you see prices go up so
 9    dramatically.
10            And then there's a little period of time in there
11    where -- where prices remain high, but then they take another
12    step up in about 2006.  And that --
13    Q   Hold up.  If I can interrupt.  Okay?
14            I want to talk about this, what you just referred to,
15    and then we'll talk about 2000 -- what happened later on.
16    A   Okay.
17    Q   We'll do it piece-by-piece.
18            You told us about Katrina and Rita and Lyondell
19    going -- not going out -- not restarting.
20    A   Correct.
21    Q   And as it was reported at the time, as you understood it,
22    why was Lyondell just not -- was just going to exit?  Do you
23    know?  As you understood it.
24    A   As was reported by their CEO to investors, it was not
25    making money and it was the worst product that Lyondell had in
```

 1    their whole company, according to their CEO.
 2    Q   I want to show you Defense Exhibit 872.
 3            MR. BERNICK:  It's pre-admitted.
 4            Just show the first page, 872, defense -- I'm sorry.
 5    972.  My mistake.
 6            If you could blow up the top part down to -- just blow
 7    up the top email.  Actually just get from the John Wilson from
 8    the "From," down to the "Re," the subject right there.
 9            (Bernick confers with the tech off the record.)
10    Q   Does this reflect -- let me just ask --
11            MR. BERNICK:  This is pre-admitted.  Do you have any
12    objection?
13            MR. SCHAEFER:  No objection.
14            MR. BERNICK:  If you just blow that up.
15    Q   Is this a report on October of 2005:  "Lyondell takes
16    hurricane-related --
17            MR. BERNICK:  You have to go back.
18    Q   -- hurricane related charges:  Ceases TDI production."
19    A   Correct.
20    Q   Okay.  Okay.  I want to also then go back to Defense
21    Exhibit 8623 and show that.
22            MR. BERNICK:  That's in evidence.
23    Q   This reflects U.S. Industry TDI production, industry
24    capacity.  And we see here -- why don't you just tell us what
25    this shows and why it changed.

 1    A    So, this is again the amount of product that's being made,
 2    TDI.  TDI fundamentally is one product.  And it shows how there
 3    was a lot of capacity that got added really starting in about
 4    1997, and that capacity, the industry was building a lot of
 5    capacity, you know, increasing it dramatically as you can see
 6    up until 2001.  And then you see capacity start to come down a
 7    little bit, and then you see this tremendous drop in 2005
 8    that's associated with the hurricanes that I just spoke about.
 9    Q    Now, what if anything was the impact of this loss of --
10    first of all, what about Huntsman, ICI, what did they do?
11    A    ICI had a TDI facility on the U.S. Gulf Coast, I believe it
12    was in Louisiana, that they sold to BASF.  And when BASF bought
13    that facility, they shut it down.

14          So that was more capacity that came out of the market
15    at that point in time, in addition to the hurricanes taking out
16    the Lyondell capacity.
17    Q    Now, when you -- just tell the jury -- I think they've
18    heard it before, but tell us what happens -- what, if any, is
19    the relationship between taking all of this capacity out and
20    what happened to prices for TDI?
21    A    Fundamentally you go from a buyer's market, buyers have the
22    power, right, because there's so much product out there, so
23    this really was the tipping point that made it a seller's
24    market.  So the sellers of TDI really had more the power at
25    that point in time when all that capacity left the marketplace.

 1    Q    This is so precipitous.  I mean, is it literally the case
 2    that, you know, the prices rose that quickly?
 3    A    Yes, absolutely.  They rose that quickly because of how
 4    much money had been lost going back to, again, the point about
 5    understanding the history.  And I think, quite frankly, it just
 6    wasn't sustainable.
 7         And this is not uncommon in a commodity type product
 8    like TDI for this -- something like this to occur, for pricing
 9    to go up that dramatically when, like I say, you go from a
10    buyer's market to now a seller's market.
11    Q    So Lyondell is out, they make that decision.  Bayer buys --
12    or BASF buys ICI.  They shut it down.  The buyers -- what
13    you're saying -- I think what you're saying -- you tell me --
14    is that these were decisions that related to the sustainability
15    of the business at the old price.  Is that --
16    A    That's correct.
17         MR. SCHAEFER:  Just so the record is clear, the chart
18    says "ICI."  I think you mean Huntsman.  Yes?
19         THE WITNESS:  Huntsman bought ICI's business, so
20    Huntsman --
21         MR. SCHAEFER:  They weren't ICI in 2005, 2006.
22         MR. BERNICK:  Okay, that's fine.  Huntsman.  Huntsman
23    ICI, whatever it is.  But I'll just correct that.
24         Thank you.
25    Q    Just explain that briefly again.  What does the -- what

```
 1    does the exit of these companies say about the sustainability
 2    of the old prices?
 3    A    It says, first of all, that those prices were not
 4    sustainable based on the overcapacity in the industry and the
 5    lack of growth.  Shutting those assets down also was an
 6    admission that those assets were not competitive going forward.
 7    Q    Wake-up call to the customers?
 8    A    A big wake-up call.
 9    Q    I want to go more quickly now to MDI.
10         Polymeric MDI.  Again, I want to go to the same period
11    of time, which was the period of time that you're there.  And
12    could you just give us -- well, maybe this will expedite it a
13    little bit.  I want to show you Defense Exhibit 5670.  And I'll
14    tell you what; I'll just hand you my copy.  It's not
15    pre-admitted.
16         MR. BERNICK:  Don't show it yet.
17    Q    Are you familiar with this document, Mr. Dawson?
18    A    I'm just looking at it here.
19         Yes, I am familiar with it.
20    Q    Is this a document that you had the opportunity to look at
21    in preparation for your coming here today?
22    A    Yes.
23    Q    Did you have anything to do with the preparation of that
24    document?
25    A    This document was prepared -- I'm looking for the date --
```

1    Q   I think it's down at the bottom left.

2    A   Yes, I'm very familiar with it.

3    Q   Okay.  Was this something that was prepared in the ordinary

4    course of Dow's business at or about the time it's dated?

5    A   Yes.

6               MR. BERNICK:  We offer it.

7               THE COURT:  Okay.

8               MR. SCHAEFER:  Just one objection.  There's some

9    handwriting in a couple of places.  I don't know if that's

10   going to be the subject of examination or not, but --

11              MR. BERNICK:  If you give me the Bates number maybe we

12   can solve that right now.

13              THE COURT:  Yeah, go ahead.

14              MR. SCHAEFER:  There's some on page 004, also on 007.

15   BY MR. BERNICK:

16   Q   Do you see the handwriting there?

17   A   Yes, that's my handwriting.

18   Q   Okay.

19              MR. SCHAEFER:  Okay.  With that, no objection.

20              THE COURT:  All right.  It will be in evidence.

21   Q   I want you to turn -- you can hand that back to me.  Thank

22   you.

23              MR. BERNICK:  If we could show page 014.

24              If you could blow that up.  Even more.  Just -- well,

25   actually that's pretty good right there.

1    Q    This says "Historic and Forecast pMDI Operating Rates."

2    Does that relate to polymeric, that is, pMDI?

3    A    Yes.

4    Q    What does that chart show?

5    A    What this chart is showing is how much money on a

6    cent-per-pound basis you make over your raw material cost which

7    is referred to as the feed stock cost.

8    Q    Could you speak a little bit more into the microphone.

9    A    Yes.

10        So this is the margin that you make when you sell the

11   product and the difference between what your selling price is

12   and your feed stock cost, which is really your raw materials,

13   like propylene or benzene, for example.  So that's the

14   difference.  That's what it's showing; the margin over your

15   feed stock or raw material cost.

16   Q    Okay.  And if we take a look here, what does this -- what

17   does this -- there's a gap between the operating rate and the

18   margin.  Margin falls in 1998, 1999, 2000, and then it slowly

19   comes up, and then it pops here with 2005.

20        What does this chart show about pMDI?

21   A    What it shows you is really in the bullet points that I had

22   made down at the bottom, and that is too much capacity of this

23   product got built in the last peak; the peak being the margin

24   back in 1995 time frame.  So people, including Dow, looked at

25   this and said, wow, we can make a lot of money on this based on

```
 1    the results.  And we built more capacity.

 2             And when --

 3    Q   Wait.  "Built more capacity.  You mentioned that peak in

 4    '95.

 5    A   Yeah.

 6    Q   We've kind of drawn a little line here.

 7             When was -- when was capacity built as you understood

 8    it, what you were referring to here, and why?

 9             MR. SCHAEFER:  Objection.  Foundation, lack of

10    personal knowledge.

11             THE COURT:  Where year are we going back to?

12             MR. BERNICK:  We're going back to '95.  What he's

13    talking about here, he wrote the chart, this is his chart.  I'm

14    just asking him --

15             THE WITNESS:  Yeah.

16             MR. BERNICK:  -- to interpret the chart.

17             THE COURT:  Go ahead, I'll allow it.

18             MR. BERNICK:  Yeah.

19    A   Yeah.  So again, you know, looking -- when I looked at

20    this, you had some very attractive margins that --

21    Q   When?

22    A   -- that justified --

23    Q   When?

24    A   -- the fact you could reinvest.  And so those margins that

25    we were looking at back in the '92, '93 time frame because it
```

1    takes you, you know, several years to build a plant and to

2    bring on new capacity.  So the margins were attractive enough

3    those prior years to say, you know, there should be more

4    capacity being built.  And that's what happened.

5         And the problem was that by the time you build this

6    capacity and you bring on, you know, 300 to 350,000 tons,

7    that's a lot of capacity, right?  And about the time that

8    capacity was being brought on the demand for product started

9    declining in those years afterwards, in that '96, '97, '98 time

10   frame.

11        And so here you bring on too much capacity of product,

12   the demand goes down and you're left with lower operating

13   rates, and these lower operating rates are against a plant that

14   cost, you know, five, $600 million to build.  So you have a lot

15   of cash invested in this thing.  It's not running at the rates

16   that it was planned to run at and it's not a good situation.

17   And then that's where, you know, the buyers -- it's a buyer's

18   market in those years prior to that, that's why margins were

19   going down and hit a bottom in about 2000, 2001.

20   Q    What about costs?  Are rising costs a factor?

21   A    It's a major factor.  Raw material costs are over 50

22   percent -- well over 50 percent of your cost structure.  So you

23   also had rising raw material cost in that late '90s time frame

24   that exacerbated the margin.  If you can't raise your prices --

25   if you can't rise your prices to offset those higher raw

 1    material costs, then that's why you make less margin which is
 2    represented in those black bar charts.
 3    Q   I forgot one thing and I want to pick something up.
 4        I think you told us that there was something else that
 5    happened with respect to TDI after the people get out of the
 6    business in the hurricanes.  You said something else happened
 7    in here.
 8    A   Yeah.
 9    Q   What else happened in there?
10    A   Yeah.  On this TDI chart, the reason that it -- it went
11    flat sideways there for about eight or nine months was, you
12    know, that capacity had been taken out.  But the reason you see
13    that second peak going up is I made a decision to shut down the
14    TDI plant in Porto Maghera, Italy because it was a plant that
15    Dow had bought from EniChem.  It wasn't a competitive plant,
16    and I shut that down in August of '06.  And that was more
17    capacity that came out of the TDI industry, and that was
18    another shock to buyers that price was going to go up even
19    higher.  And that's what's reflected on the chart and that was
20    the reason why prices went up on that second spike in '06.
21    Q   What was the problem with that plant?  Was there a problem?
22    A   It wasn't competitive.
23    Q   It what?
24    A   It wasn't competitive from a cost standpoint, and we felt
25    that it had some risk associated with environmental health and

1    safety issues that we didn't want to take that risk in the

2    future.

3    Q    Did you tell the board of directors about those risks in

4    connection with the decision?

5    A    Yes.  I reviewed that with the board and the CEO who was

6    there, along with our CFO at the time.

7    Q    Okay.  Before we get back to this chart, and I don't know

8    if we can show --

9               MR. BERNICK:  Can we show Pauley Exhibit 18, whatever

10   that is, on the left?

11              MR. SCHAEFER:  We're going to object to the use of

12   this exhibit with the witness from the Pauley deposition.

13              MR. BERNICK:  I'm just going to use it for

14   demonstrative purposes really, and that's to talk about this

15   and to talk about that and to see whether this witness'

16   testimony is consistent with Mr. Pauley's testimony, just

17   different.

18              THE COURT:  Let me hear the question.  Go ahead.

19   BY MR. BERNICK:

20   Q    I want to close out TDI here.

21              Based upon your experience in the industry and your

22   analysis of industry history on TDI, we can see that Mr. Pauley

23   has written, the jury just saw it:  "Less capacity over the

24   price spike in '06, TDI, and more capacity over the lower

25   prices earlier on."

1           And my question is whether that's consistent or

2    inconsistent with your own experience and understanding of the

3    industry?

4           THE COURT:  I know you have an objection.  Right?

5           MR. SCHAEFER:  Yeah.  I just object that it's not

6    necessary to use this other exhibit which is essentially a copy

7    of the one that he's using here.

8           THE COURT:  I'll allow this question.

9           Go ahead.

10          MR. BERNICK:  Thank you.

11   A    It's very consistent.

12   Q    Okay.

13          Now, before we go back to -- and I want to take this

14   one down.

15          MR. BERNICK:  If you could put the other one back up

16   that we just had on MDI.

17   Q    Okay.  Before we go back to MDI on this chart, if you take

18   a look down here we can see that the actual prices -- I should

19   say, the actual as opposed to proposed prices, but the industry

20   weighted prices under Dr. Raiff's curve for -- industry median

21   prices under Dr. Raiff's curve for TDI.  We can see that

22   they're kind of flat here and they kind of make a right turn.

23          If we go to this chart here for MDI, it's flat, but

24   then it kind of curves, and before '05 it starts to go up.

25          Why is there this difference between the MDI pricing

1    during this period of time and the TDI pricing, if you know?

2    A    First of all, it's different applications.  The MDI goes

3    into different applications.  It goes into, like,

4    refrigerators, hot water heaters, insulation.  You know, when

5    you do spray foam insulation like insulating your homes, that's

6    a polymeric MDI that's used in conjunction with a polyol.

7    Whereas, the TDI is used in, like, your mattresses, you know,

8    furniture, bedding type applications.  So it's different

9    applications and it has different growth fundamentals

10   associated with it.

11         So what you're -- I'll just stop there.  That --

12   Q    Okay.  But why is this curve starting to recover a little

13   bit ahead of TDI which doesn't start to move until a little bit

14   later, and then very sharply?

15   A    Yes, it's a little different than TDI because what happened

16   is the industry did overbuild capacity on MDI, as we talked

17   about on this chart behind you, and what was happening is MDI

18   has much better growth than the TDI applications.  So what you

19   see happening is there was no additional capacity added for

20   many years in MDI, and demand was growing at well above 7

21   percent.  A few of those years in that '7 -- '6, '7, '8 time

22   frame it's growing over 10 percent.

23         So the growth fundamentals were helping improve the

24   capacity utilization of the industry plants, and that's why you

25   see MDI prices rising, is because the supply and demand came

1    into better balance because people had not added capacity for a

2    long time, and you had the momentum of price increases being

3    driven by higher raw material costs at that time as well.

4    Q    Okay.  Let's get out of "Dodge."

5         Polyols.  What changed on polyols, if anything, when

6    you were there when you -- after you came on board?

7    A    The change in polyols may not be so clear to someone who

8    doesn't know this industry or this market for polyol.

9         A big part of how you make polyols is you use

10   propylene oxide.  Propylene oxide is like 60, 70 percent of

11   making a polyol.  And what happened -- and it was more gradual

12   as you can see -- but there was an inflection point in that '04

13   time frame from where it had been previously.  That inflection

14   point is the fact that propylene oxide started to get very

15   tight.  Operating rates went from the high 70s, to the low 80

16   percent operating rates at the plants.  Those operating rates

17   went above 90 percent.

18        And when operating rates go above 90 percent in a

19   product like propylene oxide, it becomes tight.  So people who

20   were making polyols that weren't integrated into propylene

21   oxide like Dow was, they had problems getting PO.  And so they

22   couldn't get enough propylene oxide because it had become

23   tight, and they couldn't make as many polyols, and that

24   tightness of PO caused the polyol price to go up along with

25   good demand for those polyols in that ridged MDI market.  So

1    that PO operating rate was a big factor of driving polyol

2    prices up during this time frame.  And that was a unique

3    circumstance.

4            And the last thing I want to say about this pricing of

5    polyols is, what had changed in the -- when we talked to

6    customers, is customers could see a lot of prices going up.

7    They saw TDI going up, they saw MDI going up, they saw a lot of

8    other raw materials going up, and polyols.  So the psychology

9    of the buyer changed because they saw a lot of things really

10   increasing during that time, and that's the other point that

11   helps support these increases for polyols.

12           THE COURT:  Go ahead, Mr. Bernick, another question.

13           MR. SCHAEFER:  Just an objection to the last piece of

14   that when the witness talked about the psychology of the buyers

15   changing.  I think that's --

16           THE COURT:  I'll allow it.  Go ahead.

17   BY MR. BERNICK:

18   Q   I now want to take a step and talk more generally, about --

19           THE COURT:  Let's recess.  Let's take a few-minute

20   recess then, this is a good time.

21           Ladies and gentlemen, we'll take a 15-minute break

22   that.  Okay?  We'll see you.  No discussion about the case,

23   please.

24           (The Jury leaves the courtroom.)

25           THE COURT:  Counsel, 1:15.  Okay?

1           MR. BERNICK:  Sure.

2           THE COURT:  All right?

3           MR. BERNICK:  Yes.

4           (Witness temporarily excused.)

5           THE COURT:  Just give me an idea, how many more

6    witnesses do you expect?

7           You can be seated, please.

8           MR. BERNICK:  How many more witnesses?

9           THE COURT:  Yeah, just --

10          MR. BERNICK:  Live witnesses or video?

11          THE COURT:  Either way.

12          MR. BERNICK:  I think Jon probably has a better sense

13   of that.

14          MR. STREETER:  Yes, your Honor.

15          So, live witnesses, I think there are five of them

16   left.  And then in terms of video witnesses, we don't have any

17   long ones, they're all a couple, two hours and a lot of half

18   hour ones.  I think it's probably somewhere in the neighborhood

19   of 15 of them, but they're short.

20          THE COURT:  You're keeping track of --

21          MR. BERNICK:  We are.

22          The live witnesses also, we have Mr. Beitel.  I don't

23   think he'll be too long, but we have a series of live witnesses

24   who will be relatively short, they relate to Ms. Barbour so

25   they'll be short, and we have Dr. Ugone.

```
 1                THE COURT:  I'm just trying get idea.

 2                Okay.  We'll see you in about 15 minutes.  Thanks.

 3                (A recess is taken.)

 4                (Proceedings resume - Jury not present.)

 5                THE DEPUTY CLERK:  Remain seated.

 6                Please rise for the Jury.

 7                (Jury present.)

 8                THE COURT:  Okay, everyone, be seated.  Thank you.

 9                Mr. Bernick, you can continue.

10                MR. BERNICK:  Thank you, your Honor.

11                    DIRECT EXAMINATION CONTINUES

12      BY MR. BERNICK:

13      Q    Mr. Dawson, if you could take a look at Defense Exhibit.

14      DX-4836.  Are you familiar with that document?

15      A    Yes.

16      Q    Is that a presentation that was put together by Bob Wood --

17      A    Yes.

18      Q    -- in 2001?

19                Was it generated in the ordinary course of business at

20      Dow?

21      A    Yes.

22      Q    Is it the kind of document that was relied upon Dow in its

23      ordinary course of business to do business planning?

24      A    Very standard, yes.

25      Q    And are you familiar with this document?  Have you reviewed
```

1    it?

2    A    Yes.

3    Q    Does this reflect facts if are part of the historical

4    background that you would look at when you came on board in

5    2004?

6    A    Yes.

7              MR. BERNICK:  We offer it, your Honor.

8              THE COURT:  All right.  It's in evidence.

9              MR. SCHAEFER:  I still object on the basis of

10   foundation.  But otherwise --

11             THE COURT:  It's in evidence then.  I understand your

12   objection.

13             MR. BERNICK:  Thank you.

14   Q    So I want to get to a concept cyclicality.

15             Does that document, does that report reflect some

16   graphs regarding cyclicality?

17   A    Yes, it does.

18   Q    In order to make this a little bit simple, if we can just

19   show up on the screen two things.  One is page 5 of DX-1170,

20   and the other is page 1 of DX-8693.

21             And is it fair to say that both of these relate to

22   MDI?

23   A    Yes.

24   Q    And it actually talks about the last cycle?

25   A    Yes.

1    Q   And we have a period '92, '93 which is negative, but then

2    rising, it comes up, it goes back down, it has capacity is

3    added.  And I think this chart ends up with -- the document

4    ends in about 2001?

5    A   Right.

6    Q   And then the if we go to the summary of financial

7    performance -- this is a summary of financial performance

8    itself.  Is that right?

9    A   That's right.

10   Q   And it actually talks about net 54 million of EP.  What is

11   "EP"?

12   A   That's economic profit.

13   Q   The same kind of thing that's down here?

14   A   Yes.

15   Q   Okay.  So then the other chart kind of picks up in mid

16   1990s, kind of corresponding here, mid 1990s, mid 1990s, but

17   then it goes out further and picks up this dip.

18          Just putting those two things together, these two

19   charts together, do they reflect essentially a business cycle

20   for MDI?

21   A   Yes.

22   Q   Okay.  If we look up on this chart here for polymeric MDI

23   we can see the same kind of bump.  This is not in economic

24   profit, this is in weighted mean industry prices per Dr. Raiff.

25          But do we see kind of the same image where it goes up,

1    it comes down for a long time, and then towards the very end

2    MDI starts to go back up again?

3    A    Correct.

4    Q    Would we see the same kind of cyclicality also for TDI?  It

5    goes up, same kind of thing.  It comes down, TDI really takes a

6    dip during the market recession, flat, and then it rises very

7    quickly with the change in the production capacity.

8    A    Right.

9            MR. SCHAEFER:  Objection, just to the extent that

10   what's on the screen is a different time period, different

11   product than --

12           MR. BERNICK:  I'll be clear.

13           THE COURT:  It's a different product, isn't it?

14           MR. BERNICK:  Yes.  I went through MDI.  This is the

15   same one.  So we did that.  This chart now I think I said, and

16   even with respect to other products, I thought my question was:

17   Do we see the same kind of cycle?

18           We can take this down if helps.

19           Does that help?

20           THE COURT:  All right.  I'll allow that.  Go ahead.

21   BY MR. BERNICK:

22   Q    Do we see also cyclicality when it comes to TDI?

23   A    Yes.

24   Q    Although we've got this big dip down here, and then it

25   comes up like that that?

 1   A    Yes.

 2   Q    But TDI had this -- these two major events that really made

 3   it sharp?

 4   A    Yes.

 5   Q    And if we go to polyols, do we then see it comes up, it

 6   comes down, not quite as sharp a thing, and then it comes up

 7   again?

 8   A    Right.

 9   Q    A few more questions and we're done.

10        If we take the period of time before 2004 -- and as

11   you know, the alleged conspiracy period here is '94 through

12   2004 --

13             MR. JOHNSON:   '3.

14             MR. BERNICK:   Yes, thank you.   That has significance

15   we won't go into.

16   Q    So up through the end of 2003, and then the period of time

17   afterwards.   So this is the dividing line.   I want to ask you

18   this question and I'll ask you the same question with respect

19   to all of these charts, and it's the same kind of question I

20   asked Mr. Pauley.

21             MR. BERNICK:   We could play Mr. Pauley's testimony

22   that I've asked to be replayed?

23             MR. SCHAEFER:   You're going to play the video?

24             MR. BERNICK:   Yeah, just a clip, a very small clip of

25   it where we deal with exactly the same point.

```
 1              THE COURT:  Yeah, we don't need that.
 2              MR. BERNICK:  Well, I'd like to ask him -- we can read
 3    the testimony if that would be better.
 4              THE COURT:  Well, what are you going to ask him?
 5              MR. BERNICK:  I'm going to ask him whether or not he
 6    has the same view as Mr. Pauley.  Mr. Pauley testified exactly
 7    on this subject.
 8              MR. SCHAEFER:  There's no reason to play the video.
 9              THE COURT:  Yeah, we don't need to have one witness
10    attributing to another witness what the other witness said.
11    Whether it was accurate or not, that's for the jury to
12    determine, that's all.
13              MR. BERNICK:  I'm asking a different question.  I'll
14    put it differently.
15    BY MR. BERNICK:
16    Q    I want you to assume -- I just want --
17              MR. BERNICK:  I don't want to play it.  I want to ask
18    him whether he agrees or disagrees with a plaintiff in the
19    case, Mr. Pauley.
20              THE COURT:  Well, ask the question.  You don't need to
21    play the video.
22              MR. BERNICK:  Okay.  I'll just do it this way.
23              (Mr. Bernick confers with co-counsel off the record.)
24              MR. BERNICK:  Can I show the transcript anyhow?
25              THE COURT:  What's that?
```

```
 1              MR. BERNICK:  Okay.  Thank you.
 2              You know what, your Honor, I think I can save time.
 3  BY MR. BERNICK:
 4  Q   I want to show you DX-6790.  Are you familiar with DX-6790?
 5  A   Is this it right here?
 6  Q   I'm sorry, I should have given it to you.  I thought he was
 7  putting that up (handing document).
 8  A   Yes, I am familiar with that.
 9  Q   And could you just identify it for the Court?
10              Go ahead and tell Court -- tell the jury and the Court
11  what it is.
12  A   Basically this is an industry interview on what was going
13  on with price increases, capacity, utilization, and there's
14  quotes from myself, there's quotes from Lyondell, there's
15  quotes from BASF about the industry and what's going on with
16  pricing and the fundamentals.
17  Q   Okay.  And the quote from you, does it appear as -- in
18  quotes?
19  A   Yes.
20  Q   And is that an accurate quote?
21  A   Yes, it is.
22              MR. BERNICK:  We'll offer it, your Honor.
23              THE COURT:  All right.
24              MR. SCHAEFER:  We object on the basis -- I mean,
25  there's a single quote from Mr. Dawson but it's a trade
```

```
 1    article.  It has other hearsay, and it's --
 2              THE COURT:  Okay.  Well, I don't know what this is.
 3    Could someone show it to me?
 4              MR. BERNICK:  Yes, I'm sorry.
 5              THE COURT:  I don't know what this is.
 6              MR. BERNICK:  I'll handle it up to the Court.  It's
 7    Chemical Week.
 8              MR. SCHAEFER:  Subject to the same limiting
 9    instruction that your Honor gave yesterday --
10              THE COURT:  Yeah, I know.
11              All right.  This is not pre-admitted.  Right?
12              MR. BERNICK:  Correct.
13              THE COURT:  All right.  Just ask him if, in fact, on
14    this date in this publication he was quoted as the following,
15    that's all.  This doesn't have to go into evidence.
16              MR. BERNICK:  That's fine, your Honor.
17    BY MR. BERNICK:
18    Q    In Chemical Week in October of 1995 -- 1995 -- 2005, were
19    you quoted as saying, with regard to the market for
20    polyurethanes the following:  That, "There has been a
21    fundamental change in the market.  People are tired of losing
22    money on these assets, and the run-up in feed stock prices have
23    exacerbated the situation and pushed them over the edge"?
24              Did you say that?
25    A    Yes, I did.
```

```
 1    Q    With regard to TDI, was it true that there was a
 2    fundamental change that, as you have indicated, was focused on
 3    the old prices and the need to change the old pricing
 4    situation?
 5    A    Yes.
 6    Q    Now, if we want to bottom-line the thing, I want to ask you
 7    about testimony from -- or a document that was used -- I
 8    probably dropped it, I'm sorry -- with Mr. Pauley.
 9              MR. BERNICK:  I'm now not going to be able to find it
10    because I dropped it.
11              Here we are.
12              This is a demonstrative --
13              Could we pull this up?
14              (Mr. Bernick confers with the tech off the record.)
15              MR. BERNICK:  The jury just saw -- I filled this out
16    in the course of examining Mr. Pauley and the jury will recall
17    what they recall concerning whether Mr. Pauley agreed with what
18    I wrote.
19              But that it says:  (Reading) 1997 to 2003:  Different
20    market for TDI versus post 1993 (sic).  Different market versus
21    pre-'97.
22              I want to focus not on pre-'97, just the
23    pre/post-2003.
24              MR. SCHAEFER:  I object to the form of the question,
25    because what Mr. Bernick is referring to is a chart that he
```

1    wrote, and to the extent he's attributing this to any testimony
2    of Mr. Pauley, that's inaccurate.
3                MR. BERNICK:  The jury will recall -- I'm sorry, your
4    Honor.
5                THE COURT:  All right.  I don't think you need to use
6    this demonstrative, Mr. Bernick.
7                MR. BERNICK:  Okay.
8                THE COURT:  Let's -- okay.  The objection is
9    sustained.
10   BY MR. BERNICK:
11   Q       QUESTION -- at line 7 of page 2013 to Mr. Pauley.  The
12   jury just saw this:
13               (Reading) So would you agree with me then that 1997
14   through 2003 was also a different market from pre-1997?
15               The witness answers:  Yes.
16               And I asked him to be clear:  I'm sorry?
17               And he answered:  Yes.
18               Would you agree with Mr. Pauley's statement that I
19   just read to you, that the market pre and post 2003 was
20   different?
21               MR. SCHAEFER:  I object to the form.
22               THE COURT:  You know, Mr. Bernick, these are
23   argumentative.  Asking him whether he agrees with another
24   witness is getting argumentative.  I'm not going to allow it.
25   He can say it was different, Mr. Pauley could say it was

```
 1   different.  In summation you can do what you want with it, but
 2   this is getting repetitive and I'm not going to allow it.
 3             MR. BERNICK:  Okay.
 4             THE COURT:  So stop doing it.
 5             MR. BERNICK:  Okay, I will.
 6             THE COURT:  Okay.
 7   BY MR. BERNICK:
 8   Q    So, Mr. Dawson, tell us whether or not the pre and post
 9   markets for polyols for before the beginning when you joined,
10   and after, tell us whether or not they're different.
11   A    Yes, they are different for the reasons I had commented on
12   before.
13   Q    The same thing, the same question with regard to TDI?
14   A    Yes.
15   Q    The same thing with regard to polymeric pMDI, are they the
16   same or were they different?
17   A    Different.
18             MR. BERNICK:  I pass the witness, your Honor.
19             THE COURT:  All right.  Thank you.
20             Counsel.
21             MR. SCHAEFER:  I'm just going to...
22             (Documents are handed to the witness by Mr. Schaefer.)
23             THE COURT:  You can proceed.  Go ahead.
24             MR. SCHAEFER:  Good afternoon, lady and gentlemen of
25   the jury.
```

```
 1                    CROSS-EXAMINATION
 2    BY MR. SCHAEFER:
 3    Q   Good afternoon Mr. Dawson.
 4             My name is Dan Schaefer.  I'll be doing the
 5    cross-examination of today, possible recross if necessary.
 6             Do you recall that you gave sworn testimony in a
 7    deposition in this case in March of 2010?
 8    A   Yes.
 9    Q   And do you also recall that you gave sworn testimony again
10    in February of 2013?
11    A   I'm not sure I recall '13.
12    Q   In February of 2013, you gave sworn testimony in connection
13    with this case.
14    A   And where was that?
15             MR. BERNICK:  Because you just showed him the
16    transcripts --
17    Q   You have the transcripts right in front of you there, Mr.
18    Dawson, if you want to take a look and see if that will refresh
19    your recollection.
20             My question is simply if you recall -- and this is yes
21    or no -- that you gave sworn testimony in February of 2013?
22    A   Okay.  Yes.
23    Q   And just to be clear, I may at certain times refer back to
24    prior testimony that you gave, and to be clear, I may be
25    referring back to testimony you gave in either March of 2010 or
```

1    in February of 2013.  That's what I mean when I say "prior

2    testimony," as opposed to something you said just now during

3    your direct examination.  Do you understand that?

4    A    Yes.

5    Q    You had no responsibilities for the urethane business prior

6    to 2004, when you became the Vice-President in charge of Dow's

7    Polyurethane business.  Correct?

8    A    That's correct.

9    Q    And to be precise, you took over the business in January of

10   2004.  Right?

11   A    Right.

12   Q    And prior to 2004, you did not work with David Fischer.

13   Correct?

14   A    Correct.

15   Q    And you testified during your direct exam that by the time

16   you became involved in polyurethanes in 2004, or very shortly

17   thereafter, within a couple of months I believe, that a number

18   of employees in Polyurethanes, including David Fischer, Bob

19   Wood, Marco Levi, Stephanie Barbour, Charles Churet and Rick

20   Beitel -- and you didn't testify to all of those -- but all

21   those folks were gone from the polyurethanes business in early

22   2004 or shortly thereafter.  Correct?

23   A    That's not correct.

24        MR. SCHAEFER:  Mr. Goldberg, let's pull up page 4782

25   of the 2013 testimony, if you would, line 2.

1    Q    The question is:

2              (Reading) By that point then when you assumed those

3    new responsibilities with respect to polyurethanes, Mr. Levi,

4    Mr. Beitel, and others were gone from the Polyurethanes group.

5    Right?

6              Answer at line 6:  Mr. Beitel was still around in a

7    transitioning role.

8              QUESTION:  But he didn't have his earlier

9    responsibilities as the head of sales for polyurethanes.

10   Right?

11             ANSWER:  There was a few months where he was

12   transitioning with Bob Elliot, and then it continues.

13             Was that the testimony that you gave --

14   A    Yes.

15   Q    -- previously?

16   A    Yes.

17             MR. BERNICK:  Your Honor, that's not impeachment, it's

18   consistent with -- he said it wasn't true with respect to the

19   answer to the first question.

20             THE COURT:  That's correct.

21             Counsel, go ahead.

22   Q    Okay.  Granting that Mr. Beitel was around for a couple of

23   months transitioning, other than that, all those employees were

24   gone from Polyurethanes in early 2004.  Correct?

25   A    Yes.

1    Q    Mr. Beitel was terminated and replaced as the Commercial
2    Director.  Right?
3    A    I don't recall he was terminated.  He was -- there was a
4    transition with Bob Elliot.
5    Q    He was relieved of his roles with respect to Polyurethanes.
6    Correct?
7    A    Correct.
8    Q    And Mr. Levi was reassigned to a different Dow business in
9    Europe.  Correct?
10   A    Correct.
11   Q    Mr. Wood had resigned and left the company.  Correct?
12   A    Correct.
13   Q    And you replaced Mr. Fischer as Vice-President in charge of
14   Polyurethanes.  Right?
15   A    It was a combination of replaying Mr. Wood and Mr. Fischer.
16   Q    Correct.  A combination of the two roles, but Mr. Fischer
17   was out of the polyurethanes business and you replaced him,
18   among other roles.  Correct?
19   A    Mr. Fischer was there for a while transitioning as he
20   stayed on a few more months as well and helping me transition
21   into the new role.
22   Q    But again, as of January of 2004, you were in charge of the
23   Polyurethanes business, not Mr. Fischer.  Correct?
24   A    That's correct.
25   Q    And you testified previously that you weren't involved in

 1    the Polyurethanes business prior to January of 2004.  Correct?

 2    A    Correct.

 3    Q    So with respect to your testimony today, you're in no

 4    position to tell us anything about whether there was or was not

 5    a price-fixing conspiracy from 1994 to 2003.  Correct?

 6    A    Not correct.

 7    Q    Well, you certainly didn't say anything in your direct

 8    testimony, did you, sir, about whether there was or was not a

 9    conspiracy in effect during 1994 to 2003.  Correct?

10    A    What I said is that I went through a lot of history in both

11    written files and transitioning with some of the people that

12    you mentioned to better learn the business.  And as I was

13    transitioning and reading through all those files, I did not

14    see anything that would lead me to believe that there was

15    anything that was going on from a conspiracy standpoint or

16    anything that was being done in an illegal manner.

17    Q    My question simply is that you weren't around in the

18    Polyurethanes business during 1992 -- 1994 to 2003, and you

19    don't really know, do you, whether there was a price-fixing

20    conspiracy during that time?

21    A    You're correct in that I was not there, I was not in

22    Polyurethanes --

23            MR. BERNICK:  Objection.

24    A    -- but I think you're incorrect in that you have to learn a

25    lot about the history and you spend a lot of time learning from

1    the people who were there.  And I think if something had been

2    going on, going through that transition and the time not just

3    with those people but with customers as well, I would have

4    thought I would have seen something.  It would not have been

5    uncommon to have customers or to see something suspicious come

6    up.

7         I did see a lot of decisions that I didn't agree with,

8    but that had nothing to do with anything being wrongdoing.

9    Q   Let's talk about the historical financial statements that

10   you looked at.  You testified that when you took over in 2004,

11   you looked at the historical financial statements.  Correct?

12   A   That's correct.

13   Q   And you also testified on direct that you were familiar

14   with the financial statements, not only with respect to 2004

15   and later but also the earlier years.  Is that right?

16   A   That's correct.

17   Q   You were trying to get an understanding for the past

18   performance and how to project how the performance of the

19   business would be in the future.  Right?

20   A   Correct.

21   Q   And you've testified that it was critical for you to read

22   those statements and understand them.  Right?

23   A   That's correct.

24   Q   Now, you have testified previously that when you joined

25   Polyurethanes in January of 2004, that the business was at the

1    very bottom of the business cycle.  Right?

2    A    It was in a trough.  No question, it was -- it was not

3    performing well.

4              MR. SCHAEFER:  Todd, can you pull that up 4727.  We'll

5    start at line 10.

6    Q    The question at line 10 is:

7              (Reading) Where was Polyurethanes -- when you joined

8    in '04, where was Polyurethanes in the business cycle?

9              And your answer was:  Well, like a number of

10   businesses at that time, it was tough.  And I would say it was,

11   you know, pretty much in the bottom of a cycle.

12             That's what you testified, sir.  Correct?

13   A    Pretty much.

14   Q    That is what you testified.  Yes?

15   A    Exactly.  But "pretty much" doesn't necessarily mean it was

16   at the bottom --

17             MR. BERNICK:  I'm sorry, it's not impeachment.  The

18   question he was asked was:  Didn't he testify that this

19   business was at the very bottom.

20             Now the question has changed because the testimony has

21   changed, so that's not impeachment.

22             MR. SCHAEFER:  I understand.

23             THE COURT:  All right.  Go ahead.

24             MR. SCHAEFER:  Okay.

25             THE COURT:  Let's hear the next question.

1          THE COURT:  I know what your objection is but it's

2    overruled for now.

3          Go ahead.

4    Q    You testified, didn't you, sir, that the Polyurethane

5    business was pretty much in the bottom of the cycle.  Correct?

6    A    Correct.

7    Q    And you said that when you took over, there was weak demand

8    and Dow didn't have a lot of leverage in the market to improve

9    your prices or margins.  Correct?

10   A    I lost this on the monitor.  Sorry.

11   Q    I'm just asking the question.  You said that when you took

12   over there was weak demand and Dow didn't have a lot of

13   leverage in the market to improve your prices or margins.

14   Correct?

15   A    Correct.

16   Q    And you said that became even more clear to you later when

17   you looked back at 2004, you testified that there was no doubt

18   in your mind that 2004 was the bottom of the business cycle.

19   Right?

20   A    Definitely it was in the -- it was tough, the conditions

21   were tough, it was near the trough or in the trough.

22         MR. SCHAEFER:  Come back to that page, Todd, that was

23   just up there, 4727.

24   Q    And we'll look at line 18.  And this is a continuation of

25   your answer from the previous, what you said at line 18:

1          (Reading) So it's very tough conditions, and you never

2      know where you are in the cycle sometimes until you look

3      backwards.  And when you look backwards it's a lot clearer.

4          And so it felt like the bottom.  And looking backwards

5      a year later, we were definitely in the bottom of a cycle.

6      A   Yes, I said that.

7      Q   And you also testified, did you not, sir, that the, quote,

8      the worm turned in 2004, meaning that Polyurethanes went from a

9      buyer's market to seller's market.  Right?

10     A   Correct.

11     Q   And, in fact, during your direct examination today when Mr.

12     Bernick put up the three charts and drew a line right down the

13     middle at 2004, you testified that the market pre January 2004

14     was fundamentally different than the market post January 2004.

15     Correct?

16     A   That's right.

17     Q   And the reason for that is that you said demand improved

18     and supply became tighter, and as a result you had to charge

19     higher prices.  Right?

20     A   Right.

21     Q   Okay.  Let's take a look back at DX-8693, which is the

22     summary exhibit you testified about.

23         Do you remember your testimony about this summary,

24     sir?

25     A   It was two years ago, so...

1    Q    Well, this is the summary that you were shown today --

2    A    Yes.

3    Q    -- by Mr. Bernick.

4    A    Correct.

5    Q    And you testified on direct that the first page here

6    reflects Dow's margins for MDI.  Correct?

7    A    Correct.

8    Q    Now I'm going to focus a little bit on the purple line

9    which is the line for E-B-I-T, EBIT.  Do you see that, sir?

10   A    Yes, I do.

11   Q    And you testified that EBIT means "Earnings Before Income

12   Taxes."  Right?

13   A    Correct.

14   Q    And EBIT, like these other measures up here, is one way of

15   measuring Dow's profitability in the marketplace.  Correct?

16   A    Yes.

17   Q    I think you said something to the effect that this was your

18   scorecard when you were running the business.  Right?

19   A    Correct.

20   Q    And for my next series of questions I will be referring

21   continuously to the EBIT line.  I may even refer to it as Dow's

22   margin, but I just want to make sure that you understand that

23   I'm going to be focusing on EBIT here specifically.  Okay?  You

24   understand that?

25   A    Yes.

```
 1   Q    Is it correct that at least according to this chart, Dow
 2   was making money, again looking at EBIT specifically, every
 3   year from 1995 through 2000 -- well stop with 2001.  Is that
 4   right?
 5   A    Yeah, 2002, looks like a break even on EBIT.
 6   Q    That's right.  In 2001 you were still in positive
 7   territory.  Right?
 8   A    That's right.
 9   Q    And then 2002 and 2003 we're both right around break even
10   points on EBIT.  Is that right?
11   A    That's right.
12   Q    And just to be clear, in 1995 through 2001, those are all
13   part of the conspiracy period that's alleged in this case.
14   Correct?
15   A    That's correct.
16   Q    Now, according to this graph, Dow's profits on MDI peaked
17   around $.30 per pound in 1996.  Correct?
18   A    Yes.
19   Q    So essentially that means that Dow made $.30 for every
20   pound of MDI that was sold that year.  Right?
21   A    Of EBIT, yes.
22   Q    On an EBIT basis.  Correct?
23        Now, are you aware, sir, that Dow produced with --
24   with this chart here in Exhibit 8693, some -- some backup data
25   in the form of financial reports?  Are you aware of that?
```

 1   A    I'd have to see that again to recall it, I believe.

 2   Q    There's in your folder there in front of you, actually the

 3   one that's marked 8693, you'll see that there are excerpts from

 4   that backup data.

 5        MR. SCHAEFER:  Counsel, you have a copy there as well.

 6        MR. BERNICK:  Yes.  Thank you very much.

 7   A    Okay.

 8   Q    And you'll see, in addition to the chart, there are three

 9   separate pieces of paper, each stapled, one for MDI, one for

10   TDI and one for polyols.  Do you see that?

11   A    Yeah, got it.

12   Q    And the first page, just to get you oriented at what you're

13   looking at it, the first page are the numbers that are in the

14   backup data that forms the basis for these charts here.  So in

15   other words, each of those data points corresponds with a point

16   on the chart.  Do you understand that?

17   A    Yes.

18   Q    And then if you flip to the second page of each of those

19   packets there you'll see the full table with the financial data

20   that was used to create the model.  Do you see that?

21   A    Yes, I do.

22   Q    Now, having seen those, have you reviewed that data before

23   today?

24   A    I don't recall the last time I reviewed this data.

25   Q    At any point in your preparation for your testimony today,

1    did you review the data that was used to create the summary

2    chart that you've testified about?

3    A    I've reviewed the chart, but I have not reviewed the actual

4    data here --

5    Q    Okay.

6    A    -- that you're now pointing me to.

7    Q    Fair enough.  At some points in the examination I may refer

8    you to the backup data and point to some specific numbers in

9    there.  That's what I'm referring to when I say that.

10   A    Okay.

11   Q    Okay.

12         MR. SCHAEFER:  Todd, if you can pull up the big

13   financial table for MDI.

14         And if you could blow up the volume for 1996.  The top

15   row.  Up here (indicating).

16   Q    Okay.  Do you see that according to the backup data that

17   was produced with this chart, that Dow had net trade units of

18   around 256 million of MDI in 1996?  Do you see that?

19   A    Yes.

20   Q    And as I understand it, net trade units refers to pounds,

21   which is the same measure on the chart itself, in 8693.  Do you

22   see that?

23   A    Yes.

24   Q    So, in other words, 250,000 -- 256,359,000, that refers to

25   number of pounds.  Is that how you understand it as well?

1    A    Yes.

2    Q    So just to put the profitability numbers on an EBIT basis

3    in 1996, if Dow sold 256 million pounds of MDI in 1996 and

4    earned $.30 per pound before taxes, that means that Dow earned

5    around 75 million on MDI in 1996 alone.  Correct?

6    A    Correct.

7    Q    And that's also the number that's at the bottom of the

8    chart there.  Correct?  75,625,000?

9    A    Yes.

10   Q    Okay.  Now coming back to these charts, we've seen that

11   EBIT stayed positive but trended downward from '96 through

12   2002.  Correct?

13   A    Correct.

14   Q    And then we see here that profits plummeted from around

15   breaking even 2003 to -- let's see here -- negative $.26 per

16   pound in 2004.  Is that right?

17   A    Yes.

18   Q    Now, 2004 was the first year after the alleged conspiracy

19   period in this case ended.  Correct?

20   A    Yes.

21   Q    So just to put that number of negative $.26 per pound in

22   context again, do you see in the backup data that Dow sold

23   about 162 million pounds of MDI in 2004?

24   A    Yes.

25   Q    And that was, again, your first year in the business?

1    A    Yes.

2    Q    So according to the backup data, Dow lost about $41 million

3    in MDI in 2004.  Is that right?

4    A    That's right.

5    Q    Okay.  So Dow's earnings then continue to fall from about

6    $.26 per pound to $.32 per pound from 2004 to 2005.  Right?

7    A    Right.

8    Q    So again, according to the backup data that Dow provided

9    with the chart, Dow lost another $48 million in 2005.  Correct?

10   A    Correct.

11   Q    And then for one more year Dow's profits continued to fall

12   from around $.32 per pound to the bottom here, which is

13   negative $.43 per pound from 2005 to 2006.  Correct?

14   A    Correct.

15   Q    So Dow lost even more money on MDI in 2006.  Right?

16   A    Yes.

17   Q    And to be precise, Dow lost another 57 million in 2006.

18   Correct?

19   A    Correct.

20   Q    All right.  So just to recap:  According to this summary,

21   Dow made money or at least broke even on MDI every year during

22   the alleged conspiracy period from 1995 to 2003.  Correct?

23   A    Yes.

24   Q    And then the first three years after the end of the alleged

25   conspiracy, Dow lost 41 million in 2004; 48 million in 2005;

1    and 57 million in 2006.  Correct?

2    A    That's what the numbers say, that's correct.

3    Q    Is it fair to say, then, that for MDI at least, 2006 was

4    the low point in the business cycle, not 2004?

5    A    I wouldn't say it was the low point in the business cycle.

6    I'd say it was the low point for Dow based on the fact that we

7    were having operating problems with our plants and we had

8    brought a new plant on that was having a lot of problems and we

9    were spending a lot of money on fixing it, and that's what get

10   reflected in EBIT.  But as you can see from the top line, the

11   margin, the prices were improving in that period.

12   Q    Well, to focus specifically on Dow then as opposed to the

13   business cycle for polyurethanes more generally, is it fair to

14   say that the bottom of the business cycle for Dow's MDI

15   business was 2006?

16   A    The bottom of our profitability was in 2006.

17    Q   And isn't the -- isn't profitability a measure for when the

18   bottom of the business cycle is for any business?

19   A    I'll call -- I think there's a distinguished difference

20   between profitability in a given year and a cycle.  I think

21   that profitability, if it's impacted by things that are under

22   your control that aren't going as planned like we were having

23   in our operations, I think that's different than a cycle that's

24   being impacted by industry supply/demand fundamentals.

25   Q    Okay.  So just to be clear, your testimony is that despite

1    that the line continues down in 2006, in your mind the bottom

2    of the business cycle was really right here in 2004?  That's

3    what your testimony is?

4    A    Yes.

5    Q    Now, you testified that MDI demand improved dramatically in

6    2004.  Correct?

7    A    That's correct.

8    Q    And you said that the MDI market went from a buyer's market

9    to a seller's market in 2004.  Correct?

10   A    It was starting to change.  And the difference is, it's one

11   thing when the actual numbers are changing and there's a

12   difference when buyers actually perceive that.  So there can be

13   some lag time between the reality of what's going on versus how

14   customers see it.

15   Q    Now, just to be clear, you testified previously, didn't

16   you, sir, that 2004 was the turning point.  That's when you say

17   the worm turned.  Right?

18   A    It was starting to turn in that time frame, and it turned

19   at different points in time for TDI, MDI and polyols.  You

20   can't tie the three together at a very specific point in time.

21   Q    So when you testified both previously in 2013 and also on

22   direct here that this precise fundamental change here in

23   January 2004, what you're saying now is that that's not exactly

24   accurate.  Correct?

25             MR. BERNICK:  Objection.

1     A    No, I'm not saying that.

2              MR. BERNICK:   It mischaracterizes his prior testimony.

3              THE COURT:   No.   Overruled.   If he did, he'll correct

4     it.

5     BY MR. SCHAEFER:

6     Q    Okay.  So now let's shift focus and talk about TDI.   And

7     we'll try to move this a little more quickly.

8              So if we look at the backup data for TDI.

9              MR. SCHAEFER:   If you can go to the second page.

10    Q    Now, if we focus on the years 2003 through 2005.

11             Okay.   Do you see here that on an absolute bottom line

12    basis for EBIT, that Dow lost about 36 million -- 37 million,

13    rather, on TDI in 2003?

14    A    Let me take a look at this.

15             Yes, 36.7, right, 2003.

16    Q    And in 2004, Dow's EBIT on TDI dropped to negative $46

17    million in 2004.   Correct?

18    A    That's correct.

19    Q    So between 2003 and 2004, Dow's EBIT in TDI decreased by

20    about nine million.   Correct?

21    A    That's correct.

22    Q    And then if we move forward here to 2005 --

23             THE COURT:   Nine million or --

24             MR. SCHAEFER:   So from 37 million to 46 million is a

25    difference --

 1           THE COURT:  You said nine million I think.  Maybe I --
 2  90 million you mean?
 3           Oh, nine million.  Okay.  I see what you're saying.
 4           MR. SCHAEFER:  Okay.
 5           THE COURT:  There's a difference between those two
 6  years.  Okay.
 7           MR. SCHAEFER:  Correct.  Thank you, your Honor.
 8  BY MR. SCHAEFER:
 9  Q   So if we come back to 2005, we have negative 53 million in
10  2005 on TDI.  Correct?
11  A   Correct.
12  Q   So if you look at the EBIT profitability number in 2005 and
13  compare it back to 2004, that's a difference of another seven
14  million.  Correct?
15  A   That's right.
16  Q   Now, you testified that there were some big changes in the
17  TDI market beginning in late 2005, early 2006.  Correct?
18  A   Correct.
19  Q   And you talked about the fact that two hurricanes hit in
20  Louisiana:  Rita and Katrina.  Right?
21  A   Yes.
22  Q   And you said those were devastating to the chemical
23  industry and fundamentally changed the industry.  Correct?
24  A   Yes.
25  Q   And the Lyondell plant for TDI was hit never came back on

1    line.  Correct?

2    A    Correct.

3    Q    And then you talked about a second fundamental change which

4    was the fact that Huntsman sold their TDI business to BASF.

5    Correct?

6    A    Correct.

7    Q    And when BASF bought Huntsman's TDI plant, they shut down

8    the plant.  Correct?

9    A    That's correct.

10   Q    And you said as a result of those two very significant

11   changes, one-third of the capacity of TDI disappeared almost

12   overnight.  Right?

13   A    That's right.

14   Q    TDI capacity in late '05, early 2006 became very tight?

15   A    Right.

16   Q    And you said these events were unprecedented and

17   game-changing for the TDI industry.  Correct?

18   A    That's right.

19   Q    Given those fundamental changes which you said were

20   unprecedented, if someone were to look at prices in 2005 and

21   2006 and after and compare those to prices during 1994 and

22   1993 -- and I'm just talking about doing this visually on a

23   chart like this one here that Mr. Bernick showed you -- that

24   would be a little bit like comparing apples and oranges.

25   Right?

```
 1   A    In some respects, since conditions had changed, yes.  On
 2   other aspects of capacity that was still around in the
 3   industry, things hadn't changed.
 4   Q    And --
 5   A    Some capacity remained, some capacity exited.
 6   Q    But based on the fact that one-third of the capacity came
 7   out of the market, if you're just looking at the absolute
 8   prices, the price lines --
 9   A    Sure.
10   Q    -- and I'm pointing to MDI but you understand I'm referring
11   to TDI -- the prices after those events and before are
12   completely different.  Correct?
13   A    Different fundamentals, that's correct.
14   Q    Okay.  Now let's move on to polyols.
15        To make a polyol you need to start with a product
16   called propylene oxide.  Correct?
17   A    Correct.
18   Q    And is propylene oxide sometimes referred to in shorthand
19   as "PO"?
20   A    That's right.
21   Q    So if I say "PO," you understand I'm referring to propylene
22   oxide.  Okay?
23   A    Sure.
24   Q    Okay.  And I think you said today, or somebody said today
25   around 60 or 70 percent of the content of polyols is propylene
```

1    oxide?  But I believe you testified previously that it's at

2    high as 80 percent.  Correct?

3    A    Yes.  It depends on the polyol.

4    Q    And Dow manufactures propylene oxide.  Correct?

5    A    Correct.

6    Q    And it's true, isn't it, that the propylene oxide that Dow

7    used to make polyols is generally self-produced?

8    A    Correct.

9    Q    In other words, most of the propylene oxide that Dow's

10   polyol business consumes is also manufactured by Dow?

11   A    Correct.

12   Q    Do you agree that the business model for Dow's

13   Polyurethanes business is influenced by its position as a

14   producer of propylene oxide?

15   A    Yes.

16   Q    And do you agree that to understand Dow's business model in

17   urethanes you also need to take into account and understand

18   Dow's business model in propylene oxide?

19   A    Partly so.

20   Q    Well, do you agree that Dow was trying to maximize the

21   return on its investment in propylene oxide?

22   A    Yes, through a variety of ways that we can use that

23   propylene oxide in the company.

24   Q    Is it fair to say that if someone was trying to get a

25   complete picture of the profits that Dow makes in the sale of

```
 1   polyols -- and again I'm referring to the polyols that are
 2   self-produced, PO -- is it fair to say that to get a complete
 3   picture of the profits on the polyols you also need to take
 4   into account any profits that Dow made on the sale of the
 5   propylene oxide?  Is that a fair statement?
 6   A   Not 100 percent.
 7   Q   Well, let me ask it this way:  Do you know for the purposes
 8   of the chart which we were looking at before in 8693, how did
 9   Dow account in the financial statements that are the backup of
10   for those summaries for any profits that Dow earned on the PO
11   business?
12   A   Can you ask that question again?  Sorry.
13   Q   Sure.
14           For the polyol summary in Exhibit DX-8693, how did Dow
15   account in the financial statements that accompany that summary
16   for the cost of the PO that Dow self-produced?
17   A   How did Dow do that?
18   Q   Yes.
19           MR. BERNICK:  Objection.  Lack of foundation at this
20   point.
21           MR. SCHAEFER:  Well, your Honor, this witness hasn't
22   been offered as a summary --
23           THE COURT:  Overruled.
24           MR. SCHAEFER:  Okay.
25   A   So how did Dow account for the cost of that PO?
```

1    Q    Yes.  And any profits that --

2    A    Okay.  So I just wanted to make sure I understood the

3    question.

4             So the way Dow would account for the cost of that PO

5    is based on the cost of propylene.  Propylene is a big

6    component of making propylene oxide, and then converting that

7    propylene to PO.  And so the cost starts with the raw material,

8    and then you convert that raw material into propylene oxide,

9    and when you're making propylene oxide you also make another

10   product called propylene glycol.  It's a co-produced product.

11            And if propylene glycol demand is strong and you can

12   sell more propylene glycol, that will actually help improve the

13   profitability of propylene oxide and it will also determine the

14   cost of that propylene oxide if you're using that co-produced

15   unit at a higher capacity utilization.

16   Q    If I may just jump in.

17            My question is really just focused on, let's take a

18   hypothetical for a minute.

19   A    Okay.

20   Q    So let's stay that on the chart for 8693 we see a

21   30-cent -- a 30-cent per pound profit.

22   A    On polyol?

23   Q    On polyols.

24   A    Okay.

25   Q    For the summary for polyols.  Do you follow so far?

1    A    Okay.

2    Q    And let's say -- well, let's say in a given year that for

3    the sale of polyols, Dow's PO business earned $.20 per pound on

4    the polyol -- on the propylene oxide -- let me back up, I might

5    have butchered that.  I apologize.

6         Let's say in a given year that Dow's PO business

7    earned a 20-cent per pound profit on the PO portion of the --

8    A    Are you talking about EBIT, are you talking about standard

9    margin or gross margin from a profitability standpoint?

10   Q    Let's talk about EBIT which is the line we were focused on

11   before.

12   A    Okay.

13   Q    Okay.  So $.20 per pound on the profit and sale of PO.  In

14   addition to that, Dow's polyurethane business earned a ten

15   cents per pound profit on the sale of the polyols to the

16   downstream customer.  Do you follow the hypothetical so far?

17   A    Okay.  Okay.

18   Q    So my question is simply whether the statements, the

19   summary we were looking at before would show the 30-cent per

20   pound profit or just the ten-cent per pound profit which is

21   only the polyol portion.  Do you follow?

22   A    I think so.

23   Q    But you're not sure?

24   A    I'm not sure.

25        You know, a large majority of our propylene oxide goes

1    in to making polyols.  We make many different types of polyols,

2    hundreds of different types of polyols.  And so that the

3    profitability of that polyol can vary differently -- can vary a

4    lot depending on where you're selling that polyol.  Because

5    propylene oxide is just one product, one product that you can

6    sell.  You can sell it -- some of it to the merchant market,

7    you can sell some of it goes into other propylene oxide

8    derivatives that Dow Chemical makes, but a lot of it, 60

9    percent of it probably goes into making polyols.

10          So I think I'm following your question.  But I was

11   just trying to help make sure I do understand it so I can

12   answer it accurately.

13   Q   I think you did, but let me ask one more quick follow-up on

14   that.

15          Just generally in your reporting in the Polyurethane

16   business when you were vice-president, when you were reporting

17   on your financials for the polyols, did those profits include

18   any profits that were embedded in the PO portion?

19   A   Got it.  Okay.

20          So what happens is we transfer that cost of propylene

21   oxide, we transferred it at cost into polyols.  So the polyols'

22   profitability benefits from that cost transfer of PO into

23   polyols.  We also take propylene oxide and sometimes we will

24   sell that to the merchant markets, somebody that wants to buy

25   PO for other types of opportunities, so that's a different

1    profitability.

2    Q   I'm not talking about that portion of the PO market, I'm

3    talking about the self-produced --

4    A   The value of the PO and the profitability that we make in

5    polyols, that value of PO is embedded in that polyol

6    profitability.

7    Q   Okay.  So moving along.  So let me come back to 8693.

8    A   I'm sorry.  It's a little complicated, I realize,

9    how we get integrated and transfer the cost of our upstream raw

10   materials like propylene oxide that goes into polyols.  So I

11   wasn't trying to ignore your question, I was just trying to

12   explain the accounting which is probably too complicated.

13   Q   I understand.  We were a little confused with it as well.

14            All right.  So coming back to 8693, is it true that

15   this summary we've been looking at for all three products, MDIs

16   polyols and TDI, has no data for 1994?

17   A   I don't see any data there for 1994, correct.

18   Q   So the jury or anyone looking at this chart can't tell what

19   Dow's profits would have been in 1994.  Correct?

20   A   That's correct.

21   Q   And it's also true, isn't it, that the margin summaries

22   we've been looking at have no data for 1992 to 1993?

23   A   That's correct.

24   Q   So again, the jury or anyone else looking at these

25   summaries won't know what Dow's profits were immediately

1    preceding the beginning of the alleged conspiracy.  Correct?

2    A    Correct.

3    Q    Now, the jury has heard testimony from Mr. Ho yesterday I

4    believe, and Mr. Ho testified that 1992 and 1993 was another

5    bottom of the business cycle for Dow's urethane business.  My

6    question is just simply:  The jury has no way to tell by

7    looking at these summaries whether that was, in fact, true.

8    Correct?

9    A    That's correct.

10   Q    All right.  I want to switch gears and go to one last

11   topic.  We'll should be almost done here.

12        Stephanie Barbour testified that she kept notes of

13   debriefing sessions that she attended with Marco Levi and David

14   Fischer at which Mr. Levi discussed his pricing conversations

15   with Mr. Hartwig of BASF.  Are you familiar with that

16   testimony?

17   A    To be honest, I don't recall that.

18   Q    Well, I'll make that representation to you --

19   A    Okay.

20   Q    -- that she did testify to that and the jury has heard that

21   testimony in this case.

22        Now, Ms. Barbour also testified that the notes that

23   she kept during those debriefing sessions were still on her

24   computer when she left Dow in early 2004.  Okay?  So I'm just

25   going to ask you a few questions about that.

1      When you took over as Vice-President of Polyurethanes

2  and you assumed operational responsibility for Ms. Barbour's

3  area, you testified on direct that you tried to get access to

4  her computer files.  Right?

5  A    Correct.

6  Q    And you said this was around January or February of 2004?

7  A    January.

8  Q    Okay.  And you also testified today that her old emails

9  were password-protected.  Correct?

10  A    Yes.

11  Q    So you went to the IT department to get access?

12  A    Correct.

13  Q    And IT came back and said you have to go back to Mr.

14  Fischer.  Correct?

15  A    Correct.

16  Q    Now, to be clear, when you went back to Mr. Fischer and

17  spoke to IT, all you did was make a specific request for

18  certain types of files that you needed for your business

19  purposes.  Isn't that right?

20  A    I believe I asked for all the files that related to the MDI

21  and the TDI.

22        MR. SCHAEFER:  Todd, can we go to 4785.

23  Q    Okay.  So we start at line 9 on page 4785.

24        The question was:  (Reading) You didn't select any of

25  Ms. Barbour's documents yourself for retention or destruction,

1    did you?

2              ANSWER:  I had a specific request on what I was

3    looking for in those files to my IT manager.

4              QUESTION:  And those were the documents you needed for

5    your business purposes.  Right?

6              ANSWER:  That's right.

7              That's what you testified.  Right?

8    A    Yes.

9    Q    You didn't specifically ask for any personal notes that she

10   may have written to herself.  Correct?

11   A    That's correct.

12   Q    And at no point in time did you need to go poking around,

13   if you will, in Ms. Barbour's computer for certain files.  You

14   just asked the IT department to give you the files you asked

15   for.  Right?

16   A    That's right.

17   Q    And aside from the files that IT sent to you, you had no

18   role whatsoever in either the preservation or the destruction

19   of whatever else might have been on Ms. Barbour's computer.

20   Correct?

21   A    That's correct.

22             MR. SCHAEFER:  Okay.

23             No further questions.  I pass the witness.

24             THE COURT:  All right.

25             Redirect in the limited area of cross, please.

```
 1              MR. BERNICK:  Yes.
 2                      REDIRECT EXAMINATION
 3    BY MR. BERNICK:
 4    Q   Ms. Barbour testified to this jury by video as part of the
 5    plaintiffs' case as follows.
 6              MR. BERNICK:  This is at page 505 of the first
 7    deposition I think.
 8    Q   QUESTION:  Did they -- did you -- what happened to the
 9    notes after the meeting?
10              It's the notes -- you wouldn't know but there's a
11    meeting.
12              ANSWER:  They are gone.
13              QUESTION:  They are gone?  What happened to them?
14              ANSWER:  I destroyed them.
15              Ms. Barbour destroyed them, said she destroyed them.
16              The question to you is:  Were you -- did you have any
17    knowledge of what she did with her notes?
18              MR. SCHAEFER:  I object to the question, to the form
19    of the question because in that portion of her testimony she
20    was referring to hard copies of her notes --
21              MR. BERNICK:  I'm going to get there.
22              MR. SCHAEFER:  Okay.
23              THE COURT:  All right.
24    Q   (Reading) QUESTION:  -- and then the question is:
25              At the time you destroyed the hard copies of the note,
```

1    did you believe that there exited on your personal folder of

2    Dow's computer systems that they still existed -- did you

3    believe that they still existed on your personal folder of

4    Dow's computer systems?  Is that right?

5             And her answer was:  I didn't know because I didn't

6    have access anymore to my computer.

7             QUESTION:  So you didn't know one way or the other?

8             ANSWER:  Right.

9             Again, do you have any personal knowledge of any of

10   these things?

11   A   No.

12   Q   Thank you.

13            It was pointed out by counsel that with respect to the

14   backup information relating to these charts that you've

15   displayed, that the backup information for 1993, 1994, 1992,

16   that Mr. -- the period that Mr. Ho talked about, was not set

17   forth on those charts.

18            MR. BERNICK:  Could we just show those charts again;

19   that is, Exhibit DX-8693.

20   Q   And, in fact, it does begin in 1995.  Do you see that?

21   A   Yes.

22   Q   Do you know whether the information, the comparable

23   information for the earlier years was available in the same

24   format that it was available for the later years?  Do you know

25   one way or the other?

1    A    Let me make sure I understand the question.  So the backup
2    data --
3    Q    Yes.
4    A    -- was it available?
5    Q    Do you know whether at the time that this was prepared,
6    whether this information was available in the same kind of
7    format for the years before 1995 that it was available for the
8    years beginning in 1995?  Do you know?
9    A    No.
10             THE COURT:  No, you don't know?
11             THE WITNESS:  No, I don't know.
12             THE COURT:  No, he doesn't know.  Okay.
13   Q    Right.
14             So in terms of whether the jury can ascertain what
15   happened to MDI, MDI in the period 1994 and earlier that Mr. Ho
16   did talk about, I want to direct your attention to DX-1170
17   which was shown to you a little while ago on direct
18   examination.
19             MR. BERNICK:  If we could show 1170, page 5.
20             Can you blow up that chart.
21   Q    In fact, do we see in this chart shown to the jury on your
22   direct examination that this does talk about the last cycle,
23   Dow's MDI business, EP, economic profit, during the period of
24   time that Mr. Ho did talk about during his testimony, and shows
25   the trend of economic profit during the period of time, and it

1    picks up with the peak in the mid '90s that's on the prior

2    chart?

3    A    Yes.

4             MR. SCHAEFER:  I object to form and foundation.  The

5    witness wasn't involved in the business in '92 and '94.

6             THE COURT:  That's all right, it's overruled.

7    Q    What was your answer?

8    A    Yes.

9    Q    In fact, I think -- well, I won't cover it again because I

10   covered it in my direct.

11            If we talk for a moment about some of the performance

12   information.  Let's just take a look -- I don't know if you

13   have this on the system.

14            DEFENDANT'S TECH:  I'm not sure.  Do we have an

15   exhibit number?

16            MR. BERNICK:  Okay.  Can you show -- this is MDI.

17            Okay.  If you could blow that up as you did there --

18   yeah, that was I think the one you showed.  Right.  And you

19   went from --

20   Q    You remember you were asked questions, Mr. Dawson, about

21   1996, 56 million -- 256 million units sold and profits of 75

22   million?

23   A    Yes.

24   Q    Do you recall that?

25            And all these figures --

 1          MR. BERNICK:  That's fine.  Thank you.

 2          Now, if you can just blow up the bottom line beginning

 3     in 2002 for me for a minute.

 4     Q   And does it show that again, as you get to the bottom line

 5     we get losses of, steady losses beginning even on an EBITDA

 6     basis from 2002 going forward?

 7     A   Correct.

 8          MR. SCHAEFER:  Objection.  The 2003 shows a

 9     positive --

10          MR. BERNICK:  You're right.  You're right.  That's

11     fine.  I accept that correction.

12          And then it goes back down again in later years.

13     A   Correct.

14     Q   Now, this is -- this is EBIT.  I think you testified --

15     A   Yes.

16     Q   -- this is EBIT.

17          What about the cost of the plants that are producing

18     all this material?  Is that anywhere included in EBIT?

19     A   The costs -- when it comes to the capital cost and the

20     inventory, no, that's not included in EBIT.  That gets

21     reflected lower and then eventually gets reflected in the

22     economic profit.

23     Q   Is there a reason why Dow calculates economic profit?  Is

24     there a reason why?

25     A   Yes.

 1   Q   And is it -- is it something that's kind of not real, or is
 2   it real?
 3   A   It's very real.
 4   Q   And again, is there -- when you presented the --
 5       MR. BERNICK:  Let's go back to the basic charts
 6   because then I'll use these.  It's Exhibit 8693.
 7   Q   When Dow goes through and presents economic profit, is that
 8   something that it actually uses and relies upon ordinarily in
 9   its business, or is it something that serves some other
10   purpose?
11   A   No, it's used in all businesses as an indicator of
12   profitability.
13   Q   Okay.  Now, there were questions to you --
14       MR. BERNICK:  If we go to MDI, that's the first one.
15   Q   There were questions to you about whether the cycle
16   actually bottomed out later on.  Do you recall that?
17   A   Yes.
18   Q   And I think you said, well, this is the Dow cycle.
19       Is this just -- are these numbers here gross margin,
20   contribution margin and the like, or are these just, you know,
21   market factors, or are there other factors that are included in
22   reaching those numbers?
23   A   There's other factors included.
24   Q   If we want to talk about the number that's closest to the
25   market's -- market's number or shows the market trend, which of

 1    these -- which of these lines come closest to mirroring the

 2    market?

 3    A    The Trade Standard Margin is the better reflection of

 4    what's going on in the market because it reflects the selling

 5    prices that we're getting working with certain -- you know,

 6    with our customer base, and of course a lot of those customers

 7    are doing business with our competitors as well.

 8    Q    When we talked about on direct examination the cycle, were

 9    we talking about all the other costs to Dow, or were we talking

10    about market prices, industry median market prices as reflected

11    by Dr. Raiff?

12    A    We were talking about market prices of --

13    Q    Is there any inconsistency between -- does the fact that

14    these went down, these other numbers went down, does that

15    change any piece of your testimony regarding the business cycle

16    on your direct examination?

17    A    Not at all.

18    Q    Now, there were then points made or questions that were

19    asked about this portion of the curve.  You remember that?

20    Counsel pointed out that, gee, during the course of the

21    conspiracy there was positive EBIT.  This purple line for every

22    day of the conspiracy -- every year of the conspiracy that's on

23    this chart, except maybe it dipped down a little bit in 2002.

24    Do you recall that?

25    A    Yes.

1    Q    Now, apparently -- you just tell me -- so, this period of
2    time here, what counsel was asking is whether, as this
3    conspiracy, alleged conspiracy progressed, he's asking -- was
4    he asking you whether Dow made less and less and less money as
5    the conspiracy progressed?  Is that how you understood the
6    question?
7                MR. SCHAEFER:  Objection, leading.
8                THE COURT:  Overruled.  I'll allow it.
9    A    I understood the question he was asking me about Dow's
10   profitability, not the industry profitability.
11   Q    Right.  And on that -- on that idea, that is, that this
12   somehow reflects the conspiracy, what does that actually say
13   about whether the alleged conspiracy was good for Dow?
14   A    Well, if there was one, it certainly doesn't look like it
15   was good for Dow from these numbers.
16   Q    So to the extent that -- he also pointed out that the line
17   then becomes even steeper after the alleged conspiracy.  Do you
18   remember that?
19   A    Yes.
20   Q    Can you explain to this jury why things actually got worse
21   after 2000 -- during the course of 2003 and thereafter for MDI?
22   I think you referenced it --
23   A    For Dow?
24   Q    For Dow.
25   A    Yeah.  They got worse because we were in the process of

 1    building a new plant in Freeport, Texas, and unfortunately one
 2    of the first things I had to do on the job was to go get an
 3    exception request from our CEO, Bill Stavropulos, for $45
 4    million to correct some mistakes that had been done in building
 5    that plant.  And so we had some additional costs associated
 6    with that plant.  We were also in the process of shutting down
 7    some old assets in LaPort, Texas for MDI as well.  We were
 8    having some problems there that was causing us to spend some
 9    money.  It gets reflected in the Dow results.
10    Q   Now, if the allegation that counsel asked you about in this
11    case is a price-fixing allegation; that is, the conspiracy that
12    he was asking you about allegedly goes from '94 to 2004, '94 a
13    little bit earlier through 2004 right here, price-fixing.  If
14    we take a look at the actual number that most closely resembles
15    price, do you see any significant change whatsoever in the
16    level of standard trade margin before, either for -- my
17    goodness, from 1999 all the way forward through 2003 and
18    thereafter other than it's going up?
19        MR. SCHAEFER:  Objection to the form, leading, and
20    argumentative.
21        THE COURT:  It is leading,
22    Q   Just use this price.  You tell the jury one way or the
23    other whether you see there's some market difference --
24    A   Right.
25    Q   -- between the way that curve is behaving before and after

1    the end of the alleged conspiracy.

2    A    Sure.  Let me just interpret the way I see that curve.

3         I see that curve as having some, obviously some

4    volatility in it.  But, you know, certainly if you look at from

5    the '99 or even from the '98 time frame, if you look at the low

6    point, you know, the low points are fairly stable to maybe

7    improving just very slightly.  The high points of, like, '99,

8    2002 and 2005, you know, if you draw a straight line through

9    that it's been pretty stable to maybe slightly improving as you

10   get into that '04, '5 time frame.  But it's pretty stable with

11   the exception of maybe some spikes, but it comes back down to

12   that stable level.

13   Q    A couple more questions and we'll be done.

14        MR. BERNICK:  Can we turn on the ELMO just very

15   briefly.

16   Q    You were asked a question about your prior testimony

17   concerning, quote, "when the worm turned."

18   A    Right.

19   Q    And I think that the reference was to this part of your

20   testimony that we have here.

21        MR. BERNICK:  Right there.

22   Q    So you see where:

23        (Reading) QUESTION:  Just jumping forward to the

24   future, as the period of time from 2004 through 2008 unfolded,

25   how did the cycle develop?

1          The answer:  Well, probably -- I always like to say
2     "the worm turned."
3          Then you go on to say:  (Reading) The worm turned in
4     that it went from a more or less buyer's market where the
5     product was long and plentiful, in that 2004, '5, '6, '7 time
6     frame, it definitely went to more of a seller's market because
7     things got tighter.
8          Is there anywhere you said in that testimony that all
9     of a sudden it did a U-turn in 2004?
10    A   No, that's what I was trying to explain earlier, and that's
11    why I tried to explain before about this, the tipping point
12    that occurred in this time frame.
13    Q   I want to go back to 8693.  First page 1.
14         MR. BERNICK:  Thank you.
15    Q   In terms of profitability, the bottom line profitability,
16    as counsel pointed out, things got worse after -- worse -- here
17    we are in the beginning of 2004.  We can see that they turned
18    worse before they get better.
19         If we go to TDI, the next slide, here we are in 2004.
20    And even between 2004 and 2005, tell me whether there is a
21    change in the direction of EBIT already in -- between 2004 and
22    2005.
23    A   Correct, that's what the graph shows.
24    Q   And now let's do polyols.  Here we go.  2004.  Right
25    turn -- left turn.

 1    A    Correct.

 2    Q    Are you comfortable that there was, in fact, as you

 3    testified, the worm turned in that it went from a more or less

 4    buyer's market where the product was long and plentiful, and

 5    that 2004, '5, '6, '7, '8 time frame it definitely went to more

 6    of a seller's market because things got tighter.

 7         Are you comfortable with that?

 8    A    I'm comfortable with that.

 9    Q    You were asked a question about apples and oranges, whether

10    it's fair to make a comparison between prices during these --

11    what you said were different markets.

12         This is MDI, but this is a different.  I think it's on

13    all the different boards.  You remember that question?

14    A    Yes.

15    Q    Whether it's fair to compare prices between these two

16    periods because it's apples and oranges, or words to that

17    effect.  Do you recall that?

18         MR. SCHAEFER:  I'll object.  I was referring

19    specifically to TDI during that --

20         MR. BERNICK:  All right.  I'll take TDI.  Fair point.

21    That's correct.

22    Q    Would it be fair to do an analysis of Dow's business, the

23    business economics that you were referring, that you've talked

24    about, would it be fair to do an analysis of Dow's business

25    assuming that the market before 2004, the business market

 1    before 2004 is the same as the business market after 2004 -- or

 2    beginning in 2004 going forward?

 3    A    Yeah, the overall fundamental --

 4              MR. SCHAEFER:  I'm sorry, I don't mean to interrupt.

 5              I'll object.  This witness is not offering an opinion

 6    on analysis of prices before and after.

 7              MR. BERNICK:  I'll --

 8              THE COURT:  Rephrase it.

 9              MR. BERNICK:  I'll rephrase my question.

10    Q    My question is:  Counsel asked you about comparing apples

11    and oranges.

12              As a businessman talking about the business market

13    conditions, would it be appropriate to compare prices and

14    circumstances surrounding prices before and after the beginning

15    of 2004 on the assumption that business conditions were the

16    same?

17    A    Yeah, you'd want to make that comparison to see what had

18    fundamentally changed in the marketplace, but you need to look

19    at the total picture of the capacity and the demand and what

20    was going on also with raw material prices to get the full

21    picture of what was going on.

22    Q    And in your view, has anything that counsel asked you

23    changed your testimony that there were differences between the

24    business market before the end of the alleged conspiracy and

25    after the end of the alleged conspiracy?

1      A     No.   No.   Nothing changed it.

2                  MR. BERNICK:   That's all I have.

3                  THE COURT:   Any recross?

4                  MR. SCHAEFER:   No, your Honor.

5                  THE COURT:   All right.   All right, Mr. Dawson, you can

6      step down.   Thanks very much.

7                  (Witness excused.)

8                  THE COURT:   Ladies and gentlemen, we'll recess for the

9      day then.

10                 Let me give you a little bit of a heads-up so you can

11     maybe plan.   We're not going to have Court on Monday, April 4th

12     and we're not going to have court on Friday, April 8th.   It's

13     not going to put us behind, okay, but for a number of reasons

14     that are not involved with this case.

15                 So we won't have Court on Monday April 4th, we won't

16     have court on Friday, April 8th.   Okay?

17                 Tomorrow we'll do a full day.   We'll start at 8:30 and

18     go to 4:00, 4:30, wherever we end up, okay, with lunch.

19                 Once again, I want to thank you for your attention and

20     really your being here promptly and your attention.   So I want

21     to compliment you on that again.

22                 Please don't discuss the case.   As it goes on

23     sometimes you forget and you get tempted, but it would be a

24     violation of your oath if you were to start to discuss the

25     case.   There's still more to go.   Okay?

1          We'll see you tomorrow morning at 8:30.  Thanks.

2          (The Jury leaves the courtroom.)

3          THE COURT:  Everyone, be seated.

4          Let me address the issue of the admissibility of

5    deposition exhibit number 23.  That's it, right?

6          MR. BERNICK:  If --

7          THE COURT:  Which is also referred to as DX-8627.

8    Correct?

9          MR. BERNICK:  Yes.  I know your Honor is going to

10   rule, but just for the sake of clarity, I did make a mistake

11   when I made a representation to the Court that Dr. Marx

12   referred to the Pauley deposition as being part of her reliance

13   materials.  That was mistaken.  What I misremembered is that by

14   the time she was deposed she had read it.  And the testimony is

15   at her deposition page 131, lines 17 to 22.  That's what I was

16   recalling, and I was mistaken to have said it was in her

17   original report, because she was deposed -- she -- her report

18   came out, then we took Mr. Pauley's deposition, then she

19   testified, and by that time she had read Mr. Pauley's

20   deposition.  So she was familiar with it.

21         THE COURT:  You're talking now when you took her

22   deposition?

23         MR. BERNICK:  When I took her deposition --

24         THE COURT:  It was after the Pauley deposition?

25         MR. BERNICK:  After Mr. Pauley's deposition.

1           THE COURT:  Right.

2           MR. BERNICK:  And I asked her about it.  And the only

3   thing I would say is that, again, we really wanted to call Mr.

4   Pauley here to testify, and it's only the plaintiffs' election

5   not produce him, otherwise he could respond.

6           THE COURT:  When she was deposed, was she asked about

7   Mr. Pauley's chart, about the chart, Exhibit 23?

8           MR. BERNICK:  Yeah, I asked extensive questions

9   regarding Mr. Pauley's testimony -- "extensive" is probably in

10  the eye of the beholder -- I specifically asked about Mr.

11  Pauley's testimony.  I used it to talk about negotiations --

12          THE COURT:  In her answers did she at any time say:

13  This chart was not an accurate reflection?

14          MR. BERNICK:  No.  What she said was she had not seen

15  it before --

16          THE COURT:  Right.

17          MR. BERNICK:  -- or she hadn't studied it.  And I then

18  asked her whether the model could explain the differences that

19  are shown, and she couldn't say.

20          THE COURT:  Okay.  How long ago was her deposition?

21          MR. BERNICK:  It was in 2013.  I think it was in --

22  November of 2013.

23          THE COURT:  All right.  Mr. Johnson, do you have

24  anything else you want to say?

25          MR. JOHNSON:  No.  I think --

```
 1                    THE COURT:  By the way, I have not -- I have not found
 2       in the Pretrial Order where you objected to this exhibit.
 3                    MR. JOHNSON:  We'll get that for you.
 4                    THE COURT:  When?
 5                    MR. JOHNSON:  We have it --
 6                    THE COURT:  Well, it's not in there.  So, I had my
 7       clerks look for it, I've looked for it personally, it's not
 8       there.  It should be on page -- it should be on page 10 of the
 9       Final Pretrial Order but it's not there.
10                    MR. JOHNSON:  I'm told that the exhibit list in the
11       Pretrial Order did not contain all the objections from either
12       side.
13                    THE COURT:  Well, it's not there as far as I'm
14       concerned.
15                    MR. JOHNSON:  Yeah.
16                    THE COURT:  Even if it were there, okay, even if it
17       were there I'd still have to rule on its admissibility today.
18       Just because it's not there -- so I still would have to rule.
19                    Look --
20                    MR. JOHNSON:  I --
21                    THE COURT:  Go ahead.
22                    MR. JOHNSON:  Just if I may, you asked me for my
23       comments.  I knew that Mr. Bernick had misstated the record
24       with respect to the expert witness and, you know, he corrected
25       that.  I appreciate that.
```

```
 1              THE COURT:  Okay.
 2              MR. JOHNSON:  As reflected, she at the time of her
 3     deposition had seen the Pauley dep, but she had not had the
 4     opportunity to study that chart or what its meaning was.  It's
 5     a rather complicated chart, she had not done that yet.  And
 6     so --
 7              THE COURT:  Okay.
 8              MR. JOHNSON:  -- she hadn't had a chance to do that at
 9     the time.  And so we did, even though it's not in the Pretrial
10     Order, we had objected to that and objected to that whole line
11     of testimony, frankly, in Mr. Pauley's deposition.
12              THE COURT:  Well, the first objection I heard about
13     this was, I think, the day before trial began when Mr. Bernick
14     wanted to use this as part of his opening.  I was not aware of
15     this particular exhibit being objected to by plaintiffs.
16              MR. JOHNSON:  No, nor did we bring any of our document
17     objections to you at that time.  You may remember you assigned
18     all the deps to Judge Pisano to deal with testimony.
19              THE COURT:  Let's not go there.  I assigned them
20     because you fellows were not prepared for this case for trial
21     on March 7.  I made it very clear early on.  You did a pretrial
22     conference in June which was a joke.  I don't think you ever
23     believed, either side, you were going to trial on March 7th.  I
24     think you still thought, oh, we're just going to kick around
25     this case.  Okay?
```

1          MR. JOHNSON:  I was pretty certain we were, your
2     Honor.
3          THE COURT:  Maybe you were, only after I finally said,
4     we're bringing Judge Pisano on to this because I couldn't
5     possibly get this case ready with all these video depositions,
6     because it wasn't prepared by either side here.
7          MR. JOHNSON:  I --
8          THE COURT:  You don't have to -- let's not go into it.
9     But you brought it up.  You brought it up; I'm responding to
10    it.
11         This is not the way I would have prefer to do have
12    this case tried.  There's too many videotaped depositions,
13    there were a lot of things that were pending too long.  The
14    purpose of a Final Pretrial Order is to have ironed out most of
15    this stuff, and it wasn't done --
16         MR. JOHNSON:  We agree.
17         THE COURT:  -- on both sides.  To a certain extent on
18    both sides.
19         This is a different situation than the other ones I've
20    rule on.
21         You can sit down, Mr. Johnson.
22         It's pretty apparent to me that this chart was in the
23    possession of a plaintiff for maybe some years.  You just
24    admitted Dr. Marx testified at her deposition, she looked at
25    it, she saw the chart.  If she had any problems with it she had

```
 1    over a couple of years to express those problems in some type
 2    of a meaningful way that it would have been brought either to
 3    Judge Falk in the pretrial conference or to me, and that didn't
 4    happen here.

 5             In addition, this chart was referred to at the
 6    deposition.  Mr. Pauley's testimony would be meaningless if the
 7    jury didn't see this chart.

 8             Now, I allowed them to see it and I allowed it to be
 9    at least initially demonstrative, but this will go in evidence.
10    This chart is one that the plaintiffs were aware of for maybe
11    years; I don't know.  2013 she was deposed?

12             If she had an issue with the data in this chart she
13    could have expressed it months, if not years ago, and that
14    didn't happen with respect to this case.  Which is different
15    than my rulings in the other case because I was satisfied in
16    the other case you didn't get the charts in the timely fashion.

17             And also, when Mr. Bernick asked Mr. Pauley questions,
18    I'm satisfied from the questions that what he said is, after
19    Mr. Pauley testified to something he saw in the chart, he asked
20    him, could you insert the following in this area.  And it was
21    consistent overall with what Mr. Pauley was saying.

22             Now, you have the statement of Dr. Marx saying this is
23    not accurate, and, you know, so this is an issue that goes to
24    the weight.  If in your summation you want to make an issue of
25    this, you'll have Dr. Marx's statement saying this is not
```

 1    accurate, Mr. Bernick will say it is accurate, and that's what
 2    trials are all about.
 3            So this will be in evidence.  Okay.
 4            MR. JOHNSON:  Your Honor, there was another exhibit
 5    that was 18, which was the other chart that he had Mr. Pauley
 6    write stuff on.
 7            MR. STREETER:  DX-8622.
 8            THE COURT:  Let me see that, because for some
 9    reason -- can you pull it up?
10            MR. STREETER:  8622.  It's this one, it's a similar
11    scenario and there's no controversy about the line.  It's just
12    things that Mr. Pauley wrote on it during the deposition in
13    response to questions.
14            THE COURT:  I'll allow it.  There is no issue with
15    respect to the line here.  Correct, Mr. Johnson?
16            MR. JOHNSON:  No.
17            MR. STREETER:  The only other thing with respect to
18    Pauley is there were two exhibits that they objected to, which
19    were trade journals.
20            THE COURT:  Right.
21            MR. STREETER:  And I think your Honor's ruling is that
22    these would be admitted not for the truth but to show that the
23    context in the market applies to these as well.  I believe that
24    they agree.
25            THE COURT:  I ruled on one for sure.  I ruled on the

```
 1    one in your right hand I believe.  Correct?
 2              MR. STREETER:  There's DX-3844 and DX-8630.
 3              THE COURT:  Well, I recall ruling on that one I
 4    believe.
 5              MR. STREETER:  I think this one just came up with Mr.
 6    Dawson.  There was one other which is 8630 which is another
 7    trait journal which Mr. Pauley was asked about.
 8              THE COURT:  This came up with Mr. Dawson?  No.
 9              The one that came up with Mr. Dawson I allowed him
10    only to testify to the paragraph in which he was quoted.
11              MR. STREETER:  Okay.
12              THE COURT:  That one is not going into evidence.
13              MR. BERNICK:  I think that these were actually -- the
14    way they were is that they were used in the Pauley --
15              MR. STREETER:  These two were used in Mr. Pauley's
16    deposition because I understand the plaintiffs' position on
17    these is they can come in as long as it's just for market
18    context, not the truth of the matters asserted.
19              Am I right?
20              MR. JOHNSON:  That's right.  Is that the one that --
21              MR. STREETER:  These are the two Pauley --
22              MR. JOHNSON:  That he's quoted --
23              MR. BERNICK:  No.
24              MR. JOHNSON:  Those two we are fine with, your Honor
25              THE COURT:  The one that Mr. Dawson was quoted in, I
```

```
 1    ruled that the quote can be obviously, it's his quote, and that
 2    could go to the truth of the matter obviously.
 3             MR. BERNICK:  Right.  And that's a different article
 4    from these, and I understood your Honor's ruling.
 5             MR. JOHNSON:  And we agree that those would come in
 6    subject to your limiting instruction.
 7             THE COURT:  Yeah, okay.  And I gave a limiting
 8    instruction, as least as to one I did.  Okay.
 9             MR. STREETER:  One more housekeeping matter.
10             THE COURT:  Go ahead.
11             MR. JOHNSON:  Are you ruling that 18 is going to be
12    allowed in even with the handwritten notations on it?
13             THE COURT:  I am, Mr. Johnson.  They were his
14    handwritten notations during the deposition, so they're
15    relevant.
16             Go ahead.
17             MR. STREETER:  A housekeeping matter.  Number one,
18    I've got a list that the plaintiffs agreed to of the exhibits
19    that were put in with Mr. Ho which I'll hand to your clerk; and
20    I've got a list of the exhibits that were admitted in light of
21    your Honor's rulings just now with respect to the Pauley
22    deposition.
23             THE COURT:  Okay.  All right.  So you'll hand those
24    up.
25             There's no objection to the ones?  You've had a chance
```

1    toe look at them?

2              MR. JOHNSON:  I haven't had a chance the look at it.

3              THE COURT:  You can hand them up in the morning then

4    if you want.  If you need time to look at it, you can do it in

5    the morning.

6              MR. JOHNSON:  We'll do that in the morning.  Very

7    good, your Honor.

8              THE COURT:  We'll see you in the morning.  Thanks.

9              MR. JOHNSON:  Thank you.

10             (At 2:49 p.m., an adjournment is taken to Thursday,

11   March 31, 2016, at 8:30 a.m.)

12                          ooOoo

13

14

15

16

17

18

19

20

21

22

23

24

25