1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
2                    Civil No. 2:08-cv-05169(WJM)-MF

3
        - - - - - - - - - - - - - -x
4       IN RE URETHANE ANTITRUST   :   TRANSCRIPT OF PROCEEDINGS
        LITIGATION                 :         - Trial -
5        - - - - - - - - - - - - - x

6
                              Newark, New Jersey
7                             April 1, 2016

8
        B E F O R E:
9
                     THE HONORABLE WILLIAM J. MARTINI,
10                    UNITED STATES DISTRICT JUDGE,
                             And a Jury
11

12

13      Pursuant to Section 753 Title 28 United States Code, the
        following transcript is certified to be an accurate record as
14      taken stenographically in the above entitled proceedings.

15

16      S/WALTER J. PERELLI

17

18

19      WALTER J. PERELLI, CCR, CRR
        Official Court Reporter
20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2        BLANK ROME LLP
          BY:   JEFFREY M. JOHNSON, ESQ.
 3              ALEX E. HASSIC, ESQ.
                DANIEL SCHAEFER, ESQ,
 4              MEGAN WOOD, ESQ.
          Attorneys for Plaintiffs
 5


 6
          GIBBONS P.C.
 7        BY:   LAWRENCE S. LUSTBERG, ESQ.
                DANIEL J. McGRADY, ESQ.
 8            - and -
          DECHERT LLP
 9        BY:   DAVID M. BERNICK, ESQ.
                JULIA CHAPMAN, ESQ.
10              WILLIAM T. McENROE, ESQ.
                JONATHAN STREETER, ESQ.
11              KENNETH J. HOLLOWAY, ESQ.
          Attorneys for Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS
     RICHARD L. BEITEL
3      By Mr. Schaefer       5                  185
       By Mr. Johnson                 80                    -
4

5

6

7                     Sidebar Discussions
                    Starting Page    Ending Page
8                        153            158

9

10              Colloquy Between Court and Counsel
                    Starting Page    Ending Page
11                        70             79
                         213            221
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       April 1, 2016
 2              (Trial resumes - Jury not present.)
 3              THE COURT:  Good morning, everyone.
 4              MR. STREETER:  Good morning.
 5              MR. JOHNSON:  Good morning.
 6              THE COURT:  Are we all set?
 7              Okay.  You have a live witness this morning?
 8              MR. STREETER:  We do, yes.
 9              THE COURT:  Okay.
10              THE DEPUTY CLERK:  Please rise for the Jury.
11              (Jury present.)
12              THE COURT:  Good morning.  You can be seated.  Thanks.
13      Welcome back.
14              Okay.  Mr. Streeter, it's your turn I guess?
15              MR. STREETER:  Yes, your Honor.
16              Dow calls Richard Beitel.
17              THE DEPUTY CLERK:  Over here by me, sir.
18
19      R I C H A R D   L.   B E I T E L, called as a witness, having
20          been first duly sworn, is examined and testifies as
21          follows:
22
23              THE DEPUTY CLERK:  Please state and spell your name
24      for the record.
25              THE WITNESS:  Richard Beitel, B-e-i-t-e-l.
```

 1              THE DEPUTY CLERK:  Thank you, you may be seated.

 2              THE COURT:  Good morning.

 3              THE WITNESS:  Good morning.

 4              THE COURT:  Mr. Beitel, keep your voice up and speak

 5     directly into the microphone, you can move it.

 6              THE WITNESS:  Can you hear me?

 7              THE COURT:  I think if you tip it down just a touch.

 8     Okay.

 9              THE WITNESS:  Okay.

10              THE COURT:  That's better.  Thanks.

11              MR. STREETER:  Good morning.

12                        DIRECT EXAMINATION

13     BY MR. STREETER:

14     Q    Good morning, Mr. Beitel.

15     A    Good morning.

16     Q    Mr. Beitel, can you start out by telling the jury where you

17     grew up?

18     A    I grew up in a little town called Red Lodge, Montana up in

19     Montana, and it's a small town around 3,000 people.  It's sort

20     of the entrance to Yellowstone Park.

21              THE DEPUTY CLERK:  Can you hear him?

22              THE COURT:  Mr. Beitel, pull your chair up a little.

23              (Discussion off the record regarding the witness

24     speaking into the microphone.)

25              THE WITNESS:  I'm sorry.  I'm not used to this.

 1             THE COURT:  That's all right.

 2             THE REPORTER:  We have to repeat the answer.

 3   A     The small town I grew up in was Red Lodge Montana which is

 4   outside of Billings.  It's one of the entrances to Yellowstone

 5   Park.  Population, about 3,000 people.

 6   Q     And where did you go to college?

 7   A     I went to college in Bozeman, Montana State University.

 8   Q     What did you study?

 9   A     I studied and became a chemical engineer, graduating from

10   MSU Bozeman.

11   Q     What year did you graduate?

12   A     I graduated in December 1969.

13   Q     And where did you go to work after college?

14   A     After college I went to work for Dow Chemical.  Interviewed

15   several companies, Dow hired me in Midland, Michigan but they

16   moved me to Los Angeles, California to start.

17   Q     And between when you started at Dow and 2004, did you work

18   at Dow that entire time?

19   A     No.  In September of 2000 -- I mean September of 1970 --

20   I'm sorry -- I took a leave of absence from Dow and went into

21   the Marines.  They delayed me going into the Marines because I

22   had to get married and I had already set up the wedding date,

23   so the Marines allowed me to wait until after I got married to

24   go into the Marines.  And I spent six months in the Marines

25   down in San Diego, Camp Pendleton area.

1    Q    After you finished with the Marines you went back to work

2    for Dow?

3    A    Went back to work for Dow, again back in Los Angeles.

4    Q    And worked there all the way through 2004?

5    A    Worked for Dow through 2004, but I moved from California

6    back to Midland, Michigan, and I moved back to Midland,

7    Michigan in 1977.

8    Q    And focusing on the time period that's relevant for this

9    case and that focuses on the allegations in this case, 1994 to

10   2003, what jobs did you have at Dow during that time period?

11   A    There was a little bit of a transition job there.  I was

12   sort of Director of Sales for Thermosets for North America;

13   then that involved me becoming Director of Thermosets for

14   Polyurethanes for North America; then eventually in 2000 I

15   became Commercial Director for Polyurethanes for North America.

16   Q    And when you were commercial director, what was sort of

17   under your responsibility?

18   A    Commercial director had both marketing responsibility and

19   the sales responsibility for the North America area.

20   Q    And when did you -- who did you report to in the period

21   from 1994 through 2003?

22   A    There were several people I reported to.  One of the major

23   ones was Bob Wood.  But 1994, there were several different

24   players that came through.  And the chain of command was a

25   little bit different because there was a chain of my direct

 1    reports of several different people than David Fischer that
 2    appeared into it.
 3    Q    Was there ever a time when you reported to Bill Long?
 4    A    Yes, I reported to Bill Long.  That started probably in
 5    1992, and that carried over until actually Bob Wood became the
 6    major guy.  I think that was 1996.
 7    Q    And then Bob Wood all the way through 2003?
 8    A    All the way through 2003.
 9    Q    And after leaving Dow, what did you do next?
10    A    After leaving Dow, I worked in the industry for so long, I
11    did some consulting work for the OmniTech or the United Soybean
12    Oil helping to promote the use of soybean oils into urethane
13    applications, but that was basically as a consulting job doing
14    some conventions and so forth for them.
15         I had moved from Midland, Michigan to Montana, but
16    then I was hired again to go to work for Bob Wood with ChemTura
17    in Connecticut.
18    Q    And how long did you work at ChemTura?
19    A    Actually it was -- I went there and started April, then I
20    quit after really 26 months, in June of 2008.
21    Q    And what did you do starting in June of 2008?
22    A    I moved back to Montana full-time from Connecticut, and I
23    had fun playing golf and traveling a little bit and plans that
24    my wife set up for me to do actually, and then went and got
25    appointed to the Yellowstone Stone County Tax Appeal Board.

 1    There's a group that people appeal their property taxes and
 2    industries appeal their property taxes, so with my background I
 3    was appointed do the Yellowstone County Tax Appeal Board which
 4    I belonged to for seven years now.
 5    Q    I want to focus in on price increase announcements which
 6    the jury has heard a lot about, and I want you to tell the jury
 7    what -- describe for us how the process worked of putting out
 8    price increase announcements during that 1994 to 2003 time
 9    period.
10    A    During that time period of course I was sort of in charge
11    of the sales for North America, but I would be the guy that
12    really put the name on the letter for the announcements going
13    out.  But if we were looking at putting together any type of
14    price increase, it was a team effort that you looked at putting
15    together.  You had the business managers in there along with
16    like a Bob Wood or Marco Levi, Stephanie Barbour.  So you'd
17    have the business managers along with the director of
18    marketing, director of sales.
19         So it was a team effort.  And actually we had Legal
20    people there and Communication people because you had a team
21    putting together exactly when and what pricing structure you
22    wanted put out.
23    Q    And you mentioned you signed the letters?
24    A    I signed the letters since I had been involved in the
25    urethane business since back in 1986 in that part of the

 1    business for North America.  So there was a lot of name

 2    recognition, but I was also the Director of Sales at the time,

 3    so the letter went out from the Director of Sales to the

 4    customer base that I knew through my salespeople and so forth.

 5    Q   And I want to talk a little bit about the team that worked

 6    on this.

 7            First of all, let's focus in on the earlier period of

 8    time, the 1994 and 1997 time.  Do you remember would the team

 9    members were that worked on price increase announcements then?

10    A   Well, it was a little bit different.  I think we had

11    several key guys in there.  But like I said, Bill Long and Bob

12    Wood were the top of the list.  And then you had people working

13    under you like David Fischer and so forth.  There was also like

14    Marco Levi, Stephanie Barbour who were in the business group

15    involved.  So there was a team effort.  It just wasn't --

16    Charles Churet from Europe had some impact because he was sort

17    of managing the European operation at that time, and there was

18    overlap and he did some work in the U.S. for a short period of

19    time there.

20    Q   And were there people involved in the process who were

21    called business managers?

22    A   That was like Marco Levi and Stephanie Barbour, they were

23    sort of like the business managers for their particular lines

24    of products in the polyurethane area, yes.

25    Q   And do you remember a person named Patrick Ho?

 1    A    Yes.

 2    Q    And in the '94 to '97 time frame, what job did he have?

 3    A    He could have been in one of those jobs involved in part of

 4    the polyurethane business for North America at that particular

 5    time, yes.

 6    Q    A business manager?

 7    A    A business manager type, yes.

 8    Q    So before Stephanie and Marco come in, Patrick was there?

 9    A    Patrick would be there.  Stephanie and Marco came in a

10    little later, yes.

11    Q    Understood.

12         And you said there was some team process.  What went

13    into that process?  What did the, for instance, what did the --

14    what did the business people contribute to the process?  What

15    was their input into the process?

16    A    Well, the business people were the ones that were actually

17    dealing more with the manufacturing location so they knew

18    exactly what the plants were doing, the volume of the plants

19    were doing.  So they were actually the ones looking at the

20    business from the standpoint of the profit and loss for those

21    particular businesses.  So they had that responsibility from

22    the standpoint of -- of the business character for their

23    systems or their part of the business of the polyurethane area.

24    Q    And what about the boss; first Bill Long and then Bob Wood,

25    what input did they have?

1    A    They had the overall responsibility.  They also had things
2    like research reporting to them, other factors, not only the
3    business but that they had all subgroups.  And at a time Bill
4    Long had other businesses that he was focused into, not only
5    the polyurethanes but he had some other businesses.
6    Q    And how about your input, what was your input into the
7    process?
8    A    My input into the process was I was giving information I
9    was getting from the customer base and so forth being in the
10   selling role, my people that were out there calling on
11   customers would be dealing individually with the customers,
12   they'd be giving me feedback what was going on with the
13   customer base.  I'd being looking at how the market was, what
14   customers we were able to increase and have a good working
15   relationship.  So we were really taking the product and selling
16   it to those major customers that we worked in a strong building
17   relationship with.
18   Q    And you described this whole team.  Would you have a
19   meeting?
20   A    Basically we were all in Midland, Michigan.  I was in
21   Midland, Michigan along with market group managers, Bob Wood
22   and everybody else, so we were all in Midland.  So we'd have a
23   team meeting to get together to decide exactly what we were
24   going to do as far as pricing.  Also we got involved in plant
25   expansions a little bit along those lines too, what the economy

 1   would do.  So we'd get together as a meeting, and for that
 2   meeting we'd decide and then implement the strategy which we
 3   were going to do.
 4   Q    Okay.  That's step one, the sort of meeting of the team.
 5   A    Right.
 6   Q    What's the next step in the process?
 7   A    Well, the meeting of the team, we'd meet as a team and
 8   decide the activities, what we were going to do.  Price
 9   increases, the team would meet; here what's our costs are for
10   these products; here's what we need to do in order to cover our
11   cost; here's the cost of -- raw material costs are going up and
12   so forth.
13        So you'd get feedback from the team.  We'd also get
14   feedback, we were looking at plant expansions, we also would
15   get feedback that we're looking at new product introductions.
16   In the polyol area there's are a lot of different products
17   going into different markets:  The flexible slab market, the
18   flexible mold market, there's the CASE market, sealants and so
19   forth.
20        So at the time the research group and manufacture
21   would go come out with new products that would be made in the
22   plants.  So we got together and discussed, here's what we have,
23   we have a new product.  Where's the market?  What was the
24   effort to go there?  And that would be fed from the business
25   team over to the sales team to look at where is our customer

 1   base and what we should do.

 2   Q    And after all that was decided and the group had decided

 3   this is what we're going to go out with the price increase

 4   announcement, what's the next step?  Is there a point where

 5   Legal gets involved?  Is there a point where Communications

 6   gets involved?

 7   A    Yeah.  The team where you have put together what you're

 8   going to do as far as pricing, right, Legal becomes involved in

 9   the decision and also Communications get involved

10   Q    What role do each of them have in the next step?

11   A    Well, Legal has to check off in everything we're doing as

12   far as the game plan.  We have a lot of customers, the

13   contracts, so Legal looks at the implications of how we're

14   increasing it, the timing of the increases and so forth.  And

15   also Communications put together typically the communications

16   goes out to the field sales organizations and also into the

17   customer base.

18   Q    And eventually a letter would come out?

19   A    Eventually a letter would come out.  But the letter

20   obviously didn't go to all the customer base, because like I

21   said, different polyols went into different applications.  You

22   have the flexible slab market, the flexible mold market, the

23   CASE market.  But there would be a price increase letter that

24   is generated that went out to the customers, yes.

25   Q    And you signed those?

 1    A    I signed them, yes.

 2    Q    And what kind of things would they say in them?  You know,

 3    what would they say about why you were raising prices?

 4    A    Well, a lot of times it could be the raw material costs

 5    that we were paying for, if raw materials costs are going up,

 6    cost of the business is going up.  So there would be cost

 7    increases that we put some identification of what exactly was

 8    going on in cost and --

 9    Q    And did you always make sure that the things that were said

10    were true before you signed those letters?

11    A    I would look at them, read the letters.  Also there would

12    be a check-off list from the marketing people and also legal

13    that everything we put in there had been checked off.  We

14    didn't create a letter just by itself, we had a check-off list

15    and we had to approve the letter on a price increase or price

16    notification before we sent it out.

17    Q    Do you have any doubt that the letters you signed were

18    accurate and true?

19         MR. JOHNSON:  Objection.  Leading.

20    A    The letters --

21         THE COURT:  No, just a moment.

22         I'll allow it.  But go ahead, let me hear.

23    A    Can you ask the question again?  I got --

24    Q    I asked whether or not -- whether or not the letters were

25    accurate and true.

 1    A    Yes.  We had everything checked off with legal and
 2    everything else.  We always felt the letters were accurate and
 3    true for the time period that they were sent out.
 4    Q    Let me ask you about the timing of these letters.  How
 5    often, generally, would you put out the letters?
 6    A    The letters -- there was a stipulation.  A lot of the
 7    customers had requirements you had to have 30-day notification.
 8    They needed 30-day notification of any type of price increase
 9    because they had to do something to increase the price with
10    their customer base.

11         So typically when we're looking at it, it was in the
12    45-day period to the day of implementation.  So we had to have
13    15 days in between the announcements because the contracts with
14    a lot of customers required 30-day notice, and some of the
15    contracts required 30-day notice on a quarterly basis.
16    Q    Let me you unpack that a little bit.

17         So your customers had a contract with you that said
18    every quarter 30 -- between 30 and 45 days before that you have
19    to give us notice of any increase in price?
20    A    They didn't have the 45 days.  They just had the 30-day
21    notification of any type of price increase for them.  And
22    typically the reason was, they needed that 30-day notification
23    that you're doing something with your prices so they can take
24    our information on price increases --
25    Q    Let me stop you right there.  In terms of the quarterly

 1    aspect of that, was that also in the contract?

 2    A    Yes, a lot of the contracts had quarterly price protection.

 3    So you couldn't raise your price every quarter, it to be done

 4    on a quarterly basis, and there were several that had on a

 5    six-month basis.

 6    Q    And did many of your customers have competitors as also

 7    their suppliers?

 8    A    We always had competitors, yes.

 9    Q    So they might have contracts with your competitors as well?

10    A    Yes.

11    Q    Did you, in fact, know from your talking to your customers

12    whether they did or did not have contracts with your

13    competitors?

14    A    Some of our customers had contracts for volume with other

15    competitors, yes.

16    Q    And do you know whether the contracts that your customers

17    had with the competitors had similar provisions about 30 days

18    before the end of the quarter you've got to announce the price

19    increase?

20    A    Yes.  That was ongoing in the industry because our

21    customers had to give notification to their customers.

22    Q    But in terms of your knowledge, did you talk to your

23    customers about what was going on with your competitors?

24    A    The information about what our competitors were doing with

25    our customers was information I got from the customers, they'd

 1    relay the information to me.  Typically it would be in a phone
 2    conversation or a meeting, they would relay what was going on.
 3    All of our major customers had more than one supplier.
 4    Q   And in terms of -- in terms of how the customers would sort
 5    of get this information from you, would they just -- a big
 6    customer, just one day a letter shows up in the mail and they
 7    open it up and it tells them their prices are going up?  Or how
 8    did this work in the real world?
 9    A   No, the major customers, there was a phone conversation
10    with them ahead of time, and sometimes there was a discussion
11    about what was going on in the industry.  But the major
12    customers would get a phone conversation.  If it wasn't from
13    me, it would be their key seller client on those particular
14    accounts, so they wouldn't get a surprise letter in the mail
15    about a price increase.
16    Q   And was there ever a time when one of the business managers
17    came to you and said:  "Price increase announcement, $.07.  Do
18    it now"?
19    A   Not that I recall, no.
20    Q   And would that even have been possible given the process
21    you described?
22    A   No.
23    Q   Why not?
24    A   The process of raising the prices in that team, the
25    polyurethanes, had to go into the sort of the committee for

 1    both business managers involved in that plus Bob Wood and so

 2    forth.  So there was a check-off thing that had to be checked

 3    off before it was given to the sales organization to implement

 4    a price increase.

 5    Q   And then I want to talk about sort of what happened after

 6    you send the announcements out.

 7             What then happens?  Describe what happens next with

 8    your customers.  What's the dialogue that then happens once the

 9    customers get the announcement?

10    A   Well, depending on the customer, some can tell me they're

11    going to throw it away, just discharge it, just get rid of it.

12    Okay.  But in reality they would like to have the letters

13    because they would use us as information.

14    Q   I want to stop you before you go any further on that.

15             I want to talk about the dialogue that you had with

16    the customers after they got the price increase letters.

17             Can you describe -- give us an example of a phone call

18    you'd get from a customer after you sent out a letter?

19    A   Well, you'd get a customer calling back saying:  We're not

20    going to accept this.

21             There would be a dialogue, what are we doing and so

22    forth.  So there would be an ongoing dialogue back-and-forth of

23    why we're doing it, the cost and so forth.  And what was

24    happening in the marketplace.

25    Q   What, if anything, would they tell you about what your

 1    competitors were doing?

 2    A    They'd tell me exactly what their competitors were doing,

 3    and there could be times where, yeah, we saw your price

 4    increase but the other guy is not going up the same amount.

 5    Q    And did you -- what was your source of information ever

 6    about what the competitors' price increase announcements were?

 7    A    Well, the source was from our own customer base.  If they

 8    got a call from our competitor saying the price was going up,

 9    they'd probably relay it back to us relatively fairly quick in

10    the conversation to see exactly what we were doing with our

11    product mix.

12    Q    And what would you do with that information once a customer

13    came back and said:  Hey, so-and-so is going up this amount,

14    what would you do?

15    A    Would -- would dialogue with our team to tell them that

16    something was going on, that the prices were going up you at

17    this particular account and so forth.

18    Q    And then I want you to describe the process that goes next

19    with the customer.  How do you then ultimately arrive at the

20    price that's going to be charged?  Describe that process to us.

21    A    Well, after the price increase announcements with the major

22    customers, there then would be a dialogue.  It would either be

23    a conference call with them or there would be a face-to-face

24    meeting as we reviewed what was going on with the pricing

25    structure and what their needs were.

 1   Q    And what would -- how long would that process last, that --
 2   after the announcement increase letter process last?
 3   A    Sometimes the conversation went -- went on before the
 4   letter actually got to them because we notified them ahead of
 5   time.  So that could have gone on immediately and would follow
 6   almost through the entire 30 days after the price increase
 7   announcement because there could be gamesmanship played on
 8   exactly what was going on with those price increases.
 9   Q    When you say "gamesmanship played," what do you mean?
10   Spell that out a little bit.
11   A    We could announce a six-cent a pound price increase to a
12   major customer, but maybe the competitor came in with something
13   less than the $.06 trying to increase volume at that particular
14   time.  So sometimes you got situations where it wasn't exactly
15   implementing the total package of your announced price
16   increase.
17   Q    And when you say -- first of all, did every price increase
18   announcement, you know, go for the full amount?
19   A    No.
20   Q    Were there some of them that went for nothing?
21   A    Some deteriorated and did go for nothing, correct.
22   Q    And then did you have some in between?
23   A    There would be some that came in less and there also would
24   be some that might have, instead of getting on the first
25   quarter would be delayed almost 90 days to a second quarter.

1    There were certain industries where their volume of business

2    was better in certain parts of the year than in others.

3    Q    So, I want to ask you about two things you said there.

4    Number one, you know, when the price would come in somewhere in

5    between.  How would you get there?  How would you get there

6    with the customer?  Describe the dialogue you had with the

7    customer to get to a price.

8    A    Well, typically if we announced a price increase and it was

9    there and the competition came in with something different,

10   there would be an ongoing dialogue with the customer telling

11   them exactly what's going on and what the other guy was doing

12   as far as his pricing and when he was -- he would implement his

13   price increase.

14   Q    What about when the competition came in with the same

15   thing, would you still have a dialogue?

16   A    Always had a dialogue.  And the dialogue always went on

17   with the customer because it impacted their part of the

18   business and their margin, so they wanted to know something on

19   it.

20   Q    And you mentioned something about delaying price increases

21   sometimes for 90 days.

22   A    Sometimes.

23   Q    Tell me how you would get to that process.

24   A    Well, sometimes you go in with a price increase, it

25   wouldn't be exactly working out, there would be some

 1    stipulations, you need a total understanding in the marketplace
 2    what was going on.  There might be a delay, impact in the
 3    marketplace.  Instead of going up July 1st it might go up
 4    October 1st.  So there could be a delay in it.  You did also
 5    sometimes get information from the customers how to handle the
 6    information, what other activity was going on with them.
 7    Q    I want to ask you to focus on some of the allegations in
 8    this case.
 9    A    Okay.
10    Q    First of all, did you ever agree with a competitor about
11    the price you were going to charge?
12    A    No, never did.
13    Q    Did you ever even talk to a competitor about what price you
14    were going to charge?
15    A    No, I never did.  Except BASF was one of our customers, so
16    when we were announcing price increases to BASF in Michigan, we
17    had to tell them what our pricing structure was going to be to
18    them since they were buying the product from us that they
19    didn't make.
20    Q    Did you ever hear about any kind of agreement by anybody on
21    your team with a competitor on the prices that would be
22    charged?
23    A    No, I didn't hear anything about our people talking with
24    the competitor about a price we were going to charge, no.
25    Q    Did you know exactly what the prices were that your

 1    competitors -- the actual prices they were charging your

 2    customers?

 3    A    You get that feedback from the customer what the actual

 4    price that they were being charged by our competitors at those

 5    prices in certain market segments.

 6    Q    Were there some times that they wouldn't give you that

 7    information?

 8    A    Typically no.  Typically they were saying, if the

 9    competition had a lower price they would give you the price

10    information and say that your price is a penny a pound higher

11    than theirs or two cents a pound higher or something along

12    those lines.

13    Q    Was there -- was there ever a time when Mr. Churet, in

14    particular, came to you and told you you've got to implement

15    this particular price increase announcement?

16    A    No.

17    Q    During the time when you -- you, from 1994 to 2003,

18    where -- Mr. Churet -- you mentioned Europe.  Where was Mr.

19    Churet physically located whenever he was part of this process?

20    A    Well, during that reporting he was in Europe, but he did

21    come to the U.S. for some meetings and so forth, yes.  So he

22    would come over to the U.S. for those meetings.  But the chain

23    of command was a little bit different in how we did our

24    pricing.  He just couldn't authorize a pricing.  It had to go

25    through the business team there.  At that time it would be

 1   Marco Levi and Stephanie Barbour.

 2   Q   You gave some prior testimony about -- about 40 to 50

 3   percent of price increase announcements.  When you gave that

 4   testimony, what were you talking about?  What were you

 5   referring to when you said 40 to 50 percent of price increase

 6   announcements?

 7           MR. JOHNSON:  Objection.  I think that testimony

 8   speaks for itself.

 9           THE COURT:  I'll allow it.

10           Go ahead.

11   A   That was in a long conversation, testimony given several

12   years ago.  And when I said 40 or 50 percent of the time, we

13   sometimes got a price increase, a lot of times we did not get a

14   price increase.

15   Q   And when you say 40 to 50 percent, are you referring to the

16   whole thing or part of the thing?

17           MR. JOHNSON:  Objection.  Leading.

18           THE COURT:  Rephrase the question, Mr. Streeter.

19   Q   When you said 40 percent of the time we got some price

20   increase, what were you saying?  What did you mean?  What were

21   you thinking?

22           MR. JOHNSON:  Objection.  The testimony speaks for

23   itself.

24           THE COURT:  He answered that already.  Yeah, he

25   answered that.

 1            MR. STREETER:  All right.  I'll move on.
 2    Q    I want to talk about the relationship that you had with
 3    your customers.  Which of your customers were your biggest and
 4    most important customers in the polyurethanes business?
 5    A    In what period of time though?  Firestone was one of the
 6    bigger ones at one time, General Foam.
 7    Q    '94 to 2003.
 8    A    '94?
 9            Leggett & Platt was one of your bigger customers and
10    we did a lot of business with Leggett & Platt over the years,
11    had a good working relationship with them.  We did some
12    business, a little bit differently with Woodbridge.  Woodbridge
13    of course was more in the molded rather than the flexible slab
14    industry.
15    Q    Describe for the jury a little bit about the relationship,
16    for instance, that you had with the people at Leggett & Platt.
17    Who did you deal with and what was the nature of your
18    relationship?
19    A    Well, I dealt with Larry Heppe when it involved -- Leggett
20    & Platt actually bought that part of the business down in
21    Texas.  And there was a Duane Potter involved.  Joe York and so
22    forth.  So there was the core people in Missouri that were
23    involved.  And then overall, Larry Heppe and Joe York were
24    heavily involved because that's where we went later to
25    negotiate what we were selling them.

 1   Q   And can you describe what relationship you had with Larry
 2   Heppe?
 3   A   The relationship with Larry Heppe was relatively pretty
 4   good.  It was one of those things that we worked together for a
 5   long period of time.  When you'd go down there, I stayed at his
 6   house rather than the hotel and we did a lot of things
 7   together.  I took him snowmobiling in Yellowstone Park -- he
 8   had never done that before -- in the cold of January.
 9         So I had a good working relationship with Larry Heppe.
10   I had a good relationship with Leggett & Platt over the years
11   because even at one time they talked about hiring me to go to
12   work for them.
13   Q   And how about, how about Carpenter, did you ever talk to
14   Carpenter about the same thing?
15   A   I talked to Carpenter.  We developed a relationship and
16   started -- Carpenter was also a little bit of a propylene oxide
17   customer so they bought isocyanate products.  They were not a
18   large customer of ours because they made some of their own, but
19   they had products they needed to buy from us that they didn't
20   make in their own chain of command.  The Carpenter relationship
21   started out well, developed over the years.  And when I left
22   Dow, Carpenter invited me down as a possibility of going to
23   work for them.
24   Q   And the Polyurethane Foam Association, what's that?
25   A   There was -- the Polyurethane Foam Organization was really

 1    made up of all the flexible slab foamers in the industry.

 2    Q    So your customers?

 3    A    They were customers of ours but some of them weren't

 4    customers of ours.  So it was made up of all the flexible slab

 5    customers in the industry.  This was the PFA.  And they had

 6    their own manager of the PFA and they had their own sort of

 7    board and team, and they'd also set up individual yearly

 8    meetings someplace where you'd get together and have

 9    conversations.

10         I was put on the board several times on those boards.

11    There was a time I was on it for several years, off, and put

12    back on the board.

13         And typically it was made up of the foamers, but they

14    did have people on their steering committee that were actually

15    suppliers to the industry.

16    Q    How many suppliers did they have on their steering

17    committee?

18    A    Two at a time.

19    Q    And you were one of them?

20    A    Yes.

21    Q    So this is -- you're on a committee set up by your

22    customers, and you're the one of two suppliers?

23    A    Right.  Set up by the customers, not by the suppliers.

24    Q    I want to turn to some of -- let me ask you to now focus on

25    putting this price increase announcements aside.  I want you to

 1    focus on the contracts.

 2            You're sitting down to negotiate a contract with a

 3    customer.  Can you describe that process?

 4    A    It was an in-person meeting rather than across the

 5    telephone, so you had a conversation sit-down.  And what you

 6    were trying to do was make sure that you had the volume so that

 7    your plants were running at a certain capacity over a period of

 8    time.  So you'd look at a contract with a major customer

 9    saying, hey, we want a contract with you to supply you these

10    grades of polyol, it could be TDI or MDI, but this grades of

11    our polyurethane material for a certain period of time.

12    Typically it could be two to three years, knowing that they

13    would be buying from you at a consistent rate which would help

14    you run your plants over a period of time, yes.

15    Q    And how about the pricing and the contract, can you

16    describe the conversation you had around that?

17    A    You'd have pricing in the contract, and that's typically

18    where you got the deal where you had to give them 30-day

19    notification on a quarterly basis because they had to have that

20    information in order to be successful in their businesses.

21            So you would have to talk about the timing of those

22    increases, and you looked at when it timing best, and then you

23    would also look at a little bit of what the pricing structure,

24    but also the volume that they'd be willing to purchase from you

25    in a given year.

 1    Q    When you say "pricing structure," what do you mean by that?

 2    A    By the pricing structure?

 3    Q    Yeah.

 4    A    Well, typically you could have a pricing structure based on

 5    here's what the volume is and here's what our prices are going

 6    to be in the marketplace.  So you'd be quoting a price, and

 7    then with reservations.  That's where you had the situation

 8    where they could raise it instead of on a quarterly basis.  So

 9    here's your price.  We couldn't raise your price, we have to

10    give you 30-day notification on a quarterly basis.

11    Q    And describe the negotiation that you had actually over

12    price.  Tell us about that negotiation that you had.

13    A    Well, you typically had the pricing negotiation because you

14    were there with your prices, you had the competition with their

15    prices because all these conferences involved more than one

16    supplier.  So you would be talking about, those are their

17    prices, here what's your prices are, what-are-you-going-to-do

18    type of situation.

19    Q    And how about, how about volume discounts, can you explain

20    what those were?

21    A    What we did was look at, if you're going to buy, you know,

22    say, 100 million pounds of product from us, we'd work at,

23    here's your price, hold the price.  But if you reach those

24    goals, then we'd give you some free goods as a reward for

25    buying that many millions of pounds of product from us.  At --

 1   Q    And what's a rebate?

 2   A    Well, the rebate was sort of the free goods that you gave

 3   to the customer for meeting those.

 4   Q    Were there rebates in forms other than free goods?

 5   A    My recollection was, there was a couple that you might have

 6   given them a credit rebate and then they could apply it against

 7   their previous invoices.  But sometimes it was a little bit,

 8   we'll give you a rail car, a product, but it could also be that

 9   we accumulated a credit that they deserved that they could

10   apply against their invoices.

11   Q    If they hit a certain volume?

12   A    Yes

13   Q    And why would you want to do that?  Why would you want to

14   hit a certain volume?

15   A    Well, typically what you want to do with your plants, you

16   had to have a certain product coming out of your plants to make

17   the plant efficient.  You didn't want to come back with a plant

18   at a low capacity and sometimes buying the raw materials if the

19   plant wasn't at that capacity.  You still needed to plan for

20   the times for the raw materials you weren't using.

21        So what you would try to do was have contracts to

22   supply to customers.  So you made sure the plant was running at

23   an efficient rate and being profitable, not being a cost

24   disadvantage to you.

25   Q    Did you ever give percentage rebates?

 1    A    Percentage of what they --

 2    Q    Percentage of the costs.  In other words, that -- what you

 3    charge them.

 4    A    Sometimes what you did on the pricing, you could give them

 5    like a one percent discount or a two percent discount for the

 6    product they buy.  So there were times where you would have a

 7    percent discount rather than giving them the free goods.

 8    Q    I want to talk a little bit about the competition.  Who

 9    were your big competitors in the polyurethanes business from

10    '94 to 2003?

11    A    The two biggest competitors of course were Bayer and BASF.

12    Q    And BASF was also a customer?

13    A    BASF was a customer based outside of Detroit.  They didn't

14    make all the products they needed for their applications that

15    they were dealing with the automotive people, so, yes, they

16    were a customer but they were also a major competitor in other

17    areas.

18    Q    I want to focus in on some documents.

19         MR. STREETER:  Going to ask that DX-2968 be put up on

20    the screen.  This is already admitted into evidence.

21         Can you blow up the very top of the document so we can

22    see the addressee.

23    A    Can you get it so I can read it?

24         Okay.  Thank you.

25    Q    Can you read that?

```
 1   A   Yes, I can.

 2   Q   So who is -- it says it's from Terry Clements.  Who's that?

 3   A   Teri Clements was my office assistant secretary.

 4           MR. STREETER:  And if we could, you know, actually

 5   just quickly go to the last page of this document and blow up

 6   the last lines.

 7           All the way down to who it's from.

 8   Q   This is from you?

 9   A   Yes.

10   Q   And your secretary sent it on your behalf essentially?

11   A   Yes.

12   Q   Okay.

13           MR. STREETER:  Let's go back up to the people to whom

14   it was addressed.

15   Q   First of all, the date.  When is this?

16   A   June 13th, 2001.

17   Q   And this group of people, can you --

18           MR. STREETER:  Can you highlight that name right

19   there.

20   Q   Stephanie Barbour.

21   A   Correct.

22   Q   You mentioned she was one of the sort of the team members?

23   A   Stephanie Barbour and Marco Levi, yes.

24   Q   And his name is on here too I think.  Right there

25   (indicating).
```

 1    A    Yeah.

 2    Q    And you mentioned Bob Wood.  Is that him right there?

 3    A    Right.

 4    Q    And David Fischer right there?

 5    A    Right.

 6    Q    So you're sending a message through your secretary to this

 7    whole group of people.  Right?

 8    A    Big group, yeah.

 9         MS. STREETER:    Okay.  Now let's go down to the

10    bottom half of the page and blow that up.

11         If you could highlight the first sentence.

12    Q    Right here.  (Reading) We have witnessed a very aggressive

13    attack by our competition over the past several months which

14    has impacted our overall volume and net unit return.

15         What do you mean by a "very aggressive attack by your

16    competition"?  What does that mean?

17    A    Well, if I'm saying "very aggressive attack," that means

18    they're aggressively going after some of our competition in

19    order to get volume.

20    Q    And how did you find out that was happening?

21    A    Typically it would be from the customer who was telling us

22    what's going on, but also you would see that in certain cases

23    the volume you were shipping to a particular customer decreased

24    dramatically.

25    Q    And when you say they're going after some of your volume,

 1    when would you learn about how they were doing that?

 2    A    From the customer.

 3    Q    But how would -- what would you learn about how the

 4    competition was doing that?  How were they going after your

 5    volume?

 6    A    Typically the customer would tell me about it.

 7    Q    And what would they tell you that?

 8    A    That the competition is coming here and we repositioned

 9    ourselves for some volume with them.

10    Q    And what would they tell you about why they would go with

11    the competitor as opposed to you?

12    A    Well, at times they would tell me that they had made a deal

13    and the deal was probably price or free goods or something

14    along those lines.

15    Q    And what would you do in response to that situation?

16    A    Well, they probably made an agreement to buy certain

17    product from them.  So you can see our volume is dropping

18    dramatically especially in the polyol area, so the market

19    became very aggressive in the polyol area, so there was

20    activity at certain accounts that we were losing business to.

21    Q    What would you do in response to that situation?

22    A    Well, in response, if we lost some business, you'd look

23    around in the marketplace and try to figure out where you could

24    increase your volume either with your current customers or

25    would there be a customer that you had been doing business

 1    with, could you promote some activity to start getting a
 2    secondary position.
 3    Q    And how would you promote getting, you know, getting a
 4    position with a new customer?
 5    A    Well, typically you'd make a call do them and start talking
 6    to them, try to find out what the pricing structure was with
 7    them, see if you could meet the price, ask for part of their
 8    business or something like that.
 9    Q    And would you ever try to win back the business your
10    competitor was taking from you?
11    A    You sort of went in and had to dialogue with them to see
12    what had happened, why you lost the business.
13    Q    When you say "them," what do you mean?
14    A    The customer themselves.  So you'd have to dialogue with
15    the customer:  What has happened?  What has caused us to be
16    falling out of grace with you that you've moved to somebody
17    else?
18    Q    Would you ever try to get that customer back?
19    A    Over a period of time, yes.  You probably -- there were key
20    customers in certain areas that you wanted to work with very
21    closely.  Like, say, in the automotive industry, if the
22    automotive industry was expanding, you had products going into
23    the automotive industry, so you wanted to work with the
24    automotive companies that were sending into the automotive
25    people if the automotive industry was increasing, yes.

 1   Q    How would you go about trying to get a customer back?

 2   A    Probably you go and talk to them in person.

 3   Q    What would you say to them?

 4   A    What can we do in order to regain our position?  What can

 5   we do --

 6   Q    What kind of things would you offer them?

 7   A    Would you ask the question again?

 8   Q    What kind of things would you offer to them?

 9   A    Well, sometimes we'd offer them new product mix.  We could

10   offer them a volume paper for free goods if they hit certain

11   volumes and so forth.  So there was sort of a buy-in-on-it

12   scenario.

13   Q    What about discussion of prices?

14   A    Well, we could talk about the pricing, look at what the

15   pricing structure was and so forth.

16   Q    When you say "look at what the pricing structure was,"

17   what --

18   A    You have to look at what the pricing structure was with

19   that particular customer and see what they were offering and if

20   it made sense to you --

21   Q    Now --

22   A    -- to try to meet the competitive --

23   Q    And would you ever try to beat the competitor?

24   A    On the pricing structure?

25   Q    Yeah.

 1    A    No.   What we really tried to do is be a better supplier and
 2    be a North America company that was supplying them and had
 3    major facilities with multiple products.   A lot of the
 4    customers could then buy different polyols from you for
 5    different applications.   Like, you could be a co-polymer along
 6    with a conventional polyol going into a flexible slab
 7    formulation.

 8         So sometimes you're able to use your product mix to
 9    help you with a customer when a competitor only had a couple.
10    Q    Let me ask you to look at the bottom of page --

11         MR. STREETER:   If you could highlight this sentence
12    that begins:   "However."

13    Q    You say:   (Reading) We are cognizant of the fact that Bayer
14    and BASF are being aggressive and could impact us.

15         What are you referring to there?
16    A    Well, that was MDI.   We were looking at impact both as to
17    lamination and the forest products.

18         There were so many different markets and sometimes
19    there's different MDIs going into different market segments, so
20    if you're looking at that we're saying, gee, you can see the
21    fact that Bayer and BASF are getting aggressive in those market
22    segments.

23    Q    And when you say "aggressive," what do you mean?
24    A    Well, that they were probably being aggressive and trying
25    to get more volume.

 1    Q    How?

 2    A    I would assume that they were trying to do something with

 3    either a different price or maybe a free goods buy-in.

 4    Q    And let me ask you to turn to the second page, TDI.  It's

 5    up at the top of the page.

 6              MR. STREETER:  Blow that up.

 7    Q    And there's that:  "We will increase our efforts" sentence.

 8              MS. STREETER:  Would you highlight that.

 9    Q    You write:  (Reading) We will increase our efforts for new

10    tank car TDI business at Woodbridge, Flexible Foam and

11    Carpenter and Foamex.

12              What would go into you increasing your effort?  How

13    would you go about doing that?

14    A    For one reason, those customers took tank cars.  Shipping

15    tank cars over the road was the safe way to do it; putting it

16    in trucks was not.  So we had special tank cars with top

17    unloading and everything, and it was protected.

18              With those accounts, they bought a lot of tank cars of

19    TDI on locations that we could deliver the tank cars to safely

20    and make quick delivers to.  So we looked at those accounts,

21    and they were all large users of TDI that took it in tank cars

22    versus accounts that might be taking it in tank trucks.

23    Q    So what kinds of things would you try to do to get those

24    accounts?

25    A    Well, if you're looking at it, we'd look at what their

```
 1   pricing structure was.  We were buying the TDA, so we had to
 2   move TDI or we'd have to pay the TDA for non-use.  So we'd look
 3   at what their pricing structure was.  And would we be
 4   competitive?  Would there be something we could offer them in
 5   return for getting their business?
 6         Typically we did a little more of:  Buy this volume,
 7   we'll give you a free goods type thing rather than actually
 8   doing something like negotiating a lower price.
 9   Q   Let me ask you to turn to DX-1055, which is pre-admitted.
10         MR. STREETER:  And if you could, blow up the bottom
11   half of the page starting there.
12   Q   This is an email from Michael Ragar.  You see that?
13   A   Yeah.
14   Q   Who's that?
15   A   He was a salesman on the West Coast.
16   Q   And that's you right there, one of the people --
17   A   Right.
18   Q   -- it was sent to?
19         Were there other folks in the sales organization?
20   A   Right.
21         I'm not really familiar with Mike McCurrie that much.
22   Q   Turning to the first sentence.
23         MS. STREETER:  If we can highlight that.
24   Q   It says:  (Reading) Rick, Mike and Bill:  Attached is a
25   polyol price increase announcement from BASF indicating a
```

 1    five-cent per pound price increase on all pluricol polyol
 2    products.
 3            Is this the typical kind of way you would learn about
 4    a price increase announcement, from a salesperson in the field
 5    or from a customer?
 6    A    Yes.
 7            MS. STREETER:  And then, go ahead and highlight this
 8    last sentence:  "Though BASF has made this announcement."
 9    Q    It says:  (Reading) Though BASF has made this announcement,
10    I can find no indication they have made attempts to support the
11    announcement in the ridged or CASE business.
12            What does that mean:  "No efforts to support the
13    announcement"?
14    A    Sometimes they made the announcement in one market segment,
15    not all the market segments.  What he indicated was the ridged
16    and CASE businesses, okay?  So he overlapped in different
17    market settings --
18    Q    Let me just ask, what do you mean by --
19            MR. JOHNSON:  Your Honor, I would like him to finish
20    his answer.
21            MR. STREETER:  Okay.
22            THE WITNESS:  Could he ask the question again, please?
23            THE COURT:  Go ahead.  Ask the question, Mr. Streeter.
24    Q    The question is:  What did you mean, or what did you
25    understand it meant when it says:  "No indication they have

 1    made attempts to support the announcement?"

 2    A    That BASF might have made the announcement but they didn't

 3    really raise it to their customers.

 4    Q    And then I want to highlight the next sentence here

 5    beginning with "Laura Breen."

 6         It says:  Laura Breen -- by the way, who's Laura

 7    Breen?

 8    A    She was a salesperson in the field selling.

 9    Q    (Reading) Laura Breen had discussions with Masco Corp.

10    today and was told BASF has a lower price on pMDI than our

11    current $.71 (indications were $.69) and had not made the

12    announcement to Masco.

13         So what is this telling you about what BASF is doing

14    on pricing compared to you?

15    A    Well, looks like they didn't go to all their customers with

16    the price increase.

17    Q    And what are they offering this customer compared to what

18    you're offering?

19    A    Well, looks like we were $.02 a pound higher according to

20    what Lauren Breen heard from the customer.

21    Q    And?

22    A    As I read through the thing further, you can see that it

23    looks like Mastro has the Dow and Bayer MDI price increase

24    letters but nothing from BASF.

25    Q    Let me now turn over to the next page and pull off that

 1    paragraph right there.

 2            It says:  (Reading) My recommendation in June was $.79

 3    a pound.  System price which was based on $.71 a pound.

 4            And then at the bottom it says:  (Reading) It now

 5    appears that $.79 a pound may not be competitive if BASF

 6    continues with what appears to be a strategy to secure the

 7    total volume at Masco.

 8            What does that mean, "$.79 may not be competitive"?

 9    A   That our price was high versus what BASF has.

10    Q   And what does that mean to you --

11            MR. JOHNSON:  Your Honor, objection.  Relevance.

12    There's nothing about Systems in this case.  There's no

13    allegation of any price-fixing with respect to Systems, it's

14    not even an allegation in this case.  That's a Systems price.

15            THE COURT:  All right.  Mr. Streeter?

16    Q   Is Systems part of the overall polyurethanes business?

17    A   You sell polyurethanes into the Systems business, yes.

18    Q   You sell polyols into the Systems business?

19    A   Yes.

20    Q   So this is a customer to whom you're selling polyols?

21    A   It's a name.  I'm not exactly sure goes it back too far.  I

22    mean --

23    Q   Understood.  I'll move on.

24    A   It's 16 years ago.  I'm not --

25            MR. STREETER:  I'll move on, your Honor.

```
 1                    THE COURT:  All right.
 2                    MR. STREETER:  If we could put defense Exhibit 3872
 3        up.
 4                    By the way, I offer DX-10554.
 5                    THE COURT:  Is there any objection?
 6                    MR. JOHNSON:  No objection, your Honor.
 7                    THE COURT:  All right.  It's in evidence.
 8                    MR. STREETER:  Could we put DX-3872 up.
 9        Q    This is an email from you.  Is that right?
10        A    Yes.
11        Q    And who is it to?
12        A    Frank Hurst.
13        Q    Who's Frank Hurst.
14        A    He's at E.R. Carpenter, one of the major managers there.
15        Q    And I want to highlight these two paragraphs right here.
16                    First of all -- here we are.
17                    You write to him:  (Reading) I really got hammered in
18        July.  Didn't realize how aggressive Huntsman, Lyondell and
19        BASF were going to get.  Lost a ton of orders.
20                    What were you referring to there?
21        A    We lost a bunch of business.
22        Q    Do you know how or why?
23        A    Well, I got a feeling that if you look at -- there might
24        have been a July 1st increase, and this was July 20th, okay?
25        So I didn't really how aggressive Huntsman, Lyondell and BASF
```

 1    were going to be.  So we lost orders in that particular month.

 2    Q    When you say "how aggressive they were going to be," what

 3    do you mean by "aggressive"?

 4    A    Well, it looks like they took some of our business from us

 5    at certain accounts that we had, so --

 6    Q    Did you learn from your customers as to how they did that?

 7    A    Over a period of time we probably learned from each

 8    customer why we lost their volume.

 9    Q    And what kinds of things would you learn from the

10    customers?

11    A    It could be that our price was slightly higher announced

12    than theirs, or there was some other activity, like a delay in

13    the price increase.

14            MR. JOHNSON:  Objection to the speculation.  Anything

15    could have been.

16            THE WITNESS:  Yeah.

17            THE COURT:  Sustained.  Strike the answer, please.

18    Q    What kinds of things did your customers tell you about why

19    you lost business?

20    A    That your price wasn't accurate to what the competition we

21    could buy it from.

22    Q    And what about -- you mentioned something about free goods.

23    What about that?

24    A    Free goods didn't go into a whole bunch of customers, but

25    there were sometimes where free goods were given as a

 1    stimulation to sign a contract or get extra volume.

 2    Q    The bigger customers, or which customers?

 3    A    The bigger customers, yeah.  There could also be a small

 4    customer that was having a new product developed and you'd

 5    actually give new product to that application so they could

 6    expand their product mix.

 7    Q    I want to turn to Carpenter, which this -- you know, this

 8    document is to Frank Hurst.

 9         What kind of relationship did you have with Carpenter?

10    A    It started out a little bit that they were competitive

11    because they could make some polyols of their own and could use

12    it internally and so forth, but they also needed TDI and MDI

13    for some of their applications.

14         So started calling on them, developed a relationship,

15    worked with Stan Pauley and a grew over a period of time.  And

16    when they needed certain polyols they didn't make or needed TDI

17    they didn't have, they were willing to come to Dow and talk to

18    us about buying products from us.

19    Q    Let me ask you to turn to DX-3060.

20         MR. STREETER:  And I want to blow up the top part of

21    the document there.

22    Q    This is you right here.  Right?

23    A    (No response).

24    Q    And you're writing Frank Hurst at Carpenter?

25    A    Right.

 1   Q    Let me ask you to focus right here.  You say:  "We will

 2   come in with a TDI price just for Carpenter.  It will not be

 3   given to others.  We can hide the true number."

 4        Do you see that?

 5   A    Correct.

 6   Q    What does that mean:  "We'll come in with a TDI price just

 7   for Carpenter"?

 8   A    Well, we're working with Carpenter and we're going to sell

 9   them TDI to certain of their locations at a certain plant --

10   price.

11   Q    And when it says "just for Carpenter," what do you mean by

12   that?

13   A    Well, that's the price to those plants would be just the

14   TDI going to their -- to Carpenter at those plants, yes.

15   Q    "It will not be given to others." What do you mean by that?

16   A    Well, TDI is a delivered price, so you look at where the

17   price is on a delivered basis to an account.  So if it's a

18   close plant, you're not paying for all the freight for a rail

19   car to go a long ways and back because it's a delivered price.

20   Q    So what did it mean, "it will not be given to others"?

21   A    Well, we singed a deal with Carpenter:  Here's your TDI

22   price for this product going to this particular plant.  We

23   looked at the dynamics and economics, and this will be a price

24   shipping to that plant.

25   Q    And you say --

 1            MR. STREETER:  If you could highlight the next
 2      sentence:  "I know that you can keep the confidence."
 3      Q   (Reading) We can hide the true number.  I know that you can
 4      keep the confidence."
 5            Why would you want Carpenter to keep your price in
 6      confidence?
 7      A   Well, you had to look at it very carefully.  Sometimes you
 8      had a price across the board, and some plants cost you a lot
 9      more to get the product there.  So you had to have a lot of
10      information.  This price was going to a particular plant.
11      Okay?  And so the freight cost would make a different net
12      return that you were paying to the railroad company.
13      Q   Let me just ask you to focus:  Why would you want Carpenter
14      not to disclose your price?
15      A   Because we were making a deal to sell them some TDI on a
16      special deal to them.
17      Q   And who would you not want to find out the price?
18      A   Well, he had two other competitors that were selling a lot
19      of TDI to them, more than us, Lionell and BASF.
20      Q   And why would you not want your competitors to find out the
21      price you were offering?
22      A   I thought we were making a special deal for Carpenter just
23      for this amount of volume in order to help our TDI plant move
24      that byproduct that comes into it.  TDI was a lot harder to
25      sell because we could only sell to certain people in rail cars.

 1    We were not -- we didn't selling in tank trucks in case there
 2    was a problem.
 3    Q    How about your other customers, did you want your customers
 4    to know the prices you were charging -- did you want one
 5    customer to know the price you were charging to another
 6    customer?
 7    A    No.
 8    Q    Why not?
 9    A    Individually we worked out a deal with each customer what
10    the competitive price was and what our price was, what the
11    volume was, and if there was some sort of volume rebate for
12    large volumes of product.
13    Q    Why wouldn't you want one customer to know what another
14    customer was paying?
15    A    We wouldn't go to a customer and tell them what E.R.
16    Carpenter was paying for the product because we probably would
17    be getting a price from them and being competitive.  So we
18    wouldn't relay information between us and the customer if they
19    had a deal, we kept it between the two of us as a relationship
20    thing.
21    Q    If you had one customer you were charging $.62 to and
22    another customer you were charging $.58 to, would you want the
23    one that you were charging $.62 to know that you were charging
24    a lower price to someone else?
25              MR. JOHNSON:  Objection.  Leading.

```
 1              THE COURT:  It is.  Rephrase the question, Mr.
 2    Streeter.
 3    Q   When you had customers who were charged different prices,
 4    did you want -- what did you want -- you know, the one that was
 5    paying the higher price, did you want them to know someone was
 6    paying a lower price?
 7    A   Not necessarily, no.  Because there were times we were
 8    meeting a competitor price for a particular part of the
 9    business.  You wouldn't take the competitor price over here and
10    give it to somebody else.  There was an agreement that here's
11    my price.  Will you meet this price?
12              So you had an obligation to the customer that
13    presented you the paperwork of what was going on to meet that
14    price and not present it to across the industry.
15    Q   Let me ask you to turn to Hickory Springs.
16              What was your relationship like with Hickory Springs?
17    A   It worked out fine.  Called on them over the years.  We're
18    more of a secondary supply to Hickory Springs because they were
19    competitors against Foamex and Leggett & Platt and so forth.
20    So sometimes the customer would know that you're a major
21    supplier to their competitors, so we were a secondary supplier
22    to Hickory Springs over the years.
23    Q   And who was that primary supplier?
24    A   At the time I thought it was BASF was more the primary
25    supplier.
```

```
 1    Q   And who did you deal with at Hickory Springs?

 2    A   Well, Neil Underdown was there, and than his son was

 3    brought in, David Underdown.  So I went far enough back that it

 4    started out with Neil, and David his son came in but became a

 5    more active role at Hickory Springs.

 6              MR. STREETER:  And I want to ask -- I want to ask you

 7    to pull up Defense Exhibit 1371.

 8              By the way, your Honor, I offer DX-3060 which was the

 9    last exhibit we looked at.

10              THE COURT:  Any objection?

11              MR. JOHNSON:  No objection, your Honor.

12              THE COURT:  Okay.  Then it's in evidence.

13              MR. STREETER:  If you could just blow up that whole

14    string there, that whole email.

15    Q   First of all, who is Ellen Gustafson?

16    A   Ellen Gustafson was the salesperson calling on Hickory

17    Springs working out of Atlanta, was her sales office.

18    Q   She worked for you?

19    A   Direct report, yes.

20    Q   And that's you being copied?

21    A   Yes.

22    Q   And who is this email being sent to?

23    A   David Underdown.

24    Q   And where was he?

25    A   He was the son of Neil Underdown at Hickory Springs.
```

 1   Q    Okay.

 2        MR. STREETER:  Let me just ask that that sentence

 3   right there be highlighted.

 4   Q    First of all, subject line:  "Summary of offer and

 5   commitment for 2002/2003."

 6        What's going on here?  What was the background?  What

 7   are you negotiating here?

 8   A    2002 -- 2001, 2002 were weak months -- or years for us.

 9   2001 was a very weak year.  2002 was also a weak year.  So

10   we're trying to increase our volume moving our polyols and

11   products in those market segments.

12   Q    But more basic question.  What are you negotiating Hickory

13   Springs here?  What --

14   A    Sell them flexible slab polyols.

15   Q    Is this a contract?  Is this a spot buy?  What is it?

16   A    Oh, no.  It would be a commitment to buy so much product

17   during a period of time, a year usually.

18   Q    And what does this mean:  "Dow will issue a signing bonus

19   in the form of a credit memo of $200,000 in December of 2002."

20   What does that mean?

21   A    Well, wrapping up 2002 we would issue them a credit memo of

22   $200,000 to pay for the product they bought so they wouldn't

23   have to send the cash check to us.  We'd give them a credit

24   memo of $200,000 to apply against the invoices.

25   Q    And then in the next --

```
 1              MR. STREETER:  If you highlight the next paragraph.
 2    Q   "Effective October 1, 2002, the selling price for
 3    conventional polyols will be $.56 a pound in rail cars with 1
 4    percent, 30 net, 31 day terms.  (Note:  Selling price can
 5    change based on flexible slab market.)  Dow agrees to a
 6    'meet-or-release' competitive price clause."
 7              It says:  "Note:  Selling price could change based on
 8    the flexible slab market.  Dow agrees to a 'meet-or-release'
 9    competitive price clause."
10              What does a meet or release competitive price clause
11    mean.
12    A   Usually in the agreement you have a clause in there that
13    the customer can give you a price increase; here's the new
14    price or here's the lower price.  Okay?  So they give you a
15    lower price.  We can either meet that price or we can say we're
16    not going to meet the price and we'll release from you the
17    obligation of the contract.
18    Q   When you say "the customer would give you another price,"
19    what do you mean by that?
20    A   Would give you documentation:  Here's really what our price
21    is.  Will you meet this price?
22    Q   Price from whom or where?
23    A   One of our key competitors, okay?
24              We looked at the key competitor factor not somebody
25    brought in from overseas or something like that.
```

 1   Q   Did this contract obligate them to buy a certain amount

 2   from you?

 3   A   I didn't read through the whole contract, I don't have it.

 4   But typically all the contracts, you had a position that they

 5   agreed to buy so many millions of pounds in that time period

 6   and that's where you base --

 7   Q   And -- I'm sorry.

 8   A   -- credit, $200,000, so there would be a credit, here's

 9   where you're going to buy in that particular time, boom.

10   Q   And the meet-or-release, what are you saying there?  We'll

11   do what?

12   A   Basically what we're saying, we either meet the agreement

13   with you, or if we don't, then you're released from the

14   contract commitment for buying the volume.

15   Q   When you say "meet the agreement with you," what do you

16   mean by that?

17   A   I'm saying, meet really what the price offer is from the

18   competition.

19   Q   And then the next sentence:  In April 2003 --

20           MR. STREETER:  If you blow up that.

21   Q   (Reading) In April 2003 -- so now this is the next year.

22   Right?

23   A   Yes.

24   Q   -- Dow will issue a second signing bonus equal to the

25   selling bonus -- selling price minus $.50 a pound for

1    conventional polyol business -- or -- purchases from October 1,
2    2002 through March 31, 2003.
3          Do you see that?
4    A    Yes.
5    Q    So what does that mean?  Well, the big picture:  What does
6    a signing bonus mean?
7    A    Usually what the signing bonus was set up that you sign
8    this contract, you commit to buy this many millions of pounds,
9    we'll give you a signing bonus that you agree to the contract
10   and we'll give you the signing bonus up front.
11   Q    I want you to turn to the relationship with Woodbridge.
12         Can you describe just a big picture of what your
13   relationship was with Woodbridge in the 1994 to 2003 time
14   period?
15   A    Woodbridge was located up in Toronto, Canada, and
16   stipulations of how we had to work, even though I was director
17   of sales for North America, when you're dealing with somebody
18   in Canada you had to work with Canadian sales organization to
19   make the calls, work on the contracts and make the agreement
20   with the customer.
21         So I would call on Woodbridge with our sales
22   organization based in Toronto to call on Woodbridge, looking at
23   supplying them the price they need for the flexible molded
24   market and their applications going into automotive seating and
25   so forth.

 1   Q    During the period of time, 1994 to 2003, did you -- how
 2   often did you supply to Woodbridge?
 3   A    I thought that we had a strong position with Woodbridge
 4   over most those years but I know there were times that there
 5   was a falling off on the volume and so forth.  Part of it
 6   depending on what's happening in the automotive company, but
 7   part of it could have certain agreements with the other
 8   suppliers to supply them differently.  They bought from more
 9   than one supplier.
10   Q    And when you say, "agreements with the other suppliers,"
11   who -- their agreements with the other suppliers?
12   A    Their agreement with other suppliers might require them to
13   buy certain volumes from the other competitors in a certain
14   time period in order to meet a goal if they had an agreement,
15   contract agreement with those guys.
16   Q    Let me ask you to put up DX-5758.
17        This is an email from Joanne Hughes to Dave Fowler.
18   A    Okay.
19   Q    Do you know who Dave Fowler was?
20   A    He would have been based really in Canada I think.  Okay?
21   Q    And what company did he work for?
22        Move the microphone closer to your mouth.
23   A    Oh, I'm sorry.
24        Well, I assumed he worked for Dow up in Toronto, yeah.
25   Q    And Joanne Hughes, who did she work for?

 1    A    Woodbridge.

 2    Q    And then --

 3    A    I'm really more just familiar with Bruce O'Brien though

 4    with Woodbridge.  I didn't know her.

 5    Q    Bruce was the person you dealt with?

 6    A    One of the persons up there we dealt with, yes.

 7    Q    And I want to look at this first paragraph here.

 8         MR. STREETER:  If we can highlight that whole thing.

 9    Q    (Reading) Rick Beitel has confirmed that Dow will allow the

10    purchaser -- meaning Woodbridge, right?

11    A    Right

12    Q    -- (Reading continues) -- to continue to pay the net net

13    pricing contained in the Supply Agreement understanding that

14    current purchases annualized will not meet the agreed to

15    minimum annual volume of 127.5 million pounds.

16              Do you see that?

17    A    Yes.

18    Q    So what's going on here?

19    A    Well, looking at July 2002, it looks like overall their

20    market was weak and they couldn't exactly live up to the total

21    commitment of that many millions of pounds going into their

22    product mix.  So if they had a net net price, typically we

23    agreed to a net net price would have been the regular price

24    with the discount already included into it for that period of

25    time.  So they were paying a net net price rather than the

 1    price with a discount.

 2            So what we're saying, we'll agree to the net net price

 3    even though they're not going to reach the agreed to volume.

 4    Q    Why would you do that with a customer?

 5    A    Well, typically sometimes the market conditions changed.

 6    It could have been differences in what's going into the bedding

 7    market.  This was the automotive market.  Was automotive being

 8    very strong and they were supplying a lot of automotive parts;

 9    or was the automotive market sales down, so they weren't able

10    to supply enough of the foam.

11    Q    Why would you agree with them?  You had a contract that

12    said they had to met certain volume and you're essentially

13    letting them off the hook with that.  Right?

14    A    Correct.

15    Q    Why would you do that?

16    A    Well, typically, when you have something like that, then

17    you'd increase the number of moving out expanding the years of

18    your contract.  We'll agree to this if you agree to doing

19    something, expanding the contract, rather than end it, say, in

20    2002, expand it to 2003.

21    Q    Although here you're not doing that, you're just saying you

22    don't have to meet it, right?

23            MR. JOHNSON:  Objection.  Leading.

24            THE COURT:  It is leading.

25    Q    Is there anything in here about how they have to sign the

1    next contract?

2    A    No.

3    Q    So why would you -- why would you release them if they

4    hadn't signed another contract yet?

5              MR. JOHNSON:  Objection.  Asked and answered.

6              THE COURT:  No, I'll allow it.

7              Go ahead.

8    A    To me this looks like a short documentation from Bruce

9    O'Brien to other Dow people.  The real negotiation would have

10   been a lot longer and more thing than this short little note

11   about what's going on.

12   Q    I'm going to ask -- I'm going to ask you to take a look at

13   a document, Defense Exhibit 1059.

14             MR. STREETER:  You could blow up this portion of the

15   document right here.

16   Q    Is that you right there?

17   A    Yeah.  Yes, I see it now.  Yes.

18   Q    And who is James Mason.

19   A    He was sort of in the business working at Dow.

20   Q    And the date is -- is that December 10th, 1997?

21   A    Yes.

22   Q    And what is Huber?  Did you do much business with Huber?

23   A    I didn't have much interface with Huber, no.

24   Q    Did Dow do much business with Huber at all?

25   A    To me it looks like it was with a different group in the

 1    Dow organization than I was.  It could always have been in the
 2    Systems business or something, I'm not sure.
 3    Q    Let me ask you to look at this first sentence.
 4              MR. STREETER:  If we would blow that up.
 5    Q    (Reading) Huber has decided to go with ICI for all four
 6    plants with a three-year contract, so we are back to where we
 7    were with Huber a month and a half ago.
 8              What does that mean?
 9    A    It looks like James and them were looking at trying to get
10    Huber as a customer of theirs and try to put together a
11    program, and it looks like it failed.
12    Q    And the last sentence:  "We have no way of knowing" --
13              MR. STREETER:  Could you blow that up or highlight
14    that.
15    Q    "We have no way of knowing how much Huber shared or didn't
16    share with ICI regarding our offer."
17              Do you see that?
18    A    Yes.
19    Q    Would you -- would you -- would you typically learn from
20    your customer what the competitors were offering to them?
21    A    Key customers, large customers, yes, we would.
22    Q    How about a situation like this where it wasn't -- it
23    wasn't a regular customer?
24    A    Customers fairly small in the business I'm not familiar
25    with, so...

 1           It looks like the relationship wasn't very strong
 2    there.  I don't -- I don't know them.
 3           MR. STREETER:  Highlight that next sentence, "ICI has
 4    made it pretty plain."
 5    Q   (Reading) ICI has made it pretty plain that they are going
 6    to play "hardball" at every account and they are fully intent
 7    on keeping Dow completely out of, quote, their market.
 8           What do you understand the "hardball" to refer to?
 9           MR. JOHNSON:  Your Honor, objection.  He's already
10    indicated that this is not even his area, he doesn't know this
11    client, and now we're just eliciting what he thinks it means
12    and what words say.  He doesn't have any familiarity with this
13    situation.
14           MR. STREETER:  He's cc'd on the document, your Honor.
15           THE COURT:  That's all right.  I'll sustain the
16    objection.
17    BY MR. STREETER:
18    Q   Do you know whether you got much business from Huber?
19    A   No, I don't.
20    Q   I want to turn to Leggett & Platt.
21           You mentioned before -- can you describe kind of the
22    business relationship with Leggett & Platt?  How much business
23    did you do with them over the '94 to 2003 time period?
24    A   We were their major supplier over that period of time and
25    we had developed a really strong relationship with Leggett &

 1    Platt both with their corporate headquarters and also with
 2    Larry Heppe and Joe York down in Fort Worth, Texas.  They were
 3    one of our major flexible slab accounts in that industry.  They
 4    were also very financially strong, which made it easier to work
 5    for the customer that you knew had financial strength, was
 6    willing to pay the bills and pay them.
 7    Q   Let me ask you to turn to Defense Exhibit 1228.
 8            This is dated January 2nd, 1997.  And it says:
 9            "Dear Larry" -- who was Larry Heppe?
10    A   Larry Heppe developed -- overall became really the
11    president of the Leggett & Platt Foam Group down there.
12    Q   And it says:  (Reading) Dear Larry:  Attached is the
13    proposal for a three-year contract between Leggett & Platt and
14    the Dow Chemical Company.  The three-year commitment
15    incorporates a 75 percent supply position for conventional
16    polyether polyol and other products.
17            So what is this?  Is this -- what -- what's going on
18    here?
19    A   Well, going back to that period, this is looking at it,
20    signing a contract so we know how much volume we were going to
21    be supplying to the different plants that Leggett & Platt had.
22            MR. STREETER:  And if we can highlight that up there.
23    Q   What year is this going to cover?
24    A   That looks like it's going to be '97, '98, '99.  So
25    typically it was a three-year contract that we had put together

 1    with them.

 2            MR. STREETER:  And if we can turn to page 5 of the

 3    document.

 4            If you could highlight this right here:  Also that

 5    part there.

 6    Q   So it says, "Leggett & Platt Urethane.  Dow Contract,

 7    January '97 to December '99.  Summary of Free Material."

 8            And then it has a bunch of different things:  Signing

 9    Bonus; Volume Commitment; Terms Adjustment; Developmental

10    Allowance.  It's has a bunch of dollar amounts, and it has this

11    dollar amount right here:  $1,593,000.

12            What is that?  What is that number?

13    A   Well, that number would be the market price for the polyols

14    and the TDI that we would be selling to them.

15    Q   Summary of Free Material.

16            What is this page here about?

17    A   In reality, when we have signing bonus, TDI, what you would

18    do is give them free goods rather than actual selling them the

19    tank car of TDI or the polyol.  So you'd give them free goods

20    over that time period of three years.

21    Q   Why would you do that?  Why would you give them free goods,

22    what was your purpose in doing that?

23    A   Well, the free goods, of course, was -- we had a margin on

24    the free goods.  I mean, so we had a profit on the free goods.

25    So if you give them free goods you'd know they wouldn't use our

 1    products in those applications and it wouldn't be the net price
 2    or the true price that was listed on invoice.  It wouldn't be
 3    as high as that because there is a margin in that product that
 4    would be retained.  And typically you use the free goods
 5    because you use the free goods, you had to use this much
 6    volume, buy it from us and we'll give you the free goods type
 7    of thing.
 8    Q    It was a way of getting more volume?
 9    A    Keeping the volume and using our products.  And they had to
10    use the material, buy the material then you give them the free
11    goods basically as the signing bonus or their bonus for buying
12    that much material from you.
13    Q    Turning to Defense Exhibit 1227, is this a similar document
14    for the years '94 to '96?
15         MR. STREETER:  Can you highlight that first sentence.
16    Q    What is this?
17    A    "As per our discussion" -- looks like the sales -- with
18    Leggett & Platt you always had a sales contract for over those
19    period of times because they would commit to buying so much
20    material from you.
21    Q    And this is the '94 to '96 period?
22    A    Yes.
23    Q    And I'll ask you to turn to the fourth page of the
24    document:  Look at the bottom.
25         MR. STREETER:  Highlight the bottom.

 1   Q   We've got prices here first.  Can you describe a little bit
 2   about the negotiation process to get to the prices?
 3   A   Well, we looked a little bit at what their volume was,
 4   where their plant locations were and what the competitive
 5   situation was with Leggett & Platt.
 6   Q   When you say the "competitive situation," what do you mean?
 7   A   Well, they'd give us a little bit what their competitive
 8   prices was, what they would be paying other people for those
 9   products.
10   Q   When you say they'd give you information about their
11   competitive situation --
12   A   They'd give us information about what they're paying for
13   products from other people, other suppliers.
14   Q   Got it.
15       And then what would happen?
16   A   Well, they were such a large customer of ours, as you can
17   see we had almost 75 percent of the requirements, and we had
18   grown with them helping them with research projects and
19   everything else, so it was a good fit company that we worked
20   with, so --
21   Q   So what would you do in response to them telling you,
22   here's what the competitor's doing?  What would you do in
23   response to that?
24   A   We'd look at the competitive, and if we worked out the
25   details, we'd meet the competitor's situation.

 1   Q   When you say "meet the competitive situation," what do you
 2   mean?
 3   A   Well, they would have to supply us, and typically you might
 4   send them a letter:  Here what's their price is and they would
 5   have to say, here's what we're paying your competitors, will
 6   you meet that price?
 7   Q   Got it.
 8          MR. STREETER:  And "Incentive Program" at the bottom
 9   of the page, if you could blow that up.
10          The whole thing.  Blow it up.  I mean highlight it.  I
11   apologize.
12   Q   It says:  (Reading) To qualify for quarterly incentive,
13   customer must purchase at least 75 percent of its quarterly
14   requirements from Dow.  During the contract period, should
15   customer purchase products equal or exceed the aforementioned
16   percentage for the products in calendar quarter, Dow agrees to
17   issue customer a 2 percent incentive credit based on the price
18   of the products purchased in said quarter.  The incentive
19   credit should be in the form of customer credit to be supplied
20   toward the purchase of additional products.
21          Do you see that?
22   A   Yes.
23   Q   So what does that mean?
24   A   Well, instead of giving them cash for buying something, we
25   gave them a credit for buying material, living up to the

 1    contract, and then that credit could be used to buy -- to pay
 2    off an invoice and so forth.  So it was a credit against the
 3    invoice, not actually money going out to them.  So you had to
 4    buy -- they got a 2 percent credit and they could apply that to
 5    the invoices due.
 6    Q    Let me ask you the turn to DX-1191.
 7         The jury has seen this document before.  I just want
 8    to ask you a few questions about it.  So first of all, it's
 9    from -- who is that from?
10    A    Joe York reported to -- actually he was more of a personal
11    guy reporting to Larry Heppe.
12         MR. STREETER:  Josh, if you could just highlight the
13    bottom.  Undue that and highlight the bottom.
14    Q    And then who is it to?
15    A    Larry Heppe was sort of the president of the Leggett &
16    Platt Foam Division.
17    Q    Okay.  And you described before the kind of relationship
18    you had with him.
19         MR. STREETER:  If you could highlight that paragraph
20    right there.
21    Q    (Reading) Rick, someone must be signing your name to
22    increase letters without your knowledge again.  I received one
23    this afternoon and promptly sent it to the circle file.  You
24    should check out who is sending this BS and terminate them
25    immediately - before someone reminds us of announced recent

 1   price increases that deteriorate below the existing price.
 2            First of all, what did you understand the circle file
 3   to mean?
 4   A    Garbage can.
 5   Q    And when he says:  "...before someone reminds us of
 6   announced recent price increases that deteriorate below the
 7   existing price," what did you understand that to mean?
 8   A    To me it looks like he was getting a lower price than he
 9   was currently paying from a competitor.
10   Q    And when it says:  "...announced recent price increases
11   that deteriorate below the existing price," what's he saying
12   about what might happen to the price they're paying if you
13   insist on an increase?
14            MR. JOHNSON:  Objection.  Asked and answered.
15            THE COURT:  I don't think so.  I'll allow it.
16            Go ahead.
17            MR. STREETER:  Can you could read back the question.
18            (The record is read.)
19            MR. STREETER:  Let me try --
20   Q    When he says, "...announced recent price increases that
21   deteriorate below the existing price," what did you understand
22   that to mean about what might happen to the price if you
23   insisted on an increase?
24   A    Well, his terminology was, if we increased, the price would
25   fall even further down do what product was currently being sold

 1    to him for.

 2    Q    Then I want to look at the top of this here.

 3         It says --

 4         MR. STREETER:  If we can high height this portion of

 5    the document.

 6    Q    Joe York; who is he?

 7    A    He was actually doing most of the actual purchasing of the

 8    products for Larry Heppe and Leggett & Platt.

 9    Q    He worked at Leggett & Platt?

10    A    He worked in the same office in Fort Worth as Larry.

11    Q    And he's sending an email to Larry Heppe?

12    A    Right.

13         MR. STREETER:  And then if we could blow up that

14    paragraph right here.

15    Q    (Reading) Larry, along this line, I spoke with BASF today

16    and told them we would not accept the price increases before

17    April 1st, 2004.  Any increase at that time would depend on

18    business conditions.  I told David if a supplier was not

19    willing to work with us in this regard we would move the

20    business elsewhere.

21         What do you understand that to mean?

22         MR. JOHNSON:  Objection.  That's not to him.  Is he

23    interpreting somebody else's words here?  The document speaks

24    for itself.

25         THE COURT:  Yeah.  Sustained.

 1   Q   Did you ever have a customer come to you and say:  "If you
 2   insist on this price, we're going to move somewhere else?"
 3   A   Yes.
 4   Q   The last document, Defense Exhibit 1225.
 5           THE COURT:  Mr. Streeter, I just want to get an idea.
 6   How much longer?
 7           MR. STREETER:  This is it.
 8           THE COURT:  This is it?  Okay.
 9           MR. STREETER:  Yeah.
10           Could you blow up the top -- actually if you could go
11   to the last page of it first.  Sorry.  The second to last page.
12   Q   Is that your signature right there?
13   A   Yes.
14   Q   And this is Larry Heppe?
15   A   Yes.
16   Q   And then if we go back to the front page.
17           Was there a time when you had a problem with a product
18   that you sold to Leggett & Platt, an odor problem?
19   A   Yes.
20   Q   And did you ultimately settle that dispute with them?
21   A   Yes.
22   Q   And is this the settlement agreement?
23   A   Didn't read through it all, but we did have an odor problem
24   and we did make a settlement because it impacted their
25   products.

```
 1    Q    And this -- let me just go to the second to last page.
 2              MR. JOHNSON:  Your Honor, I'm going to object to this
 3    examination.  At best this is a legal issue, not one for the
 4    jury.  Perhaps we need a sidebar.
 5              MR. STREETER:  Two things, your Honor.  It's
 6    pre-admitted; and my last question is, I just offer it and then
 7    I'm done.
 8              MR. JOHNSON:  It's not pre-admitted, your Honor.
 9              THE COURT:  All right.  If that's it, then subject to
10    that issue we'll take a recess.  Okay.
11              MR. STREETER:  Okay.
12              THE COURT:  Ladies and gentlemen, we'll recess for 15
13    minutes to 10:30.  We'll see you back at 10:30.
14              Thank you very much.
15              THE DEPUTY CLERK:  Please rise for the Jury.
16              (The Jury leaves the courtroom.)
17              THE COURT:  Mr. Beitel, stay here a minute.
18              THE WITNESS:  I'm sorry.
19              THE COURT:  All right.  You can step down now
20              Well, let's see.
21              What is the objection now?
22              MR. STREETER:  We just want to put the document into
23    evidence.  We're not going to ask him any questions about it.
24    There is a legal issue, but I need to get it into the record
25    and that's all I'm doing.
```

 1            THE COURT:  Well, is it pre-admitted, number one?

 2            MR. JOHNSON:  It is not, your Honor.  We had an

 3    objection to the document.

 4            THE COURT:  All right.  So you have an objection.

 5            MR. JOHNSON:  It is a legal issue.

 6            MR. STREETER:  We had it --

 7            THE COURT:  Wait, don't interrupt, please.  Let's do

 8    one at a time.

 9            MR. JOHNSON:  This was an odor problem -- you've heard

10    about that in other testimony -- that Dow had with their TDI

11    for a time period, and there was a settlement between these

12    parties with respect to that issue.  And there was a general

13    release.  And they're trying to claim that somehow that release

14    is the antitrust claims.  There's a lot of law on that that you

15    can't release antitrust claims unless it's absolutely

16    specifically to the antitrust claims.  That's the legal issue.

17            They can make that argument in a motion, it doesn't

18    need to be a part of the record.

19            THE COURT:  In a motion?  Okay.

20            MR. STREETER:  I just want to clarify something.  Do

21    we have your agreement that with respect to our Rule 50 motions

22    we don't need to put the documents connected to them on these

23    legal issues into evidence.

24            MR. JOHNSON:  No, on this issue.

25            MR. STREETER:  On this issue.

```
 1                  MR. JOHNSON:  This issue alone, yes.

 2                  MR. STREETER:  Okay.  How about the Burtin, Skypark

 3       assignment issue?

 4                  MR. JOHNSON:  No, you're going to have to put that

 5       evidence in.  That goes to something.

 6                  THE COURT:  Can I see the document during the recess,

 7       please?

 8                  MR. STREETER:  Sure.

 9                  THE COURT:  All right.  Then we'll break until 10:30.

10                  MR. JOHNSON:  Your Honor, would you remind the witness

11       that he's not to speak to anyone about his testimony?

12                  THE COURT:  Yeah.  I think the attorneys understand

13       that.

14                  During your examination, you're not to confer with the

15       attorneys about your testimony.  Okay?

16                  THE WITNESS:  Okay.

17                  THE COURT:  Thank you.

18                  (Witness temporarily excused.)

19                  THE COURT:  We'll come back and you'll be ready for

20       cross-examination.  Right, Mr. Johnson?

21                  MR. JOHNSON:  Yes, indeed.

22                  THE COURT:  Okay.

23                  MR. STREETER:  After the witness leaves I think it

24       might make sense for us --

25                  THE COURT:  Go ahead.
```

 1            MR. STREETER:  We're going to want to write to your
 2   Honor about this issue --
 3            THE COURT:  Pull the microphone closer.
 4            MR. STREETER:  On this issue of -- it's a totally
 5   separate issue but it just came up here, and this is the
 6   question:  There are some questions in this case about whether
 7   or not the parties who are suing have the claims, whether or
 8   not they can bring the claims.  They're all legal issues.
 9   They're all about contracts, they're all about assignments,
10   they're all about those kinds of things.  And we're going to
11   write to your Honor about the question whether we need to put
12   that evidence in front of the jury or whether that's just a
13   question for you to resolve whether or not some claim was or
14   was not assigned and whether or not someone owns a claim.  And
15   I don't think it makes any sense for us to be putting in front
16   of the jury contracts and assignments that they can't possible
17   interpret.
18            So we're going to write to you about this but I just
19   wanted to put that out there to give --
20            THE COURT:  Before you start writing to me --
21            MR. STREETER:  Right.
22            THE COURT:  -- I want to know why wasn't this issue
23   previously addressed to the Court?
24            I must have received 14 motions in limine or more from
25   both sides.  This sounds like an issue that should have been

 1    addressed in motions in limine.

 2              MR. STREETER:  It's --

 3              THE COURT:  Don't interrupt me.

 4              MR. STREETER:  My apologies.

 5              THE COURT:  You always do that, Mr. Streeter.  Okay?

 6         I'm just raising one issue.  You know, it sounds like

 7    a lot of -- a number of things that have come up here could

 8    have been anticipated by way of motions in limine that I

 9    addressed about, more than 14.  Okay?  And we didn't timely.

10         This sound like one that should have been addressed

11    pretrial.  That's the first thing.  I don't know what it's

12    about.  Before you start sending in briefs, I'll hear more

13    about it after the break or some time.  Okay?

14              MR. STREETER:  Just so your Honor understands, this is

15    a Rule 50 motion.  It's a directed verdict motion.  It's not a

16    question of a motion in limine, it's a directed verdict motion.

17              THE COURT:  Yeah, but you're telling me it has to do

18    with certain legal settlements and/or documents that -- I don't

19    know whether they're going to be in evidence or not in evidence

20    or not.  So, you know, I'm hearing they're not pre-admitted,

21    and so I'm hearing there's objections to these.

22         So it sounds like an issue that could have been

23    raised, whether it's in part of the Rule 50 or not, earlier

24    than today.

25              MR. STREETER:  But, your Honor, part of it is

 1    dependent upon what evidence they put in at trial.  They have

 2    not put in any evidence to support these assignments at all,

 3    none.  And we want to move for a directed verdict on their

 4    failure in that regard.  That's the issue.

 5              But, your Honor, I think it makes sense --

 6              THE COURT:  Well, you reserved on the directed

 7    verdict.

 8              MR. LUSTBERG:  Exactly.  We haven't filed it, yes,

 9    correct, we haven't filed it.

10              THE COURT:  Correct.  Right?

11              MR. JOHNSON:  Your Honor, the only thing I would say

12    is that these issues could have and should have been raised in

13    a matter of either summary judgment or motion in limine if they

14    are truly just legal issues.  And we certainly don't have an

15    obligation to put in something unless there's a dispute.  And

16    so far I haven't seen any evidence that there's a dispute.

17              THE COURT:  Now you're talking about a motion, you

18    know, a directed verdict motion.  I mean, now you're both

19    talking about that.  And I guess -- I don't know -- I guess I'm

20    anticipating you're going to file a formal motion.  Okay?

21              MR. LUSTBERG:  That's correct, Judge.  Just so it's

22    clear, the rules require us, as I mentioned, that we file it

23    before the jury retires and that's what we'll do.

24              THE COURT:  Well, if you're going to file that motion,

25    since you reserved on it you can file it at any time --

```
 1              MR. LUSTBERG:  Correct.

 2              THE COURT:  -- to give me the benefit of having it and

 3    giving them the benefit of seeing what it is you're saying.

 4    Don't drop it on my desk the day we're going to charge the

 5    jury.

 6              MR. LUSTBERG:  Of course.

 7              THE COURT:  Although I can reserve on it.

 8              MR. BERNICK:  We will be getting those motion to

 9    you --

10              THE COURT:  I can reserve on that too, which I

11    probably will based on the fact that I hear you're going to be

12    submitting a lengthy, probably a lengthy motion.  We'll see.

13              MR. BERNICK:  No, I'm not -- I didn't mean to give you

14    an expression --

15              THE COURT:  I am just trying to say, timing means

16    something.

17              MR. BERNICK:  I understand.

18              THE COURT:  Okay?  We're getting I think close to the

19    end.  I promised this jury we would have it in their hands

20    within six weeks.

21              MR. BERNICK:  We will certainly, we will certainly do

22    that, your Honor.  We know that these things are still coming

23    at you, and I know that we have -- we were -- we weren't ready

24    for the date that you gave us.  There's just no question about

25    it, and we've missed things, we understand that.
```

 1                THE COURT:  Well, I'm a little shocked, to be very
 2      frank with you, and I think you know my annoyance about that,
 3      this case has been out there for 10 years you've been working
 4      on this -- well, you've been working on this -- when was the
 5      Complaint filed?
 6                MR. JOHNSON:  2008.
 7                THE COURT:  Yeah.  So you've been working on this
 8      seven years.  Okay?  You've been doing your depositions.  And
 9      then it sat around.
10                MR. BERNICK:  Yes.
11                THE COURT:  And it sat around because nobody really --
12      you know -- okay?
13                MR. BERNICK:  That's true.
14                THE COURT:  I didn't have it that long, another judge
15      did, and it sat there.
16                MR. BERNICK:  Yes.
17                THE COURT:  I don't mean to be critical but I can
18      understand why because nobody really -- okay.
19                MR. BERNICK:  Right.
20                THE COURT:  Okay.  Well, back in June when I said you
21      had a pretrial trial conference with Judge Falk.  I initiated
22      that with Judge Falk --
23                MR. BERNICK:  Right.
24                THE COURT:  -- and nothing happened.
25                MR. BERNICK:  Well --

 1            THE COURT:  Very little happened.  That pretrial

 2   conference, that Final Pretrial Order is an embarrassment to

 3   both of you.

 4            MR. BERNICK:  All I'll saying, your Honor, the reason

 5   I raise an old -- not an old issue -- but obviously a

 6   troublesome issue from our point of view is that really in a

 7   little bit of fairness, the record in this case and the number

 8   of documents is mind-boggling.  And both sides I think failed

 9   to -- failed to timely do work for the reasons that you've

10   indicated.  But from June going forward there's a tremendous

11   amount of work that got done, and you can just see that there

12   are thousands and thousands of documents, all kinds of

13   testimony.  And as much as we dedicated ourselves to being

14   ready on time, there are some issues that carry forward.  And

15   we understand that, we understand this is an imposition on the

16   Court.

17            THE COURT:  It's clear that that's the case.

18            MR. BERNICK:  Yes.

19            THE COURT:  That's the case.

20            MR. BERNICK:  But we're trying to do our best to only

21   focus on the ones that really, really make a difference.

22            THE COURT:  I'm not prejudging, I'm just saying, I'm

23   trying to give you an idea, you know, there's a time factor

24   coming up in the next few weeks.

25            MR. BERNICK:  Yes.

```
 1              THE COURT:  You know, there's one juror that has a
 2    problem, Juror No. 2.
 3              MR. BERNICK:  We are going to be -- to set your mind
 4    at ease a little bit perhaps, your Honor, I believe that we're
 5    going to be done, done this coming Thursday, maybe even --
 6    maybe even before the end of the day.
 7              THE COURT:  Are you having any rebuttal?
 8              MR. JOHNSON:  There may be some.  It depends primarily
 9    on Dr. Ugone and some of those types of issues.
10              THE COURT:  All right.
11              MR. BERNICK:  So we're really very close.  And the
12    number of issues --
13              THE COURT:  I know you are because I've been keeping
14    track and I know exactly where we are.  Okay?  I'm not being
15    overly -- I'm just saying, when I hear there's issues that were
16    not resolved and that there appears to be some significant
17    dispute, just let me know about them quicker than this is
18    happening.
19              MR. BERNICK:  I know we have a letter to your Honor,
20    they have a letter to your Honor.  I think that's probably one
21    of the last evidentiary matters that --
22              THE COURT:  You're talking about Barbour?
23              MR. BERNICK:  The Barbour thing, yes.
24              THE COURT:  I'll deal with that.  I'll deal with that
25    when we come back, or this morning some time.
```

1           MR. BERNICK:  Thank you.

2           THE COURT:  Fifteen minutes.  Okay?  Twenty of.

3           (A recess is taken.)

4

5      R I C H A R D   L.   B E I T E L, resumes, testifies further as

6           follows.

7

8           (Proceedings resume - Jury not present.)

9           THE DEPUTY CLERK:  Remain seated.

10          THE COURT:  Let's get started.

11          Please, bring out the jury.

12          THE DEPUTY CLERK:  All rise for the Jury, please.

13          (Jury present.)

14          THE COURT:  You can be seated, thank you.

15          All right.  Mr. Johnson, cross-examination.

16          MR. JOHNSON:  Thank you very much, your Honor.

17          Good morning, all.  Nice to see you again.

18                          CROSS-EXAMINATION

19     BY MR. JOHNSON:

20     Q    Mr. Beitel, good morning.

21     A    Good morning.

22     Q    My name is Jeff Johnson.  We've not met before.  Correct?

23     A    Correct.

24     Q    Do you recall that you gave sworn testimony in this case

25     twice:  Once in December 2009 and then again in February of

1    2013?

2    A    In those cases, yes.

3    Q    And each time you met beforehand with Dow's counsel and you

4    reviewed pertinent documents.  Right?

5    A    I recall that, yes.

6    Q    And before you came here today you sat down with Dow's

7    counsel and reviewed pertinent documents.  Right?

8    A    Reviewed documents, yes.

9    Q    We've placed those transcripts from your prior testimony to

10   your left there on the witness stand in case you need that to

11   refresh your recollection.  Okay?

12   A    Okay.  I didn't bring my reading glasses.

13   Q    We'll find a pair for you.  I have two, plus.  Would that

14   work for you?

15   A    We'll see.

16   Q    Okay.  Very good.

17        Most of these will come right up on the screen so you

18   may not even need to look at that.

19   A    Okay.

20   Q    So in your direct examination by Mr. Streeter, you

21   mentioned that oftentimes with these bigger customers you would

22   use free goods as a method of inducing them to give you larger

23   volumes.  Is that about right?

24   A    We used free goods with some of the accounts, yes.

25   Q    Yeah.  And one of the advantages of using free goods is

 1    that you had a profit margin built in there, so it really cost
 2    you less because of the profit that you would have on the
 3    product anyway.  Right?
 4    A    Most of them were delivered after they lived up to their
 5    contract.
 6    Q    Right.  But the fact of the matter of giving free goods, if
 7    you're selling at $.70 a pound, that's not Dow's cost.  Dow's
 8    cost might only be $.50 a pound and therefore it was cheaper
 9    for Dow to give incentives in that fashion.  Right?
10    A    It worked out well for the customer too.
11    Q    Sure, of course.
12         Now, you mentioned that these kind of things did not
13    go to most customers.  Right?
14    A    Correct.
15    Q    This was only for those big customers with big volumes.  It
16    was all about volumes.  Right?
17    A    And the product line.
18    Q    So you also talked a little bit in your examination about
19    the price increase letters.  And when they would go out
20    market-wide, let's say hypothetically, it went out market-wide,
21    it wasn't just a segment.  Okay?  And so a price increase
22    announcement goes out market-wide.  The start of negotiations
23    for all these customers would be whatever that price was, that
24    price increase announcement.  Say you were going up $.06.  The
25    start of negotiations would be at that level.  Correct?

 1   A    Correct, but we didn't always send it to the whole
 2   polyurethane market.
 3   Q    I understand.  I'm just saying hypothetically if it went
 4   out to the entire market, negotiations for all customers would
 5   start at the same place.  Right?
 6   A    Correct.
 7   Q    Let me talk a little bit about your responsibilities and
 8   your reporting relationships.
 9            As I understand it, you were the Sales and Marketing
10   Director for Dow's urethane business in North America from 12/
11   1995 into mid-2000.  Correct?
12   A    2003.
13   Q    It was only to mid-2000 that you were the sales --
14   A    Okay.
15   Q    -- and marketing director for Dow's urethane business.
16   Correct?
17   A    Then I became the Commercial Director which I had the sales
18   responsibility.
19   Q    We haven't gotten there yet.
20   A    Okay.
21   Q    So we've got the first part.  Right?
22            From 12/1995 into mid-2000, you were the Sales and
23   Marketing Director for Dow's urethane business in North
24   America?
25   A    Just the Director of Sales.

 1   Q   Okay.  And then you became the Commercial Director for
 2   urethanes for North America from mid-2000 to 2004.  Correct?
 3   A   Till June 2004, correct.
 4   Q   And you actually replaced Mr. Charles Churet as the
 5   Commercial Director for North America.  Correct?
 6   A   I didn't think I replaced him.
 7   Q   Okay.
 8   A   Do you have a chart?
 9   Q   Let's try --
10   A   I thought it was David Fischer that replaced him.
11   Q   Okay.  Let's try an exhibit.
12       MR. JOHNSON:  Could we bring up PX-524, please.
13   Q   I'll hand you a paper copy in case you need it, but it's on
14   the screen there.  You may find that easier to work with.
15       So in the beginning there, if you -- this is an
16   organizational chart for Dow during the relevant period
17   involved in this lawsuit.  If you look about three quarters of
18   the way down there you'll see Sales and Marketing Director
19   North America, your name, 12/95 to 8/2000.  Do you see that,
20   sir?
21   A   Yes.
22   Q   And that's accurate.  Right, sir?
23   A   I thought I was only the Director of Sales during that
24   period of time.
25   Q   Well, this has been verified by corporate witnesses for

 1    Dow.  But whatever your recollection is, you were at least

 2    Sales Director of North America, right, for that period of

 3    time?

 4    A    Yes.

 5    Q    All right.  And you'll see that Commercial Director North

 6    America a couple of steps above that included Mr. Charles

 7    Churet from 1/1/98 to 7/1/2000.  Correct?  You see that, sir?

 8    A    Yes.

 9    Q    All right.  So if we go to the next page and look about a

10    quarter of the way down there, you'll see that you took over

11    Mr. Churet's position as Commercial Director of North America

12    7/2000 -- that's the same time that Mr. Churet left that

13    position --

14    A    Okay.

15    Q    -- to 7/04.  Correct?  You see that, sir?

16    A    I remember me being the Commercial Director in that period,

17    yes.

18    Q    Okay.  And that was for North America, just like Mr. Churet

19    was Commercial Director of North America prior to you.

20    Correct?

21    A    I guess, yes.

22    Q    Now, Mr. Churet was based in Switzerland while he was the

23    Commercial Director for North America.  Correct?

24    A    In Europe, yes.

25    Q    Let's go to DX-1370.

 1              Once again, it may be easier for you to look on the
 2    screen but I'll give you a paper copy in case you need it.
 3              These are notes prepared by David Underdown.  You
 4    spoke of Mr. Underdown in your direct examination.  Right?
 5    A    Yes, I knew David.
 6    Q    And David was with Hickory Springs.  Correct?
 7    A    Correct.
 8    Q    And he's the -- Hickory Springs is one of the plaintiffs in
 9    this case, and these are notes of Mr. Underdown's relating to
10    phone calls and meetings and written communications he had with
11    you over a number of years when you called on Hickory Springs
12    as a customer of Dow's.  Okay?
13              Now, Hickory Springs, as you mentioned, was a customer
14    of Dow's.  Correct?
15    A    Correct.
16    Q    And in your role as sales director, you would call on Mr.
17    Underdown from time to time.  Correct?
18    A    Hickory Springs, Underdown, yes.
19    Q    Okay.  If you would turn to page 7 of DX-1370, 007, in this
20    exhibit, you see about halfway down the page that Mr. Underdown
21    reports that he had a phone call with you on May 5th, 2000 at
22    8:35 a.m.
23    A    Okay.
24    Q    Do you see that, sir?
25    A    It's highlighted.  I can read it, yes.

1    Q   Good.  Excellent.

2            In the last paragraph of that entry, Mr. Underdown

3    wrote, quote:  Major reorganization.  Charles and Phillipe not

4    involved in biz after May.  Rick will have more say.  Control

5    moves back to U.S.  Should be announced next Wednesday, closed

6    quote.

7            Now, "Charles" is a reference to Charles Churet.

8    Correct?

9    A   Correct.

10   Q   And this refers to the reorganization at Dow that led you

11   to replacing Mr. Churet as Commercial Director in North

12   America.  Correct?

13   A   I guess so, yes

14   Q   And it was at this point in time that control of Dow's

15   polyurethanes business moved back to the U.S. from Europe.

16   Correct?

17   A   No.  The business was controlled by the business managers

18   in North America --

19            THE COURT:  Mr. Beitel, speak into the microphone,

20   please.

21            THE WITNESS:  I thought I was.  Okay.

22            THE COURT:  You can pull it closer to you.

23            THE WITNESS:  Sorry.

24            MR. STREETER:  The witness was in a middle of an

25   answer.  I would like him to finish the answer.

 1    A    Could you ask the question again, please?

 2    Q    Sure.  It was at this point in time as reported in this

 3    telephone call from Mr. Underdown that control was moving back

 4    to the United States.  Correct?

 5    A    The control of what was happening in the United States

 6    never left the United States.

 7    Q    Okay.  So are you telling me that Mr. Underdown got it

 8    wrong here when he said:  "Rick will have more say.  Control

 9    moves back to U.S."?

10    A    The control always moved up to Bob Wood in the U.S., that's

11    where the top of the level was.

12    Q    Isn't it a fact, sir, that prior to this reorganization,

13    control was from Mr. Churet in Europe, sir?

14    A    No, it was a team that controlled what was going on in the

15    business.

16    Q    Okay.  We'll come back to that in a bit.

17         As the commercial director, you had responsibility for

18    the sales and some responsibility for marketing of urethanes.

19    Correct?

20    A    Correct.

21    Q    And the salespeople who reported to you were responsible

22    for large customer accounts like Carpenter, Woodbridge, Vita,

23    et cetera.  Right?

24    A    Not necessarily Vita because that was an account that was

25    in Canada, so the sales organization had to report up to the

1    Canadian organization not to me in the U.S.

2    Q    But certainly Carpenter and Woodbridge.  Right?

3    A    Carpenter and Woodbridge, Leggett & Platt, yes.

4    Q    Woodbridge, for example, was one of Dow's largest counts?

5    A    Well, Woodbridge still reported to Canada too.

6    Q    You tried to develop strong person relationships with these

7    customers.  Correct?

8    A    I was brought in by the people in Canada to meet with them

9    because of me being so heavily involved in urethanes in the

10   U.S., yes.

11   Q    And you had, as you've testified on your direct, many

12   personal interactions with your customers.  I think there was

13   one you even stayed at his house.

14   A    More than one, yes.

15   Q    Okay.  Now, competitor interactions for you were a

16   different thing.  Right?  You didn't have very many of those?

17   A    Competitive interactions?

18   Q    Correct.

19   A    No.

20   Q    I think that you testified that while you were the

21   commercial director, you had a small number of communications

22   with Mr. Bernstein of BASF because BASF purchased polyols from

23   Dow.  Correct?

24   A    Correct.

25   Q    In your words, these were infrequent communications.

 1    Correct?

 2    A    Infrequent communications in regards to their business, but

 3    frequent communications with regard to him being the Chairman

 4    of the Steering Committee of the API where I was vice chairman.

 5    Q    I haven't gotten to the associations yet.

 6    A    Sorry.

 7    Q    I'm just talking about the business about them being a

 8    customer of Dow's at the time period.  You characterized those

 9    communications as infrequent.  Correct?

10    A    Correct.

11    Q    And you were not like some others in this case, you weren't

12    responsible for co-producer arrangements like swaps, that kind

13    of thing.  Right?

14    A    Correct.

15    Q    Swaps were handled by employees who worked in the supply

16    chain function.  Right?

17    A    Supply chain, but also with the business managers.

18    Q    And the supply chain people were not a part of your sales

19    group.  Right?

20    A    Correct.

21    Q    So a competitor would have no reason to call you about a

22    co-producer arrangement.  Right?

23    A    Correct.

24    Q    And you mentioned in your last answer, which I said I would

25    get to, that you had some contact with Dow's competitors in

 1    connection with the Alliance for Polyurethanes Industry trade

 2    association.  Right?

 3    A    Correct.

 4    Q    For example, Mr. Geaman of Huntsman --

 5              MR. JOHNSON:  You have him there?

 6              Yeah, there he is.

 7    Q    -- he was on the board of the API when you were vice chair,

 8    chairman and chairman of the API.  Correct?

 9    A    Yes, I recognize him and know the name.

10    Q    And Mr. Geaman performed functions similar to yours at

11    BASF.  Correct -- rather, rather at Huntsman.  Correct?

12    A    Yeah, he was with Huntsman.

13    Q    Yes.  And he performed functions similar to yours.  Right?

14    A    Not exactly sure but I assume similar.

15    Q    Well, let's take a look at your deposition, page 74, lines

16    four through 8.

17              (Reading) QUESTION:  As to Bayer, who did you look to

18    as performing functions similar to yours?

19              ANSWER:  Didn't know.

20              As to Huntsman?

21              ANSWER:  Greg Banks or Greg Geaman.

22              Is that an answer you gave?

23    A    Yes.

24    Q    So you would agree that Mr. Geaman performed functions

25    similar to yours at Huntsman.  Correct?

 1    A    I assume that, yes.

 2    Q    But all of your communications, all of your communications

 3    with Mr. Geaman dealt with the API, nothing else.  Right?

 4    A    Correct.

 5    Q    The same with Greg Banks of Huntsman; he also performed, as

 6    we just saw your answer before, functions similar to yours with

 7    respect to TDI.  Correct?

 8    A    I assume.  Not sure.

 9    Q    And the only communications you've had with Mr. Banks

10    involved seeing him at Polyurethane Foam Association meetings,

11    and I believe you testified once you were both guests of

12    Flexible Foam at a convention in Las Vegas in 2002 or '3.

13    Correct?

14    A    I remember that, yes.

15    Q    Now, from time to time you attended social outings with

16    Dow's competitors, such as golf and dinners.  Correct?

17    A    The only one I played golf with would have been at BASF

18    because we were supplying products down there in Michigan.

19    Q    Yes.  I think you played golf with Bill Bernstein of BASF

20    on the Island Course in Wyandotte, Michigan.  Right?

21    A    Right.

22    Q    Okay.  And you also had dinners from time to time with

23    these competitors in connection with association meetings and

24    the like?

25    A    When you had an association meeting like the API, you met

 1    for a couple of days, so in between there was a dinner

 2    arrangement.

 3    Q   And over time you and Mr. Bernstein became friends.

 4    Correct?

 5    A   Correct.

 6    Q   Let's talk about reporting relationships now.

 7         You reported to David Fischer.  Correct?

 8    A   During that period of time.

 9    Q   Mr. Fischer was the vice-president in charge of

10    polyurethanes.  Correct?

11    A   In that certain time period, yes.

12    Q   And Mr. Fischer reported to Bob Wood who was the business

13    group president.  Right?

14    A   Correct.

15    Q   And during the time -- I think you mentioned this -- that

16    during the time that you were the commercial director,

17    Stephanie Barbour also reported to Mr. Fischer as the business

18    director for MDI and ridged and CASE polyols.  Right?

19    A   Yes.

20    Q   And Mr. Levi reported to Mr. Fischer as the business

21    director for TDI and flexible polyols.  Right?

22    A   And flexible molded I think.

23    Q   All right.  Let's jump forward a moment to 2004.

24         In early 2004, a lot of people in the urethanes

25    business at Dow were either fired or left.  Correct?

 1    A    Correct.

 2    Q    I think you said that 12 of the 16 people within your group

 3    had been eliminated.  Correct?

 4    A    I guess that's the number.

 5    Q    That sound about right to you?

 6    A    That sounds about right, yes.

 7    Q    And one of those people that was fired was David Fischer.

 8    Right?

 9    A    Correct.

10    Q    At some point during this early 2004 period, did you become

11    aware of an investigation within Dow into urethane antitrust

12    issues?

13    A    No.

14    Q    Mr. Fischer testified that in connection with his

15    termination --

16              MR. STREETER:  Objection, your Honor.  The witness --

17              THE COURT:  Let me hear the question.  Let me hear the

18    question.

19    Q    In connection with his termination in early 2004, that Dow

20    HR informed him that he was being investigated for improper

21    activities with competitors.  The jury has heard this

22    testimony.  I'd like to show it to you now.

23              MR. STREETER:  Objection, your Honor.  The witness

24    said he knew nothing about it.

25              THE COURT:  Okay.  You can ask him, without referring

1    to the testimony, you can ask him if he knew about that.

2              MR. STREETER:  Your Honor, he already said he didn't

3    know anything about it.

4              THE COURT:  Well, if he wants to ask some other

5    questions, go ahead.

6    BY MR. JOHNSON:

7    Q    Sir, you were not aware that Mr. Fischer was under

8    investigation at Dow for improper activities with competitors?

9    Is that your testimony, sir?

10   A    No, I was not aware of that.

11   Q    Okay.  Do you recall whether you, sir, were interviewed by

12   anyone at HR or Legal about improper activities with

13   competitors?

14             MR. STREETER:  Objection.

15             THE COURT:  I'll allow that.  Overruled.

16   Q    You may answer, sir.

17   A    No, Legal didn't ask me those questions, no.

18   Q    Now, you were terminated by Dow in June of 2004.  Correct?

19   A    Correct.

20   Q    And by the time you were terminated in mid-2004, Mr. Wood,

21   Mr. Fischer, Mr. Levi and Ms. Barbour had been removed from

22   their positions in polyurethanes.  Correct?

23   A    I believe -- would you repeat the names again?

24   Q    Sure:  Mr. Wood, Mr. Fischer, Mr. Levi and Ms. Barbour.

25   A    Bob Wood left in 2003.

1   Q   Correct.  But he was also gone by then too.  Right?

2   A   Yeah, he left in 2003, yes, he was gone.

3   Q   And I believe you said actually at some point later you

4   went back to work for him?

5   A   Correct.

6   Q   And for the first part of 2004, you were still around

7   mainly in a transitioning role.  Correct?

8   A   Yes.

9   Q   Let's go to those price increase announcements.

10          You were involved in decisions when to issue price

11  increase announcements and by how much.  Right?

12  A   I was involved in the committee that discussed it, yes.

13  Q   And, in fact, you signed most of the price increase

14  announcement letters that Dow sent out to its customers.

15  Correct?

16  A   Correct.

17  Q   Now, Mr. Fischer, your boss, was actively involved in

18  pricing decisions on urethanes as well.  Correct?

19  A   It was a team effort where he was sometimes the lead with

20  the product people and myself, yes.

21  Q   Okay.  Was he, in fact, actively involved in pricing

22  decisions on urethanes as well?

23  A   It was urethanes he was involved in, yes.

24  Q   Actively involved.  Right?

25  A   Decisions on when to raise the price and what to be, yes.

 1   Q   And over the course of 1999 to 2003, you estimated that you

 2   were successful in achieving the full amount of the price

 3   increase announcements 40 to 50 percent of the time.  Correct,

 4   sir?

 5   A   I was -- that was in the testimony, and I would have to say

 6   that that wasn't really that accurate, no.

 7   Q   Okay.  Let's take a look at that testimony at page 3549 of

 8   the February 2013 testimony at 15 through 20:

 9              (Reading) QUESTION:  And over the course of 1999 to

10   2003, how successful were you in achieving the full amount of

11   the price increase announcements that you sent out?

12              ANSWER:  I'm not exactly sure.  40 to 50 percent of

13   the time.

14              You see that answer, sir?

15   A   Yes.  I'd have to say that that wasn't really accurate.

16   Sorry.

17   Q   At other times you were successful in achieving some

18   portion of the price.  Correct?

19   A   Some portion.  Sometimes we didn't receive any of it.

20   Q   And sometimes you achieved a portion and sometimes you

21   achieved it tall.  Correct, sir?

22   A   Sometimes all, sometimes a portion, sometimes none.

23   Q   When you took over as commercial director in 2000, there

24   was a lot of pressure to try to increase prices and increase

25   margins.  Correct?

 1    A    Correct.

 2    Q    Around 2000, 2001, there was a change in management and the

 3    pressure became very aggressive.  Correct?

 4    A    2001, 2002 were really poor profitability years, yes.

 5    Q    Could you answer my question, sir?

 6    A    Would you repeat it, please, then?

 7    Q    Sure.  Around 2000, 2001, there was a change in management

 8    and the pressure became very aggressive.  Correct?

 9    A    I thought Bob Wood was still there and so was David

10    Fischer.

11    Q    Let's take a look at your deposition.

12              Page 132, lines four through 9:

13              (Reading) QUESTION:  During this period of time, the

14    2001 to 2001 period of time until you left, did you get a lot

15    of pressure from the people above you to improve your margins?

16              ANSWER:   There was a change in management and the

17    pressure became very aggressive.

18              Do you recall being asked that question and giving

19    that answer?

20    A    No, I don't remember the question or the answer, but it's

21    relatively true, yes.  There was a change in management and the

22    pressure became very aggressive, yes.

23    Q    Let's step back to 1999 for a moment.  Let's take a look

24    again at that DX-1370, those were the notes of Mr. Underdown at

25    Hickory Springs about conversations with you that we were

 1    looking at earlier.

 2           If you turn to the page 9, do you see near the bottom

 3    of the page an entry for a meeting between you and Mr.

 4    Underdown on March 23rd, 1999 at 3:30 p.m.?  Do you see that,

 5    sir?

 6    A    Yeah.  It's highlighted now, I can read it.

 7    Q    Mr. Underdown wrote, quote:  Rick -- that would be you.

 8    Right?

 9    A    Correct.

10    Q    -- (Reading) Rick says that as of 8:25 a.m. this morning,

11    Dow's polyol and TDI prices will be up $.06 pound April 1,

12    closed quote.

13    A    Okay.

14    Q    You don't have any reason to doubt the accuracy of what Mr.

15    Underdown reported here, do you, sir?

16    A    It's 1999, but with -- I really -- the price had to go up

17    April 1st, okay?  So 3/23, probably saying that the prices were

18    going up, yes.

19    Q    And so do you recall as it says here, that Dow had

20    announced the price increase to Hickory Springs for TDI and

21    polyols for April 1, 1999?

22    A    It would have been for April '99 on a quarterly basis, yes.

23           I don't see that there though.

24    Q    It's not there.  But you're pretty certain it happened

25    given this entry in his notes?

1    A    Well, it looks like he's saying something on March 23rd, so

2    we announced a price increase for April 1st, so we're saying

3    the prices are up, yes.

4    Q    Mr. Underdown reports that you told him that you were,

5    quote, on the phone with Charles -- I guess that's Charles

6    Churet.  Right?

7    A    Yeah, spelled wrong but that's him.

8    Q    A phonetic spelling there, huh?  And thought -- and thought

9    he had him convinced to hold up the price increase, but he

10   failed.

11        That would be "you failed."  Right?

12   A    (After pause) I guess I'm reading through that.  Let me

13   read it again.

14        He said he was on the phone and then -- and thought he

15   had him convinced --

16   Q    "He" is "you" there, sir.

17   A    Okay.

18   Q    He is Rick.

19   A    Okay.  I'm rereading it.  I'm sorry.

20   Q    He's reporting on what you're telling him.

21   A    Okay.  I'm rereading it.  Okay?

22   Q    Sure.

23   A    He said he had -- he thought he had him convinced to hold

24   up the price increase, but he failed.  So...

25   Q    You had tried to convince Mr. Churet to hold up on the

```
 1    4/1/99 price increase.  Right?  That's what Mr. Underdown is

 2    reporting?

 3    A   Well, looks like I'm trying to hold up not increasing the

 4    price (sic), but I failed.  Okay?

 5    Q   Yes, you failed.

 6         You were unable to persuade Mr. Churet, and he decided

 7    to move forward with the price increase anyway.  Correct?

 8    A   Well, in order to get the price increase he had to have the

 9    committee agree to it.

10    Q   Well, that may be true, sir.  But the fact of the matter

11    is, you went to Mr. Churet and tried to get him to hold up on

12    the price increase according to these notes.  Correct, sir?

13    A   Okay.  I guess I was reading it -- I was reading that we

14    hold up the price increase, keep the $.06 up.

15    Q   No, sir.

16    A   Okay, I was reading it wrong.  I'm sorry.

17    Q   Okay.  You understand now that you went to Mr. Churet and

18    tried to convince him not to raise the price?

19    A   To not raise the price.

20         MR. STREETER:  Your Honor, I'm going the put an

21    objection in here.  This is a document that --

22         THE COURT:  No, no, no.  Overruled.  I'll allow this

23    line of questioning.

24         Go ahead.

25    Q   Now, sir, this was the time period when Europe, Mr. Churet
```

 1   was calling the shots on North American price increases.

 2   Correct?

 3   A    He had to work through his team.  It was not individual

 4   announcing price.  He had to get approval from the lawyers,

 5   also from the -- his two business guys --

 6   Q    Wherever he had to get approval of --

 7            MR. STREETER:  I object.

 8   Q    -- you were going to him --

 9            MR. STREETER:  Your Honor, objection.  The witness was

10   in the middle of an answer.

11            THE COURT:  All right.  Go ahead, Mr. Beitel, go

12   ahead, answer it.

13   A    In order to get a price increase Charles Churet might have

14   been in charge of the thing but he still had to get approval

15   from the business guys of running the business in North America

16   along with getting approval from Bob Wood.

17   Q    You didn't seek to stop the price increase by going to talk

18   to the business guys, you went to Charles Churet, didn't you,

19   sir?

20   A    You know, I hate to tell you this, it's so long ago, I

21   don't recall doing that.  But it might have been we all agreed

22   to a price increase and I went back and said it wasn't going to

23   fly at that particular time in April.

24   Q    Let's turn to the next page, maybe we'll refresh your

25   recollection here a little bit.

 1    A    1999?

 2    Q    So if you turn to the next page, on page 10 about halfway

 3    down the entry, starting with the "he again stated there."

 4    Yeah.

 5             The next couple of sentences there.

 6             He again stated:  (Reading) That us -- Hickory

 7    Springs -- taking 10 million pounds of polyol and four million

 8    pounds of TDI from them -- Dow -- was helping his case because

 9    this is not the right time to increase prices with Bob Wood and

10    Charles.  That's Charles Churet.  Right?

11    A    Right.

12    Q    So what you were actually suggesting here to Mr. Underdown

13    is that he take business away from Dow to make a point with Bob

14    Wood and Charles Churet.  Correct, sir?

15    A    I don't know the whole paragraph in there.

16             He again stated that he was -- us taking 10 million

17    pounds plus -- from them -- was helping the case that this is

18    not the right time to increase price -- oh, so Hickory was

19    taking the business away from us.

20    Q    Yes, sir.

21             And you suggested that that was helping your case;

22    helping his case, that this was not the right time to increase

23    prices with Bob Wood and Charles Churet.  Right?

24    A    I was getting feedback from the customer that if we did

25    that we'd lose that much business, so I'm undoubtedly feeding

 1    it back to Bob Wood and Charles Churet.

 2    Q    You were going to go back to the bosses and say, we just

 3    lost business, this is not the right time for the price

 4    increase.  Right?

 5    A    I was feeding back information of what the customer was

 6    telling me, yes.  I was not the decision-maker.

 7    Q    And you didn't agree with Mr. Churet or Mr. Wood because

 8    you thought it wasn't the right time for Dow to increase

 9    prices.  Right?

10    A    It looks like with this documentation in '99, probably the

11    timing was wrong, yes.

12    Q    Now, Mr. Underdown responded to you, quote:  I told him --

13    that would be you -- that this was exactly what I feared when

14    they -- meaning Dow -- moved their polyurethane management to

15    Europe.

16          And that was, in fact, the case:  Dow had moved its

17    polyurethane management to Europe?

18    A    Only the one individual.  The rest of the business team

19    still stayed in Midland, Michigan.

20    Q    And that one individual, the man in charge was Charles

21    Churet.  Correct, sir?

22    A    For that short period of time he was in charge reporting to

23    Bob Wood, who was the real boss.

24    Q    It's fair to say that Mr. Underdown was critical of Dow's

25    polyurethane management in Europe, and Mr. Churet specifically.

1    Correct, sir?

2    A    Correct.

3    Q    Mr. Underdown was critical of Dow's management because Dow

4    was trying to push through price increases that he felt were

5    unwarranted.  Correct?

6             MR. STREETER:  Objection.  Your Honor, there's no

7    foundation for that.

8             THE COURT:  No, it's cross-examination.  He can ask

9    him, if he can answer it.

10            Go ahead.

11   Q    Go ahead, sir, you can answer.

12   A    I thought they felt any increase was unwarranted, Hickory

13   Springs.

14   Q    I'm talking about this case in particular.  He was critical

15   of Dow's management being in Europe, he was critical of this

16   price increase.  Correct, sir?

17   A    Charles Churet was in Europe, the rest of the management

18   with Bob Wood was in Midland, Michigan though.

19   Q    I understand that, sir.  But in this communication between

20   you two, Mr. Underwood was critical --

21   A    Of Charles Churet.

22   Q    -- of Charles Churet?

23   A    Right.

24   Q    And this price increase in particular.  Correct, sir?

25   A    Looks like it, yes.

 1   Q   And you agreed with Mr. Underdown.  Correct?

 2           And I said "Underwood" a moment ago.  Too much "House

 3   of Cards."

 4   A   Okay.

 5   Q   And you agreed with Mr. Underdown.  Correct?

 6   A   Going back that far, looks like the timing wasn't right to

 7   get an increase in the middle of the year, yeah.

 8   Q   Okay.  Now, Stephanie Barbour testified in this case that

 9   there was an incident, and she pegged it at about 1998 to 1999

10   when Mr. Churet was the commercial director for the U.S. in

11   Europe, and when Mr. Churet came to Dow's offices in Midland --

12   you mentioned he came to Midland from time to time.  Right?

13   A   Right.

14   Q   And apparently Mr. Churet was insisting on a price

15   increase.

16           She says that you and her argued against the price

17   increase because you and her didn't think the price increase

18   was supported by supply and demand.

19           Do you remember that, sir, with Mr. Churet arguing

20   against the price increase with Stephanie Barbour?

21   A   I remember arguing times about not having a price increase

22   at those periods of time, yes.

23   Q   And indeed her testimony is consistent with what Mr.

24   Underdown is reporting here.  Correct, sir?

25           MR. STREETER:  Objection.

 1    A    I --

 2              THE COURT:  No.  Overruled.  Go ahead.

 3    A    What did she say?

 4    Q    She said that you two were arguing against Mr. Churet about

 5    instituting a price increase because supply and demand factors

 6    didn't support the increase.

 7    A    Made sense to me that we -- she was running part of that

 8    business, so her along with other people would be arguing about

 9    when to do it and so forth.  They had the bottom line

10    responsibility.

11    Q    And you were one of the people arguing against it, because

12    supply and demand didn't match -- didn't justify a price

13    increase.  Correct?

14    A    Correct.  And I'd have to do with it the customers because

15    I was involved with selling the product.

16    Q    And you were the front line guy.  Right?

17    A    Correct.

18    Q    And Mr. Churet could sit back and say:  Institute the price

19    increase.  He didn't have to deal with Mr. Underwood.  Right?

20    A    He didn't have to deal with certain of the customers, yes.

21    Q    Underdown.  Excuse me.

22              Did you know that Mr. Churet was pushing price

23    increases because he was having pricing discussions with Dow's

24    competitors at trade association meetings?

25    A    No, I did not.

 1    Q    Now, if we move up in that paragraph on page 10 of Mr.
 2    Underdown's notes, he writes, starting with "Foamex is in
 3    trouble," He writes:  (Reading) Foamex is in trouble because
 4    Dow has them at 50 percent allocation and they cannot get all
 5    they want from anybody else.  He said BASF is Foamex's second
 6    largest TDI supplier.  He said that Foamex is trying to save
 7    themselves by driving the cost of chemicals down and trying to
 8    make sure that it only happens there.  Said it won't happen.
 9    Anything that goes on at Foamex will get passed to everyone
10    else sooner or later.  Said this won't get settled out anywhere
11    until everyone settles with Foamex.
12         Do you recall that conversation, sir?
13    A    No, I don't.
14    Q    Well, Dow was trying to get prices up at Foamex.  Correct?
15    A    Like everyone else, yes.
16    Q    And Dow was Foamex's biggest TDI supplier.  Correct?
17    A    At the time, yes.
18    Q    And BASF was Foamex's second largest TDI supplier.
19    Correct?
20    A    They had more than one supplier, I just don't know which
21    one was number two and which was number three.
22    Q    And Foamex was in trouble here because they couldn't get
23    enough TDI supply.  Right?
24    A    Undoubtedly the TDI market was tight.
25    Q    And Foamex was trying to get this better TDI price, but you

1    reported to Mr. Underdown, you said:  It won't happen.

2         You see that, sir?  "Said, it won't happen."  That's

3    you, isn't it, sir?

4    A    Telling Underdown that it won't happen.  Right?  Is that

5    what you're saying?

6    Q    Correct.

7    A    I guess I said it back there.  I don't know.

8    Q    And he goes on reporting your discussion with him:

9    (Reading) If Dow and BASF got prices up at Foamex, it would

10   only be a matter of time until other customers' prices went up,

11   too.

12        Correct?

13   A    You had to announce a price increase to everybody at the

14   same time.  So you couldn't do one without the others because

15   you had to do it on a quarterly basis and announce that your

16   TDI price was going up.

17   Q    And that's exactly what actually happened eventually,

18   right, Dow's prices went to Foamex and everybody else on July

19   1, 1999.  Correct?

20   A    I can't remember July 1, 1999, I'm sorry.

21   Q    Well, if you look-back at page 8 of Mr. Underdown's notes,

22   7/26/1999, a call at 3:27 p.m., you go down to -- in the first

23   paragraph towards the end:  "Dow gave Foamex chems at old price

24   in June and prices up $.06 July 1."

25        You see that, sir?

 1    A    Yes.

 2    Q    Does that confirm for you that, in fact, that's what

 3    happened and everybody's prices went up because you got the

 4    prices at Foamex up $.06 a pound.  Right?

 5    A    July 1st, 1999 is too long for me to remember exactly what

 6    happened to everybody else, I'm sorry.

 7    Q    But you don't have any reason to doubt the accuracy of what

 8    Mr. Underdown down is reporting here, do you?  These are your

 9    conversations with him.

10    A    (Reading/mumbling) Announce a major restructuring August,

11    said that they would write office in September, Dow gave Foamex

12    at the old price in June, price is up -- well, we're talking

13    the price went up July 1st, yeah.

14    Q    Okay.  Let's move forward now to 2000.

15         Let's take a look at PX-707.  This is a document that

16    was produced from Dow's files.  First, if you turn to the

17    second page, do you see your name there?

18    A    Correct.

19    Q    The title of this document in the front is "Price Recovery

20    2000."  Do you recognize this as a memorandum that you

21    prepared?

22    A    Probably would help.

23    Q    Do you recognize it?  I mean, it's got your name on it.  It

24    may be too long ago.

25    A    Yeah, it's almost 16 years ago.

 1   Q   Right.  But it's got your name on it.  You probably
 2   prepared the memo?
 3   A    Involved in preparing the memorandum.
 4            THE COURT:  Mr. Beitel, you have to speak into the
 5   microphone.
 6            THE WITNESS:  I'm sorry, sorry.
 7            THE COURT:  You can pull the microphone closer, it
 8   moves.  The base of the microphone.
 9            JUROR NO. 4:  Thank you.
10   Q   Okay.  Just to make sure, you don't have any reason to
11   doubt that this is something that was either prepared by you or
12   at your direction?
13   A   When you have documents like that, you have communication
14   people helping you prepare the documents.  I don't sit at my
15   desk writing out long things like that.  So there's data and
16   communication that goes back-and-forth, just the information to
17   get it looking good.
18            MR. JOHNSON:  Move the admission of PX-707.
19            THE COURT:  No objection?  It's --
20            MR. STREETER:  No objection.
21            THE COURT:  All right.  It's in evidence then.
22   Q   I will represent to you that the metadata data from this
23   document indicates that it was created on June 26, 2000.  All
24   right, sir?  You prepared this shortly --
25   A   I can't.

```
 1    Q    -- after you took over as the commercial director -- I'm
 2    sorry?
 3    A    I can't see anything.
 4              THE COURT:  He's having --
 5    Q    Oh, it doesn't have a date on it.  When I said the
 6    "metadata data," that's the electronic data underlying this
 7    document --
 8    A    Okay.
 9    Q    -- shows that it was created on June 26th, 2000.
10              MR. STREETER:  Your Honor, counsel is now testifying.
11    This is not evidence.
12              THE COURT:  Do you dispute that?
13              MR. STREETER:  I don't know.  I don't have the
14    metadata data in front of me.
15              MR. JOHNSON:  Here's the metadata.  You can look at
16    it.
17              THE COURT:  Based on that representation, go ahead,
18    ask the question.
19              MR. JOHNSON:  Thank you, your Honor.
20    BY MR. JOHNSON:
21    Q    You prepared this shortly after you took over as commercial
22    director in North America, right, given that date, June 26,
23    2000?
24    A    I'm assuming that's the date I became commercial director.
25              THE COURT:  Mr. Beitel, you're going to have to move
```

```
1     that microphone closer to you.  No, it goes -- it bends down a
2     little bit.
3                  THE WITNESS:  Okay.  It bends down like this?
4                  Like this?  Sorry.
5                  THE COURT:  And speak into that, please.
6                  THE WITNESS:  Sorry?
7                  THE COURT:  Okay.
8     A     The question again, please?
9     Q     Yes.
10                 If you look at the first paragraph of the price
11    recovery 2000 memo, you say that, starting with the second
12    sentence:  You say that Dow announced a price increase on
13    polyols and TDI effective April 1, and that, quote, these have
14    had a partial success in certain market segments, closed quote.
15                 You see that, sir?
16    A     Now I see it, yes.
17    Q     And that was a true statement.  Right, sir?
18    A     I assume it was, yes.
19    Q     You then said that Dow was entering a new phase of price
20    increases that you started May 15th, 2000, with increases on
21    polyols, $.07 a pound; TDI $.07 a pound; MDI $.08 a pound.
22    Right?
23    A     And systems, $.07 a pound, yeah.
24    Q     Yeah, Systems is not really relevant to our discussion.
25    A     Okay.
```

 1   Q   So this was the current state of play when you wrote this
 2   on June 26, 2000.  Right?
 3   A   I assume it was, yes.
 4   Q   And you also wrote in the second paragraph:  "We have had
 5   strong support by our two major competitors, Bayer and BASF, in
 6   their market segments." Correct?
 7   A   Correct.
 8   Q   Is that consistent with your recollection that Bayer and
 9   BASF were strongly supporting Dow's price increases?
10   A   The period there, 2002 -- 2000 -- was a very low period for
11   pricing, so, yes, I would assume that they were following
12   someplace or leading.
13   Q   And you write further, and you actually underline it in the
14   third paragraph:  "We need these price recoveries."  Correct?
15   A   Correct.
16   Q   And a little bit later in the next paragraph down at the
17   end you underline:  "We must change this erosion in
18   profitability for our business."  Correct?
19   A   Correct.
20   Q   Okay.  So, do your comments here reflect the pressure that
21   you spoke about to us earlier, that Dow was under -- was
22   placing you under pressure to increase margins and call in the
23   polyurethane business when you took over as commercial
24   director?
25   A   Taking over commercial director I had responsibility for

1    sales and marketing, so the team would tell me:  Here what's

2    you need to do from a marketing and sales standpoint to

3    increase our margin.

4    Q    And my question to you simply is:  Does this memo reflect

5    that pressure you talked about earlier, getting very aggressive

6    on raising prices?

7    A    During that time period, yes.

8    Q    Let's take a look now at PX-176.  Sir, I'll represent to

9    you that this is a folder of Bill Bernstein's documents

10   relating to BASF's customer Woodbridge who is plaintiff in this

11   case.

12        Now, Woodbridge, as I think we established earlier,

13   was a Dow customer in August of 2000.  Correct?

14   A    I assume they were still a customer then, yes.

15   Q    If you turn to page 4 of this exhibit --

16        MR. JOHNSON:  And highlight the top line there.  Yeah,

17   that's fine.

18   Q    Mr. Bernstein testified that these were his own handwritten

19   notes --

20        MR. STREETER:  Objection, your Honor.  Foundation.

21   It's a document written by Mr. Bernstein.  The witness has

22   never seen it.

23        THE COURT:  Sustained, Mr. Johnson.

24   Q    Do you see at the top of the page next to the date August

25   3rd, 2000, Mr. Bernstein on those dates called out the price --

1             MR. STREETER:  Your Honor, there's an objection.

2             THE COURT:  Go ahead.

3             MR. STREETER:  -- which I understand has been

4    sustained.

5             THE COURT:  Yeah.

6    Q   My question to you, sir, is:  Were you the person at Dow

7    Mr. Bernick called about prices not up in August?

8             THE COURT:  Without referring to that, ask him the

9    question.

10             MR. JOHNSON:  Sure.

11    Q   Did you call, sir, Mr. Bernstein in August of 2000 about

12    prices not being up in August?

13    A   Sorry, I don't recall what happened August 2000.

14    Q   Okay.  Do you recall talking to Mr. Bernstein about not

15    getting your prices up in August at all?

16    A   Bernstein was a customer we sold product to.  So it could

17    be that I didn't get his prices up.

18    Q   Let's turn to PX-307.

19             This is an email from you to Marco Levi, David Fischer

20    and others at Dow dated August 6th, 2000.

21             Do you see that, sir?

22    A   Yes.

23             MR. JOHNSON:  I move the admission of PX-307.

24             MR. STREETER:  No objection.

25             THE COURT:  All right.  It's in evidence then.

 1  Q   You wrote this email in response to an email below from Mr.

 2  Levi dated August 4th, 2000.  Correct?

 3  A   Yes, I assume.

 4  Q   In terms of timing, you wrote your email three days after

 5  Mr. Bernstein made that notation on the Woodbridge file that we

 6  looked at a moment ago, just in terms of timing.  Do you

 7  understand that, sir?

 8  A   I assume.

 9  Q   Okay.

10  A   I didn't see it.

11  Q   Now, at this point in time, at the time of your email, you

12  and Mr. Levi felt that Bayer was being too aggressive in the

13  marketplace.  Right?

14  A   I was trying to read, I'm sorry.  I lost -- I couldn't see

15  the --

16          MR. JOHNSON:  Let's see if we can bring it up on his

17  screen a little bigger there.  The first paragraph.

18  A   It was there and then phased out.

19          MR. JOHNSON:  The first paragraph, yeah.  Bring that

20  out.  That should help.

21  Q   So the question to you that you and Mr. Levi felt that

22  Bayer was being a little too aggressive in the market with

23  respect to Woodbridge.

24  A   I see that, yes.

25  Q   And Dow was worried that Bayer might take away some of the

 1    business from your customer Woodbridge.  Right?

 2    A    Correct.

 3    Q    But at least at this point in time nothing had happened

 4    yet, Bayer had not yet moved on the Woodbridge account.

 5    Correct?

 6    A    Is that written further down the statement there?

 7              When we are sure that they are not -- okay.

 8              Looks like we were not sure we lost the business yet.

 9    Q    This email was about what you would do if Bayer made a

10    move.  Correct?

11    A    (After pause) It looks like in the conversation that if

12    Bayer made a move, we'd make a move someplace else to move our

13    product, yes.

14    Q    So you were thinking about retaliating against Bayer and

15    another customer if they took your business away at Woodbridge.

16    Right?

17    A    If you lost the business someplace, you had to go someplace

18    else to sell the product to keep the price running smoothly.

19    Q    But you weren't going to do that until you were sure

20    whether or not you really lost the business at Woodbridge.

21    Right?

22    A    Correct.

23    Q    Now, that's because Dow had announced price increases and

24    was trying to get the prices up at that point in time.

25    Correct?

 1   A    So we're raising them July 1st, is that -- I assume when

 2   you raise the prices you try to hold your own market share and

 3   not go out and steal business from somebody else.

 4   Q    Well, maybe it would refresh your recollection when you

 5   look in the third paragraph there.

 6        MR. JOHNSON:   If you could highlight the first

 7   sentence of that third paragraph there.

 8   Q    Quote:  We have rank the accounts -- I assume you meant

 9   "ranked" -- the accounts and stayed away from BASF since they

10   are supporting the increases.

11        Does that refresh your recollection that Dow had

12   announced price increases and that you had ranked the accounts

13   and you were going to stay away from BASF because they were

14   supporting the price increases?

15   A    If you're supporting a price increase and both of you are

16   raising the same price, you don't go attack somebody else's

17   account and try to steal it away if you're trying to get your

18   prices up.  So if we were both going up with accounts, you

19   wouldn't attack a BASF account.

20   Q    Well, in fact, you had ranked the accounts.  You actually

21   knew who was supporting the price increases and who wasn't.

22   Right?

23   A    Well, we'd know who we supplied to and typically we knew

24   who our competitors were supplying to those accounts to.

25   Q    Yes.  And in order to rank the accounts you had to know

 1    what they were doing.  Correct?

 2    A    Well, I had to know what BASF was doing at those accounts

 3    because we probably heard what they were doing at the accounts.

 4    Q    Sure.  So you were staying away from the customers of your

 5    competitors who were supporting price increases, but you were

 6    preparing to attack a competitor if they did not support the

 7    price increase.  Correct?

 8    A    If we lost the business at Woodbridge we had product of

 9    flexible molded grade that we needed to move someplace, so we

10    would have to look at what accounts would buy that particular

11    product in order to keep the plant functioning well.  So you

12    had to look someplace else to sell the product that wasn't

13    being sold to Woodbringe anymore.

14    Q    Okay.  The bottom line is though, Dow -- and you stated

15    here -- was going to stay away from BASF's accounts because

16    they were supporting the price increases.  Correct, sir?

17    A    If their price is going up at an account, we were at that

18    account, why attack and take away the BASF business that was

19    going on?  We would look for other places to move the product

20    where Bayer was, yes.

21    Q    Do you recall playing golf with Mr. Bernstein and other

22    BASF employees a little later that month in August?

23    A    I didn't until I saw the information I played with -- I

24    knew I played with them; I didn't know who all was at that

25    outing.

 1    Q    Let's take a look at PX-90.

 2         This is a series of emails between Bill Bernstein at

 3    BASF and your Dow colleague, Don Marquette, between July 7 and

 4    July 10, 2000.  Do you see that, sir?

 5    A    Okay.  From Bill to Don, okay.

 6    Q    And wouldn't was Don Marquette?

 7    A    Don Marquette was really the carpet sales manager --

 8    Q    You have to speak into the microphone.

 9    A    Sorry.  Don Marquette was really the corporate sales

10    manager based in Philadelphia.  They had all the major accounts

11    in the New York/Philadelphia area.

12              MR. JOHNSON:  Move the admission of PX-90.

13              MR. STREETER:  No objection.

14              THE COURT:  It's in evidence then.

15    Q    Mr. Marquette and Mr. Bernstein are setting up a golf

16    outing between BASF and Dow for August 29th, 2000.  Correct,

17    sir?

18    A    It looks like it, yes.

19    Q    And that golf outing took place in August 29th, and you

20    attended.  Correct?

21    A    Correct.

22    Q    You and Mr. Fischer, among others, spent the whole day with

23    Mr. Bernstein and others at BASF.  Correct?

24    A    Meeting and golf, yes.

25    Q    Well, it's fair to say as of the time that Mr. Bernstein

 1    wrote this on July 7th, there was no specific business purpose.
 2    Isn't that correct, sir?
 3    A    We called the meeting because we had the people there.  We
 4    did have a business meeting before we played any golf.
 5    Q    Well, he says -- where it says, "We should try" --
 6         MR. JOHNSON:  Could you highlight that sentence,
 7    please.
 8    Q    He says:  (Reading) We should try and develop some issues
 9    to discuss in a.m. and plan golf in the p.m. after lunch.
10         So the time this was being put together, there wasn't
11    even an agenda or an issue to be discussed.  Correct?
12    A    The meeting was just being set up, right.
13    Q    Right.  So you didn't really have a business purpose at
14    this point.  There was going to be maybe some business
15    discussion in the morning as an excuse to play golf.  Right?
16    A    Well, with that many people flying in there had to be some
17    business involved.
18    Q    And you certainly do not recall Mr. Marquette ever putting
19    together a formal agenda for this meeting.  Correct?
20    A    Typically Marquette just put together the meetings and
21    entertained customers.
22    Q    You do not recall anybody putting together a formal agenda
23    for this meeting.  Correct?
24    A    No, I don't at this time.
25    Q    This is just a chance to play golf with your buddies at

1    BASF.  Correct?

2    A    Some of the people I knew at BASF.

3    Q    And this was the same competitor, BASF, that Dow wasn't

4    going after because they were supporting Dow's price increases.

5    Right?

6    A    It was also the same people we were selling product to.

7    Q    Do you recall that Dow announced a polyol price increase on

8    November 9th, 2000 to go into effect January 1st, 2001?

9    A    Sorry.  November -- for January 1st when?  2000 --

10   Q    The increase announcement was November 9th, 2000 to go into

11   effect January 1, 2001.

12   A    I don't recall, but typically we gave 45-day notification

13   before the date of the implementation of the price increase.

14   Q    Okay.  Let's go to PX-1414.

15        This is a summary exhibit that the parties have agreed

16   accurately cites all the price increases through the entire

17   period of -- that is relevant to this case.

18        If you would turn to be -- if we could turn to page 10

19   of this summary.  Can you see there on page 10 -- and you have

20   to actually look at the prior page to see it's polyols -- and

21   you'll see the top heading is:  "Dow, $.10 a pound, 11/9/2000."

22        Do you see that, sir?

23        MR. JOHNSON:  Can we highlight it for him?

24   A    I see it now, 11/9/ 2000, Dow, $.10.

25   Q    If you go --

1    A    Is that polyol?

2    Q    Yes, that's polyol.

3         If you go to the prior page, you'll see in the product

4    class, which is the second column...

5         MR. JOHNSON:  Can we highlight polyols in the second

6    column on page 9, please.

7    Q    And then if you look in the first column, you'll see it had

8    an effective date of 1/1/2001.

9         Do you follow that, sir?

10   A    Yes.

11   Q    Okay.  And Dow was the chemical manufacturer that usually

12   led polyol price increases.  Correct?

13   A    In certain market segments, yes.

14   Q    Let's turn to PX-708.

15        Do you recognize this as a memo you wrote?

16   A    I'm sorry.  I can't read it unless it's --

17        MR. JOHNSON:  Maybe we can --

18   A    Okay.

19        MR. JOHNSON:  -- highlight the little initials down at

20   the bottom left-hand corner there.

21   Q    Maybe that will help.  "RLB"; that would be you.  Right?

22   A    My initials, yes.

23   Q    Right.

24        MR. JOHNSON:  Move the admission of PX-708.

25        MR. STREETER:  No objection.

THE COURT: It's in evidence then.

Q I will represent to you again that the metadata shows that you created this memo, or someone created it on your behalf on November 13th, 2000.

MR. JOHNSON: Would you like to see the metadata?

MR. STREETER: No. Thank you.

A When was this created? I'm sorry.

Q November 13th, 2000.

A November 13th, 2000. Okay.

Q And just to put that in context, that was four days after Dow announced its polyol increase on 11/9. Correct?

A Okay.

Q 9th to the 13th. All right?

So let's go down to the heading, "Price Increases." Do you see that?

MR. JOHNSON: Can we highlight that? Bring it up for him so he can see it.

A Could you go all the way to the bottom first?

Q Sure. Do you want to see something at the bottom?

A Yeah.

Q Just the initials again?

A Okay.

Q Okay? Are we good?

A I've never seen it -- a report like this before, so I just --

 1   Q   Okay.  We're going to "Price Increases," and this document
 2   is titled "North America."
 3   A   Okay.
 4   Q   And let's look at the second bullet point there: "Polyol
 5   $.10 increase announced for 1/1/2001."
 6       That's the announcement we just looked at from Dow in
 7   PX-1414.  Right?
 8   A   Okay.
 9   Q   Now, the next bullet point says:  "Need TDI price
10   announcement.  Need MDI leadership."
11       You were referring to the fact that you were expecting
12   somebody else in the industry to go there making the opening
13   TDI and MDI price announcements.  Right?
14   A   Really effective in the foam industry, you need two pounds
15   of polyol, one pound of TDI to make the application.  So if
16   you're doing pricing you really want both prices go up the same
17   time for polyol and TDI for those applications, not one go up
18   and the other.  So you usually look at sometimes the TDI price
19   increase being roughly at the same time as the polyol increase
20   to the flexible slab and molded business.
21   Q   I appreciate that, sir, and now I'd like you to answer my
22   question.
23   A   Okay.  What was it?
24   Q   My question was:  In this bullet point you were referring
25   to the fact that you were expecting somebody else in the

1    industry to go there, make the opening TDI and MDI price

2    announcements.  Right?

3    A    Correct.

4    Q    Next bullet point:  "Bayer needs to support and position

5    polyol and TDI."

6            You were expecting that to happen.  Correct, sir?

7            MR. STREETER:  Objection to the "expecting," your

8    Honor.

9            THE COURT:  I'll allow it.  Overruled.

10   A    No.  I don't -- I think I wasn't expecting.  I think in

11   order to get it to be successful Bayer needs to do something.

12   If they don't do anything, the thing will fall apart because

13   they're so large in those areas.

14   Q    Let's turn to your testimony in February 2013, page 3620,

15   lines 12 through 15.

16   A    I forget.  Exactly what date was this, 2013 when?

17   Q    This was November 13th, 2000.

18   A    November?

19   Q    13th, 2000 is the date of this memo.  Okay?  Are you with

20   me?

21   A    Okay.  This is -- the memo?  When was the other --

22   Q    Oh, the testimony?

23   A    Yes.

24   Q    That was in February of 2013.

25   A    February, okay.  Thank you.

1   Q   Sure.

2           Do you recall being asked the following question:

3   Next bullet point -- which is the bullet point we were just

4   looking at:  Quote, Bayer needs to support and position polyol

5   and TDI, closed quote.

6           So you were expecting that to happen?

7           ANSWER:  According to this note, yes.

8           Did you give that testimony, sir?

9   A   Looks like I did.

10  Q   Was it accurate at the time?

11  A   What I was saying was --

12  Q   Sir, was it accurate at the time?

13          MR. STREETER:  Objection, your Honor, he --

14          THE COURT:  No, whether or not that's an accurate

15  representation of what you said at the time is a fair question.

16  A   That's what I said.

17  Q   In the same bullet point you say at the end, quote:  BASF

18  will follow, closed quote.

19          You were expecting that to happen too.  Correct, sir?

20  A   Yes.

21  Q   Now, in fact, what you wrote here is exactly what did

22  happen.  Correct?

23  A   I guess.

24  Q   Well let's go back to PX-1414, page 9 at the bottom.  And

25  this is again with respect to polyols and TDI.

1          So you wrote on the 13th of November that Bayer needs

2    to support and position polyol and TDI.  And the summary chart

3    shows that on November 17th that Bayer, in fact, issued a price

4    announcement for polyols, $.10 a pound, a couple of days after

5    you wrote that memo.  Correct, sir?

6    A    I guess, yes.

7    Q    And you also wrote on the 13th that BASF will follow.  In

8    fact, that's what happened.  On November 27th BASF did, in

9    fact, follow.  Correct?

10   A    Correct.

11   Q    And when you wrote on November 13th that BASF will follow,

12   you didn't say they may follow, they might follow; there was no

13   maybes there.  Correct?

14   A    That's what I said, "they will follow," yes.

15   Q    Instead, you said that BASF will follow.  And that was very

16   concise, wasn't it, sir?

17   A    BASF followed a lot when you did increases but sometimes

18   they didn't.

19   Q    Sir, can you answer my question?

20   A    Okay.

21   Q    You said that BASF will follow.  And that was very concise,

22   wasn't it, sir?

23   A    For that time, that's what I said.

24   Q    Let's turn to 2002.

25          Do you recall that Dow announced polyol and TDI price

 1    increases to be effective March 1st, 2002?

 2    A    March 1st?

 3    Q    Yes, sir.

 4    A    Could I see it?

 5         Typically we announced them to be on the quarter, not

 6    in the middle of the -- it would be like April 1st, not March

 7    1st.

 8    Q    We have this handy-dandy summary chart, so if you would go

 9    back to it, PX-1414, and go to pages 13 and 14.  And do you see

10    there that the polyol price increase by Dow of $.10 a pound

11    with an effective date of March 1st, 2002 on page 13?  Do you

12    see that there, sir?

13    A    I see it now, yes.

14    Q    And the TDI increase, if we look over on the next page for

15    Dow, that was $.15 per pound.  Right?

16    A    I see it, yes.

17    Q    Okay.  Let's turn now to PX--

18    A    What was the effective date of that one?

19    Q    The same effective date, March 1st, 2002.

20         All you have to do is turn to the prior page and read

21    off the column.

22    A    Okay.  I didn't do that.

23    Q    Let's turn to PX-699.

24         Do you see that this is a Dow presentation from Steve

25    English dated March 28th, 2002.  Correct?

 1    A    That's what it says, yes.

 2    Q    And that's a few weeks after the effective date of the Dow

 3    polyol and TDI price announcements that we just looked at.

 4    Correct?

 5    A    Yes.

 6    Q    Please turn to page 17 of this presentation.

 7         The title of this slide is "Successes."

 8         Do you see that, sir?

 9    A    Yes.

10    Q    And if you look down at pricing, it says:  "We announced

11    $.10 on polyols March 1st, we announced $.15 on TDI March 1st,

12    2002.  And it's working."  Correct, sir?

13    A    Yes, I see that.

14    Q    As of this time Dow was getting the March 2002 price

15    increases to stick in the marketplace.  Correct?

16    A    That's what it says, yes.

17    Q    And all of your competitors have followed you in a

18    lock-step fashion.  Isn't that correct, sir?

19         MR. STREETER:  Objection, your Honor.

20    A    I'm not sure.

21         THE COURT:  Okay.

22    Q    Well, you can look back --

23         THE COURT:  Yeah.  I'll allow the question.

24    Overruled.  Go ahead.

25    Q    You can look back if you like to 1414.  Do you want to see

1    what your competitors did?

2    A    Looks like they had similar pricing.

3    Q    They had the same pricing, sir --

4    A    Okay.

5    Q    -- with the same effective date.  Right?

6    A    That's what it shows, yes.

7    Q    All right.  Sir.  Let's turn to August of 2002.

8         Do you remember being in Lucerne, Switzerland --

9         MR. JOHNSON:  Oh, a reminder.  I move admission of

10   PX-699.

11        MR. STREETER:  No objection.

12        THE COURT:  It's in evidence then.

13   Q    Do you remember being in Lucerne, Switzerland in August

14   2002 for a global business meeting for polyurethane?

15   A    Yes.

16   Q    And at that time Mr. Fischer was based nearby in Horgen --

17   I'm probably mispronouncing that -- Switzerland.  Right?

18   A    He was based in Switzerland, yes.

19   Q    So that's why you ended up going over there, because Mr.

20   Fischer was the boss and he said, you guys come over here.

21   Right?

22   A    For the meeting, yes.

23   Q    And on August 6th, the second day of the business meeting,

24   Christian Buhse from Bayer came all the way down from Germany

25   to meet with you and Mr. Levi for lunch at the hotel in

1    Lucerne.  Right?

2    A    I met with him for lunch.  It was set up the last minute

3    for me to join that luncheon.

4    Q    You were a little surprised that these guys from Bayer came

5    all the way down from Germany to meet you and Mr. Levi.

6    Correct?

7    A    Yes.

8    Q    Do you recall that a few days before you and Mr. Levi met

9    with Bayer's Christian Buhse on August 6th, that Bayer had

10   announced price increases for polyols and TDI?

11   A    No, I don't recall that, no.

12   Q    If you turn to PX-1414 again.

13        And turn to page 15 and 16.  You'll see that Bayer

14   announced the price increase on polyols of $.06 on August 1,

15   2002.

16   A    Yes, I see it.

17   Q    And that was just five days before your meeting in Germany

18   with Mr. Buhse on August 6th.  Correct?

19   A    Yes.

20   Q    Now, BASF and Lyondell also announced on August 1st.  Do

21   you see that?

22   A    It's not BASF, I thought before it flipped off.  I'm sorry.

23   Q    Actually if you look over to the next page on 16, maybe we

24   can -- I don't know if we can get these all brought out -- but

25   we've got polyol increases by BASF, Bayer, Dow and TDI

 1    increases by BASF, Bayer, Dow, Huntsman and Lyondell.  Do you
 2    see that, sir?
 3    A    The print is too small.  I assume it's -- okay, there it
 4    goes.
 5    Q    You see that?
 6    A    Yeah.  But I can't tell what product it is.
 7    Q    Okay.  It is polyols and TDI we're talking about here, all
 8    with effective date of 9/1/2002.
 9    A    Okay.
10    Q    Do you recall that on the same day you and Mr. Levi met
11    with Mr. Buhse August 6th, Dow announced -- Dow followed
12    Bayer's price increase on TDI and polyols?
13    A    No, I don't recall that.
14    Q    All right.  Well, if you look back at 1414 you can see on
15    polyols --
16              MR. JOHNSON:  Can we bring up Dow there, please.
17    Q    -- $.06 a pound, August 6, 2002.  You see that, sir?
18    A    The highlighted one, yes.
19    Q    Your testimony though is that you did not discuss these
20    price increases during your meeting with Mr. Buhse.  Correct?
21    A    Correct.
22    Q    It's just a coincidence that Mr. Buhse drove down from
23    Germany to meet with you that day and Dow followed Bayer's lead
24    on that very same day.  Correct?  That's just a coincidence?
25    A    I never knew who the guy was until I went to meet him for a

1    short lunch.

2    Q   Certainly Mr. Levi knew who he was.  Correct, sir?

3    A   I assume Marco did.

4    Q   Let's go back to something we talked about earlier, your

5    interactions and contacts with employees of Huntsman.

6           Now, I believe you testified that during this 1999 to

7    2004 time period Dow was not selling any product to Huntsman.

8    Correct?

9    A   I don't recall selling any product to Huntsman, no.

10   Q   And we've already established that during that same 1999 to

11   2004 period, you didn't have any discussions with Greg Geaman

12   of Huntsman except in connection with API trade association

13   meetings.  Correct?

14   A   That's where I would have met him I'm sure.

15   Q   Specifically, it was after Mr. Geaman replaced Tony Hankins

16   on the board of the API that you had some conversations with

17   him at API meetings.  Correct?

18   A   If he was at the meetings there would be conversation, yes.

19   Q   And I think you estimated that between 1999 and 2004, you

20   spoke with Mr. Geaman maybe ten or 12 times at API board

21   meetings, and that had lawyers and other board members present.

22   Right?

23   A   A big staff, yes.

24   Q   And if we exclude all those API meetings, you only spoke

25   with Mr. Geaman maybe five, six times.  Correct?

1    A    Did he attend the PFA meetings?

2          Someplace I would have talked to him.

3    Q    Okay.

4    A    I just don't know where.

5    Q    Let's see if we can answer my questions first.

6          If we exclude the API meetings, you only spoke with

7    Mr. Geaman maybe five or six times.  Correct?

8    A    I'm sorry, I don't remember that we had those

9    conversations.  I know who he was.  I don't remember.

10   Q    Let me just see if I can refresh your recollection.

11         MR. JOHNSON:  Can we bring up his deposition, page

12   298, lines 17 through 24.

13   Q    (Reading) QUESTION:  Let me exclude the API meetings.  How

14   many times did you believe you spoke with Mr. Geaman between

15   1999 and 2004?

16         And you said, "Five or six times," and you said some

17   other things there.

18         But the purposes for this question:  It was five or

19   six times.  Right?

20   A    Because I talked to him about the API conventions, yes.

21   Q    And those communications, as you just said, were all

22   related to the API, because you and Mr. Geaman were working

23   together on setting up an API convention out in Salt Lake City,

24   Utah.  Right?

25   A    Correct.

 1   Q    Now, Mr. Geaman actually replaced Mr. Hankins on the API

 2   steering committee around April 2003.  Correct?

 3   A    I knew both the names, I don't exactly know when they

 4   replaced each other.

 5   Q    I'll show you PX-566.  This is Huntsman's Response to

 6   Plaintiffs' Fourth Set of Interrogatories at page 14 and 15.

 7            MR. STREETER:  Objection.

 8   Q    And if you look --

 9            MS. STREETER:  Your Honor, can he take it down from

10   the screen?

11            THE COURT:  All right.

12            MR. JOHNSON:  What's the objection?

13            MR. STREETER:  Hearsay.

14            THE COURT:  Yeah.  Let me see the document, please.

15   Could I see the document?

16            MR. JOHNSON:  Yes, your Honor.

17            Your Honor, I was only going to refer to the page, I

18   was not going to seek to admit it in evidence.

19            THE COURT:  Okay.

20            MR. STREETER:  Your Honor --

21            THE COURT:  Objection overruled for now.

22            Rephrase the question and let me see -- don't put it

23   up yet.

24            MR. JOHNSON:  Okay.

25   BY MR. JOHNSON:

```
 1    Q    Huntsman in its interrogatory answers --
 2              MR. STREETER:  Objection, your Honor.
 3              THE COURT:  Well, what's the question?
 4              MR. JOHNSON:  I'm trying to establish when Mr. Geaman
 5    joined the steering committee for the API.
 6              THE COURT:  Ask him the question if he knows that, and
 7    then if he doesn't you can use that maybe to refresh his
 8    recollection.
 9    BY MR. JOHNSON:
10    Q    And that was my question earlier I believe:  That were you
11    aware that Mr. Geaman actually replaced Mr. Hankins on the API
12    steering committee around April 2003?
13    A    No, I don't recall that.
14    Q    All right.  Huntsman in its interrogatories --
15              MR. STREETER:  Objection, your Honor.  He's trying --
16              THE COURT:  Just show him the document and ask him if
17    whatever is in there refreshes his recollection on the date.
18              MR. JOHNSON:  Can we show it --
19              THE COURT:  Just hand it to him this time.
20              MR. JOHNSON:  Could I have the copy back?  That was
21    his.
22              THE DEPUTY CLERK:  Here it is.
23              MR. JOHNSON:  Thanks.
24              THE COURT:  Just point to the document and ask him if
25    that helps refresh his recollection.
```

1    A    When was this actually again?   2003, when?

2              I can't ask a question?

3              THE COURT:   Mr. Beitel, just take a look.   Read this

4    for a moment and then...

5    Q    You can just read this paragraph right here (indicating).

6    A    Okay.

7    Q    You need some reading glasses?

8    A    No.   I did leave them in my duffel bag, but I think I can

9    read this okay.

10   Q    If you do, I have an extra pair.

11             (There is a pause for the witness.)

12             (Mr. Johnson and Mr. Streeter confer off the record.)

13   Q    Have you read that, sir?

14   A    Just this last part here?

15   Q    Yes.

16   A    I just read the last paragraph, yes.

17   Q    Does that refresh your recollection that Mr. Geaman

18   actually replaced Mr. Hankins on the API steering committee

19   around April 2003?

20   A    I know the names, I didn't know exactly whether they

21   replaced each other, no.   I knew where they came from but I

22   have no recollection of that many people on the board when

23   transitions took place.

24   Q    Well, in any event, other than API-related subjects, you

25   did not have any communications with Mr. Geaman.   Right?

 1    A    Not that I'm aware of.

 2    Q    And you never spoke with Mr. Geaman about any of the

 3    products in your purview; MDI, TDI, polyols.  Right?

 4    A    Correct.

 5    Q    Now, you testified that you saw Greg Banks.  He was another

 6    Huntsman guy.  Right?

 7    A    Name recognition, yes.

 8    Q    And you saw him at six or seven PFA conventions.  Right?

 9    A    If I attended a PFA conventions yes, he'd be there, yes.

10    Q    And in addition, I think you recall one time when you and

11    Mr. Banks were guests of Flexible Foam at an industry event,

12    correct, in Las Vegas?

13    A    Yes.  Yes.

14    Q    And you do not recall ever talking to Mr. Banks on the

15    phone.  Correct?

16    A    Don't recall that at all, no.

17    Q    And you never talked to Mr. Geaman or Mr. Banks about

18    pricing of urethanes products.  Correct?

19    A    Correct.

20    Q    Now, as you understood their roles -- and I think we

21    already covered Mr. Geaman -- but Mr. Banks was also a

22    counterpart to you at Huntsman with respect to the commercial

23    sales functions similar to yours.  Right?

24    A    I assume that.  I don't recall exactly what he was.

25    Q    All right.  Let's see if I can refresh your recollection.

1    Your deposition, page 74, lines 4 through 8:

2           (Reading) QUESTION:  As to Bayer, who did you look to

3    as performing functions similar to yours?

4           ANSWER:  Didn't know.

5           As to Huntsman?  Question.

6           ANSWER:  Greg Banks or Greg Geaman.

7           Do you recall that testimony, sir?

8    A    They were active in the industry, I just didn't know which

9    one did what.

10   Q    Well, you testified that they performed functions similar

11   to yours.  Right?

12   A    Right.

13   Q    Okay.

14   A    But I don't know which one did that and which one didn't.

15   Q    And, finally, you spoke to Tony Hankins of Huntsman maybe

16   four or five times and only at API meetings.  Correct?

17   A    Correct.

18   Q    Let's turn to PX-670.

19          THE COURT:  Mr. Johnson, we'll take a break.

20          We're going to take a 15-minute break right now ladies

21   and gentlemen.  We'll see you back here at 12:30.  Okay.

22   Thanks very much.

23          (The Jury leaves the courtroom.)

24          THE COURT:  We'll see you 12:30, everyone.  Thanks.

25          Mr. Beitel, you can step down.

 1              (Witness temporarily excused.)

 2          THE COURT:  We'll probably go to somewhere between

 3    1:30 and 2:00 today.  Do you have much more, of Mr. Beitel?

 4          MR. JOHNSON:  I do.

 5          THE COURT:  Okay.  All right.  So we'll see where we

 6    are.  Thanks.

 7              (A recess is taken.)

 8              (Proceedings resume - Jury not present.)

 9          THE COURT:  We'll bring out the jury.

10          MR. BERNICK:  There's a question, your Honor, on

11    timing.

12          So, Mr. Johnson --

13          THE COURT:  Use the microphone.  Go ahead.  What is

14    it?

15          MR. BERNICK:  Mr. Johnson says that he's got an hour,

16    maybe more.  Mr. Beitel lives in Montana.

17          THE COURT:  Yeah.

18          MR. BERNICK:  And so we would really like to finish

19    him today, if possible, so he doesn't have to come back for the

20    redirect.

21          THE COURT:  I have a -- I'll do my best.

22          MR. BERNICK:  Okay.

23          THE COURT:  But I have a commitment that I have to be

24    out of here by no later than 2:15.  So let's get started and

25    see where we are.

```
 1              MR. BERNICK:  Okay.  Thank you.

 2              THE COURT:  That gives us an hour and 45 minutes.

 3              MR. BERNICK:  Yeah.

 4              THE COURT:  Okay.

 5              We'll do our best, Mr. Bernick.

 6

 7    R I C H A R D   L.   B E I T E L, resumes, testifies further as

 8       follows.

 9

10              THE DEPUTY CLERK:  Please rise for the Jury.

11              (Jury present.)

12              THE COURT:  Proceed, Mr. Johnson.

13              MR. JOHNSON:  Thank you, your Honor.

14                           CROSS-EXAMINATION

15    BY MR. JOHNSON:

16    Q    Before we broke I was referring you to PX-670.  I'll

17    represent to you this is experts from Huntsman's corporate

18    phone records.

19              Let's turn the page 205.

20              If you see three entries from the bottom, a call from

21    Huntsman -- you're going get this on the screen.

22    A    Okay.

23    Q    It would be much easier for you to see.

24    A    Yeah.

25    Q    Three entries from the bottom.  A call from Huntsman to
```

1    your office line on November 19th, 2002.

2            Your office line number was 989 636-9386.  Correct?

3    A    Correct.

4    Q    And that was your office number in Midland in 2002.

5    Correct?

6    A    From my memory, that is correct, yes.

7            MR. JOHNSON:  Move the admission of PX-670.

8            THE COURT:  Without objection, it's admitted.

9    Q    According to Huntsman's records, someone at Huntsman placed

10   a call to you on 11/19 at 10:14 a.m.  Correct?

11   A    That's what it says.

12   Q    And that call lasted about one minute.  Right?

13   A    Oh, okay.

14   Q    That's what it says right there.  1:06.  You see that?

15   A    At one time I thought it was one hour six minutes, I'm

16   sorry.  I didn't...

17   Q    Do you remember who spoke to at Huntsman?

18   A    No, I don't recall.

19   Q    Do you remember what you discussed?

20   A    When again was the convention out in Salt Lake?

21   Q    That was in 2003.

22   A    So I was chairman of the steering committee of the Alliance

23   board, Alliance Industry board, I was chairman of that steering

24   committee, so Huntsman was setting up a little bit to have

25   their convention in Salt Lake.

 1   Q    I'm told it was October 2002, that convention in Salt Lake.

 2   A    That convention in Salt Lake?

 3   Q    Let's turn to page 207 of PX-670.  You see the fourth entry

 4        from the top there?  Another call from Huntsman to your office

 5        line in Midland on November 19th, 2002 at 10:36 a.m.  Correct?

 6   A    Correct.

 7   Q    This is another call from Huntsman to you about 20 minutes

 8        after the phone call we just talked about.  Right?

 9   A    Correct.

10   Q    This second call lasted only about -- looks like 18

11        seconds.  Right?

12   A    Correct.

13   Q    Do you remember who called from you Huntsman or what the

14        call was about?

15   A    No idea, no.

16   Q    Okay.  Let's turn back now to page 192.

17             You see about midway down the third down the page that

18        someone at Huntsman placed a third call to your office that

19        same day, November 19th, at 2:41 p.m.  That's your number.

20        Right?

21   A    Correct.

22   Q    And that third call lasted one minute.  Correct?

23   A    Correct.

24   Q    So according to Huntsman's phone records, somebody at

25        Huntsman called you three times on November 19th, 2002.

1    Correct?

2    A    That's what the record shows.

3    Q    Now, you see a few entries down from that call to you,

4    someone at Huntsman had a 48-second call at 2:43 p.m. to a

5    number in Wyandotte, Michigan.  Do you see that, sir?

6    A    Yes.

7    Q    Do you recognize that number, 734 552-9998?

8    A    No, I don't.

9    Q    I'm going to refer you to page 18, and I'll just show the

10   page 18 on PX-533 which is interrogatory responses that were

11   produced in this litigation from BASF.

12            MR. STREETER:  Objection, your Honor, putting that up

13   on the screen.  It's hearsay.

14            MR. JOHNSON:  I'm trying to do this quickly.  I can

15   show it to him if you prefer.

16            THE COURT:  Okay.  Mr. Streeter, do you prefer that he

17   do it by showing it to him first?

18            MR. STREETER:  I would, yes.  It's not a document that

19   should come into evidence.

20            MR. JOHNSON:  I'm not offering it into evidence.  It's

21   interrogatory answers.

22            THE COURT:  I'll allow it then, go ahead.

23            MR. JOHNSON:  Okay.

24            THE COURT:  In the interest of saving some time, I'll

25   allow it.

1          Let's go.

2          MR. JOHNSON:   Thank you, your Honor.

3   BY MR. JOHNSON:

4   Q   So this is BASF's interrogatory answers.  And you'll see

5   there they've got the phone numbers for the people at BASF,

6   including Mr. Berkowski.  You see that, sir?

7   A   I see Berkowski's number.

8   Q   His cell phone number, sir.  Do you see it?

9   A   I see it, yes.

10  Q   734 552-9998.  Right?

11  A   Correct.

12  Q   Okay.  So it appears that one minute after someone at

13  Huntsman contacted you, someone at Huntsman called Mr.

14  Berkowski's cell phone.  Correct?

15  A   Somebody called his cell phone, yes.

16  Q   And you know Larry Berkowski, don't you, sir?

17  A   Not well.  My recognition is I'm more with Bill Bernstein.

18  Q   Yeah.  He was the director of BASF's polyurethanes business

19  at this time.  Correct, sir?

20  A   Well, he was the guy I was replacing on the board of the

21  Alliance Polyurethane Industry, that's where I met him.

22  Q   And he was the director of BASF's urethanes business at

23  this time, correct, sir?

24  A   The total business?  I wasn't aware of that.

25  Q   I think you testified previously about one time you

1    interacted with him at an API convention.  Right?

2    A    With Berkowski?

3             It's a name that pops up.  I just don't remember with

4    a convention back there 12 years ago I interfaced with him.

5    Q    When you spoke to someone at Huntsman on November 19th,

6    2002, did your Huntsman contact tell you that he or she was

7    going to call Mr. Berkowski immediately after speaking with

8    you?

9    A    No recollection of that.

10   Q    Please turn to the next page, 194, of PX-670.

11            A little more than halfway down the page do you see a

12   call to Pittsburgh, Pennsylvania?

13   A    Yes.

14   Q    Do you recognize that number, sir, 412 777-7601?

15   A    No, I don't.

16   Q    If you turn briefly to PX-646.  This is an email that was

17   produced from Bayer's files.  And if you look down at the

18   bottom, you'll see Jerry Phelan of Bayer Corp., and his number

19   is 412 777-7601.  Do you see that, sir?

20   A    Yes.

21   Q    And that's the same number we see in the phone records of

22   Huntsman on 11/19/2002 at 3:25 p.m.  Correct?

23   A    Yes, I guess so.

24            MR. JOHNSON:  Move the admission of PX-646.

25            MR. STREETER:  No objection.

1          THE COURT:  It's in evidence then.

2   Q   Are you aware that Gary Phelan was a Bayer salesman for MDI

3   and polyols?

4   A   No recollection of that name, no.

5   Q   So let's recap here.  Someone at Huntsman contacted you

6   three times on November 19th, 2002; someone at Huntsman called

7   Mr. Berkowski at BASF on his cell phone one minute after the

8   third phone call with you; and someone from Huntsman called

9   Jerry Phelan, a Bayer salesman for MDI 40 minutes later.  Have

10  I got that about right?

11  A   I guess so.

12  Q   Do you recall that BASF announced a price increase on MDI

13  that same day?

14  A   No, I don't.  What day was it again?

15  Q   November 19th, 2002.

16          Let's turn to PX-1093.

17          Do you see that this is a price announcement letter

18  from BASF to Mr. Frank Hurst of the Carpenter Company?

19  A   Yes.

20  Q   And this letter is dated November 19th, 2002.  Correct?

21  A   Correct.

22  Q   This letter is signed by Lawrence A Berkowski, Director of

23  Urethane Chemicals for BASF.  Correct?

24  A   Yes.

25  Q   That's the same BASF employee who someone at Huntsman

1    called right after they called you on the same day on November

2    19th, 2002.  Correct?

3    A    That's what it listed on the schedule.  I don't remember

4    talking to him, so...

5    Q    BASF's announcement is for $.06 on MDI.  Right?

6    A    Correct.

7         MR. JOHNSON:  Move the admission of PX-1093.

8         MR. STREETER:  No objection.

9         THE COURT:  It's in evidence.

10   Q    Do you recall that three days later Dow announced an

11   identical MDI increase?

12   A    No, I don't recall.

13   Q    Let's take a look at PX-1085.  Do you see that this is a

14   price increase announcement from Dow to Carpenter Company?

15   A    Frank Hurst at Carpenter, yes.

16   Q    That's your signature.  Right?

17   A    Yes.

18   Q    And the letter is dated November 22, 2002.  That's three

19   days after BASF's letter.  Correct?

20   A    Their letter was on the 19th?

21   Q    Yes.

22   A    Three days later, yes.

23   Q    And Dow's announcement is also for $.06 for MDI, which is

24   the same amount that BASF announced.  Correct, sir?

25   A    I see the six-cent a pound increase for tank cars, yes.

 1            MR. JOHNSON:  Move the admission of PX-1085.

 2            MR. STREETER:  No objection.

 3            THE COURT:  It's in evidence.

 4    Q    Let's turn to PX-662.  This is a series of emails that was

 5    produced in the file of Huntsman dated November 25th and 26th,

 6    2002.  Now that's three or four days after Dow's announcement

 7    letter went out.  Correct?

 8    A    What day was this again?  November --

 9    Q    This is emails from November 25th and 26th.

10            MR. STREETER:  Your Honor --

11    Q    Your letter was November 22.

12            MR. STREETER:  -- objection.

13            THE COURT:  What's the objection?

14            MR. STREETER:  I'm going to ask that the document be

15    taken down unless there's some foundation laid.

16            MR. JOHNSON:  Your Honor, this is cross-examination of

17    this witness.

18            MR. STREETER:  He's cross-examining a witness on a

19    document from another company.  We object.

20            THE COURT:  What's the question first, Mr. Johnson?

21    You're going to show him the document?

22            MR. JOHNSON:  I'm going to talk to him about what it

23    says and what the time stamps reflect with respect to the

24    timing of these events around this price increase.

25            THE COURT:  Go ahead, let me hear the question.

1   BY MR. JOHNSON:

2   Q   I think I asked the question, that these emails were three

3   or four days after Dow's announcement letter went out.

4   Correct?

5   A   Correct I guess.

6   Q   Well, Dow's announcement was November 22?

7   A   Okay.

8   Q   These emails are November 25th and 26th.  Okay?

9   A   Three days later, yes.

10  Q   Now, if you look at the bottom --

11      MR. JOHNSON:  I put up the email again?

12  Q   On the second page --

13      MR. STREETER:  No, I object.

14      THE COURT:  I'll allow it for now, I'll allow it.  Go

15  ahead.

16  Q   This is a page from Larry Winger to a number of Huntsman

17  employees, and the subject line is:  "Americas ridged price

18  increase."  Do you see that sir?

19  A   Yes.

20  Q   And it says, quote:  The Americas Ridged Team wish a price

21  increase seeking $.06 a proud, and they have their trade names

22  for MDI.  Right?

23      You recognize those?  Rubanate, JEFFOL and Rubitherm?

24  A   Just the Rubanate.

25  Q   That's MDI.  Right?

1   A    I recognize Rubanate is there.

2            MR. STREETER:  Judge, could we have a sidebar?

3            When I was examining him he wasn't even allowed to

4   testify about a Dow document that he was cc'd on --

5            THE COURT:  Okay.

6            MR. STREETER:  -- that he didn't remember.

7            MR. JOHNSON:  Your Honor, this is cross --

8            MR. STREETER:  This is another company's document --

9            THE COURT:  I'll here you at sidebar.

10           (At the sidebar.)

11           THE COURT:  Okay, go ahead.

12           MR. JOHNSON:  So this is a letter which immediately

13  follows the increase by Dow that was produced from Huntsman

14  internally talking about the same identical price increase on

15  MDI.  And the document indicates obviously what was going on

16  within Huntsman and the time stamps of various emails within

17  this document, including Ms. Alonis' (phonetic) email that was

18  sent at 2:00 p.m.

19           I am going to establish that immediately after this

20  email, some of these emails were sent, there were further phone

21  calls to Berkowski, Phelan and Beitel during this time period

22  that appeared to follow immediately after this internal

23  communication in Huntsman about what they were doing with the

24  price increase.

25           THE COURT:  Go ahead, let me hear you, Mr. Streeter.

 1              MR. STREETER:  Your Honor, when I was questioning
 2    him --
 3              THE COURT:  Don't tell me what you did.  We don't have
 4    to time to go back to what happened there.
 5              MR. STREETER:  It's not a Dow document.  The witness
 6    isn't on it.  He has no recollection of it.  It's 11 years ago.
 7              THE COURT:  Mr. Johnson, he's not anywhere on this
 8    document.  He's not a cc, it's not his document, it's not his
 9    company's document.  Correct?
10              MR. JOHNSON:  That's correct.
11              THE COURT:  All right.  Yeah.  No, so first of all
12    you're not going to move this into evidence, not through him.
13    All right?
14              MR. JOHNSON:  It's pre-admitted, your Honor, it's a
15    business record.  It's authentic.
16              THE COURT:  It may be but --
17              MR. JOHNSON:  We certainly having been proceeding on
18    that way in the past, we've been allowed to put in exhibits
19    like this that are business records and have been agreed to be
20    pre-admitted.
21              MR. STREETER:  The pre-admission rule was subject to a
22    witness being on the stand who could sponsor the document.
23    This witness cannot sponsor the document.
24              THE COURT:  Is anybody from Huntsman going to testify?
25              MR. JOHNSON:  Well, Huntsman has already testified.

 1    Mr. Geaman has testified, Mr. Hankins has testified.

 2              THE COURT:  Yeah.

 3              MR. JOHNSON:  Lots of people have testified.

 4              THE COURT:  I know, and this document wasn't used.

 5              MR. JOHNSON:  And it says in here -- it absolutely

 6    says that they can rest assured they will succeed.

 7              And my point is that they could rest assured that they

 8    will succeed, that's what it says, because they had all talked

 9    to each other about these price increases, and I'm going to

10    establish that through this examination.

11              MR. STREETER:  Your Honor --

12              MR. JOHNSON:  And this is cross-examination.  I should

13    be permitted to do that.  This is -- this is --

14              THE COURT:  No.

15              MR. JOHNSON:  -- on point.  This guy testified --

16              THE COURT:  You could ask him things that are in here,

17    okay --

18              MR. JOHNSON:  Yes.

19              THE COURT:  -- by way of a cross-examination question.

20    But not by reference -- you can ask him:  Is he aware of this;

21    is he aware of that, things like that without referring to the

22    document itself.

23              MR. STREETER:  Your Honor, can I --

24              THE COURT:  Depending on the question you ask I'll

25    decide if I should sustain the objection or not.

 1          MR. STREETER:  A clarification.  I think that that's
 2    going the lead Mr. Johnson to go in there and read from the
 3    document which the jury has just heard about but it's been
 4    taken down off the screen.  He's going to read from the
 5    document.  That should not be allowed.
 6          THE COURT:  I'm allowing him -- it depends.  Let me
 7    hear how you phrase the question, without waving this in front
 8    of the jury.
 9          MR. JOHNSON:  Okay.  I'm not waving.
10          THE COURT:  No, without, waving it or showing it and
11    let me see.
12          MR. JOHNSON:  Yes.
13          THE COURT:  If you want to get into the subject
14    matters in here:  Is he aware?  Does he know?  Does he know
15    that Huntsman believed that this was going to happen?
16          MR. JOHNSON:  Yes.
17          THE COURT:  Then I'll allow it.
18          MR. JOHNSON:  Okay.
19          THE COURT:  That's proper cross-examination.
20          MR. BERNICK:  I'm sorry, your Honor.  Your Honor?
21          THE COURT:  What was that?
22          MR. BERNICK:  Just a second, if I could.
23          The question of examining witnesses with respect to
24    matters that are not in evidence goes all the way back to Wood.
25    And Wood was asked a whole bunch of questions on

```
 1    cross-examination that relate to Schefsky, related to other

 2    people who hadn't even testified.

 3              When I stood up on redirect examination I was not

 4    permitted to show the witness anything that related to those

 5    people.

 6              THE COURT:  I'm not allowing him to show this.

 7              MR. BERNICK:  But it is exactly the same thing to the

 8    jury.  It all even has to do -- they know exactly what's going

 9    on.

10              THE COURT:  No, they don't.  You think they know

11    exactly what's going on with that document and they're going to

12    remember that document?

13              MR. BERNICK:  Your Honor, your Honor --

14              THE COURT:  Look --

15              MR. BERNICK:  -- it is obvious that --

16              THE COURT:  Off the record for a second.

17              (Off the record discussion.)

18              THE COURT:  I'll hear the questions.  Don't start

19    reading from that.  Put it on your dais and just ask:  Is he

20    aware of this; is he aware of that, and I'll allow it depending

21    on what the question is and how it's phrased.  I'll consider

22    it.

23              MR. JOHNSON:  Thank you, your Honor.

24              THE COURT:  Okay.

25              (In open court.)
```

 1           THE COURT:  All right.  Mr. Johnson, you can proceed.
 2           MR. JOHNSON:  Sure.
 3    BY MR. JOHNSON:
 4    Q   Mr. Beitel, were you aware --
 5           BY MR. JOHNSON:  Take that down, please.
 6    Q   Were you aware that Huntsman, in fact, was preparing to
 7    follow the MDI increase announced by Dow?
 8    A   No.
 9    Q   Were you aware that Mr. -- that that letter was due to be
10    mailed to all the market segments for Huntsman on Wednesday of
11    that week?
12    A   No.
13    Q   Let's turn back to Huntsman's phone records at PX-670.
14           MR. JOHNSON:  Turn to page 291.
15    Q   Can you see about a third of the way down the page another
16    call from someone at Huntsman to Larry Berkowski's cell phone
17    number, 734 552-9998 in Wyandotte, Michigan on November 25th,
18    '02 at 2:06 p.m.?  You see that, sir?
19    A   Yes.
20    Q   That call lasted one minute, 18 seconds.  This was a phone
21    call from someone at Huntsman at the same time that Huntsman
22    was getting ready to issue its price increase letter.  Were you
23    aware of that, sir?
24    A   No.
25    Q   If you flip to page 293, the first entry at the top of the

 1    page, do you see at 2:36 p.m. the same day, about 30 minutes

 2    later, another call from Huntsman to Jerry Phelan of Bayer, 412

 3    777-7601, the same number as above.  Do you see that, sir?

 4    A    I see the numbers, yes.

 5    Q    Were you aware that Mr. Geaman was assuring his people at

 6    Huntsman --

 7              MR. STREETER:  Objection, your Honor, exactly what we

 8    discussed.

 9              THE COURT:  Let me hear the question.  He hasn't even

10    finished it.

11    Q    Were you aware that Mr. Geaman at Huntsman was assuring his

12    salespeople that they would succeed with this price increase

13    announcement?

14    A    No, not aware.

15    Q    Let's turn to PX-369.  Do you see this is a letter from

16    Huntsman dated November 29th, 2002, announcing a price increase

17    for MDI, polyols and systems.  Do you see that, sir?

18    A    Yes.

19    Q    And like BASF's and Dow's price increases, Huntsman's is

20    also for $.06 effective January 1, 2003.  Correct?

21    A    Yes.

22              MR. JOHNSON:  Move the admission of PX-369.

23              MR. STREETER:  No objection.

24              THE COURT:  It's in evidence.

25    Q    Your testimony though is that you did not discuss this

1   price increase with Mr. Banks, Mr. Geaman, or anyone else at

2   Huntsman?

3   A    Correct.

4   Q    Your three phone calls with Huntsman on November 19th,

5   2002, were totally unrelated to these price announcements and

6   the timing is just a coincidence.  Right?

7   A    Don't even remember the calls.

8   Q    Do you recall that your friend, Mr. Bernstein, that you got

9   together for drinks with him in December of 2002?

10  A    I knew him.  I didn't -- December 2nd, 2002?

11  Q    Yes.  December 2002.

12  A    Yeah.

13           No, I'm not aware that I had drinks with him.  Where

14  was that?

15  Q    Let's take a look at PX-93.

16           Do you see on page 1 of Mr. Bernstein's expense report

17  there's an entry dated 12/22/02, reflecting that Mr. Bernstein

18  had cocktails with you.  Do you see that, sir?

19  A    Yes.

20           MR. STREETER:  Oh, the same objection, your Honor.

21           THE COURT:  This is pre-admitted or not?

22           MR. JOHNSON:  Pre-admitted, your Honor.

23           MR. STREETER:  Is it in evidence?

24           THE COURT:  No.  You know, that's one of the problems.

25  Well, it will take more time.

 1            Show him the document rather than showing it on the

 2    screen.

 3            MR. JOHNSON:  Your Honor, his name is on this

 4    document.

 5            THE COURT:  Okay.

 6            MR. JOHNSON:  I mean, how can I not be able to show

 7    him this?

 8            THE COURT:  You can.  We're using the video.  And

 9    typically you would just show it to him first and ask him,

10    and --

11            MR. STREETER:  Can that it be taken down until the

12    objection is resolved?

13            THE COURT:  We'll take all the time in the world.

14            Go ahead, if you're objecting to that.  If his name is

15    on it, go ahead.

16            Mr. Johnson, show him the document, ask him if he

17    recognizes it, is his name on there, and then they'll be no

18    objection and then it will go into evidence and then the jury

19    can see it.

20            MR. JOHNSON:  Thank you.

21    BY MR. JOHNSON:

22    Q    This is PX-93.  You see on the first page there -- and once

23    again you can probably see it better on the screen.

24            MR. JOHNSON:  He can't read very well without his

25    glasses.

```
 1                THE COURT:  Somebody, give him a set of glasses, you
 2      know?
 3                MR. JOHNSON:  I have an extra pair.  I'll get them.
 4                MR. STREETER:  Judge, just to move this along --
 5                THE COURT:  No.  If you have an objection, I'll
 6      recognize it.  I know what you're saying.  I know what you're
 7      saying.  But if, ultimately, if his name is on this document,
 8      unlike something else --
 9                MR. STREETER:  It's another company's document.
10                THE COURT:  Okay.  I don't know what the -- you know,
11      counsel represented his name is on there as a cc?
12                MR. STREETER:  No.
13                MR. JOHNSON:  It's an expense report, it shows that he
14      had drinks with Mr. Bernstein.
15      A    Is this the $6.00 we had drinks?
16      Q    Try that (handing eyeglasses).
17                THE COURT:  Ask him if it refreshes his recollection
18      then if he had drinks with Mr. Bernstein at a certain day.
19      Q    Does that help?
20                MR. STREETER:  That's all I'm asking for, your Honor,
21      is that he do it the way the rules say.
22      A    Okay.  So we had --
23                THE COURT:  You know, Mr. Streeter, I know how the
24      rules require it, but we were trying to move this along this
25      afternoon for reasons that we have that we all know about.  But
```

1       if you insist, I'll apply the rules strictly.

2               Objection sustained.

3               Show him the document.  And then ask the proper

4       question.

5       Q    So this is the expense report for Mr. Bernstein.  Does it

6       reflect at the bottom of the page your name as having a drink

7       with Mr. Bernstein?

8       A    Yes.

9       Q    Thank you.

10              MR. JOHNSON:  Move the admission --

11              THE COURT:  Do you have an objection?

12              MR. JOHNSON:  -- of PX-93.

13              THE COURT:  No, if you do -- do you have --

14              MR. STREETER:  No, I don't have an objection, your

15      Honor.

16              THE COURT:  All right.  I'll listen to your objection

17      if you have it.

18              MR. STREETER:  My objection is that that's not the

19      proper way to refresh a witness' recollection.  You put the

20      document in front of them and you ask them whether it refreshes

21      their recollection, you don't get to read from it.  That's my

22      objection, and Mr. Johnson knows it.

23              THE COURT:  All right.  We heard your objection.

24      BY MR. JOHNSON:

25      Q    The business purpose that Mr. Bernstein indicated here was

1        "customer relations."

2               Do you see that, sir?

3    A    I see it here, yes.

4    Q    Now, isn't it true, sir, that when you met with Mr.

5    Bernstein, Dow and its competitors had just announced price

6    increases for urethane products to become effective January

7    1st, 2003?

8    A    Yes.

9    Q    If you turn the PX-1414 at pages 16 through 17.

10              Do you see starting there near the bottom of page 16

11   of the summary through the middle of page 17, that BASF, Bayer,

12   Dow, Huntsman all announced price increases for MDI; and Bayer,

13   Dow and Huntsman announced price increases for polyols in late

14   November of 2002?  Do you see that, sir?

15   A    MDI, polyol.

16   Q    Yes, sir.

17   A    Yep.

18   Q    And all of those announcements were made within a few days

19   during the last week of November.  Correct?

20   A    22nd, yeah --

21   Q    And all of the announcements?

22   A    -- and 19 --

23   Q    I'm sorry?

24   A    I'm sorry.  I didn't see the 19th.  So it was the 19th,

25   22nd, 27th, 29th.  Okay.

1    Q    And all the announcements were $.06 a pound.  Correct?

2    A    Both were TDI -- yes.

3    Q    And all the announcements became effective January 1, 2003?

4    A    BASF -- did BASF also do the polyols?

5    Q    No, I didn't say that.  I said Bayer, Dow and Huntsman

6    announced price increases for policies.

7    A    Okay.  I was looking at -- okay.  I was looking at the BASF

8    number.  I'm sorry.

9    Q    All of the announcements became effective January 1, 2003?

10             THE COURT:  Can you hear?

11             They're having a hard time hearing you, so please --

12             THE WITNESS:  I'm sorry.

13             THE COURT:  -- again, try to keep your voice up.

14             THE WITNESS:  Can I move this over closer so I can see

15   the screen?

16             THE COURT:  Use the microphone, please.

17             THE WITNESS:  Sorry.

18   A    Pardon.  Ask the question again, please.

19   Q    All the announcements became effective January 1st, 2003?

20   A    Correct.

21   Q    Isn't it true that you and Mr. Bernstein met for cocktails

22   specifically so that you could discuss this price increase

23   initiative?

24   A    No.

25             MR. JOHNSON:  Your Honor, I just want to clarify:

1    PX-93 is admitted?

2              THE COURT:  Is there any objection?

3              MR. STREETER:  No objection.

4              THE COURT:  All right.  Then it's in evidence.

5    Q   Okay.  Let's move forward.

6              Do you recall that Dow and its competitors announced

7    another round of price increases in late February 2003 to

8    become effective April 1, 2003?

9    A   I don't recall, but it seems possible because we were

10   trying to recover --

11   Q   This was a period when demand was weak and Dow predicted

12   that it would be difficult to get prices up.  Correct?

13   A   2001 and 2002 were difficult times, margins had dropped.

14   Yes, we were trying get our prices up.

15   Q   Okay.  We're talking about late February 2003 here, sir.

16   A   Right.

17   Q   Do you recall this was a period when demand was weak and

18   Dow predicted that it would be difficult to get prices up?

19   A   We were making a move to get our prices up.

20   Q   Let's turn to PX-271.

21             This is a presentation by David Fischer, an Investor

22   Relations Review, dated January 20th, 2003.  That would be a

23   presentation made by your boss, David Fischer.  Correct?

24   A   Correct.

25   Q   If you turn to Slide 10, at the top bullet point Mr.

```
 1    Fischer wrote, quote, "Overall demand is weak."

 2              Is that consistent with your recollection of market

 3    conditions in early 2003?

 4    A    In '1 and '2 it was week in that period of time, yes.

 5    Q    And on the next slide, page 11, Mr. Fischer wrote:  "Bayer,

 6    BASF seems to be supporting price increases in the market;

 7    Huntsman is supporting MDI increase in North America.  Quiet

 8    elsewhere."

 9              Do you see that, sir?

10    A    Correct.

11    Q    And finally on page -- on Slide 13 under, "Specific Issues"

12    Mr. Fischer wrote, quote:  Price increases very difficult in

13    environment of weak demand, closed quote.

14              Is that consistent with your recollection, sir, of

15    this time period?

16    A    2001, 2002.  2003 the market turned around though.

17    Q    This was --

18    A    This was early --

19    Q    This presentation was in January of 2003.  Do you recall

20    that that was the condition of the market in January of 2003?

21    A    The market going into 2003 was week.

22              MR. JOHNSON:  I move the admission of PX-271.

23              MR. STREETER:  No objection.

24              THE COURT:  It's in evidence then.

25    Q    Do you agree that it was very difficult to increase prices
```

 1    in periods of week demand?

 2    A    Yes.

 3    Q    Isn't it true, however, that the industry announced price

 4    increases the very next month?

 5    A    Sometimes price increases were generated to try to get the

 6    price to move up, but also stop it from going down.

 7    Q    Yes.   That was one reason you sent out price increases,

 8    wasn't it, sir, to stop prices from going down?

 9    A    But you also tried to recover what has been going away.

10    Q    Just answer my questions, sir:   That was one of the reasons

11    for price increases, right, to prevent the price from going

12    down further?

13    A    No, to recover losing margins you've had on the previous

14    products.

15    Q    I had a different question, sir.

16    A    Okay.

17    Q    Price increases were issued in order to prevent the prices

18    from falling further.   Right?

19    A    Not -- not really.   2003 is when we turned the market

20    around.

21    Q    Let's turn back to PX-1414, which is the summary of price

22    increase announcements.   If you turn to page 18 and 19 of

23    PX-1414, do you see that on February 21st, 2003, Bayer

24    announced price increases for MDI and polyols?

25    A    Bayer, MDI polyols.   Looks like February 21st and February

1    27th.

2    Q    And that was in the amount of 6 to $.08 per pound.

3    Correct, sir?

4    A    Yeah, some were six and some were eight.

5    Q    And Bayer's increase had an effective date of April 1,

6    2003.  Correct?

7    A    Correct.

8    Q    And do you see in the days following, that Dow, BASF,

9    Lyondell and Huntsman all announced similar increases in the

10   range of 6 to $.08 per pound for MDI and polyols, and all five

11   companies announced price increases of $.10 a pound for TDI?

12   Do you see that, sir?

13   A    I don't see the TDI, but...

14   Q    Todd would be glad to show it to you.

15   A    I see the $.10 on TDI, yes.

16   Q    And that was for $.10 a pound.  Right?

17   A    Correct.

18          THE COURT:  Mr. Beitel, please try to speak into the

19   microphone and keep your voice up.  Your voice drops and I

20   think --

21          THE WITNESS:  Okay.  Sorry.

22          THE COURT:  All right.

23   Q    Did you speak with your contact at Huntsman about these

24   price increase announcements for MDI and polyols?

25   A    No, I did not.

1   Q   Let's turn to PX-668 and look at page -- this is Huntsman

2   phone records again.  And look at page 96.

3          Do you see on March 7, 2003 down at the bottom at

4   11:36 a.m. we have another call from someone at Huntsman to

5   your office lasting 18 seconds?  Right?

6   A   Yes.

7   Q   Let's turn now back to page 80 of the same exhibit.  Do you

8   see that same afternoon at 1:59 p.m., a one-minute call from

9   someone at Huntsman to Mr. Berkowski's cell phone number?  You

10  see that there, Wyandotte, Michigan?

11  A   Yes.

12  Q   And then do you see that one minute later someone at

13  Huntsman placed another call to you at 2:01 p.m.?

14         Do you see that, sir?

15  A   Yes.

16  Q   And that call to you lasted just under two minutes.

17  Correct?

18  A   Yes.

19  Q   Did your Huntsman contact tell you that he had just gotten

20  off the phone with Mr. Berkowski?

21  A   I have no recollection of the telephone call.

22  Q   Did your Huntsman contact tell that you BASF and Huntsman

23  planned to support the price increases?

24  A   No recollection of the call.

25  Q   So is it just a coincidence that someone at Huntsman called

1    Mr. Berkowski and then called you back-to-back on March 7th,
2    2003?
3    A    One of the problems is that Teri Clements, my secretary,
4    answered the phones at times.  So I don't remember the call and
5    it could have been talking to my secretary.
6    Q    Well, let's turn to page 84 of PX-668.  Do you see the
7    fifth line down, another call, one-minute call from Huntsman at
8    3:25 to a number in Wyandotte, Michigan?
9    A    Yes.
10   Q    That's Mr. Berkowski's office telephone number.  Do you
11   recognize it, sir?
12   A    No.
13          MR. JOHNSON:  I need to see PX-533 and I'll need to
14   show it to the witness.
15          Oh, he still has it.
16   Q    Apparently you still have it.  PX-533.
17          MR. JOHNSON:  Woodbridge.
18          That had the phone numbers on it.
19   A    Here's PX-533 here.
20   Q    And you see on page 18, Mr. Berkowski's office telephone
21   number for 2001 to 2005, 737 324-5484.  Do you see that, sir?
22   A    Yes, I see it.
23   Q    So to recap again:  Someone at Huntsman calls you at 11:36
24   a.m. on March 7; then Mr. Berkowski of BASF at 1:59 p.m.; then
25   you again on 2:01; and then Mr. Berkowski again at 3:25.

 1          Have I got that right, sir?

 2  A    I guess.

 3          MR. JOHNSON:  Move the admission of PX-668.

 4          THE COURT:  Without objection --

 5          MR. STREETER:  No objection.

 6          THE COURT:  It's admitted.

 7  Q    Okay.  Let's move forward again.

 8          Do you recall that Dow and its competitors announced

 9  another round of price increases later that year for MDI and

10  polyols with effective dates of October 1st, 2003?

11  A    I don't recall.

12  Q    Okay.  If you'll turn back to PX-1414 to pages 20 and 21.

13  Here's a hard copy of PX-1414 if that would help.  I know

14  you've got some glasses now so if its easier for you to see on

15  there (handing document).

16          So do you see on pages 20 and 21 that Dow and all of

17  its competitors announced another round of price increases for

18  MDI and polyols with effective dates of October 1st, 2003?

19  A    MDI, then polyols?

20  Q    Yes.

21  A    Yes, I see them.

22  Q    And do you see that Dow and its competitors issued those

23  price increases in late August and early September 2003?

24  Correct?

25  A    Correct.

1    Q    And Dow led both those price increases.  Correct?

2    A    For the MDI and polyol?

3    Q    Yes.

4    A    Yes.

5    Q    And you testified that Dow typically led polyol increases

6    in particular because Dow was the biggest player in polyols and

7    was backward-integrated on that product.  Correct?

8    A    To the propylene oxide, yes.

9    Q    And, yes, you were referring to the fact that Dow

10   manufactured propylene oxide, which is a precursor to polyols.

11   Correct?

12   A    That's what you make polyols out of, yes.

13   Q    Let's turn to PX-1089.  Do you recognize this as a price

14   announcement from you on behalf of Dow to Carpenter, dated

15   August 25th, 2003?

16   A    Correct.

17   Q    The increase was $.06 on MDI.  Correct?

18   A    In rail car shipments, yes.

19        MR. JOHNSON:  Move the admission of PX-1089.

20        MR. STREETER:  No objection.

21        THE COURT:  All right.  Its in evidence.

22   Q    Please turn to PX-1090.

23        Do you recognize this as a price announcement from you

24   on behalf of Dow to Carpenter dated the same day, August 25th,

25   '03?  This was the increase of $.06 on polyols.  Correct?

 1    A    Rail car shipments, yes.

 2              MR. JOHNSON:  Move the admission of PX-1090.

 3              MR. STREETER:  No objection.

 4              THE COURT:  All right.  It's admitted.

 5    Q    Now, in this particular instance, Huntsman and BASF hadn't

 6    announced yet.  Right?  At the time of your letter, August

 7    25th, 2003, Huntsman and BASF had not announced yet.

 8              You can look back at PX-1414.

 9    A    What page again?

10    Q    Pages 20 and 21 I believe.

11              Huntsman announced on August 29th, '03 --

12    A    What --

13    Q    -- and BASF announced on August 28th, 2003.  Do you see

14    that, sir?

15    A    Is this the polyol?  Is this the polyol here?

16    Q    Polyol and MDI.

17    A    What page?  I'm looking at -- this shows an announcement

18    date was 12/6.  Do I have the wrong one?

19              Okay.  I'm sorry.  I had the wrong one.

20    Q    Have you got it?

21    A    It's on the screen so I can see it now, yes.

22    Q    Okay?

23    A    Okay.

24    Q    All right.  So let me see here.

25              So the question was:  In this particular instance, at

1    the time you sent out your letters to Carpenter on August 25th

2    announcing these price increases, Huntsman and BASF hadn't

3    announced yet.  Right?

4    A    Correct.

5    Q    Okay.  And Huntsman you saw announced on 8/29/03, and BASF

6    announced on 8/28/03.  Right?

7    A    Correct.

8    Q    And your letter had gone out on August 25th.  Right?

9    A    Correct.

10   Q    Now, do you recall that the very next day, August 26th,

11   which was prior to Huntsman's decision to follow Dow's

12   announcement, that you had multiple phone calls with someone at

13   Huntsman?

14   A    I don't recall that, no.

15   Q    Okay.  Let's turn to PX-666.

16        Page 269, another set of phone records from Huntsman.

17   A    On the last one, who was that letter to?

18   Q    Frank Hurst, I believe.

19   A    Okay.

20   Q    Okay.

21        Yes, Frank Hurst at Carpenter.  Okay?

22   A    As -- I mentioned before, you call the customer before you

23   sent the letter.

24   Q    Please move to PX-666, page 269.

25        Let's start first with a call from Huntsman to Mr.

1    Berkowski from BASF at 1:31 on August 26, '03.  Do you see

2    that, sir?

3    A    Yes.

4    Q    737 324-5484.  We've already established that that's Mr.

5    Berkowski's office phone.  Do you see that, sir?

6    A    Yes.

7    Q    You see right below that a call from Huntsman to your

8    office at 1:33 p.m., 989 636-9386?  You see that, sir?

9    A    Yes.

10   Q    And that call lasted 1.5 minutes.  Right?

11   A    1.5 minutes?

12   Q    Yes.

13   A    Right.

14   Q    And those calls were literally on top of each other.

15   Correct, sir?

16   A    Short period afterwards awards, three minutes or two

17   minutes, yes.

18   Q    Do you see on page 274 another call to your office line

19   later that same afternoon at 3:33 p.m.?  You see that, sir?

20   A    3:30 --

21   Q    3:00 p.m.

22   A    Yep.

23   Q    But that one only lasted 18 seconds.  Right?

24   A    Yes.

25   Q    I guess you were not in your office, because that call was

1    followed immediately by another call from Huntsman to your cell

2    phone.  Correct, sir?

3    A    I guess that's my cell phone.

4    Q    You guess, sir?  Do you know that that's your cell phone?

5    A    It's an old number.  I have a new cell phone number and

6    that's not it.

7    Q    Okay.  Well, I don't want any doubt about this.

8    A    Okay.

9          MR. JOHNSON:  Can I see PX-563, please.

10   A    That's, you know, 13 years ago.

11   Q    I understand.  I appreciate that.

12         But I don't want anybody to have any doubts about

13   this.

14   A    I gave up that cell phone in 2004.

15   Q    This is PX-563, it's interrogatory answers.  If you would

16   take a look at page 13.

17         Are you there yet?

18   A    Yes.

19   Q    Do you see that your cell phone number during this time

20   period was 989 860-9880?

21   A    Yes.

22   Q    Okay.  So let's turn back to the phone record again,

23   PX-666.  Do you see this call to your cell phone from someone

24   at Huntsman lasted 26 minutes?  Right?

25   A    I see it now, yes.

```
 1   Q    And then if we turn to page 276, do you see that someone at
 2   Huntsman called Mr. Berkowski of BASF, again about 20 minutes,
 3   after they finished speaking with you?
 4   A    Yes.
 5   Q    So again, to recap for the jury:  Dow leads a price
 6   increase; the next day someone at Huntsman called Mr. Berkowski
 7   at 1:31 p.m.; then you at 1:33 p.m.; then you again to your
 8   office line at 3:33 p.m.; and then again to your cell phone at
 9   3:33 for 26 minutes; and then Mr. Berkowski again at 4:19 p.m.
10        Have I got that right, sir?
11   A    There are so many of them, I guess -- you must have them
12   listed down right, I just can't see that many, bang, bang,
13   bang, bang.
14             MR. JOHNSON:  Move in the admission of PX-666.
15             THE COURT:  No objection, it's in.
16             MR. STREETER:  Which document is that?
17   Q    And all of that is just a coincidence.  Right?
18             MR. STREETER:  Just a moment.
19             THE COURT:  Just a moment, please.
20             MR. JOHNSON:  Oh.
21             THE COURT:  Let's hear --
22             MR. STREETER:  No objection.
23             THE COURT:  Okay, it's in evidence.
24   Q    All that is just a coincidence.  Right, sir?
25   A    When was the convention?  I never remember even talking to
```

 1    these people.

 2  Q    Let's turn to PX-390 -- actually, let's not.

 3         If we stay with Exhibit PX-666 and turn to page 295.

 4  Do you see there towards the bottom of the page a call from

 5  Huntsman to Mr. Berkowski at 1:51 p.m., sir, on August 27th,

 6  2003?

 7  A    I see the telephone numbers, yes.

 8  Q    Would it surprise you to learn that someone at Huntsman

 9  called you again that very same morning?

10  A    Yes.

11  Q    Let's go to PX-666 at 333.  There's a call from someone at

12  Huntsman to you at 11:05 a.m., it's 21 minutes duration.

13         Do you see that, sir?

14         MR. STREETER:  It's the next day, your Honor, just for

15  the record.

16         THE COURT:  All right.

17  A    Yes.

18         MR. JOHNSON:  I said "the very next morning," didn't

19  I?

20         MR. STREETER:  You --

21         MR. JOHNSON:  Did I say "the same morning"?

22         THE COURT:  The next day.

23  Q    My fault if I did.  I meant the very next morning, sir.

24         And you see that that phone call had a 21-minute

25  duration.  Correct?

1   A   Correct.

2   Q   And once again that is your cell phone.  Right?

3   A   You have the number, I'd have to look it up again.  I'm

4   sorry.

5   Q   I'll represent to you that's your cell phone.

6   A   Cell phone number, okay.

7   Q   Do you recall that Huntsman announced an identical $.06

8   increase for MDI and polyols on the next day, August 29?

9   A   No, I don't recall that.

10  Q   If you look at PX-1414 again at page 21.

11       MR. JOHNSON:  Can we bring up Huntsman's identical

12  six-cent increase for MDI and polyols on 8/29.

13  Q   Do you see that now, sir?

14  A   Yes.

15  Q   Do you recall that BASF and Bayer also announced identical

16  six-cent increases for MDI and polyols on August 28th and

17  September 1?  Do you see that, sir?  He'll bring it up for you.

18  A   Yes.

19  Q   You do see that?

20  A   When did we announce?

21  Q   You'll see it on this chart there, sir.

22  A   Okay.  So the chart -- those are MDI price increases there?

23       MR. JOHNSON:  Can we see what the product is?

24       MR. SCHAEFER:  Top line.

25       MR. JOHNSON:  Oh, MDI, yes.

1    Q    See at the top left?

2    A    Okay, that's -- okay.  I thought they'd be hooked together,

3    they're not.

4    Q    Okay.  So the question was:  Do you recall that BASF and

5    Bayer also announced identical six-cent increases for MDI and

6    polyols on 8/28 and 9/1?

7         And you've just seen that in this Exhibit 1414.

8    Correct?

9    A    I've seen the exhibits, yes.

10   Q    So we have seen that you spoke to someone at Huntsman three

11   times on August 26th, and again for 21 minutes on August 28th.

12   Right?

13   A    Yes.

14   Q    And the timing of your phone calls with Huntsman relative

15   to these price announcements, that's just a big coincidence.

16   Right?

17   A    Well, looks like we already announced the increase.

18   Q    That's just a big coincidence.  Is that right, sir?

19   A    That we had already previously announced the increase and

20   then there are calls afterwards?

21        I -- yeah, it's a coincidence.  I don't remember even

22   talking to Huntsman.

23   Q    Now, we've been reviewing a number of phone calls between

24   you and Huntsman and from Huntsman's corporate phone records.

25   Now, if I'm going to get you out of here we don't have time to

 1    review every -- every time Huntsman called you between 2002 and

 2    2003 while you were commercial director at Dow.

 3              Would it surprise you to learn that we found 51 phone

 4    calls between you and Huntsman over that two-year period?

 5    A    I was working with Huntsman because they were going to

 6    handle the API convention in Salt Lake, so there was a lot of

 7    calls working, putting it together since I was chairman of the

 8    Alliance Polyurethane Industry at that time, and they wanted to

 9    make sure that the convention was held in Salt Lake.

10    Q    Would it surprise you to learn that out of that 51 times

11    you spoke on the phone with Huntsman during 2002 to '03, we

12    found 17 separate instances when Huntsman spoke to you and then

13    immediately called Mr. Berkowski at BASF, or vice-versa?

14    A    No recollection of that, no.

15    Q    Would it surprise you to learn that out of the 51 times you

16    spoke on the phone with Huntsman, we found six separate

17    instances in which Huntsman spoke to you; Mr. Berkowski at

18    BASF; and Mr. Phelan of Bayer back-to-back-to-back on the same

19    day?

20    A    There would be calls to BASF.  I'm surprised Bayer.

21    Because they were trying to have the convention out there in

22    Salt Lake, and it was up to Bill and myself to coordinate and

23    have the convention out there in Salt Lake to have Huntsman be

24    the lead.

25              MR. JOHNSON:  Your Honor, plaintiffs tender PX-1422,

 1    which is a compilation of Huntsman phone records deemed

 2    authentic business records in this case showing 51 phone calls

 3    between Huntsman and Mr. Beitel in 2002, and '03, including 17

 4    separate days when Huntsman placed back-to-back calls to Mr.

 5    Beitel and Mr. Berkowski of BASF, and on six of those days

 6    Huntsman called Mr. Phelan of Bayer as well, and we move its

 7    admission into evidence.

 8            MR. STREETER:  No objection.

 9            THE COURT:  All right.  No objection, it's in evidence

10    then.

11    Q   Your testimony is that during the course of all these phone

12    calls with Huntsman, you never discussed urethane prices.  Is

13    that right?

14    A   Correct.

15    Q   Any relationship, any relationship between your calls and

16    price increase announcements is purely a coincidence.  Right?

17    A   If we were selling somebody some product we'd talk about

18    the pricing, but I don't recall selling Huntsman at all.

19    Q   No, you didn't recall selling Huntsman any products at all,

20    did you, sir?

21    A   No.

22    Q   Because it didn't happen, did it, sir?

23    A   Not that I recall, no.

24    Q   Now, we've only been reviewing exclusively Huntsman's phone

25    records.  Are you aware that Dow's corporate representative

```
 1    testified in this case that Dow produced no phone records for
 2    you or other Dow employees for the period of the conspiracy
 3    alleged in this case?  Are you aware of that, sir?
 4              MR. STREETER:  Objection, your Honor, that's simply
 5    false.
 6              MR. JOHNSON:  It is what he testified, your Honor.
 7              MR. STREETER:  No, it isn't.
 8              THE COURT:  Just a moment.
 9              MR. STREETER:  Regardless, it's not a proper question
10    for this witness.
11              THE COURT:  I'll sustain the objection, Mr. Johnson.
12    BY MR. JOHNSON:
13    Q    Based on the number of calls we've seen in Huntsman's
14    records from Huntsman to you, do you think it's possible we'd
15    see additional calls from you to Huntsman employees if we had
16    copies of Dow's phone records?
17              THE COURT:  Sustained.
18              MR. STREETER:  Objection -- okay.
19    Q    Now, when you were asked about all of your contacts with
20    Huntsman in the course of your deposition and in the course of
21    your testimony in February of 2013, you didn't say anything
22    about all these calls we just reviewed, did you, sir?
23    A    In reality that far long, I don't remember all those calls,
24    and I worked with Huntsman on the convention is what I worked
25    on them with.
```

1   Q   You said you only spoke to Mr. Geaman five or six times and
2   all were relating to a specific API convention in October 2002.
3   Correct?

4   A   Correct.

5   Q   And the truth of the matter is that you spoke with someone
6   at Huntsman numerous times between 2002 and 2003, and that many
7   of those calls were at the same time as lock-step price
8   increases by Dow and its competitors.  Isn't that a fact, sir?

9   A   I don't know.

10             MR. JOHNSON:  Nothing further, your Honor.

11             THE COURT:  All right.  Mr. Streeter, some redirect?

12             MR. STREETER:  Yes, your Honor.

13                      REDIRECT EXAMINATION

14   BY MR. STREETER:

15   Q   I want to start with the phone calls that you were asked
16   about.

17             MR. STREETER:  I'm going to ask that PX-670 be pulled
18   up on the board.  And can you blow up the first page.

19   Q   Mr. Johnson asked you about phone calls between Huntsman
20   and you in November of 2002.  Right?

21   A   Yes.

22   Q   And I believe he asked you about one, two, three -- three
23   phone calls between you and Huntsman in November of 2002.  Is
24   that right?

25   A   I think that's the right number.

 1   Q   I want to pull up PX-135.

 2           Wait, before we do that.  Do you remember Mr. Johnson

 3   said he represented to you that -- that the convention had

 4   occurred in Salt Lake City the month before those phone calls?

 5   Do you remember that?

 6   A   Yes.

 7   Q   I want to pull up PX-135, please.

 8           MR. STREETER:  Can we blow up the top of that.

 9   Q   You at this time were the chairman of the API.  Right?

10   A   Correct.

11   Q   And before that, you had been the vice chairman of the API.

12   Right?

13   A   Correct.

14   Q   And you'd been involved in the organization for many years.

15   Right?

16   A   Correct.

17   Q   And as the chairman of the API, you had responsibility to

18   coordinate things in connection with it.  Correct?

19   A   Along with the API staff, yes.

20   Q   And this is --

21           MR. STREETER:  If we could blow up the part in the

22   right-hand corner where it says December 3rd, all the way down

23   that whole section.

24   Q   On December 3rd, 2002, from 8:00 a.m. to 4 p.m. in

25   Arlington, Virginia there was a meeting of the Joint

1    Steering/Management Committee of the API.  Correct?

2    A    Correct.

3    Q    And there were people from Huntsman, many of them who were

4    involved in the API.  Right?

5    A    Yes.

6    Q    And this is the beginning of December just after November

7    of the phone calls he showed you.  Correct?

8    A    Yes.  2002.

9    Q    And there were also people from BASF involved in the API.

10   Correct?

11   A    Yes.

12   Q    And there were people from Bayer involved in the API.

13   Right?

14   A    Yes.

15   Q    You spent a lot of time on the API, didn't you?

16   A    About four years.

17   Q    But in terms of the amount of time you spent --

18   A    Yes.

19   Q    -- on sort of, as part of your life during those four

20   years, did you spend a lot of time on it?

21   A    Especially being the chairman and the assistant chairman,

22   yes.

23   Q    And especially getting ready for a meeting like this?

24   A    And setting up conventions.

25   Q    I want to move down the page.  It shows you as the Chair.

 1    I want to move down the page.

 2              MR. STREETER:  I want you to highlight -- I want you

 3    to highlight Jim Chapman from Bayer.

 4    Q    So he's the person from Bayer who was involved.  Correct?

 5    A    Yes.

 6    Q    And then I want to go to Joe Jadlocki from Huntsman.  You

 7    see that?

 8    A    Yes.

 9    Q    Another person from Huntsman who was involved in the API.

10    Correct?

11              MR. STREETER:  Go to the next page, page 4 of the

12    document.  Next page.  If you could, it's page 3 of the

13    document.

14              If you could blow up just the text of the document.

15              And can you highlight the name "Steven Oujin."

16    Q    That's another person from Huntsman that was involved in

17    the API that you were the chairman of.  Right?

18    A    Sorry, I don't recall his name, no.

19    Q    How about there's your name at the bottom:  Rick Beitel.

20    Right?

21    A    Yes.

22    Q    And there are two people right above your name from

23    Huntsman listed there as well.  Right?

24    A    Correct.

25    Q    And in the run-up to one of these meetings --

```
 1              MR. STREETER:  Would you -- can we blow it up,
 2    please?
 3    Q   In the run-up to one of these meetings --
 4              MR. STREETER:  Can you highlight the two Huntsman
 5    names right there above Rick Beitel.  And right above Rick
 6    Beitel.
 7    Q   In the run-up to one of these meetings you'd have a lot of
 8    conversations with people who were involved in the API to get
 9    ready for the meetings.  Correct?
10    A   Ready for the meetings and also make time for the
11    conventions.
12              MR. STREETER:  And can we go to the three, four --
13    fifth page of this document.
14              If we blow up the top of that.
15    Q   Do we see more names of Huntsman people on this list here?
16              Tony Hankins.  Do you see that?
17    A   I see Tony Hankins.
18    Q   You see Joseph Jadlocki?
19    A   Right.
20    Q   Do you see people from Bayer on the list?
21    A   Yes.
22    Q   Do you see Bill Bernstein from BASF?
23    A   Yes.
24              MR. STREETER:  Why don't we just blow up that whole
25    list right there.
```

 1   Q   You're the chairman of this organization.  Right?

 2   A   Yes.

 3   Q   We've got Bayer; BASF; Huntsman; BASF; Bayer; Dow:

 4   Huntsman; Huntsman; BASF; Bayer; Bayer; Huntsman.

 5          Do you see that?

 6   A   Yes.

 7   Q   And this convention was December 3rd, right after the phone

 8   calls that Mr. Johnson asked you about.  Right?

 9   A   I guess it was December 3rd.  I don't remember the exact

10   date.

11   Q   And on page 4 of the document --

12          MR. STREETER:  If you pull that up.

13   Q   -- at the top of the page, "Action Items."  Do you see --

14          MR. STREETER:  Can we just highlight that first part

15   where it says, Rick Beitel and W. Bernstein.

16   Q   So you and Bernstein had actually worked on things in

17   connection with this convention.  Right?

18   A   Yeah.  He was still there, yeah.

19   Q   He was the predecessor as chairman before you.  Right?

20   A   He was predecessor.  I replaced him but --

21   Q   So you would have communications with him.  Correct?

22   A   Sure.

23          MR. JOHNSON:  Your Honor, this is terribly leading.  I

24   know we're trying to get done, but he's just leading every

25   question.

1                 THE COURT:  That's okay.  It might be leading but it's

2      not of great significance.  Overruled.

3                 MR. STREETER:  One more.  Page 1, 2, 3, 4, 5, 6, 7, 8,

4      9 -- 10 of the document.  One more page.  One more page.

5            Blow up the top half of the document.

6      Q   And someone from Huntsman -- you're the Chair, Rick Beitel,

7      and someone from Huntsman is on the committee right below you;

8      Joseph Jadlocki.  Right?

9      A   A recognized name, yes.

10     Q   Yeah.

11           And you testified when Mr. Johnson was examining you

12     that you -- your conversations with people from Huntsman were

13     around the API.  Is that right?

14     A   Yes.

15     Q   I want to turn now to the questions he asked you.

16                 (Mr. Streeter confers with Mr. Bernick off the

17     record.)

18                 MR. STREETER:  You know what, let's go down the page.

19     "Operational Support Groups."  Can you blow that up.

20     Q   It says:  "Operational Support Group."  You see that?

21     A   Yes.

22     Q   You see Larry Berkowski?

23     A   Yes.

24     Q   So Larry Berkowski himself, one of the people that Mr.

25     Johnson asked about those phone calls, was actively involved in

 1    the API too.  Right?

 2    A   Yes.

 3    Q   And people at Huntsman would have had reason to talk to him

 4    about that.  Right?

 5             MR. JOHNSON:  Objection.  Leading.

 6             THE COURT:  It's leading, but try and rephrase it, Mr.

 7    Streeter.

 8    Q   Do you know one way or the other whether or not people

 9    involved in this organization would have had reason to talk to

10    each other in advance of a meeting like this?

11    A   You'd be setting up to have conferences there on top of

12    that.  Plus, in a particular case with this one, Huntsman was

13    taking the lead on the convention.

14    Q   So they would have had reason to talk to participants in

15    the convention?

16    A   Right, and for the activities in the convention and the

17    speakers.

18    Q   All right.  I want to move now to March of 2003.  Mr.

19    Johnson asked you some questions about phone calls in March of

20    2003.

21             And I believe he asked you about one, two, three,

22    four -- five phone calls involving Huntsman, you, and

23    Berkowski.

24             (Mr. Streeter confers with Mr. Bernick off the

25    record.)

1       MR. STREETER:  You might as well highlight "Conference

2   Planning" on that.

3   Q    That's the thing you just referred to.

4   A    Okay.

5   Q    Is that right?

6       Is that the thing you just referred to in terms of the

7   planning?

8   A    They would be the chief people involved with the planning

9   of the conventions, yes.

10  Q    Okay.  All right.  March of 2003, Mr. Johnson asked you

11  about one, two, three, four, five -- six phone calls between

12  Huntsman and either you or Berkowski.  Do you remember those

13  questions?

14  A    No.

15  Q    And, by the way, when Mr. Johnson was questioning you, did

16  he put this document up on the board?

17      MR. JOHNSON:  Objection.

18  A    No.

19      THE COURT:  It's okay.  Go ahead.

20  Q    And let's move to March of 2003.  We talked about those

21  phone calls.

22      MR. STREETER:  Let's put up -- by the way, I move into

23  evidence PX-135.

24      MR. JOHNSON:  No objection.

25      THE COURT:  It's in evidence then.

 1          MR. STREETER:  Now let's pull up PX-139.

 2          Blow up the top half.

 3    Q    Again, this lists you as Chair.  Right?

 4    A    Correct.

 5    Q    Steering Committee meeting.  Right?

 6    A    Correct.

 7          MR. STREETER:  Can you blow up the portion on the

 8    right there that discusses meeting.

 9    Q    Spring meeting, April 29, 2003.  Do you see that?

10    A    April 29, 2003, yes.

11    Q    And this is April, right after the March phone calls he

12    asked you about.  Right?

13    A    I forget what calls.  Was it March?  There were too many

14    calls.

15    Q    For now I'll represent to you that it was March of 2003.

16    A    Okay.

17    Q    And this is another meeting of the -- there's an actual

18    meeting of the API, right, the steering committee?

19    A    Correct.

20    Q    And the same thing here, people from BASF and Bayer and

21    Huntsman and Dow are involved in the organization.  Right?

22    A    Correct.

23    Q    And there's a lot of planing that goes into setting up one

24    of these meetings.  Right?

25    A    Correct.

```
 1   Q   And those people have to talk to each other beforehand to
 2   plan?
 3   A   Correct.
 4   Q   And it wouldn't surprise you to see that they're talking to
 5   each other in the month before the meeting?
 6   A   As it closes, yes, more calls.
 7   Q   All right.  He asked you about some phone calls in August
 8   of 2003.
 9           MR. STREETER:  And I move into evidence PX-139.
10           MR. JOHNSON:  No objection.
11   A   August 2003?  Okay.
12   Q   He asked you some questions about phone calls in August of
13   2003.
14           THE COURT:  It's in evidence.
15   Q   And I've got one, two, three, four, five, six, seven phone
16   calls between people at Huntsman and either you or people at
17   BASF, in this case Berkowski.  Do you remember that testimony?
18   A   Part of it, yes.
19   Q   August of 2003.
20           Do you recognize this thick document right here, which
21   is DX-2430?
22   A   No.
23   Q   You don't recognize it?
24   A   It's so big and everything else.  I know they had big
25   documents on what they were doing, but this is 2002.
```

1    Q   Go ahead and look at this document and tell me whether or
2    not it's an API document.
3    A   Well, API did a lot of work like that in the industry
4    organization accumulating data, so something this large, they
5    spend a lot of time and effort putting together the
6    information, yes.
7    Q   People from the API would spend a lot of time and effort
8    putting it together?
9    A   Yes.
10   Q   Now, this is now 13 years ago.  So you're saying you don't
11   have a vivid memory of it?
12   A   Well, I knew they had these and they did this work, I just
13   don't remember a document from 2002.
14   Q   Thirteen years ago?
15   A   That's 13 years ago.
16        MR. STREETER:  We offer it into evidence.  It's
17   DX-2430.
18        MR. JOHNSON:  No objection.
19        THE COURT:  All right.  It's in evidence then.
20        MR. STREETER:  Pull it up on the screen.
21   Q   "2002, End-Use Market Survey on Urethanes Industry."
22        You were a salesman in the urethanes industry.  Right?
23   A   Correct.
24   Q   The API was about -- it was Alliance for urethanes
25   industry.  Right?

1    A    Correct.

2    Q    And on the second page --

3              MR. STREETER:  Can we pull up the second page.

4              Go down to the bottom of the screen and blow up the

5    date.

6    Q    August of 2003.  Do you see that?

7    A    Yes, I do.

8    Q    So this document was prepared in August of 2003.  Right?

9    A    Correct.

10   Q    The same time that all those phone calls in August that Mr.

11   Johnson asked you about.  Do you remember that?

12   A    Correct.

13   Q    And from time to time -- I want to ask you some questions

14   about, when Mr. Johnson was questioning you, he asked you about

15   some -- some discussions that you had with some of the business

16   leaders about whether to do a price increase and whether not to

17   do one.  Right?

18   A    He asked that question.

19   Q    He had you talked about an argument that you had about

20   whether it was the right time to do a price increase?

21   A    He asked that, yes.

22   Q    And was that a typical kind of spirited discussion that

23   would go on between people at Dow about what to do?

24   A    No, it was more complimentary and -- being presented

25   because we were all working together.  So it wasn't very -- a

 1    time was a very argumentative type discussions like that.

 2    Q    But from time to time you would disagree about what you

 3    should do?

 4    A    From time to time we would disagree.  And that's why we had

 5    a team put together to work together to see exactly what we

 6    wanted to do, and the timing.

 7    Q    And from your perspective, you're a salesman, you're

 8    dealing with the customers.  Right?

 9    A    Correct.

10    Q    And so you have a close relationship with the customers.

11    Right?

12    A    With some of them, yes.

13    Q    And you're the one who has to go and face the customer when

14    you're asking them for more money.  None of these other people,

15    you know, in the -- sort of the business group back in Midland

16    had to go sit in a room with a customer and ask them for money

17    the way you did.  Right?

18    A    I had to do it more often.  But we also had field sellers

19    that called on accounts that sometimes did that first initial

20    discussion, yes.

21    Q    But the people who were the business directors back in

22    Midland, they didn't.  Right?

23    A    No.

24    Q    And so sometimes you would have a relationship with the

25    customer and you'd be close to the customer.  Right?

 1           MR. JOHNSON:  Objection.  This is just -- everything

 2     is just leading terribly.

 3           THE COURT:  It's leading.  Please.

 4     A   Some of the customers I had a good relationship, yeah.

 5     Q   Don't answer, don't answer.

 6           From time to time did you sympathize with the

 7     customers when you were asking them for a price increase?

 8     A   When you're asking for a price increase with a key

 9     customer, you talk to them and try to understand their dilemma

10     on raising the prices to their customers and passing it along.

11     And there would be times that it would be very difficult for

12     them to make the move in the marketplace, so you had to listen

13     both ways on what was going on.  And that's why a little bit,

14     if you notice, that we always gave typically 30-day

15     notification to the customer so it wasn't immediately a price

16     increase, they had time to put it together and get to their

17     customers with the increase in their products.

18     Q   From time to time did you feel sympathy for the customers

19     when you were asking for more money?

20           MR. JOHNSON:  Objection.  Asked and answered.

21           THE COURT:  It has, it was.

22     Q   I want to pull up a document that Mr. Johnson asked you

23     about; PX-707.

24           MR. STREETER:  Would you put that up on the screen?

25           Can we blow up the text of this so it's a little more

1    readable?  The whole thing.  Make the text bigger.

2    Q    He was asking you about this document on your

3    cross-examination.

4         I want to point to some sections of the document he

5    didn't ask you about.  Okay?

6    A    Okay.

7    Q    All right.

8         MR. STREETER:  Let's focus, first of all, on the

9    second -- the bottom half of the document.  So from the

10   underlined portion, down.  Blow up from the underlined portion

11   down.

12   A    Okay.

13   Q    Okay.

14        MR. STREETER:  Can you please blow up the sentence

15   that begins, or highlight the begins that begins:  "MDI has

16   seen an almost"; and do that all the way to the bottom of the

17   paragraph?

18   Q    It says:  (Reading) MDI has seen an almost 25-cent per

19   pound decline on margins in the past five years; polyols

20   declined $.25 per pound and TDI by $.15 per pound.

21        This was a year 2000 document.  Right?

22   A    Okay.

23   Q    So let's say for the five years from 1995 to 2000, you've

24   experienced though kinds of declines.  Right?

25   A    As represented here, yes.

 1   Q   And are those the exact kind of circumstances when you
 2   would say to yourself:  We have to get prices up?
 3           MR. JOHNSON:  Objection, leading.
 4   A   We had to --
 5           THE COURT:  I'll allow it.  Go ahead.
 6   A   When your margins went away and you see declines, you had
 7   to get the price up to cover the margins to get some
 8   profitability in those margin mixes, yes.
 9   Q   And what happens to the business if you don't have any
10   margins?
11   A   If you're in the business and over a period of time you
12   don't have any margin making any profitability, you shut down
13   the plant or sell it.
14   Q   And from your customers' perspective, is it a good thing
15   for them if you shut down your plant?
16   A   Typically no, because it reduces the number of competitors
17   out there selling the product, and also it shuts down the
18   capability of how much product is out there for them to
19   actually --
20   Q   Do you know one way or another whether your customers
21   wanted you to have no margin and basically have to shut down?
22   A   No.
23           MR. JOHNSON:  Objection to what the customers wanted.
24           THE COURT:  Sustained.
25           MR. STREETER:  Let's go up just a little bit on the

 1    page and highlight the underlined portion.

 2    Q   It says:  "We need these price recoveries."

 3           And then it says:  "We have strong dedication with the

 4    customer showing a commitment to get these energy costs passed

 5    through."

 6           Energy costs.  Petroleum, natural gas are feed stocks

 7    for MDI, TDI and polyol.  Right?

 8    A   Yes.

 9    Q   That's the stuff you need in order to make your product.

10    Right?

11    A   Right.

12    Q   And when the cost of that goes up, you've got to raise the

13    price of your product?

14    A   Correct.

15    Q   And when you say, "Showing a commitment"; "We have strong

16    dedication with the customer showing a commitment to get these

17    energy costs pass through," what is that a reference to?

18    A   When our costs go up we have to work with the customer and

19    tell them, explain what's going on with the cost and explain

20    this to them that we need a dedication of the customer

21    showing -- you need to get the energy cost passed through or

22    there's going to be a shutdown in the availability of products.

23    Q   And are these the exact kind of circumstances -- when your

24    energy costs are going up, are these the exact kind of

25    circumstances when you and a businessman need to raise prices?

1    A    Our costs are going up, so you try passing on the costs in
2    the product to the customers down the road.
3    Q    Okay.  And when the costs are going up for Dow, are the
4    costs also going up for your competitors?
5         MR. JOHNSON:  Objection to what they were doing with
6    their competitors.
7         THE COURT:  Yeah.  Sustained.
8    Q    Do you know, do you know one way or the other whether or
9    not your competitors need to use the same raw materials as you
10   to make the product?
11        MR. JOHNSON:  Your Honor, just because they use the
12   same materials don't mean they have the same costs.
13        THE COURT:  There could be variety of different
14   variables that could change that.  So sustained.
15        MR. STREETER:  If we can -- if we could blow up the
16   bottom half of that document again.
17        I want to blow up the one that begins -- highlight the
18   one that begins:  "Our economic profitability."
19   Q    (Reading) Our economic profitability has declined to
20   negative numbers in North America for the first quarter and we
21   are projecting negative EP for the second quarter.  We are
22   seeing continued increases in energy costs that will continue
23   to affect our business in the third and fourth quarter.
24        When you know that information, what does that tell
25   you you need to do in order to maintain your business?

 1   A    We need to increase the price to get some margin in there
 2   to make sure that we can continue the keep that product line
 3   for the customer base.
 4          MR. STREETER:   If we could blow up, "Now is the time,"
 5   that paragraph.
 6   Q    (Reading) Now is the time for all to have the energy and
 7   fortitude to work with our customers to get our costs passed
 8   through and also generate the dynamics for them to move their
 9   markets to higher prices.
10          So these circumstances described in this document, the
11   document --
12          MR. STREETER:   Blow up the whole thing and just show
13   the title again.
14   A    "Price recovery."
15   Q    "Price recovery."
16          So what are the circumstances here, and what does it
17   mean in terms of what you have to do with prices in order to
18   keep your business going?
19   A    You had to get your price up so you make some sort of
20   profitable margin so you could keep the plants in good shape
21   and move forward.  If you keep on losing money in the plants,
22   you'd shut the plants down and move away from its products.
23          So you had to make sure you had some return on the
24   money you're investing in those plants in order to continue to
25   keep those plants going.

 1          If the plants weren't making money over a period of

 2     time, they could be shut down and that business or volume of

 3     product would go away from the marketplace.

 4     Q   And is the stuff described in this document the exact kind

 5     of things you would go talk to your customers about?

 6     A   Yes, we'd be talking to them about how the price -- they'd

 7     see that the prices have dropped, margins were weak, they'd

 8     understand.  And also that they would be looking at what

 9     they're doing in their market when they would have to buy our

10     products.

11     Q   I want to turn to Bill Bernstein for a second.

12          MR. STREETERI:  Want to pull up PX-90 on the screen.

13          Blow up the text portion of the document.  The whole

14     thing, everything that shows text.  Thank you.

15     Q   Do you remember being asked questions about this document

16     which relates to the golf game that you had with BASF?

17     A   Yes.

18     Q   Some people from Dow, and some people from BASF were going

19     to have a golf game.  Right?

20     A   In Michigan, yes.

21     Q   And in addition to being a competitor, was BASF also a

22     customer?

23     A   Yes, we sold them certain products that they did not make

24     and they needed for their marketing.

25     Q   How big a customer were they?

```
 1    A    You know, I don't really recall now.  I'm saying it was in
 2    the millions of dollars worth of business with them.
 3    Q    And they were just south of you in Michigan?
 4    A    They were about -- about a two-hour drive.
 5              MR. STREETER:  And if we could blow up Don Marquette.
 6    In the middle of the page you can see the people who were
 7    having this discussion.  You can actually blow it up.
 8    Q    What role did Don Marquette have with respect to that
 9    relationship where BASF was your customer?
10    A    Don Marquette was actually the corporate account manager
11    for many accounts, so he had responsibility for many of the
12    corporate accounts working out of Philadelphia.  So he
13    interfaced with somebody like --
14              THE COURT:  Mr. Beitel, please --
15    A    -- interfaced with somebody --
16    Q    Can you move the whole microphone --
17              THE COURT:  Either that, or sit up or --
18    Q    You can actually move the microphone.
19              THE COURT:  Mr. Streeter --
20    A    Is this better?  Can you hear okay?
21              THE COURT:  Do you have much longer?
22              MR. STREETER:  I'll be finished by the time you --
23              THE COURT:  I'll see you at sidebar.  We don't have to
24    be on the record.  Let's go.
25              (Sidebar discussion off the record.)
```

```
 1                  (In open court.)

 2   Q    So BASF is a big customer of Dow.  Right?

 3   A    BASF was a big customer of certain products they did not

 4   manufacture themselves, yes.

 5   Q    Unusual for people from Dow to have a golf game with a big

 6   customer?

 7   A    No.

 8   Q    To talk about the millions of dollars in business that

 9   they're buying from you?

10             MR. JOHNSON:  Objection, leading.

11             THE COURT:  That's okay.  Overruled for now.

12   Overruled.

13   A    We'd have a meeting, of course we'd talk about a discussion

14   of the products they were buying and our availability to supply

15   them their needed requirements, plus the pricing structure we

16   were going to charge them.

17   Q    And did you have a conversation with Bill Bernstein in

18   which you talked about what you were charging your other

19   customers?

20   A    No.

21   Q    And you testified about a lunch you had in Lucerne with Mr.

22   Buhse.  Do you remember that?

23   A    I didn't remember the name, but I remember lunches, yes.

24   Q    And Mr. Levi was there with you?

25   A    Marco and him set it up, and I was the last minute invite.
```

```
1    Q    And Buhse was from Bayer?

2    A    Correct.

3    Q    Had you ever met him before?

4    A    Not to my recollection, no.

5    Q    Were any discussions during the course of that lunch about

6    the prices that Dow was charging to its customers?

7    A    No.

8    Q    Were there any discussions during that lunch about the

9    prices that Bayer was charging to its customers?

10   A    No.

11   Q    Had Bayer been a huge customer of Dow from time to time?

12   A    There were times where we did do business with Bayer just

13   like we did with BASF, yes.

14   Q    Did you sell them PO?

15   A    PO was the one that we sold when I had responsibility for

16   propylene oxide, yes.

17            MR. STREETER:  I want to ask that PX-708 be put up on

18   the screen.

19   Q    This is another document that Mr. Johnson asked you about.

20            When you wrote:  "Bayer and Huntsman have the lead in

21   2001" -- do you see that at the top?

22   A    About MDI, yes, I see that.

23   Q    Tell us in your own words what you mean, what you're

24   talking about there.

25   A    Typically you had the major guy that was the strongest in
```

 1    that particular field.  Okay?  If you're talking about polyols,

 2    we're back into propylene oxide and so forth, we were sort of

 3    the biggest, strongest in the polyol area.

 4          When you look at some of the other markets like MDI,

 5    you had to look at who were the big leaders and the strength

 6    suppliers into that market and who had the strength.  So you

 7    usually looked to see who was the strongest in the market to be

 8    the leader, not the fall-behind guy.  The same thing in TDI.

 9    Q   If you're the small guy in the market, would you ever have

10    a chance at having a price increase succeed if the big guy

11    doesn't do it?

12    A   You can --

13          MR. JOHNSON:  Objection about what other people would

14    do.

15          THE COURT:  Sustained.

16          MR. STREETER:  I'm just asking as a factual matter:

17    If the big player didn't do a price increase announcement and

18    you were the small player as you sometimes were, would you

19    succeed in getting a price increase announcement if the big

20    player who was your competitor didn't do one?

21          THE COURT:  Sustained.

22          MR. STREETER:  Judge, I'm just asking about --

23          THE COURT:  All right.  Go ahead.

24    Q   What did you mean by -- okay, I want to ask the question.

25          Big player, your competitor doesn't do a price

 1    increase announcement.  Did you in your judgment, based on your
 2    experience, have any success doing a price increase
 3    announcement to that same market when you were the little
 4    player in that particular market?
 5              MR. JOHNSON:  Objection.  Lacks foundation.
 6              THE COURT:  I'll allow it.
 7    A    It would be very difficult to get an increase if the major
 8    player didn't announce a price increase or do something in the
 9    marketplace.  Now, there were specialty products that they
10    might not be involved in.
11    Q    Let me ask you, is that what you were referring to when you
12    wrote "Bayer and Huntsman have to lead in 2001"?
13    A    They'd have to lead because they were the big players in
14    that particular market segment at that time.
15    Q    Were you referring to any agreement whereby you had an
16    agreement with your competitors where they would lead and you
17    would follow?
18    A    No.
19    Q    Down the page.
20              You've got, "Bayer needs to lead BASF support."  It's
21    in the TDI section.  You see that?
22    A    Right.
23    Q    Was BASF the second biggest player in the TDI market?
24    A    They were bigger than Dow, both of them, yes.
25    Q    Bayer biggest, BASF second biggest?

 1   A    I'm not exactly sure.  They were both strong enough in that

 2   marketplace.

 3   Q    Tell us in your own words what you mean by "BASF needs to

 4   support."

 5   A    Well, if you had the two major players, and one major

 6   player announced the increase and the second major player

 7   doesn't, the market (sic) is not going to go through because

 8   they're not going to see that BASF raised their price.

 9   Q    One more on this page.  Bottom of the page:  "Bayer needs

10   to support BASF will follow."  You see that, all the way

11   through that?

12   A    Correct.

13   Q    When you say "BASF will follow," were you saying that you

14   knew because you talked to them that they were going to follow?

15   A    No.

16   Q    What are you saying?

17   A    I'm saying that Bayer needs to lead, and BASF will be a

18   follower in certain market segments.

19        MR. STREETER:  I have one more document and then I'll

20   be done.

21        PX-699.

22   Q    Turn to page 17.  This is a document that Mr. Johnson asked

23   you about.

24        MR. STREETER:  Let's go to the first page again.

25        Go to page 17.

 1   Q   He asked you some questions about this page.  At the bottom
 2   he didn't ask you about the sentence:  "It's up and demand is
 3   strong."
 4           Do you see that?
 5   A   Yes.
 6   Q   What does "demand being strong" mean in terms of whether or
 7   not you've got a shot at getting your price increase
 8   announcement to work?
 9   A   Demand being strong helps you move more product and also
10   means you have the capability of doing some price increases.
11           MR. STREETER:  I don't have anything further, your
12   Honor.
13           THE COURT:  Mr. Johnson, any recross?
14           MR. JOHNSON:  None at all.
15           THE COURT:  Okay.  Thank you very much.
16           Ladies and gentlemen, as I told you yesterday, we're
17   not having court on Monday.  We'll see you on Tuesday at 8:30
18   and we'll probably have a similar day Tuesday, so bring any
19   snacks if you need them.  Okay?  It'll probably be 8:30 to
20   around 2:30 or so on Tuesday.  And then the rest of the week,
21   Wednesday and Thursday we'll probably go back to full day, you
22   know, full, with a break to mix it up a little bit.  Okay?
23           Please don't discuss anything about the case.  Have a
24   nice long weekend and we'll see you on Tuesday at 8:30.
25           Thanks again.

```
 1                  (The Jury leaves the courtroom.)

 2                  THE COURT:  Mr. Beitel, just wait here.

 3                  Okay.  You can step down now.  You can step down.

 4                  THE WITNESS:  I'm sorry.

 5                  THE COURT:  All right.  Everyone, be seated, please.

 6                  We want to get you back to Bozeman.  Are you in

 7       Bozeman?

 8                  THE WITNESS:  No, Billings.  My son and grandkids.

 9                  THE COURT:  I've been in Bozeman.  Nice good looking

10       area of the country.

11                  THE WITNESS:  That's where I graduated, where I got my

12       chemical engineer.  1969.  So you can see how old I am.

13                  THE COURT:  All right.

14                  (Witness excused.)

15                  THE COURT:  I'm going to have to do this rather

16       quickly, but I wanted to address two legal issues that were

17       raised so you have the weekend to deal with them.  Okay.

18                  The first one is with respect to this release

19       regarding Leggett & Platt.  Okay?

20                  I'll let you submit briefs simultaneously Monday

21       morning, no more than ten pages.

22                  You know, I guess I have a couple of questions you

23       might want to address.  This would appear to me to have been an

24       issue that should have been raised before the MDL judge.  It

25       appears to be a legal issue whether or not this release would
```

```
 1    release them from any further litigation, including this
 2    litigation.  But I don't believe in the record there was any
 3    motion to dismiss or for judgment in favor of the defendant
 4    against Platt -- Leggett & Platt in the MDL process.  And
 5    that's the whole purpose of the MDL process.  The whole purpose
 6    of that process is to sort out these types of things.  And, I
 7    mean, Dow was aware of this document at that time.  And so I'm
 8    raising that because that's one of the things that comes to my
 9    mind.
10         And then it would appear to be a legal issue as to
11    whether or not this bars this lawsuit against -- I think that's
12    your position.  Right?
13         MR. STREETER:  It is, yes, your Honor.
14         THE COURT:  Okay.  Whether it bars this lawsuit
15    against Leggett & Platt.  Okay.  So address that.
16         And then I've read your letters as to supplementing
17    Stephanie Barbour's testimony.
18         First of all, when that question was asked to Mr.
19    Wood -- and the question -- I'm referring to Mr. Lustberg's
20    letter of March 31st, 2016, the first page, the question was
21    asked, there was no objection raised to that question when it
22    was asked I don't believe, was there?
23         MR. BERNICK:  Could you give me the letter?
24         I remember Mr. Wood being on the stand.
25         THE COURT:  I don't -- I don't know.  I don't know, if
```

```
 1         the record --
 2                   MR. BERNICK:  If this is about Mr. Schefsky --
 3                   THE COURT:  Right.
 4                   MR. BERNICK:  -- I don't -- all I remember is that
 5         we -- we did not have the opportunity to examine him on that
 6         issue, to examine Mr. Wood on that issue himself.  I don't know
 7         whether at the time there was an objection to the
 8         cross-examination.  Remember, they called him adversely.
 9                   THE COURT:  Okay.
10                   MR. BERNICK:  So --
11                   THE COURT:  You know, I don't recall.  Even if there
12         was, I don't recall that there was an objection to this
13         question.  And the answer was "no."
14                   And you're calling Mr. Schefsky?
15                   MR. BERNICK:  We're calling Mr. Schefsky.
16                   THE COURT:  You know, it would appear to me that
17         the -- you were aware of this issue during the course of the
18         process with Judge Pisano.  It's clear, because you did object
19         to certain areas, and certain areas he ruled in your favor
20         eliminating certain areas of Stephanie Barbour's testimony.  So
21         I mean, you went through that process.
22                   And in reading the areas you're seeking to supplement,
23         she's already -- yeah, I mean, it wasn't included in the record
24         and I don't think at this juncture -- I don't think the
25         question is so misleading.  And you're going to have Mr.
```

```
 1    Schefsky testify, and he's going to explain it because --
 2              MR. BERNICK:  Your Honor, that might be a simple way
 3    to address this issue, is that the way the record reads is that
 4    she never says it was a price-fixing issue.  She says --
 5              THE COURT:  She never said those words,
 6    "price-fixing."
 7              MR. BERNICK:  But she actually says it was a business
 8    issue.
 9              THE COURT:  But Mr. Schefsky believed it was.
10              MR. BERNICK:  Mr. Schefsky inferred, if you
11    actually --
12              THE COURT:  Okay.  He inferred from the information
13    that she provided him --
14              MR. BERNICK:  That it might --
15              THE COURT:  -- that there was something wrong in terms
16    of either antitrust or price-fixing.
17              MR. BERNICK:  Or business practice.  Either
18    inappropriate --
19              THE COURT:  No, no, no.  His testimony -- I'll hear
20    what he has to say.  It would sound like his investigation was
21    initiated by her because of the concerns -- well, we'll hear
22    what he has to say.
23              MR. BERNICK:  Exactly.  But to the extent, to the
24    extent you have him saying, I'm not sure, or I inferred.
25              And they're going to use that to establish that, in
```

1    fact, she made the complaint; whereas, under her own testimony
2    she did not.
3            And what -- we can simply solve this.  We're flagging
4    it in advance --
5            THE COURT:  Even in her testimony so far she never
6    said "price-fixing."
7            MR. BERNICK:  Correct.
8            THE COURT:  Yeah.
9            MR. BERNICK:  So all we would expect to do, want to do
10   in order to address the contention that they're making based
11   upon his inference, is to show him --
12           THE COURT:  Whose inference?
13           MR. BERNICK:  Schefsky's inference.
14           THE COURT:  No.  Your concern to open this up now is
15   based on a question that was asked of Robert Wood before this
16   jury:  Mr. Schefsky, Dow's in-house lawyer for the urethanes
17   business testified that he conducted two separate
18   investigations in response to complaints that Ms. Barbour made
19   that she suspected Mr. Fischer of engaging in price-fixing with
20   competitors.
21           MR. BERNICK:  Yes.
22           THE COURT:  You weren't aware of these investigations,
23   were you, sir?
24           And the answer was "No."
25           MR. BERNICK:  Right.

```
 1                THE COURT:  And so you're arguing now that that should
 2      open up this to more testimony from Ms. Barbour based on that?
 3                MR. BERNICK:  No.
 4                THE COURT:  That's the premise of this whole --
 5                MR. BERNICK:  Not quite.  That's the notice point;
 6      that is, that's when we woke up to this.
 7                MR. JOHNSON:  Oh, gee.
 8                MR. BERNICK:  I'm sorry, that's not really very
 9      courteous.
10                We woke up to it --
11                THE COURT:  When you say you woke up to it --
12                MR. BERNICK:  No, no.  The argument that they make,
13      the argument that they're making they made -- they made earlier
14      on, in fact, a similar argument earlier on in their trial
15      brief.
16                The key thing is, your Honor, we want to establish
17      with Mr. Schefsky that he is making an inference, and then we
18      want to use her testimony to refresh his recollection, if we
19      can, to refresh his recollection about what it is that she
20      actually said.
21                THE COURT:  All right.  Mr. Bernick, you knew all
22      about this for months or more.  You knew all about it.  I read
23      these -- it was clear to me that you were aware of her
24      testimony.
25                MR. BERNICK:  Correct.
```

 1          THE COURT:  You were aware of what Mr. Schefsky have
 2     was saying.
 3          MR. BERNICK:  Correct.
 4          THE COURT:  For whatever, as part of the process for
 5     preparing these video depositions through the Master here,
 6     Judge Pisano, you didn't include it.
 7          MR. BERNICK:  In the designations.  And so I'm now --
 8          THE COURT:  This question in my mind doesn't open the
 9     door to supplementing the record right now.  That's it.  Okay.
10          MR. BERNICK:  I understand that.
11          THE COURT:  And that's the "hook" on which you're
12     making this argument.
13          MR. STREETER:  Your Honor --
14          MR. BERNICK:  Just give me a second.
15          Understanding that, I just want to make sure.  We
16     intend -- we will seek to refresh Mr. Schefsky's recollection
17     with what she actually says, and I want to make sure that when
18     we do that we don't give rise to this hullabaloo that we can't
19     refresh his recollection.
20          We understand what your Honor is saying about the
21     designation, but we should be able to refresh his recollection
22     about what she actually said based upon her own testimony --
23          THE COURT:  It would depend on what he says initially
24     as to what he recalls her saying.
25          MR. BERNICK:  Do you want to -- I think that's fine.

 1                    THE COURT:  Okay.  Well, you know, he's also got his
 2      deposition in which he's also made certain statements.  No?
 3                    MR. BERNICK:  Correct.  And I don't believe he's ever
 4      been shown her testimony in connection with that; that is to
 5      say --
 6                    THE COURT:  He's never been shown that testimony?
 7                    MR. BERNICK:  I never showed him the testimony.
 8                    THE COURT:  Okay.
 9                    MR. BERNICK:  And I represented him at the trial and
10      at the subsequent deposition --
11                    MR. JOHNSON:  So if he hasn't been shown it, how could
12      it possibly refresh his recollection?
13                    MR. BERNICK:  That's the point.  He hasn't been --
14                    THE COURT:  Go ahead.
15                    Don't interrupt.
16                    Go ahead.
17                    MR. BERNICK:  That's exactly what refreshing
18      recollection is, that he hasn't been shown.  If he had been
19      shown I kind of suspected his testimony would have been
20      different.
21                    So we will show him that and we will see what his
22      testimony is going to be.
23                    THE COURT:  You think his testimony is going to be
24      different if he had been aware of what Ms. Barbour said based
25      on her deposition, not his own recollection?

```
 1              MR. BERNICK:  Certainly it would have been.  Because
 2    he drew an inference, he drew an inference when he said those
 3    things.  It's very plain.  He says, I'm not sure but it may
 4    have been; or it may have been that that's -- he says it was
 5    either inappropriate or it involved some kind of allegation.
 6              THE COURT:  Well, for purposes of where we are now,
 7    I'm not going to allow the supplement of Stephanie Barbour's
 8    in, and the rest of it we can deal with on Tuesday if we have
 9    to as far as -- you'll be calling him when, Tuesday?
10              MR. BERNICK:  No, we'll be calling him probably on
11    Wednesday.
12              Is that right?
13              MR. STREETER:  Yes.
14              THE COURT:  We'll have time to further hear you both
15    on that.
16              Have a nice weekend.  See you Tuesday.
17              MR. BERNICK:  Thank you.
18              THE COURT:  Tuesday morning.
19              (At 2:18 p.m., an adjournment is taken to April 5,
20    2016 at 8:30 a.m.)
21                               ooOoo
22
23
24
25
```